was being bought and sold. In some instances, HWANG would further instruct the traders to purchase the same stock after the market opened, to firm up the now-inflated price. HWANG referred to this practice as "setting the tone" for the day and intended, through Archegos's buying, to both artificially inflate the prices of stocks Archegos owned and to induce unsuspecting third parties to buy at those inflated prices. Archegos engaged in this type of premarket trading in a number of its largest positions, including GSX, DISCA, VIAC, VIPS, TME, BIDU, and FUTU.

### Trading Into the Close

c.   Similarly, during the course of the scheme, HWANG undertook securities transactions at particular times, and in particular sizes or volume, to affect the closing price of the relevant stocks. In some instances, these trades involved the purchases of hundreds of thousands of shares in those short periods of time. Archegos's high-volume trading at the end of market hours was designed to, and did, cause artificially inflated closing prices.

d.   At times, HWANG also directed traders to use limit order prices above the prevailing market prices in the final minutes of the trading day. In other words, HWANG established orders for stocks that could be filled automatically up to the above-market prices he set, and which caused purchases of the stocks at prices that increased into the close of the market. This

strategy was intended to create positive momentum for the stock price for the end of the day and into the following day. Additionally, this strategy was further intended to enable Archegos to access excess margin from its Counterparties if swap positions had gained value at the close of market hours.

36.   BILL HWANG, the defendant, also used certain trading techniques to preserve and increase the fund's trading capacity and, therefore, its market influence.

a.   In particular, HWANG sometimes would direct the execution of trades that would generate capacity at a broker — including through the sale or short sale of a stock — in order to enable later trading in the same name in the opposite direction. In other words, HWANG wanted to "make room" for later trades, when they would be most likely to create the desired impact on the securities price.

b.   For example, for a stock in which Archegos held an existing long position, HWANG might direct traders to enter a sale or short sale of the stock in the morning. That had the effect of reducing the capacity utilized by Archegos in that stock, for its long position, at a particular counterparty. Later, when Archegos wanted to inflate the price through additional purchases, it would have the trading capacity to do so.

c.   HWANG referred to this practice as using "bullets," and in particular as creating or saving "bullets" for

use in the course of trading. HWANG directed the traders to use the "bullets," or trading capacity, at opportune moments that would create upward pressure on the stock price. HWANG employed this strategy with increasing frequency as Counterparties began to curtail or restrict his access to additional trading capacity.

37.   In a similar effort to maximize trading capacity and market impact, BILL HWANG, the defendant, coordinated certain trades with a close friend and former colleague ("Adviser-1"), who founded a certain hedge fund ("Fund-1") and controlled Fund-1 during the relevant time period. In or about 2021, on certain occasions, HWANG confronted a cap in the total amount of GSX stock a Counterparty would hold — that is, a maximum amount of swap positions that a Counterparty would make available to all its customers in aggregate. In certain instances, HWANG was aware that Fund-1 also held a position at the same Counterparty in GSX. At times, without the Counterparty's knowledge, HWANG caused Adviser-1 to move the Fund-1 position to a different financial institution. Archegos then attempted to, and at times did, purchase a similarly sized GSX position at that same Counterparty. These coordinated trades allowed HWANG and Archegos to create and use additional capacity at the Counterparty, which allowed for additional purchases of GSX without onboarding new counterparties.

38.   Additionally, and as discussed further below, the Archegos Conspirators pursued relationships with additional

counterparties. By in or about January 2021, Archegos had established swap counterparty or brokerage relationships with at least nine financial institutions, and it was exploring the possibility of opening up accounts with at least three more.

**The Market Manipulation Scheme Distorted the Market**

39.   As BILL HWANG, the defendant, intended, at various times between in or about June 2020 and March 2021, Archegos's trading caused and established certain stock prices that were not set by ordinary market forces of supply and demand. For example, at times, Archegos's substantial and well-timed purchases caused daily price inflation for its long positions. At other times, Archegos's purchasing counteracted negative market events that would have otherwise decreased the stock prices.

40.   Moreover, and in addition to specific days of price manipulation, by design, the cumulative effect of the Archegos Conspirators' schemes over the course of 2020, and particularly in or about fall 2020 and through March 2021, contributed to significant artificial increases in the prices of the securities underlying Archegos's long swaps. Thus, in or about late March 2021, when BILL HWANG, the defendant, could no longer maintain the manipulative schemes, virtually all of Archegos's largest stock positions saw their prices collapse.

**The Archegos Conspirators Defrauded Counterparties**

41.    From in or about 2020, up to and including in or about March 2021, BILL HWANG and PATRICK HALLIGAN, the defendants, engaged in a scheme to defraud Archegos's Counterparties regarding significant aspects of Archegos's portfolio. Specifically, HALLIGAN, William Tomita, and Scott Becker, with the implicit and at times explicit permission and direction of HWANG, provided false and misleading information to Counterparties in an effort to conduct swap transactions and obtain margin lending, all to facilitate the manipulative trading scheme.

42.    As described above, Archegos's trading occurred through prime brokers and swap Counterparties. In order to manage their own risk from exposure to client trading, the Counterparties imposed certain restrictions on positions clients could take. As to Archegos, those restrictions varied by Counterparty, and took various forms, including (i) limits on the total dollar amount of Archegos's positions with the Counterparty, (ii) limits based on the percentage amount of company stock a bank was willing to hold as a hedge, which therefore limited the amounts Archegos could buy on swap, and (iii) limits based on individual stocks, or on the amount of economic exposure to certain business sectors or geographic areas. The Counterparties also used margin rates to reduce risk, increasing the amount of collateral a client like Archegos was required to post in order to trade. Such margin

requirements functionally reduced the capital the Counterparty would lend the client.

43. Archegos's Counterparties made risk assessments in order to determine whether to transact with Archegos, whether to continue transacting with Archegos, whether to impose or raise limits on trading with Archegos, and whether to raise or lower their margin lending rates. The Counterparties conducted due diligence about Archegos before onboarding it as a client, engaged in periodic credit reviews with Archegos personnel to track its risk profile, and sought additional information from Archegos on an ad hoc basis. Such ad hoc instances included responses to shifts in Archegos's positions at that Counterparty or to requests by Archegos to engage in additional trading.

44. Any given Counterparty had full visibility only into the portion of Archegos's portfolio that was held through that Counterparty. Accordingly, because Archegos's overall portfolio was significant to its creditworthiness, the Counterparties frequently sought information from Archegos regarding positions that it held through other banks or institutions. Certain information, such as the names or precise sizes of its overall portfolio, Archegos declined to provide. However, PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker did provide quantitative information, including the

relative size of Archegos's largest positions and the time it would take to liquidate portions of the portfolio.

45.  The Counterparties relied upon this information to assess how concentrated Archegos's portfolio was, which would give some indication of market risk, and the number of days it would take Archegos to sell its positions in normal market conditions, which would provide an indication of liquidity risk. PATRICK HALLIGAN, the defendant, Tomita, and Becker also provided certain qualitative descriptions, including some that gave Counterparties indications about the Archegos portfolio across all Counterparties. As described further below, much of the information provided by HALLIGAN, Tomita, and Becker was deceptive, false, and misleading.

46.  In or about late 2020 and into 2021, certain Counterparty trading limits began to constrain Archegos's ability to increase the size of its positions. These limits threatened to hamper the constant buying that was necessary to facilitate the market manipulation scheme described above. In response, BILL HWANG, the defendant, directed his subordinates to obtain more trading capacity from existing and prospective Counterparties.

47.  The Archegos Conspirators knew that if the Counterparties were told the truth about Archegos's portfolio, they would not supply the trading capacity demanded by BILL HWANG, the defendant. The Archegos Conspirators also knew that if the

Counterparties learned the truth about the concentration of Archegos's positions and their liquidity, the Counterparties might require Archegos to reduce its positions, to lower the associated risk, or even to cease trading altogether. Accordingly, with HWANG's implicit and, at times, explicit approval, PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker systematically misled the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions.

48. Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. Additionally, during the final week of Archegos's trading, as its positions collapsed, the Archegos Conspirators made false representations to Counterparties regarding Archegos's cash position and financial condition, in an effort to withdraw excess margin.

49. These representations were directly relevant to the Counterparties' evaluation of the risk that ultimately materialized: an unexpected decrease in the value of Archegos's positions could quickly cause it to default on its margin loans and swap guarantees to its Counterparties, which would then be forced to sell their hedges at significantly reduced and declining

prices, causing substantial losses. When that scenario in fact occurred, across numerous brokers at the same time, the Archegos Conspirators' lies caused billions of dollars in losses.

### Misrepresentations Regarding Concentration

50. Archegos's Counterparties routinely sought to understand the concentration of Archegos's overall portfolio, including, for example, the relative size of its largest position, and how much of its portfolio consisted of exposure to a small number of stocks. Metrics reflecting concentration were important to Counterparty decision-making because a more concentrated portfolio generally is more susceptible to a market downturn than a diversified portfolio. From a credit perspective, a highly concentrated portfolio therefore can be a greater risk.

51. The Counterparties knew what positions Archegos held at their own institutions. Because Archegos's positions at each Counterparty were concentrated, including in some particularly volatile stocks, the Counterparties were aware of concentration risk associated with Archegos. If it turned out — as was in fact the case — that Archegos's portfolio was similarly concentrated everywhere, then if its positions fell in value, all the Counterparties would be looking to sell the same stocks, causing the prices to further deteriorate.

52. Accordingly, some Counterparties attempted to learn more information about whether Archegos's positions at other banks

34

and brokers were similar to those they held, or were instead more diversified and liquid. Among other things, certain Counterparties asked Archegos to provide information regarding the concentration of its overall portfolio. Those requests typically occurred during calls, meetings, or other communications between Archegos personnel and a Counterparty's credit risk team. PATRICK HALLIGAN, the defendant, typically represented Archegos on communications with credit risk teams until in or about 2018, when Scott Becker, whom HALLIGAN had trained, and to whom Becker reported, took over the lead role. HALLIGAN and Becker maintained a practice of consistently representing that Archegos's largest position represented 35% of its capital, even when that figure was inaccurate and misleading, and of otherwise falsely minimizing the size of Archegos's largest positions. Examples of deceptive, false, and misleading statements regarding position concentration include the following:

a.     In or about January 2021, at the direction of HALLIGAN, Becker claimed to representatives of Credit Suisse, in substance, that as of November 30, 2020, the largest gross position in Archegos's portfolio — including money loaned from its Counterparties for leveraged positions — totaled 35% of Archegos's capital. That was false. In truth, as of November 30, 2020, Archegos's largest long position (VIAC) constituted approximately 96% of Archegos's capital. Indeed, as of that date, Archegos had

35

six positions that were greater than 35% of capital, including VIAC at approximately 96%, BIDU at approximately 67%, GSX at approximately 55%, TME at approximately 48%, IQ at approximately 45%, and VIPS at approximately 43%. Additionally, at the time of the representation in January 2021, Archegos had four positions greater than 35% of capital, ranging from 39% to 60%.

b.    Similarly, in or about February 2021, Becker misrepresented Archegos's position concentrations to UBS. At that time, UBS had imposed an absolute limit on the total value of Archegos's positions with UBS. BILL HWANG, the defendant, wanted to increase that limit in order to further his market manipulation scheme. Accordingly, Becker falsely claimed to representatives of UBS, in substance, that the ten largest investments in Archegos's overall portfolio were generally evenly weighted at approximately 30-35% of capital each, with Archegos's largest single position representing approximately 35% of capital. In fact, at the time of the call, Archegos's position in VIAC was approximately 67% of capital, BIDU approximately 56%, and GSX approximately 41% — all in excess of the 35% represented by Becker. The ninth and tenth largest positions in the fund were just approximately 6.4% and 5.6% of capital, respectively. Based in part on these misrepresentations, as well as statements described below, UBS approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules. Archegos

quickly used up the additional capacity, including by entering new, leveraged swap positions.

c. In or about March 2021, at the direction of HWANG, Archegos sought an additional increase in the UBS gross trading limit. In furtherance of that request, during a call in or about March 2021, Becker again assured representatives of UBS that the ten positions in Archegos's overall portfolio each represented approximately 35% of capital, ranging between 25% of capital and 35% of capital. That was also false. In fact, as of the most recent trading day, Archegos's VIAC position constituted approximately 78% of capital, and BIDU constituted approximately 50%. Additionally, the three smallest positions of Archegos's top ten were each less than 15%, including the smallest being just 5.2% of capital. Based in part on these misrepresentations, as well as statements described below, UBS approved an increase in Archegos's total trading limit of approximately $2 billion. Within days, Archegos had used up the entirety of that additional capacity, including by entering into new, leveraged swap positions.

d. The Archegos Conspirators made similar deceptive, false, and misleading statements regarding the size of Archegos's largest positions on additional occasions and to additional Counterparties, including in or about October 2020 and January 2021 to representatives of Mitsubishi UFJ Financial Group; in or about December 2020, January 2021, and February 2021 to

representatives of Goldman Sachs; in or about December 2020 and
March 2021 to representatives of Credit Suisse; in or about January
2021 and March 2021 to representatives of Nomura; in or about
January 2021 and February 2021 to representatives of Deutsche Bank;
and in or about February 2021 and March 2021 to representatives of
Macquarie.

<u>Misrepresentations Regarding Liquidity</u>

53. Archegos's Counterparties often sought to
understand the liquidity of Archegos's overall portfolio, meaning
how quickly the positions in Archegos's portfolio could be sold in
the market. Metrics reflecting liquidity were important to
Counterparty decision-making because if Archegos's positions
decreased in value by a certain amount, the underlying stocks would
have to be sold in order for Archegos to pay its Counterparties
what they were owed under the swap agreements. If Archegos's
positions were illiquid, it would be difficult or impossible to
sell the shares in a way — and at a volume — that avoided further
depressing the share prices.

54. For these reasons, among others, Counterparties
asked Archegos to provide information regarding the liquidity of
its overall portfolio. In response, certain of the Archegos
Conspirators provided information that fraudulently overstated the
liquidity of Archegos's positions. Examples of these deceptive,
false, and misleading statements include the following:

a.    In or about February 2021, Archegos sought to raise its existing trading limit at UBS. In discussions about an increase, Becker told UBS, in substance, that Archegos could liquidate its entire portfolio in approximately two weeks, or ten trading days, selling at approximately 15% of average daily trading volume ("ATV"), measuring from the prior 20 days. The metric of 15% of ATV was significant because, as described above, selling or buying at volumes exceeding this amount would be expected to impact the price of the security. Becker's claim grossly and fraudulently overstated the actual liquidity of Archegos's positions. In fact, to liquidate at 15% of ATV at that time, it would have taken, for example, approximately 134 trading days to liquidate Archegos's position in VIPS and approximately 78 trading days to liquidate its position in VIAC. Even had Archegos sold its positions at 100% of ATV, which would have severely impacted the prices of the stocks, it would have taken approximately 20 trading days to liquidate VIPS, approximately 16 days to liquidate IQ, and approximately 12 days to liquidate VIAC. As discussed above, based in part on these misrepresentations, UBS approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules.

b.    In or about March 2021, as part of the request for an increase of the UBS cap for Archegos's positions, PATRICK

HALLIGAN, the defendant, William Tomita, and Scott Becker again misled UBS regarding Archegos's liquidity profile.

i.   First, Becker told UBS, in substance, that the portion of Archegos's portfolio at UBS was not representative of its portfolio with other counterparties, and that Archegos's largest positions overall were in large, liquid technology stocks, such as Amazon, Google, Microsoft, and Apple. In truth, none of Amazon, Google, Apple, or Microsoft ranked in the top ten of Archegos's positions. And despite the claim that Archegos's trades at UBS were dissimilar to its bets through other counterparties, its positions at UBS largely overlapped with its positions at other brokers.

ii.   Second, following a request by UBS's representatives for Becker to confirm the liquidity profile of Archegos's overall portfolio, HALLIGAN, Tomita, and Becker convened to discuss how to respond to UBS, and agreed to provide deceptive, false, and misleading information in response. Specifically, they agreed that Becker would falsely state, as he later did, that Archegos could unwind half its overall portfolio in 10 trading days, 75% in 20 days, and the entire portfolio in approximately one month, all at between 10% to 15% of daily traded volume. In fact, it would have taken well over 100 days to liquidate Archegos's largest positions at 15% of daily trading volume. As discussed above, based in part on these

40

misrepresentations, UBS approved an increase in Archegos's total trading limit of approximately $2 billion.

        c.   The Archegos Conspirators made similar deceptive, false, and misleading statements regarding the liquidity of Archegos's positions in or about December 2020 and March 2021 to representatives of Credit Suisse; in or about January 2021 and February 2021 to representatives of Goldman Sachs; in or about March 2021 to representatives of Jefferies; in or about March 2021 to representatives of Deutsche Bank; and in or about March 2021 to representatives of Macquarie.

### Representations Regarding Archegos's Portfolio

        55.  Archegos's Counterparties asked questions relating to the contents of Archegos's portfolio. As described above, Archegos ordinarily did not provide explicit information to Counterparties regarding particular companies in which it invested. However, Counterparties frequently sought information that would provide some insight into Archegos's positions. Such information would assist the Counterparties in understanding, or making inferences about, the concentration, liquidity, and general risk profile associated with Archegos's positions. Archegos's Counterparties generally became particularly concerned with Archegos's portfolio as its positions became dramatically larger and more concentrated at each Counterparty — and as Archegos

expanded its exposure to GSX, which was an especially volatile stock.

56.   The Archegos Conspirators' efforts to mislead its Counterparties regarding the contents of its portfolio began as early as before it entered into the counterparty relationship. When considering such a relationship with Goldman Sachs, for example, BILL HWANG, the defendant, instructed William Tomita and others to determine whether Goldman Sachs had capacity for Archegos to invest in GSX, but not to disclose Archegos's true interest in the stock. Accordingly, at HWANG's direction, Tomita provided "dummy" or "decoy" names when discussing Archegos's portfolio and investment interests with Goldman Sachs to camouflage Archegos's primary interest in GSX. Tomita further represented, in substance, that Archegos's primary investments were in large, liquid technology stocks, which, as discussed above, was not accurate. Once Archegos began investing with Goldman Sachs, Tomita suggested that Archegos was trying to pursue new investment opportunities through Goldman Sachs. In fact, the companies in which Archegos invested through Goldman Sachs consisted of the same ones in which it invested through other Counterparties, including GSX, VIAC, DISC, and IQ.

57.   Certain of the Archegos Conspirators made similar deceptive, false, and misleading statements about Archegos's portfolio to other Counterparties. For example, during the

onboarding process with UBS in spring and summer 2020, Tomita and Becker falsely implied that Archegos was establishing new positions with UBS, when in fact Archegos was building the same concentrated positions at UBS as elsewhere. Further, as noted above, Becker falsely represented to UBS in March 2021, that Archegos's largest positions overall were in large, liquid technology stocks, such as Amazon, Google, Microsoft, and Apple.

58.   In or around the end of November 2020, William Tomita, in consultation with BILL HWANG, the defendant, made analogous misleading statements to representatives of Morgan Stanley. In particular, as with other Counterparties, Morgan Stanley had grown concerned about the concentration of Archegos's portfolio in general and its position in GSX in particular, with respect to Archegos's trades at Morgan Stanley. Representatives of Morgan Stanley asked Tomita if Archegos could transfer some of its position in GSX to another counterparty and replace it with the more diversified and liquid stocks, such as Apple and Amazon, that Morgan Stanley believed Archegos had invested in through other financial institutions. Tomita told Morgan Stanley, in substance, that Archegos's margin was optimized at the time, and that HWANG did not want to make any changes to it before the year's end. In truth, however, HWANG and Tomita knew that in fact Archegos could not move its GSX position elsewhere because Archegos lacked capacity to add additional GSX investment at its other

Counterparties at the current margin rates; moreover, the large holdings of liquid stocks Morgan Stanley believed Archegos held at other financial institutions did not in fact exist.

59. Additionally, certain Counterparties required Archegos to certify that its exposure to individual positions was below particular thresholds. BILL HWANG and PATRICK HALLIGAN, the defendants, each falsely signed these certifications knowing that, in fact, Archegos's positions exceeded the warranted thresholds.

a. On or about December 15, 2020, HWANG signed an ISDA agreement with Credit Suisse. The ISDA agreement contained a provision representing that Archegos beneficially owned less than 20% of the outstanding shares of any issuer's stock, including both cash and swap positions. However, the day HWANG signed the certification, Archegos owned equities and swaps equivalent to more than 25% of the float of DISCA, a $1.2 billion position at the time; more than 30% of the float of VIAC, a $6 billion position; and more than 35% of the float of GSX, a $3.5 billion position. Additionally, Archegos owned equities and swaps constituting more than 18% of the float of IQ, and topped 20% approximately two weeks later.

b. Similarly, on multiple occasions, HALLIGAN signed swap transaction confirmations with Mitsubishi UFJ Financial Group, representing that Archegos's stock and derivative positions together represented less than 5% of the outstanding

shares of the issuer's stock. HALLIGAN's representations were inconsistent with Archegos's securities holdings, including, at times, its positions in IQ, TME, VIAC, GSX, and DISCA.

## The Schemes Collapsed

60.  After the trading day on or about March 22, 2021, ViacomCBS announced a secondary stock offering. When markets reopened on March 23, 2021, VIAC stock began to decline, and, with it, the value of Archegos's portfolio. In response, BILL HWANG, the defendant, attempted to defend the price of VIAC by initiating an extraordinary amount of trading. HWANG's strategy amounted to an attempt to overpower the market, to prevent the collapse of artificial stock prices and thereby to avoid margin calls. Because this trading consumed a significant amount of Archegos's free cash, if HWANG's ploy were to fail, Archegos would be left with margin calls across its Counterparties and insufficient funds to meet them.

61.  PATRICK HALLIGAN, the defendant, recognized the peril of the trading by BILL HWANG, the defendant — much of which was occurring at 100% margin. During that day, HALLIGAN asked, "Are we going to be able to pay for these trades today? I don't see how we can[.]" Later, William Tomita attempted to raise the issue to HWANG, reporting back to others within Archegos that HWANG would not relent: "I spoke to Bill and he said to just keep work[ing] the orders."

45

62.   The trading gambit failed. VIAC's price declined, and Archegos's portfolio suffered billions of dollars in market losses. Moreover, BILL HWANG, the defendant, had spent more than approximately $2 billion on additional buying — including more than approximately $900 million in VIAC alone — and in doing so had critically depleted Archegos's available cash. Later that evening, William Tomita circulated an internal message to HWANG, PATRICK HALLIGAN, the defendant, and others forecasting margin calls for the following day, predicting "cash shortfalls for after tomorrow," and identifying particular sets of swaps that could be unwound to generate cash.

63.   On or about March 24, 2021, however, BILL HWANG, the defendant, did not unwind his concentrated positions to generate cash. Instead, HWANG once again directed hundreds of millions of dollars of additional trading in those positions, and directed and encouraged the trading team to use various manipulative techniques in a last-ditch effort to prevent the scheme's collapse.

64.   At the same time, PATRICK HALLIGAN, the defendant, Scott Becker, and the operations group worked to respond to margin calls. Because Archegos did not have sufficient cash on hand to cover its margin calls, the operations team, with HALLIGAN's assistance, worked to withdraw excess margin from any Counterparty at which Archegos could obtain it. On various calls with

Counterparties about the request, Becker lied about the purpose of the withdrawals and, on at least one occasion, falsely asserted that Archegos still had $9 billion in excess cash when it did not.

65.   By the end of the day, on or about March 24, 2021, many of Archegos's largest positions had experienced price declines, the portfolio losses had deepened, and it became obvious within Archegos that it would be unable to meet the following day's margin calls. Because unwinding its positions would, in effect, flood the market with the stock it had amassed and reverse months of price manipulation, the Archegos Conspirators opted to try to stall the Counterparties insisting that Archegos sell some of its positions to generate cash.

66.   During a series of calls beginning on or about March 24, 2021, and continuing the following day, various Archegos personnel, including PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker attempted to lull Counterparties into believing that Archegos had experienced an unexpected liquidity event and that it just needed time to orderly unwind some of its positions. Various of these calls included misleading statements and characterizations and some included outright false statements.

67.   Beginning on or around March 26, 2021, after BILL HWANG, the defendant, failed to timely reduce his positions, generate sufficient cash, or meet outstanding margin calls, Archegos's Counterparties began to unwind Archegos's swaps

directly. In a matter of days, the companies at the center of Archegos's trading scheme lost more than $100 billion in market capitalization, Archegos owed billions of dollars more than it had on hand, and Archegos collapsed. Market participants who purchased the relevant stocks at artificial prices lost the value they believed their investments held, the Counterparties lost billions of dollars, and Archegos employees, many of whom were required to invest 25% or more of their bonuses with Archegos as deferred compensation, lost millions of dollars.

### Statutory Allegations

#### The Racketeering Conspiracy

68.  From at least in or about 2020, up to and including in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants, and others known and unknown, being persons employed by and associated with the enterprise described above, namely, the Archegos Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Archegos Enterprise through a pattern of

racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

a.    Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

b.    Offenses involving fraud in the sale of securities, in violation of Title 18, United States Code, Section 1348; and

c.    Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud).

69.    It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

<u>Purposes of the Racketeering Conspiracy</u>

70.    The principal purpose of the racketeering conspiracy was to manipulate the prevailing prices of certain securities held in the Archegos Enterprise's investment portfolio.

71.    A further purpose of the racketeering conspiracy was to obtain trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages.

72.  A further purpose of the racketeering conspiracy was to maintain and increase the industry standing, public reputation, and wealth of the Enterprise, generally, and its leader, BILL HWANG, the defendant, specifically.

73.  A further purpose of the racketeering conspiracy was to conceal the defendants' criminal conduct from the marketplace and from counterparties.

### Means and Methods of the Racketeering Conspiracy

74.  BILL HWANG, PATRICK HALLIGAN, the defendants, William Tomita, and Scott Becker sought to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the Archegos Enterprise, through various unlawful means and methods, including:

a.   The defendants caused the Archegos Enterprise to amass significant market power in certain publicly traded securities and deployed that market power using assorted trading techniques intended to increase the prevailing prices of those securities.

b.   The defendants obtained trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages.

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
## (Securities Fraud)

The Grand Jury further charges:

75.    The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

76.    From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HWANG engaged in a scheme to secretly amass market power in numerous securities traded on United States securities exchanges and use that market power through

51

manipulative and abusive trading techniques for the purpose of fraudulently altering the prices of those securities.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNTS THREE THROUGH NINE
### (Market Manipulation)

The Grand Jury further charges:

77.  The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

78.  From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG, the defendant, willfully and knowingly, directly and indirectly, by the use of the mails and means and instrumentalities of interstate commerce, and of the facilities of national securities exchanges, and being a member of national securities exchanges, effected, alone and with one and more other persons, a series of transactions in securities registered on national securities exchanges, securities not so registered, and in connection with security-based swaps and security-based swap agreements with respect to such securities creating actual and apparent active trading in such securities, and raising and depressing the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, to wit, HWANG engaged in a series of transactions in

securities and securities-based swaps relating to the following tickers in order to raise or depress the price of and induce others to purchase those securities:

| Count | Company | Ticker |
|-------|---------|--------|
| THREE | ViacomCBS | VIAC |
| FOUR | Discovery Communications, Inc. | DISCA |
| FIVE | Discovery Communications, Inc. | DISCK |
| SIX | GSX Techedu Inc. | GSX |
| SEVEN | iQIYI, Inc. | IQ |
| EIGHT | Tencent Music Group | TME |
| NINE | Vipshop Holdings Ltd | VIPS |

(Title 15, United States Code, Sections 78i(a)(2) and 78ff; and
Title 18, United State Code, Section 2.)

### COUNT TEN
### (Securities Fraud – Counterparties)

The Grand Jury further charges:

79.  The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

80.  From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and

of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HWANG and HALLIGAN engaged in a scheme to defraud Archegos's counterparties through false and misleading statements regarding Archegos's business, portfolio, and assets.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

### COUNT ELEVEN
**(Wire Fraud - Counterparties)**

The Grand Jury further charges:

81. The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

82. From in or about 2020, up to and including in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants,

willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HWANG, HALLIGAN, and others at Archegos engaged in a scheme to defraud Archegos's trading counterparties of their rights to control their assets, and thereby exposed Archegos's counterparties to risk of economic harm, by false and misleading statements regarding Archegos's business, portfolio, and assets, including through interstate wires.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS AND SUBSTITUTE ASSET PROVISIONS

### FORFEITURE ALLEGATION AS TO COUNT ONE

83. As a result of committing the offense alleged in Count One of this Indictment, BILL HWANG and PATRICK HALLIGAN, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963,

a. any interest acquired or maintained in violation of Section 1962;

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of

55

influence over, any enterprise the defendants and their co-conspirators established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and

c.    any property constituting, or derived from, any proceeds obtained, directly or indirectly, from the racketeering activity charged in Count One.

FORFEITURE ALLEGATIONS AS TO COUNTS TWO THROUGH ELEVEN

84.    As a result of committing one or more of the offenses alleged in Counts Two through Eleven of this Indictment, BILL HWANG, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

85.    As a result of committing one or more of the offenses alleged in Counts Ten and Eleven of this Indictment, PATRICK HALLIGAN, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not

limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

<u>SUBSTITUTE ASSETS PROVISION</u>

86. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 492, 981, 982, and 1963; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.)

_____                    _____
FOREPERSON                                 DAMIAN WILLIAMS
                                           United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**SUNG KOOK (BILL) HWANG, and
PATRICK HALLIGAN,**

                        **Defendants.**

---

**SEALED INDICTMENT**

22 Cr. ____

(15 U.S.C. §§ 78i(a)(2), 78j(b), and
78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C.
§§ 1343, 1962(d), and 2.)

---

DAMIAN WILLIAMS
United States Attorney

_Foreperson_

---

4/25/22 FILED INDICTMENT, WARRANT ISSUED

Committing USMJ

59