**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SUNG KOOK (BILL) HWANG and PATRICK HALLIGAN,<br><br>Defendants. | Criminal Action No. 22-240 (AKH)<br><br>*Document Electronically Filed* |

---

**OMNIBUS BRIEF IN SUPPORT OF DEFENDANTS' PRETRIAL MOTIONS**

---

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Mary E. Mulligan
Timothy M. Haggerty
Bonnie M. Baker
Anil Vassanji
Rupita Chakraborty
7 Times Square
New York, New York 10036
(212) 833-1100
*Attorneys for Defendant Patrick Halligan*

**GIBBONS P.C.**
Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
Andrew J. Marino
One Gateway Center
Newark, New Jersey 07201
(973) 596-4500
*Attorneys for Defendant Sung Kook (Bill) Hwang*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... v

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY.................... 4

      1.     The Rise and Fall of Archegos.....................................6

      2.     The Alleged Criminality ............................................11

          a.     The Manipulative Trading Allegations......................... 12

          b.     The Misrepresentation Allegations .............................. 15

      3.     Post-Indictment ......................................................17

ARGUMENT ....................................................................................... 20

I.     THE COURT SHOULD DISMISS THE INDICTMENT FOR FAILURE TO CHARGE AN OFFENSE..............................................................20

    A.    Legal Standard ....................................................................20

    B.    The RICO Count (Count One) Should Be Dismissed For Failure To Allege A Pattern Of Racketeering Activity Or Agreement. ..................................23

        1.     The Indictment Does Not Allege At Least Two Predicate Acts. ...............25

        2.     The Indictment Fails to Sufficiently Allege Continuity. ...........................28

            a.     The Indictment Fails to Allege Closed-Ended Continuity........... 29

            b.     The Indictment Fails to Allege Open-Ended Continuity. ............. 30

        3.     The Indictment Fails to Sufficiently Allege Mr. Halligan's Agreement................................................................31

    C.    The Manipulation Counts (Counts Two Through Nine) Should Be Dismissed For Failure to Charge a Market Manipulation Offense Under Either Section 10(b) or Section 9(a)(2)....................................33

        1.     Deceptive Conduct is Required to Sustain a Manipulation Charge under Sections 10(b) and 9(a)(2). ...........................................35

        2.     The Indictment Alleges No Deception by Mr. Hwang. ............................42

            a.     Large Volume Trading................................................. 43

i

Table of Contents (continued)

Page

b.    Timing of Trades............................................................ 46

c.    Generating Capacity..................................................... 49

3.    The Section 9(a)(2) Claims Also Fail Because the Indictment Does Not Allege Mr. Hwang Traded for the Purpose of Inducing Others to Buy or Sell Any Underlying Security.....................................................51

4.    Alternatively, the Indictment's Allegations of Market Manipulation Under Sections 10(b) and 9(a)(2) are Unconstitutionally Vague (Counts Two through Nine)............................55

a.    The Constitution Requires that Criminal Statutes Be Clear and Definite. ....................................................... 55

b.    Section 10(b) Fails to Give Fair Notice That Open-Market Manipulation is Prohibited, and Applying It in that Context Invites Arbitrary and Discriminatory Enforcement. ................................. 58

c.    Section 9(a)(2) Fails to Provide Sufficient Notice that Trading Solely to Impact a Stock's Price is Illegal. ................................... 63

D.    The Misrepresentation Count (Count Ten) Should Be Dismissed For Failing to Charge an Offense For Securities Fraud Under Section 10(b) of the Exchange Act. ....................................................................64

1.    The Alleged Misrepresentations Were Not Made "In Connection With" the Purchase or Sale of Securities. ...................................65

2.    The Indictment Fails to Allege that Either Mr. Hwang or Mr. Halligan Was a "Maker" of a Misrepresentation Under Section 10(b) or Rule 10b-5(b). .................................................72

3.    Recent Second Circuit Law Forecloses the Government's "Scheme Liability" Theory Under Section 10(b) and Rule 10b-5(a) and (c). ..........76

E.    The Court Should Defer Ruling Upon the Wire Fraud Count (Count Eleven) Pending the Outcome of A Likely Dispositive and Fully Briefed Supreme Court Case. .......................................................................80

1.    The Right to Control Theory upon which the Wire Fraud Count is Expressly Based is Under Supreme Court Review....................................80

2.    The Indictment Does Not Adequately Allege Facts to Establish That Defendants Engaged in Wire Fraud, Either as Primary Violators or as Aiders and Abettors.........................................................82

Table of Contents (continued)

Page

F.    The Forfeiture Allegations of the Indictment Fail to State an Offense..................84

1.    There Are No "Proceeds" Subject to Forfeiture. ......................................84

2.    The Offenses Specified in Counts Two through Ten Do Not Authorize Forfeiture......................................................................................86

II.    THE COURT SHOULD STRIKE FROM THE INDICTMENT REFERENCES TO TIGER ASIA MANAGEMENT. .................................................................88

A.    Background ...............................................................................................89

B.    Legal Standard .........................................................................................92

C.    The Allegations Against Tiger Asia Are Irrelevant and Immaterial to the Present Charges.........................................................................................94

D.    The Indictment's Reference To Tiger Asia Is Inflammatory And Prejudicial. ..............................................................................................95

III.    THE COURT SHOULD SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS ISSUED TO MR. HWANG'S ELECTRONIC ACCOUNTS BECAUSE THE AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE THAT A FEDERAL CRIME HAD OCCURRED AND THAT EVIDENCE OF THE CRIME WOULD BE FOUND IN MR. HWANG'S ACCOUNTS. .................................................................................................98

A.    The Affidavit's Allegations Concerning Entirely Lawful Conduct are Insufficient to Establish Probable Cause. ..........................................100

B.    The Affidavit's Allegations of Mr. Hwang's Involvement in the Alleged Misrepresentations to Counterparties Do Not Give Rise to Probable Cause.......104

IV.    IF THE INDICTMENT SURVIVES THE MOTION TO DISMISS, THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE A BILL OF PARTICULARS. ........................................................................................106

A.    The Government Should Identify All Alleged Misrepresentations (Requests 1(a) – (b)). ............................................................................109

B.    The Government Should Identify Uncharged Co-Conspirators and Others Involved in the Alleged Schemes (Requests 2(a) and 2(e))................................111

C.    The Government Should Identify All Acts and Transactions Alleged to Comprise the Purported Schemes (Requests 2(b)-(d), 3(a)-(e), and 4(a)-(b))....................................................................................................112

Table of Contents (continued)

Page

D. The Government Should Identify Allegedly Defrauded Victims (Request 4(c)).................................................................................................................115

E. The Government Should Identify the Dates that the Alleged Archegos Enterprise Was Formed and the Alleged Scheme to Defraud Began (Requests 2(a) and 4(d))......................................................................................115

F. The Government Should Identify All Instances in Which Defendants Are Alleged to Have Aided and Abetted Supposed Misrepresentations to Counterparties (Request 4(e)). .............................................................................116

V. THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS *BRADY* OBLIGATIONS. ...............................................................................116

CONCLUSION ........................................................................................................ 121

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrash v. Fox*,
  805 F. Supp. 206 (S.D.N.Y. 1992) ...................................................................................67, 68

*Africa v. Jianpu Tech. Inc.*,
  No. 21-cv-1419 (JMF), 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) .................................77

*Alex, Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
  No. 96-CV-2549, 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997) ...........................................68, 69

*Allen v. New World Coffee, Inc.*,
  No. 00 CIV 2610 AGS, 2001 WL 293683 (S.D.N.Y. Mar. 27, 2001) ...................................33

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ...........................................................................................................21

*Arriaga v. Mukasey*,
  521 F.3d 219 (2d Cir. 2008) ...............................................................................................56

*Arthur Andersen LLP v. United States*,
  544 U.S. 696 (2005) ...........................................................................................................55

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................................................... *passim*

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011) ...............................................................................................46

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  126 F. Supp. 3d 342 (S.D.N.Y. 2015) ..................................................................................47

*Beck v. Prupis*,
  529 U.S. 494 (2000) ...........................................................................................................25

*Bissell v. Merrill Lynch & Co.*,
  937 F. Supp. 237 (S.D.N.Y.1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) ......................68, 69, 71

*Black Radio Network, Inc. v. NYNEX Corp.*,
  44 F. Supp. 2d 565 (S.D.N.Y. 1999) ...................................................................................24

*Blank v. TriPoint Global Equities, LLC*,
  338 F. Supp. 3d 194 (S.D.N.Y. 2018) ..................................................................................73

*Brady v. Maryland*,
　373 U.S. 83 (1963) ................................................................................................. *passim*

*CFTC v. Archegos Capital Management, LP et al.*,
　No. 1:22-cv-3401 (JPO) (S.D.N.Y. Sep. 2, 2022) ........................................... 9, 17, 30

*Chadbourne & Parke LLP v. Troice*,
　571 U.S. 377 (2014) ...................................................................................................... 66

*Charles Schwab Corp. v. Bank of Am. Corp.*,
　883 F.3d 68 (2d Cir. 2018) ...................................................................................... 66, 71

*Chemical Bank v. Arthur Andersen & Co.*,
　726 F.2d 930 (2d Cir. 1984) .............................................................................. 66, 69, 71

*Ciminelli v. United States*,
　No. 21-1170 .................................................................................................... 81, 83, 84

*City of Chicago v. Morales*,
　527 U.S. 41 (1999) ................................................................................................. 57, 58

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
　187 F.3d 229 (2d Cir. 1999) .................................................................................... 29, 30

*Cohen v. Stevanovich*,
　722 F. Supp. 2d 416 (S.D.N.Y. 2010) ................................................................... *passim*

*In re College Bound Consol. Litig.*,
　93-CV-2348, 1995 WL 450486 (S.D.N.Y. Jul. 31, 1995) ............................................ 45

*Connally v. General Constr. Co.*,
　269 U.S. 385 (1926) ...................................................................................................... 55

*Connolly v. Havens*,
　763 F. Supp. 6 (S.D.N.Y. 1991) .................................................................................... 32

*Conte v. Newsday, Inc.*,
　703 F. Supp. 2d 126 (E.D.N.Y. 2010) ........................................................................... 24

*Coolidge v. New Hampshire*,
　403 U.S. 443 (1971) ...................................................................................................... 98

*Copeland v. Vance*,
　893 F.3d 101 (2d Cir. 2018) .................................................................................... 57, 62

*Crane Co. v. Westinghouse Air Brake Co.*,
　419 F.2d 787 (2d Cir. 1969) .......................................................................................... 52

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*,
    No. 1:08 Civ. 2764 (LAK) (S.D.N.Y. June 2, 2008) ................................................... 9

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ..................................................................................... 29

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
    817 F.3d 393 (2d Cir. 2016) ..................................................................................... 37

*In re Eastman Kodak Co. Sec. Litig.*,
    No. 21-cv-6418 (EAW), 2022 WL 4473629 (W.D.N.Y. Sept. 27, 2022) ................... 77

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010) ................................................................. 31, 33

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ................................................................................... 111

*Ernst & Co. v. Marine Midland Bank, N.A.*,
    920 F. Supp. 58 (S.D.N.Y. 1996) ............................................................................. 68

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................................................... 35, 58

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006) ................................................................................ 59, 62

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ............................................................................. *passim*

*First Pac. Bancorp, Inc. v. Bro*,
    847 F.2d 542 (9th Cir. 1988) ................................................................................... 26

*Flexborrow LLC v. TD Auto Fin. LLC*,
    255 F. Supp. 3d 406 (E.D.N.Y. 2017) ...................................................................... 30

*Flickinger v. Harold C. Brown & Co.*,
    947 F.2d 595 (2d Cir. 1991) ..................................................................................... 66

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) .......................................................................... 41, 61

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) .............................................................................. 41, 61

*GICC Cap. Corp. v. Tech. Fin. Grp.*,
    67 F.3d 463 (2d Cir. 1995) ....................................................................................... 28

*Goldfine v. Sichenzia*,
    118 F. Supp. 2d 392 (S.D.N.Y. 2000) .......................................................................24

*Grace Int'l Assembly of God v. Festa*,
    797 F. App'x 603 (2d Cir. 2019) .....................................................................29, 30

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ...................................................................................................24

*Hamling v. United States*,
    418 U.S. 87 (1974) ..........................................................................................20, 21, 83

*Herring v. United States*,
    555 U.S. 135 (2009) ...................................................................................................99

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...................................................................................................57

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) .............................................................73, 75

*Illinois v. Gates*,
    462 U.S. 213 (1983) ...................................................................................................99

*Int'l Data Bank, Ltd. v. Zepkin*,
    812 F.2d 149 (4th Cir. 1987) ....................................................................................26

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ...........................................................................................*passim*

*Johnson v. United States*,
    576 U.S. 591 (2015) ...................................................................................................55

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) .......................................................................................80, 81

*Kentucky v. King*,
    563 U.S. 452 (2011) ...................................................................................................98

*Koch v. S.E.C.*,
    793 F.3d 147 (D.C. Cir. 2015) .................................................................................48

*Kolender v. Lawson*,
    461 U.S. 352 (1983) .........................................................................................56, 57, 61

*Kyles v. Whitley*,
    514 U.S. 419 (1995) .......................................................................................116, 117

*Lanzetta v. New Jersey*,
   306 U.S. 451 (1939)...............................................................................................58

*Levitin v. Painewebber, Inc.*,
   933 F. Supp. 325 (S.D.N.Y. 1996), *aff'd*, 159 F.3d 698 (2d Cir. 1998)..................................69

*Manela v. Garantia Banking Ltd.*,
   5 F. Supp. 2d 165 (S.D.N.Y. 1998) ........................................................................67

*Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*,
   770 F. Supp. 176 (S.D.N.Y. 1991) ..........................................................................67

*Markowski v. SEC*,
   274 F.3d 525 (D.C. Cir. 2001)...............................................................................41

*Maryland v. Garrison*,
   480 U.S. 79 (1987)..............................................................................................99

*McDonnell v. United States*,
   579 U.S. 550 (2016)............................................................................................57

*McNally v. United States*,
   483 U.S. 350 (1987)............................................................................................80

*Medinol Ltd. v. Boston Scientific Corp.*,
   346 F. Supp. 2d 575 (S.D.N.Y. 2004)....................................................................29

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
   No. 19-CV-6002 (LJL), 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ......................................34

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*,
   No. 2-CV-767 (LBS), 2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ....................................49

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*,
   165 F. Supp. 2d 514 (S.D.N.Y. 2001)...............................................................32, 33

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ...................................................................................37

*In re Olympia Brewing Co. Sec. Litig.*,
   613 F. Supp. 1286 (N.D. Ill. 1985) .......................................................................39

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) .................................................................26, 27

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   591 F. Supp. 2d 586 (S.D.N.Y. 2008).....................................................................48

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..................................................................74

*United States v. Poore*,
    594 F.2d 39 (4th Cir. 1979) .............................................................................96

*Prod. Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*,
    6 F. Supp. 2d 236 (S.D.N.Y. 1998) ...............................................................66

*Prousalis v. Moore*,
    751 F.3d 272 (4th Cir. 2014) .....................................................................75, 76

*Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*,
    587 F. Supp. 875 (S.D.N.Y. 1984) .................................................................25

*Ring v. AXA Fin., Inc.*,
    483 F.3d 95 (2d Cir. 2007) .............................................................................71

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ..........................................................................111

*Russell v. United States*,
    369 U.S. 749 (1962) .......................................................................................83

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) .........................................................................36

*S.E.C. v. Markusen*,
    143 F. Supp. 3d 877 (D. Minn. 2015) .............................................................48

*S.E.C. v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) ............................................................48

*S.E.C. v. Stubos*,
    No. 22-CV-04674, 2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022) .......................79

*Salinas v. United States*,
    522 U.S. 52 (1997) .........................................................................................31

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ..................................................................................35, 58

*Schaffer v. United States*,
    362 U.S. 511 (1960) ......................................................................................120

*Schreiber v. Burlington Northern, Inc.*,
    472 U.S. 1 (1985) ............................................................................35, 36, 58

x

*Sec. Indus. Ass'n v. Bd. of Governors, FRS*,
    468 U.S. 207 (1984)..........................................................................................36

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)..................................................52, 76, 77

*SEC v. Hwang et al.*,
    No. 1:22-cv-3402 (JPO) (S.D.N.Y. Nov. 4, 2022) ...................................11, 17, 30

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)............................................................76, 78

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992) ...............................................................47

*SEC v. Rio Tinto plc*
    41 F.4th 47 (2d Cir. 2022) ....................................................................... *passim*

*SEC v. Rio Tinto plc*, No. 17-cv-7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18,
    2019) ................................................................................................73

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
    No. 3-CV-3120, 2009 WL 1492196 (S.D.N.Y May 27, 2009) .............................45

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018)............................................................................57, 64

*Set Capital LLC v. Credit Suisse Group*,
    996 F.3d 64 (2d Cir. 2021)..........................................................................41

*Skilling v. United States*,
    561 U.S. 358 (2010)..................................................................................56, 59

*Southwest Airlines Co. v. Saxon*,
    __ U.S. __, 142 S. Ct. 1783 (2022)..................................................................27

*Speakes v. Taro Pharm. Indus., Ltd.*,
    16-cv-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)....................35

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)...........................................................................28, 30

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ...................................................................... *passim*

*In re Take Two Interactive Secs. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................79

xi

*Taylor v. Westor Cap. Grp.*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013).................................................................70, 71

*Touchstone Strategic Trust v. Gen'l Elec. Co.*,
    No. 19-cv-1876, 2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ...............................77

*Trane Co v. O'Connor*,
    561 F. Supp. 301 (S.D.N.Y 1983) ............................................................................52

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 20-cv-08585, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) .......................77, 78

*U.S. v. Padilla*,
    208 F. App'x 476 (7th Cir. 2006) .............................................................................79

*U.S. v. Zafiro*,
    945 F.2d 881 (7th Cir. 1991), *aff'd*, 506 U.S. 534 (1993) .....................................79

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)..................................................................................21, 23

*United States v. Aleynikov*,
    737 F. Supp. 2d 173 (S.D.N.Y. 2010).................................................................20, 22

*United States v. Altimari*,
    No. 93-CR-650 (LMM), 1994 WL 116086 (S.D.N.Y. Mar. 25, 1994) ................................112

*United States v. Alvarado*,
    01-cr-156, 2001 WL 1631396 (S.D.N.Y. Dec. 19, 2001)........................................93

*United States v. Applins*,
    637 F.3d 59 (2d Cir. 2011).......................................................................................31

*United States v. Bagley*,
    473 U.S. 667 (1985).................................................................................................116

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1998)....................................................................................112

*United States v. Basciano*,
    599 F.3d 184 (2d Cir. 2010)......................................................................................24

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) ..................................106

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015)......................................................................................80

*United States v. Birrell*,
    242 F. Supp. 191 (S.D.N.Y. 1965) ....................................................................101

*United States v. Blitz*,
    533 F.2d 1329 (2d Cir. 1976).............................................................................39

*United States v. Bortnick*,
    No. 03-CR-414, 2004 WL 2752471 (E.D. Pa. Nov. 29, 2004)..............................83

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)........................................................................ *passim*

*United States v. Brouillette*,
    478 F.2d 1171 (5th Cir. 1973) ........................................................................101

*United States v. Brown*,
    828 F.3d 375 (6th Cir. 2016) ..........................................................................104

*United States v. Bullock*,
    451 F.2d 884 (5th Cir. 1971) ...........................................................................93

*United States v. Cain*,
    671 F.3d 271 (2d Cir. 2012)..................................................................23, 24, 25

*United States v. Carey*,
    152 F. Supp. 2d 415 (S.D.N.Y. 2001)...............................................................93

*United States v. Chan*,
    No. CR. 96-350 WBS, 2006 WL 224389 (E.D. Cal. Jan. 27, 2006) ....................86

*United States v. Connolly*,
    No. 16-cr-370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017)....................113

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012)............................................................................84

*United States v. Cook*,
    557 F.2d 1149 (5th Cir. 1977) .........................................................................96

*United States v. Coriaty*,
    No. 99-CR-1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001) ...........................67

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1988)........................................................................107

*United States v. Davis*,
    12-10996, __ F.4th __, 2022 WL 16944171 (5th Cir. Nov. 15, 2022)....................85

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ................................................................................. 57, 64

*United States v. Deeb*,
   175 F.3d 1163 (9th Cir. 1999) ............................................................................ 26

*United States v. Dupree*,
   870 F.3d 62 (2d Cir. 2017) ............................................................................ 20, 21

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017) ................................................................................ 82

*United States v. Finnerty*,
   533 F.3d 143 (2d Cir. 2008) .............................................................................. 37

*United States v. Gilbert*,
   668 F.2d 94 (2d Cir. 1981) ..................................................................... 39, 46, 53

*United States v. Gilbertson*,
   970 F.3d 939 (8th Cir. 2020) ........................................................................ 41, 61

*United States v. Glover*,
   755 F.3d 811 (7th Cir. 2014) ........................................................................... 105

*United States v. Gonzalez*,
   686 F.3d 122 (2d Cir. 2012) .............................................................................. 21

*United States v. Goodrich*,
   12 F.4th 219 (2d Cir. 2021) .............................................................................. 39

*United States v. Grass*,
   274 F. Supp. 2d 648 (M.D. Pa. 2003) ................................................................. 86

*United States v. Grasso*,
   585 F. Supp. 3d 484 (S.D.N.Y. 2022) ................................................................. 21

*United States v. Greebel*,
   No. 15-CR-637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017) ................................ 96

*United States v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999) .............................................................................. 82

*United States v. Gupta*,
   848 F. Supp. 2d 491 (S.D.N.Y. 2012) .................................................. 117, 118, 120

*United States v. Hall*,
   48 F. Supp. 2d 386 (S.D.N.Y. 1999) ................................................................... 39

*United States v. Hawit*,
  No. 15-CR-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ..................................112

*United States v. Heicklen*,
  858 F. Supp. 2d 256 (S.D.N.Y. 2012).................................................................................22, 23

*United States v. Hernandez*,
  85 F.3d 1023 (2d Cir. 1996)........................................................................................................93

*United States v. Hughes*,
  766 F. 2d 875 (5th Cir. 1985) ....................................................................................................93

*United States v. Ikoli*,
  No. 16-CR-148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017).....................................115

*United States v. Kalish*,
  No. 06 Cr. 656 (RPP), 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009).......................................85

*United States v. Keuylian*,
  23 F. Supp. 3d 1126 (C.D. Cal. 2014) .......................................................................................83

*United States v. Knox*,
  cr-21-02195-001, 2021 WL 5492543 (D. Ariz. Nov. 23, 2021), *adopted by*
  2021 WL 5908394 (D. Ariz. Dec. 13, 2021) ............................................................................94

*United States v. Lahey*,
  967 F. Supp. 2d 698 (S.D.N.Y. 2013)......................................................................................104

*United States v. Lieberman*,
  15 F.R.D. 278 (S.D.N.Y. 1953) ...............................................................................................116

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012)............................................................................................85, 116

*United States v. Mango*,
  No. 96-CR-327, 1997 WL 222367 (N.D.N.Y. May 1, 1997)................................................110

*United States v. Martoma*,
  990 F. Supp. 2d 458 (S.D.N.Y. 2014)......................................................................................118

*United States v. McLaughlin*,
  565 F. App'x 470 (6th Cir. 2014) ..............................................................................................84

*United States v. McMurtrey*,
  704 F.3d 504 (7th Cir. 2013) ....................................................................................................103

*United States v. Mennuti*,
  639 F.2d 107 (2d Cir. 1981)........................................................................................................23

*United States v. Miller*,
   26 F. Supp. 2d 415 (N.D.N.Y 1998) ................................................. 92

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ................................................. *passim*

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016) ................................................. 116

*United States v. Nacchio*,
   573 F.3d 1062 (10th Cir. 2009) ................................................. 85

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................. 106, 112, 114

*United States v. Nance*,
   533 F.2d 699 (D.C. Cir. 1976) ................................................. 21

*United States v. Navarro*,
   551 F. Supp. 3d 380 (S.D.N.Y. 2021) ................................................. 4

*United States v. Neumann*,
   21 CR. 439, 2022 WL 3445820 (S.D.N.Y. Aug. 17, 2022) ................................................. 21

*United States v. Ocampo-Vergara*,
   857 F.3d 303 (5th Cir. 2017) ................................................. 97

*United States v. Pacione*,
   738 F.2d 567 (2d Cir. 1984) ................................................. 22

*United States v. Pena*,
   CR 19-3611 JB, 2021 WL 5280247 (D.N.M. Nov. 12, 2021) ................................................. 105

*United States v. Perez*,
   575 F.3d 164 (2d Cir. 2009) ................................................. 4

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018) ................................................. 112

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ................................................. 20, 21, 22

*United States v. Pristell*,
   941 F.3d 44 (2d Cir. 2019) ................................................. 27

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
   793 F. Supp. 1114 (E.D.N.Y. 1992) ................................................. 25

xvi

*United States v. Rajaratnam,*
   No. 09-CR-1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ...................................106, 113

*United States v. Ramirez,*
   609 F.3d 495 (2d Cir. 2010).............................................................................................106

*United States v. Raymonda,*
   780 F.3d 105 (2d Cir. 2015)...............................................................................................99

*United States v. Real Prop.,*
   301 F. Supp. 2d 868 (W.D. Wis. 2002) ............................................................................105

*United States v. Regan,*
   937 F.2d 823 (2d Cir. 1991)...............................................................................................39

*United States v. Reich,*
   479 F.3d 179 (2d Cir. 2007)...............................................................................................88

*United States v. Resendiz-Ponce,*
   549 U.S. 102 (2007)............................................................................................................20

*United States. v. Reyes,*
   922 F. Supp. 818 (S.D.N.Y. 1996) ....................................................................................95

*United States v. Rodriguez,*
   496 F.3d 221 (2d Cir. 2007).............................................................................................116

*United States v. Rosenblatt,*
   554 F.2d 36 (2d Cir. 1977).................................................................................................31

*United States v. Russo,*
   74 F.3d 1383 (2d Cir. 1996)...............................................................................................39

*United States v. Rutherford,*
   14CR417–LTS, 2014 WL 6772163 (S.D.N.Y. Dec. 2, 2014)...........................................101

*United States v. Rutherford,*
   71 F. Supp. 3d 386 (S.D.N.Y. 2014).................................................................................104

*United States v. Sattar,*
   272 F. Supp. 2d 348 (S.D.N.Y. 2003).................................................................................56

*United States v. Savin,*
   No. 00 CR 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)...........................112, 114

*United States v. Scarpa,*
   913 F.2d 993 (2d Cir. 1990)...............................................................................................93

xvii

*United States v. Scop*,
  846 F.2d 135, *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988)....................................39

*United States v. Singh*,
  390 F.3d 168 (2d Cir. 2004)..............................................................................102

*United States v. Smith*,
  985 F. Supp. 2d 547 (S.D.N.Y. 2014)..................................................................56

*United States v. Standard Drywall Corp.*,
  617 F. Supp. 1283 (E.D.N.Y. 1985) ...................................................................25

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992)..............................................................................83

*United States v. Stein*,
  456 F.2d 844 (2d Cir. 1972)....................................................................36, 39, 46

*United States v. Swinton*,
  3:19-cv-65-1, 2020 WL 1940744 (D. Conn. Apr. 22, 2020) ......................................94

*United States v. Vaid*,
  No. 16 CR. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) ........................110

*United States v. Vernace*,
  811 F.3d 609 (2d Cir. 2016).............................................................................25

*United States v. Verra*,
  203 F. Supp. 87 (S.D.N.Y. 1962) ......................................................................94

*United States v. Victor Teicher & Co., L.P.*,
  726 F. Supp. 1424 (S.D.N.Y. 1989)....................................................................97

*United States v. Walsh*,
  194 F.3d 37 (2d Cir. 1999)...............................................................................21

*United States v. Weigand*,
  482 F. Supp. 3d 224 (S.D.N.Y. 2020)...........................................................99, 101

*United States v. Wilson*,
  493 F. Supp. 2d 364 (E.D.N.Y. 2006) ...............................................................115

*United States v. Yung*,
  37 F.4th 70 (3d Cir. 2022) ...............................................................................88

*United States v. Zichettello*,
  208 F.3d 72 (2d Cir. 2000)...............................................................................31

*United States v. Zukerman*,
  897 F.3d 423 (2d Cir. 2018) ..............................................................................27

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ..........................................................................................56

*Watral v. Silvernails Farm LLC*,
  51 F. App'x 62 (2d Cir. 2002) ..........................................................................24

*Worldwide Directories, S.A. de C.V. v. Yahoo! Inc.*,
  No. 14-cv-7349 (AJN), 2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) .................30

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978) ...............................................................................99, 100

**Statutes**

15 U.S.C. § 77b .......................................................................................27, 88

15 U.S.C. § 78ff ..............................................................................................5

15 U.S.C. § 78i .................................................................................... *passim*

15 U.S.C. § 78j .................................................................................... *passim*

18 U.S.C. § 2 ....................................................................................... *passim*

18 U.S.C. § 371 ..............................................................................................31

18 U.S.C. § 492 ................................................................................................5

18 U.S.C. § 981 ................................................................................................5

18 U.S.C. § 982 ................................................................................................5

18 U.S.C. § 1343 .................................................................................. *passim*

18 U.S.C. § 1346 ............................................................................................59

18 U.S.C. § 1348 ......................................................................................26, 28

18 U.S.C. § 1956 ............................................................................................87

18 U.S.C. § 1961(1) ...........................................................................25, 26, 28, 87

18 U.S.C. § 1961(1)(D) ..................................................................................26

18 U.S.C. § 1961(5) ........................................................................................25

18 U.S.C. § 1962 ................................................................................................ *passim*

18 U.S.C. § 1963 ................................................................................................................5

18 U.S.C. § 3301 ..............................................................................................................87

21 U.S.C. § 853 ..................................................................................................................5

26 U.S.C. § 7206 ..............................................................................................................22

28 U.S.C. § 1658 ..............................................................................................................37

28 U.S.C. § 2461 ................................................................................................................5

**Other Authorities**

Billionaire Philosophy, *Charlie Munger Interview, Investment Methods to Get You Rich*, BBC, 2012, available at https://www.youtube.com/watch?v=fp7U-_mmTJI ....................................................................................................................7

C. Steven Bradford, *"Make" Means "Make": Rejecting the Fourth Circuit's Two-Headed Interpretation of Janus Capital*, 68 SMU L. Rev. 645 (2015) ..........................76

CFTC, "CFTC Charges Archegos Capital Management and Three Employees with Scheme to Defraud Resulting in Swap Counterparty Losses Over $10 Billion," April 27, 2022, *available at* https://www.cftc.gov/PressRoom/PressReleases/8520-22 ....................................119

Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?,* 105 Harv. L. Rev. 503, 553 (1991) ....................................................41, 47

Dow Jones Industrial Average Historical Prices, available at https://finance.yahoo.com/quote/%5EDJI/history?period1=1584662400&period2=1616198400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true ............................................................................................................10

George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure? Evidence from Confidential 13F Filings*, 48 J. Fin. & Quantitative Analysis 1499 (2013) ......................................................................................8

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation,* 68 Duke L.J. 479 (2018) ..............................................................14, 42

International Swaps and Derivatives Association, *About ISDA*, https://www.isda.org/about-isda/ (last visited Nov, 29, 2022) ....................................8

Matt Levine, *Take the Swaps Off the Balance Sheet*, Bloomberg, May 24, 2022 ..........................9

Matthew Goldstein & Alexandra Stevenson, "In Insider Trading Settlement, Steven Cohen Will Be Free to Manage Outside Money in 2 Years," THE NEW YORK TIMES (Jan. 8, 2016), *available at* https://nyti.ms/2Vymb1s ......................................92

New York, "United States Attorney Announces Charges in Connection with Collapse of Archegos Capital Management," April 27, 2022, *available at* https://youtu.be/DZIWvpDmhc8 ......................................119

OXFORD ENGLISH DICTIONARY 66 (1933) ......................................72

Public Affairs Release: "Four Charged in Connection with Multibillion-Dollar Collapse of Archegos Capital Management," April 27, 2022, *available at* https://bit.ly/3dRCFjF ......................................119

*Return On Coronavirus Hedge That Yielded $2.6 Billion,* Forbes (Mar. 25, 2020), available at https://www.forbes.com/sites/antoinegara/2020/03/25/billionaire-bill-ackman-100-fold-return-on-coronavirus-hedge-2-billion/?sh=1262939b6fcc ......................................7

S&P 500 Historical Prices for Mar. 20, 2020 through Mar. 19, 2021, Yahoo! Finance, https://finance.yahoo.com/quote/%5EGSPC/history?period1=1584662400&period2=1616198400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true ......................................10

SEC Release No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021) ......................................72

SEC, "SEC Charges Archegos and its Founder with Massive Market Manipulation Scheme," April 27, 2022, *available at*: https://www.sec.gov/news/press-release/2022-70 ......................................119

Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought,* 39 No. 10 Futures & Derivatives. L. Rep. NL 2, n.10, Nov. 2019 ......................................42

Webster's New International Dictionary 1485 (2d ed. 1934) ......................................72

**Rules**

Fed. R. Civ. P. 9 ......................................109, 111

Fed. R. Crim. P. 7 ...................................... *passim*

Fed. R. Crim. P. 12 ......................................4, 12, 86

Federal Rule of Evidence 401 ......................................97

Federal Rule of Evidence 403 ......................................97

**Treatises**

BLACK'S LAW DICTIONARY (11th ed. 2019) ..................................................................37

BLACK'S LAW DICTIONARY (9th ed. 2009) ...................................................................35

**Regulations**

17 C.F.R. § 240.10b-5 .......................................................................... *passim*

17 C.F.R. § 275.202(a)(11)(G)-1 .......................................................6, 61, 92

17 CFR § 240.13d-1 ...............................................................................8, 61

87 Fed. Reg. 6652 .......................................................................................8

**Constitutional Provisions**

U.S. Const. amend. IV .................................................................98, 99, 100

U.S. Const. amend. V.........................................................................20, 55

U.S. Const. amend. VI ............................................................................20

**Declarations**

Declaration of Lawrence S. Lustberg .................................................. *passim*

**Exhibits**

Exhibit B: September 27, 2021 Search Warrant and Affidavits .......................................... *passim*

Exhibit T: June 19, 2022 Letter from Lawrence Lustberg....................................................18, 117

Exhibit U: August 24, 2022 Letter from Lawrence Lustberg..................................18, 19, 110, 117

Exhibit V: November 15, 2022 Letter from Lawrence Lustberg..........................................18, 117

Exhibit W: August 29, 2022 Letter from Mary Mulligan.....................................................18, 117

Exhibit X: October 11, 2022 Letter from Mary Mulligan ...........................................18, 110, 117

Exhibit Y: November 14, 2022 Letter from Mary Mulligan ........................................18, 110, 117

Exhibit Z: June 1, 2022 Status Conference Transcript .............................................................18

Exhibit AA: August 24, 2022 Letter from Mary Mulligan..............................................18, 19, 110

Exhibit BB: December 2, 2022 Letter from Andrew Thomas......................................18, 118, 117

Exhibit CC: December 12, 2012 SEC Complaint in 12-cv-7601 (DNJ) ...........................89, 90, 91

Exhibit DD: Consent Judgment between SEC and Tiger Asia Management, LLC
in 12-cv-7601 (DNJ) ..........................................................................................................89, 91

Exhibit EE: Final Judgment as to Tiger Asia Management, LLC in 12-cv-7601
(DNJ) ...................................................................................................................................89, 91

Exhibit FF: Consent Judgment between SEC and Tiger Asia Partners, LLC in 12-
cv-7601 (DNJ) ...................................................................................................................89, 91

Exhibit GG: Final Judgment as to Tiger Asia Partners, LLC in 12-cv-7601 (DNJ) ...............89, 91

Exhibit HH: Consent Judgment between SEC and Sung Kook (Bill) Hwang in 12-
cv-7601 (DNJ) ...................................................................................................................89, 91

Exhibit II: Final Judgment as to Sung Kook (Bill) Hwang in 12-cv-7601 (DNJ)..................89, 95

## PRELIMINARY STATEMENT

The Government has charged two people, Sung Kook (Bill) Hwang and Patrick Halligan, with crimes exposing them to severe penalties, but it is clear from the Indictment that in reality it is the securities markets and the rules that have long regulated them that the Government seeks to put on trial.  This extraordinary Indictment alleges paragraph after paragraph of entirely lawful activity, primarily swap transactions that were fully executed according to their negotiated terms, and that exposed Mr. Hwang to real economic risk, and seeks to criminalize them as "not motivated by any business interest."  Indictment, ECF 1 ¶ 28.[1]  Trying to fashion a crime where none exists, the Indictment relies upon a novel theory of  "open-market manipulation" that has been discredited by the Second Circuit, has never been accepted in the criminal context by any court, and that has been rejected even in the civil context by almost every court to consider it.

The Indictment essentially argues that a high volume of entirely real trading and the utilization of trading methods that are clearly permitted by the existing regulatory structure, such as operating as a family office and trading via swaps and on margin, transformed legal conduct into a variety of criminal offenses.  These charges fly in the face of the existing law, and no investor could possibly have known that these actions would someday be deemed criminal just because the trading backfired in the short term, costing Mr. Hwang billions of dollars in losses.  Allowing such an unprecedented attempt to rewrite the law and apply it retroactively would itself be unlawful, unfair, and a grave threat to our free market system.

More specifically, the Indictment alleges eleven counts and seeks forfeiture.  Count One charges a RICO conspiracy, alleging two types of purported crimes, stock market manipulation

---

[1] Unless otherwise noted, all subsequent references to the Indictment are in the following format: "¶ _."

and misrepresentations to banks, which it vainly tries to stitch together.  It claims that in 2020, after years of highly profitable, lawful operations, Archegos Capital Management ("ACM" or "Archegos"), the family office that Mr. Hwang founded and that employed Mr. Halligan, was converted into a racketeering enterprise in order to implement the purported manipulation scheme. But even taking the facts alleged as true, as we recognize the Court must on a motion to dismiss, the Indictment falls woefully short of meeting the pleading requirements for RICO, including because it fails to allege a pattern of statutory predicate acts and continuity, as those requirements have been clearly defined by this and other courts; nor does it even allege that Mr. Halligan agreed to participate in the predicate acts.

Next, in Counts Two through Nine, the Indictment charges Mr. Hwang, but not Mr. Halligan, with market manipulation under the novel open-market manipulation theory mentioned above.  But, as discussed in detail below, market manipulation cases, particularly criminal cases, have always had as a central element some deceptive conduct visited upon the market in connection with the trading, such as spoofing or wash sales.  The open-market theory, predicated as it is here entirely on the volume and timing of actual swap transactions, and based solely upon Mr. Hwang's alleged intent for those transactions to affect the prices of the stocks referenced in the swaps, has never been the basis for sustaining a criminal prosecution.  Nor should it be here, not only because no deception is alleged, but also because there are several other statutory pleading defects, and because allowing a prosecution to proceed under such an unprecedented theory would violate fundamental principles of due process.

In Count Ten, the Government charges Mr. Hwang and Mr. Halligan with securities fraud based upon misrepresentations made to banks by two other ACM employees, whose job functions included managing such counterparty relationships.  But the Indictment fails to allege, as is

required to maintain such a securities fraud claim, that any such misrepresentation was made "in connection with the purchase or sale" of a security.  As the Second Circuit and district courts within it have consistently held, misrepresentations that are not about the securities being purchased or sold do not satisfy this requirement; the misrepresentations alleged here were not about securities but instead were about Archegos and its portfolio.  Further, although the Indictment alleges, without specific facts, that Mr. Hwang and Mr. Halligan "permitted" or "directed" the misrepresentations, such allegations fail to meet the requirement that securities fraud charges can only be brought against the "maker" of the false statement.  Moreover, Count Ten also fails because the Second Circuit has recently held that as a matter of law that "scheme liability" for securities fraud cannot be based solely upon misrepresentations, as is alleged here.

Count Eleven charges wire fraud, expressly premised upon the "right to control" theory endorsed by the Second Circuit.  Because the parameters, and potentially the viability, of that theory are presently being reviewed by the United States Supreme Court in a case that has been fully briefed and argued on the merits, this Court should consider Count Eleven after the Supreme Court has clarified the governing law later this term.

The Indictment also seeks forfeiture of any proceeds of the charged crimes.  But the Indictment fatally fails to allege that there were any such proceeds or that Mr. Hwang or Mr. Halligan took any money out of the fund during the time of the alleged criminal conduct; on the contrary, it (correctly) states that ACM lost essentially all of its money and is in debt to creditors.

Mr. Hwang and Mr. Halligan also seek additional relief, the basis for which is set forth in Points II through IV, in the event that any of the charges survive the motion to dismiss.  This relief includes striking certain allegations regarding charges brought and settled a decade ago against a hedge fund with which Mr. Hwang and Mr. Halligan were associated.  In addition, the Court should

suppress the fruits of certain search warrants for which there was not probable cause.  As well, the Court should grant a bill of particulars, in which, *inter alia*, all of the alleged misrepresentations and manipulative trades would be identified.  Finally, the Court should order the Government to fully comply with its *Brady* obligations.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[2]

On April 25, 2022, a federal grand jury sitting in the Southern District of New York returned an Indictment against Sung Kook (Bill) Hwang, who was the founder and principal of Archegos, and Patrick Halligan, who was Archegos's Chief Financial Officer.  ECF 1.  The gravamen of the Indictment is "two interrelated criminal schemes," one involving alleged manipulative trading to artificially inflate the price of certain securities in Archegos's portfolio and the other concerning "materially false and misleading statements" to counterparties.  ¶ 2.  The Indictment asserts that "[f]rom in or about 2020, up to and including in or about March 2021," ¶ 1, specifically "to drive up the prices" of certain securities, Mr. Hwang "amassed extraordinary exposure" to a handful of stocks "through billions of dollars in purchases made with money borrowed from counterparties based on lies and misrepresentations," ¶ 21(a).  The Indictment claims that Mr. Hwang "personally made all investment and trading decisions, and [] directed the Archegos Enterprise research analysts as well as the Archegos Enterprise traders in carrying out his decisions."  ¶ 12(a).

---

[2] This Statement of Facts is directed to the issues presented by Defendants' Motion to Dismiss the Indictment, with regard to which the facts as set forth in the Indictment are assumed to be true, although Mr. Hwang and Mr. Halligan deny many of them.  *See United States v. Navarro*, 551 F. Supp. 3d 380, 388 (S.D.N.Y. 2021) ("On a Rule 12(b) motion to dismiss an indictment, 'the Court accepts the allegations in the indictment as true.'"); *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (same).  Where additional information, often from public sources, is described in this portion of the brief, as occurs in a few footnotes, it is provided solely for context, and not as the basis for the motion to dismiss.

Based upon these allegations, the eleven-count Indictment charges Mr. Hwang with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) [hereinafter Section 10(b)] and 78ff, 17 C.F.R. § 240.10b-5 [hereinafter Rule 10b-5], and 18 U.S.C. § 2 (Counts Two and Ten); market manipulation, in violation of 15 U.S.C. §§ 78i(a)(2) [hereinafter Section 9(a)(2)] and 78ff, and 18 U.S.C. § 2 (Counts Three through Nine); and wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Eleven). The Indictment charges Mr. Halligan as a defendant in Counts One, Ten, and Eleven, but not in the counts alleging market manipulation (Counts Two through Nine). The Indictment also seeks forfeiture from both Defendants pursuant to 18 U.S.C. §§ 492, 981, 982 and 1963; 21 U.S.C. § 853; and 28 U.S.C. § 2461. ¶¶ 83-86.

The facts contained in the Indictment, stripped of characterizations and spin, tell two very different stories. The first, as more fully set forth in subsection 1 below, is of a family investment office that successfully employed a very aggressive, daring investment strategy for many years; doubled down on that strategy to take advantage of market opportunities created by the COVID-19 pandemic; made extraordinary amounts of money over a few months as the markets soared in late 2020 and 2021; then lost it all when several unexpected, external market events caused prices in key positions to fall simultaneously, leading to a series of margin calls and then defaults called by counterparties. The second story, told through the Indictment's characterizations of certain facts, plus its allegations of misconduct by two former Archegos employees, Scott Becker and William Tomita, superimposes a criminal gloss on the first story. It posits that the "central aim" of Archegos's trading "from in or about 2020, up to and including in or about March 2021," was to manipulate the price of certain securities, and that lies told by Mr. Becker and Mr. Tomita to Archegos's counterparties about its portfolio were in some instances directed by Mr. Halligan

and/or made with Mr. Hwang's "implicit and, at [unspecified] times, explicit approval" to fool the banks into giving Archegos more capacity to buy more securities on margin. But even in the second story, most of the facts the Indictment alleges describe legal conduct – in particular, investing in large swap positions and taking advantage of a regulatory structure that allowed family offices to operate with great freedom and limited disclosures. This second narrative is further discussed in subsection 2 below.

### 1.      The Rise and Fall of Archegos

In 2013, Mr. Hwang founded Archegos, a family office that managed his personal wealth. ¶ 9. As a family office,[3] Archegos had no outside investors and no obligation to report its holdings or activities to the SEC; it was solely owned by Mr. Hwang. ¶¶ 9, 12(a). To assist Mr. Hwang with daily operations and evaluating investment strategies, Archegos employed approximately fifty people across various departments and offices, retained consultants with expertise in particular market sectors, and engaged several outside vendors. ¶¶ 10, 12(a). The Archegos employees included a research team with analysts who studied the sectors and companies in which Archegos invested and provided Mr. Hwang with reports and recommendations. ¶¶ 12(a), 33. Ultimately, however, Mr. Hwang, made all of the final investment decisions for his money and had complete discretion as to how to do so, based upon his own personal goals, interests, and risk tolerance. ¶¶ 9, 12(a).

Patrick Halligan was Archegos's Chief Financial Officer, and helped supervise the accounting and cash management functions at Archegos. ¶ 12(b). Archegos's Director of Risk

---

[3] A family office is "a company . . . that (1) [h]as no clients other than family clients . . . ; (2) [i]s wholly owned by family clients and is exclusively controlled (directly or indirectly) by one or more family members and/or family entities; and (3) [d]oes not hold itself out to the public as an investment adviser." 17 C.F.R. § 275.202(a)(11)(G)-1(b).

Management was Scott Becker.  ¶ 12(d).  In this role, Mr. Becker served as the primary point of contact with Archegos's bank counterparties, as described below.  ¶ 12(d).  Archegos's trading team was supervised by its Head Trader, William Tomita.  ¶ 12(c).  Mr. Tomita also helped manage relationships with Archegos's counterparties and implemented Mr. Hwang's trading decisions.  ¶ 12(c).  Archegos also had a compliance team that, among other things, provided training to employees and maintained a compliance manual.  ¶ 10.

As the Indictment describes it, Archegos employed a private equity-type approach to investing in publicly traded companies, growing large concentrated positions in companies that Mr. Hwang deemed to be undervalued, with an eye toward holding the positions long-term, while in some instances taking short positions in securities he deemed to be overvalued.[4]  ¶¶ 22, 24.  In line with this trading philosophy, when attractive buying opportunities arose for issuers in which Archegos had already invested, Archegos would aggressively add to its existing holdings.  ¶ 24.  For example, Archegos grew equity positions in ViacomCBS (VIAC); Discovery Communications, Inc. (DISCA); Discovery Communications, Inc. (DISCK); GSX Techedu Inc. (GSX); iQIYI, Inc. (IQ); Tencent Music Group (TME); Vipshop Holdings Ltd (VIPS); Baidu

---

[4] While such large, concentrated investing is aggressive and might be considered risky, it is not uncommon.  *See*, *e.g.*, Billionaire Philosophy, *Charlie Munger Interview, Investment Methods to Get You Rich*, BBC, 2012, available at https://www.youtube.com/watch?v=fp7U-_mmTJI (describing Berkshire Hathaway's investment in Coca-Cola after the market crash of 1987 as, "there are times when even a company as big as Coca-Cola is too cheaply priced by the market considering what it's going to do for the shareholder.  And there are times when we can figure that out . . .  And the times where we can figure it out we tend to go in heavily.  For many-many months, we were buying as much Coca-Cola as we could buy – roughly a third of the volume trading. Every day, for months."); Antoine Gara, *Billionaire Bill Ackman Made 100-Fold Return On Coronavirus Hedge That Yielded $2.6 Billion,* Forbes (Mar. 25, 2020), available at https://www.forbes.com/sites/antoinegara/2020/03/25/billionaire-bill-ackman-100-fold-return-on-coronavirus-hedge-2-billion/?sh=1262939b6fcc.  ("Most of the time Ackman's fund, Pershing Square, is almost 100% long by way of an ultra-concentrated portfolio of large stock holdings. His current style is to find about seven-or-eight companies he believes strongly in and bet between $500 million and $1 billion on each.").

(BIDU); Farfetch (FTCH); and Texas Capital Bancshares Inc. (TCBI); and took short positions in Futu Holdings (FUTU); and Rocket Companies, Inc. (RKT).  ¶ 21.

To carry out its trading, Archegos typically established a cash equity position in a company, until it approached 5% ownership of the outstanding shares of the issuer's security.  ¶ 14.  When its holdings neared the 5% threshold, beyond which a regulatory filing obligation would be triggered, Archegos would enter into contract-based "swap" agreements, which further increased its investments, and its economic exposure.[5]  ¶¶ 4, 9, 12(a), 13-14, 27.  These swaps were effected pursuant to contractual agreements between Archegos and a bank or brokerage (commonly referred to as a "counterparty") whereby they agreed to exchange payments based on the market price movements of the specified stocks.[6] ¶ 15.  In general, the swap terms provided that the

---

[5] Pursuant to Section 13(d) of the Exchange Act and the regulations promulgated thereunder, 17 CFR § 240.13d-1, holders of securities are required to file a Schedule 13D after acquiring more than 5% beneficial ownership of a registered class of voting equity securities.  But, as the Government acknowledges, Archegos did not acquire more than 5% ownership in stock and was not required to publicly disclose its stock, swap, or aggregate (stock + swap) positions because its long positions in cash-settled equity derivatives (swaps) did not confer "beneficial ownership" of the reference equity securities.  ¶¶ 14, 17.  As commentators have explained, lawfully avoiding disclosure of investment positions is important to many investors, including because it can help them avoid "front running" by those who may anticipate their trades and trade before or against them.  *See, e.g.*, George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure? Evidence from Confidential 13F Filings*, 48 J. Fin. & Quantitative Analysis 1499, 1517 (2013).  While the SEC has, in the wake of Archegos's collapse, proposed a new rule that would require securities-based swap positions to be disclosed, that rule has not yet been finalized, and was not in effect at the time of the actions here at issue.  *See* Prohibition Against Fraud, Manipulation, or Deception in Connection With Security-Based Swaps; Prohibition Against Undue Influence Over Chief Compliance Officers; Position Reporting of Large Security-Based Swap Positions, 87 Fed. Reg. 6652 (proposed Dec. 15, 2021).

[6] These agreements were set forth in various contracts, including ISDA Agreements with provisions governing terms such as the duration of the swap agreement and margin requirements, described below.  ¶¶ 15, 18, 59(a).  "ISDA" stands for the International Swaps and Derivatives Association, which, among other things, provides form contracts for entities trading in swaps and other derivative instruments.  *See* International Swaps and Derivatives Association, *About ISDA*, https://www.isda.org/about-isda/ (last visited Nov, 29, 2022).

counterparty would pay Archegos an amount equal to any increase in the value of the referenced security (*i.e.*, its price) and Archegos would pay the counterparty the amount of any decrease in the value of that referenced security.   ¶ 15.   Thus, the swaps were derivative instruments that represented synthetic exposure to an underlying stock – they did not represent actual purchases of shares in the underlying company or direct stock market activity by Archegos.   ¶¶ 15, 17.

Archegos's counterparties were many of the largest and most sophisticated banks in the world, including Credit Suisse, UBS, Mitsubishi UFJ, Goldman Sachs, Jefferies, Deutsche Bank, Macquarie, and Morgan Stanley.   ¶¶ 52, 54, 58.   For these counterparties, Archegos's swap trades were very valuable irrespective of the movement of the underlying stock, given the large transaction fees they generated.   ¶ 16.   Indeed, to avoid market exposure created by the swap trades, counterparties would "typically" hedge against the market risks.   Sometimes, but by no means all the time, they would hedge by purchasing shares of the same stock referenced in the swap.[7]   ¶¶ 16, 25.   The counterparties often allowed Archegos to trade swaps on margin, meaning that Archegos would post a specified amount of collateral in cash or securities rather than pay the full cost of the swap in advance.   ¶ 18.   When the underlying security appreciated in price, there would be "excess margin," in that the increase in price would leave the counterparty with more collateral than the

---

[7] There are many other ways a bank can hedge against the market exposure created by a swap, including by entering into an offsetting swap with another customer, that would have no impact on the price of the security.   *See*, *e.g.*, Br. of Amici Curiae Int'l Swaps and Derivatives Ass'n, Inc. and Sec. Ind. and Financial Markets Ass'n, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 1:08 Civ. 2764 (LAK) (S.D.N.Y. June 2, 2008), ECF 80 (summarizing testimony)); Matt Levine, *Take the Swaps Off the Balance Sheet*, Bloomberg, May 24, 2022, at 2-4.   As the CFTC acknowledges in the parallel civil action it filed against Archegos, whether and how to hedge market risks was left entirely to the banks' discretion; the swap contracts did not require either party to actually purchase the underlying security in the market, or, if the bank did purchase the security, to hold it for any length of time.   *See CFTC v. Archegos Capital Management, LP et al.*, No. 1:22-cv-3401 (JPO) (S.D.N.Y. Sep. 2, 2022), ECF 33, Amended Complaint, at ¶ 3 n.1 (noting that swap agreements "do not transfer title to the underlying assets or require that either party actually own them").

contract required.  ¶ 18.  Archegos was generally allowed to withdraw any such excess margin.  ¶ 18.  Conversely, if a stock's value depreciated, counterparties would issue a margin call, requiring Archegos to deposit additional collateral as security for its swaps in order to remain in compliance with the contractual security requirements.  ¶¶ 5, 18.

For many years, Archegos's trading strategy was extremely successful.  ¶ 3.  From March 2020 up until the week of March 22, 2021, Archegos grew from a fund with approximately $1.5 billion in capital to one with more than $35 billion.  ¶ 3.  This period of growth coincided with the COVID-19 pandemic, which not only brought widespread changes to daily life but also had profound impacts on securities markets.[8]  ¶ 23.  During that period, Archegos moved to a remote work environment, digitalized its operations, and shifted to electronic communications.  ¶ 23.  The pandemic's onset in early 2020 depressed equity markets and caused the prices of several securities that Archegos had invested in to fall.  ¶ 23.  But these market conditions created buying opportunities in several securities of interest to Archegos, which, consistent with its long-held approach, took advantage of the depressed market conditions and continued to build large positions in certain securities that Mr. Hwang thought were undervalued.[9]  ¶ 24.

---

[8] Between March 20, 2020 and March 19, 2021, the S&P 500 and the Dow Jones Industrial Average each increased by approximately 70%.  S&P 500 Historical Prices for Mar. 20, 2020 through Mar. 19, 2021, Yahoo! Finance, https://finance.yahoo.com/quote/%5EGSPC/history?period1=1584662400&period2=1616198400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true; Dow Jones Industrial Average Historical Prices, available at https://finance.yahoo.com/quote/%5EDJI/history?period1=1584662400&period2=1616198400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[9] Not surprisingly, Mr. Hwang was not the only major investor who viewed the market slump during the pandemic as a great opportunity to buy stock at depressed prices.  *See, e.g.*, Gara, *supra* at 4 (describing a letter to Pershing Square's shareholders in March 2020 that they were "unwinding [their] hedges and redeploying [their] capital in companies [they] love at bargain prices that are built to withstand this crisis, and which [they] believe will flourish long term").

On Monday, March 22, 2021, after the market closed, ViacomCBS announced a secondary stock offering. ¶ 60. The offering was not favorably received, and when the market reopened on Tuesday, March 23, 2021, Viacom stock dropped, and Archegos's portfolio (which included a significant investment in Viacom) began to decline substantially. ¶¶ 60, 62. Seeking to take advantage of that price drop, and consistent with its established trading strategy, Archegos continued to add to its established positions, including those in Viacom, by purchasing shares while the price was comparatively low. ¶¶ 5, 60, 62, 63. But over the course of the week, the value of Archegos's positions continued to depreciate, leading to successive margin calls by its counterparties. ¶¶ 62, 64-66. Archegos was ultimately unable to cover the margin calls, resulting in Archegos and its counterparties liquidating many positions and suffering substantial losses, including all of the wealth Mr. Hwang had built in the fund, which had grown to a book value of more than $35 billion.[10] ¶¶ 3, 67.

## 2. The Alleged Criminality

The Indictment claims that after Archegos had operated legally for almost a decade and had amassed approximately $1.5 billion worth of assets, starting at some unspecified time in 2020 and for some unspecified reason, the Defendants "corrupted the operations and activities" of Archegos through "two interrelated criminal schemes" – one involving alleged manipulative trading to artificially inflate the price of certain securities and another to make "materially false and misleading statements" to counterparties in order to cause them to maintain swap agreements with and extend additional trading capacity to Archegos.[11] ¶¶ 1-3, 21, 41.

---

[10] Elsewhere, the Government has conceded that Archegos is not operational and is winding down. *See SEC v. Hwang et al.,* No. 1:22-cv-3402 (JPO) (S.D.N.Y. Nov. 4, 2022), ECF 71 at 11 ("Archegos has no ongoing business operations and [] it is engaged in winding down its affairs").

[11] In an attempt to paint Mr. Hwang in an unfairly negative light, paragraph 8 of the Indictment references Mr. Hwang's prior hedge fund, Tiger Asia Management. After a Government

11

### a.       The Manipulative Trading Allegations

According to the Indictment, "at various times between in or about June 2020 and March 2021, Archegos's trading caused and established certain stock prices that were not set by ordinary market forces of supply and demand." ¶ 39.  During this time, the Indictment alleges, Mr. Hwang amassed significant market power with respect to certain securities and used that power, "employ[ing] various strategies to manipulate the markets." ¶ 21.  In charging manipulation, the Indictment relies on the following allegations. *First*, the Indictment points to the large amount of swap trading in a highly concentrated number of companies, to such an extent that Archegos allegedly came "to dominate the marketplace" for those companies, ¶ 27, and "significantly altered [their] shareholder composition" ¶ 25, such that Archegos's trading could affect the stocks' price. ¶¶ 22-31.  Specifically, "[b]etween mid-November 2020 and late March 2021", Archegos held very sizeable swap positions in "a handful of securities" ¶ 24, "exceeding $5 billion in eight different stocks, including more than $10 billion in GSX, BIDU, and TME, respectively, and more than $20 billion in VIAC," ¶ 24.  By in or about 2021, Archegos's positions in certain companies "equated" to more than 50% of the outstanding shares of a given issuer.[12] ¶ 26.

---

investigation into certain trades by Tiger Asia, the parties reached an agreement under which Tiger Asia pled guilty to a single count of wire fraud, based solely on allegations of trading on material nonpublic information, and Mr. Hwang and two of Tiger Asia's other employees (neither of whom was Mr. Halligan) entered into a civil settlement with the SEC under which they did not admit to any misconduct whatsoever.  In or about August 2012, in connection with the settlement negotiations, Tiger Asia returned investor capital and Mr. Hwang de-registered Tiger Asia as an investment advisor with the SEC.  *See* Point II below.  Defendants move to strike that paragraph from the Indictment as irrelevant and prejudicial surplusage under Federal Rule of Criminal Procedure 7(d).

[12] The Government's calculations and use of the word "equated" are misleading because Archegos's swap positions did not confer ownership of the underlying stock to anyone.  As discussed, the swap transactions themselves are synthetic transactions that have no direct impact on the stock price or shareholder composition of the issuer referenced in the swap.  If counterparties purchased shares of that issuer's stock for themselves to hold as a hedge against

The Indictment alleges that Mr. Hwang intended his trading "in the same stocks in large quantities day after day" to "drive up the price of the stocks." ¶ 28(a).  In particular, the Indictment alleges that, if a company faced negative press or market movements, Mr. Hwang would buy heavily to "defend" the stock price and thereby avoid margin calls.  ¶¶ 28(b), 29.  Thus, it is charged that Mr. Hwang would, at times, trade in amounts as much as or even more than 10-15% of certain issuers' daily trading volumes.  ¶ 28(c).  Engaging in that volume of trading, it is alleged, "would likely affect the market price in the stock."  ¶ 28(c).  For example, the Indictment describes a text message from Mr. Hwang to an Archegos consultant, wherein Mr. Hwang commented with an emoji that a stock's price on a certain day may have been affected by his buying activity.  ¶ 30. The Indictment alleges that the only purpose for this trading was to affect the stock price, stating that the trades "were not motivated by any business interest other than the desire to manipulate the prices of certain securities in which Archegos held long positions."  ¶ 28.

*Second*, the Indictment claims that as Archegos's positions grew, its counterparties imposed increasing costs and requirements on Archegos, causing Mr. Hwang to "engage in various types of manipulative open-market trading to further influence the prices of the top stocks in his portfolio and to maximize his capacity to conduct further trading."  ¶ 34.  This purported "manipulative open-market trading" included such practices as:

- Trading before the market opened to "have a greater impact on the price of the stock than at times of day when more of the stock was being boughtught or sold," and, on occasion, purchasing the same stock when the market opened, "to firm up the now-inflated price."  ¶ 35(a)-(b).

- Trading in large volumes at the end of market hours and, at times, "us[ing] limit order prices above the prevailing market prices in the final minutes of the trading day," in order push up prices, with the goal of generating excess margin.  ¶ 35(c)-(d).

---

their swap positions, it was their choice to do so.  Thus, it is inaccurate to equate swap positions with the number of outstanding shares of stock.

- Trading "to preserve and increase" Archegos's "trading capacity and, therefore, its market influence"; for example, Mr. Hwang would direct certain trades to generate capacity with a counterparty in order "to 'make room' for later trades." ¶ 36(a)-(c).

- Coordinating trades with a friend and former colleague to create additional capacity for Archegos to use with a counterparty, specifically causing the friend to move his fund's positions in GSX to another financial institution to allow Archegos to "purchase a similarly sized GSX position at that same Counterparty." ¶ 37.[13]

*Third*, the Indictment asserts that as counterparties increased margin requirements to keep pace with Archegos's growing positions, Mr. Hwang disregarded his "prior focus on low-cost margining" and continued to trade in the same group of securities. ¶ 32. The Indictment further claims that Mr. Hwang "increasingly ignored internal Archegos analyst research throughout 2020 and 2021" and disregarded analysts' recommendations to purchase "new, different stocks in any significant size." ¶ 33. By January 2021, the Indictment claims, Archegos had accounts with nine different swap counterparties and was exploring the possibility of establishing relationships with more, both to create the impression "that different parties were buying the companies' stock"[14] and to give Archegos access to additional capacity to trade even more on margin. ¶¶ 27, 38. All of this was done, according to the Indictment, to "control the price and artificially increase the value of securities in Archegos's portfolio."[15] ¶ 21.

---

[13] The Indictment does not (and could not) allege that any of these acts are in and of themselves prohibited or illegal, but rather contends that they were undertaken for the purpose of effectuating the alleged price manipulation scheme. ¶¶ 34-37.

[14] The Indictment does not explain how this impression would be created, but this allegation, again, assumes (as was not in fact true) that Archegos's bank counterparties would always hedge by purchasing equity positions in the underlying issuers. *See supra* at note 7.

[15] While the Indictment alleges that all of this conduct was undertaken to artificially increase the market price of the subject securities, it does not explain how Mr. Hwang could have intended to realize profits from this "scheme." If, as the Government alleges, counterparties were purchasing stock to hedge their swap exposures, then terminating all of Archegos's large swap positions would cause the counterparties to sell any underlying equities they had purchased as hedges, thus pushing the market prices back down. *See* Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 DUKE L.J. 479, 503 (2018) ("Naked manipulation

14

Thus, the Indictment claims that "between on or about October 1, 2020, and March 23, 2021" the stock prices for VIAC and DISCA – two of Archegos's large positions – rose more than 250%, when the Nasdaq-100 index only appreciated approximately 20% during that same period. ¶ 31. But, the Indictment further alleges, in late March 2021, Mr. Hwang could no longer maintain his manipulation scheme, and the prices of Archegos's largest positions collapsed. ¶ 40. As a result, Archegos could not meet its margin calls and its counterparties liquidated many of Archegos's positions, causing billions of dollars of losses to Mr. Hwang, and purportedly to the companies whose securities were allegedly targeted by the supposed trading scheme, market participants, counterparties, and Archegos employees who had deferred their bonuses to be paid later based upon Archegos's performance. ¶¶ 5-7, 62-67.

### b.    The Misrepresentation Allegations

In addition to market manipulation, the Indictment charges that Messrs. Hwang, Halligan, Tomita, and Becker "systematically misled the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions." ¶ 47. All of the specific misrepresentations alleged were uttered by Mr. Tomita and Mr. Becker, though the Indictment alleges that Mr. Halligan "directed" some of them, *e.g.* ¶ 52(a), and that either those or unspecified others were made with Mr. Hwang's "implicit and, at times, explicit approval." ¶ 47. In particular, Mr. Tomita and Mr. Becker allegedly made "misrepresentations" to Archegos's counterparties regarding the concentration and liquidity of Archegos's positions and the composition of Archegos's portfolio. ¶ 48. Additionally, as Archegos's positions began to

---

is difficult because as the trader tries to buy low, her purchases will, in theory, increase the price of the asset. Likewise, as she tries to sell at the increased price, her sales will decrease the price. To be successful in a naked manipulation scheme, the trader must have some way of preventing the price from increasing as she purchases, decreasing as she sells, or both.").

collapse during the week of March 22, 2021, "false representations" were allegedly made "regarding Archegos's cash position and financial condition, in an effort to withdraw excess margin." ¶ 48. Thus, the Indictment alleges that:

- Mr. Halligan and Mr. Becker "maintained a practice of consistently representing that Archegos's largest position represented 35% of its capital, even when that figure was inaccurate and misleading, and of otherwise falsely minimizing the size of Archegos's largest positions." ¶ 52.

- Mr. Becker "fraudulently overstated" Archegos's liquidity profile; specifically, Mr. Becker told UBS "that Archegos could liquidate its entire portfolio in approximately two weeks, or ten trading days, selling at approximately 15% of average daily trading volume ('ATV')," and that "the portion of Archegos's portfolio at UBS was not representative of its portfolio with other counterparties," in that Archegos's largest positions were in "large, liquid technology stocks, such as Amazon, Google. Microsoft, and Apple." ¶ 54.

- Mr. Tomita and Mr. Becker "falsely implied" that Archegos was pursuing new positions with UBS and Goldman Sachs, when in fact Archegos was investing in the same companies at UBS and Goldman Sachs as elsewhere. ¶¶ 56, 57.

- Mr. Becker "lied" about why Archegos sought to withdraw excess margin from its counterparties during the week of its collapse and, "on at least one occasion, falsely asserted that Archegos still had $9 billion in excess cash when it did not." ¶ 64.

With regard to Mr. Hwang and Mr. Halligan, there are few specific allegations of misrepresentations. The Indictment alleges that Mr. Hwang signed an agreement with Credit Suisse and Mr. Halligan signed trade confirmations with Mitsubishi that included false representations regarding the size of Archegos's largest positions. ¶ 59. And it alleges that Mr. Hwang directed Mr. Tomita to mislead Goldman Sachs during negotiations about Goldman potentially becoming one of Archegos's counterparties; specifically, that Mr. Tomita used "decoy names" when describing Archegos's "investment interests" to Goldman.[16] ¶ 56. Finally, it alleges

---

[16] The Indictment does not suggest any actual swap transactions could be made with Goldman or any counterparty without Archegos revealing the referenced security underlying the swap.

that Mr. Hwang told Mr. Tomita to give Morgan Stanley a false explanation for why Archegos was rejecting the bank's request that Archegos voluntarily reduce the size of its swap exposure through the bank to GSX in order to hide from the bank the fact that Archegos had used up all of its capacity for GSX with its other counterparties. ¶ 58. The alleged purpose of these misrepresentations was "enabling and facilitating the market manipulation scheme." ¶ 2.

### 3.    Post-Indictment

On April 27, 2022, the Government unsealed the Indictment, and Mr. Hwang and Mr. Halligan were arrested. ECF 1, 2. That same day, culminating a common process by which the U.S. Attorneys' Office, SEC, and CFTC coordinated their work, the SEC filed a civil suit against Mr. Hwang, Mr. Halligan, and Archegos for securities law violations, while the CFTC filed a civil suit against Mr. Halligan and Archegos for commodities law violations based on the same two schemes alleged in the Indictment.[17] *SEC v. Hwang et al.*, No. 1:22-cv-3402 (JPO) (S.D.N.Y.); *CFTC v. Archegos Capital Management, LP et al.*, No. 1:22-cv-3401 (JPO) (S.D.N.Y.).

During Defendants' arraignment, and confirmed by a subsequent Order, ECF 4 (*Brady* Order)), Magistrate Judge Willis directed the Government to comply with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and advised the Government of the potential consequences for violating those obligations. The *Brady* Order explained that "the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers,

---

[17] In both the SEC and CFTC actions, Archegos, Mr. Hwang, and Mr. Halligan have filed motions to dismiss the complaints in their entirety for failure to state a claim upon which relief can be granted (and, in the CFTC action, for lack of subject matter jurisdiction). Briefing on those motions will be completed in January. In addition, the U.S. Attorneys' Office has filed motions to intervene and to stay any discovery in those actions pending resolution of this criminal case. Archegos, Mr. Hwang, and Mr. Halligan have opposed those motions primarily on the grounds that they are premature, given that no party has sought to commence any discovery in those cases.

and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged." ECF 4 at 2.  Although the Order required the Government to make the disclosures regardless of whether Defendants made specific requests, both Defendants sent detailed, written *Brady* demands to the Government setting out specific categories of information that must be disclosed.  Lustberg Decl. ¶¶ 34-43; Exs. T-BB (correspondence between Government and defense counsel).[18]   While the Government made supplemental disclosures on October 19, 2022, Lustberg Decl. ¶ 43, Defendants believe that the Government has not fully complied with its *Brady* obligations—particularly as it relates to the Government's refusal to search for all disclosable materials in the possession of the other governmental offices that engaged with the U.S. Attorney's Office in the joint investigation that culminated in this prosecution—and seek appropriate relief below.  *See* Pt.V.

On May 19, 2022, an initial pre-trial conference in this matter was held before the Honorable Andrew L. Carter, Jr.  *See* ECF 31 at 5:21-6:1; 6:17-19 (Tr. of May 19, 2022 proceedings held before Judge Andrew L. Carter, Jr.).  During that conference, Judge Carter recused himself from the case due to a conflict of interest, *id.*, and the matter was subsequently reassigned to this Court, which held a status conference on June 1, 2022.  During that status conference, the Court ordered the Government to "identify each and all [of] the alleged misrepresentations, by persons who made it, by their nature, persons who received it, date, time, [and] place."  Lustberg Decl. ¶ 40; Ex. Z (ECF 29 at 16:24-17:1 (Tr. of June 1, 2022 Status Conference)).  In response to the Court's order, the Government provided a letter on August 18, 2022, supplying some of the required information about some of the alleged misrepresentations

---

[18] "Citations in this format are to the December 2, 2022, Declaration of Lawrence S. Lustberg, submitted concurrently with this Brief."

identified in the Indictment and providing "additional examples" of alleged misstatements.  ECF 38 (8/18/22 Government Letter).  But, notwithstanding the Court's clear Order, while the Government provided general topical characterizations of alleged statements regarding Archegos's concentration, liquidity, portfolio, and general operations, it did not in the majority of instances provide the identity of the alleged speaker, or the date, time, and place of the misrepresentations.  (*Id.*).  On August 24, 2022, counsel for Mr. Hwang and Mr. Halligan responded to the Government's letter, expressing concern that the Government had not fully complied with the Court's June 1, 2022 Order and requesting further particularity regarding the nature of its scheme liability theory.  Lustberg Decl. ¶¶ 35, 41  Exs. U, AA.  Despite a series of further requests from Defendants that the Government comply with the Court's Order, the Government has not provided any additional information to date.[19]

On September 8, 2022, the parties appeared before the Court for a second pretrial status conference.  *See* ECF 40 (Tr. of Sept. 8, 2022 Status Conference).  At that time, the Court set a trial date of October 10, 2023 and set a briefing scheduling for pre-trial motions, ordering Defendants' motion papers to be filed no later than December 2, 2022.  *Id.* at 12:22, 14:6-7.  This submission is in accordance with that schedule.

---

[19]  The Government's non-compliance with the Court's June 1 Order is addressed further below in connection with Defendants' request for a bill of particulars.

<u>ARGUMENT</u>[20]

I. **THE COURT SHOULD DISMISS THE INDICTMENT FOR FAILURE TO CHARGE AN OFFENSE.**

A. **Legal Standard**

The Constitution of the United States provides that citizens shall not be "deprived of life, liberty, or property, without due process of law," and that a criminal defendant must "be informed of the nature and cause of the accusation" against him.  U.S. Const. amends. V, VI.  To accomplish this, the Supreme Court has "identified two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  As such, it is well established that "[i]ndictments must contain both 'a plain, concise, and definite written statement of the essential facts constituting the offense charged' and a 'citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.'"  *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) (quoting Fed. R. Crim. P. 7(c)(1)).  "The statements of essential facts and statutory citation are separate requirements, and a deficiency in the factual allegations cannot be cured by a statutory citation in the same count."  *United States v. Dupree*, 870 F.3d 62, 70 (2d Cir. 2017).  Thus, "courts must be mindful that '[a]n indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments.'"  *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

To comply with constitutional requirements, an indictment must also "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case

---

[20] Unless otherwise indicated, citations and quotations are omitted in case citations throughout.

with facts other than those considered by the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). To fulfill this function, "[t]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." *Apprendi v. New Jersey*, 530 U.S. 466, 489 n.15 (2000). The indictment "must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Pirro*, 212 F.3d at 93. While the language of the statute may be used to describe the crime, "the description 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged.'" *United States v. Neumann*, 21 CR. 439 (NSR), 2022 WL 3445820, at *3 (S.D.N.Y. Aug. 17, 2022) (quoting *Hamling*, 418 U.S. at 117–18). Where the statute in question uses "generic" terms to define an offense, it is not sufficient for the indictment to charge the offense in the same generic terms; rather, it must "descend to particulars" to sufficiently inform the defendant of the charges against him. *Pirro*, 212 F.3d at 92-93; *see also United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) (holding indictment for obtaining something of value by false pretenses to be deficient where it failed to recite the substance of alleged misrepresentations).

Federal Rule of Criminal Procedure 12(b)(1), governing pretrial motions, provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Under this provision, a defendant may seek the dismissal of a charge that "fails to allege a crime within the terms of the applicable statute." *United States v. Grasso*, 585 F. Supp. 3d 484, 488 (S.D.N.Y. 2022) (quoting *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see also Dupree*, 870 F.3d at 70 ("An indictment that does not set out all of the essential elements of the offense charged is defective.") (quoting *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012)). Indeed, "[d]ismissal is required where the conduct alleged in the

indictment as a factual basis for the offense is not actually prohibited by the language of the statute." *Aleynikov*, 737 F. Supp. 2d at 176.   That is because "it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish at trial." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 n.5 (S.D.N.Y. 2012); *see also Pirro*, 212 F.3d at 92 (noting that a defendant who "objects to the indictment before trial" is "entitled to a more exacting review of the indictment than one who waits until after trial to object.").

For example, in *United States v. Pirro*, the Second Circuit upheld the District Court's determination that the indictment, which alleged that the defendant "willfully and knowingly made and subscribed a false 1992 tax return for [p]roperties in violation of [26 U.S.C. §] 7206(1)," based on his alleged failure to disclose an ownership interest in an S corporation, failed to allege an offense.   212 F.3d at 88, 91, 93.   Specifically, in the absence of any statute, regulation, or case law "specifically stat[ing] that S corporations were required to report 'ownership interests' on their corporate tax returns," the court found "[t]he tax law provided [the defendant] no notice that failure to report an 'ownership interest' was criminal." *Id.* at 90-91.   The court further held that "[t]he indictment failed to sufficiently allege the second element of a section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood," as "[a]n omission cannot amount to a false statement, which is an essential element of a section 7206(1) violation, without the crucial background fact that gives rise to the duty to disclose the fact that was omitted." *Id.* at 93; *see also United States v. Pacione*, 738 F.2d 567, 568-73 (2d Cir. 1984) (affirming district court's dismissal of an indictment charging the defendant "with violations of the extortionate credit transactions statute" where "the totality of facts asserted by the government to be provable against [the defendant did] not establish a violation of the statute" as the defendant made no "threats of

any sort to anyone"); *Aleynikov*, 676 F.3d at 76-82 (dismissing indictment because transferring proprietary computer source code did not constitute an offense under the National Stolen Property Act or the Economic Espionage Act of 1996 based on the statutory language); *Heicklen*, 858 F. Supp. 2d at 275-76 (dismissing indictment that charged the defendant with attempting to influence the actions or decisions of a juror as legally insufficient, where it failed to allege an essential element of the offense, *i.e.*, that the defendant attempted to influence a juror in relation to a specific case or point in dispute); *United States v. Mennuti*, 639 F.2d 107, 113 (2d Cir. 1981) (upholding district court's pre-trial dismissal of an indictment on the ground that the government's proposed proof would not establish a crime within the terms of the statute).

### B. The RICO Count (Count One) Should Be Dismissed For Failure To Allege A Pattern Of Racketeering Activity Or Agreement.

The heart of the Government's attempt to tie its allegations regarding Mr. Hwang's investment decisions to Mr. Tomita's and Mr. Becker's misrepresentations to counterparties is its flawed RICO charge. In particular, Count One of the Indictment, ¶¶ 68-74, charges that Mr. Hwang, Mr. Halligan, and others participated in a racketeering conspiracy under 18 U.S.C. § 1962(d), by which they allegedly "amass[ed] . . . and deployed . . . market power using assorted trading techniques intended to increase the prevailing price of [certain publicly traded] securities" in Archegos's portfolio, ¶ 74(a). Further, Count One continues, "[t]he defendants obtained trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages." ¶ 74(b).

To engage in a RICO conspiracy, a defendant must "agree[] with others" to "further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense"— here, 18 U.S.C. § 1962(c), as charged in Count One. *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012) (cleaned up). Where allegations are insufficient to make out the elements of a

substantive RICO offense, a RICO conspiracy charge must necessarily fail as well. *See, e.g.*, *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 139 (E.D.N.Y. 2010) (citing cases). That is the case here, as the alleged racketeering activity essential to the substantive RICO provision, 18 U.S.C. § 1962(c), consists of purported acts of securities fraud and wire fraud, ¶¶ 68(a)-(c), none of which, as alleged, violate the statutes upon which the Government relies, for the reasons discussed below at Points C-E. For this threshold reason, the "RICO conspiracy claim must fail . . . [because] the substantive claims themselves are deficient." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 406 (S.D.N.Y. 2000) (quoting *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999)).

Moreover, to sustain a charge under section 1962(d), an indictment must allege that the defendants "reached a meeting of the minds as to the operation of the affairs of the enterprise *through a pattern of racketeering conduct*." *Cain*, 671 F.3d at 285 (quoting *United States v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010)) (emphasis in original). The Indictment fundamentally fails to do this. Specifically, Count One does not, as a matter of law, allege the "pattern of racketeering activity" essential to a RICO charge for two separate reasons. *First*, the Government has failed to plead the occurrence of at least two predicate acts, as the statute requires. *See Watral v. Silvernails Farm LLC*, 51 F. App'x 62, 64 (2d Cir. 2002) ("A 'pattern of racketeering activity' must involve at least two predicate acts of racketeering activity committed in a ten-year period.") The Indictment centers on an alleged scheme that supposedly allowed Archegos to *purchase* increasing amounts of stock and security-based swaps, but as discussed below, fraud in connection with the *purchase* of securities is not a cognizable predicate act under the RICO statute's explicit and exhaustive definitions. *Second*, because the racketeering statute targets only conduct that "amount[s] to or pose[s] a threat of continued criminal activity," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492

U.S. 229, 239 (1989), the predicate acts alleged must present a pattern of racketeering characterized by *continuity* or a *threat of continuity*. *Cain*, 671 F.3d at 284; *see also United States v. Vernace,* 811 F.3d 609, 615 (2d Cir. 2016) ("RICO does not apply to the perpetrators of isolated or sporadic criminal acts") (cleaned up).[21]   By its own terms, Count One fails to allege the continuity required to constitute a "pattern of racketeering activity" as would be necessary to support a prosecution under 18 U.S.C. § 1962(d).   Either defect mandates dismissal of Count One. In addition, the Indictment fails to sufficiently allege the essential element that Mr. Halligan agreed to participate in the alleged conspiracy, and should be dismissed for this separate reason as well.

### 1.        The Indictment Does Not Allege At Least Two Predicate Acts.

Count One fails to allege "'at least two [predicate] acts of racketeering activity,'" as the RICO statute requires. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (quoting 18 U.S.C. § 1961(5)).   "Section 1961(1) [of that same statute] contains an exhaustive list of acts of 'racketeering,' commonly referred to as 'predicate acts.'"   *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000).   Conduct not enumerated therein thus does not constitute a predicate act.   *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1129 (E.D.N.Y. 1992) ("Any act that does not fall within the purview of Section 1961(1) is not an act of racketeering activity.").

Here, the Indictment alleges three categories of purported racketeering activity: (1) fraud *in the sale of securities* pursuant to Section 10(b) of the Exchange Act and Rule 10b-5; (2) fraud

---

[21] Because the elements of a RICO violation are the same in civil and criminal cases, courts routinely rely on civil RICO decisions in criminal cases. *United States v. Standard Drywall Corp.*, 617 F. Supp. 1283, 1294 n.9 (E.D.N.Y. 1985) ("Interpretation of section 1962(c) is assisted by reference to both civil and criminal RICO cases, since the elements of the claim are identical."); *see also Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*, 587 F. Supp. 875, 878 (S.D.N.Y. 1984) ("The elements of this RICO claim are the same whether the case is civil or criminal.").

*in the sale of securities* pursuant to 18 U.S.C. § 1348 (Securities and Commodities Fraud); and (3) wire fraud under 18 U.S.C. § 1343 (¶ 68(a)-(c)).  As reflected by the first two offenses identified in the three-part list directly above, the only mention in section 1961(1) of securities fraud is "fraud in the sale of securities."  18 U.S.C. § 1961(1)(D).  The phrase in the Indictment "fraud in the sale of securities" tracks that statutory language, but the facts actually alleged are not about sales but purchases.

To be clear, "fraud in the sale of securities," for RICO purposes, is limited in scope, and extends only to *sales* of securities induced by fraud—not all securities-related conduct.  As a Court in this District has explicitly held:  "By the plain language of § 1961(1)(D), securities fraud is only a predicate offense if the fraud occurs in the actual *sale* of a security."  *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 683 (S.D.N.Y. 1990) (emphasis in original); *see also United States v. Deeb*, 175 F.3d 1163, 1167 & n.6 (9th Cir. 1999) ("If Congress had intended to include fraud in the *purchase* of securities in RICO's definition of 'racketeering activity,' it would only have needed to insert the words 'or purchase' after 'sale' as it did in 15 U.S.C. § 78j.") (emphasis in original); *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 152 (4th Cir. 1987) ("The statutory language describing the predicate offense—'fraud in the sale of securities'—is . . . narrow and suggests the pivotal role of the actual sales transaction."); *First Pac. Bancorp, Inc. v. Bro*, 847 F.2d 542, 546 (9th Cir. 1988) (no RICO predicate act where alleged violation of the Exchange Act did not involve sale of securities).  As Judge Patterson explained,

> RICO does not incorporate all violations of § 10(b) and Rule 10b-5, but rather is limited to those fraudulent acts that occur in an actual sale transaction. . . .  Had Congress intended RICO to be coextensive with §10(b), it certainly knew how to do so.  However, "fraud in the sale of securities" is quite limited in comparison to the broader language Congress used in §10(b), which prohibits fraud "in connection with the purchase or sale of any security."

*In re Par Pharm.*, 733 F. Supp. at 683.[22]

Here, the focus of the Indictment is the *purchase*—not the sale—of stocks, and predominantly security-based swaps, by the putative enterprise. *E.g.*, ¶ 21(a) ("The majority of Archegos's positions were 'long' . . . .); ¶ 24 (alleging that Mr. Hwang "buil[t] extraordinarily large positions in a handful of securities"); ¶ 74(a) ("The defendants caused the Archegos Enterprise to amass significant market power in certain publicly traded securities . . ."). Reinforcing the fact that this case is not about the sale of securities but rather their purchase, the Indictment goes so far as to allege that Archegos *could not have sold* its positions without "leading to a downward spiral" in the prices of those stocks to its own detriment. ¶ 5.[23] But under the plain language of the statute and the case law interpreting it, discussed above, neither Archegos's

---

[22] Further supporting the conclusion that the securities fraud alleged in the Indictment does not constitute a RICP predicate act, there is no indication that "fraud in the sale of securities" extends to security-based swaps, like those which, as the Indictment alleges, Archegos predominantly traded. ¶ 4 (Mr. Hwang "conducted most of his trading through derivative securities," to wit, total return swaps); ¶¶ 14-15; ¶ 27 ("Archegos established and maintained most of its positions on swap."). Unlike other sections of the U.S. Code that define "security" to include "any . . . security-based swap," *e.g.*, 15 U.S.C. § 77b(a)(1), the RICO statute does not. *See Southwest Airlines Co. v. Saxon*, __ U.S. __, 142 S. Ct. 1783, 1789 (2022) (applying the "well-settled" canon that "[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea") (citations omitted); *United States v. Pristell*, 941 F.3d 44, 52 (2d Cir. 2019) (noting that "the presence of a phrase applicable to one factor makes clear that the phrase's omission elsewhere was deliberate") (quoting *United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018)). Importantly, too, because they were derivative contracts, those swaps did not inherently entail any transaction at all—sale or purchase—of underlying stock.

[23] Paragraph 36(a) in the Indictment alleges that Mr. Hwang "sometimes would direct the execution of trades that would generate capacity at a broker – including through the sale or short sale of a stock – in order to enable later trading in the same name in the opposite direction." It is not alleged, however, that such sales were themselves manipulative. Rather, the allegation is that the purchases at issue, which were allegedly meant to increase prices, or to prevent prices from falling, were manipulative. ¶ 39 ("[A]t times, Archegos's substantial and well-timed purchases caused daily price inflation for its long positions. At other times, Archegos's purchasing counteracted negative market events that would have otherwise decreased the stock prices.") Those purchases, as set forth above, are not addressed by the RICO statute.

purchases of securities, nor the allegedly "false and misleading statements to banks and brokerages" related to them, ¶ 74(b), constitute RICO predicate acts. Accordingly, neither of the purported securities fraud offenses relied upon in the Indictment—under Section 10(b) and Rule 10b-5 or under 18 U.S.C. § 1348—can amount to racketeering activity under Section 1961(1).

In sum, the only offense alleged in the Indictment that could definitionally constitute a predicate act is wire fraud. But as discussed in Point E below, the right-to-control theory of wire fraud advanced by the Government runs afoul of the Supreme Court's recent efforts to constrain prosecutors' overreaching expansion of the mail and wire fraud statutes, and may well fail to survive Supreme Court review. Accordingly, no substantive RICO charge can be made out and, as a result, the RICO conspiracy charge cannot survive. *See Satinwood*, 385 F.3d at 182 (holding that "because Plaintiffs did not adequately allege a substantive violation of RICO . . . the District Court properly dismissed Count Six, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d)").

### 2.    The Indictment Fails to Sufficiently Allege Continuity.

Even if Count One alleged the required RICO predicate acts, it would still fail because it does not adequately allege the essential pattern element of "continuity." That continuity requirement, which can be satisfied by either "open-ended" or "closed-ended" continuity, ensures that the RICO statute is not used to prosecute conduct that is "isolated [ ]or sporadic." *GICC Cap. Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 466-67 (2d Cir. 1995). A closed-ended pattern is "a series of related predicate acts extending over a substantial period of time," while an open-ended pattern "poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). The Indictment fails to allege either type of continuity.

28

### a.      The Indictment Fails to Allege Closed-Ended Continuity.

"[C]losed-ended continuity is primarily a temporal concept." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).  That is, "[t]o satisfy closed-ended continuity, the [Government] must prove a series of related predicates extending over a substantial period of time." *Id.* (internal quotation marks and citation omitted).  The Second Circuit, significantly, has "never found predicate acts spanning less than two years to be sufficient to constitute closed-ended continuity." *Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 605 (2d Cir. 2019); *see also DeFalco v. Bernas*, 244 F.3d 286, 322 (2d Cir. 2001) (predicate acts over a period of a year and a half insufficient to establish closed-ended continuity); *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 615 (S.D.N.Y. 2004) (Hellerstein, J.) (noting Second Circuit's application of "two-year minimum . . . to find closed-ended continuity").  And yet here the racketeering conspiracy is alleged to have lasted at most 15 months—"[f]rom at least in or about 2020, up to and including in or about March 2021," ¶ 68.  But even that 15-month period (itself deficient) is overstated by some five months, given the allegations in the Indictment that the supposed open-market manipulation began no sooner than "spring 2020," ¶ 24, or June 2020, ¶ 39, and the supposed misrepresentations to counterparties began no sooner than "spring and summer 2020" and occurred in primarily "late 2020," ¶¶ 46, 52, 54, 57-59.[24]  Count One thus falls decidedly short of alleging the necessary 24-month "*minimum* duration necessary to find closed-ended continuity." *Festa*, 797 F. App'x at 605 (quoting *First Capital*, 385 F.3d at 181) (emphasis in original).

---

[24] Notwithstanding that generally alleged timeframe, the earliest specific month in which the Indictment alleges a misrepresentation is October 2020, ¶ 52(d), and of course no misconduct at all is alleged to have taken place after "[t]he [s]chemes [c]ollapsed" in March 2021, ¶¶ 60-67.  The alleged conduct at issue thus occurred over approximately a five-month period.

###### b.       The Indictment Fails to Allege Open-Ended Continuity.

Nor does the Indictment allege open-ended continuity, which requires "'a threat of continuing criminal activity beyond the period during which the predicate acts were performed.'" *Spool*, 520 F.3d at 185 (quoting *Cofacredit*, 187 F.3d at 243).  On the contrary, as the Indictment plainly alleges, "Archegos collapsed" on March 26, 2021, ¶ 67, and ceased trading thereafter, ¶ 48. Similarly, in its motions to intervene and stay discovery in the related SEC and CFTC actions, the Government acknowledged that "Archegos has no ongoing business operations" and that it is "winding down its affairs."  ECF 68 at 12 of 17 in *SEC v. Hwang, et al.*, No. 22-cv-3402-JPO (S.D.N.Y.); ECF 52 at 13 of 17 in *CFTC v. Archegos Cap. Mgmt. LP, et al.*, No. 22-cv-3401-JPO (S.D.N.Y.).   In no way, then, could the purported enterprise pose a threat of continuing racketeering activity, as is required for open-ended continuity; rather, the market manipulation scheme, as alleged in the Indictment, has terminated, *cf. Festa*, 797 F. App'x at 606 ("scheme that was inherently terminable does not plausibly imply a threat of continued racketeering activity"), and there is no risk of repetition, *see Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 419 (E.D.N.Y. 2017) (no open-ended continuity where "business is apparently defunct").  And, obviously, the Indictment does not allege a single act of racketeering activity after March 2021. Because Count One fails to charge a continuous pattern of racketeering activity, it lacks an essential element of a viable RICO charge and must be dismissed.  *See Worldwide Directories, S.A. de C.V. v. Yahoo! Inc.*, No. 14-cv-7349 (AJN), 2016 WL 1298987, at *12 (S.D.N.Y. Mar. 31, 2016) ("Because the complaint fails to plausibly allege either form of continuity, it fails to adequately plead a pattern of racketeering activity, and the RICO claim therefore fails against all Defendants.").

###### 3.    The Indictment Fails to Sufficiently Allege Mr. Halligan's Agreement.

Count One also fails as against Mr. Halligan for the additional reason that it fails to allege facts sufficient to support an inference that Mr. Halligan agreed to participate in the alleged conspiracy.  A RICO conspiracy "centers on the act of *agreement*."  *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (citation omitted) (emphasis in original).  Such an agreement cannot be inferred from conclusory allegations of a defendant's agreement, or parallel conduct by a co-defendant.  *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010).

To sufficiently allege a defendant's agreement to participate in a RICO conspiracy, an alleged conspirator must know "what the other conspirators 'were up to'" and "embrace[] the objective of the alleged conspiracy[.]"  *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000); *Salinas v. United States*, 522 U.S. 52, 63 (1997) ("partners in the criminal plan must agree to pursue the same criminal objective").  An indictment must thus be clear about what each defendant allegedly agreed to.  *See United States v. Rosenblatt*, 554 F.2d 36, 42 (2d Cir. 1977) (holding that when proceeding under the conspiracy-to-defraud clause of 18 U.S.C. § 371, the government "must plead . . . an *agreement with respect to the essential nature* of the alleged fraud.") (emphasis added).

Here, the Indictment alleges no facts from which the Court could infer that Mr. Halligan agreed with Mr. Hwang, or anyone else, to violate RICO's substantive provisions.  In fact, the alleged pattern of racketeering conduct described in the Indictment hinges on supposed market manipulation that Archegos effected through its trading with the counterparties.  *See, e.g.,* ¶¶ 1, 74(a).  But there is no allegation that Mr. Halligan was aware of—much less participated in— illegal, manipulative trading activity.  Indeed, there is not a single allegation that Mr. Halligan had a knowing role in the alleged strategy associated with the supposedly manipulative trading, the

execution of that trading, or anything else about it.  Significantly, the Government has charged eight substantive securities fraud counts (Counts Two through Nine) related to this trading conduct, but Mr. Halligan is not named in any of them.  ¶¶ 75-78.[25]

The Indictment seeks to connect Mr. Halligan to the trading conduct only indirectly, and without any contention that he knew about or agreed to facilitate any wrongful trading conduct. This is not sufficient to allege a wrongful agreement for the purposes of a RICO conspiracy charge. *See Nasik Breeding & Research Farm Ltd. v. Merck & Co.,* 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001) (a "plaintiff must plead facts sufficient to show that each defendant knowingly agreed to participate in the conspiracy.") (citation omitted).  Specifically, the Indictment alleges that Mr. Halligan made or participated in the making of alleged misstatements to counterparties, that those alleged misstatements induced the counterparties to do business with ACM, and that this in turn "enabl[ed] and facilitate[d] the market manipulation scheme."  ¶ 2.  But the Indictment is devoid of factual allegations that Mr. Halligan was ever *aware* of the alleged market manipulation in which others are alleged to have engaged, much less that Mr. Halligan agreed to act in furtherance of that market manipulation scheme.  Without any facts connecting Mr. Halligan to the alleged market manipulation scheme, the Indictment fails sufficiently to allege that he "understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses."  *Connolly v. Havens*, 763 F. Supp. 6, 14 (S.D.N.Y. 1991) (internal quotation marks and citation omitted).

---

[25] *See also* ¶ 12(b) (in the role of CFO, Mr. Halligan "oversaw the accounting, cash management, and operations functions" of Archegos).  Even with respect to the alleged misrepresentation scheme, which the Government asserts was designed to enable the "interrelated" market manipulation scheme, ¶ 2, the Indictment acknowledges that Mr. Halligan ceased being ACM's primary point of contact with the counterparties years before either alleged scheme began, ¶ 52.

On the contrary, instead of facts, the Indictment recites boilerplate and conclusory allegations that are insufficient as a matter of law. *See Nasik*, 165 F. Supp. 2d at 541 (conclusory allegations are insufficient to withstand a motion to dismiss); *cf. Elsevier,* 692 F. Supp. 2d at 313 (dismissing § 1962 (d) claim where complaint "contains nothing more than a conclusory allegation of an agreement among defendants and a further allegation that each of the individual defendants committed certain discrete acts of fraud").  The bald allegations that Mr. Halligan, Mr. Hwang, and unnamed others "agreed together and with each other to violate . . . Section 1962(c)," and that "each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise," ¶¶ 68, 69, are therefore legally insufficient.  Thus, in addition to the reasons set forth above, the absence of sufficient allegations as to the essential element of agreement requires that Count One be dismissed as against Mr. Halligan.  *Allen v. New World Coffee, Inc.*, No. 00 CIV 2610 AGS, 2001 WL 293683, at *9 (S.D.N.Y. Mar. 27, 2001) (dismissing Section 1962(d) claim where "pleadings fail to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy.").

### C.   The Manipulation Counts (Counts Two Through Nine) Should Be Dismissed For Failure to Charge a Market Manipulation Offense Under Either Section 10(b) or Section 9(a)(2).

In Counts Two through Nine the Government alleges market manipulation claims against Mr. Hwang in purported violation of Section 10(b) and Rule 10b-5 (Count Two) and Section 9(a)(2) (Counts Three through Nine) of the Securities Exchange Act of 1934.[26]   Market manipulation charges brought under these provisions have always required, and still require, allegations of deceptive conduct that artificially affected a stock's price—actions such as

---

[26] Mr. Halligan is not charged in Counts Two through Nine.

"spoofing"[27] or publishing false information about the value of a security.  The Indictment alleges no such conduct.  Instead, the Government alleges a novel theory of "open-market manipulation," that is, an alleged scheme to manipulate the market based solely upon real transactions conducted through lawfully executed transactions.[28]  The Government's theory, predicated as it is entirely on the volume and timing of legitimate trades, turns on Mr. Hwang's alleged sole intent to affect the prices of the stocks that were referenced in the swap trades.  That theory, however, has never been the basis for a criminal conviction; on the contrary, the Second Circuit expressed serious doubt about its viability in *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).  And this Court should, strictly as a matter of law, reject its application here.

The manipulation charges must be dismissed on several grounds.  *First*, in the Second Circuit, deception is required to establish manipulation under Sections 10(b) and 9(a)(2); because the unprecedented Indictment in this case fails to allege deceptive conduct by Mr. Hwang, those charges must be dismissed.  *Second*, the manipulation charges under Section 9(a) fail for an independent reason based upon the elements of that statute:  the Indictment fails to allege facts demonstrating that Mr. Hwang traded for the purpose of *inducing others* to buy or sell an underlying security.   And *third*, in the alternative, the market manipulation claims are unconstitutionally vague as applied to the allegations in the Indictment.

---

[27] "Spoofing" generally refers to the manipulative practice of entering orders with the intent to quickly cancel them.  *See*, *e.g.*, *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-CV-6002 (LJL), 2021 WL 827190, at *2 (S.D.N.Y. Mar. 4, 2021).

[28] As noted above, Archegos established equity positions in its investments until it approached 5% ownership of outstanding shares.  ¶ 14.  The Indictment, however, focuses on Archegos's swap positions and alleges that Mr. Hwang "conducted most of his trading through derivative securities that had no public disclosure requirement."  ¶ 4.  As discussed earlier, Archegos's swap trades were purely synthetic—they did not require any purchase of stock in the market.

### 1. Deceptive Conduct is Required to Sustain a Manipulation Charge under Sections 10(b) and 9(a)(2).

The Supreme Court has instructed that, when "used in connection with securities markets," manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). The Court has further explained that manipulation refers generally to practices "such as wash sales,[29] matched orders,[30] or rigged prices.[31]" *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977). Thus, manipulation involves "a range of misleading practices," *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 6 (1985), designed to simulate forces of supply and demand, *see Santa Fe Indus.*, 430 U.S. at 476; *see also Mulheren*, 938 F. 2d at 371 n.5 (noting that wash sales and matched orders create only "the appearance of legitimate market activity").

Because the critical inquiry in manipulation cases is "what activity 'artificially' affects a security's price in a deceptive manner," the Second Circuit "has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007). A transaction distorts that "natural interplay" when it "sends a false pricing signal to the market."[32] *Id.* That is, some deceptive conduct or false market information is required to

---

[29] "A wash sale is a 'sale of securities made at about the same time as a purchase of the same securities . . . resulting in no change of beneficial ownership.'" *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 426 (S.D.N.Y. 2010) (quoting BLACK'S LAW DICTIONARY 1456 (9th ed. 2009)).

[30] "A matched order is an 'order to buy and sell at the best price immediately available on the market.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1208 (9th ed. 2009)).

[31] Price rigging, or fixing, occurs when parties collude to buy or sell securities only at a fixed price, or to control supply and demand to maintain the market conditions that result in a fixed price. *See*, *e.g.*, *Speakes v. Taro Pharm. Indus., Ltd.*, 16-cv-08318 (ALC), 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018).

[32] The inquiry, therefore, "focus[es] on disruptions to the efficient pricing of a security." *ATSI*, 493 F.3d at 100 (citing *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)

prove market manipulation.  *See id.*  Real transactions in the open market, such as those in which

Mr. Hwang engaged here, are accordingly not—as set forth in detail below—manipulative.

This is true for manipulation claims under both Sections 10(b) and 9(a)(2).  In relevant

part, Section 10(b) prohibits the use of "any manipulative or deceptive device" "in connection with

the purchase or sale of any security registered on a national securities exchange or any security not

so registered, or any securities-based swap agreement."  15 U.S.C. § 78j(b).  Similarly, Rule 10b-

5 makes it unlawful to, "in connection with the purchase or sale of any security," "employ any

device, scheme, or artifice to defraud," make any false or misleading statements, or engage in any

practice that "would operate as a fraud or deceit."  17 C.F.R. § 240.10b-5.  Likewise, Section 9(a)

prohibits "Manipulation of Security Prices," and Section 9(a)(2) makes it unlawful to engage in "a

series of transactions" "creating actual or apparent active trading in such security, or raising or

depressing the price of such security, for the purpose of inducing the purchase or sale of such

security by others."  15 U.S.C. § 78i(a)(2).

Section 10(b) and Rule 10b-5 expressly require deceptive conduct.  *Schreiber*, 472 U.S. at

7-8 (observing that "manipulative" in the phrase "'manipulative or deceptive' in § 10(b)" is

interpreted "to require misrepresentation" because "words grouped in a list should be given related

meaning") (quoting *Sec. Indus. Ass'n v. Bd. of Governors, FRS*, 468 U.S. 207, 218 (1984)).  As

the Second Circuit has recently reiterated, for market manipulation claims under Section 10(b) and

---

(the "central objective" of securities laws "is to prevent practices that impair the function of stock
markets in enabling people to buy and sell securities at prices that reflect undistorted (though not
necessarily accurate) estimates of the underlying economic value of the securities traded.")); *see
also S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) ("The theory of a natural,
unrigged market is that the 'competing judgments of buyers and sellers as to the fair price of the
security brings about a situation where the market price reflects as nearly as possible a just price.'")
(quoting H. R. Rep. No. 1383, 73rd Cong., 2d Sess., at 11 (1934)); *United States v. Stein*, 456 F.2d
844, 850 (2d Cir. 1972) ("The purpose of [Section 9(a)(2)] is to prevent rigging of the market and
to permit operation of the natural law of supply and demand.").

Rule 10b-5, "the critical question is what activity 'artificially' affects a security's price *in a deceptive manner*." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (cleaned up and emphasis added); *see also United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) (explaining that deception "irreducibly entails some act that gives the victim a false impression").

Courts construe manipulation claims under Sections 10(b) and 9(a) similarly, and, while the text of Section 9(a)(2) does not use the word "deception," courts have held that like Section 10(b), Section 9(a)(2) requires proof of deceptive conduct. As Judge Sweet explained:

> To state a claim for manipulation under Section 9(a)(1), plaintiffs must specifically identify particular wash sales or matched orders. *Similarly*, Section 9(a)(2) requires plaintiffs to identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors. *Likewise*, to state a manipulation claim under Section 10(b) and Rule 10b–5, plaintiffs must identify wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) (emphases added and citations omitted). Indeed, the Second Circuit has explicitly held that a manipulation claim under Section 9 "involves a claim of fraud, deceit, manipulation or contrivance." *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 403 (2d Cir. 2016) (applying the statute of repose under 28 U.S.C. § 1658(b), which only applies to private rights of action that involve "fraud, deceit, manipulation, or contrivance," to Section 9(f), the provision granting a private right of action to enforce Sections 9(a), (b), and (c)); *see also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "fraud" as "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment"). In sum, illegal market manipulation under both Sections 10(b) and 9(a)(2) requires an act of deception.

37

In *Mulheren*, the Second Circuit criticized an open-market manipulation theory similar to the one alleged here and reversed a criminal conviction that was based entirely upon real, executed trades. 938 F.2d at 366. There, the government alleged that the defendant manipulated the price of Gulf & Western Industries, Inc.'s common stock by purchasing 75,000 shares for the purpose of raising the price to $45 per share. *Id.* at 365, 368. The government further alleged that the defendant purchased those shares as a favor to a friend who wanted to sell an "enormous block" of Gulf and Western's stock at that price. *Id.* at 365. The Second Circuit made a point of stating that it "harbor[ed] doubt about the government's theory of prosecution" and ultimately reversed the conviction because no rational trier of fact could have found beyond a reasonable doubt that defendant purchased the shares "for the sole purposes of raising the price at which it traded on the NYSE, rather than for his own investment purposes." *Id.* at 366.

The Court reasoned that "[n]one of the traditional badges of manipulation" were present where the defendant (1) lost over $64,000 as a result of his trades; (2) purchased "significantly more shares," and put his company "in a position of greater risk" than necessary to raise the stock price to $45 per share; and (3) "conspicuously purchased" the shares for his company's account "in the open market." *Id.* at 370-71. Critically, the Court rejected the government's argument that "deceptive intent" could be inferred from the facts that (1) the defendant allegedly concealed his trading activity by using a broker he did not normally use for the trades in issue; and (2) engaged in high volume trading, as his purchases comprised 70% of the trading volume between market open and 11:10 a.m., when the trades were completed. *Id.* at 371-72. Even taken together, those allegations were insufficient to sustain a conviction for market manipulation. *Id.* at 366, 372.

Neither before nor since *Mulheren* has there ever been a successful criminal market manipulation prosecution in this Circuit for transactions on the open market that did not involve

acts of deception or false information.  *See*, *e.g.*, *United States v. Goodrich*, 12 F.4th 219, 224 (2d Cir. 2021) (involving wash and matched trades); *United States v. Russo*, 74 F.3d 1383, 1387 (2d Cir. 1996) (involving "parking" and unauthorized placement of shares); *United States v. Regan*, 937 F.2d 823, 828 (2d Cir. 1991) (involving an underwriter who did not reveal that it was the moving party behind short sales of the security in issue); *United States v. Scop*, 846 F.2d 135, 137, *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988) (involving matched orders through fictitious nominees); *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981) (involving fictitious accounts, matched orders, wash sales, and dissemination of false literature); *United States v. Blitz*, 533 F.2d 1329, 1333 (2d Cir. 1976) (involving bribery); *United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972) (involving use of nominee accounts and bribery).

In *United States v. Hall*, then-District Judge Chin emphasized that some deception or false information is required to demonstrate that a defendant's "manipulation" created an "artificial" price.  48 F. Supp. 2d 386, 387 (S.D.N.Y. 1999).  The court contrasted two examples:

> A company may lawfully seek to "manipulate" the market by hiring legitimate stock promoters who disseminate information about the company to the public.  As a consequence, the price of the stock may be driven up, but the new level is not an artificial one because it is the result of a better educated public.  A company may not unlawfully seek to "manipulate" the market, however, by hiring illegitimate stock promoters who seek to drive the price up by generating trading by making undisclosed payments to brokers to push the stock with their customers.

*Id.*  Notably, in both examples, the market participant intends to increase the stock price.  But the conduct in the first example is lawful because the company transmitted legitimate information to the market.  In contrast, the second example constitutes unlawful manipulation because the company concealed the fact that it was making payments to brokers in exchange for their promotion of the stock.  *Id.*; *see also In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286,

1292 (N.D. Ill. 1985) ("[I]njection of accurate information into the market price, while perhaps unlawful under other securities laws such as those pertaining to insider trading, cannot state a claim for market manipulation.").

In a civil case outside the Second Circuit, Judge Posner explained in detail why legal trading activity, such as that alleged in the Indictment, cannot substitute for the required deceptive conduct. In *Sullivan & Long, Inc. v. Scattered Corp.*, the plaintiff based a market manipulation claim on a massive short selling scheme that "jeopardized the solvency of the Chicago (formerly Midwest) Stock Exchange." 47 F.3d 857, 859 (7th Cir. 1995). The Seventh Circuit affirmed dismissal of the action because there was no "false impression of supply or demand." *Id.* at 864. There, like here, all of the trades were real, with real market participants on the other side:

> [Plaintiffs] contend first and foremost that "by unprecedented massive short selling and by disguising the nature of their trades, the defendants controlled the price of LTV," in violation of section 9(a)(2) of the Securities Exchange Act of 1934. . . . As the plaintiffs themselves point out, the essence of the offense is creating "a false impression of supply or demand," for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock. . . . There was nothing like that here. On the other side of all of Scattered's transactions were real buyers, betting against Scattered, however foolishly, that the price of LTV stock would rise. And Scattered made no representations, true or false, actual or implicit, concerning the number of shares that it would sell short. Maybe the plaintiffs' theory is that every short seller implicitly warrants that it won't sell short in such quantity as to jeopardize its financial solvency. This is an argument against short selling, or perhaps against short selling without borrowing the shares to be sold short — or perhaps against arbitrage. But other than in tender-offer situations, where short selling is prohibited, there is as yet no rule barring persons with a pronounced taste for risk from trading on stock exchanges.

*Id.* (citations omitted). In sum, actual trades, even at great volume and high risk, are not illegal.

The Second Circuit has similarly made clear in civil cases that something more than open-market trading is required to sustain a manipulation claim.[33]  For example, in *ATSI*, the Second Circuit held that allegations of market manipulation were insufficient where they centered on "(1) high-volume selling of ATSI's stock with coinciding drops in the stock price, (2) trading patterns around conversion time, (3) the stock's negative reaction to positive news, and (4) the volume of trades in excess of settlement during a 10-day period."  493 F.3d at 100-03.  And, even in *Set Capital LLC v. Credit Suisse Group*, a case in which the court discussed what it called "open-market manipulation," the Second Circuit made clear that alleged deceptive acts connected to the defendant's trading were essential to sustaining the claim:  "[w]hile a defendant may manipulate the market through open-market transactions, *some misrepresentation or nondisclosure is required*."  996 F.3d 64, 77, (2d Cir. 2021) (emphasis added).[34]

---

[33] Other Courts of Appeals also have held that some deceptive conduct is required to sustain a market manipulation claim.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (holding that a manipulator must be shown to have "injected 'inaccurate information' into the market or created a false impression of market activity" so as to "distinguish between legitimate trading strategies"); *United States v. Gilbertson*, 970 F.3d 939, 949 (8th Cir. 2020) (adopting *GFL*'s standard when evaluating a manipulation claim); *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016) (holding that manipulation requires "engag[ing] in any kind of simulated market activity or transactions designed to create an unnatural and unwarranted appearance of market activity").  To date, there has been only one Court of Appeals decision purportedly allowing a purely open-market manipulation theory to proceed based on allegations of a trader's manipulative "intent" alone.  *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001).  But even there, the Court acknowledged that "[i]t may be hard to separate a 'manipulative' investor from one who is simply over-enthusiastic, a true believer in the object of investment."  *Id.* at 528.  And, in any event, *Markowski* is distinguishable because the trading in that matter involved deception, specifically an underwriter's alleged scheme to promote its brokerage business by making it appear that stocks underwritten by the firm were good investments.  *Id.* at 529 ("Global supported Mountaintop's price not to profit from later sales of Mountaintop, but to maintain customer interest in Global generally and to sustain confidence in its other securities.").  In contrast to that case, Archegos operated as a family office and, therefore, did not have customers and did not invest third parties' assets at all.  ¶¶ 9-10.

[34] The "open-market" manipulation theory has been extensively debated and criticized by legal scholars.  *See, e.g.*, Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 553 (1991) (finding "no compelling reason" to

In sum, to sustain a charge under either Sections 10(b) or 9(a)(2), the Government must allege that Mr. Hwang engaged in some deceptive conduct, and not simply that he executed real trades in swaps.  As demonstrated below, however, the Indictment fails to do so.

### 2.    The Indictment Alleges No Deception by Mr. Hwang.

The Government alleges that Mr. Hwang violated Section 10(b) and Rule 10b-5 by engaging in "a scheme to secretly amass market power . . . through manipulative and abusive trading techniques . . .." ¶ 76.  It also alleges that Mr. Hwang violated Section 9(a)(2) by engaging in a series of transactions in securities and securities-based swaps to raise or depress the price of certain securities to induce others to purchase those securities.[35]  ¶ 78.  However, the Indictment does not allege any deceptive acts that relayed "a false impression of how market participants value a security."  *ATSI*, 493 F.3d at 101.  Instead, the Government alleges that Mr. Hwang engaged in real trades with real counterparties that reflected how Mr. Hwang valued the securities in issue, and which exposed Archegos and Mr. Hwang to genuine economic risk.  Because the

---

prohibit open-market manipulation based on a trader's "bad intent"); Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation,* 68 Duke L.J. 479, 486, 501 (2018) (noting that regulators' recent "intent-centric approaches" to "open-market manipulation" are a "significant departure from the traditional conceptualization of market manipulation" and "lack[] a coherent basis for [imposing] liability," and arguing that the SEC's focus "exclusively on intent" has resulted in "significant confusion and discord in the markets, as participants try to determine what constitutes open-market manipulation"); Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought,* 39 No. 10 Futures & Derivatives. L. Rep. NL 2, n.10, Nov. 2019 (arguing that even if courts allow claims for open-market manipulation to proceed they should require proof of "manipulative or deceptive conduct" and not just "intent alone").

[35] Those securities are: ViacomCBS (now Paramount) (Count III); Discovery Communications, Inc. Class A (Count IV); Discovery Communications, Inc. Class C (Count V); GSX Techedu Inc. (now Gaotu Techedu Inc.) (Count VI); iQIYI, Inc. (Count VII); Tencent Music Entertainment Group (Count VIII); and Vipshop Holdings Ltd (Count IX).  ¶ 78.

Indictment fails to allege deceptive conduct, the Sections 10(b) and 9(a)(2) claims in Counts Two through Nine must be dismissed.

Indeed, the Indictment is replete with allegations of genuine and lawful trading activity that the Government nevertheless contends, when aggregated, turn into a manipulative scheme to artificially affect the market prices of certain securities. Thus, the Government submits that Mr. Hwang transacted with multiple swap counterparties to make it appear as though "different parties were buying the companies' stock when, in fact, that buying was all dictated by Archegos," ¶ 27, traded in high volumes, ¶ 28, and engaged in "deceptive" trading strategies such as trading in the pre-market hours; trading at or near the market close; raising the limit prices of orders when the security prices ultimately increased due to market activity; and generating capacity by selling or short selling shares or moving positions between counterparties, ¶¶ 34-38. No such allegations, either alone or in combination, can amount to deceptive conduct that sends false signals to the market. Indeed, the Government does not and cannot dispute that every trade alleged had a willing buyer, a willing seller, and exposed Mr. Hwang to a genuine risk of economic loss. Such trading has never supported a criminal market manipulation charge. *See, e.g., Mulheren*, 938 F.2d at 366, 368; *see also Cohen*, 722 F. Supp. 2d at 424 (dismissing claims under Sections 9(a)(1), 9(a)(2), and 10(b) where the complaint "contain[ed] no allegations of wash transactions, matched orders or other similar activity, and [did] not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transactions"). Thus, each of the prosecution theories, discussed in turn below, is wrong.

### a.    Large Volume Trading

The Government alleges that Mr. Hwang traded in the same stocks in large quantities and large volumes, and submits that Mr. Hwang "defended" the prices of certain securities by buying

heavily to avoid margin calls.  ¶ 28.  In particular, the Indictment alleges that Archegos "routinely"

accounted for more than 20% of volume in DISCA between November 2020 and March 2021;

more than 10% of the volume in VIAC between October 2020 and March 2021; more than 15%

of volume in GSX between December 2020 and March 2021; and more than 10% of the volume

in TME between November 2020 and March 2021.  ¶ 28(c)(i)-(iv).  And, the Indictment arbitrarily

selects certain days between October 2020 and March 2021 where Archegos's trading reached up

to 35% of the volume in certain securities.[36]  ¶ 28(c)(i)-(iv).  According to the Government, those

trading "techniques" created artificial securities prices.  ¶¶ 28-33.  That theory fails for two

reasons.

     First, while the Second Circuit has accepted that market dominance can be relevant to

establishing manipulation, "the extent to which an investor controls or dominates the market at

any given period of time cannot be viewed in a vacuum. . . .  The percent of domination must be

viewed in light of the time period involved and other indicia of manipulation."  *Mulheren*, 938

F.2d at 371.  Ignoring this direction, the Indictment cherry picks certain days (*e.g.*, four days

---

[36] The Indictment alleges the following:

- In DISCA, Archegos "exceeded 30% of daily volume on approximately nine days, and exceeded 35% on approximately four days" between early November 2020 and early January 2021;

- In VIAC, Archegos "exceeded 15% of daily volume on approximately 10 of 40 trading days, and exceeded 25% on approximately four days" between February and March 2021;

- In GSX, Archegos "exceeded 30% of daily volume on approximately 11 days, and exceeded 35% on approximately five days" between December 2020 and March 2021; and

- In TME, Archegos "exceeded 15% of daily trading volume on approximately 19 of 25 trading days" and "exceeded 20% on approximately 14 days" between February 22 and March 26, 2021, and "exceeded 35% of trading volume on approximately eight days" between October 2020 and March 2021.

¶ 28(c)(i-iv).

between November 2020 and January 2021) on which Archegos's trading in certain securities reached 35% of daily volume. ¶ 28(c). Isolating those dates ignores the many days in which Archegos's trading volume was much lower. Indeed, the Indictment describes the alleged conspiracy period as approximately fifteen months, "from in or about 2020, up to and including in or about March 2021," ¶ 1, but confines *all* of the high-volume trading allegations to at most six months: November 2020 through March 2021 for DISCA, October 2020 through March 2021 for VIAC, December 2020 and March 2021 for GSX, and November 2020 and March 2021 for TME, ¶ 28. Selectively and myopically viewing Archegos's trading activity in such manner is precisely what *Mulheren* prohibits. *See* 938 F.2d at 371.

Second, and regardless of the fallacies in the Indictment's factual presentation, high volume trading, especially for only a handful of months, does not suggest manipulation. *See Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 3-CV-3120, 2009 WL 1492196, at *7 (S.D.N.Y May 27, 2009) (concluding that while defendant's trades "accounted for about 30% of all the volume" over the course of three months, without any false information, such trading was "not indicative of anything manipulative"); *In re College Bound Consol. Litig.*, 93-CV-2348, 1995 WL 450486, at *6 (S.D.N.Y. Jul. 31, 1995) (Mukasey, J.) ("[F]or market domination to be an indicium of manipulation, the domination must be alleged either over a long period, such as a year, or over a short period in tandem with other fraudulent actions."). Thus, and most to the point, without some deceptive conduct, courts have rejected manipulation claims predicated on high-volume trading. *See Mulheren*, 938 F.2d at 371 (vacating conviction for market manipulation where defendant's purchasing comprised 70% of the volume in the security in issue over the span of two hours); *ATSI*, 493 F.3d at 100-03 (rejecting market manipulation claim based on allegations

of "high-volume selling" with coinciding drops in the stock price and excess "volume" trades during a 10-day period).

Absent deceptive conduct, Mr. Hwang's alleged market dominance and "heavy buying" cannot support a manipulation charge. *Compare Gilbert*, 668 F.2d at 95 (affirming judgment of conviction for market manipulation where defendant's trading "often account[ed] for more than 50% of the trading" and where defendant and his co-conspirators engaged in an elaborate series of wash sales and matched orders) *and Stein*, 456 F.2d at 846-47, 850-51 (affirming judgment of conviction for manipulation where defendant's trading accounted for 28.8% of the daily exchange volume and where defendant utilized nominee accounts and secretly bribed brokers to purchase the security), *with Mulheren*, 938 F.2d at 371 (declining to infer manipulative intent from mere fact that defendant's trading constituted 70% of the volume on one trading day). Thus, because the Government does not allege that Mr. Hwang's high-volume buying sent any false signal to the market, it is simply not indicative of any deception or manipulation.

### b.    Timing of Trades

The Government alleges that on "numerous occasions," Archegos traded in the pre-market, "when liquidity was low and, at times, when prices were comparatively poor." ¶ 35(b). Additionally, the Government alleges that Archegos engaged in "high-volume trading at the end of market hours." ¶ 35(c). And, the Government submits that Mr. Hwang raised limit orders, at times, "in the final minutes of the trading day." ¶ 35(d). This trading allegedly "was intended to create positive momentum" for the stock price. ¶ 35(d).

First, far from being deceptive or indicative of manipulation, each of the trading practices alleged in the Indictment is perfectly lawful, and indeed routine. *See Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 881 n.5 (2d Cir. 2011) ("Securities may be traded off the

exchange before the exchange or exchanges on which the securities are traded open.").  And, as a matter of common sense, if purchases in the pre-market drive up a stock's price to a level that other investors think is too high, then market participants will sell when the market opens.  In any event, if, as the Indictment alleges, Archegos's trading at the start of the day, during the course of the day, and at the end of the day are all indicative of manipulation, it is unclear when trading may take place without giving rise to manipulation claims.  In this regard, the allegations regarding the timing of trading reflect the deep flaws of the Indictment as a whole:  that which is legal is alleged to be criminal, and trading, at any time, in the open market is deemed manipulation just because—purely as a matter of economics—it obviously can have an effect on price.  But that, of course, is not the law.  *See, e.g.*, Fischel & Ross, 105 Harv. L. Rev. at 509 ("If prices move in response to trades, the price cannot be said to be 'artificial' unless the trades are defined as illegitimate in some way."); *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (the "central purpose" of Section 9(a)(2) "is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price").

Second, the Government attempts to characterize Archegos's use of limit orders, "which permit traders to buy or sell a stock below or above a particular price," as nefarious, but such trading activity, too, is routine.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 352 (S.D.N.Y. 2015) (describing limit orders as "traditional" and "generally used by ordinary investors").  Indeed, there is absolutely nothing unlawful or deceptive about increasing a limit order as the price of a stock increases during the trading day; such conduct only indicates Mr. Hwang's desire to buy the stock.  More fundamentally, however, placing a limit order is meant to do precisely what the name suggests:  *limit*, not increase, the price at which a

trader purchases shares.  Thus, placing a limit order—and raising that limit when a price increases but the investor still wants to buy the stock—is a routine practice that does not send any false signal to the market and is not manipulative.

Third, the end-of-day trading alleged is not unlawful.  *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 370 (S.D.N.Y. 2007) ("It should be stated clearly that stock transactions made at the close of the day are not prohibited.").  Indeed, trading at the end of the day is common because of the increased liquidity in the market at that time.  *See id.* ("[S]tudies have shown that trading in organized securities is heaviest just before the market closes, as traders monitor activity and their positions throughout the day before conducting their trades.").  Accordingly, the theory that "marking the close" over the stretch of consecutive days by itself constitutes market manipulation "has not been endorsed by any Article III court."  *Id.* at 371.  In contrast to what is alleged here, the type of "marking the close" allegations that may, under some circumstances, be actionable involve more than simply trading at or near the close on the open market; rather they involve some element of deception.  For example, a hedge fund marking the close at the end of the month to temporarily make its investments appear more profitable just before a reporting event is the type of "marking the close" allegation that some courts have found can give rise to an inference of manipulation.  *See*, *e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 591 F. Supp. 2d 586, 587 (S.D.N.Y.  2008) (marking the close to make fund appear more valuable and increase client fees); *Koch v. S.E.C.*, 793 F.3d 147, 152-54 (D.C. Cir. 2015) (marking the close to ensure that defendant's client accounts "appeared to retain their value"); *S.E.C. v. Markusen*, 143 F. Supp. 3d 877, 885-86 (D. Minn. 2015) (engaging in end-of-day trading only on the last trading day of the month "to inflate the Funds' monthly returns and extract additional management fees").  There is no allegation that Archegos only traded near the close right before

any such external event.  And, because Archegos was a family office that did not invest outside money, there could be no allegation that Archegos was marking the close to falsely represent its performance in order to increase client fees or raise investor funds.[37]

In sum, none of the alleged trading suggests anything other than Mr. Hwang's desire to buy stock.  There is simply nothing inherently deceptive about trading at various times of day as alleged here, and such trading cannot support the manipulation charges against Mr. Hwang.

### c.    Generating Capacity

The Government also alleges that Mr. Hwang "used certain trading techniques to preserve and increase the fund's trading capacity."  ¶ 36.  But the Indictment never explains how attempting to increase one's buying power is somehow unlawful.  Indeed, the obvious aim of trading in securities is to grow one's positions.  The Government, however, seeks to cast Archegos's desire for growth as insidious and indicative of manipulation.  Additionally, the Government alleges that Archegos sold certain positions or engaged in short selling to "generate capacity at a broker" to "make room" for other trades.  ¶ 35(a), (b).  But again, lawfully transacting business in a way that generates capacity is perfectly appropriate, and short selling, in particular, is neither illegal nor inherently manipulative.  *See ATSI*, 493 F.3d at 101 ("[S]hort selling—even in high volumes—is not, by itself, manipulative."); *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*, No. 2-CV-767 (LBS), 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false

---

[37] While, the Government submits that trading near the end of the day allowed "Archegos to access excess margin from its counterparties if swap positions had gained value at the close of market hours," ¶ 35(d), the Indictment does not allege how this is so, *e.g.*, how and when each individual counterparty calculated margin or why or how the timing of Archegos's trades during the day would be relevant to such a calculation.  Moreover, such theory would, in any event, fail under Section 9(a) because the conduct would not be (and it is not alleged that it was) for the purpose of inducing others to trade in the underlying security.  *See* 15 U.S.C. § 78i(a)(ii); *see also infra* Pt. I.D discussing the inducement element under Section 9(a)(2).

information into the market place, nor can a party inject false information into the marketplace . . . simply by selling stock on the open market."). And that is so even if, by going short, one gains the ability to take advantage of opportunities that might later arise on the long side, *i.e.*, by purchasing on margin or engaging in swap transactions. Indeed, selling positions to create opportunities to grow Archegos's investments in other ways demonstrates a *bona fide* economic purpose behind the activity—directly contrary to what the Government alleges. *See* ¶ 28. Such economic purpose is the antithesis of manipulation.[38]

Finally, the Government alleges that Archegos pursued relationships with multiple counterparties to make it appear as though "different parties" were buying the securities. ¶¶ 27, 38. But again, contracting with multiple counterparties to engage in swap transactions is, of course, perfectly legal, and not at all indicative of "deceptive intent." *See ATSI*, 493 F.3d at 104 (rejecting the allegation that scienter can be inferred from "a legitimate investment vehicle," such as the convertible preferred stock in issue). And, Archegos's use of multiple counterparties did not impermissibly conceal any information that would otherwise have been known to the market if there were fewer, or even just one, counterparty; nor does, or can, the Government allege that it sent false information to market participants. Finally, and again, because the swap trades between Archegos and its counterparties did not require the counterparties to purchase the equity positions underlying Archegos's swaps, the Government does not and cannot allege that Archegos or its swap transactions sent *any* signal to the marketplace. In sum, Mr. Hwang's relationships with

---

[38] The Government also alleges that Mr. Hwang asked a friend to move his position in GSX from a certain financial institution so that Archegos could grow its own position in GSX with that institution. ¶ 37. Again, that conduct is not in any way unlawful. And, far from demonstrating manipulation, the only thing that allegation shows is that Mr. Hwang desired to invest in GSX, just as other buyers did.

multiple counterparties cannot support the element of deception required to sustain the Government's manipulation claims.

***

The Government alleges that "the cumulative effect" of Archegos's trading, from fall 2020 through March 2021, "contributed to significant artificial increases in the prices of the securities underlying Archegos long swaps."  ¶ 40.  However, as the above demonstrates, each and every trade constituted a legitimate transaction between Archegos and its counterparties and exposed Mr. Hwang and Archegos to genuine economic risk.  Where, as here, a market participant engages in a legitimate transaction exposing the investor to real economic risk, the only pricing signal he or she is sending to the market is an *accurate* one;  *a fortiori*, such transaction cannot create an "artificial" price or constitute manipulation.  *See Cohen*, 722 F. Supp. 2d at 424 (dismissing manipulation claims where complaint did not assert that the sales in issue "were anything other than bona fide buyers and sellers trading at the reported price of the transaction"); *Sullivan*, 47 F.3d at 859, 864 (affirming dismissal of Sections 9(a)(2) and 10(b) claims where there was no "false impression of supply or demand" because real buyers were on the other side of all defendant's sales).  Because the Indictment fails to allege any deceptive conduct that could have created artificial stock prices, its market manipulation claims under Section 10(b) and 9(a)(2) (Counts Two through Nine) must be dismissed.

> **3.      The Section 9(a)(2) Claims Also Fail Because the Indictment Does Not Allege Mr. Hwang Traded for the Purpose of Inducing Others to Buy or Sell Any Underlying Security.**

As explained above, Counts Three through Nine fail because the Indictment does not allege that Mr. Hwang engaged in deceptive conduct.  The manipulation claims under Section 9(a)(2) in these counts also fail for an additional and independent reason based on the elements of that statute:

the Indictment does not allege that Mr. Hwang traded, or manipulated the prices of certain securities, with the purpose of inducing others to buy or sell those securities.

Section 9(a) prohibits:

> a series of transactions in any security. . . or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2).  To establish a violation under Section 9(a)(2), the Government must prove not only that Mr. Hwang intentionally engaged in a series of transactions that raised or depressed the price of a security, but that he did so "for the purpose of inducing the security's sale or purchase by others."  *See SEC v. Fiore*, 416 F. Supp. 3d 306, 325 (S.D.N.Y. 2019).  That provision reflects Congress's decision to outlaw devices "used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage."  *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969).  This specific intent is the critical distinction between manipulation claims under Section 9(a) and those under Section 10(b):  the Government must prove that the defendant *intended that others* buy or sell the allegedly manipulated security.  *See id.*; *see also Mulheren*, 938 F.2d at 368 (noting that the government would have to prove that the defendant "acted for the purpose of inducing the purchase or sale of such security by others" to proceed under Section 9(a)(2)); *Trane Co v. O'Connor*, 561 F. Supp. 301, 305 (S.D.N.Y 1983) (finding no market manipulation in violation of Section 9(a)(2), despite heavy buying over eight months that grew defendant's position in a security from zero to 15% of outstanding shares, where defendants' purpose was not to induce public investment).

The Indictment fails to satisfy this requirement of Section 9(a)(2).  First, the Indictment fails to allege that Mr. Hwang traded with any purpose to influence general market investors in

any way.[39]  That, of course, is exactly what one does in a spoofing or wash sale case, which is the typical subject of a 9(a) charge.  *See, e.g.*, *Sullivan*, 47 F.3d at 864 ("[T]he essence of the [Section 9(a)] offense is creating a false impression of supply or demand, for example through wash sales."); *Gilbert,* 668 F.2d at 95 (Section 9(a)(2) case involving fictitious accounts, matched orders, wash sales, and dissemination of false literature); *see also Mulheren*, 938 F.2d at 368 (no Section 9(a)(2) violation where the defendant did not seek to induce others to purchase securities and the alleged misconducted concerned only the defendant's own trading).  Here, there is no allegation of spoofing or any intent to influence market participants to buy or sell anything.

Instead of alleging the necessary intent to induce others to trade in the underlying securities, the Indictment – at length – alleges, first and foremost, that Mr. Hwang traded only with the intent, through his own trading, to raise the price of the securities for the companies in which he invested. *See*, *e.g.*, ¶ 21 ("The central aim . . . was to control the price and artificially increase the value of securities in Archegos's portfolio."); ¶ 28(a) (Mr. Hwang "intended these transactions to drive up the price of the stocks"); ¶ 28(b) ("As the portfolio became more concentrated," Mr. Hwang "traded with the further purpose of propping up the stock price to avoid margin calls."); ¶ 29 (Mr. Hwang "understood and intended his trading to affect the prices of securities he traded."); ¶ 34 (Mr. Hwang "began to engage in various types of manipulative open-market trading to further influence the prices of the top stocks in his portfolio and to maximize his capacity to conduct further trading.")).  But an allegation of mere intent to raise the price through one's own trading is

---

[39] The only allegation in the Indictment that even vaguely sounds in allegations of inducing others to invest in the market concerns Archegos's pre-market trading.  *See* ¶ 35(b).  But beyond the fact that, as explained above, *supra* Pt. I.C., pre-market trading is lawful and not indicative of manipulative intent, such pre-market trading appears to be at issue in only a subset—and, indeed, an unspecified subset—of the trades alleged in the Indictment.  Nor, in fact, is inducement even mentioned in the Indictment until Counts Three through Nine, when those counts conclusorily attempt to set forth the elements of an offense under Section 9(a)(2).

not, and cannot be, sufficient to support a charge under Section 9(a), which requires intent to induce third parties to buy or sell the security.  15 U.S.C. § 78i(a)(2) (prohibiting trading for the "purpose of inducing the purchase or sale of such security by others").

Second, the Indictment appears to imply, although it nowhere expressly alleges, that Mr. Hwang intended for the counterparties to buy the actual stock as a hedge for their swap transaction—otherwise a swap would not impact any price.  But, again, it is not alleged—and could not be—that the counterparties were compelled to or would always purchase the underlying security as a matter of course.  *See* ¶ 16.  Moreover, under the Government's expressed theory of the case, as alleged in the Indictment, when a swap is purchased it is not trading activity or any price movement that induces the bank to buy the underlying security.  Rather, the Indictment clearly alleges that the banks entered into the swap agreements for the purpose of being paid the transaction fee, and that they sometimes purchased the underlying stock for the purpose of hedging their exposure under the swap agreement.  *See id.*  It does not, however, allege that they were induced to buy that stock by Mr. Hwang's trading activity, the terms of the swap agreements with Archegos, or the price of any security (either the swap or the underlying security).

Third, Section 9(a) is addressed to circumstances where a defendant and the victim purchased *the same security*.  *See* 15 U.S.C.A. § 78i(a)(2) (prohibiting transactions designed to "creat[e] actual or apparent active trading in *such security*, or raising or depressing the price of *such security*, for the purpose of inducing the purchase or sale of *such security* by others") (emphases added).  But that is not what the Indictment alleges; instead, the securities Mr. Hwang purchased were the swaps, and the securities the counterparties purchased, if they in fact hedged in that way, were equity shares.  *See* ¶ 16.  These are not the same securities, and therefore this allegation does not satisfy Section 9(a), per its express language.  Nor does the Indictment allege

that Mr. Hwang intended his purchases of swaps to induce trading in the underlying securities by the counterparties or, for that matter, by anyone else.

In sum, Counts Three through Nine fail because the Indictment does not allege facts demonstrating that Mr. Hwang engaged in allegedly manipulative trading for the purpose of inducing others to trade in any of the underlying securities in issue.

> ### 4.    Alternatively, the Indictment's Allegations of Market Manipulation Under Sections 10(b) and 9(a)(2) are Unconstitutionally Vague (Counts Two through Nine).

As discussed above, the Government's theory of criminal liability is truly novel:  it alleges that through repeated iterations of legal conduct, Mr. Hwang—because he allegedly intended that his actions influence prices—violated the federal securities laws.  If such a theory is prosecutable under the U.S. Code, it is unclear what heretofore legitimate market conduct will not expose other large investors to similar prosecutions in the future.  Like those other large investors, Mr. Hwang could never have anticipated that his actions would be deemed unlawful, let alone criminally so. Prosecution of Mr. Hwang under Sections 10(b) and 9(a)(2) therefore violates his right to due process because the statutes' language is unconstitutionally vague as applied to the allegations in the Indictment.  This Court therefore should dismiss Counts Two through Nine.

> ### a.    The Constitution Requires that Criminal Statutes Be Clear and Definite.

The Fifth Amendment to the United States Constitution prohibits depriving a person of liberty "without due process of law."  U.S. Const. amend. V.  That provision gives rise to the constitutional bar on vague criminal statutes, which is the "first essential of due process," and is "consonant alike with ordinary notions of fair play and the settled rules of law." *Johnson v. United States*, 576 U.S. 591, 596-96 (2015) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)); *cf. Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) (noting that courts

should "exercis[e] restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed" (citations and quotations omitted)).  In particular, this prohibition requires that "a penal statute define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

These dual requirements are embodied in the void-for-vagueness doctrine. *Skilling v. United States*, 561 U.S. 358, 403 (2010). A challenge to a statute as unconstitutionally vague does not necessarily imply that the statute could never be applied, but rather that "as applied to the conduct at issue in [a] criminal case, a reasonable person would not have notice that the conduct was unlawful and there are no explicit standards to determine that the specific conduct was unlawful." *United States v. Sattar*, 272 F. Supp. 2d 348, 357 (S.D.N.Y. 2003) (citation omitted).[40] The void-for-vagueness doctrine applies with particular force in the criminal context. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (expressing lower tolerance for vague criminal laws because "the consequences of imprecision are qualitatively [more] severe" than those of vague civil laws); *Arriaga v. Mukasey*, 521 F.3d 219, 222-23 (2d Cir. 2008) (noting that criminal laws challenged as vague receive "close scrutiny").

---

[40] This brief does not argue that Sections 10(b) and 9(a)(2) are facially vague—that is, vague in all applications.  It instead argues that the statutes are unconstitutionally vague as applied to the conduct alleged in the Indictment.  *See United States v. Smith*, 985 F. Supp. 2d 547, 592-93 (S.D.N.Y. 2014) ("The principal difference between as-applied- and facial-vagueness inquiries is that the first requires that a court address only the application of the challenged statute to the person challenging the statute based on the charged conduct, while the second requires that a court also address the application of the challenged statute to others based on different conduct.").

"[A] statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  The Supreme Court has emphasized that the "Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."  *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).  This principle is embodied in the constitutional requirement that "a legislature establish minimal guidelines to govern law enforcement."  *Kolender*, 461 U.S. at 358; *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) ("Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions.").[41]

The void-for-vagueness doctrine thus vindicates separation of powers, as well as due process, concerns.  That is,

> [v]ague laws contravene [due process because] statutes must give people 'of common intelligence' fair notice of what the law demands of them. Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect.  Only the people's elected representatives in the legislature are authorized to 'make an act a crime' . . . Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide.

*United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (collecting cases).

---

[41] *Cf. McDonnell v. United States*, 579 U.S. 550, 576 (2016) (noting that courts "cannot construe a criminal statute on the assumption that the Government will use it responsibly" (citations and quotations omitted)).

As applied to this case, Sections 10(b) and 9(a)(2) do not give any indication that the conduct alleged in Counts Two through Nine of the Indictment is prohibited.  As such, penalizing Mr. Hwang's alleged conduct violates the fair notice element of the void-for-vagueness doctrine, the purpose of which "is to enable the ordinary citizen to conform his or her conduct to the law." *Morales*, 527 U.S. at 58; *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.").

> **b.      Section 10(b) Fails to Give Fair Notice That Open-Market Manipulation is Prohibited, and Applying It in that Context Invites Arbitrary and Discriminatory Enforcement.**

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  Rule 10b-5, promulgated under Section 10(b), prohibits the employment of "any device, scheme, or artifice to defraud," the making of "any untrue statement of a material fact," and the engaging in of "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  This language is capacious, but—as discussed above—has been interpreted by courts to apply to specific practices of market manipulation.  But those specific practices are limited and well-defined: when "used in connection with securities markets," manipulation is "virtually a term of art."  *Hochfelder*, 425 U.S. at 199.  As explained above, the market manipulation statutes are designed to target traditionally "misleading practices," *Schreiber*, 472 U.S. at 6-10, that intentionally create a false picture of supply and demand, *Santa Fe Indus.*, 430 U.S. at 476, and "artificially" and "deceptive[ly]" affect a security's price, *ATSI*, 493 F.3d at 100.

These well-recognized and explicitly misleading practices—whether wash sales, matched orders, pump-and-dumps, fictitious accounts, or the dissemination of false statements to the market—fall within the "core" of Section 10(b)'s prohibition of "manipulative devices."  *See Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006) (in determining whether a statute is vague as applied, courts consider whether "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute"); *see also Skilling*, 561 U.S. at 406-08 (interpreting 18 U.S.C. § 1346 and limiting the statute to "a salvageable honest-services core").  Applying Section 10(b) to conduct within that core is not unconstitutional:  that conduct is classically manipulative and is at the heart of what Section 10(b) was designed to prohibit.  But the conduct alleged here falls far outside of that core.  And Section 10(b)'s text gives no warning that the conduct such as is alleged – actual purchases of swaps or securities on the open market, that can affect price but are done without sending deceptive signals to the marketplace – is somehow covered by the statute's broad language.[42]

For example, the prohibitions in Rule 10b-5 of "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" say next to nothing about the various aspects of Mr. Hwang's trading (each permitted by statute or regulation) that, the Indictment alleges, combine to create an unlawful scheme.  First, Section 10(b) and Rule 10b-5 give no indication that large volume trading in a given security is illegal because it will, in many cases, affect price.  Nor does the statutory language or, for that matter, the cases interpreting it, define what level of trading crosses the line into

---

[42] In part because of the statutory language's breadth, commentators have noted that "the law governing manipulations has become an embarrassment—confusing, contradictory, complex, and unsophisticated."  Fischel & Ross, 105 Harv.  L. Rev. at 506.

illegality.  Thus, for instance, the Indictment alleges that Mr. Hwang's trading "accounted for" 10% to 35% of the daily trading volume of certain stocks on certain days.  Even assuming that high volume trading could be somehow illegal, even these allegations do not propose a limit on a trader's share of the daily trading volume beyond which it would become criminal:  is it 10 percent?  17 percent?  22.5 percent?  35 percent?  The statute and rule say nothing, and had Mr. Hwang looked at them before embarking on his alleged scheme, they would have given him no guidance as to the legal limit on large volume trading.

The same applies to the Indictment's allegations that the timing of Mr. Hwang's trades was manipulative.  It alleges that Mr. Hwang's trades occurred in pre-market hours, toward the end of market hours, and during the final minutes of the trading day, and also that he directed his traders to buy stocks throughout the day, and to increase their limit prices as the stocks increased in price.  ¶¶ 29, 35.  Section 10(b), however, has nothing to say about the timing of securities transactions.  And, as discussed above, both pre-market and end-of-day trading is legal under this Court's precedent.  *See supra* Pt. I.C.2.b.  But under the Government's apparent interpretation of the law, the only time a person can safely trade securities without risking prosecution for manipulation appears to be between 9:30 a.m. and sometime before 3:30 p.m.—so long, that is, as he does not amend his limit orders during the day too much for the Government's liking.

The Indictment also appears to allege that Mr. Hwang's use of a family office and security-based swaps was part of his illegal scheme to accumulate market power.  ¶ 76.  The Government's logic appears to be that if the family office, which was not subject to the disclosure requirements that apply to hedge funds, used swaps, which are not subject to the disclosure requirements that

apply to transactions in securities,[43] to trade with multiple counterparties, then neither these counterparties nor the market as a whole would be aware that much of the market interest in the given securities was in fact generated by Mr. Hwang.  The contention seems to be that though these devices are indisputably lawful, they somehow aggregate into an illegal whole.

The statutes at issue provide no notice that the use of a family office and swaps in combination is illegal.  Indeed, it was not until after Archegos ceased operations that the SEC introduced proposed regulations that would, if adopted, impose disclosure requirements on holders of swaps.[44]  That such new proposed regulations were necessary is persuasive evidence that no one could have known that failing to disclose swap purchases could lead to a manipulation charge before their adoption.  In any event, an ordinary investor, examining the vague text of Section 10(b) and Rule 10b-5 in conjunction with 17 C.F.R. § 275.202(a)(11)(G)-1(a) (exempting family offices from regulation as investment advisers) and 17 C.F.R. § 240.13d-1 (imposing disclosure limits on securities holders but not swaps holders) would have no reason to think that the use of a family office and swaps in conjunction would be unlawful.  Indeed, a reasonable investor might consider such nondisclosure to be both prudent (as a way to avoid third parties front-running the investor's stock picks) and actually encouraged by the existing regulatory scheme.[45]

For the same reasons, applying Section 10(b) here violates the vagueness doctrine's second requirement:  that the statute "establish minimal guidelines to govern law enforcement" so that the

---

[43] *See infra* at pp. 6 n.3, 8 n.5 (discussing rules and regulations applying to family offices and swaps).

[44] *See infra* at p. 71 n.47 (discussing proposed Rulemaking).

[45] Indeed, the case law discussed above shows that, if Mr. Hwang were to have turned to the Federal Reporter for guidance, he would have been informed that open-market conduct was not manipulative under Section 10(b) as a matter of law.  *See supra* Pt. I.C. (citing *Mulheren*, 938 F.2d at 370-71; *GFL Advantage Fund*, 272 F.3d at 205; *Gilbertson*, 970 F.3d at 949; *Galectin Therapeutics*, 843 F.3d 1273; *Sullivan & Long*, 47 F.3d at 859).

law does not "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (cleaned up).   A statute violates this requirement if "some element of the statute turns on the law enforcement officer's unguided and subjective judgment." *Copeland*, 893 F.3d at 120.   Courts consider whether "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006).

Here, the Government's attempted use of Section 10(b) falls outside of the statute's "core" and is therefore unconstitutional.   As discussed above, the core of Section 10(b) is prohibiting a set of traditional manipulative practices:   the use of fake accounts, wash sales, matched orders, false statements to the market, and similar actions.   Criminalizing conduct that falls outside of this core—conduct that occurs on the open market, conduct that does not simulate but actually is created by the interplay between supply and demand, and conduct that does not involve explicitly deceptive actions—invites prosecutors to exercise their "unguided and subjective judgment" to determine what market action is, in their eyes, sufficiently manipulative to warrant prosecution. *Copeland*, 893 F.3d at 120.   The conduct alleged in the Indictment is precisely this non-core conduct:   it occurred on the open market and involved real buyers and real sellers.   Unlike wash sales, matched orders, or rigged prices, which are all fake transactions designed to look like market activity, Mr. Hwang's alleged conduct was real market activity that exposed him to a real risk of loss.   There is, therefore, a clear line delineating the fake transactions simulating market activity with which Section 10(b) has traditionally been concerned, *see supra* Pt. I.C., from the genuine open-market transactions which are the basis of the accusations against Mr. Hwang.

Permitting prosecutors to extend Section 10(b)'s reach beyond that limit would give them unfettered discretion to determine what combinations of real market activity can constitute a scheme to defraud. Worse, perhaps, the existence of this broad discretion would inject significant uncertainty into the stock market, as securities and securities-based swap traders (like Mr. Hwang) would be unable to predict which of their legal actions, aggregated together, might be second-guessed and prosecuted by the Government.

> **c.      Section 9(a)(2) Fails to Provide Sufficient Notice that Trading Solely to Impact a Stock's Price is Illegal.**

Applying Section 9(a)(2) to the conduct alleged in the Indictment also implicates vagueness concerns. The statute prohibits "a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." The Indictment alleges that Mr. Hwang engaged in large-scale purchases of multiple securities for the purpose of increasing the share price of those securities (and, as discussed above, fails to sufficiently allege that Mr. Hwang engaged in these purchases "for the purpose of inducing the purchase or sale of such security by others"). *See supra* Pt. I.D. (citing ¶¶ 21, 28, 30. But Section 9(a)(2)'s text gives no notice to a trader that trading for the purpose of increasing a security's share price would violate the statute and subject him or her to potential imprisonment. Instead, any fair reading of the statute indicates that it is meant to apply to attempts to induce others in the market to purchase or sell a security. Put another way, trading to induce others to buy or sell a stock and trading to increase that stock's share price are not the same thing, and to the extent Section 9(a)(2) can be used to prosecute the latter under the guise of prosecuting the former, it is unconstitutionally vague.

Permitting prosecutors to use Section 9(a)(2) to criminalize the activities of traders who, in the Government's eyes, purchase too much stock would be a shocking and incredibly dangerous

precedent.  Traders who are enthusiastic about a stock's potential returns, and who therefore seek to create significant exposure to that stock through either direct purchases or swaps, risk exposing themselves to criminal liability just because they buy what prosecutors and FBI agents see as an unreasonably large amount.  Setting aside the extraordinary consequences for the stock market of a prosecutorially imposed ceiling on how much traders can trade, such regulations are best left to Congress, or at least federal regulators subject to Congressional oversight and not criminal prosecutors (or juries or judges) in the ad hoc manner that would be the effect of this prosecution. *See Davis*, 139 S. Ct. at 2325 ("Only the people's elected representatives in the legislature are authorized to 'make an act a crime.' . . .  Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide."); *Dimaya*, 138 S. Ct. at 1212 (the void-for-vagueness doctrine "is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not").

For these reasons, Counts Two through Nine of the Indictment should be dismissed.

### D.     The Misrepresentation Count (Count Ten) Should Be Dismissed For Failing to Charge an Offense For Securities Fraud Under Section 10(b) of the Exchange Act.

In Count Ten, the Government alleges that Mr. Becker and Mr. Tomita provided false and misleading information to Archegos's counterparties "in an effort to conduct swap transactions and obtain margin lending" and seeks to hold Mr. Hwang and Mr. Halligan liable for Mr. Becker's and Mr. Tomita's misrepresentations.  ¶ 41.  Based upon those Becker and Tomita misrepresentations, the Government charges that Mr. Hwang and Mr. Halligan "engaged in a scheme to defraud Archegos's counterparties" in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  ¶ 80.

Count Ten fails for three separate reasons, each of which flows from the efforts of Congress and the courts to cabin the scope of enforcement actions brought under Section 10(b). *First*, the alleged misrepresentations did not concern the nature, value, or characteristics of the underlying securities and, therefore, were not made "in connection with" the purchase or sale of any securities, as that phrase has been defined. *Second*, to the extent the Government alleges direct liability, the claim fails because neither Mr. Hwang nor Mr. Halligan was the maker of the alleged misrepresentations. *Third*, based on recent Second Circuit authority, the alleged misrepresentations alone cannot support a claim for so-called scheme liability under Section 10(b) and Rule 10b-5.

### 1.    The Alleged Misrepresentations Were Not Made "In Connection With" the Purchase or Sale of Securities.

Count Ten must be dismissed because the alleged misrepresentations were not made "in connection with" the purchase or sale of securities, as required under Section 10(b) and Rule 10b-5. The Indictment identifies three broad categories of alleged misrepresentations made by Becker and Tomita: (1) "misrepresentations regarding the concentration of Archegos's positions"; (2) "misrepresentations regarding the liquidity of Archegos's positions"; and (3) "misrepresentations regarding the composition of Archegos's portfolio." ¶ 48. In addition, the Indictment alleges misrepresentations during Archegos's last week of trading "regarding Archegos's cash position and financial condition." *Id.* Fatally, however, not one of the alleged misrepresentations concerns the nature or value of the securities underlying the swap transactions in issue, or the terms of the securities purchase or sale transactions. Therefore, the alleged misrepresentations were not made

"in connection with" the purchase or sale of any security for the purposes of Section 10(b) and Rule 10b-5 and Count Ten must be dismissed.[46]

Section 10(b) and Rule 10b-5 proscribe the use of deception "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5. That language prohibits only those material misrepresentations that have a nexus to the purchase or sale of a security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"); *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 598 (2d Cir. 1991) (to satisfy the "in connection with" prong, "the fraud must have been integral to the plaintiff's purchase or sale of the security").

In *Chemical Bank v. Arthur Andersen & Co.*, the Second Circuit explained that the purpose of Section 10(b) and Rule 10b-5

> is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

726 F.2d 930, 943 (2d Cir. 1984). Therefore, courts in this Circuit dismiss claims under the "in connection with" prong where the alleged misrepresentations did not concern the value, nature, or

---

[46] In its August 18, 2022 letter to the Court and defense counsel providing additional particularization of some of the alleged misrepresentations, the Government reiterated that the alleged misrepresentations concerned (1) concentration, (2) liquidity, and (3) Archegos's portfolio. ECF 38 at 3-10 (8/18/22 Ltr.). Additionally, the Government's letter identified "other standardized misrepresentations about the fund and its operations" and "Archegos's available cash and how cash was managed." *Id.* at 10-11. Like the alleged misrepresentations in the Indictment, none of the additional details provided by the Government concerns the underlying nature or value of any of the securities in issue, or the terms of any securities transactions. *See generally id.*

investment characteristics of the particular securities in issue.  *See*, *e.g.*, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) ("A claim fails where the plaintiff does 'not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return.") (cleaned up); *Prod. Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998) (misrepresentations are not made "in connection with the purchase or sale of securities [when they do] not pertain to the value, nature or investment characteristics of the securities at issue"); *Abrash v. Fox*, 805 F. Supp. 206, 208 (S.D.N.Y. 1992) ("[E]ven when there is a clear causal connection between the misrepresentations and the investment decision, there is no securities law violation unless the misrepresentations or omissions involved in a securities transaction pertain to the securities themselves."); *Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*, 770 F. Supp. 176, 181 (S.D.N.Y. 1991) ("Misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves cannot form the basis of a violation of Section 10(b) or Rule 10b–5.").

For example, in *United States v. Coriaty*, the court overturned a jury verdict of guilty under Section 10(b) where the "government failed to show how the 'intrinsic, monetary value' of the securities was affected by [the defendant's] actions."  No. 99-CR-1251, 2001 WL 1910843, at *6-7 (S.D.N.Y. July 16, 2001).  There, the defendant fraudulently induced an investment manager to sell another's holdings in an investment account and transfer the money into an account controlled by the defendant, who then ultimately transferred the money into a personal account.  *Id.* at *7. The court found sufficient evidence that the defendant (1) lied when he said that "he needed the proceeds of the sale of the securities for a legitimate purpose"; (2) evaded the alleged victim's inquiries regarding her investment and account statements; and (3) misled the alleged victim about a third party's participation in her financial affairs.  *Id.*  The court held, however, that those

misrepresentations were not made "in connection with" the sale of securities because there was no evidence that the defendant misrepresented "the nature or value of the securities." *Id*; *see also Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165, 175 (S.D.N.Y. 1998) (alleged deception regarding the identity of the seller of bonds "had nothing to do with the value of the bonds themselves," and therefore was not made "in connection with" the purchase or sale of securities); *Alex, Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96-CV-2549, 1997 WL 97837, at *5-6 (S.D.N.Y. Mar. 6, 1997) (dismissing Section 10(b) claim against a bank, where it was alleged that the bank had misrepresented that funds were available to purchase the securities at issue, because the alleged misrepresentations did not "relate to the fundamental investment attributes of the securities"); *Bissell v. Merrill Lynch & Co.,* 937 F. Supp. 237, 242–44 (S.D.N.Y.1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) (failure to disclose interest that was earned on collateral deposited to cover short sales was not a misrepresentation "in connection with" the sale of securities, but pertained instead "to the terms of the relationship between the broker and the customer"); *Ernst & Co. v. Marine Midland Bank, N.A.*, 920 F. Supp. 58, 61 (S.D.N.Y. 1996) (misrepresentations about the availability of funds to effectuate a securities transaction did not implicate the "'characteristics' or 'attributes' of any particular security"); *Abrash*, 805 F. Supp. at 209 (misrepresentations regarding business advisor's qualifications and his future intentions did not support Section 10(b) claim despite inducing plaintiffs to set up corporation).

Here, none of Mr. Tomita's and Mr. Becker's alleged misrepresentations concern the nature, value, or investment characteristics of the securities underlying Archegos's swap transactions, or the terms of those transactions. Instead, by the Government's own characterization, the alleged misstatements concern Archegos's concentration, liquidity, portfolio, and cash positions. ¶ 48. According to the Indictment, Mr. Tomita and Mr. Becker provided such

false information "to conduct swap transactions and obtain margin lending." ¶ 41.  Thus, as the Government itself makes clear, the alleged misrepresentations were relevant only to the counterparties' evaluation of the risks involved in contracting with Archegos.  ¶¶ 43, 49.  For example, the Indictment alleges that the counterparties would not have supplied trading capacity if they "were told the truth about Archegos's portfolio," and may have "cease[d] trading altogether" if they were aware of Archegos's concentration and liquidity.  ¶ 47.  Importantly, however, the Government does not allege that any misstatements concerning the securities being purchased or sold, as margin and capacity are not, of course, securities.

Under the cases cited above, it is not enough that the swap transactions involved securities, or that the allegedly fraudulent conduct occurred between counterparties to securities transactions. Nor could Archegos's margin arrangements with its counterparties satisfy the requirement, as the law in this Circuit is well established that conduct related to borrowing money for the purpose of conducting securities transactions does not satisfy the "in connection with" element.  *See*, *e.g.*, *Chem. Bank*, 726 F.2d at 943-44 (requirement not satisfied where bank was defrauded into making lending decisions based upon misrepresentations relating to certain stock pledged as collateral for a loan); *Levitin v. Painewebber, Inc.*, 933 F. Supp. 325, 329 (S.D.N.Y. 1996), *aff'd*, 159 F.3d 698 (2d Cir. 1998) (dismissing securities fraud claim based on defendant's nondisclosure of interest earned on collateral posted to cover short sale because the nondisclosure related only "to the terms of the relationship between the broker and the customer"); *Bissell*, 937 F. Supp. at 243-44 (same); *Alex, Brown*, 1997 WL 97837 at *6 ("in connection with" prong not met where misrepresentations pertained to the status of an investor's "credit and the availability of funds in his account").

This is particularly so because, as the Indictment makes a point of emphasizing, while Archegos used the trading capacity supplied by the counterparties to purchase swap positions, the

value of the underlying security was essentially irrelevant to the counterparties, who "did not enter into swap contracts with Archegos in order to bet on the increase or decrease of the stock price," but rather did so to earn the lucrative transaction fees.  ¶ 16.  That admission is fatal to the Government's securities fraud charges against Mr. Hwang and Mr. Halligan.

Put simply, the Indictment does not allege that anyone at Archegos made any fraudulent or deceptive statement "in connection with" any securities transaction as that phrase has been defined. To the contrary, the counterparties received exactly what they bargained for in their swap trades with Archegos.  Likewise, the Indictment does not allege that Mr. Hwang or Mr. Halligan made any misrepresentation about the value of the securities.[47]  *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013) (dismissing Rule 10b-5 claim where defendant's alleged fraud pertained to broker-customer relationship rather than the value of the securities in issue).  Instead, the alleged misrepresentations related to metrics associated with Archegos's overall investment portfolio, and the Indictment does not allege that those metrics were terms or conditions of any specific securities transaction.  *See above* at pp. 68-69.

The Government's allegations about supposed misstatements during the week of March 22, 2021 fail for the same reason.  The Indictment alleges only two supposed instances of misrepresentations during that week.  *First*, it alleges that during conversations with counterparties regarding Archegos's requests to withdraw excess margin, Becker misstated the purpose of the withdrawals and, on one occasion, falsely told a counterparty "that Archegos still had $9 billion in excess cash when it did not."  ¶ 64.  *Second*, the Indictment alleges that during calls with

---

[47]  Indeed, the Indictment does not allege that Mr. Halligan had any role in trading between Archegos and the counterparties—he did not make investment decisions (*i.e.*, deciding which swaps to purchase or sell) and did not engage in the actual trading (*i.e.*, purchasing or selling the swaps).  Thus, whatever vague role he is alleged to have had in the supposed fraud, it certainly is not "in connection with" securities transactions in which he had no part.

counterparties on March 24 and 25, Messrs. Halligan, Tomita, and Becker "attempted to lull counterparties into believing that Archegos had experienced an unexpected liquidity event and that it just needed time to orderly unwind some of its positions," and that some of these conversations "included misleading statements and characterizations and some included outright false statements." ¶ 66. But under the cases cited above, neither a request to withdraw excess available margin nor a characterization of Archegos's liquidity qualifies as a representation made "in connection with" a securities transaction, such that it could be prosecuted under Section 10(b).

The Indictment fares no better with its allegation that the supposed misrepresentations induced counterparties to extend more capacity or provide more favorable margin rates to Archegos, ¶¶ 41-49, and that the counterparties would not have transacted with Archegos but for these misrepresentations, ¶ 47. *First,* in *Chemical Bank*, the Second Circuit expressly held that "[s]uch 'but-for' causation is not enough" to bring a transaction within the ambit of Section 10(b) and Rule 10b-5. 726 F.2d at 943. This remains good law today. *See Ring v. AXA Fin., Inc.*, 483 F.3d 95, 101 (2d Cir. 2007) (rejecting argument that *Chemical Bank* is "archival"); *Charles Schwab Corp.*, 883 F.3d at 96 (holding in 2018 that a Section 10(b) claim fails where the plaintiff does "not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return.") (internal quotation marks and citations omitted). *Second*, and more fundamentally, the counterparties' capacity limits and margin arrangements are not securities transactions. Rather, they are the operational "terms of the relationship between the customer and the broker," and they therefore cannot support liability under the securities laws. *See Bissell*, 937 F. Supp. at 244; *Taylor,* 943 F. Supp. 2d at 403.

In sum, Mr. Tomita's and Mr. Becker's misstatements pertained only to the composition and liquidity of Archegos's assets and its access to cash to meet its margin responsibilities. Such

alleged misstatements are too attenuated from any securities transaction to support criminal liability under Section 10(b), and Count Ten must therefore be dismissed.[48]

### 2. The Indictment Fails to Allege that Either Mr. Hwang or Mr. Halligan Was a "Maker" of a Misrepresentation Under Section 10(b) or Rule 10b-5(b).

Insofar as Count Ten is based on alleged misrepresentations to Archegos's counterparties in violation of Section 10(b) and Rule 10b-5(b), it also must be dismissed under the Supreme Court's holding in *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), because neither Mr. Hwang nor Mr. Halligan is the "maker" of any misrepresentations alleged in the Indictment. In *Janus*, the Court held that because Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" in connection with the purchase or sale of securities, an individual may be liable under the Rule only if he or she "made" the statement at issue. 564 U.S. at 141. The Court looked to basic grammar and dictionary definitions to define "make":

> One 'makes' a statement by stating it. When 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb. 6 OXFORD ENGLISH DICTIONARY 66 (def.59) (1933) . . .; accord, Webster's New

---

[48]  The conclusion that Section 10(b) does not reach alleged misrepresentations made by swap counterparties in the course of negotiating the terms of their relationships (such as margin rates and capacity limits) is confirmed by the SEC's recent rulemaking efforts. In a direct response to Archegos's collapse and what the SEC apparently perceived as gaps in existing rules, the Commission resurrected a rule proposal that it first made more than a decade ago following the financial crisis but failed to implement, which would significantly expand the reach of the anti-fraud provisions to cover conduct that does not occur in connection with the purchase or sale of the swap, but occurs within the context of the transactional relationship more generally. *See* SEC Release No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021). The SEC's proposing release explained plainly that the expanded rule "would apply not only to the 'purchase' or 'sale' of security-based swaps," but would also apply to various other aspects of the trading relationship more generally, as well as attempted conduct that Section 10(b) does not reach. *Id.* at *11. In fact, the alleged misrepresentations at issue in this case are so attenuated from any securities purchase or sale transactions that they would not even satisfy this greatly expanded proposed rule (because capacity limits and margin terms, and a counterparty's portfolio composition, are not rights or obligations that arise under the swaps, but rather relate only to the parties' general course of dealing), further underscoring that the existing rules do not reach them.

> International Dictionary 1485 (def.43) (2d ed. 1934) ('Make
> followed by a noun with the indefinite article is often nearly
> equivalent to the verb intransitive corresponding to that noun"). . .
> The phrase at issue in Rule 10b-5, '[t]o make any . . . statement,' is
> thus the approximate equivalent of 'to state.'

*Id.* at 142.

Applying these principles, the Court held that for purposes of Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* The Court and lower courts following *Janus* have explained that establishing "ultimate authority" over a statement requires two elements—control over its content and over whether and how to communicate the statement (*i.e.*, its delivery). *Id.*; *see also SEC v. Rio Tinto plc*, No. 17-cv-7994, 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019). The Supreme Court illustrated the operation of this rule by reference to a speechwriter, explaining that although a speechwriter drafts a speech, "the content is entirely within the control of the person who delivers it," and thus the speechwriter would not be the "maker" for the purposes of the securities laws. *Janus*, 564 U.S. at 143.

Here, the Indictment vaguely asserts that, at times, Mr. Hwang and Mr. Halligan permitted or directed the alleged misstatements and, at other times, were aware of or approved them. ¶¶ 41-58. But there is no allegation that either of them made any of the misstatements. *Cf. Blank v. TriPoint Global Equities, LLC*, 338 F. Supp. 3d 194, 211 (S.D.N.Y. 2018) (co-founder/president/COO was not liable for CEO's oral statements); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (CFO not liable for CEO's oral statements). Indeed, the Indictment fails to identify a single false statement uttered by Mr. Hwang or Mr. Halligan; rather, every identified misrepresentation regarding concentration and liquidity is

attributed to Mr. Becker.  ¶¶ 52(a)-(d); 54(a)-(c).[49]  And every alleged misrepresentation regarding Archegos's portfolio was uttered either by Mr. Becker or Mr. Tomita—none by Mr. Hwang or Mr. Halligan.  ¶¶ 57-58.[50]

The closest the Government comes to alleging a statement made by either Mr. Hwang or Mr. Halligan involves signed certifications containing allegedly false statements.  ¶¶ 59(a)-(c). Specifically, the Indictment alleges that on December 15, 2020, Mr. Hwang signed an ISDA agreement with Credit Suisse containing an inaccurate representation that Archegos's overall concentration in any single position was below a certain threshold.  ¶ 59(a).  Fatally, however, the Indictment fails to allege that Mr. Hwang was aware of the existence of this representation in the ISDA when he signed it.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (dismissing Section 10(b) claim based on the signing of a certification without alleging any facts to show defendant was aware of misleading statements). Similarly, the Indictment alleges that Mr. Halligan signed swap transaction confirmations containing representations that were purportedly "inconsistent with Archegos's securities holdings."  ¶ 59(b).  Again, however, the Government fails to allege that Mr. Halligan was aware of those alleged misrepresentations when he signed the instruments.  *See Plumbers*, 89 F. Supp. 3d at 615.  Because the Government fails to allege that either Mr. Hwang or Mr. Halligan was the "maker" of any of the alleged misrepresentations, Count Ten fails to state an offense under Section 10(b) and Rule 10b-5(b).  *See Janus*, 564 U.S. at 141, 143.

---

[49] In the Government's August 18 letter, it identified additional alleged misrepresentations regarding capacity and liquidity that are not described in the Indictment.  ECF 38 at 4-8 (8/18/22 Ltr.).  There too, every identified misrepresentation was uttered by Mr. Becker.  *Id.*

[50] The additional portfolio-related allegations provided in the Government's August 18 letter are also attributed to Mr. Becker and/or Mr. Tomita.  ECF 38 at 9 (8/18/22 Ltr.).

The Government appears to rely generally on Mr. Hwang's seniority over Mr. Tomita and Mr. Halligan's seniority over Mr. Becker to claim they had "ultimate authority" over the content and delivery of the alleged misrepresentations by Tomita and Becker.  That approach is unavailing.  As to Mr. Halligan, the Indictment expressly concedes that Mr. Halligan *did not* have "ultimate authority" over communications with Archegos's counterparties.  *See* ¶¶ 20, 41, 56.  And to impose liability of either Mr. Hwang or Mr. Halligan simply on the basis of supervisory authority would eviscerate *Janus*, as it would make supervisors automatically liable for their subordinates' misstatements.  That is not the law.  *See Ho,* 887 F. Supp. 2d at 572, n.13.[51]

With respect to Mr. Halligan, Count Ten fails for another reason as well.  The Indictment alleges that the exclusive purpose of the alleged misrepresentations was to facilitate the supposed market manipulation scheme, ¶ 2, but Mr. Halligan is not charged with that scheme.[52]  According to the Indictment, Mr. Halligan was a back-office employee who oversaw accounting, cash management, and operations function for Archegos, ¶ 12(b), and *had no involvement in trading*, ¶¶ 12(a), (c) (emphasis added).

The Government may seek to rely on the Fourth Circuit's opinion in *Prousalis v. Moore* to argue that *Janus* is limited to cases asserting private rights of action.  751 F.3d 272 (4th Cir. 2014).  The Second Circuit, however, has never held that *Janus* does not apply to criminal cases.

---

[51] The only allegations that even suggest any specific instruction from Mr. Hwang about what Tomita or Becker should say to counterparties are that, during negotiations about Goldman potentially becoming one of Archegos's counterparties, he directed Tomita to use "decoy names" when describing Archegos's "investment interests" to Goldman, ¶ 56, and that he told Tomita to give Morgan Stanley a false explanation for why Archegos was rejecting the bank's request that Archegos voluntarily reduce the size of its swap exposure through the bank to GSX, ¶ 58.  But neither of these alleged misrepresentations is even remotely "in connection with" a securities transaction under the case law discussed above, and nor are such instructions sufficient to make Mr. Hwang the "maker," under *Janus*, of Tomita's statements to the counterparties.

[52] Count Two (securities fraud – market manipulation) and Counts Three through Nine (market manipulation) are brought only against Mr. Hwang.

Moreover, the Supreme Court in *Janus* based its reasoning upon the statutory construction of the word "make" as used in Rule 10b-5, and neither the text of Rule 10b-5 nor the meaning of the word "make" vary depending on whether the case is a private action, an SEC enforcement action, or a criminal action. *See Prousalis*, 751 F.3d at 279 (Traxler, C.J., concurring) ("'[M]ake' has the same meaning in the criminal context as it does in the context of a private right of action."); C. Steven Bradford, *"Make" Means "Make": Rejecting the Fourth Circuit's Two-Headed Interpretation of Janus Capital*, 68 SMU L. Rev. 645, 647 (2015) ("*Prousalis* is, quite simply, wrong. . . . [T]he substance of the conduct prohibited by Rule 10b-5, including whether the defendant has 'made' a false statement, does not depend on who brings the action."). Indeed, the Second Circuit and numerous district courts in this Circuit and elsewhere have applied *Janus* to SEC enforcement proceedings, undermining *Prousalis*'s incorrect conclusion that *Janus* is limited to implied private rights of action. *See, e.g., SEC v. Rio Tinto plc*, 41 F.4th 47, 52, 54 (2d Cir. 2022); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). Simply put, under *Janus*, there is a single meaning of "make" that applies in *all* Rule 10b-5 cases.

### 3. Recent Second Circuit Law Forecloses the Government's "Scheme Liability" Theory Under Section 10(b) and Rule 10b-5(a) and (c).

Count Ten appears to charge a violation of Section 10(b) and Rule 10b-5 under the "misrepresentation" theory of liability, but for all the reasons stated above, it fails adequately to allege such a theory. There is a second theory of liability available to the Government, commonly referred to as "scheme liability." However, the factual allegations underlying Count Ten all relate to alleged misrepresentations, and under the relevant case law, scheme liability cannot be premised upon a mere repackaging of misrepresentations. Count Ten is therefore fatally defective regardless of which theory the Government seeks to pursue.

To establish a violation under subsection (b) of Rule 10b-5, the misrepresentation theory, the Government must allege that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019) (quotation marks and citations omitted). For the reasons set forth above, the Indictment here fails to do that, as a matter of law. Alternatively, to establish a violation of subsections (a) or (c), the scheme liability theory, the Government must allege that a defendant "(1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." *Id.* The Indictment fails to do that, either.

In July 2022, after the Indictment in this matter was returned, the Second Circuit ruled in *SEC v. Rio Tinto plc*, that misstatements alone cannot form the basis of a violation of Rule 10b-5(a) or (c), and that "an actionable scheme liability claim also requires something *beyond* misstatements and omissions." 41 F.4th 47, 49, 54 (2d Cir. 2022) ("Maintaining distinctions between the subsections of Rule 10b-5 . . . is consistent with [the statute's] text") (emphasis in original). Although the decision is only a few months old, numerous courts have already applied its ruling to reject scheme liability allegations that, like the Indictment here, merely recycle alleged misstatements as purported "schemes to defraud." *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585, 2022 WL 4085677, at *54-59 (S.D.N.Y. Sept. 2, 2022) (dismissing scheme liability claims where plaintiff failed to sufficiently allege any deceptive conduct beyond the making or dissemination of misstatements, and distinguishing them from circumstances where a deceptive act could be sufficiently pled—"*i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent"). *See also Touchstone Strategic Trust v. Gen'l Elec. Co.*, No. 19-cv-1876, 2022 WL 4536800, at *6 (S.D.N.Y. Sept. 28,

2022) (dismissing scheme liability claims where the complaint "alleges misstatements and omissions, not inherently deceptive conduct"); *Africa v. Jianpu Tech. Inc.*, No. 21-cv-1419 (JMF), 2022 WL 4537973, at \*13 (S.D.N.Y. Sept. 28, 2022) (same); *In re Eastman Kodak Co. Sec. Litig.*, No. 21-cv-6418 (EAW), 2022 WL 4473629, at \*14 (W.D.N.Y. Sept. 27, 2022) (dismissing scheme liability claims where plaintiff failed to allege that "a deceptive or manipulative act—independent from the alleged misstatements or omissions—occurred").

Count Ten does not allege any deceptive or fraudulent act of Mr. Hwang or Mr. Halligan—as opposed to conduct by Mr. Becker and/or Mr. Tomita—as would be required to survive a challenge under *Rio Tinto plc*.  To the extent Defendants are alleged to have been aware that Mr. Tomita and Mr. Becker engaged in "ad hoc" informational calls at the request of counterparties, this provides no help to the Government, because there is nothing "inherently deceptive" about speaking with counterparties.  Indeed, the Government implicitly concedes that Archegos had non-fraudulent communications with the counterparties for many years preceding the Relevant Period. *See SEC v. Kelly*, 817 F. Supp. 2d at 344 ("Scheme liability hinges on the performance of an inherently deceptive act.").  Likewise, while the Indictment repeatedly alleges that Mr. Hwang directed his subordinates to seek increased trading capacity for Archegos, ¶¶ 46, 52(b), 52(c), there is nothing "inherently deceptive" about an investment fund expanding its ability to trade, both by increasing the number of its counterparties and seeking to improve the terms those counterparties extend.

Similarly, the Government's allegations that Mr. Hwang and/or Mr. Halligan conferred with Mr. Becker or Mr. Tomita before certain of the misstatements also fall short, because they, too, fail to identify any specific fraudulent or deceptive act that is distinct from the alleged misrepresentations.  *See* ¶¶ 54(b)(ii), 56, 58.  This would be true even if, *arguendo*, the

Government had adequately pled that Mr. Halligan or Mr. Hwang had any role in creating the false statements that Mr. Becker or Mr. Tomita made, which it has not.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *55 ("the creation of a false statement that is then disseminated by another who is the 'maker' is not sufficient to create scheme liability").  Thus, the bald assertion that Mr. Hwang and Mr. Halligan conferred with colleagues before or after these colleagues made the statements at issue is insufficient under *Rio Tinto plc*.

Nor can the requirement of an inherently deceptive act be implied as against Mr. Hwang or Mr. Halligan through "guilt by association" (in this case, Defendants' association with Becker and Tomita).  *See In re Take Two Interactive Secs. Litig.,* 551 F. Supp. 2d 247, 305 (S.D.N.Y. 2008); *see also U.S. v. Padilla*, 208 F. App'x 476, 479 (7th Cir. 2006) ("[M]ere presence and guilt by association fail to prove criminal liability under an aiding-and-abetting theory."); *U.S. v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991), *aff'd*, 506 U.S. 534 (1993) ("Guilt by association is not a permissible theory of criminal liability . . . .").  At bottom, any potential claim of scheme liability under Rule 10b-5(a) and (c) would be nothing but a repackaging of a misrepresentation claim under Rule 10b-5(b), and while such a claim might arguably have been viable before *Rio Tinto plc*, it clearly no longer is.[53]

***

For the reasons explained above, Count Ten fails under Section 10(b) and Rule 10b-5 because **(1)** the alleged misrepresentations were not made "in connection with" the purchase or sale of any securities; **(2)** neither Mr. Hwang nor Mr. Halligan was the maker of the statements as

---

[53] The recent decision in  *S.E.C. v. Stubos*, No. 22-CV-04674, 2022 WL 6776741, at *15 (S.D.N.Y. Oct. 11, 2022), upholding a scheme liability claim where the SEC alleged that the defendant concealed its ownership in certain securities in addition to making misleading representations is easily distinguished because while Stubos had a duty to report his holdings, Mr. Hwang had no such obligation to disclose his transactions under the existing law.  *See supra* at p. 8 n.5.

necessary for liability under a misrepresentation theory; and **(3)** the alleged misrepresentations cannot support a claim for scheme liability.

>      **E.      The Court Should Defer Ruling Upon the Wire Fraud Count (Count Eleven) Pending the Outcome of A Likely Dispositive and Fully Briefed Supreme Court Case.**

>           **1.      The Right to Control Theory upon which the Wire Fraud Count is Expressly Based is Under Supreme Court Review.**

Count Eleven, alleging wire fraud under 18 U.S.C. § 1343, charges that Mr. Hwang, Mr. Halligan, and others "engaged in a scheme to defraud Archegos's trading counterparties *of their rights to control their assets* . . . by false and misleading statements regarding Archegos's business, portfolio, and assets, including through interstate wires."   ¶ 82 (emphasis added).   Under the controversial right-to-control theory upon which Count Eleven is expressly and solely premised, the Government appears to contend that an alleged scheme may be actionable as wire fraud if the defendant schemes to "deprive the victim of potentially valuable economic information" that is "necessary to make discretionary economic decisions."   *See, e.g.*, *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (internal quotation marks and citations omitted).   But following the Supreme Court's unanimous decision in *Kelly v. United States*, in which the Court once again emphasized that to obtain a conviction for wire fraud the Government must "prove *property* fraud," 140 S. Ct. 1565, 1571 (2020) (emphasis in original) ("The wire fraud statute . . . prohibits only deceptive 'schemes to deprive [the victim of] money or property.'") (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)), the viability of the right to control theory has been thrown into serious doubt, because the intangible "right to control" assets or to receive "potentially valuable economic information" is not itself money or property.[54]

---

[54] In *Kelly*, the Supreme Court reversed convictions for wire fraud arising from the shutdown of travel lanes at the George Washington Bridge's toll plaza in Fort Lee, New Jersey.   The

Indeed, this very issue is pending before the Supreme Court in *Ciminelli v. United States*, No. 21-1170, in which the question presented is "[w]hether the Second Circuit's 'right to control' theory of fraud—which treats the deprivation of complete and accurate information bearing on a person's economic decision as a species of property fraud—states a valid basis for liability under the federal wire fraud statute, 18 U.S.C. § 1343." Pet. Br. at i.  While the Supreme Court's decision cannot be predicted with certainty, its "precedents establish that the mail and wire fraud statutes prohibit only schemes to deprive someone of money or property," *id.* at 12 (collecting cases); as the petitioner has persuasively argued, "[n]o traditional property interest is infringed by the withholding of complete and accurate information bearing on economic decisions." *Id.* at 15. Indeed, even the Solicitor General concedes that "[i]f . . . the right to make informed decisions about the disposition of one's assets, without more, were treated as the sort of 'property' giving rise to wire fraud, it would risk expanding the federal fraud statutes beyond property fraud . . . ." Resp. Br. at 25-26.  Given the Supreme Court's recent—and unanimous— reluctance in *Kelly* to endorse such an expansion of the wire fraud statute, the future of the right-to-control theory on which Count Eleven hinges is very much in question.

Defendants respectfully submit that the wire fraud count in this case, like that in *Ciminelli*, is not actionable as a matter of current law, but for the sake of efficiency and to avoid burdening the Court now with argument that may well be unnecessary if the right-to-control theory is struck down or modified, Defendants respectfully raise and thereby preserve the issue here, but seek leave to brief it fully following a decision by the Supreme Court in *Ciminelli*.  That decision will be

---

Government argued that the defendants had targeted the Port Authority's money or property by commandeering the physical travel lanes and causing the Port Authority to incur additional costs (such as staffing) associated with the lane shut-down.  The Court held that these interests were not the "object of the fraud" and therefore could not support a wire fraud prosecution.

rendered before the end of this term, and therefore well before the trial of this matter.  Meanwhile, Defendants ask that the Court hold in abeyance any ruling on Count Eleven until the Supreme Court has ruled.

> **2.      The Indictment Does Not Adequately Allege Facts to Establish That Defendants Engaged in Wire Fraud, Either as Primary Violators or as Aiders and Abettors.**

Beyond the questions about the continued viability of the right-to-control theory, and although there is no reason to decide this issue either pending the Supreme Court's decision, the wire fraud count is also subject to dismissal because the facts set forth in the Indictment do not support the conclusory allegation in Count Eleven that either Defendant made "false and misleading statements regarding Archegos's business, portfolio, and assets, including through interstate wires."  ¶ 82.  As discussed above, not a single one of the purported misrepresentations to counterparties is alleged to have been made by Mr. Hwang or Mr. Halligan, and nor is there any allegation of fraudulent intent, which is essential to a wire fraud prosecution.  *Cf. United States v. Guadagna*, 183 F.3d 122, 132-33 (2d Cir. 1999) (finding that the government failed to meet its burden to show that defendant knowingly made a material misrepresentation and, thus, could not establish fraudulent intent to prove wire fraud).  Moreover, there is no allegation in the Indictment that Mr. Hwang or Mr. Halligan contemplated harm or injury to the counterparties.  *Cf. United States v. Finazzo*, 850 F.3d 94, 107 n.15 (2d Cir. 2017) (fraudulent intent means that "defendants contemplated some actual, cognizable harm or injury to their victims").  On the contrary, the Indictment describes Archegos's mutually beneficial contractual relationships with the counterparties for the better part of a year, and concedes that the counterparties were adversely affected only when an external event – the precipitous drop of Viacom stock, ¶ 60 – occurred.

To the extent the Government instead seeks to impose aider and abettor liability on Mr. Hwang or Mr. Halligan simply by citing 18 U.S.C. § 2, the Indictment fails to provide Defendants with adequate notice of the essence of the aiding and abetting of which they are accused.  As to Mr. Hwang, the Indictment alleges merely that others at Archegos provided misinformation to counterparties "with the implicit and at times explicit permission and direction of" Mr. Hwang.  ¶ 41; *accord*  ¶¶ 20, 47.  As to Mr. Halligan, the Indictment alleges that years before the relevant time period, he "trained" Mr. Becker in a general sense; in one instance he somehow "directed" Mr. Becker; and in one other instance he "agreed" with Mr. Becker.  ¶¶ 52, 52(a), 54(b)(ii).  These utterly vague allegations do not constitute the requisite "statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  *Hamling*, 418 U.S. at 117-18; *see also United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (noting "the Supreme Court's caveat that when the definition of an offense includes 'generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars'") (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).  Which of the actions proscribed by 18 U.S.C. § 2(a)—aiding, abetting, counseling, commanding, inducing, or procuring—the commission of wire fraud are Mr. Hwang and Mr. Halligan charged with?  And precisely how, pursuant to 18 U.S.C. § 2(b), did either of them "cause[ ] an act" of wire fraud to be committed?

Courts have dismissed indictments that were similarly so lacking in detail as to fail to provide constitutionally adequate notice.  *See, e.g.*, *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1130 (C.D. Cal. 2014) (dismissing indictment that tracked "the language of the wire fraud statute [but] d[id] not allege any act of deception by [the defendant], nor d[id] it allege that [the bank] was

deceived"); *United States v. Bortnick*, No. 03-CR-414, 2004 WL 2752471, at *4 (E.D. Pa. Nov. 29, 2004) (granting motion to dismiss indictment lacking in factual allegations to support the charged offense). As discussed above, the Supreme Court's upcoming decision in *Ciminelli* may well render the wire fraud count invalid. If that occurs, this issue would be mooted. Under these circumstances, Defendants respectfully suggest that the Court also defer ruling on this issue until after the Supreme Court's decision in *Ciminelli*.

### F. The Forfeiture Allegations of the Indictment Fail to State an Offense.

The Indictment alleges that as to Count One, Mr. Hwang and Mr. Halligan should forfeit "any interest acquired or maintained in violation of [18 U.S.C. § 1962]"; any interest in the alleged Archegos enterprise; and "any property constituting, or derived from, any proceeds obtained, directly or indirectly," from the alleged racketeering activity. ¶¶ 83(a)-(c). It also alleges that as to Counts Two through Eleven, they should forfeit "all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of [the offenses alleged in Counts Two through Eleven], including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses." ¶¶ 84-85. These forfeiture allegations are legally defective for two independent reasons.

### 1. There Are No "Proceeds" Subject to Forfeiture.

For a defendant to forfeit ill-gotten gains to the government, he must have actual gains to forfeit. *United States v. Contorinis*, 692 F.3d 136, 146-47 (2d Cir. 2012) (noting that "the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain"); *United States v. McLaughlin*, 565 F. App'x 470, 475 (6th Cir. 2014) (holding that funds unlawfully obtained by defendant, but invested in company and not used for defendant's personal benefit, were not subject to forfeiture). But nowhere does the Indictment allege that Mr. Hwang

or Mr. Halligan acquired any proceeds from the alleged offenses.[55]  Indeed, the Indictment alleges

that Mr. Hwang directed Archegos to spend its "remaining cash" in the last few days of the putative

scheme.  ¶¶ 5, 60-66.  It also acknowledges that at the end of the scheme, "Archegos owed billions

of dollars more than it had on hand, and Archegos collapsed."  ¶ 67.  But it does not allege that

Mr. Hwang or Mr. Halligan withdrew a single dollar from the fund during the period covered by

the alleged scheme.  Accepting as true all of the allegations of the Indictment, Mr. Hwang invested

his "personal fortune" in Archegos, grew it from approximately $1.5 billion to more than $35

billion, and watched that sum fall to $0, all over the course of a year, ¶ 3 – without any allegation

that he at any point realized any personal profit on his investments.  Indeed, it is not alleged that

Mr. Hwang took any money out of Archegos during the time in which he is alleged to have engaged

in misconduct (March 2020 through March 2021, ¶¶ 3, 24), and he subsequently lost everything

he had invested in Archegos – the vast majority of his wealth.

     Mr. Halligan is not alleged to have had the ability to withdraw Archegos's funds for his

own benefit, much less to have done so.  Moreover, like all of the other Archegos employees who

had deferred a portion of their annual bonus compensation to mirror the fund's performance, he

---

[55] Title 18 of the U.S. Code contains two definitions of "proceeds" subject to forfeiture.  Section 981(a)(2)(A) applies to cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes"; it defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  Section 981(a)(2)(B) applies to cases "involving lawful goods or lawful services that are sold or provided in an illegal manner"; it defines "proceeds" as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  Only the latter definition, which applies to net gains and not gross receipts, could apply here.  *See United States v. Mahaffy*, 693 F.3d 113, 137-38 (2d Cir. 2012) (holding that forfeiture premised on "fraud in the sale of securities" is governed by § 981(a)(2)(B)); *United States v. Nacchio*, 573 F.3d 1062, 1090 (10th Cir. 2009) (same); *United States v. Davis*, 12-10996, __ F.4th __, 2022 WL 16944171, at *13 (5th Cir. Nov. 15, 2022) (holding that forfeiture premised on wire fraud is governed by § 981(a)(2)(B)); *United States v. Kalish*, No. 06 Cr. 656 (RPP), 2009 WL 130215, at *7-8 (S.D.N.Y. Jan. 13, 2009) (same).

lost substantially all of that value when Archegos collapsed.   ¶ 7.   Thus, even accepting the allegations in the Indictment as true, there are no proceeds of the offenses charged.

As the Indictment does not allege any proceeds that would be subject to forfeiture, the forfeiture allegations and substitute asset provisions, ¶¶ 83-86, must be dismissed.   This request is ripe for adjudication now: multiple courts have held that legally insufficient forfeiture allegations may, and indeed should, be dismissed.   *See*, *e.g.*, *United States v. Chan*, No. CR. 96-350 WBS, 2006 WL 224389, at *3 n.3 (E.D. Cal. Jan. 27, 2006) ("[A] count of criminal forfeiture may be dismissed for being legally insufficient"); *United States v. Grass*, 274 F. Supp. 2d 648, 650-51, 660 (M.D. Pa. 2003) ("[T]he Government, in Count 32 of the Indictment, asserts that it is entitled to a criminal forfeiture of Defendants' assets . . . .   Defendants moved to dismiss that count pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) . . . .   [T]he facts alleged in the Indictment—as explicated by the Bill of Particulars—are insufficient to entitle the Government to a criminal forfeiture . . . .   Accordingly, the court will dismiss Count 32 of the Indictment.").   Indeed, dismissal of the forfeiture allegations here is consistent with the purpose of Federal Rule of Criminal Procedure 12(3)(B)(v), which requires that motions like this one be made pretrial, when they "can be determined without a trial on the merits …"

### 2.    The Offenses Specified in Counts Two through Ten Do Not Authorize Forfeiture.

Beyond the unavailability of forfeiture based upon the absence of an allegation that Defendants realized ill-gotten gains, the Indictment's forfeiture allegations as to Counts Two through Ten fail for a second reason: the offenses charged in these counts of the Indictment do not permit forfeiture.   That is, the forfeiture allegations of the Indictment are divided into two sets: the first applies to Count One, alleging a RICO conspiracy, as to which forfeiture could be permitted if that Count were not otherwise subject to dismissal.   ¶¶ 83; *but see supra* Pt. I.B.   But the second

set of forfeiture allegations, specifically separated from the first, applies by its terms only to Counts Two through Eleven of the Indictment.  ¶¶ 84-85.  As to these counts, the Indictment alleges that Mr. Hwang and Mr. Halligan should be required to forfeit property to the United States "pursuant to Title 18, United States Code, Section 981(a)(1)(C)."  ¶¶ 84-85.  That provision lists, as subject to forfeiture, property derived from proceeds traceable to violations of a series of listed offenses, as well as "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18]), or a conspiracy to commit such offense."  But Section 981(a)(1)(C) does not include the offenses alleged in Counts Two through Ten.

Likewise, 18 U.S.C. § 1956(c)(7), defines "specified unlawful activity" as a series of particular offenses, and includes the offenses enumerated in 18 U.S.C. § 1961(1), which defines "racketeering activity."  Although 18 U.S.C. § 1961(1) lists dozens of offenses that may constitute "racketeering activity" (and may therefore constitute "specified unlawful activity"), none of the offenses charged in Counts Two through Eleven are included in that list except for wire fraud, charged in Count Eleven (18 U.S.C. § 1343).  As for Counts Two through Ten, the only language in Section 1961(1) that the Government could conceivably seek to rely upon is the statute's reference to "fraud *in the sale* of securities" (emphasis added).  But this language is very specific: it does not encompass *all* securities-related conduct but, as is discussed in detail above, *see supra* Pt. I.B.1, only fraud in the *sale* of securities, *i.e.,* sales of securities induced by fraud.

Specifically, this category of offense is distinct from a "securities fraud offense," as defined in 18 U.S.C. § 3301, which explicitly includes criminal violations of the Securities Exchange Act of 1934.  *See* § 3301(a)(2).  That is, Congress could have, as it did in that provision, use the term "securities fraud offense," but instead, for purposes of the forfeiture provisions, selected a narrower phrase, addressed only to proceeds traceable to a fraudulent *sale* of a security.  Moreover,

as is also discussed above, the phrase "fraud in the sale of securities" does not encompass security-based swaps. *Supra* Pt. I.B.1. Congress is aware of the distinction between securities and swaps, and in other sections of the U.S. Code has defined "security" to include "any . . . security based-swap." *See* 15 U.S.C. § 77b(a)(1). That it did not do so in the forfeiture statute (or the cross-referenced RICO statute) is dispositive, and underscores the narrow scope of the laws governing forfeiture. *See, e.g., United States v. Reich*, 479 F.3d 179, 189 (2d Cir. 2007) (holding that the presence of an intent-to-defraud element in some statutes but not others was a "meaningful variation" indicating that Congress did not intend for the latter offenses to require an intent to defraud); *United States v. Yung*, 37 F.4th 70, 79 (3d Cir. 2022) ("Normally, where Congress uses different words, we read those words to have different meanings.")

Thus, all of the forfeiture allegations should be dismissed because there is no allegation that Mr. Hwang or Mr. Halligan derived any proceeds from any allegedly unlawful activity. And the forfeiture allegations as to Counts Two through Ten warrant dismissal for the additional reason that forfeiture is not available for the offenses charged in those counts.

## II. THE COURT SHOULD STRIKE FROM THE INDICTMENT REFERENCES TO TIGER ASIA MANAGEMENT.

The Government includes in the Indictment a completely superfluous and irrelevant discussion of criminal charges brought against a corporate entity, Tiger Asia Management ("Tiger Asia"), and of a civil complaint filed against Tiger Asia and Mr. Hwang, based upon conduct that occurred over a decade before the conduct now charged in connection with Archegos. ¶ 8. The prior criminal action and the SEC enforcement action concerning Tiger Asia resulted in no judgment of conviction against, or any admission of liability from, Mr. Hwang or any other

individual.[56]   Nevertheless, the Government incorporates these long-resolved matters into the Indictment, relying upon these irrelevant facts to cast Mr. Hwang in a negative light, and to impermissibly try to portray him as a repeat offender, though he certainly is not.  As irrelevant and inflammatory as these allegations are as to Mr. Hwang, they are even more grossly prejudicial to Mr. Halligan, who was not a party to either of these decade-old matters but would be prejudiced by any negative and incorrect inferences that could be drawn from any reference to these prior proceedings.  As set forth below, these allegations are classic surplusage within the meaning of Federal Rule of Criminal Procedure 7(d), and they should be stricken.[57]

### A.    Background

As described above, the Indictment charges eleven counts based upon alleged misconduct that took place "from in or about 2020, up to and including in or about March 2021" and purportedly involved the "operations and activities of the family office known as Archegos Capital Management and its related corporate entities and employees."  ¶ 1.  The Government does not allege that Archegos or its employees were engaged in any unlawful conduct when the family office opened in 2013 or during the half-decade that followed.  ¶¶ 1, 20.  Nonetheless, the Government includes the following allegations in the Indictment:

> In or about 2001, Bill HWANG, the defendant, founded a hedge fund, Tiger Asia Management ("Tiger Asia"), that operated as an investment advisor.  In 2013, Tiger Asia faced regulatory and criminal sanctions relating to Tiger Asia and HWANG's trading. Specifically, and among other things, the Securities and Exchange Commission ("SEC") alleged in a civil complaint that, at HWANG's direction, Tiger Asia engaged in open-market manipulation of the prices of certain stocks listed on the Hong Kong

---

[56]  Copies of the SEC Complaint and the resulting Consent Judgments are attached as Exhibits CC-II to the Lustberg Declaration.

[57]  Defendants reserve the right to move to preclude the Government from introducing evidence at trial or making any arguments regarding the Tiger Asia criminal and regulatory matters.

Stock Exchange.  In response to this complaint, HWANG consented to an order enjoining him and his employees, among others, from violating Section 10(b) of the Securities Exchange Act of 1934, relating to securities fraud.  HWANG also returned all outside investor capital and deregistered the fund as an investment advisor.  HWANG then rebranded Tiger Asia as Archegos.  Archegos subsequently managed HWANG's wealth and the compensation of certain employees.

¶ 8.

These allegations are completely irrelevant to the charges in *this case*.  The now-defunct Tiger Asia was an investment advisor registered with the SEC.  Lustberg Decl. ¶ 44,  Ex. CC, (SEC Complaint).  After a broad-ranging investigation into certain trades that Tiger Asia made around the time of the 2008 financial crisis, Tiger Asia, Mr. Hwang, and the Government reached an agreement resolving the matter.  Tiger Asia pleaded guilty to a single count of wire fraud, based solely on allegations of trading on material nonpublic information, and Mr. Hwang (and one of Tiger Asia's other employees) entered into a civil settlement with the SEC under which they admitted to no misconduct whatsoever.  As part of the process of effectuating that settlement, the SEC filed a complaint against Tiger Asia and Mr. Hwang in December 2012, alleging insider trading and manipulation, all of which purportedly occurred over the course of four months—from November 2008 to February 2009.  *Id.* ¶¶ 1-2.  Mr. Halligan was not a party to the prior SEC proceeding or the resolved criminal matter.

Specifically, the focus of the SEC's allegations was that Tiger Asia obtained material non-public information in connection with three private placements for the securities of two Chinese banks after agreeing not to use that information to trade in the relevant stocks.  *Id.* ¶¶ 10-12.  The SEC alleged that Tiger Asia contravened these "wall crossing" agreements by trading on the information that it had obtained and profited by approximately $16.2 million.  *Id.* ¶¶ 13-16.

Of the forty-five paragraphs in the SEC Complaint setting forth the SEC's factual allegations against Tiger Asia, only five addressed allegedly manipulative trading—what the SEC referred to as "marking the close."  More specifically, the SEC alleged that Tiger Asia was entitled to receive an annual management fee of 1.5% of the value of the net assets under management, calculated at the end of each month.  *Id.* ¶ 40.  The SEC claimed that Tiger Asia attempted to manipulate month-end closing prices on four occasions for a total of five stocks listed on the Hong Kong Stock Exchange by placing trades near the market close on the last day of the month, for the purpose of depressing the price of stocks in which Tiger Asia held short positions.  *Id.*  The SEC alleged that doing so inflated the value of Tiger Asia's assets under management and, correspondingly, its management fee.  *Id.*  Significantly, these allegations were never admitted nor proven.  On the contrary, Mr. Hwang and the other defendants consented to judgment in the SEC matter "without admitting or denying the allegations of the Complaint (except as to jurisdiction)." *Id.*; Lustberg Decl. ¶¶ 44-50; Exs. CC-HH (Consent and Final Judgments).  Accordingly, the SEC's claims against Tiger Asia were never adjudicated.  Lustberg Decl. ¶ 45; Ex. DD.  And, again, the criminal case, which was brought against Tiger Asia only, and not against either Defendant here, involved admissions solely related to allegations of insider trading, and not to any supposed market manipulation.

In or about August 2012, in connection with the settlement negotiations, Tiger Asia returned investor capital and was de-registered as an investment advisor with the SEC.  Lustberg Decl. ¶ 46; Ex. EE.  Then, in 2013, Mr. Hwang started Archegos Capital Management.  Archegos succeeded to certain of Tiger Asia's organizational documents and registrations (such as its LLC agreement), but is a fundamentally different organization.  Unlike Tiger Asia, which was a hedge fund, Archegos only ever operated as a "family office," meaning that it managed only Mr. Hwang's

and his family's personal funds  As a family office, it did not and could not manage the investments

of any non-family clients, and, accordingly, it was paid no management fees whatsoever.  *Id.*  The

Government does not allege that it was improper for Hwang to establish a family office following

the resolution of these prior matters; nor could it, as it is not uncommon for investors to open

family offices after resolving regulatory matters.[58]

The Indictment alleges that, seven years after founding Archegos, in 2020, Mr. Hwang

began to "corrupt[] . . . [its] operations and activities."  ¶ 1.  The Indictment alleges no misconduct

prior to 2020, and it expressly alleges that it was not until "in or about June 2020" that "Archegos's

trading caused and established certain stock prices that were not set by ordinary market forces of

supply and demand."  ¶ 39.  Thus, there is an approximately 11-year-and-3-month gap between

the misconduct that the SEC alleged (but Mr. Hwang did not admit) had occurred at Tiger Asia

(concluding in February 2009) and that which the Government currently alleges occurred at

Archegos (beginning "in or about June 2020").  And as to the prior criminal matter, not only did

the alleged misconduct occur many years ago, but neither Defendant here was charged.

### B.     Legal Standard

Federal Rule of Criminal Procedure 7(d) provides that, "[u]pon the defendant's motion, the

court may strike surplusage from the indictment or information."  "The purpose of Rule 7(d) is to

protect the defendant against prejudicial allegations of irrelevant facts."  *United States v. Miller*,

26 F. Supp. 2d 415, 420 (N.D.N.Y 1998) (striking reference to confrontations with police from an

---

[58]     Under rules that the SEC adopted pursuant to the Dodd-Frank Act, family offices are
specifically exempted from registration and regulation under the Investment Advisors Act.  *See* 17
CFR § 275.202(a)(11)(G)-1; *see also* Matthew Goldstein & Alexandra Stevenson, "In Insider
Trading Settlement, Steven Cohen Will Be Free to Manage Outside Money in 2 Years," THE NEW
YORK TIMES (Jan. 8, 2016), *available at* https://nyti.ms/2Vymb1s (discussing Steven A. Cohen's
management of family office, Point72 Asset Management, following criminal and regulatory
sanctions arising from the operation of his hedge fund, SAC Capital Advisors).

indictment charging commercial smuggling of cigarettes and tobacco); *see also* 1 C. Wright, Fed. Practice & Proc. § 128 (5th ed. 2008).  "The decision to strike . . . is within the discretion of the trial court."  *Miller*, 26 F. Supp. 2d at 420.  "If, for example, the government asserts irrelevant or immaterial facts, particularly those that might prejudice the jury, the defendant may compel their deletion."  *United States v. Hughes*, 766 F. 2d 875, 879 (5th Cir. 1985).  Surplusage may accordingly be stricken because it "serve[s] only to inflame the jury, confuse the issues, and blur the elements necessary for conviction . . . ."  *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971); *United States v. Alvarado*, 01-cr-156, 2001 WL 1631396, at *8-9 (S.D.N.Y. Dec. 19, 2001) (striking paragraphs from an indictment concerning a broker/dealer registered representative's undisclosed compensation because it was not material to the charges brought and was likely to mislead the jury because it appeared under a heading titled "fraudulent sales practices").

In *United States v. Scarpa*, the Second Circuit set out a two-part test to determine whether surplusage should be stricken from an indictment, stating that motions to strike should be "granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  913 F.2d 993, 1013 (2d Cir. 1990); *see also United States v. Carey*, 152 F. Supp. 2d 415, 429-30 (S.D.N.Y. 2001) (granting motion to strike unnecessary and inflammatory references to organized crime and "La Cosa Nostra" from the indictment because "[i]t is appropriate to grant a motion to strike language 'where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial'") (quoting *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996)).  Here, the allegations in Paragraph 8 of the Indictment concerning ancient conduct by Tiger Asia are irrelevant, immaterial, prejudicial, and inflammatory.  They should be stricken.

**C.      The Allegations Against Tiger Asia Are Irrelevant and Immaterial to the Present Charges.**

None of the offenses charged in the Indictment includes an element requiring proof of a prior conviction or "regulatory or criminal sanction."  This is critical:  courts in this Circuit and elsewhere regularly conclude that, where a prior conviction is not an element of the presently charged criminal activity, allegations concerning prior convictions are irrelevant and immaterial and should be stricken from the indictment pursuant to Rule 7(d).  *See, e.g., United States v. Swinton*, 3:19-cv-65-1, 2020 WL 1940744, at *3-4 (D. Conn. Apr. 22, 2020) (granting motion to strike in part, by striking all allegations in the indictment that were not elements that needed to be submitted to the jury and were instead only factors that affected potential penalties); *United States v. Verra*, 203 F. Supp. 87, 89-90 (S.D.N.Y. 1962) (prior conviction and appeal were "not ingredients of the [present] offense, nor essential elements thereof" and were therefore stricken). *See also United States v. Knox*, cr-21-02195-001, 2021 WL 5492543, at *2-3 (D. Ariz. Nov. 23, 2021) (where prior conviction was not an element to prove the presently-charged crime, it was proper to strike it from the indictment), *adopted by* 2021 WL 5908394 (D. Ariz. Dec. 13, 2021); *Cohen*, 2018 WL 3822466 at *2-3 (striking reference to prior conviction for sodomy upon a minor in present indictment charging crimes involving child pornography, both because a prior conviction was not an element of the present charges and because the similarity between the crimes were inflammatory and prejudicial).

That is particularly true where, as here, Defendants were not charged with or convicted of anything in the prior matter.  As noted above, Tiger Asia, Mr. Hwang, and the Government reached an agreement resolving the matter with a plea by Tiger Asia to a single count of wire fraud, based solely on allegations of trading on material nonpublic information, and Mr. Hwang entered into a civil settlement with the SEC under which he did not admit to any misconduct whatsoever.  *See*

Lustberg Decl. ¶ 50, Ex. II.  Mr. Halligan was not charged, named, or involved in the resolutions of the prior criminal and regulatory matters.  The Tiger Asia matters are thus irrelevant and immaterial to this matter.

### D.    The Indictment's Reference To Tiger Asia Is Inflammatory And Prejudicial.

The Indictment's reference to prior allegations of "regulatory and criminal sanctions" that Tiger Asia "faced" is also unfairly prejudicial to the Defendants.  As drafted, Paragraph 8 of the Indictment – which mentions securities trading, market manipulation and securities fraud in violations of Section 10(b) – suggest the inescapable inference that the prior criminal and regulatory actions are similar to the allegations charged here.  Only when the earlier matter is placed in full context is it plain that the Tiger Asia cases were entirely unrelated to, and completely dissimilar from, the allegations in the instant Indictment.  Worse still, the allegation that Mr. Hwang consented to the entry of an injunction and returned investor capital, ¶ 8, suggests that he admitted serious wrongdoing in that matter when, in fact, he did no such thing.

The Government's characterization in Paragraph 8 of Tiger Asia as having been "rebranded" as Archegos in this context further amplifies the confusion and thus the unfair prejudice.  This allegation suggests that the two entities engaged in the same type of investment activity and that Mr. Hwang essentially just changed the name of his entity.  This would be a false inference, because, among other things, Tiger Asia returned all outside investor capital and Archegos exclusively managed Mr. Hwang's own money.  The regulatory distinction between a hedge fund and a family office – a distinction that is essential to an understanding of the defense in this matter – is effectively de-emphasized by the "re-branding" reference.  In this sense, too, Paragraph 8 is patently inflammatory and prejudicial.  *See United States. v. Reyes,* 922 F. Supp. 818, 839–40 (S.D.N.Y. 1996) (granting motions to strike references to "Reyes Crew" as both

prejudicial and inflammatory because "[i]f a RICO enterprise or RICO conspiracy were established at trial, Reyes would face an insurmountable task in convincing the jury that he was not a member of the enterprise or conspiracy bearing his name.").  The fact that the Government does not allege that Mr. Hwang engaged in any illegal activity at Archegos until June 2020—an approximate 11-year-and-3-month gap since the unproven allegations at Tiger Asia—underscores the impropriety of its less-than-subtle suggestion that Archegos was some illicit continuation of Tiger Asia's activities.  *United States v. Greebel*, No. 15-CR-637 (KAM), 2017 WL 3610570, at *2 (E.D.N.Y. Aug. 4, 2017) (granting motion to strike indictment's allegations that "create[d] a significant risk of jury confusion and prejudice").

Cumulatively, these allegations are designed to, or at a minimum, will have the effect of, inappropriately suggesting that Mr. Hwang either previously committed the kinds of offenses with which he is now charged or was somehow engaged in ongoing misconduct.  Of course, it would be completely improper for the government at trial to imply a defendant's guilt as to a present charge based on a prior proceeding in which he did not admit wrongdoing, and it is just as improper for the government to seek to create such an inference through the inclusion of highly inflammatory surplusage in its indictment.  *See United States v. Cook*, 557 F.2d 1149, 1154 (5th Cir. 1977) (admission of prior injunction orders entered upon resolution of SEC proceedings was error where the defendant had "neither admitt[ed] nor den[ied] any wrongdoing").

The Indictment's references to Tiger Asia and its "regulatory or criminal" difficulties are also inflammatory and prejudicial to Mr. Hwang in that they are likely to cause the jury to make assumptions about his character, weaken the presumption of innocence to which he is entitled, and deny him his fundamental right to due process.  Indeed, it is for precisely these reasons that where an indictment references a prior conviction for the same type of offense with which a defendant is

presently charged, courts consistently grant defendants the relief sought here, for fear that such an allegation will lead a jury to improperly consider such past conduct in adjudicating present guilt or innocence. *See, e.g., United States v. Poore*, 594 F.2d 39, 41-42 (4th Cir. 1979); *see also Cohen*, 2018 WL 3822466 at *2; *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1441 (S.D.N.Y. 1989) (holding that where "language does not add anything to the charges in the indictment and would lead the jury to draw improper inferences regarding other crimes not charged in the indictment, it should be stricken") (cleaned up).

Finally, the Indictment's allegations regarding Tiger Asia are irrelevant and prejudicial to Mr. Halligan for all of the reasons discussed above, and more.  As noted, Mr. Halligan was not a party to the resolution of either of the prior matters, nor was he alleged by the Government or the SEC to have participated in the Tiger Asia conduct.  These allegations have no conceivable relevance as to him, but the risk that they could unfairly prejudice him is extreme.  Because Mr. Halligan was employed by Tiger Asia and, subsequently, by Archegos, these allegations about Tiger Asia's alleged trading misconduct could *only* lead the jury to impermissibly assign Mr. Halligan "guilt by association," *i.e.*, his continued association with Mr. Hwang.  *See, e.g.*, *United States v. Ocampo-Vergara*, 857 F.3d 303, 307 (5th Cir. 2017) ("There are two problems with such guilt-by-association evidence.  First, it is not relevant as that term is defined in Federal Rule of Evidence 401 and hence is inadmissible under Federal Rule of Evidence]402.  Second, even if it is relevant, it is unduly prejudicial and excludible under Federal Rule of Evidence 403.").  Thus, the reference to the prior criminal and regulatory matters should be struck because its inclusion is entirely irrelevant and exceedingly prejudicial as to Mr. Halligan.

***

For these reasons, Paragraph 8 of the Indictment is classic surplusage that has no place among the allegations against Defendants , or in the trial of this matter.  Accordingly, the Court should strike Paragraph 8 of the Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

### III.   THE COURT SHOULD SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS ISSUED TO MR. HWANG'S ELECTRONIC ACCOUNTS BECAUSE THE AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE THAT A FEDERAL CRIME HAD OCCURRED AND THAT EVIDENCE OF THE CRIME WOULD BE FOUND IN MR. HWANG'S ACCOUNTS.

On September 27, 2021, the Federal Bureau of Investigation ("FBI" or "the Government") applied for and obtained four search warrants for "all content and other information" associated with seven Microsoft accounts, a Google Gmail account, seven Bloomberg accounts, and an Apple iCloud account.  Lustberg Decl. ¶ 6; Ex. B (Search Warrants and Supporting Affidavit).  The Gmail and iCloud accounts belonged to Mr. Hwang and were utilized in his personal capacity, while one of the seven Microsoft Accounts, "Microsoft Account-4", and one of the seven Bloomberg accounts, "Bloomberg Account-4," were controlled by Archegos and utilized by Mr. Hwang for business purposes.  *Id.* ¶¶ 3d, 5d, 10a, 61, 69.  The application for all four search warrants was supported by an affidavit sworn by FBI Special Agent Thomas McDonald.  *Id.* ¶ 1.  Based on nothing more than attenuated, speculative and conclusory allegations, many of which have nothing to do with Mr. Hwang, the affidavit claimed there was probable cause "to believe that Archegos and certain of its officers and employees engaged in a scheme to defraud certain of its prime brokers, manipulate the price of certain securities, and caused at least hundreds of millions of dollars in losses," and that Mr. Hwang's accounts contained evidence thereof.  *Id.* ¶ 19.

The Fourth Amendment guarantees: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The purpose of the Fourth Amendment's warrant provision is to ensure that "those searches deemed necessary should be as limited as possible."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also Kentucky v. King*, 563 U.S. 452, 459 (2011) ("a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity"); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (the Fourth Amendment protects against "wide-ranging exploratory searches" unsupported by probable cause).  Accordingly, to justify an intrusion into an individual's right to privacy, especially into the deeply personal information stored in electronic accounts, "a search warrant must . . . set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched."  *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020).  Probable cause is demonstrated where warrant indicates a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Because "probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts," it is not "readily or even usefully, reduced to a neat set of legal rules."  *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (cleaned up).  Therefore, whether probable cause exists to support the issuance of a search warrant is a "commonsense, practical question" that is decided on a case-by-case basis by viewing the "totality-of-the-circumstances."  *Gates*, 462 U.S. at 230.  The factual information to support a probable cause finding "must be contained within the four corners of a written affidavit given under oath."  *Falso*, 544 F.3d at 122.  Only when the affidavit provides sufficient information to establish probable cause will a search warrant be properly issued under the Fourth Amendment.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978).  Evidence obtained as the result of an improperly issued search warrant is subject

to suppression.  *Herring v. United States*, 555 U.S. 135, 139 (2009) (exclusionary rule forbids the use of improperly obtained evidence at trial).

In this case, Agent McDonald's affidavit fails to allege sufficient facts to establish probable cause that a cognizable federal crime had been committed and that evidence thereof would be found in Mr. Hwang's accounts.  Accordingly, any information seized pursuant to those warrants should be suppressed.

### A.    The Affidavit's Allegations Concerning Entirely Lawful Conduct are Insufficient to Establish Probable Cause.

In an effort to demonstrate the probable cause that might allow it to rummage through Mr. Hwang's business and personal accounts, the Government attempted to turn completely legal trading activity into an alleged large-scale criminal open-market manipulation scheme.  For instance, by relying on an unprecedented open-market manipulation theory, based on entirely lawful trading, to justify an intrusive search of Mr. Hwang's accounts, the Government's affidavit fails to satisfy the most fundamental requirement of the Fourth Amendment—a showing of probable cause that a crime was committed.  *See Zurcher*, 436 U.S. at 558 ("Once it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime.") (citation omitted).  As detailed in the warrants' supporting affidavit, the Government's overriding theory of the case, is one of purely open-market manipulation, *i.e.*, that Archegos engaged in a manipulative trading strategy to raise the price of publicly traded securities entirely through real transactions in lawful total return swaps.  *See* Lustberg Decl. ¶ 6; Ex. B (Search Warrants and Supporting Affidavit) ¶¶ 18, 55.  Indeed, according to the affidavit, all of the alleged crimes were perpetrated through an interwoven scheme that would ultimately inflate the share price of companies in which Archegos traded.  *Id.* ¶¶ 18, 19.

100

While the affidavit baldly asserts that "Archegos's trading strategy was calculated to produce increases in the stock price of companies in whose stock Archegos traded," *id.* ¶ 46, the conduct set forth in support merely describes bona-fide trading activity conducted for legitimate investment purposes.  As set forth in Point I.C above, a market manipulation claim based on entirely lawful open-market trading, without any element of deception, is not a recognized crime under Second Circuit law, *see Mulheren*, 938 F.2d at 368-69, 372 (criticizing the government's open-market manipulation theory and reversing a criminal conviction based upon it), or indeed the law of any other Circuit.  Without any degree of suspicion that the conduct alleged could amount to a crime under the law, there was no probable cause for the issuance of these search warrants and no basis to invade Mr. Hwang's personal and business accounts.  *See Weigand*, 482 F. Supp. 3d at 240 (a search warrant must establish probable cause to believe that a crime has been committed); *see also United States v. Brouillette*, 478 F.2d 1171, 1177-78 (5th Cir. 1973) (invalidating a warrant authorizing the government to search for evidence of interstate and foreign travel and transportation in aid of racketeering enterprises where it failed to allege facts to justify a belief that interstate commerce was used in the violation and, thus, could not "establish probable cause that a federal crime ha[d] been committed."); *United States v. Birrell*, 242 F. Supp. 191, 201 (S.D.N.Y. 1965) (finding search warrant based on purported violations of the mail fraud statute to be "insufficient on its face" where it failed to allege facts showing that the defendant used the mails as a means of committing the offense); *United States v. Rutherford*, 14CR417–LTS, 2014 WL 6772163, at *4-5 (S.D.N.Y. Dec. 2, 2014) (invalidating a warrant that "contained no facts that the judge could have interpreted in reaching a reasoned conclusion that the guns alleged to be in the apartment were unlawfully possessed" and thus constituted evidence of a crime).

The affidavit further alleges that Mr. Hwang ignored his analysts and "frequently both dictated target stock prices far in excess of what his analysts proposed and revised those target prices upwards as the stock prices increased during the period in which Archegos was taking its concentrated positions." Lustberg Decl. ¶ 6; Ex. B (Search Warrants and Supporting Affidavit) ¶ 53(a). The affidavit suggests that Mr. Hwang's deviations from analysts' recommended target prices evidence an attempt to "artificially inflate the price of the underlying stock." *Id.* ¶ 53. However, rejecting an analyst's target price is neither illegal nor inherently fraudulent, and Mr. Hwang, as a far more experienced investor than his analysts and the sole owner of Archegos, had no duty and was under no obligation to accept his analysts' proposals; he was completely free to reject their price targets in favor of his own. Thus, the fact that Mr. Hwang, who was investing his own capital and lawfully permitted to set his own target price for a stock, chose not to accept his employees' price recommendations (even as he otherwise utilized their research), does not constitute probable cause to search his accounts. *See United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (probable cause to search must be based on "a sufficient nexus between the criminal activities alleged" and the items to be searched).

In another attempt to concoct probable cause, the affidavit asserts that "the manner in which Archegos traded obscured the fact that it was one entity–Archegos–that was causing much of the trading of the companies in which Archegos had concentrated positions." Lustberg Decl. ¶ 6; Ex. B (Search Warrants and Supporting Affidavit) ¶ 5. In support, the affidavit relies heavily on the assumption that "Archegos would invest in a company's shares until just shy of the 5% threshold," *id.* ¶ 52(a), and "[a]fter reaching approximately 4.9% ownership interest through the purchase of shares, Archegos would begin investing in the given company through swap trading," *id.* ¶52(b). The affidavit claims that, by investing through swap trading, "Archegos would cause its prime

broker to purchase the shares," and "even though Archegos caused its prime brokers to purchase in many cases far more than 5% of the outstanding shares of a company, it was the prime brokers and not Archegos that had to publicly disclose their ownership interest." *Id.*   However, such conduct – trading on swaps to avoid public disclosure – is simply not illegal and there is no rule or current regulatory prohibition on using swaps to keep market investments private; on the contrary, the regulatory structure in place at the relevant time, and even today, authorizes exactly that conduct.  Thus, the fact that Archegos lawfully used swap transactions to invest in a company, "[a]fter reaching approximately 4.9% ownership interest" through its own purchase of shares, cannot support a finding of probable cause that a crime had occurred.

Nor can probable cause be established by the contention that every swap transaction was hedged by the counterparty with an actual purchase of the shares of the underlying security; this was simply not true, as the Government concedes.  *See id.* ¶ 50 n.6.  That is, the affidavit correctly states that the majority of Archegos's transactions occurred in the form of swap agreements, which by the Government's own definition do not involve actual market trades, but are rather "two-sided financial contract[s] in which one counterparty pays out the total return of the equity . . . and in return, receives a regular fixed or floating cash flow." *Id.* ¶ 21(e).  In turn, the Government avers that "although the prime brokers generally purchased shares to be fully hedged—that is on a one-to-one ratio with the number of shares Archegos had exposure to through a swap contract—prime brokers did not in every instance purchase shares equal to the number of shares referenced in a swap contract with Archegos." *Id.* ¶ 50 n.6.  Indeed, as noted above, *supra* note 7, the regulators have admitted that the contracts between Archegos and its counterparties did not require the banks to hedge at all or in any particular way, let alone by purchasing the securities referenced in the swap agreements.  In sum, as the Government knew, and its own affidavit acknowledges, the

counterparties did not, in every instance, purchase corresponding equity shares of the underlying stock. This undermines the contention that Archegos's trading impacted the price of any given security. By its own terms, then, the affidavit does not, in this sense, set forth probable cause. *Cf. United States v. McMurtrey*, 704 F.3d 504, 510, 512-14 (7th Cir. 2013) (defendant sufficient challenged probable cause and a *Franks* hearing was warranted in light of evidence that officers submitted search warrant affidavits including factual statements that were internally inconsistent and contradictory).

**B.      The Affidavit's Allegations of Mr. Hwang's Involvement in the Alleged Misrepresentations to Counterparties Do Not Give Rise to Probable Cause.**

In a further attempt to obtain a finding of probable cause, the affidavit sets forth five instances in which persons other than Mr. Hwang (*e.g.*, Tomita and Becker) allegedly made false and misleading statements to Archegos's counterparties about Archegos's portfolio composition, exposure, and liquidity to "preserve the ability to place large-value, leveraged trades through" these counterparties. *Id.* ¶¶ 22-43. With respect to Mr. Hwang's purported involvement in the scheme to defraud, the affidavit baldy asserts that "many of these representations" were made "at the direction of Hwang." *Id.* ¶ 52d. However, as asserted in the affidavit, in each and every instance, the purportedly false statements made to counterparties were occasioned by other Archegos employees, such as Becker and Tomita, not by Mr. Hwang. The conclusory allegation that Mr. Hwang, as owner of Archegos, "directed" others does not make him legally responsible for their conduct. *See, e.g.*, *United States v. Rutherford*, 71 F. Supp. 3d 386, 392 (S.D.N.Y. 2014) ("[A] conclusory legal allegation is insufficient to establish the existence of probable cause sufficient to support the issuance of a search warrant."); *see also United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) ("We have never held . . . that a suspect's 'status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home'" (citations omitted)).

Nor does Mr. Hwang's mere association with Archegos employees – who may have been involved in the alleged scheme to defraud counterparties – give rise to probable cause that Mr. Hwang engaged in criminal conduct sufficient to support the issuance of the search warrants.  *See, e.g., United States v. Lahey,* 967 F. Supp. 2d 698, 727 (S.D.N.Y. 2013) (granting suppression where warrant was not supported by probable cause because it was "premised on very thin evidence" connecting the defendant, let alone the place to be searched, to the alleged criminal activity) Finally, the references in the affidavit to a strategy call following the collapse wherein "Hwang instructed that Archegos's representatives should tell prime brokers that Archegos had faced a perfect storm, but that Archegos was comfortable with its stock and capital, that Archegos knew the companies it invested in well, and that those companies were household names," *id.* ¶ 29b, and to Mr. Hwang's attendance on a Zoom meeting with Mills, Becker, Halligan and Tomita to discuss "cash stuff," *id.* ¶ 43e, cannot possibly establish probable cause to believe these accounts would contain evidence of crimes.  *See, e.g., Falso*, 544 F.3d at 122-24 (holding that a search warrant for defendant's home that alleged that he was a possible subscriber to a website that distributed child pornography lacked probable cause to believe that evidence of child pornography would be found in defendant's home, since there were no allegations that defendant violated the law by gaining access to website); *United States v. Real Prop.*, 301 F. Supp. 2d 868, 871 (W.D. Wis. 2002) (finding that asserted rumors and innocuous information "do not add up to probable cause, whether considered as individual pieces of information or in their totality"); *United States v. Glover*, 755 F.3d 811, 817-18 (7th Cir. 2014) (affidavit containing "minimal" corroboration of "only minor facts and legal conduct," "provided an insufficient basis for finding probable cause to support the search warrant."); *United States v. Pena*, CR 19-3611 JB, 2021 WL 5280247, at *26 (D.N.M. Nov.

12, 2021) (noting that "the Court should not rely solely on a suspect's engagement in legal activity to presume that a suspect has engaged in illegal activity.").

For all of these reasons, probable cause was not shown for the search warrants issued on all four of Mr. Hwang's accounts, and the evidence seized pursuant to those warrants should therefore be suppressed.

## IV.   IF THE INDICTMENT SURVIVES THE MOTION TO DISMISS, THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE A BILL OF PARTICULARS.

Under Rule 7(f) of the Federal Rules of Criminal Procedure, a defendant may request and the Government must provide a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [the] defendant to prepare for trial[ and] to prevent surprise . . ." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). Because "the potential for unfair surprise and the difficulty of preparing a defense are amplified" in complex conspiracy cases, the Government cannot avoid the responsibility of identifying with sufficient particularity the nature of the charge pending against a defendant by relying on the sheer quantity of discovery produced. *United States v. Rajaratnam*, No. 09-CR-1184, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010). Indeed, courts in this Circuit have repeatedly recognized that "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States  v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008); *see also United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) ("because so much discovery was produced to the defendants," a bill of particulars was ordered to "significantly condense[] the voluminous discovery"); *Bortnovsky*, 820 F.2d at 575 ("providing mountains of documents to defense counsel" when the indictment contained general allegations of fraud

"impermissibly shifted" the burden of proof to the defendants, necessitating a bill of particulars); *United States   v. Nachamie*, 91 F. Supp. 2d 565, 571-72 (S.D.N.Y. 2000) (granting bill of particulars where government had produced 200,000 documents relating to 2,000 Medicare claims, but had not told the defendants which claims were alleged to be false).

The Second Circuit has explained that the need for particularization is critical when defendants have been charged under broad criminal statutes like RICO.  *See United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (holding that trial court abused discretion by denying bill of particulars in RICO conspiracy case and that discovery and Jencks Act disclosures were not "an adequate substitute for a straightforward . . . bill of particulars").  As the Court pointed out in *Davidoff*, the RICO conspiracy statute affords "wide latitude . . . [to] the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity.'"  *Id.* at 1154.  But with that latitude "comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."  *Id.*

Here, the Indictment fails to sufficiently inform Defendants of the essential facts allegedly establishing the charged RICO conspiracy, including the predicate acts, and therefore prevents the Defendants from adequately investigating and preparing trial defenses.  If the Indictment is not dismissed outright, Defendants request that this Court order the Government to provide a bill of particulars identifying the following, which are grouped by category for ease of discussion:

1. With regard to the misrepresentations alleged in the Indictment ¶¶ 41-59,

   a. Each and every alleged misrepresentation, by the person(s) who made it, by its nature, the person(s) who received it, and the date, time, and place; and

   b. Any misrepresentation to Archegos's counterparties that Mr. Halligan or Mr. Hwang made or directed to be made prior to March 2020 upon which the Government intends to rely at trial.

107

2.  With regard to the RICO conspiracy charge (Count One),

    a.  What or who is meant by the "Archegos Enterprise" and the date when it was allegedly formed.

    b.  Any alleged racketeering acts not listed in the Indictment.

    c.  Any overt acts not listed in the Indictment.

    d.  The means and methods by which the alleged conspiracy was carried out.

    e.  All unindicted co-conspirators.

3.  With regard to the manipulation counts (Counts Three-Nine),

    a.  Every trade alleged to be manipulative or otherwise unlawful.

    b.  Every trade alleged to have created an artificial price.

    c.  Every person or entity induced to sell (or buy) a security bought (or sold) by Archegos based upon an alleged artificial price, including the name of the security and the date/time of the trade.

    d.  Any person at Archegos other than Mr. Hwang alleged to have executed the manipulative or otherwise unlawful trades.

    e.  The allegedly false information injected into the market by the allegedly manipulative trades.

4.  With regard to the securities fraud counts (Counts Two and Ten),

    a.  Any and all trades or transactions that Mr. Halligan allegedly made or directed to be made between Archegos and its counterparties from 2020 to March 31, 2021.

    b.  Any and all trades or transactions over which Mr. Halligan allegedly had ultimate authority during the relevant time period.

    c.  The victims of the alleged misconduct.

    d.  The date on which the alleged "scheme to defraud Archegos's Counterparties" began.

    e.  All instances in which Mr. Halligan and/or Mr. Hwang are alleged to have aided and abetted supposed misrepresentations to counterparties.

As set forth more fully below, disclosure of the foregoing items is necessary to "enabl[e] [Defendants] to prepare for trial" and "to prevent surprise." *Bortnovsky*, 820 F.2d at 574.

### A. The Government Should Identify All Alleged Misrepresentations (Requests 1(a) – (b)).

Six months ago, the Court directed the Government to identify "each and all [of] the alleged misrepresentations, by persons who made it, by their nature, persons who received it, date, time, [and] place." ECF 29 (June 1, 2022 Tr. at 16:24-17:1 (the "June 1 Order")). Contrary to the Government's *post hoc* attempt to re-characterize the June 1 Order as a "suggestion" and its disclosure obligations as "voluntary," the Government plainly acknowledged at the June 1 conference the scope of what the Court was ordering. *See id.* at 16:24-17:1, 19:15-16 (THE COURT: "*mak[e] sure* that there is identification of each and all the alleged misrepresentations, by persons who made it, by their nature, persons who received it, date, time, place . . . . *[Y]ou already heard my exercise of discretion with regard to misrepresentations.*") (emphasis added); *id.* at 17:2-8 ("MR. PODOLSKY: *Understood, [Y]our Honor.* THE COURT: Like a Rule 9 allegation in a civil action. MR. PODOLSKY: Understood. I should just preview for the Court that there are, I believe, dozens, many misrepresentations in this case. But with that, *I understand the Court's indication.*") (emphases added).

The Government has not complied with the Court's directive. Rather than identifying "*each and all* [of] the alleged misrepresentations that [it contends] will be actionable," *id.* at 16:4-5, the Government has provided Defendants with only "examples" of the alleged misstatements at issue. *See* ECF 38 at 5-11. This is exactly what the Court indicated was insufficient. June 1, 2022 Tr. at 16:6-16:11 ("MR. PODOLSKY: . . . What the indictment has done is describe by category the nature of each type of misrepresentation; it gives examples. . . . THE COURT: Is it complete? Will you be wanting to try misrepresentations not alleged in the indictment?")).

109

Defendants have engaged extensively with the Government to seek to obtain compliance with the June 1 Order.  *See* Lustberg Decl. ¶¶ 35, 38, 39, 41, Exs. U, X, Y, AA.  Notwithstanding these efforts, the Government has declined to represent that the alleged misrepresentations identified to date are complete.  The need for a bill of particulars is particularly acute in this case, given that almost none of the alleged misstatements to at least nine different third-party financial institutions were made by Defendants themselves or even in their presence.  As a result, those misrepresentation are not ascertainable absent a bill of particulars.  *See United States v. Vaid*, No. 16 CR. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (granting in part bill of particulars in prosecution charging conspiracy to make false statements relating to health care, mail, and wire fraud, because "[i]n cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this information is not ascertainable"); *United States v. Mango*, No. 96-CR-327, 1997 WL 222367, at *12 (N.D.N.Y. May 1, 1997) (requiring bill of particulars on conspiracy count to identify every alleged false representation, the maker of that representation, the date it was made, to whom it was made, and each co-conspirator who knew the representation was false when made); *see also Bortnovsky*, 820 F.2d at 575 (trial court's failure to grant a bill of particulars was error because without it defense counsel was "left unguided as to which documents would be proven falsified").

Compounding the Government's non-compliance is the fact that certain of the alleged misrepresentations it has identified are lacking in key details, including "who made" them.  *See* ECF 29 at 16:25 (June 1, 2022 Tr.) .  For example, the Government's disclosures refer to (1) an alleged statement "[o]n or about March 4, 2021," by an unidentified "representative of Archegos"; (2) an alleged misstatement "[o]n or about March 23, 2021" by unidentified "representatives of

110

Archegos"; (3) various alleged misrepresentations made at unspecified times on March 24 and 25, 2021 to various counterparties by "various combinations of Archegos's senior leadership"; and (4) an alleged misrepresentation "[i]n or about March 2021" by an unnamed "Archegos representative."  ECF 38 at 5-6, 10, 11 (Aug. 18, 2022 Ltr.).

As to other alleged misrepresentations, the Government provides essentially no particulars at all.  For example, the Government alleges that unidentified "Archegos Conspirators" made misrepresentations to unidentified representatives of Goldman Sachs about position concentration and liquidity in January 2021, ¶¶ 52(d), 54(c), without disclosing any further details.  Nor does the Government offer any reference as to where evidence of them might be found in the voluminous discovery produced to date.  Accordingly, the Government should be ordered to comply with all aspects of the June 1 Order by means of a bill of particulars identifying "each and all [of] the alleged misrepresentations, by persons who made it, by their nature, persons who received it, date, time, [and] place."[59]  ECF 29 at 16:24-17:1 (June 1, 2022 Tr.).  Should the Government fail to comply fully and promptly with respect to any alleged misrepresentation, it should be precluded from attempting to rely on such alleged misrepresentations for any purpose at trial.

**B.    The Government Should Identify Uncharged Co-Conspirators and Others Involved in the Alleged Schemes (Requests 2(a) and 2(e)).**

The Indictment defines "Archegos Conspirators" to refer to Messrs. Hwang, Halligan, Tomita, and Becker, as well as "*others known and unknown*."  ¶ 2 (emphasis added).  Likewise,

---

[59] This directive is consistent with the pleading standard under Civil Rule 9(b), to which the Court made reference at the June 1 conference.  ECF 29 at 17:2-5 (June 1, 2022 Tr.).  *See, e.g., Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004))).

the Indictment defines the "Archegos Enterprise" as including Mr. Hwang; Mr. Halligan; Mr. Tomita; Mr. Becker; Archegos Fund, LP; Archegos Capital Partners, LLC; Archegos Capital Management, LP and its employees; and Archegos Capital, LLC "*and others known and unknown*." ¶ 11 (emphasis added).  Such vague allegations are insufficient because, as courts in this Circuit regularly recognize, defendants are entitled to know the identity of every known person or entity with whom they are alleged to have conspired.  *See, e.g.*, *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) (granting request for identities of unindicted co-conspirators known to the government); *Nachamie*, 91 F. Supp. 2d at 573 (ordering government to provide defendants with names of any known unindicted co-conspirators); *United States v. Savin*, No. 00 CR. 45 (RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) (granting defense request for list of known unindicted co-conspirators).  This same result is appropriate here.

### C.   The Government Should Identify All Acts and Transactions Alleged to Comprise the Purported Schemes (Requests 2(b)-(d), 3(a)-(e), and 4(a)-(b)).

Count One of the Indictment charges Defendants with violating the RICO conspiracy statute "multiple" times through unspecified acts of securities and wire fraud, ¶¶ 68, and alleges that Defendants conducted the affairs of the Archegos Enterprise "through various unlawful [but unspecified] means and methods," ¶ 74.  The Indictment likewise alleges, equally generically, in Counts Ten and Eleven that Mr. Hwang and Mr. Halligan violated Section 10(b) of the Exchange Act and the wire fraud statute, respectively.  But courts in this Circuit demand more, requiring notice of "particular illegal actions on the part of a defendant within the alleged object of the conspiracy."  *United States v. Altimari*, No. 93-CR-650 (LMM), 1994 WL 116086, at *3 (S.D.N.Y. Mar. 25, 1994); *see also United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (where indictment lacked sufficient particulars of drug conspiracy, "the defendant was entitled to be otherwise apprised of the conduct that he was alleged to have undertaken in furtherance of this

multi-faceted" conspiracy); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (requiring the government to file a bill of particulars specifying the transactions that it "will seek to prove were tainted by an unlawful conspiracy of which [the defendant] was a part"); *Rajaratnam,* 2010 WL 2788168, at *3 (noting that "courts have sometimes ordered the government to provide more particulars about overt acts alleged in terms too general to enable the defendant to defend against them").

The Indictment also broadly alleges that "the market manipulation scheme distorted the market," ¶¶ 39-40, because "at various times between in or about June 2020 and March 2021, Archegos's trading caused and established certain stock prices that were not set by ordinary market forces of supply and demand," ¶ 39. Additionally, the Indictment continues, "the cumulative effect of the Archegos Conspirators' schemes over the course of 2020, and particularly in or about fall 2020 and through March 2021, contributed to significant artificial increases in the prices of the securities underlying Archegos's long swaps." ¶ 40. These sweeping allegations are bereft of any detail about *which specific trades* among the many thousands Archegos executed during this months-long period were manipulative and/or created an artificial price. For each trade that allegedly resulted in a stock price that was not set by ordinary forces of supply and demand, the Indictment fails to identify *who in particular* was induced to sell to (or buy from) Archegos, *which securities* those parties sold (or bought) based on an artificial price, *the date and time* of any such sales or purchases, *what false information* was injected into the market in connection with such transactions and *by whom* at Archegos.

Absent these particulars, Mr. Hwang confronts the herculean task of preparing a defense to every one of the thousands of trades that Archegos executed across seven different stocks spanning scores of days. He is clearly entitled to more guidance than that. *See United States v.*

113

*Connolly*, No. 16-cr-370 (CM), 2017 WL 2537808, at *5 (S.D.N.Y. May 24, 2017) (requiring Government, in light of the sheer volume of potentially relevant data, to provide the defense in a manipulation case "with a list of trades that will, or at least may, be presented to the jury"); *Savin*, 2001 WL 243533, at *3-4 (granting request for particulars where defendant otherwise would have had to "attempt to guess at" which transactions during a six-year period were allegedly improper); *Nachamie*, 91 F. Supp. 2d at 571-72 (granting bill of particulars where government had not told defendants which among 2,000 Medicare claims were false).

*Bortnovsky*, in which the defendants were charged with RICO violations and mail fraud for allegedly faking burglaries to obtain insurance money, is particularly instructive. 820 F.2d at 573-74. Although the indictment did not identify which of twelve different burglaries the Government would seek to prove were staged, the trial court denied the defendants' request for a bill of particulars, and, at trial, the government argued only that three of the twelve burglaries were staged. *Id.* at 574. The Second Circuit reversed the conviction, holding that the Government's failure to identify before trial the supposedly fake burglaries and the allegedly fraudulent documents "hindered [the defendants] in preparing their defense." *Id.* The Court further found that the failure to provide particularity effectively and impermissibly shifted the burden of proof to the defendants to "explain the events surrounding [] actual burglaries and to confront numerous documents unrelated to the charges pending." *Id.* at 574–75. These same concerns are amplified here, as Defendants do not know which of the myriad trades that Archegos executed in multiple stocks or which of the sometimes daily communications and interactions Archegos had with its many counterparties will be presented at trial. The Government should therefore be ordered to provide the particulars set forth in Defendants' Requests 2(b)-(d), 3(a)-(e), and 4(a)-(b).

114

**D.       The Government Should Identify Allegedly Defrauded Victims (Request 4(c)).**

The Indictment broadly describes the victims of the offenses alleged in the Indictment as other market participants, companies whose stock Archegos purchased (in shares or swaps), Archegos's employees,[60] and financial institutions (presumably counterparties and unidentified other institutions).  ¶ 1.  Defendants are entitled to know precisely who these alleged victims are in order to meet the charges.  Thus, "[t]o the extent that the Government knows the identities of the alleged victims of these charged crimes and has not disclosed this information, a bill of particulars is warranted."  *United States v. Wilson*, 493 F. Supp. 2d 364, 373 (E.D.N.Y. 2006).

**E.       The Government Should Identify the Dates that the Alleged Archegos Enterprise Was Formed and the Alleged Scheme to Defraud Began (Requests 2(a) and 4(d)).**

The Indictment alleges that the "Archegos Enterprise" was corrupted "by at least in or about 2020," ¶¶ 1, 20, and that the "scheme to defraud Archegos's Counterparties lasted "[f]rom in or about 2020, up to and including in or about March 2021," ¶ 41.  Without knowing the duration of the alleged scheme, Defendants are hindered in preparing their defense.  *See United States v. Ikoli*, No. 16-CR-148 (AJN), 2017 WL 396681, at *5 (S.D.N.Y. Jan. 26, 2017) (allegations that "conspiracy lasted from 'November 2013 through in or about February 2016'" failed to identify approximate dates of key events and thus lacked sufficient particularity).

---

[60] The reference to Archegos's employees as alleged victims is particularly opaque, given that the Government alleges that Archegos was a racketeering enterprise over portions of 2020 and 2021. In other words, the Indictment offers Defendants no clarity as to which employees were allegedly part of the enterprise, or even unindicted co-conspirators, and which are supposedly victims.

**F.      The Government Should Identify All Instances in Which Defendants Are Alleged to Have Aided and Abetted Supposed Misrepresentations to Counterparties (Request 4(e)).**

Although the Indictment includes, at the end of Counts Ten and Eleven, a citation to the aiding and abetting statute, 18 U.S.C. § 2, it does not clearly charge aiding and abetting securities fraud or wire fraud.  As a result, the Indictment does not describe, much less pinpoint, which purported misrepresentations Defendants allegedly aided and abetted, or how they did so.  A bill of particulars thus is necessary "to identify with sufficient particularity the nature of the [aiding and abetting] charge pending against [Defendants], thereby enabling [them] to prepare for trial [and] prevent surprise . . . ."  *Bortnovsky*, 820 F.2d at 574.  Indeed, courts have order a bill of particulars in similar circumstances.  *See United States v. Murgio*, 209 F. Supp. 3d 698, 723 (S.D.N.Y. 2016) (granting bill of particulars in part because "[t]he preparation necessary to defend against a claim that [defendant] aided and abetted a bribe looks very different from the preparation necessary to defend against a charge that he personally made one"); *United States v. Lieberman*, 15 F.R.D. 278, 281 (S.D.N.Y. 1953) (ordering government to state whether defendant would be tried on theory that he "aided, abetted, counseled, commanded, induced, procured or caused such [an act]" and, if so, "which one or ones he performed and the means by which it or they were performed").  The Court should order the same relief here.

**V.      THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS *BRADY* OBLIGATIONS.**

"*Brady* and its progeny require the Government to disclose material information that is favorable to the accused, either because it is exculpatory, or because it is impeaching."  *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007)).  The *Brady* obligation extends to any potentially exculpatory information that may directly, or indirectly, rebut the prosecution's case "to assist the defense in making its case," *United States v. Bagley*, 473 U.S. 667, 675 & n.6 (1985),

116

even if the information contains portions that are consistent with the government's theory, *United States v. Mahaffy*, 693 F.3d 113, 130-33 (2d Cir. 2012).  "[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  Thus, in *United States v. Rivas*, the Second Circuit vacated a conviction where the Government failed to disclose a statement by a witness who supported the defendant's theory of the case.  377 F.3d 195, 199-200 (2d Cir. 2004).

On April 27, 2022, Magistrate Judge Willis, at Defendants' arraignment, orally ordered the Government to comply with its *Brady* obligations, and she further issued a detailed and specific written Order providing informing the Government that failure to comply with those obligations could result in consequences up to and including dismissal of the Indictment.  ECF 4 at 2-3 (emphasis added).  Since that time, Defendants have engaged in extensive communications with the Government to seek to ensure that the Government complies with its *Brady* obligations, including submitting specific written requests for evidence that must be disclosed under *Brady*. *See* Lustberg Decl. ¶¶ 34-39, 42; Exs. T-Y, BB.  While the Government has made numerous *Brady* disclosures, Defendants have sought clarification as to the scope and completeness of these productions.  The parties have now reached an impasse with respect to certain *Brady* issues, and Defendants therefore seek relief from the Court compelling the Government to comply forthwith with its obligations under *Brady*.

Most notably, the Government has fallen short of its *Brady* obligations by refusing to review and produce exculpatory records created or obtained by the SEC and CFTC in the course of the joint investigation that those agencies conducted with the U.S. Attorney's Office.  The Government "has a duty to learn of any favorable evidence known to the others acting on the [G]overnment's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.  "Where the

USAO conducts a joint investigation with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (citing cases).

In correspondence with defense counsel that preceded this motion, the Government confirmed that it has not made, and does not intend to make, appropriate efforts to collect, search, review, and produce *Brady* material that may have been created or maintained by the SEC or CFTC.  Lustberg Decl., ¶43 at 1-2 (Oct. 19 Letter).  And in a letter received the day pre-trial motions were due to be filed, the Government reiterated its refusal to obtain and produce *Brady* material from the SEC and the CFTC, once again contending that the SEC and CFTC are not "members of the prosecution team," and therefore were not part of any joint investigation.  *Id.*; Lustberg Decl., ¶ 42; Ex. BB at 2 (Dec. 2 Letter).  The law, however, is to the contrary:  "For *Brady* purposes, it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-gathering that might not otherwise be available to the defendant."  *Gupta*, 848 F. Supp. 2d at 494; *see also United States v. Martoma*, 990 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2014) ("At various times in connection with the criminal investigation . . . representatives of the U.S. Attorney's Office conferred with the SEC about the SEC's parallel investigation. . . .  Clearly, the agencies were engaged in joint fact-gathering, even if they were making separate investigatory or charging decisions.") (cleaned up).[61]

---

[61] The Government has produced some documents that the CFTC obtained and later produced to the Government, thus demonstrating that it can access files in the possession of its partner agencies. That correspondence, however, does not indicate that this constitutes all of the exculpatory material in the CFTC's possession.

The Government's position is also entirely at odds with the plain text of the *Brady* Order itself, which explicitly imposes on the Government "an affirmative obligation to seek all information subject to disclosure under this Order from *all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, **or investigation that led to the prosecution**, of the offense or offenses with which the defendant is charged*."   ECF 4 at 2 (emphasis added)).   The Government cannot plausibly deny that the SEC and CFTC participated in the "investigation that led to the prosecution" of this matter. In fact, counsel from the SEC and CFTC attended many of the proffers provided by Mr. Hwang and his counsel (*see generally* Lustberg Decl.; Mem. of Law in Support of Motion to Dismiss for Prosecutorial Misconduct) and the Government, the SEC, and the CFTC have all publicly trumpeted, in statements released simultaneously as part of the coordinated filing of their cases on April 27, 2022, that they were "partners," and that they "assisted," "cooperated," and contributed "hard work" to the joint investigation.   Indeed, the U.S. Attorney himself even praised the SEC's and CFTC's "invaluable" assistance in the investigation.[62]   That open acknowledgement readily

---

[62]   *See* DOJ Office of Public Affairs Release: "Four Charged in Connection with Multibillion-Dollar Collapse of Archegos Capital Management," April 27, 2022, *available at* https://bit.ly/3dRCFjF ("This case was investigated by the U.S. Attorney's Office for the Southern District of New York and the FBI. The Justice Department's Organized Crime and Gang Section provided valuable assistance. ***The U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission, each of which today filed a parallel civil action, assisted and cooperated in this investigation***."); U.S. Attorneys' Office for the Southern District of New York, "United States Attorney Announces Charges in Connection with Collapse of Archegos Capital Management," April 27, 2022, *available at* https://youtu.be/DZIWvpDmhc8, at 9:16 ("I also want to thank our partners at the FBI, the SEC, and the CFTC. ***Their dedication and hard work on this investigation was invaluable.***"); SEC, "SEC Charges Archegos and its Founder with Massive Market Manipulation Scheme," Press Release No. 2022-70, April 27, 2022, *available at*: https://www.sec.gov/news/press-release/2022-70 ("***The SEC acknowledges the assistance and cooperation of the U.S. Attorney's Office for the Southern District of New York, the FBI, and the CFTC***"); CFTC, "CFTC Charges Archegos Capital Management and Three Employees with Scheme to Defraud Resulting in Swap Counterparty Losses Over $10 Billion," Press Release No. 8520-22, April 27, 2022, *available at*

119

distinguishes this case from any other authority upon which the Government has relied in pre-motion correspondence.

Accordingly, consistent with the *Brady* Order and the cases cited above, the Government should be required to obtain, review, and produce forthwith all discoverable records that were created by the SEC and CFTC in the course of their joint investigations of Defendants, including all exculpatory evidence.[63]  *See Gupta*, 848 F. Supp. 2d at 495 ("[T]he Court directs the Government to promptly review the SEC's memoranda for any additional *Brady* material, and if there be such, to disclose it to the defense").[64]

---

https://www.cftc.gov/PressRoom/PressReleases/8520-22) ("***The Division of Enforcement thanks and acknowledges the assistance of the U.S. Attorney's Office for the Southern District of New York, the Federal Bureau of Investigation, and the SEC.***") (all emphases added).

[63] Defendants will continue trying to work through any remaining *Brady* issues with the Government.  But given the timing of the Government's most recent letter—received the very same day this motion was due to be filed—Defendants respectfully reserve the right to move for relief at a later date if those discussions prove unsuccessful.

[64] Finally, at this time, Mr. Hwang and Mr. Halligan make no motion for a severance of defendants or counts.  However, they wish to reserve the right to move for a severance in the event a basis becomes apparent from any further discovery materials that may be produced or reviewed, and as the adequacy of the Indictment continues to be reviewed.  *See, e.g.*, *Schaffer v. United States*, 362 U.S. 511, 516 (1960) ("[T]he trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.").

## CONCLUSION

For these reasons, Defendants Sung Kook (Bill) Hwang and Patrick Halligan respectfully request that the Court enter an Order dismissing the Indictment in its entirety.  Alternatively, the Court should enter an Order striking prejudicial allegations from the Indictment referencing Tiger Asia, suppressing evidence unlawfully seized from certain electronic accounts, and compelling the Government to provide a bill of particulars and to comply with its *Brady* obligations.

Dated:  December 2, 2022

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
Andrew J. Marino
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Defendant*
*Sung Kook (Bill) Hwang*

s/Mary E. Mulligan
Mary E. Mulligan
Timothy M. Haggerty
Bonnie M. Baker
Anil Vassanji
Rupita Chakraborty
**FRIEDMAN   KAPLAN   SEILER   &**
**ADELMAN LLP**
7 Times Square
New York, New York 10036
(212) 833-1100
mmulligan@fklaw.com

*Attorneys for Defendant*
*Patrick Halligan*