**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

     v.

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,

       Defendants.

Criminal Action No. 22-240 (AKH)

*Document Electronically Filed*

**MEMORANDUM OF LAW IN SUPPORT OF HWANG'S MOTION TO DISMISS**
**FOR PROSECUTORIAL MISCONDUCT**

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ................................................................................ 2

    I.      The Government Begins Its Investigation ............................................................ 2

    II.     The Proffer Process ............................................................................................. 4

    III.    The Post-Proffer Process ..................................................................................... 9

ARGUMENT ............................................................................................................................. 15

    I.      Relevant Legal Background ............................................................................... 16

    II.     Mr. Hwang was Induced to Proffer by the Government's Affirmative
           Misrepresentations as to His Target Status. ...................................................... 28

    III.    The Government Obtained Crucial Information About Mr. Hwang's Trial
           Testimony and Eventual Defense Strategy Through a Sham
           Post-Proffer Process. ......................................................................................... 31

CONCLUSION .......................................................................................................................... 39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayers v. Hudson*,
  623 F.3d 301 (6th Cir. 2010) ................................................................37

*Banks v. Dretke*,
  540 U.S. 668 (2004) ............................................................................24

*Berger v. United States*,
  295 U.S. 78 (1935) ..........................................................................17, 36

*Brady v. Maryland*,
  373 U.S. 83 (1963) ..............................................................................24

*Briggs v. Goodwin*,
  698 F.2d 486 (D.C. Cir. 1983), *overruled on other grounds*, 712 F.2d 1444
  (D.C. Cir. 1983) ..................................................................................38

*Connick v. Thompson*,
  563 U.S. 51 (2011) ..............................................................................17

*DaCosta v. City of New York*,
  296 F. Supp. 3d 569 (E.D.N.Y. 2017) ..................................................17

*Daye v. Attorney General of State of N.Y.*,
  712 F.2d 1566 (2d Cir. 1983) ..............................................................26

*Evans v. Jones*,
  996 F.3d 766 (7th Cir. 2021) ...............................................................25

*Franks v. Delaware*,
  438 U.S. 154 (1978) ............................................................................18

*Giglio v. United States*,
  405 U.S. 150 (1972) ............................................................................24

*Hodge v. Hurley*,
  426 F.3d 368 (6th Cir. 2005) ...............................................................25

*Hoffa v. United States*,
  385 U.S. 293 (1966) ............................................................................24

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ............................................................................24

*Massiah v. United States*,
    377 U.S. 201 (1964) ...................................................................................................23

*Miranda v. Arizona*,
    384 U.S. 436 (1966) .............................................................................................17, 22

*Mooney v. Holohan*,
    294 U.S. 103 (1935) ...................................................................................................25

*Strickler v. Greene*,
    527 U.S. 263 (1999) .............................................................................................16, 24

*United States v. Agurs*,
    427 U.S. 97 (1976) .....................................................................................................24

*United States v. Babb*,
    807 F.2d 272 (1st Cir. 1986) ...........................................................................19, 20, 28

*United States v. Bagley*,
    473 U.S. 667 (1985) ...................................................................................................24

*United States v. Booker*,
    05-CR-313(JBS), 2006 WL 242509 (D.N.J. Feb. 2, 2006) .......................................37

*United States v. Breslin*,
    916 F. Supp. 438 (E.D. Pa. 1996) .............................................................................18

*United States v. Brink*,
    39 F.3d 419 (3d Cir. 1994) .........................................................................................37

*United States v. Brito*,
    907 F.2d 392 (2d Cir. 1990) .......................................................................................22

*United States v. Bryson*,
    No. 13-00041, 2014 WL 1653244 (D. Conn. April 22, 2014) ...................................18

*United States v. Carter*,
    236 F.3d 777 (6th Cir. 2001) .....................................................................................25

*United States v. Ciambrone*,
    601 F.2d 616 (2d Cir. 1979) .................................................................................17, 18

*United States v. Costanzo*,
    740 F.2d 251 (3d Cir. 1984) .......................................................................................36

*United States v. Danielson*,
    325 F.3d 1054 (9th Cir. 2003) ...................................................................................38

*United States v. Drake*,
310 F. Supp. 3d 607 (M.D.N.C. 2018) .........................................................................19, 21

*United States v. Fish*,
No. 05-CR-228A, 2006 WL 3731292 (W.D.N.Y. Dec. 18, 2006).........................................23

*United States v. Gillespie*,
974 F.2d 796 (7th Cir. 1992) ...................................................................................19, 20, 28

*United States v. Hasting*,
461 U.S. 499 (1983)..........................................................................................................26

*United States v. Henry*,
447 U.S. 264 (1980)..........................................................................................................23

*United States v. HSBC Bank USA, N.A.*,
863 F.3d 125 (2d Cir. 2017)................................................................................................27

*United States v. Jacobs*,
547 F.2d 772 (2d Cir. 1976).........................................................................................22, 37

*United States v. Johnson*,
221 F.3d 83 (2d Cir. 2000).................................................................................................26

*United States v. Kastigar*,
406 U.S. 441 (1972)....................................................................................................37, 38

*United States v. Landji*,
(S1) 18 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ...........................27, 28

*United States v. Lombardozzi*,
491 F.3d 61 (2d Cir. 2007)..................................................................................................22

*United States v. Male Juvenile*,
121 F.3d 34 (2d Cir. 1997)..................................................................................................17

*United States v. Mandell*,
752 F.3d 544 (2d Cir. 2014)................................................................................................18

*United States v. Ming He*,
94 F.3d 782 (2d Cir. 1996)......................................................................................26, 27, 36

*United States v. Mohr*,
CR 05-326-RE, 2007 WL 2344875 (D. Or. Aug. 13, 2007)................................................27

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011).............................................................................................25

*United States v. Myers*,
  123 F.3d 350 (6th Cir. 1997) ............................................................................19, 20, 37

*United States v. Pacheco-Ortiz*,
  889 F.2d 301 (1st Cir. 1989) .............................................................................20, 21, 28

*United States v. Payner*,
  447 U.S. 727 (1980) ....................................................................................................37

*United States v. Pelullo*,
  399 F.3d 197 (3d Cir. 2005) ........................................................................................24

*United States v. Percoco*,
  16-CR-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ...........................21, 22, 23

*United States v. Restrepo*,
  547 F. App'x 34 (2d Cir. 2013) ...................................................................................22

*United States v. Ross*,
  372 F.3d 1097 (9th Cir. 2004) .....................................................................................27

*United States v. Russell*,
  916 F. Supp. 2d 305 (E.D.N.Y. 2013) .........................................................................22

*United States v. Sabri*,
  973 F. Supp. 134 (W.D.N.Y. 1996) .............................................................................26

*United States v. Shaffer*,
  789 F.2d 682 (9th Cir. 1986) .......................................................................................25

*United States v. Sinclair*,
  No. 10-CF-6211L, 2013 WL 6148078 (W.D.N.Y. May 10, 2013) ...............................27

*United States v. Slough*,
  679 F. Supp. 2d 55 (D.D.C. 2010) ..........................................................................18, 19

*United States v. Smith*,
  814 F.3d 268 (5th Cir. 2016) .......................................................................................25

*United States v. Struckman*,
  611 F.3d 560 (9th Cir. 2010) .......................................................................................27

*United States v. Velazquez*,
  1 F.4th 1132 (9th Cir. 2021) ........................................................................................25

*United States v. Vetere*,
  663 F. Supp. 381 (S.D.N.Y. 1987) ..............................................................................18

*United States v. Voigt*,
    89 F.3d 1050 (3d Cir. 1996) ........................................................................ 36

*United States v. Washington*,
    431 U.S. 181 (1977) .................................................................................... 19

*United States v. Williams*,
    836 F.3d 1 (D.C. Cir. 2016) ........................................................................ 25

*United States v. Young*,
    470 U.S. 1 (1985) ........................................................................................ 25

*Weatherford v. Bursey*,
    429 U.S. 545 (1977) .................................................................................... 38

**Statutes**

18 U.S.C. § 2701 ............................................................................................. 3, 29

18 U.S.C. § 3127 ................................................................................................... 3

**Rules**

Fed. R. Crim. P. 16 .............................................................................................. 34

**Treatises**

Model Rules of Professional Conduct ................................................................. 17

ABA Model Code of Professional Responsibility (1981) .................................... 17

ABA Canons of Professional Ethics (1908) ........................................................ 17

**Constitutional Provisions**

U.S. Const. amend. V .......................................................................................... 21

U.S. Const. amend VI .......................................................................................... 23

**Declarations**

Declaration of Lawrence S. Lustberg ........................................................... *passim*

**Exhibits**

Exhibit A: July 21, 2021 Pen Register Application ........................................ 3, 29

Exhibit B: September 27, 2021 Search Warrant and Affidavits ...................... 3, 4, 29

Exhibit C: October 21, 2021 Email from Matthew Podolsky...........................................................4

Exhibit D: November 15, 2021 Email from Lawrence Lustberg.....................................................4

Exhibit E: December 20, 2021 Email from Lawrence Lustberg .....................................................5

Exhibit F: January 14, 2022 Email from Andrew Thomas ..........................................................5, 6

Exhibit F: January 7, 2022 PowerPoint Presentation....................................................................5

Exhibit H: February 20, 2022 PowerPoint Presentation ...............................................................6

Exhibit I: February 22, 2022 Email from Lawrence Lustberg.......................................................6

Exhibit J: March 8, 2022 Email from Alejandra de Urioste ..........................................................7

Exhibit K: March 9, 2022 Email from Andrew Dean.....................................................................7

Exhibit L: March 9, 2022 Email from Lawrence Lustberg ............................................................7

Exhibit M: March 16, 2022 Email from Andrew Dean ..................................................................7

Exhibit N: April 1, 2022 Email from Matthew Podolsky ..............................................................9

Exhibit O: April 8, 2022 Email from Lawrence Lustberg ...........................................................10

Exhibit P: April 19, 2022 PowerPoint Presentation....................................................................12

Exhibit Q: April 25, 2022 PowerPoint Presentation ...................................................................13

Exhibit R: April 26, 2022 Email from Lawrence Lustberg ..........................................................14

Exhibit S: April 27, 2022 Email from Lawrence Lustberg...........................................................14

**Other Authorities**

Enforcement Div., SEC, SEC Enforcement Manual § 2.4 (2016), www.sec.
       gov/divisions/enforce/enforcementmanual.pdf..................................................................10

New York. DOJ Office of Public Affairs, *Readout of Deputy Attorney General
       Lisa O. Monaco's Trip to New York City* (April 28, 2022),
       https://www.justice.gov/opa/pr/readout-deputy-attorney-general-lisa-o-
       monaco-s-trip-new-york-city .............................................................................................15

Practising Law Institute, SEC Compliance and Enforcement Answer Book § 6.1
       (2017), *available at* https://www.wlrk.com/webdocs/ wlrknew/AttorneyPubs
       /WLRK.25580.17.pdf .........................................................................................................10

YouTube, *Q&A with Deputy Attorney General Lisa Monaco – 2022 White Collar Crime Institute*, https://www.youtube.com/watch?v=jNuvM2uY6is&t=1863s ......................15

## PRELIMINARY STATEMENT

When the Government's investigation became known to Defendant Bill Hwang, his counsel sought, as defense attorneys always do, to ascertain their client's status in the investigation; they were told he was a "subject," a description that at least left open the possibility that he would not be charged.  This description was never, over the course of scores of communications with the Government, ever retracted or modified.  But in light of that representation and others, in an effort to present Mr. Hwang's version of events and to avoid an unjust indictment, counsel commenced a process that included attorney and client proffers and presentations to the authorities with regard to the law and facts, as Mr. Hwang saw them.  That process lasted for months.  And, the record now reveals, it went on long after the Government had determined that Mr. Hwang was no mere subject and had made the decision to indict him.  When precisely that threshold was crossed is not known, and cannot be known by Mr. Hwang or the Court without a hearing, which Mr. Hwang requests here.  But there can be no question, based upon the record already assembled and discussed below, that the Government had made its decision long before numerous sessions in which the Government elicited information from Mr. Hwang and his counsel that would never have been revealed but for the misimpression, fueled by the Government, that the decision of whether to indict had not been made.

The Government's conduct cannot be accurately described as anything other than deceitful.  Whatever the origins of its interactions with Mr. Hwang and his counsel, there came a time when they only continued because the Government was not honest with the defense.  The consequences are that the Government now has unique insight into the defense that it should not.  Even more to the point, the consequences are a stain on a system of justice that depends upon Government prosecutors being forthcoming, turning square corners, and being fair, even at the expense of eschewing a litigation advantage.  Deception by the Government, such as occurred here, should

1

not be permitted.  In an exercise of the Court's supervisory powers, the Court should order a hearing and eventually appropriate relief for this troubling and fundamental breach.

## RELEVANT FACTUAL BACKGROUND

### I.     The Government Begins Its Investigation

The charges at issue and procedural history of this matter are summarized in Defendants' Joint Omnibus Brief in Support of Pretrial Motions, filed contemporaneously herewith.  In sum, Archegos Capital Management was an investment fund composed entirely of the personal money of Mr. Hwang, a longtime investor.  In late March 2021, Archegos, which had a concentrated investment strategy focusing on a small number of highly researched stocks, began experiencing liquidity issues.  As a result of drops in the value of some of its stocks, Archegos was unable to make payments to its counterparties, large banks with which Archegos had swap contracts and margin accounts.  Lustberg Decl. ¶ 3.[1]

Archegos's default on its agreements with its counterparties caused the fund to cease functioning as a going concern.  At its peak, the fund was worth over $30 billion; after defaulting, the fund lost essentially all of its value, as a result of which Mr. Hwang lost most of his assets, and a number of Archegos's counterparties lost significant sums.  Lustberg Decl. ¶ 3.

Shortly after Archegos's high-profile collapse, Government investigations—closely coordinated with one another—commenced.  On July 7, 2021, the United States Securities and Exchange Commission ("SEC") issued a subpoena to Archegos for documents relating to Archegos's trading in certain securities.  Lustberg Decl. ¶ 4.  On July 21, 2021, the United States Attorney's Office for the Southern District of New York ("SDNY") applied for pen registers and

---

[1] Citations in this format are to the December 2, 2022, Declaration of Lawrence S. Lustberg, submitted concurrently with this Brief.

trap-and-traces[2] of two phones associated with Archegos, and the Federal Bureau of Investigation ("FBI") applied for a search warrant of former Archegos employee Scott Becker and his electronic devices.  Lustberg Decl. ¶ 5; Ex. A (7/21/21 Pen Register Application).  The investigation continued throughout 2021 (and according to the Government, still continues), including SDNY applications for pen-traps of more devices on September 20 and October 1, 2021, and a search warrant obtained by the FBI for Archegos-related communications on the Microsoft, Bloomberg, Google Gmail and Apple iCloud accounts of several Archegos employees, including defendants Hwang and Halligan, on September 27, 2021, and for the iPhones and iPad of former Archegos employee William Tomita on September 29, 2021.  Lustberg Decl. ¶ 6; Ex. B (9/27/21 Search Warrant Affidavit).

The record revealed in discovery, following the Indictment in this matter, establishes without any real question that Mr. Hwang was a target of the investigation from the outset. For example, SDNY's July 21, 2021 pen-trap and search warrant applications referenced "a criminal investigation conducted by the Federal Bureau of Investigation . . . of Bill Hwang, Andrew Mills, William Tomita, Patrick Halligan, and Scott Becker and others known and unknown."  Lustberg Decl. ¶ 5; Ex. A at ¶ 2 (7/21/21 Pen Register Application).  Subsequent applications for search warrants or court orders narrowed the list, but made clear that SDNY continued to view Mr. Hwang as a target of its investigation.  For example, FBI agent Thomas MacDonald's affidavit in support of a request for a court order under the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.*,

---

[2] A pen register is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."  18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

dated September 27, 2021, states that Archegos took steps to mislead its prime brokers, and that misrepresentations "were occasioned by Tomita and/or Becker, at the direction of Hwang." Lustberg Decl. ¶ 6;  Ex. B at ¶ 52 (9/27/21 Search Warrant Affidavit).[3]  And it states that "I believe that there is probable cause to believe that Archegos, at the direction of Hwang, engaged in a manipulation trading strategy designed to cause others to trade in securities of companies in which Archegos had invested at prices artificially inflated by a pattern of undisclosed buying by Archegos that gave the false impression that numerous actors in the market were actively trading."  *Id.* at ¶ 55.

## II.   **The Proffer Process**

In late October 2021, SDNY began inviting Archegos personnel to meet with the Assistant United States Attorneys ("AUSAs") conducting the SDNY investigation in order to discuss Archegos and its collapse.  Lustberg Decl. ¶ 7.  Given that Mr. Hwang founded and funded Archegos, and was ultimately responsible for its trading decisions, and in an effort to answer the Government's questions in order to demonstrate why any potential charges would be without merit, on October 21, 2021, counsel for Mr. Hwang called the AUSAs whom they understood were overseeing the investigation to commence this process.  Lustberg Decl. ¶ 8; Ex. C (10/21/21 Podolsky Email).  On November 15, 2021, the AUSAs called to continue the prior month's discussion; two days later, Mr. Hwang's attorneys spoke with them about having an attorney proffer in late December 2021 or early in 2022.  Lustberg Decl. ¶ 9; Ex. D (11/15/21 Lustberg Email).  On the November 15 phone call, the AUSAs informed Mr. Hwang's attorneys that Mr. Hwang was a "subject" of their investigation.  Lustberg Decl. ¶ 9.  At no point between then and

---

3 Mr. Hwang has, as the Court knows, pleaded not guilty and denies these factual assertions, or having engaged in any misconduct whatsoever, criminal or otherwise.

the unsealing of the Indictment did the AUSAs, or any other Government personnel, ever revise their statement and inform Mr. Hwang's counsel that he was a "target."[4]  Lustberg Decl. ¶ 9.

In proposing an attorney proffer on the November 15, 2021 call, the AUSAs stated that they were interested in three topics:  (1) how Archegos functioned, including which decisions were made by which employees; (2) Archegos's investment practices in 2020 and 2021, including its identification of investment targets and its trading strategy; and (3) relationships between Archegos and its bank counterparties, including what information was conveyed to the counterparties about Archegos and Mr. Hwang's role in that process.  Lustberg Decl. ¶ 10.  On December 10, and further to scheduling an attorney proffer session, the AUSAs stated that while they did not want to impose on Mr. Hwang's attorneys during the holidays, "it would be helpful to have the benefit of your presentation in the next month."  Lustberg Decl. ¶ 11; Ex. E (12/10/21 Lustberg Email).  The attorney proffer session was ultimately scheduled for January 7, 2022.  Lustberg Decl. ¶ 12.  In that proffer, which lasted approximately 90 minutes, Mr. Hwang's counsel presented a 30-page PowerPoint that discussed decision-making authority at Archegos, the fund's investment and trading strategy, the people at the fund in charge of conveying information to counterparties, the representations made to counterparties regarding the size of Archegos's positions, and the events of the week of March 22, 2021.  At the conclusion of the proffer, the AUSAs posed specific follow-up questions, to which Mr. Hwang's counsel agreed to respond as

4 The labels "subject" and "target" are terms of art created by the Justice Department to communicate specific information to attorneys and individuals during the course of a criminal investigation.  According to the United States Department of Justice's U.S. Attorney's Manual ("DOJ Manual"), a "'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation."  DOJ Manual § 9-11.151.  A "'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."  *Id.* § 9-11.151.

quickly as possible.[5]   Lustberg Decl. ¶ 12; Ex. F (1/14/22 Thomas Email); Ex. G (1/7/22 PowerPoint).

After that session, the AUSAs emailed Mr. Hwang's counsel, stating:  "Thanks again for the presentation, for the follow-up, and for the willingness to address our questions.  We look forward to the continued dialogue."  Lustberg Decl. ¶ 12; Ex. F (1/14/22 Thomas Email).  The AUSAs' email proposed a second attorney proffer session sometime in mid-to late-February at which their specific follow-up questions would be answered and, in closing, expressed their "hope" that "our continued conversation with you will give us an understanding of Mr. Hwang's personal perspective and understanding."  *Id.*  That second attorney proffer took place on February 10, 2022; at which time Mr. Hwang's counsel walked the AUSAs through a 37-page PowerPoint presentation providing detailed answers to the AUSAs' questions.  Lustberg Decl. ¶ 13; Ex. H (2/10/22 PowerPoint).  Shortly thereafter, the AUSAs requested the opportunity to meet with Mr. Hwang for an "interview," and on February 18, 2022, the AUSAs and Mr. Hwang's attorneys discussed having in-person proffer sessions for Mr. Hwang in mid-and late-March.  Lustberg Decl. ¶ 14; Ex. I (2/22/22 Lustberg Email).  In that and subsequent communications, the decision was

---

[5] These questions included the following:
- Did Mr. Hwang convey analytical guidance to his analysts?
- What were Mr. Hwang's practices with respect to sharing his investment strategy/portfolio composition with non-bank outsiders?
- What reports about positions, cash, margin, and similar topics did Mr. Hwang routinely receive?
- What is Mr. Hwang's understanding of capacity limits or other trade restrictions imposed by counterparties?
- Were there occasions when Mr. Hwang directed to buy and sell the same security during the course of the same day?
- What role did Mr. Hwang play in selecting counterparties?
- What information did Mr. Hwang authorize to be shared with banks and counterparties about Archegos's business?
- Is Mr. Hwang aware of any misrepresentation made by an Archegos employee to a bank representative?

made to hold two separate sessions: the first was to address Mr. Hwang's overall investment strategy, as well as his use of research analysts, and the second would concern Archegos's trading and portfolio management, its counterparties' capacity and margin requirements, and its interactions and negotiations with banks. At Mr. Hwang's request, the Government provided some of the documents that would be the subject of their questioning at these sessions. Lustberg Decl. ¶ 14. Meanwhile, the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") requested that they be able to participate in these sessions as well, to which Mr. Hwang agreed. Lustberg Decl. ¶ 15; Ex. J (3/8/22 de Urioste Email); Ex. K (3/9/22 Dean Email). In mid-March, Mr. Hwang executed proffer agreements with all three agencies. Lustberg Decl. ¶ 16; Ex. L (3/9/22 Lustberg Email); Ex. M (3/16/22 Dean Email).

Mr. Hwang had his first proffer session with SDNY on March 14, 2022; lawyers from both the SEC and CFTC also attended. Lustberg Decl. ¶ 17.[6] For about six hours, with two breaks, Mr. Hwang was questioned extensively by AUSAs about his investment strategy, including the selection of stocks to invest in, use of direct stock purchases versus "swaps," and his target prices for stocks. *Id.* He was also questioned in detail about Archegos's research department, including his use of analysts to learn more about particular stocks; his analysts' development of target prices for stocks, and his view of them; and whether his use of the research department changed during the COVID-19 pandemic. *Id.* The AUSAs further questioned Mr. Hwang about the "concentration" of his investments—both the ratio of particular investments to the size of the

---

[6] In separate video conferences, counsel for Mr. Hwang also briefed the SEC and CFTC attorneys, who had not sat in on the attorney proffers in January and February, and walked them through the key points contained in their presentations to SDNY. Lustberg Decl. ¶ 18.

overall fund and the ratio of a particular investment to the percentage of outstanding shares in that stock. *Id.*

Mr. Hwang had a second proffer session with SDNY, the SEC, and the CFTC on March 30, 2022. Lustberg Decl. ¶ 19. Again the session lasted about six hours, with two breaks.[7] *Id.* During the session, Mr. Hwang was questioned at length about, *inter alia*, the mechanics of Archegos's trading activity, including who ordered particular trades, who executed the trades, how orders were communicated, what information Mr. Hwang looked at when trading, whether Mr. Hwang considered the impact of a particular trade on the price of a security, and Mr. Hwang's use of limit versus market orders. *Id.* Mr. Hwang was asked about Archegos's "pre-market" trading (that is, trades executed before the market officially opened at 9:30 A.M.), as well as its trading toward the end of the trading day, and his use of a stock's trading volume as a factor in deciding how much of a stock to trade. *Id.* The AUSAs asked Mr. Hwang about his thought process and motivations in connection with specific trades he executed over the course of a year at Archegos, inquiring as to his reasons for buying particular quantities of particular stocks at particular times and how he responded to selling pressures. *Id.* They also specifically asked Mr. Hwang whether he understood and intended that certain trades could impact the price of stocks. *Id.* Mr. Hwang was also asked about Archegos's negotiations with its bank counterparties, the entities through which Archegos made its trades, and focused on how involved Mr. Hwang was in negotiating trading agreements with counterparties, as well as Archegos's acquisition of "capacity," or its ability to trade more stock. *Id.*

---

[7] Mr. Hwang's attorneys had been provided with 20 documents prior to this session about which the AUSAs stated they intended to ask Mr. Hwang. As it turned out, the AUSAs actually discussed 24 documents with Mr. Hwang; several of those that were not provided in advance are documents central to and specifically mentioned in the Indictment (*see, e.g.*, Indictment ¶¶ 30, 56). Lustberg Decl. ¶ 20.

III.    **The Post-Proffer Process**

After Mr. Hwang's second in-person proffer, the AUSAs informed Mr. Hwang's counsel that they were meeting internally the following day, after which they would be prepared to discuss next steps; they made clear that the time was coming when, on behalf of Mr. Hwang, his counsel might be asked to provide their "perspective" on the case. Lustberg Decl. ¶ 21. Accordingly, late in the day on Friday, April 1, the AUSAs expressed to Mr. Hwang's counsel for the first time that SDNY had "serious concerns" with regard to the "lawfulness of Mr. Hwang's conduct," and "the credibility of some of his answers" at his second in-person proffer. Lustberg Decl. ¶ 21; Ex. N (4/1/22 Podolsky Email). Nonetheless, making clear that a decision with respect to criminal prosecution had not been made, they requested another meeting with Mr. Hwang's attorneys to hear counsel's perspective on certain topics, including specific factual information that was not available from any other sources. Lustberg Decl. ¶ 21. In particular, SDNY stated that an "effective" presentation would include information relating to Mr. Hwang's "state of mind" and "intent" when ordering the trades that were the subject of the prosecutors' investigation. *Id.* Making clear that this was a serious request, one that would bear upon SDNY's charging decision, the AUSAs stated that the Deputy United States Attorney for the Southern District of New York would be attending the meeting, as would the two co-chiefs of the office's Securities and Commodities Fraud Task Force. *Id.*

This post-proffer meeting was originally scheduled on a very short timeline; having requested the presentation on April 1, SDNY asked Mr. Hwang's counsel to present by April 14. Lustberg Decl. ¶ 22. Because it would be a time-consuming process to collect and distill information regarding thousands of trades that occurred over the course of the year in question, evaluate it in light of the complex business practices of Mr. Hwang's investment fund, and then craft an appropriate presentation for the leadership of the U.S. Attorney's Office that addressed

that information, and unaware of any reason to rush such a presentation (there was obviously not, for example, an impending statute of limitations problem), Mr. Hwang's attorneys repeatedly asked for more time. *Id.* The AUSAs, however, informed them that "they are not the decisionmakers and they are concerned that the decisionmakers will not be receptive to the request." *Id.*

After multiple phone calls over three days, on April 8, Mr. Hwang's lawyers sent a final email to SDNY requesting further time to make their presentation.[8] Lustberg Decl. ¶ 24; Ex. O (4/8/22 Lustberg Email). The email noted that "we are unaware of any justification for the urgency (such as the running of a statute of limitations or the like)." *Id.* The email requested a meeting with the AUSAs' superiors on the subject, emphasizing that the request for more time to convince SDNY of Mr. Hwang's innocence was "motivated by no more than a desire to have the kind of open-minded, thorough and careful discussion that a case like this, in particular, deserves and that has been in the tradition of the U.S. Attorney's Office for the Southern District of New York." *Id.*

---

[8] On April 5, Mr. Hwang's attorneys also spoke with the SEC about conducting a joint meeting with SDNY. Lustberg Decl. ¶ 23. The SEC began the call by expressing that it was not a "Wells call"—that is, a notice by the SEC that it is considering bringing charges against a prospective defendant and an invitation to present defenses and impact the SEC's view of the potential lawsuit. Enforcement Div., SEC, SEC Enforcement Manual § 2.4 (2016), www.sec. gov/divisions/enforce/enforcementmanual.pdf. While there is no formal requirement that the SEC issue a Wells notice, issuance is part of the SEC's longstanding practice and underlies the agency's reputation as a "tough but fair" regulator. *See* Practising Law Institute, SEC Compliance and Enforcement Answer Book § 6.1 (2017), *available at* https://www.wlrk.com/webdocs/ wlrknew/AttorneyPubs /WLRK.25580.17.pdf. The absence of a Wells notice—and, moreover, the SEC's explicit affirmation that its communications with Mr. Hwang's counsel did not constitute such a notice—further led Mr. Hwang's attorneys to believe that government agencies had not yet decided to prosecute or sue Mr. Hwang and continued to have open minds. This belief was further reinforced when Mr. Hwang's counsel mentioned their struggles to understand any legal theory underlying a potential suit for market manipulation in light of the undisputed facts, and the SEC responded that "we totally get where you're coming from on the manipulation piece." Lustberg Decl. ¶ 23.

10

The following day, Mr. Hwang's lawyers and line prosecutors spoke by telephone; a brief extension was allowed and two presentations were scheduled:  a law-focused presentation on April 19, at which Mr. Hwang's counsel would address what they understood to be the Government's legal theory of open market manipulation; and a fact-focused presentation on April 25, intended to demonstrate the facts underlying Mr. Hwang's innocence to the "decisionmakers" at SDNY, including the Deputy U.S. Attorney for the District.  Lustberg Decl. ¶ 25.  The AUSAs characterized this second presentation, which they insisted could not be postponed, as a "focused discussion . . . about Mr. Hwang's intentions."  Lustberg Decl. ¶ 25.  They noted that what trades occurred when, and the volume of those trades, were not in dispute, but that they wanted to know "what did Bill [Hwang] mean by it?"  Lustberg Decl. ¶ 25.  In setting the schedule, which still remained very expedited, the SDNY stated that "we understand" the frustration with the timing but "we do institutionally" have an intention to "wrap up" decisionmaking and wanted to have "Bill's presentation" fresh in mind and as "close as possible" to the office's ultimate decisionmaking.  Lustberg Decl. ¶ 25.

During this April 9 call, Mr. Hwang's counsel noted that some topics relevant to the presentation might implicate Mr. Hwang's or Archegos's attorney-client or work-product privilege, and asked whether this potential privilege waiver issue required resolution by April 25.  Lustberg Decl. ¶ 26.  The AUSAs stated that they "cannot assure further process beyond the 25th." *Id.*  They then asked counsel to identify which topics in particular implicated attorney-client privilege and noted which of those topics they had "huge interest" in:  Archegos's "box trades" (holding long and short positions in the same stock, as referenced in the Indictment at ¶ 36) and Archegos's relationship with "Adviser-1" and "Fund-1" (as referenced in the Indictment at ¶ 37). *Id.*

On April 19, Mr. Hwang's lawyers made the first of their two presentations to SDNY, the SEC, and the CFTC on the law of open market manipulation. Lustberg Decl. ¶ 27. In a 44-page PowerPoint presentation, Mr. Hwang's attorneys argued, as they still do, that such a theory is legally unsupportable. Lustberg Decl. ¶ 27; Ex. P (4/19/22 PowerPoint). *See* Defendants' Joint Omnibus Brief in Support of Pretrial Motions at I.C. No other legal theories had been advanced by, or inquired about, by the AUSAs at the time, and Mr. Hwang's lawyers presented on no other. After the presentation, the AUSAs asked Mr. Hwang's counsel to discuss, at the next presentation, four very specific questions: (1) whether intent alone can create an "artificial price" for purposes of market manipulation; (2) whether there are material differences between Sections 9(a)(2) and 10(b) of the Securities Act; (3) whether "marking the close" (heightened end-of-day trading) can constitute criminal market manipulation; and (4) what Mr. Hwang's understanding was of Archegos's negotiations with counterparties (specifically, what information they asked for and received from Archegos). Lustberg Decl. ¶ 27.

Meanwhile, only two days later, on April 21, and unbeknownst to Mr. Hwang or his counsel, a sealed information was filed against former Archegos employee Scott Becker, who voluntarily surrendered to the authorities and entered a plea of guilty to multiple counts that same day. Lustberg Decl. ¶ 28. The next day, April 22, a sealed information was filed against former Archegos employee William Tomita, who likewise voluntarily surrendered and pleaded guilty at the same time. *Id.* Needless to say, none of this was disclosed to Mr. Hwang's lawyers, who continued in good faith to discuss with SDNY the circumstances of Archegos's collapse. *Id.*

On April 25, Mr. Hwang's lawyers gave a 90-minute presentation to SDNY, including the SDNY Deputy United States Attorney. Lustberg Decl. ¶ 29. The presentation consisted of a 42-page PowerPoint that Mr. Hwang's lawyers provided to SDNY the next day, assuming that Mr.

Hwang's position was still under consideration.  Lustberg Decl. ¶ 29; Ex. Q (4/25/22 PowerPoint).

The PowerPoint discussed Archegos's overall investment strategy and operations, the role of

research in Mr. Hwang's selection of investments, Archegos's use of total return swaps as opposed

to direct purchases of stocks, and Archegos's goals when exiting investment positions.  *Id.*  It

examined Archegos's increased trading activity after the onset of the pandemic, the changes in the

fund's largest stock positions, and the justifications behind almost twenty individual trades about

which the AUSAs had asked Mr. Hwang during his second in-person proffer session.  *Id.*  It

discussed Mr. Hwang's pre-market, intraday, and end-of-day stock purchases, and explained

instances when Mr. Hwang instructed traders to trade "without impact," an issue that the

Government had raised at that same interview.  *Id.*  And it examined the practice of providing

potential counterparties with "sample portfolios" and explained Mr. Hwang's knowledge of

specific provisions in contracts containing his signature.  *Id.*  The presentation also addressed the

four questions that the AUSAs had asked Mr. Hwang's counsel to discuss after the April 19

meeting.  *Id.*

In response to these questions, and as described above, Mr. Hwang's lawyers provided

SDNY with a comprehensive and detailed presentation with respect to Archegos's collapse and

Mr. Hwang's activities, as well as Mr. Hwang's intent, in accordance with the AUSAs' direction.

Lustberg Decl. ¶ 30.  And they did so with the understanding that such a presentation could have

a significant impact on SDNY's decision whether to prosecute Mr. Hwang—an understanding

derived from multiple conversations with line prosecutors, including conversations about how the

presentations needed to be expedited so that a decision could be made with Mr. Hwang's interview

fresh in mind.  *Id.*  That this was counsel's understanding was confirmed in an email exchange

with the prosecutors the day after the final presentation, in which Mr. Hwang's counsel wrote, "I

really do appreciate the courtesy, professionalism and serious consideration that you . . . (and indeed the whole office) has given this matter," to which the AUSA responded, thanking Mr. Hwang's lawyer for "the note, for the thoughtful and thorough presentation, and for the collegiality throughout, which is how I think these matters should work and helps everyone."  Lustberg Decl. ¶ 30; Ex. R (4/26/22 Lustberg Email).[9]

Of course, this was a completely disingenuous response that followed upon a truly sham process.  It now seems obvious that, at least by the time of the April 25 presentation—and perhaps long before—Mr. Hwang's indictment was a *fait accompli*.  Indeed, on the very same day as that presentation, SDNY obtained the 59-page, 11-count Indictment, including a charge of violating the Racketeer Influenced and Corrupt Organizations ("RICO") Statute.  The timing of the return of that Indictment, and the identity of the SDNY personnel who obtained it from the grand jury is unknown, but it is at least possible that it was returned, or was in the process of being returned, even as Mr. Hwang's counsel, acting in reliance on the Government's good faith, was presenting its factual theory regarding their client's intent to the Government.  Lustberg Decl. ¶ 32.

On April 27, at approximately 6:00 A.M., less than 48 hours after meeting with SDNY, Mr. Hwang was arrested at his home in New Jersey; though Mr. Hwang had voluntarily appeared for interviews, he was not permitted to surrender for processing.  Lustberg Decl. ¶ 33; Ex. S (4/27/22 Lustberg Email).  The same morning, bespeaking coordination that could not have been spontaneous, the SEC filed a civil suit against Mr. Hwang and Archegos (among others), and the

---

[9] Seemingly confirming that spirit of collaboration and its ongoing nature, at the conclusion of the April 25 presentation, SDNY asked Mr. Hwang's counsel for additional follow-up information regarding the 2012 criminal and civil matters regarding Tiger Asia Management, Mr. Hwang's prior hedge fund, and the effect of "market dominance" on a legal analysis of market manipulation. Counsel was in the process of expeditiously gathering this information when the Indictment of Mr. Hwang was unsealed two days later.  Lustberg Decl. ¶ 31.

CFTC filed a civil suit against Archegos (among others).  Lustberg Decl. ¶ 33.  Indeed, at 11:30 A.M. that day, SDNY United States Attorney Damian Williams, Deputy Attorney General Lisa Monaco,[10] Special Agent-in-Charge for the New York Field Division of the FBI Michael Brodack, and SEC Director of Enforcement Gurbir Grewal held a press conference to discuss the arrests of Mr. Hwang and Mr. Halligan.  *Id.*  The presentation included an elaborate demonstrative exhibit purportedly explaining how Mr. Hwang's alleged scheme worked.  *Id.*

## ARGUMENT[11]

The Government here breached its duties of fundamental fairness and candor, subjecting Mr. Hwang and his counsel to a sham process in which the prosecutors claimed to be open-minded, when they were not, and on these false pretenses, lured the defense to reveal its legal and factual positions.  In particular, repeatedly professing their good faith, the prosecutors induced defense counsel and the Defendant to continue to meet with the prosecutors to discuss Mr. Hwang's state of mind and intent—a particularly challenging matter for the Government to prove—even as the case was on the precipice of an indictment that, if it had not already been returned, was to be returned within moments or, at most, hours.  Never once, over months of an investigation that,

---

[10] That same day, DAG Monaco (who, as Deputy Attorney General, normally works in Washington, D.C.) had given the keynote address at an event in New York held by the White Collar Crime Institute, a date that had been set at least two months before.  There, DAG Monaco referenced the indictment that had been issued earlier that morning, praised the prosecutors and investigators who had worked on the matter, emphasized "the speed with which this case has been developed," and noted that she would have more to say at the subsequent press conference. YouTube, *Q&A with Deputy Attorney General Lisa Monaco – 2022 White Collar Crime Institute*, https://www.youtube.com/watch?v=jNuvM2uY6is&t=1863s beginning at 27:40.  At the SDNY press conference, DAG Monaco again noted "the exceptional speed of the investigation."  DAG Monaco's participation in the SDNY press conference was highlighted in the Department of Justice's "readout" of her trip to New York. DOJ Office of Public Affairs, *Readout of Deputy Attorney General Lisa O. Monaco's Trip to New York City* (April 28, 2022), https://www.justice.gov/opa/pr/readout-deputy-attorney-general-lisa-o-monaco-s-trip-new-york-city.

[11] Citations and quotations are omitted in case quotations throughout.

unbeknownst to Mr. Hwang, was rushing to a conclusion for no reason dictated by the law, did the prosecutors demonstrate the candor or decency to disclose to the defense that Mr. Hwang was not only a target of their investigation, but was about to become a defendant, even as he—based upon explicit and implicit representations that he was in the midst of a full and fair process—revealed what has now become (as prosecutors doubtless knew it would) his defense strategy.

Of course, the Government will argue that counsel for Mr. Hwang sought to articulate their client's position, and could have walked away from it at any time; it will contend that it had no obligation to reveal anything about its investigation before charges were brought, or to provide any particular process to the defense.  But this renunciation of any responsibility to be candid, or fair, flies in the face of not only traditions of prosecutorial integrity, but also of the general responsibility of federal prosecutors to do the right thing and the legal obligations that flow from that responsibility.  The jurisprudence that has emerged from those principles, and this Court's supervisory authority to enforce them, is described below.  At the very least, a hearing should be ordered to explore just what the prosecutors knew and when, so that an appropriate remedy may be imposed for their alarming actions.

## I.    <u>Relevant Legal Background.</u>

Underlying this disturbing sequence of events is a simple yet crucial principle:  prosecutors play a "special role . . . in the search for truth in criminal trials," and have the fundamental obligation to do justice.  *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  As the Supreme Court cautioned almost 90 years ago, a United States Attorney is

> the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States,* 295 U.S. 78, 88 (1935); *see also Connick v. Thompson*, 563 U.S. 51, 65-66 (2011) ("Prosecutors have a special duty to seek justice, not merely to convict.").   This prosecutorial obligation is embodied in both contemporary and longstanding codes and canons of professional responsibility.  *See* Model Rules of Professional Conduct, 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."); ABA Model Code of Prof'l Responsibility, EC 7-13 (1981) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."); ABA Canons of Prof'l Ethics, Canon 5 (1908) ("The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done.").

Stemming from their unique role in our adversarial system is prosecutors' ethical obligation to refrain from "fundamentally unfair tactics."  *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979).  Thus, it is "uncontroversial that a lawyer representing the government in the criminal context has a heightened ethical obligation that extends beyond just representing the narrow interests of her most direct client; she also must endeavor to 'do justice.'"  *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017).

These obligations exist throughout the criminal process.  Pretrial, prosecutors are subject to constraints that serve to prevent them from using their extraordinary investigative powers to unfairly gain the upper hand on a potential defendant and thus tilt the adversarial process in their favor.  For example, prosecutors are prohibited from convincing an accused to waive his *Miranda* rights through deceit.  *See Miranda v. Arizona*, 384 U.S. 436, 476 (1966) ("[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."); *United States v. Male Juvenile*, 121 F.3d 34, 41 (2d Cir. 1997) (a defendant may not be "misled" into waiver, "thus denying him any rational

17

choice of whether to waive his rights and confess"). Likewise, prosecutors are barred from using false statements in search warrant affidavits. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Mandell*, 752 F.3d 544, 551-52 (2d Cir. 2014). And, of course, prosecutors are prohibited from making false representations to the grand jury, and thus "may not 'mislead [the grand jury] or . . . engage in fundamentally unfair tactics before it.'" *United States v. Bryson*, No. 13-00041, 2014 WL 1653244, at *3 (D. Conn. April 22, 2014) (alteration in original) (quoting *Ciambrone,* 601 F.2d at 623); *see, e.g.*, *United States v. Vetere*, 663 F. Supp. 381, 386-87 (S.D.N.Y. 1987) (dismissing indictment where prosecutor made extensive use before the grand jury of false and misleading evidence regarding defendant's alleged criminal background); *United States v. Breslin*, 916 F. Supp. 438, 443 (E.D. Pa. 1996) (dismissing indictment when the prosecutor, among other misconduct, "improperly characterized the evidence and inserted his opinions regarding the strength and weight of the evidence"); *United States v. Slough*, 679 F. Supp. 2d 55, 62 (D.D.C. 2010) (concluding that "the prosecution's distorted presentation of witness testimony, gratuitous remarks about the defendants' failure to appear before the grand jury and other purported missteps . . . may have justified dismissal of the indictment" if it had not already been dismissed on other grounds).

But beyond these other manifestations of the principle that prosecutors have a constitutional obligation of candor, and perhaps most directly applicable here, prosecutors have an obligation not to affirmatively misrepresent a person's status as a target, subject, or witness of a government investigation. Specifically, as set forth above, the labels "subject" and "target" are terms of art created by the Justice Department to communicate specific information to attorneys and individuals during the course of a criminal investigation. As noted, a "'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation," DOJ

Manual § 9-11.151, while a "target" is "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *Id.* The DOJ Manual explicitly "encourage[s]" prosecutors to notify targets of their status as a target before seeking an indictment. *Id.* § 9-11.153.[12]

Mr. Hwang recognizes that there is no constitutional requirement that prosecutors warn an individual that he or she is a "target" or "subject" of an investigation. *See United States v. Washington*, 431 U.S. 181, 189 (1977). That said, courts have made clear that the appropriate application of DOJ policies is required to guarantee that prosecutors treat targets and subjects in "a consistent manner," *see United States v. Myers*, 123 F.3d 350, 358 (6th Cir. 1997), to avoid misunderstandings during the investigative process, *United States v. Drake*, 310 F. Supp. 3d 607, 621 n.12 (M.D.N.C. 2018), and to ensure that the government upholds its "commitment to fairness," *United States v. Gillespie*, 974 F.2d 796, 802 (7th Cir. 1992).

Specifically, based upon these principles, courts have concluded that, while the DOJ Manual does not confer any rights upon those being investigated to be informed of their status, prosecutors may not misrepresent that status. And doing so can merit dismissal of an indictment when that misrepresentation (1) is affirmative; and (2) is material in that it induced the defendant-to-be to take action that prejudices his defense. For example, in *United States v. Babb*, the First Circuit considered the possibility that a prosecutor's misrepresentations to a defendant that he was neither a target nor a subject of the grand jury's investigation induced the defendant to perjure himself. 807 F.2d 272, 275-76 (1st Cir. 1986). The court concluded that the defendant's perjury

---

[12] A "witness," the third category of persons who may become involved in a criminal matter, is a person with information relevant to the grand jury's investigation. *Id.* § 9-11.151. Witnesses can also qualify as targets or subjects.

was not caused by the misrepresentations, but reasoned that if the falsehoods had materially induced the perjury, "then [the] conviction would have been a product of the prosecutor's improper conduct, and we would have been willing to exercise our supervisory powers." *Id.* at 279 & n.6.

In *United States v. Gillespie*, the Seventh Circuit declined to dismiss an indictment merely because the prosecutors failed to give the defendant a subject warning. 974 F.2d at 800. But the court noted that because "there is no indication that the government acted in bad faith in failing to provide the target warnings, or that it proffered an affirmative misrepresentation to [the defendant] regarding his target status, we limit ourselves to verbal admonitions." *Id.* at 802. Similarly, the Sixth Circuit in *United States v. Myers* held that a defendant who was not given a target warning despite having been a target could not suppress his grand jury testimony because he had no affirmative right to that warning. 123 F.3d at 356-58. But again, the court stated that if the defendant had produced evidence of "bad faith on the part of the government," it would be able to "invoke [its] supervisory powers in this dispute to suppress [defendant's] grand jury testimony." *Id.* at 358.

Other courts have considered prosecutors' affirmative misrepresentations to defendants as to their status as a target or subject, but declined to provide a remedy due to a lack of prejudice stemming from those misrepresentations. For example, the First Circuit in *United States v. Pacheco-Ortiz* declined to suppress a defendant's grand jury testimony, holding that even if there had been an affirmative misrepresentation as to his status, the innocuous nature of his testimony meant that he suffered no prejudice. 889 F.2d 301, 309-11 (1st Cir. 1989). Though it did not take action in that case, the First Circuit nonetheless stated its disapproval of the prosecutor's failure to provide a target warning: "We assume that these policies [in the U.S. Attorneys' Manual] are meant to be enforced and will be, if violations are brought to the attention of the appropriate

persons . . . In appropriate circumstances, we will consider whether to refer future violations of the Department's internal policies regarding grand jury target warnings which come to our attention on appeal to [the Office of Professional Responsibility]." *Id.* at 311.

More to the point, the court in *United States v. Drake* considered a prosecutor's affirmative representation that a grand jury witness was neither a target nor a subject. 310 F. Supp. 3d at 620. The court concluded that this representation was false and misleading—at the time of the representation, the witness was a "putative defendant" and therefore a target or subject under the U.S. Attorneys' Manual's definitions. *Id.* at 623-24. And this misleading statement had consequences: it led the witness, for example, not to invoke her Fifth Amendment privilege. *Id.* at 625. The court warned that "a statement that the witness is neither a target nor a subject but only a witness has a significant capacity to mislead as to the Government's knowledge and possible future consequences." *Id.* at 629. Ultimately, however, the court concluded that there had been no prejudice to the witness because, in part, her grand jury testimony did not cause her any legal harm, and so the prosecutor's misrepresentation was harmless error. *Id.* at 635-36. But the underlying legal principles still apply: prosecutors cannot and should not misrepresent a defendant's status to a defendant, to his prejudice, as occurred here.

Accordingly, and perhaps most directly on point, a court in this district has concluded that "[i]t would be of grave concern if a representative of the prosecution intentionally misled targets of an investigation into believing that they were mere subjects in order to lure them into making proffers." *United States v. Percoco*, 16-CR-776 (VEC), 2017 WL 6314146, at *25 (S.D.N.Y. Dec. 11, 2017) (Caproni, J.). In *Percoco*, the defendants alleged that prior to attending a proffer session with the government, at which they allegedly made false statements for which they were later indicted, they were informed that they were "subjects" of the investigation. *Id.* They claimed that

after the interview, an AUSA informed counsel that they were in fact "targets" and claimed to have

told them in advance of the proffer session. *Id.* They asserted that they would not have attended

the proffer session had they known they were targets. *Id.*

*Percoco* ultimately concluded that the alleged prosecutorial misconduct did not rise to the

level of "a systematic and pervasive pattern of misconduct that undermines the fundamental

fairness of the process that generated the indictment." *Id.*[13] Here, however, such a pattern was

established in the lengthy series of interactions described above. And beyond *Percoco*, which

itself suggests the prevalence of this misconduct, looking at the issue more broadly, U.S.

Attorneys' Offices in this Circuit have long been warned that they should candidly provide target

or subject warnings. Thus, as far back as 1976, the Second Circuit made clear that prosecutors

are, in most cases, obligated by principles of fairness, as enforced by courts exercising their

supervisory power, to advise witnesses if they are targets or subjects. *See United States v. Jacobs*,

547 F.2d 772, 773-75 (2d Cir. 1976) (relying on supervisory authority to "impose a one-time

sanction" requiring prosecutors to advise a witness that she was a target of their investigation); *see

also United States v. Russell*, 916 F. Supp. 2d 305, 313 n.1 (E.D.N.Y. 2013) (declining to dismiss

indictment due to failure to receive *Miranda* or target/subject warning, but noting that "[w]hile the

Court has found no constitutional violation here, . . . [i]n the future, members of the U.S. Attorney's

---

[13] Mr. Hwang does not agree that he must show a "systematic and pervasive pattern of misconduct," a requirement that is unsupported in the law, and appears to derive from cases alleging grand jury misconduct in a post-conviction context. *See Percoco*, 2017 WL 6314146 at *25 (citing *United States v. Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) ("[D]ismissal of an indictment following conviction is an extraordinary remedy."); *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (same); *United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990) (defendants sought dismissal of indictment after conviction). Of course, neither of those circumstances are true here, where the prosecutors' actions did not occur before the grand jury, and this motion is raised pre-trial. In any event, if the Government makes a misrepresentation and prejudices the defendant, that should give rise to relief, as the cases discussed herein demonstrate.

Office are well advised to adhere to DOJ policies as reflected in the [U.S. Attorney's Manual], particularly with respect to the rights of witnesses, victims, and defendants"); *United States v. Fish*, No. 05-CR-228A, 2006 WL 3731292, at *11 (W.D.N.Y. Dec. 18, 2006) (where AUSA failed to follow practice of advising grand jury targets of the opportunity for assigned counsel, no basis to suppress grand jury testimony, but "[t]his Court shares Magistrate Judge Schroeder's disappointment with the procedures employed in this case and notes that at least two Department of Justice ("DOJ") directives were disregarded by the prosecutor"). And if they are obligated to provide such warnings, it follows, *a fortiori*, that they should not be able to affirmatively misrepresent a witness's status, as occurred here.

This is particularly so given the effect of the prosecution's actions in this case. While Mr. Hwang, unlike the defendants in *Percoco*, did not make any false statements in his interviews, and that is not a basis of charges in the Indictment, his interviews nevertheless had the apparent purpose and certainly had the effect of giving the Government access to defense strategy, including its factual and legal positions. This runs afoul of still other prosecutorial obligations. Thus, it is well-settled that prosecutors may not take action to intrude into the defense camp, for example by using an informant to surreptitiously elicit incriminating statements from the defendant without the presence of counsel. *See*, *e*.*g*., *United States v. Henry*, 447 U.S. 264, 274 (1980) (where government told jailhouse informant to be alert to statements, but not to initiate conversations with defendant, government violated Sixth Amendment right to counsel by "intentionally creating a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel"); *Massiah v. United States*, 377 U.S. 201, 202-05 (1964) (cooperating co-defendant permitted government agents to listen via radio to secret conversations with defendant). Indeed, the Supreme Court has made clear that the Sixth Amendment right to counsel is violated not only

when the government or its agents elicit incriminating statements, but also when they take inappropriate action to obtain information regarding defense strategy.  *See Hoffa v. United States*, 385 U.S. 293, 306-07 (1966).  That is what occurred here, albeit through a different type of deception, occurring pre-indictment.

Indeed, this motion really follows from the basic principle that deception in any form is an inappropriate way for prosecutors to proceed.  It is the basis for the *Brady* obligation, which obligates the prosecution to disclose to the defense all impeaching or exculpatory evidence in its possession so as not to deceive the Court or the defense as to the real facts of the case.  *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995) ("The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation."); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Agurs*, 427 U.S. 97 (1976); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  As the Supreme Court has emphasized, prosecutors' *Brady* obligations reflect "the special role played by the American prosecutor in the search for truth in criminal trials," as the representative of a government "whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Strickler*, 527 U.S. at 281.  And in view of that "special role," the Supreme Court has made clear that a defendant is entitled to rely upon a prosecutor's representations regarding the government's compliance with its *Brady* obligations.  *See Banks v. Dretke*, 540 U.S. 668, 693, 697-98 (2004); *Strickler*, 527 U.S. at 283 n. 23 ("[I]f a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.").  Likewise, the government breaches its obligations when "the prosecutor misleads the defense into believing certain evidence will not be favorable to the defendant."  *United States v.*

*Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005); *see also United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (government breaches its duty when it misleadingly tells the defense that certain evidence would be of "no value"). The analogy to this case is obvious.

Finally, of course, multiple constitutional and ethical obligations constrain prosecutors' conduct at trial. For example, the prosecution has a broad and substantial duty to correct false evidence introduced by its witnesses. Knowingly procuring and using perjured testimony is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Nor may prosecutors misrepresent the record in their closing statements. *E.g., Evans v. Jones*, 996 F.3d 766, 778 (7th Cir. 2021) (prosecutor's statements during closing argument about witness intimidation were improper because the record did not support them, nor did they reflect a reasonable inference from the record, affirming grant of habeas relief); *United States v. Moore*, 651 F.3d 30, 52-53 (D.C. Cir. 2011) (noting that prosecutors may strike "hard blows" but not "foul ones" during closing argument); *United States v. Carter*, 236 F.3d 777, 784, 793 (6th Cir. 2001) (remanding for a new trial due to plain error when prosecutor during closing argument misrepresented witness testimony and repeatedly accused defense counsel of lying).[14] And prosecutors cannot "vouch" by informing the jury of their personal belief in the accused's guilt or the truth or falsity of a witness's testimony–a practice which creates the false impression that there exists evidence not presented to the jury, but known to the prosecutor. *See, e.g., United States v. Young*, 470 U.S. 1, 18-19 (1985); *United States v. Smith*, 814 F.3d 268, 274 (5th Cir. 2016); *Hodge*

---

[14] Prosecutors also may not misrepresent the relevant law on summation. *United States v. Velazquez*, 1 F.4th 1132, 1137-38 (9th Cir. 2021) (government improperly compared the reasonable doubt standard to the confidence one needs to "hav[e] a meal" or "travel to . . . court" without worrying about the "possib[ility]" that one will get sick or end up in an accident); *United States v. Williams*, 836 F.3d 1, 16 (D.C. Cir. 2016) (government's error in stating what evidence the jury could consider in determining intent substantially prejudiced defendant and merited new trial).

*v. Hurley*, 426 F.3d 368, 378, 388-89 (6th Cir. 2005) (granting habeas relief due to defense counsel's failure to object when prosecutor misrepresented evidence, and made "numerous statements on witness credibility—often unsupported by any rational justification other than an assumption that the defendant was guilty—[which could not] avoid suggesting to the jury that the prosecutor knows something they do not").

Each of these obligations, whether pre- or post-indictment or at trial, vindicates the principle that was apparently so readily discarded here:  that prosecutors have an obligation to be candid to those whom they would, or do, prosecute.  When prosecutors fail to live up to that obligation, courts have the inherent authority to remedy their misconduct, even when it does not specifically violate the Constitution.  "Guided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress."  *United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)).  As the Second Circuit has emphasized, "It is our task to supervise the administration of justice in the federal courts, and to that end we must ensure that fair standards of procedure are maintained."  *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996); *see also Daye v. Attorney General of State of N.Y.*, 712 F.2d 1566, 1571 (2d Cir. 1983) ("[F]ederal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts.").  The exercise of such supervisory powers can result in the dismissal of indictments, as well as the overturning of convictions or sentences.  *Johnson*, 221 F.3d at 96; *see also United States v. Sabri*, 973 F. Supp. 134, 148 (W.D.N.Y. 1996) (noting that "[i]t is settled . . . that supervisory power to dismiss an indictment . . . does exist" and dismissing indictment when the government used undisclosed informants to intrude on the attorney-client relationship).

26

This Court has noted that there are three principle purposes of its supervisory authority: "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *United States v. Landji*, (S1) 18 Cr. 601 (PGG), 2021 WL 5402288, at *30 (S.D.N.Y. Nov. 18, 2021) (quoting *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 135 (2d Cir. 2017)). The core purpose is "to redress government misconduct." *United States v. Sinclair*, No. 10-CF-6211L, 2013 WL 6148078, at *7 (W.D.N.Y. May 10, 2013); *see also United States v. Mohr*, CR 05-326-RE, 2007 WL 2344875, at *3 (D. Or. Aug. 13, 2007) ("A district court has supervisory powers, which permit the court to supervise the administration of justice in order to deter illegal conduct, and to protect judicial integrity. Indeed, federal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them. To preserve judicial integrity, a district court may exercise its supervisory powers to dismiss an indictment based on ethical misconduct.").

In sum, courts can—and sometimes must—use their supervisory authority to remedy unfairness or impropriety even when the misconduct does not rise to the level of a constitutional violation. *See Ming He*, 94 F.3d at 792 ("On occasion, and we think this is one, we must act to secure rights even though they may not be guaranteed by the Constitution when we are persuaded a procedure followed in a trial court is wrong."). That is, "[e]ven if the government's conduct does not rise to the level of a due process violation, a court may nonetheless dismiss an indictment with prejudice under its supervisory powers." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (cleaned up); *see also United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004) ("Even

where no due process violation exists, a federal court may dismiss an indictment pursuant to its supervisory powers.").[15]  This case cries out for just such relief.

## II.  Mr. Hwang was Induced to Proffer by the Government's Affirmative Misrepresentations as to His Target Status.

In this case, the Government misrepresented to Mr. Hwang's counsel that Mr. Hwang was a subject, not a target, of its investigation.  Its failure to revise that statement at any point during its investigation induced Mr. Hwang to do that which he never otherwise would have: to make repeated presentations through counsel, and by proffering twice himself, all with the understanding that the Government had not decided whether to indict him, though clearly it already had.  The Government's conduct satisfies the standards for actionable misrepresentations: (1) it was false or misleading; (2) it induced Mr. Hwang to act in some way; and (3) it prejudiced his defense.  *See Gillespie*, 974 F.2d at 802 (declining to dismiss indictment because the government did not act in bad faith or make an affirmative misrepresentation); *Babb*, 807 F.2d at 279 & n.6 (if government falsehoods materially induced perjury, it would have been a product of the prosecutor's improper conduct justifying use of supervisory authority); *Pacheco-Ortiz*, 889 F.2d at 309-11 (government falsehoods not actionable because they had not prejudiced the defendant).  All three elements are satisfied here; alternatively, the Court should hold a hearing at which each of these elements may be established.

*First*, the Government's representation that Mr. Hwang was a mere subject of its investigation was plainly false.  A clear-eyed review of the investigative history, with the benefit of hindsight informed by discovery, reveals that Mr. Hwang was a target of the investigation from

---

[15] For example, this Court has acknowledged its ability to dismiss an indictment due to prosecutorial misrepresentations concerning document discovery.  *See Landji*, 2021 WL 5402288 at *30 (acknowledging that the government "made repeated misrepresentations . . . concerning, *inter alia*, the nature of Defendants' Documents," but declining to dismiss the indictment due to lack of prejudice).

its inception.  Prosecutors first sought pen-traps and filed applications for search warrants on July 21, 2021.  These requests referenced "a criminal investigation conducted by the Federal Bureau of Investigation . . . of Bill Hwang, Andrew Mills, Patrick Halligan, and Scott Becker and others known and unknown ."  Lustberg Decl. ¶ 5; Ex. A at ¶ 2 (7/21/21 Pen Register Application).  Those requests alone indicate the centrality of Mr. Hwang to the Government's investigation, but subsequent applications for search warrants or court orders—none of which were brought to Mr. Hwang's attention before he commenced the process of presenting or proffering to SDNY—only confirmed that Mr. Hwang was, by any measure, a target of the Government's  investigation.  For example, FBI agent Thomas MacDonald's affidavit in support of a request for a court order under the Stored Communications Act, dated September 27, 2021, stated that Archegos's misrepresentations to its prime brokers "were occasioned by Tomita and/or Becker, at the direction of Hwang."  Lustberg Decl. ¶ 6; Ex. B at ¶ 52 (9/27/21 Search Warrant Affidavit).  It averred that as part of a price manipulation scheme, Mr. Hwang dictated stock prices "far in excess of what his analysts proposed" and continued to push his own target prices for those stocks upward.  *Id.* at ¶ 53(a).  And it concluded that "I believe that there is probable cause to believe that Archegos, at the direction of Hwang, engaged in a manipulation trading strategy designed to cause others to trade in securities of companies in which Archegos had invested at prices artificially inflated by a pattern of undisclosed buying by Archegos that gave the false impression that numerous actors in the market were actively trading."[16]  *Id.* at ¶ 55.

---

[16] Agent MacDonald's application also stated that accounts used by Mr. Hwang, including his personal Gmail account, "contain[] evidence of the Subject Offenses," including evidence of the "use of criminal proceeds by Hwang" and Mr. Hwang's "association with co-conspirators."  *Id.* at ¶¶ 64, 73.

Taken together, this mélange of allegations about Mr. Hwang's relation to various alleged Subject Offenses demonstrates that at least as of September 27, 2021—and likely earlier—the Government viewed Mr. Hwang as not only *a* target, but the *prime* target of its investigation.  It believed then that Mr. Hwang not only directed others to participate in the Offenses, but, in effect, reoriented his entire family investment office into becoming a criminal enterprise.  And it thought that Mr. Hwang's personal email account and internet history would contain evidence of those crimes and the proceeds thereof.  The idea that the Government could simultaneously take the position that Mr. Hwang was the mastermind of a vast market manipulation scheme and yet tell the defense, in no uncertain terms, that he was a mere "subject" of its investigation is alarming, and warrants relief.

In light of the Government's misrepresentation that Mr. Hwang was just a subject of its investigation, Mr. Hwang and his attorneys engaged in a series of proffers with and presentations to representatives of SDNY, the SEC, and the CFTC.  Mr. Hwang's attorneys participated in two "attorney proffer" sessions with the Government, which were reprised with the SEC and CFTC. And Mr. Hwang himself participated in two lengthy, in-person proffer sessions, which were directed to specific topics, as were the subsequent presentations that Mr. Hwang's attorneys were asked to make:  one detailing their legal objections to the presumed legal theory that would underlie any hypothetical indictment, and one explaining, in painstaking detail, certain factual issues relating primarily to the critical and otherwise difficult-to-prove fact of Mr. Hwang's state of mind during the pertinent period of time.  It goes without saying that these sessions would not have occurred if Mr. Hwang or his legal team had been truthfully informed that he was actually a target of the investigation.  They were instead told that he was just a subject, a designation that implied

a level of open-mindedness that induced Mr. Hwang and his team to meet with the prosecutors multiple times, including on the very day that he was being indicted.

Finally, although its full scope is unknown, the prejudice to his case that resulted from Mr. Hwang's participation in this process is manifest. Mr. Hwang shared his thought processes with prosecutors from SDNY, discussing every aspect of his role at Archegos in great detail and giving the Government unique information about his factual and legal position. The ultimate damage to his defense is, of course, yet unknown and may never be completely knowable, but the insight into the defense that Mr. Hwang provided to the Government under false pretenses is undoubtedly valuable to the prosecution and potentially, at least, harmful to the defense, which had every right not to share a single syllable of it, as certainly would have been the case had it been told the truth.

### III.   The Government Obtained Crucial Information About Mr. Hwang's Trial Testimony and Eventual Defense Strategy Through a Sham Post-Proffer Process.

Not only did the prosecution lie to the defense about Mr. Hwang's status in the investigation, but it is indisputable that the prosecutors engaged in a series of explicit and implicit misrepresentations to Mr. Hwang's counsel to create the impression that they had open minds as to whether to prosecute Mr. Hwang, and that further engagement by Mr. Hwang's counsel could play a material role in the decision whether to prosecute when the decision was—or at least seems to have been—made long before. If necessary, a hearing should be held to determine when precisely that decision was made, so that the Court can understand the extent of the Government's deceit and determine to what extent the Court should exercise its supervisory authority to redress this improper conduct.

Many of the critical facts are now, in retrospect, perfectly clear. For one, at some point during the process the prosecution became intent on indicting Mr. Hwang, and nothing Mr. Hwang's attorneys did could have changed its course. In late March and early April, the

Government went to great lengths in terms of both what the AUSAs said, and how they said it, to make it appear as though SDNY was engaged in genuine and thoughtful dialogue with Mr. Hwang's counsel over whether to file an indictment, when it now seems that its course had already been determined. In identifying subjects that it wished Mr. Hwang's lawyers to address (in follow-up to their initial presentation), before meeting with Mr. Hwang himself (on two separate occasions), and then requesting two further presentations from counsel (once with regard to the law and the other to the facts), the Government clearly conveyed that the answers to these questions could determine whether Mr. Hwang would face the life-altering prosecution he now does.

As just one particularly outrageous example, the Government requested that Mr. Hwang's attorneys give a presentation to the SDNY Deputy United States Attorney regarding specific topics in which the Government represented it was very interested, at least implying that this presentation could affect its ultimate charging decision. Specifically, SDNY requested a "focused discussion . . . about Mr. Hwang's intentions" underpinning his stock trading. Lustberg Decl. ¶ 25. The prosecutors emphasized that they wanted to know "what did Bill [Hwang] mean by" his trades. *Id.* And they asked Mr. Hwang's counsel to address four particular questions following their April 19, 2022 law-focused presentation: (1) whether intent alone can create an "artificial price" for purposes of market manipulation; (2) whether there are material differences between Sections 9(a)(2) and 10(b) of the Securities Act; (3) whether "marking the close" (heightened end-of-day trading) can constitute criminal market manipulation; and (4) what Mr. Hwang's understanding was of Archegos's negotiations with counterparties (specifically, what information did they ask for from Archegos and what were they told in response). *Id.*

In making these requests, the prosecutors at least implied, but really overtly expressed, that this information would be relevant to its charging decision. In pressing for the presentation to

occur on a highly expedited basis and denying Mr. Hwang's request for more time to put it together, SDNY claimed that it wanted to have "Bill's presentation" fresh in mind and as "close as possible" to the office's ultimate decision-making regarding an indictment.  As they did so, the prosecutors made no effort to rebut Mr. Hwang's attorneys' understanding that they shared a "desire to have the kind of open-minded, thorough and careful discussion that a case like this, in particular, deserves and that has been in the tradition of the U.S. Attorney's Office for the Southern District of New York."   Also relevant, of course, was the fact that the Deputy United States Attorney was to attend the meeting; to Mr. Hwang's counsel, her presence indicated a serious and thoughtful consideration of Mr. Hwang's factual and legal position.

Having presented on the law a week earlier, and in response to the Government's requests, Mr. Hwang's counsel gave a 90-minute presentation on April 25, 2022, detailing Mr. Hwang's state of mind throughout his tenure at Archegos.  It analyzed aspects of Archegos's business that are reflected throughout the Indictment that soon followed:  the role of research analysts, ¶ 33; the decision to use swaps versus stocks, ¶¶ 14-17; the changes to Archegos's operations and trading due to the pandemic, ¶¶ 23-24; Archegos's pre-market, intraday, and end-of-day purchases, ¶¶ 35-36; the use of "sample portfolios" when negotiating margin rates with counterparties, ¶ 56; and Mr. Hwang's knowledge of provisions in contracts containing his signature, ¶ 58.  The presentation was contained in a 42-page PowerPoint that Mr. Hwang's lawyers promised to provide to the prosecutors, which they did the next day, without knowing that Mr. Hwang had already been indicted.

The presentation was, in sum, a thorough explanation of the most crucial and otherwise elusive evidence the Government could hope to obtain: Mr. Hwang's intent when he engaged in a series of thousands of now-allegedly illegal transactions, as well as his state of mind relating to

almost every aspect of Archegos's collapse.  In essence, the Government received a comprehensive preview of what Mr. Hwang's eventual trial strategy—both legal and factual—would be were an indictment to be filed.  And the prosecution obtained this information by representing to Mr. Hwang's counsel that it had an open mind, that it was not determined to prosecute Mr. Hwang, and that this information could have a genuine impact on its decision-making process.

These representations were false.  Indicting Mr. Hwang was inevitable before April 25, 2022, when Mr. Hwang's counsel gave their in-depth factual presentation to the Government.  This fact is clear in hindsight.  By that time, the prosecution had filed sealed informations against Scott Becker (on April 21) and William Tomita (April 22), indicating that SDNY had already decided to use Mr. Becker's and Mr. Tomita's cooperation to prosecute Mr. Hwang.

More damningly, the Indictment against Mr. Hwang and Mr. Halligan was returned on the same day as Mr. Hwang's attorneys delivered the factual presentation on his behalf; a hearing will reveal whether the Government was already in the process of indicting Mr. Hwang, or had even done so as the meeting progressed.  Given this timeline, there can be no question:  the Government had no intention of taking the presentation seriously, though they pretended to do so, even going so far as to ask for additional follow-up information, which Mr. Hwang's counsel continued to gather, with the intent of producing, even after Mr. Hwang had, unbeknownst to them, been indicted.  Now, of course, it appears that these follow-up requests were still further attempts to mislead Mr. Hwang's lawyers, as once the Indictment was returned, the Government's requests for information would be governed by Federal Rule of Criminal Procedure 16(b), and could not be so easily obtained.  Nonetheless, counsel—believing the Government was acting in good faith—proceeded to obtain that information, which they were in the process of gathering and preparing to share with the Government when Mr. Hwang was arrested.

Indeed, facts subsequently revealed show that the wheels were in motion for the Indictment to be returned, and Mr. Hwang to be arrested and charged, long before April 25th. For example, though it had never been mentioned in any meetings, the Indictment contains an allegation that Mr. Hwang and Mr. Halligan conspired to violate RICO. But RICO charges must be approved in advance by DOJ's Criminal Division. *See* DOJ Criminal Resource Manual § 110; DOJ Justice Manual § 9-110.101 ("No RICO criminal indictment or information or civil complaint shall be filed, and no civil investigative demand shall be issued, without the prior approval of the Criminal Division."). A final draft of a proposed indictment, along with a "RICO prosecution memorandum," must be forwarded to the Organized Crime and Gang Section of the Criminal Division. DOJ Justice Manual § 9-110.210. Because the review process usually takes at least 15 working days, prosecutors are "cautioned to budget their time and to await receipt of approval before scheduling the presentation of the indictment to a grand jury." *Id.* Assuming that the U.S. Attorney's Office followed DOJ regulations, this means that a draft indictment, which was sealed on April 25, would have been sent to the Organized Crime and Gang Section by at least April 4, if not earlier.

Even more to the point, it now appears—though again a hearing may be necessary to flesh out all of the facts—that the prosecution's target date for arresting Mr. Hwang had long been set. Deputy Attorney General Lisa Monaco had been scheduled to be present in New York on April 27, the date of the arrest, for an event held by the New York City Bar's White Collar Crime Institute. By all appearances, the decision had been made that an indictment would be returned so that she could be present at the press conference announcing Mr. Hwang's arrest. Indeed, this is consistent with the Government's repeated refusals to allow a reasonable period of time for Mr. Hwang's lawyers, after months of investigation and numerous subpoenas yielding over 1.7 million

documents (totaling 4.6 million pages), as well as the prior presentations and proffers discussed above, to set forth their position. The necessary, and necessarily time consuming, coordination with the SEC and CFTC (given their internal processes) and preparation for the press conference that followed, likewise confirm that, even as the Government (including the SEC and CFTC) were soliciting information from Mr. Hwang on the false pretense that good faith, open-minded discussions were taking place, that was far from the truth: decisions had already been made and the Government's efforts were, it appears, an elaborate ruse to obtain Mr. Hwang's and his attorneys' views of the facts and law of the case, *i.e.*, to obtain "confidential defense strategy information." *United States v. Costanzo*, 740 F.2d 251, 254 (3d Cir. 1984).

The process undertaken by prosecutors here—from attorney proffer to Mr. Hwang's proffers to presentations in which the Government set the agenda, seeking specific, targeted information that would reveal a future defendant's trial strategy under the guise of a genuine consideration of whether or not to file an indictment—is deeply disturbing. Respectfully, the Court should not countenance this lack of candor, breach of prosecutorial duty, and end-run around the Constitution and Federal Rules. Instead, the Court should use its inherent authority to "supervise the administration of justice" and "formulate procedural rules" over prosecutors who are "members of the bar of this Court." *Ming He*, 94 F.3d at 792-93. Such an exercise of supervisory authority—a "directi[on] . . . not to further [a] practice relied on by a federal prosecutor"—is "within the traditional role of the Court." *Id.* And it should dismiss this case, or at the very least hold an evidentiary hearing to resolve any disputed facts and to determine the appropriate remedy for the prosecution's failure to fulfill its obligation to see "that justice shall be done." *Berger*, 295 U.S. at 88; *see also United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) (holding that a defendant is entitled to a hearing where the defendant's moving papers "demonstrate a 'colorable

claim' for relief . . . [by raising] issues of fact material to the resolution of the defendant's constitutional claim."); *United States v. Brink*, 39 F.3d 419, 422-24 (3d Cir. 1994) (directing trial court to conduct evidentiary hearing where defendant raised colorable claim that government violated constitutional right to counsel); *see also Ayers v. Hudson*, 623 F.3d 301, 311 (6th Cir. 2010) (in cases regarding alleged intrusions into the defense camp, courts must "analyze the facts and circumstances of a particular case").

These remedies could, of course, include suppression of any statements that Mr. Hwang made to the Government. *See, e.g.*, *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (holding that when using their supervisory powers to craft remedies for non-Constitutional misconduct by the government and supervise the administration of criminal justice, federal courts may use suppression to exclude evidence taken from the defendant); *Jacobs*, 547 F.2d at 775-76 (Second Circuit invoking its supervisory powers to suppress grand jury testimony as a sanction for failing to provide target warnings to grand jury witnesses); *Myers*, 123 F.3d at 356-58 (concluding that, had the defendant shown bad faith on the part of the prosecution, the court could invoke its supervisory powers to suppress the defendant's grand jury testimony due to the government's failure to inform him of his target status); *see also, e.g.*, *United States v. Booker*, 05-CR-313(JBS), 2006 WL 242509, at *9-10 (D.N.J. Feb. 2, 2006) (suppressing statements elicited by a government agent in violation of the Sixth Amendment).

Or, under the principles of *United States v. Kastigar*, 406 U.S. 441 (1972), the Court could order the matter dismissed since the information provided by Mr. Hwang surely taints the entire prosecution, unless the Government can bear its "heavy burden," *id.* at 461-62, to show "all of the evidence it proposes to use, and all of its trial strategy, were derived from legitimate independent sources. In the absence of such an evidentiary showing by the government, the defendant has

suffered prejudice.  *Id.* at 460, *cited in, e.g.*, *United States v. Danielson*, 325 F.3d 1054, 1071-72

(9th Cir. 2003).[17]  At the very least, a *Kastigar* hearing should be held to further explore this

question of taint.

---

[17]  And "strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal."  *Danielson*, 325 F.3d 1054 at 1074.

Some courts have adopted a per se rule that the prosecution's mere possession of improperly obtained trial strategy information constitutes proof of prejudice.  The D.C. Circuit in *Briggs v. Goodwin*, 698 F.2d 486 (D.C. Cir. 1983), *overruled on other grounds*, 712 F.2d 1444 (D.C. Cir. 1983), concluded that prejudice could be established simply by showing that the government possessed "confidential knowledge about the defense's strategy or position."  *Id.* at 494-95.  The court noted that the prosecution's possession of that information is "inherently detrimental, . . . unfairly advantage[s] the prosecution, and threaten[s] to subvert the adversary system of criminal justice."  *Id.* at 495 (alterations in original) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 556 (1977)).  This inherent prejudice occurs because "[t]he prosecution makes a host of discretionary and judgmental decisions in preparing its case[, and] [i]t would be virtually impossible for . . . a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions."  *Id.* at 494.

## **CONCLUSION**

For these reasons, Defendant Hwang respectfully requests that the Court dismiss the Indictment, or, in the alternative, set a hearing to determine the extent of the Government's use of the information it has obtained from Mr. Hwang.

Dated:  December 2, 2022                    Respectfully submitted,


                                            s/ Lawrence S. Lustberg
                                            Lawrence S. Lustberg
                                            Thomas R. Valen
                                            Jeffrey L. Nagel
                                            GIBBONS P.C.
                                            One Gateway Center
                                            Newark, New Jersey 07102
                                            (973) 596-4500
                                            llustberg@gibbonslaw.com