UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SUNG KOOK (BILL) HWANG and<br>PATRICK HALLIGAN,<br><br>Defendants. | No. 22-cr-240 (AKH) |

## DECLARATION OF LAWRENCE S. LUSTBERG

I, Lawrence S. Lustberg, declare as follows:

1. I am an attorney-at-law, admitted to the bars of the States of New York and New Jersey and admitted to practice in the United States District Court for the Southern District of New York, among other Courts. I am also a Director with Gibbons P.C., counsel for Defendant Sung Kook (Bill) Hwang in the above-captioned matter.

2. I submit this Declaration based upon my personal knowledge and review of the attached relevant documents in support of both (1) Mr. Hwang's and Mr. Halligan's Joint Omnibus Pretrial Motions to Dismiss the Indictment and for other relief; and (2) Mr. Hwang's Motion to Dismiss the Indictment for Prosecutorial Misconduct.

3. Archegos Capital Management was an investment fund composed entirely of the personal money of Bill Hwang, a longtime investor. In late March 2021, Archegos, which had a concentrated investment strategy focusing on a small number of highly researched stocks, began experiencing liquidity issues. As a result of drops in the value of some of its stocks, Archegos was unable to make payments to its counterparties, large banks with which Archegos had swap

contracts and margin accounts. Archegos's default on its agreements with its counterparties caused the fund to cease functioning as a going concern. At its peak, the fund was worth over $30 billion; after defaulting, the fund lost essentially all of its value, as a result of which Mr. Hwang lost most of his assets, and a number of Archegos's counterparties lost significant sums.

4. Shortly after Archegos's high-profile collapse, Government investigations—closely coordinated with one another—commenced. On July 7, 2021, the United States Securities and Exchange Commission ("SEC") issued a subpoena to Archegos for documents relating to Archegos's trading in certain securities.

5. On July 21, 2021, the United States Attorney's Office for the Southern District of New York ("SDNY") applied for pen registers and trap-and-traces of two phones associated with Archegos, and the Federal Bureau of Investigation ("FBI") applied for a search warrant of former Archegos employee Scott Becker and his electronic devices. Attached as Exhibit A is a true and correct copy of SDNY's July 21, 2021 pen-trap and search warrant application in 21 Mag. 7284, bearing Bates Numbers SDNY_001_00000060 through SDNY_001_00000067, which the defense received in discovery subsequent to the indictment of this matter.

6. The investigation continued throughout 2021 (and according to the Government, still continues), including SDNY applications for pen-traps of more devices on September 20 and October 1, 2021; as well, the FBI obtained a search warrant for Archegos-related communications on the Microsoft, Bloomberg, Google Gmail and Apple iCloud accounts of several Archegos employees, including defendants Hwang and Halligan, on September 27, 2021 and for the iPhones and iPad of former Archegos employee William Tomita on September 29, 2021. Attached as Exhibit B is a true and correct copy of an affidavit by Thomas McDonald in support of SDNY's September 27, 2021 application for a search warrant under the Stored Communications Act in 21

Mag. 9335, and the four resulting search warrants, bearing Bates Numbers SDNY_001_00000139 through SDNY_001_00000291.

7. In late October 2021, SDNY began inviting Archegos personnel to meet with the Assistant United States Attorneys ("AUSAs") conducting the SDNY investigation in order to discuss Archegos and its collapse.

8. Given that Mr. Hwang founded and funded Archegos, and was ultimately responsible for its trading decisions, and in an effort to answer the Government's questions in order to demonstrate why any potential charges would be without merit, on October 21, 2021, counsel for Mr. Hwang called the AUSAs whom they understood were overseeing the investigation to commence this process. Attached as Exhibit C is a true and correct copy of an October 21, 2021 email from Matthew Podolsky to Lawrence Lustberg, Thomas Valen, Andrew Thomas, and Alexander Rossmiller following that call.[1]

9. On November 15, 2021, the AUSAs called to continue the prior month's discussion; two days later, Mr. Hwang's attorneys spoke with them about having an attorney proffer in late December 2021 or early 2022. Every phone call described in this Declaration between Mr. Hwang's counsel and the AUSAs involved at least two of the AUSAs. On the November 15 phone call, the AUSAs informed Mr. Hwang's attorneys that Mr. Hwang was a "subject" of their investigation. At no point between then and the unsealing of the Indictment did the AUSAs, or any other Government personnel, ever revise their statement and inform Mr. Hwang's counsel that he was a "target." Attached as Exhibit D is a true and correct copy of a

---

[1] The printed copies of emails attached to this declaration include redactions necessary to ensure that the printed copy is identical to the versions that were emailed; no substantive information has been redacted.

November 15, 2021 email chain between Lawrence Lustberg, Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, and Thomas Valen following the November 15 phone call.

10. In proposing an attorney proffer on the November 15, 2021 call, the AUSAs stated that they were interested in three topics: (1) how Archegos functioned, including which decisions were made by which employees; (2) Archegos's investment practices in 2020 and 2021, including its identification of investment targets and its trading strategy; and (3) relationships between Archegos and its bank counterparties, including what information was conveyed to the counterparties about Archegos and Mr. Hwang's role in that process.

11. On December 10, and further to scheduling an attorney proffer session, the AUSAs stated that while they did not want to impose on Mr. Hwang's attorneys during the holidays, "it would be helpful to have the benefit of your presentation in the next month." Attached as Exhibit E is a true and correct copy of a December 10, 2021 email chain between Lawrence Lustberg, Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, and Thomas Valen scheduling an attorney proffer.

12. The attorney proffer session was ultimately scheduled for January 7, 2022. In that proffer, which lasted approximately 90 minutes, Mr. Hwang's counsel presented a 30-page PowerPoint that discussed decision-making authority at Archegos, the fund's investment and trading strategy, the people at the fund in charge of conveying information to counterparties, the representations made to counterparties regarding the size of Archegos's positions, and the events of the week of March 22, 2021. At the conclusion of the proffer, the AUSAs posed specific follow-up questions, to which Mr. Hwang's counsel agreed to respond as quickly as possible.[2] After that

---

[2] These questions included the following:
- Did Mr. Hwang convey analytical guidance to his analysts?

4

session, the AUSAs emailed Mr. Hwang's counsel, stating: "Thanks again for the presentation, for the follow-up, and for the willingness to address our questions. We look forward to the continued dialogue." The AUSAs' email proposed a second attorney proffer session sometime in mid- to late-February at which their specific follow-up questions would be answered and, in closing, expressed their "hope" that "our continued conversation with you will give us an understanding of Mr. Hwang's personal perspective and understanding." Attached as Exhibit F is a true and correct copy of the referenced January 14, 2022 email chain between AUSA Andrew Thomas, Lawrence Lustberg, Thomas Valen, Jeffrey Nagel, Kevin Reich, Alexander Rossmiller, and Matthew Podolsky. Attached as Exhibit G is a true and correct copy of the PowerPoint presentation emailed to and left with SDNY on January 7, 2022.

13. That second attorney proffer took place on February 10, 2022; Mr. Hwang's counsel walked the AUSAs through a 37-page PowerPoint presentation providing detailed answers to the AUSAs' questions. Attached as Exhibit H is a true and correct copy of the PowerPoint presentation emailed to and left with SDNY on February 10, 2022.

14. Shortly thereafter, the AUSAs requested the opportunity to meet with Mr. Hwang for an "interview," and on February 18, 2022, the AUSAs and Mr. Hwang's attorneys discussed

---

- What were Mr. Hwang's practices with respect to sharing his investment strategy/portfolio composition with non-bank outsiders?
- What reports about positions, cash, margin, and similar topics did Mr. Hwang routinely receive?
- What is Mr. Hwang's understanding of capacity limits or other trade restrictions imposed by counterparties?
- Were there occasions when Mr. Hwang directed to buy and sell the same security during the course of the same day?
- What role did Mr. Hwang play in selecting counterparties?
- What information did Mr. Hwang authorize to be shared with banks and counterparties about Archegos's business?
- Is Mr. Hwang aware of any misrepresentation made by an Archegos employee to a bank representative?

5

having in-person proffer sessions for Mr. Hwang in mid- and late-March. In that and subsequent communications, the decision was made to hold two separate proffer sessions: the first was to address Mr. Hwang's overall investment strategy, as well as his use of research analysts, and the second would concern Archegos's trading and portfolio management, its counterparties' capacity and margin requirements, and its interactions and negotiations with banks. At Mr. Hwang's request, the Government provided some of the documents that would be the subject of their questioning at these sessions. Attached as Exhibit I is a true and correct copy of a February 22, 2022 email chain between Lawrence Lustberg, Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, Thomas Valen, Jeffrey Nagel, and Kevin Reich scheduling an in-person proffer.

15. Meanwhile, the SEC and the Commodity Futures Trading Commission ("CFTC") requested that they be able to participate in these sessions as well, to which Mr. Hwang agreed. Attached as Exhibit J is a true and correct copy of a March 8, 2022 email from Alejandra de Urioste to Lawrence Lustberg, Thomas Valen, Steven Ringer, Jack Murphy, Jacob Memelstein, and Benjamin Rankin attaching a proffer agreement. Attached as Exhibit K is a true and correct copy of a March 9, 2022 email from Andrew Dean to Lawrence Lustberg, Thomas Valen, Joshua Brodsky, David Zetlin-Jones, Osman Nawaz, and Brian Fitzpatrick attaching a proffer agreement.

16. In mid-March, Mr. Hwang executed proffer agreements with all three agencies. Attached as Exhibit L is a true and correct copy of a March 9, 2022 email chain between Lawrence Lustberg, Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, Thomas Valen, Jeffrey Nagel, and Kevin Reich regarding a proffer agreement. Attached as Exhibit M is a true and correct copy of a March 16, 2022 email from Andrew Dean to Lawrence Lustberg, Thomas Valen, Joshua Brodsky, David Zetlin-Jones, Osman Nawaz, Brian Fitzpatrick, and Jack Kaufman containing an executed proffer agreement.

17.     Mr. Hwang had a first proffer session with SDNY on March 14, 2022; lawyers from both the SEC and CFTC also attended. For about six hours, with two breaks, Mr. Hwang was questioned extensively by the AUSAs about his investment strategy, including the selection of stocks to invest in, use of direct stock purchases versus "swaps," and his target prices for stocks. He was also questioned in detail about Archegos's research department, including his use of analysts to learn more about particular stocks; his analysts' development of target prices for stocks, and his view of them; and whether his use of the research department changed during the COVID-19 pandemic. The AUSAs further questioned Mr. Hwang about the "concentration" of his investments—both the ratio of particular investments to the size of the overall fund and the ratio of a particular investment to the percentage of outstanding shares in that stock.

18.     In separate video conferences, counsel for Mr. Hwang also briefed the SEC and CFTC attorneys, who had not sat in on the attorney proffers in January and February, and walked them through the key points contained in their presentations to SDNY.

19.     Mr. Hwang had a second proffer session with SDNY, the SEC, and the CFTC on March 30, 2022. Again the session lasted about six hours, with two breaks. During the session, Mr. Hwang was questioned at length about, *inter alia*, the mechanics of Archegos's trading activity, including who ordered particular trades, who executed the trades, how orders were communicated, what information Mr. Hwang looked at when trading, whether Mr. Hwang considered the impact of a particular trade on the price of a security, and Mr. Hwang's use of limit versus market orders. Mr. Hwang was asked about Archegos's "pre-market" trading (that is, trades executed before the market officially opened at 9:30 A.M.), as well as its trading toward the end of the trading day, and his use of a stock's trading volume as a factor in deciding how much of a stock to trade. The AUSAs asked Mr. Hwang about his thought process and motivations in

connection with specific trades he executed over the course of a year at Archegos, inquiring as to his reasons for buying particular quantities of particular stocks at particular times and how he responded to selling pressures. They also specifically asked Mr. Hwang whether he understood and intended that certain trades could impact the price of stocks. Mr. Hwang was also asked about Archegos's negotiations with its bank counterparties, the entities through which Archegos made its trades, and focused on how involved Mr. Hwang was in negotiating trading agreements with counterparties, as well as Archegos's acquisition of "capacity," or its ability to trade more stock.

20. Mr. Hwang's attorneys had been provided with 20 documents prior to this session about which the AUSAs stated they intended to ask Mr. Hwang. As it turned out, the AUSAs actually discussed 24 documents with Mr. Hwang; several of those that were not provided in advance are documents central to and specifically mentioned in the Indictment, *see* Ind. ¶ 30 (text message between Mr. Hwang and an analyst), ¶ 56 (email between Mr. Hwang and William Tomita).

21. After Mr. Hwang's second in-person proffer, the AUSAs informed Mr. Hwang's counsel that they were meeting internally the following day after which they would be prepared to discuss next steps; they made clear that the time was coming when, on behalf of Mr. Hwang, counsel might be asked to provide their "perspective" on the case. Then, late in the day on Friday, April 1, the AUSAs expressed to Mr. Hwang's counsel for the first time that SDNY had "serious concerns" with regard to the "lawfulness of Mr. Hwang's conduct," and "the credibility of some of his answers" at his second in-person proffer. Nonetheless, making clear that a decision with respect to criminal prosecution had not been made, they requested another meeting with Mr. Hwang's attorneys to hear counsel's perspective on certain topics, including specific factual information that was not available from any other sources. In particular, SDNY stated that an

"effective" presentation would include information relating to Mr. Hwang's "state of mind" and "intent" when ordering the trades that were the subject of the prosecutors' investigation. Making clear that this was a serious request, one that would bear upon SDNY's charging decision, the AUSAs stated that the Deputy United States Attorney for the Southern District of New York would be attending the meeting, as would the two co-chiefs of the office's Securities and Commodities Fraud Task Force. Attached as Exhibit N is a true and correct copy of an April 1, 2022 email chain between Matthew Podolsky, Lawrence Lustberg, Thomas Valen, Jeffrey Nagel, Andrew Thomas, and Alex Rossmiller scheduling the referenced phone call.

22.     This post-proffer meeting was originally scheduled on a very short timeline; having requested the presentation on April 1, SDNY asked Mr. Hwang's counsel to present by April 14. Because it would be a time-consuming process to collect and distill information regarding thousands of trades that occurred over the course of the year in question, evaluate it in light of the complex business practices of Mr. Hwang's investment fund, and then craft an appropriate presentation for the leadership of the U.S. Attorney's Office that addressed that information, and unaware of any reason to rush such a presentation (there was obviously not, for example, an impending statute of limitations problem), Mr. Hwang's attorneys repeatedly asked for more time. The AUSAs, however, informed them that "they are not the decisionmakers and they are concerned that the decisionmakers will not be receptive to the request."

23.     On April 5, Mr. Hwang's attorneys also spoke with the SEC about conducting a joint meeting with SDNY. The SEC began the call by expressing that it was not a "Wells call"— that is, a notice by the SEC that it was considering bringing charges against a prospective defendant and an invitation to present defenses and impact the SEC's view of the potential lawsuit. The absence of a Wells notice—and, moreover, the SEC's explicit affirmation that its communications

9

with Mr. Hwang's counsel did not constitute such a notice—further led Mr. Hwang's attorneys to believe that government agencies had not yet decided to prosecute or sue Mr. Hwang and continued to have open minds. This belief was further reinforced when Mr. Hwang's counsel mentioned their struggles to understand any legal theory underlying a potential suit for market manipulation in light of the undisputed facts, and the SEC responded that "we totally get where you're coming from on the manipulation piece."

24. After multiple phone calls over three days, on April 8, Mr. Hwang's lawyers sent a final email to SDNY requesting further time to make their presentation. The email noted that "we are unaware of any justification for the urgency (such as the running of a statute of limitations or the like)." And it requested a meeting with AUSAs' superiors on the subject, emphasizing that the request for more time to convince SDNY of Mr. Hwang's innocence was "motivated by no more than a desire to have the kind of open-minded, thorough and careful discussion that a case like this, in particular, deserves and that has been in the tradition of the U.S. Attorney's Office for the Southern District of New York." Attached as Exhibit O is a true and correct copy of the referenced April 8, 2022 email chain between Lawrence Lustberg, Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, Thomas Valen, and Jeffrey Nagel.

25. The following day, Mr. Hwang's lawyers and the AUSAs spoke by telephone; a brief extension was allowed and two presentations were scheduled: a law-focused presentation on April 19, at which Mr. Hwang's counsel would address what they understood to be the Government's legal theory of open market manipulation; and a fact-focused presentation on April 25, intended to demonstrate the facts underlying Mr. Hwang's innocence to the "decisionmakers" at SDNY, including the Deputy U.S. Attorney for the District. The AUSAs characterized this second presentation, which they said could not be postponed, as a "focused discussion . . . about

Mr. Hwang's intentions." They noted that what trades occurred when, and the volume of those trades, were not in dispute, but that they wanted to know "what did Bill [Hwang] mean by it?" In setting the schedule, which still remained very expedited, SDNY stated that "we understand" the frustration with the timing but "we do institutionally" have an intention to "wrap up" decisionmaking and wanted to have "Bill's presentation" fresh in mind and as "close as possible" to the office's ultimate decisionmaking.

26.  During this April 9 call, Mr. Hwang's counsel noted that some topics relevant to the presentation might implicate Mr. Hwang's or Archegos's attorney-client or counsel's work-product privilege, and asked whether this potential privilege waiver issue required resolution by April 25. The AUSAs stated that they "cannot assure further process beyond the 25th." They then asked which topics in particular implicated attorney-client privilege, and noted which of those topics they had "huge interest" in: Archegos's "box trades" (holding long and short positions in the same stock, as referenced in the Indictment at ¶ 36) and Archegos's relationship with "Adviser-1" and "Fund-1" (as referenced in the Indictment at ¶ 37).

27.  On April 19, Mr. Hwang's lawyers made the first of their two presentations to the SDNY, the SEC, and the CFTC on the law of open market manipulation. In a 44-page PowerPoint presentation, Mr. Hwang's attorneys argued that such a theory is legally unsupportable. No other legal theories had been advanced by, or inquired about, by the AUSAs at the time, and Mr. Hwang's lawyers presented on no other. After the presentation, the AUSAs asked Mr. Hwang's counsel to discuss, at the next presentation, four very specific questions: whether intent alone can create an "artificial price" for purposes of market manipulation; whether there are material differences between Sections 9(a)(2) and 10(b) of the Securities Act; whether "marking the close" (heightened end-of-day trading) can constitute criminal market manipulation, and what Mr.

11

Hwang's understanding was of Archegos's negotiations with counterparties (specifically, what information did they ask for and receive from Archegos). Attached as Exhibit P is a true and correct copy of the PowerPoint presentation delivered to and left with SDNY on April 19, 2022.

28. Meanwhile, only two days later, on April 21, and unbeknownst to Mr. Hwang or his counsel, a sealed information was filed against former Archegos employee Scott Becker, who voluntarily surrendered to the authorities and entered a plea of guilty to multiple counts that same day. The next day, April 22, a sealed information was filed against former Archegos employee William Tomita, who likewise voluntarily surrendered and pleaded guilty at the same time. None of this was disclosed to Mr. Hwang's lawyers, who continued in good faith to discuss with SDNY the circumstances of Archegos's collapse.

29. On April 25, Mr. Hwang's lawyers gave a 90-minute presentation to SDNY, including the SDNY Deputy U.S. Attorney. The presentation consisted of a 42-page PowerPoint, a hard copy of which was provided to the Government the next day (April 26), at which point counsel believed that Mr. Hwang's position was still under consideration. The PowerPoint discussed Archegos's overall investment strategy and operations; the role of research in Mr. Hwang's selection of investments; Archegos's use of total return swaps as opposed to direct purchases of stocks; and Archegos's goals when exiting investment positions. It examined Archegos's increased trading activity after the onset of the pandemic, the changes in the fund's largest stock positions, and the justifications behind almost twenty individual trades about which the AUSAs had asked Mr. Hwang during his second in-person proffer session. It discussed Mr. Hwang's pre-market, intraday, and end-of-day stock purchases, and explained Mr. Hwang's instructions to traders to trade "without impact," an issue that the Government had raised at that same interview. And it examined the practice of providing potential counterparties with "sample

portfolios" and explained Mr. Hwang's knowledge of specific provisions in contracts containing his signature. The presentation also addressed the four questions that the AUSAs had asked Mr. Hwang's counsel to discuss after the April 19 meeting. Attorneys representing the Archegos entities attended this presentation, as well as the presentation that took place on April 19, 2022. Attached as Exhibit Q is a true and correct copy of the PowerPoint presentation delivered to the Government on April 25, 2022 and provided in hard copy the next day.

30. In response to these questions, and as described above, Mr. Hwang's lawyers provided the Government with a comprehensive and detailed presentation with respect to Archegos's collapse and Mr. Hwang's activities, as well as Mr. Hwang's intent, in accordance with the AUSAs' direction. And they did so with the understanding that such a presentation could have a significant impact on the Government's decision whether to prosecute Mr. Hwang—an understanding derived from multiple conversations with line prosecutors, including conversations about how the presentations needed to be expedited so that a decision could be made with Mr. Hwang's interview fresh in mind. That this was counsel's understanding was confirmed in an email exchange between defense counsel and the prosecutors the day after the final presentation, in which Mr. Hwang's counsel wrote "I really do appreciate the courtesy, professionalism and serious consideration that you . . . (and indeed the whole office) has given this matter" and the AUSA responded, thanking Mr. Hwang's lawyer for "the note, for the thoughtful and thorough presentation, and for the collegiality throughout, which is how I think these matters should work and helps everyone." Attached as Exhibit R is a true and correct copy of that April 26, 2022 email chain between Lawrence Lustberg and Matthew Podolsky.

31. At the conclusion of the April 25 presentation, SDNY asked Mr. Hwang's counsel for additional follow-up information regarding the 2012 criminal and civil matters regarding Tiger

Asia Management, Mr. Hwang's prior hedge fund, and the effect of "market dominance" on a legal analysis of market manipulation. Counsel was in the process of expeditiously gathering this information when the Indictment of Mr. Hwang was unsealed and Mr. Hwang was arrested two days later.

32. The same day as the April 25 presentation, SDNY obtained a 59-page, 11-count indictment, including a charge of violating the Racketeer Influenced and Corrupt Organizations ("RICO") Statute.

33. On April 27, at approximately 6:00 A.M., less than 48 hours after meeting with SDNY, Mr. Hwang was arrested at his home in New Jersey; though Mr. Hwang had voluntarily appeared for interviews, and though the Government was aware that he did not have a passport, he was not permitted to surrender for processing. The same morning, the SEC filed a civil suit against Mr. Hwang and Archegos (among others), and the CFTC filed a civil suit against Archegos (among others). Indeed, at 11:30 A.M. that day, SDNY United States Attorney Damian Williams, Deputy Attorney General Lisa Monaco, Special Agent-in-Charge for the New York Field Division of the FBI Michael Brodack, and SEC Director of Enforcement Gurbir Grewal held a press conference to discuss the arrests of Mr. Hwang and Mr. Halligan. The presentation included an elaborate demonstrative exhibit allegedly explaining how Mr. Hwang's purported scheme worked. Attached as Exhibit S is a true and correct copy of an April 27, 2022 email from Lawrence Lustberg to Andrew Thomas, Alexander Rossmiller, Matthew Podolsky, and Thomas Valen offering Mr. Hwang's surrender.

34. Attached as Exhibit T is a true and correct copy of a letter sent by Lawrence Lustberg to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated July 19, 2022 regarding the Government's *Brady* obligations.

35. Attached as Exhibit U is a true and correct copy of a letter sent by Lawrence Lustberg to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated August 24, 2022 regarding the Government's bill of particulars and *Brady* obligations.

36. Attached as Exhibit V is a true and correct copy of a letter sent by Lawrence Lustberg to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated November 15, 2022 regarding the Government's *Brady* obligations.

37. Attached as Exhibit W is a true and correct copy of a letter sent by Mary Mulligan to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated August 29, 2022 regarding the Government's *Brady* obligations.

38. Attached as Exhibit X is a true and correct copy of a letter sent by Mary Mulligan to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated October 11, 2022 regarding the Government's bill of particulars and *Brady* obligations.

39. Attached as Exhibit Y is a true and correct copy of a letter sent by Mary Mulligan to Matthew Podolsky, Alex Rossmiller, Danielle Sassoon, and Andrew Thomas dated November 14, 2022 regarding the Government's bill of particulars and *Brady* obligations.

40. Attached as Exhibit Z is a true and correct copy of the transcript of the June 1, 2022, Status Conference before this Court.

41. Attached as Exhibit AA is a true and correct copy of a letter sent by Mary Mulligan to Matthew Podolsky, Alex Rossmiller, and Andrew Thomas dated August 24, 2022 regarding the Government's bill of particulars obligations.

42. Attached as Exhibit BB is a true and correct copy of a letter sent by Andrew Thomas to Lawrence Lustberg, Thomas Valen, Mary Mulligan, and Tim Haggerty dated December 2, 2022 regarding the Government's *Brady* obligations.

43. On October 19, 2022, the Government sent Defendants a letter concerning its *Brady* obligations. The Government designated the contents of this letter as Sensitive Material, which is not a defined term in the Protective Order entered in this matter, ECF 22. Rather than file publicly that which the Government may have intended to keep confidential, I have not attached the letter to this Declaration but will provide it to the Court upon request.

44. Attached as Exhibit CC is a true and correct copy of the December 12, 2012 Complaint filed by the SEC against Tiger Asia Management, Tiger Asia Partners, and Mr. Hwang in 12-cv-7601 (DNJ).

45. Attached as Exhibit DD is a true and correct copy of the consent judgment between the SEC and Tiger Asia Management in 12-cv-7601 (DNJ).

46. Attached as Exhibit EE is a true and correct copy of the final judgment as to Tiger Asia Management in 12-cv-7601 (DNJ).

47. Attached as Exhibit FF is a true and correct copy of the consent judgment between the SEC and Tiger Asia Partners in 12-cv-7601 (DNJ).

48. Attached as Exhibit GG is a true and correct copy of the final judgment as to Tiger Asia Partners in 12-cv-7601 (DNJ).

49. Attached as Exhibit HH is a true and correct copy of the consent judgment between the SEC and Mr. Hwang in 12-cv-7601 (DNJ).

50. Attached as Exhibit II is a true and correct copy of the final judgment as to Mr. Hwang in 12-cv-7601 (DNJ).

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: December 2, 2022  
       Newark, New Jersey

By: s/ Lawrence S. Lustberg  
Lawrence S. Lustberg  
**GIBBONS P.C.**  
One Gateway Center  
Newark, New Jersey 07102  
(973) 596-4500  
tvalen@gibbonslaw.com

*Attorneys for Defendant*  
*Sung Kook (Bill) Hwang*