UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

                               :

UNITED STATES OF AMERICA       :

                               :

          - v. -          :                  22 Cr. 240 (AKH)

                               :

SUNG KOOK (BILL) HWANG and  :

PATRICK HALLIGAN,        :

                               :

             Defendants.      :

------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO HWANG'S MOTION TO DISMISS THE INDICTMENT**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Matthew Podolsky
Alexander Rossmiller
Danielle Sassoon
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................II

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................ 3

    A.  Hwang's Conduct and the Collapse of Archegos ........................................ 3

    B.  Investigation and Indictment ...................................................................... 4

    C.  Hwang's Pre-Indictment Advocacy ........................................................... 5

LEGAL PRINCIPLES ...................................................................................................... 10

    A.  The Grand Jury Process and the Court's Supervisory Authority .............. 10

    B.  Justice Manual Categories for Grand Jury Witnesses ............................... 11

    C.  Right Against Self-Incrimination .............................................................. 12

    D.  Substantive Due Process ........................................................................... 13

ARGUMENT .................................................................................................................... 14

    A.  Supreme Court and Second Circuit Law Forecloses Hwang's Motion..................... 14

        1.  There Is No Basis for Dismissal Under the Court's Limited Supervisory Power Over the Grand Jury Process................................. 15

        2.  Hwang's Motion Cannot Be Supported by Other Constitutional Doctrines......... 21

        3.  Hwang's Allegations Do Not Entitle Him to Any Relief ................... 26

    B.  Hwang's Motion Rests on Factually Erroneous Assumptions ................... 31

    C.  No Additional Factfinding Is Warranted ................................................... 34

CONCLUSION.................................................................................................................. 36

# TABLE OF AUTHORITIES

**CASES**

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988).............................................. 11, 19, 31

*Campaneria* v. *Reid*, 891 F.2d 1014 (2d Cir. 1989) ..................................................... 14

*Beckwith v. United States*, 425 U.S. 341 (1976) ........................................................... 28

*Colorado v. Connelly*, 479 U.S. 157 (1986) ................................................................ 14

*Colorado v. Spring*, 479 U.S. 564 (1987)................................................... 13, 29, 30, 37

*Couch v. United States*, 409 U.S. 322 (1973) .............................................................. 28

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)................................................... 14

*Hamling v. United States*, 418 U.S. 87 (1974).............................................................. 10

*Hoffa v. United States*, 385 U.S. 293 (1966) ............................................................... 27

*In re Grand Jury Subpoena*, 826 F.2d 1166 (1987)...................................................... 12

*In Re Three Grand Jury Subpoenas Jan. 5, 1988*, 847 F.2d 1024 (2d Cir. 1988) ...................... 13

*Johnson v. Newburgh Enlarged School District*, 239 F.3d 246 (2001)........................................ 15

*Massiah v. United States*, 377 U.S. 201 (1964)............................................................ 26

*Michigan v. Tucker*, 417 U.S. 433 (1974)................................................................... 13

*Minnesota v. Murphy*, 465 U.S. 420 (1984) ................................................................ 28

*Miranda v. Arizona*, 384 U.S. 436 (1966) .................................................................. 27

*Moran v. Burbine*, 475 U.S. 412 (1986) .................................................................... 26

*Oregon v. Elstad*, 470 U.S. 298 (1985)...................................................................... 14

*Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005) ............................................................. 14

*Rochin v. California*, 342 U.S. 165 (1952).................................................................. 15

*United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir. 1975)........................................... 15

*United States v. Al-Kassar*, 660 F.3d 108 (2d Cir. 2011) .......................................... 15, 25

*United States v. Artuso*, 618 F.2d 192 (2d Cir. 1980)...................................................... 32

*United States v. Ash*, 19 Cr. 780 (LAK) (S.D.N.Y. Nov. 23, 2021)...................................... 25

*United States v. Babb*, 807 F.2d 272 (1st Cir. 1986) ............................................... 21, 24

*United States v. Barcelo*, 13 Cr. 38 (RJS) (S.D.N.Y. Aug. 15, 2014) ........................................... 32

*United States v. Becker, et al.*, 22 Cr. 231 (LTS) (S.D.N.Y. Apr. 22, 2022) ............................ 4, 9

*United States v. Brito*, 907 F.2d 392 (2d Cir. 1990) .......................................................... 18, 19

*United States v. Broward*, 594 F.2d 345 (2d Cir. 1979) ................................................................ 10

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983) ................................................................ 10, 11

*United States v. Chin*, 934 F. 2d 393 (2d Cir. 1991) ....................................................................... 14

*United States v. Corbett*, 750 F.3d 245 2d Cir. 2014) ................................................................... 13

*United States v. Crocker*, 568 F.2d 1049 (3d Cir. 1977) ............................................................... 21

*United States v. Drake*, 210 F. Supp. 3d 607 (M.D.N.C. April 18, 2018) .................................... 21

*United States v. Fish*, 05 Cr. 228 (W.D.N.Y. Dec. 18, 2006) ........................................................ 21

*United States v. Gaudin*, 515 U.S. 506 (1995) ............................................................................... 22

*United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) ..................................................................... 15

*United States v. Ghailani*, 751 F. Supp. 2d 502 (S.D.N.Y. 2010) ................................................ 16

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) .............................................. 10, 11

*United States v. Gillespie*, 974 F.2d 796 (7th Cir. 1992) .......................................................... 21, 24

*United States v. Gonzalez*, 529 F.3d 94 (2d Cir. 2008) ................................................................ 31

*United States v. Hasting*, 461 U.S. 499 (1974) .............................................................................. 30

*United States v. Havens*, 446 U.S. 620 (1980) ............................................................................... 32

*United States v. Henry*, 447 U.S. 264 (1980) ................................................................................. 26

*United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976) .............................................................. 22, 23

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ...................................................................... 10

*United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008) ......................................................... 31

*United States v. Mandujano*, 425 U.S. 564 (1976) ........................................................................ 23

*United States v. Maxwell*, 545 F. Supp. 3d 72 (S.D.N.Y. June 25, 2021) .................................... 28

United States v. Mechanik, 475 U.S. 66 (1986) ................................................................ 10, 11, 31

*United States* v. *Mullens*, 536 F.2d 997 (2d Cir. 1976) ................................................................ 14

*United States v. Myers*, 123 F.3d 350 (6th Cir. 1997) ................................................................... 22

*United States v. Nunan*, 236 F.2d 576 (2d Cir. 1956) .................................................................... 10

iii

*United States v. Okwumabua*, 828 F.2d 950 (2d Cir. 1987) .................................................... 13, 28

*United States v. Pacheco-Ortiz*, 889 F.2d 301 (1st Cir. 1989) ................................................ 22, 24

*United States v. Percoco*, 16 Cr. 776 (VEC) (S.D.N.Y. Dec. 11, 2017) .................................... 19

*United States v. Percoco*. 13 F.4th 158 (2d Cir. 2021) ................................................................ 20

*United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994) ...................................................... 12, 38

*United States v. R. Enters., Inc.*, 498 U.S. 292 (1991) ................................................................ 10

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ............................................................ 16, 25

*United States v. Roberts*, 660 F.3d 149 (2d Cir. 2011) ................................................................ 14

*United States v. Russell*, 916 F. Supp. 2d 305 (E.D.N.Y. 2013) .................................................. 20

*United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015) .................................................... 11

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ............................................................. 18, 31

*United States v. Washington*, 431 U.S. 181 (1977) ................................................................. 29, 33

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................. 11, 18, 30

*Watts v. Indiana*, 338 U.S. 49 (1949) ........................................................................................ 15

## OTHER AUTHORITIES

Justice Manual 1-1.200 ................................................................................................................ 11

Justice Manual 9-11 ..................................................................................................................... 34

Justice Manual 9-11.151 ......................................................................................................... 11, 33

## RULES

Fed. R. Crim. P. 52 ...................................................................................................................... 21

Fed. R. Crim. P. 6(d) ................................................................................................................... 20

Fed. R. Evid. 408 ...................................................................................................................... 5, 9

Fed. R. Evid. 410 ............................................................................................................. 5, 7, 9, 31

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. V ................................................................................................................. 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA       :
                                          :

           - v. -            :                 22 Cr. 240 (AKH)
                                          :

SUNG KOOK (BILL) HWANG and   :
PATRICK HALLIGAN,          :
                                          :

                 Defendants.     :
------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Sung Kook (Bill) Hwang's motion to dismiss Indictment 22 Cr. 240 (AKH) (the "Indictment") as a sanction for alleged prosecutorial misconduct, ECF Doc. No. 49 (motion) & ECF Doc. No. 50 (memorandum in support, hereinafter "Hwang Br.").

Hwang's motion is predicated on a series of inflammatory claims about the Government's conduct that are entirely baseless. Given the vehemence of Hwang's rhetoric, and to assure the Court and the public that the Government was at all times forthright with Hwang and his counsel, in the pages that follow the Government responds to those allegations in detail.

But, to be clear from the outset, this is not a case in which the Court must resolve a disputed issue of fact to determine whether the defendant is entitled to the relief he seeks. As detailed below, even if every fact alleged by Hwang's counsel were accepted as true, his motion would still be meritless. That is because the law is clear that the Court's power to dismiss an indictment as a sanction for Government misconduct is a limited one. And, even on his own account of the facts, Hwang has failed to describe any of the exceptionally rare and extreme situations that courts have determined might merit such relief.

Perhaps recognizing that his motion is legally infirm, Hwang resorts to attacking the Government. According to Hwang, Government attorneys made a "plainly false" statement about

1

how they viewed his conduct and engaged in a "sham" process to obtain insight into defense strategy. *See generally* Hwang Br. 14-15, 28. But, as explained below, what Hwang characterizes as indicia of deceit were in fact part of a good faith effort by the Government to arrive at a just outcome by affording Hwang and his lawyers an opportunity to be fully heard before making a charging decision.

Hwang's attorneys contacted the United States Attorney's Office for the Southern District of New York ("USAO") on October 21, 2021. Like many defense attorneys who learn that their client's conduct is under investigation, Hwang's lawyers did so to request that the USAO give those lawyers an opportunity "to demonstrate why any potential charges would be without merit." Lustberg Decl. ¶ 8. Also like many defense attorneys who learn that their client's conduct is under investigation, the defendant's attorneys sought information regarding the focus of the Government's investigation and areas of particular concern. AUSA Notes of November 17, 2021 Call, Ex. B to Thomas Decl.

Despite being under no obligation to entertain Hwang's pre-charge advocacy, to highlight areas of investigative interest, or to provide Hwang with any information whatsoever about its ongoing criminal investigation, the Government granted the defendant's requests. Indeed, the Government not only permitted the defendant's attorneys to give four separate presentations of advocacy to the USAO and to bring the defendant himself, under a proffer agreement, to the USAO on two occasions, but also provided the defendant's attorneys with documents of particular importance and extensive information regarding the Government's investigation, the questions it was focused on in its evaluation of the evidence and of potential charges, and even the timing of the Government's process. Lustberg Decl. ¶¶ 10-12, 14, 17, 19-21, 25-27, 29-31. In the end, Hwang's lawyers failed to convince the Government not to pursue charges, and the Government sought, and a grand jury returned, a multi-count indictment against Hwang. *See* ECF Doc. 1.

Apparently disappointed by the failure of their strategy—and in an effort to spare the defendant from meeting the accusations of the Indictment—the defendant's lawyers filed the present motion, accusing the Government attorneys of misconduct. But neither Hwang's claim that

the Government misled him nor his claim that the Government elicited information from him as part of a sham process is rooted in fact. The USAO never misinformed Hwang about his investigative status. And for weeks leading up to Hwang's arrest, he was on notice that the USAO may imminently seek charges. On April 1, 2022, for example, Government counsel affirmatively told Hwang's counsel that the USAO had serious concerns about the lawfulness of Hwang's conduct and had doubts about the honesty of Hwang's responses to questions during a voluntary interview. And on April 9, 2022, Government counsel agreed to give Hwang's legal team more time to prepare a presentation—but emphasized that they could be assured of no further opportunity beyond April 25, 2022—and conditioned that schedule on an assurance that Hwang's counsel would take possession of Hwang's passport, lest Hwang flee from potential arrest.

\* \* \*

Put simply, the defendant's motion finds no support in the law; it contains false and misleading factual claims, and outrageous and conspiratorial accusations; and it is wholly without merit. The motion should be denied.

## BACKGROUND

### A.    Hwang's Conduct and the Collapse of Archegos

From at least in or about March 2020 through in or about March 2021, Sung Kook "Bill" Hwang operated his investment fund, Archegos Capital Management, L.P. ("Archegos" or the "fund"), through systematic fraud. In part, Hwang's schemes relied on deceitful and abusive trading practices designed to artificially increase prices in various stocks for the benefit of Archegos's portfolio. In further part, Hwang's schemes centered on providing banks and brokerages with false and misleading statements about the risks of Archegos's positions, designed to cause those institutions to extend billions of dollars of credit to Archegos—and to engage in many billions of dollars of securities transactions—that the banks would otherwise have refused. The various fraudulent acts reinforced each other: the fraud on the banks generated the cash, trading venues, and margin lending required to carry out the market manipulation scheme, and in

turn, the success of the manipulation scheme in driving up market prices provided both cover and cause for Archegos's false statements to banks and brokerages about Archegos's portfolio.

Hwang's schemes had vast consequences for market participants and, in March 2021, temporarily risked destabilizing the entirety of the United States securities markets. By substantially distorting the price of multiple securities, between March 2020 and the week of March 21, 2021, Hwang increased the value of Archegos's own capital from approximately $1.5 billion to approximately $36 billion. Including Archegos's leveraged investments, its gross exposure to the market was in excess of $150 billion. During the week of March 21, 2021, however, multiple events out of Archegos's control led to the collapse of those artificial prices, massive margin calls, and the subsequent forced sale of Archegos's assets. In the process, more than $50 billion in market capitalization across nearly a dozen companies evaporated, harming both the companies that had relied on rising stock prices to make business decisions and the investors in those companies who had purchased securities at inflated prices. Hwang's conduct also caused billions in losses to the financial institutions that Hwang and his co-conspirators had misled, as the risks that they had hidden from those counterparties materialized.

### B.  Investigation and Indictment

On April 25, 2022, a grand jury returned an indictment charging Hwang in eleven counts related to his conduct at Archegos, including racketeering conspiracy, securities fraud, and wire fraud. *See* ECF Doc. 1, Indictment 22 Cr. 240 (AKH) (the "Indictment"). The Indictment also charged Patrick Halligan, Archegos's CFO, in three of those counts, including the racketeering conspiracy. Special agents with the Federal Bureau of Investigation arrested Hwang and Halligan on April 27, 2022. The same day, the Hon. Laura Taylor Swain, Chief U.S. District Judge, at the Government's request, unsealed charges against and guilty pleas by William Tomita, Archegos's head trader, and Scott Becker, Archegos's director of risk management. *See United States v. Becker*, *et al.*, 22 Cr. 231 (LTS), at ECF Doc. 3, 9.

The Indictment and the guilty pleas followed a year-long criminal investigation by a team of prosecutors at the United States Attorney's Office and special agents with the Federal Bureau

of Investigation (the "SDNY prosecution team"). The SDNY prosecution team gathered facts primarily through the grand jury process, review of materials obtained pursuant to search warrants, and numerous voluntary witness interviews.

### C. Hwang's Pre-Indictment Advocacy

On or about October 21, 2021, counsel to Hwang reached out to members of the SDNY prosecution team. *See* Ex. C to Lustberg Decl. at 1. Hwang's counsel contacted the SDNY prosecution team out of a strategic effort "to demonstrate why any potential charges would be without merit." *See* Lustberg Decl. ¶ 8.

On October 22, 2021, Hwang's counsel spoke by telephone with members of the SDNY prosecution team. Among other things, and in substance, Hwang's counsel conveyed that they had spoken to counsel for Archegos and understood that the Government's investigation was neither at its beginning nor at its end, and that they stood ready to provide information to the Government. Hwang's counsel also said that they assumed that Hwang was a subject of the investigation; in response, Government counsel, in substance, agreed that it was fair to say that the Government considered Hwang a subject at that point in the investigation. *See* AUSA Notes of October 22, 2021 Call, Ex. A to Podolsky Decl. Hwang's counsel then emphasized that Hwang's offer to supply information should not be viewed as limited in any way and that it might even include the possibility that the client would be available for an interview or proffer at some point. Government counsel responded it would consider the offer and get back in touch. *See* Ex. A to Podolsky Decl.

On a follow-up call on or about November 17, 2021, Government counsel informed Hwang's counsel, in substance, that the Government would accept Hwang's offer to provide information. Hwang's counsel, in substance and in part, said that he did not want to "shadow box" and asked for the Government to identify the issues it was considering. The Government identified three subjects that might benefit from Hwang's counsel's attention: (1) Archegos's structure; (2) Archegos's relationship to banks and counterparties, including what was told to them and why; and (3) Archegos's trading strategy and investment decisions. *See* Ex. B to Thomas Decl.; *see also* Lustberg Decl. ¶ 10.

On or about January 7, 2022, counsel to Hwang presented to members of the SDNY prosecution team. Hwang's counsel indicated that they were making the presentation subject to Rules 408 and 410 of the Federal Rules of Evidence, which govern settlement and plea discussions. *See* Ex. G to Lustberg Decl., at 2. During that presentation, Government counsel posed a number of questions that Hwang's team asked to follow-up on at a later date; Hwang's team provided a follow-up presentation on the outstanding topics, and a few others flagged by Government counsel in a subsequent email. *See* Ex. I to Lustberg Decl., at 11-12.

By email on or about February 3, 2022—approximately fourteen weeks after Hwang's counsel first reached out to the Government and suggested that it may be willing to make Hwang available—the Government conveyed to Hwang's counsel that "[l]onger term . . . we do think it is going to be helpful to hear from Mr. Hwang directly." *See* Ex. I to Lustberg Decl., at 11. The Government proposed a voluntary interview; the Government did not compel Hwang to appear before the grand jury or threaten to do so; and the Government offered to discuss "procedure, format, and topics as we move forward." *See* Ex. I to Lustberg Decl., at 11.

Counsel for Hwang and the Government ultimately agreed preliminarily to two interviews, one in mid-March and one in late March, with each interview restricted to certain pre-determined topics. *See, e.g.* Ex. L to Lustberg Decl., at 9. In advance of the first interview, counsel to Hwang requested that the USAO extend proffer protection[1] to Hwang's statements at the interview: "We have not previously discussed whether there would be a proffer agreement with your office as well [as with the staff of the Securities and Exchange Commission and the Commodity Futures Trading Commission]; it seems, in the interest of consistency, at least, that we should have one, unless

---

[1] Voluntary interviews typically occur under one of three sets of arrangements: pursuant to no terms or restrictions whatsoever; pursuant to a letter from the government that deems the interview an "innocence proffer" with certain associated understandings; or pursuant to a signed agreement between the parties usually called a "proffer agreement" that strictly limits the government's use of the information conveyed. Here, Hwang's counsel requested the most protective of these potential terms, and the Government agreed.

there is some reason why you think we should not." Exhibit L to Lustberg Decl., at 2. The USAO agreed to the request.

On March 14, 2022, Hwang met with prosecutors for a voluntary interview focused on the structure of Archegos and Hwang's stock-picking philosophy. Hwang was represented at the interview by multiple attorneys. The parties executed a proffer agreement, as Hwang's counsel had requested. Ex. C to Thomas Decl. (the "Proffer Agreement"). The Proffer Agreement expressly noted that Hwang "has agreed to provide the Government with information, and to respond to questions, so that the Government may evaluate [Hwang's] information and responses in making prosecutive decisions." Proffer Agreement ¶ 1. The Proffer Agreement significantly limited the USAO's ability to offer Hwang's interview statements as evidence on its case-in-chief or in connection with any sentencing proceeding. Proffer Agreement ¶ 2. The Proffer Agreement also referred specifically to how the information could be used by the Government "for the purpose of obtaining leads to other evidence" and "for purpose of cross-examination should [Hwang] testify" at a trial. Proffer Agreement ¶ 3. The Proffer Agreement further noted Hwang's agreement that he "shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed." Proffer Agreement ¶ 5.

On March 30, 2022, Hwang participated in a second voluntary interview. Once again, the Government agreed to extend proffer protection to Hwang's statements during the interview and it renewed the Proffer Agreement. *See* Proffer Agreement at 2. And, once again, Hwang was represented at the interview by multiple attorneys. As had been agreed to in advance, the interview focused on Archegos's trading. *See* Lustberg Decl. ¶ 19.

During the March 30, 2022 meeting, Hwang made a number of dubious and self-evidently false statements, including the assertion that he "was not aware that his trading could be moving the market because the market 'is a complicated thing.'" Thomas Decl. ¶ 5. (As Hwang's counsel himself has since informed the Court, "Everybody knows when they trade it's going to affect the price." June 1, 2022 Tr. at 10.) After the interview concluded, prosecutors met briefly with

Hwang's counsel outside of Hwang's presence and conveyed, in substance and among other things, that Hwang had made a number of troubling assertions during the interview.

On or about April 1, 2022, members of the prosecution team spoke by telephone to Hwang's counsel about the potential defense presentation. During that call, the prosecution team expressly informed Hwang's counsel that the Government had developed serious concerns about the lawfulness of Hwang's conduct and the credibility of his responses at the interviews. *See* AUSA Notes of April 1, 2022 Call, Ex. B to Podolsky Decl. Government counsel noted that whether and how to make any presentation was up to Hwang, but that the Government would benefit from Hwang's counsel's thoughts on certain topics, including Hwang's state of mind during his trading, as it considered potential charges. Ex. B to Podolsky Decl.

On or about April 6, 2022, Hwang's counsel requested additional time to prepare a presentation. In substance, and among other things, Hwang's counsel stated that they "took very seriously what you said about serious concerns about [Hwang's] conduct and truthfulness" but that "we don't think two weeks is enough time to put together a sufficiently thoughtful presentation." See AUSA Notes of April 6, 2022 call, Ex. C to Podolsky Decl. Initially, however, the Government conveyed to Hwang's counsel that the Government intended to make a charging decision in the next few weeks and it would not delay at Hwang's request. *See* Lustberg Decl. ¶ 22.

On April 8, 2022, Hwang's counsel by email renewed their request for additional time to prepare a presentation. In their email, and among other things, Hwang's counsel asserted that it would be unfair to insist that Hwang present "on the proposed timetable" because it was "insufficient to allow us reasonable time to adequately prepare for [the] important session." Ex. O to Lustberg Decl. On or about April 9, 2022, Government counsel spoke with Hwang's legal team to address their request for additional time to present. During that call, and among other things, the Government informed defense counsel that it had an intention to conclude the decision-making in this matter promptly; that the last opportunity it could assure counsel they would have to present would be on April 25, 2022; and that, if the defense team took until April 25, 2022 to present, it

would very likely be late in the Government's decision-making process. As reflected by contemporaneous notes, the Government, in substance, conveyed:

> By waiting, you must understand that people will continue to work on this and they may have more informed views by the time you present than if you had presented earlier in the process. Everyone will still be interested in hearing from you, of course, but it will be coming later in the process.

*See* AUSA Notes of April 9, 2022 Call, Ex. D to Thomas Decl.; Lustberg Decl. ¶¶ 25-26. The Government also required "in exchange for our extending [the defense team] more time," that defense counsel take possession of Hwang's passport. *Id.* After that call, Hwang's counsel chose to make a legal presentation on April 19, 2022 and broader presentation on April 25, 2022.

On April 19, 2022, Hwang's counsel, joined by counsel to Archegos, made a presentation setting forth its views of the law to some members of the SDNY prosecution team and unit supervisors. The slide deck accompanying that presentation noted that the presentation was being made subject to Rules 408 and 410 of the Federal Rules of Evidence. While the presentation focused on statutory and decisional law related to allegations of market manipulation, Hwang's counsel also took time to emphasize that the Archegos fact pattern would be the wrong circumstance to bring criminal market manipulation charges. Lustberg Decl. ¶ 27 & Ex. P.

On April 21, 2022 and April 22, 2022, Scott Becker and William Tomita, respectively, pled guilty to various charges relating to their activities at Archegos. *See* Case No. 22 Cr. 231 (LTS), at Minute Entries Dated April 26, 2022 (referring to proceedings on April 21 and April 22). In connection with applications to seal temporarily the transcripts of those change-of-plea proceedings, the Government informed the court that it "soon expects to decide whether or not to seek a sealed indictment against other targets of the investigation." *See, e.g.*, Case No. 22 Cr. 231 (LTS), ECF Doc. 8 ¶ 3.

On April 25, 2022, Hwang's team, once again joined by counsel to Archegos, made a broader presentation about the appropriateness of bringing charges against Hwang to the Deputy United States Attorney (who would ultimately decide whether or not to seek charges against

Hwang), unit supervisors, and members of the investigative team. The slide deck accompanying the presentation noted, once again, that the presentation was being made subject to Rules 408 and 410 of the Federal Rules of Evidence. Hwang's presentation emphasized that Hwang was innocent of any allegations of market manipulation and should not be prosecuted. Lustberg Decl. ¶ 29.

Following Hwang's fourth and final presentation, and further internal consideration, the Deputy United States Attorney authorized the SDNY prosecution team to seek an indictment against Hwang. Garnett Decl. ¶¶ 3-4. The grand jury returned the Indictment later that day and a magistrate judge issued a warrant for Hwang's and Halligan's arrests. ECF Doc. 1, 3, 5.

## LEGAL PRINCIPLES

### A.  The Grand Jury Process and the Court's Supervisory Authority

A defendant is "constitutionally entitled to have his case considered by an impartial and unbiased grand jury," *United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983). Grand jury proceedings carry a "presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters., Inc*., 498 U.S. 292, 301 (1991) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in the judgment)); *see also*, *e.g*., *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974); *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994) (describing the "presumption of regularity that attaches to the grand jury proceedings"); *United States v. Nunan*, 236 F.2d 576, 594 (2d Cir. 1956) (same); *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (same).

A defendant seeking to overcome the strong presumption of regularity faces a high bar, which can be met only in "truly extreme cases." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979). Indeed, a defendant cannot carry that burden without demonstrating "some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the grand jury's substantial interest in secrecy. *Gibson*, 175 F. Supp. 2d at 534. Such a showing requires more than mere "speculation and surmise," *id.* (quotation marks omitted); rather, the defendant must present "persuasive evidence of actual grand jury prejudice" before the presumption of regularity may be overcome, *Burke*, 700 F.2d at 82.

10

Furthermore, "[d]ismissal of an indictment because of a defect in the grand jury proceedings is a drastic remedy that is rarely used." *United States v. Silver*, 103 F. Supp. 3d 370, 376 (S.D.N.Y. 2015) (internal quotations marks omitted). Thus, "[t]he district court's authority to dismiss an indictment, whether to eliminate prejudice or to deter official misconduct, is narrowly circumscribed to instances where the misconduct at issue 'amounts to a violation of one of those few, clear rules which were carefully drafted and approved by the Supreme Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 376-77 (quoting *United States v. Williams*, 504 U.S. 36, 46 (1992)) (internal quotations and brackets omitted). Even then, a defendant moving to dismiss an indictment must demonstrate that the misconduct prejudiced him or her, meaning " 'that the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring in the judgment)).

**B. Justice Manual Categories for Grand Jury Witnesses**

As set forth in the Department of Justice's Justice Manual, the Department of Justice has a policy of advising a grand jury witness of his or her rights if the witness is a "target" or "subject" of the grand jury investigation. Justice Manual § 9-11.151-"Advice of 'Rights' of Grand Jury Witnesses."

As defined by that policy, a "target" is:

> a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. An officer or employee of an organization which is a target is not automatically considered a target even if such officer's or employee's conduct contributed to the commission of the crime by the target organization. The same lack of automatic target status holds true for organizations which employ, or employed, an officer or employee who is a target.

As defined by DOJ policy, a "subject" of an investigation is a person whose conduct is within the scope of the grand jury's investigation.

This DOJ policy "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law." Justice Manual § 1-1.200; *see also United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) (the guidelines contained in the United States Attorney's Manual—now the Justice Manual—"provide no substantive rights to criminal defendants").

### C.  Right Against Self-Incrimination

The Fifth Amendment provides in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To establish a Fifth Amendment violation, an individual must "demonstrate the existence of three elements: 1) compulsion, 2) a testimonial communication, and 3) the incriminating nature of that communication." *In re Grand Jury Subpoena*, 826 F.2d 1166, 1168 (1987); *see also, e.g.*, *In Re Three Grand Jury Subpoenas Jan. 5, 1988*, 847 F.2d 1024, 1028 (2d Cir. 1988).

It is "axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials." *Washington*, 431 U.S. at 186. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *Id.* at 187. "[T]he Fifth Amendment proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'" *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 440 (1974)); *see also Washington*, 431 U.S. at 187 ("Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions."). Nor does the Constitution "prohibit every element which influences a criminal suspect to make incriminating admissions." *Id.* The question is not whether a witness was encouraged to speak, but whether his "free will," when he spoke, "was overborne." *Id.* at 188; *see also*, *e.g.*, *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014).

It follows that a government agent need not inform a witness of the nature of its investigation, *see Okwumabua*, 828 F.2d at 953, much less his individual status in the investigation, *see Washington*, 431 U.S. at 189 & 190 n.6. The Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in

deciding whether to speak or stand by his rights." *Colorado v. Spring*, 479 U.S. 564, 576-77 (1987) (quotation marks omitted); *see also, e.g.*, *id.* at 576 (there is no requirement that law enforcement give information that might affect "the wisdom" of speaking). Nor does the Constitution require that someone be questioned only in the manner most likely to ensure that he gives the decision whether to speak careful thought. *See, e.g.*, *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (defendant questioned while in the hospital suffering from a knife wound, in pain, had tubes running in and out of his body, and complained of dizziness); *see also United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) ("the Fifth Amendment does not protect against hard choices" (internal quotation marks omitted)); *United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976) (there is a difference between "those choices which are physically or psychologically coerced and those which are merely difficult").

In short, the Fifth Amendment is only violated by "government misconduct" that is "coercive." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986); *see also Oregon v. Elstad*, 470 U.S. 298, 312 (1985) (Fifth Amendment prohibits "coercion" effected "by physical violence or other deliberate means calculated to break the suspect's will").

### D.  Substantive Due Process

In certain limited circumstances, government misconduct may be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" and thereby violate substantive Due Process. *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *United States v. Chin*, 934 F. 2d 393, 398 (2d Cir. 1991). Those circumstances are extreme. *See, e.g.*, *Breithaupt*, 352 U.S. at 435 (conduct that is "brutal and offensive" (internal quotation marks omitted; alteration incorporated)); *Johnson*, 239 F.3d at 252 ("malicious and sadistic abuses of government power").

To establish that he suffered from such a violation, a defendant must show that the government's misconduct was "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *United States v. Al-Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (internal quotation marks omitted). This burden is not met when the

13

challenged conduct "is 'simply illegal'; rather, it must be 'egregious.'" *United States v. Getto,* 729
F.3d 221, 228 (2d Cir. 2013) (quoting *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 (2d
Cir. 1975)); *cf. Rochin v. California*, 342 U.S. 165, 172 (1952) (forcible stomach-pumping for
evidence); *Watts v. Indiana*, 338 U.S. 49, 55 (1949) (involuntary confession after six days of
custodial interrogation). The Second Circuit has explained:

> The paradigm examples of conscience-shocking conduct are
> egregious invasions of individual rights. *See, e.g.*, *Rochin*, 342 U.S.
> at 172, 72 S. Ct. 205 (breaking into suspect's bedroom, forcibly
> attempting to pull capsules from his throat, and pumping his
> stomach without his consent). Especially in view of the courts' well-
> established deference to the Government's choice of investigatory
> methods, *see United States v. Myers*, 692 F.2d 823, 843 (2d Cir.
> 1982), the burden of establishing outrageous investigatory conduct
> is very heavy, *see United States v. Schmidt*, 105 F.3d 82, 91 (2d
> Cir.1997).

*United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999).

There also "must be a causal connection between the violation and the deprivation of the
defendant's life or liberty threatened by the prosecution." *United States v. Ghailani*, 751 F. Supp.
2d 502, 505 (S.D.N.Y. 2010). "That is to say, relief against the government in a criminal case is
appropriate if, and only if, a conviction otherwise would be a product of the government
misconduct that violated the Due Process Clause." *Id.*

## ARGUMENT

### A.  Supreme Court and Second Circuit Law Forecloses Hwang's Motion

Notwithstanding that Hwang's motion rests on misleading and in many instances false
characterizations of the facts, *see infra* Part B, no fact-finding is necessary to resolve his motion;
Hwang's factual assertions, even if accepted as true, would not merit relief because they do not
describe a violation of any constitutional or statutory rights. Indeed, the Supreme Court and Second
Circuit have repeatedly confronted the sort of claim raised here—that a district court may invoke
its supervisory authority to dismiss an indictment or preclude the admission of evidence to redress

allegations of government misconduct—and those courts have identified the exceptionally rare and extreme situations that might merit such relief.

This is not one of them. The central claim animating Hwang's argument is that the Government characterized Hwang as a "subject" early in its investigation and that "[t]his description was never, over the course of scores of communications with the Government, ever retracted or modified." Hwang Br. 1. Even if the Government had, in fact, never revised its description of Hwang's status for the benefit of Hwang's lawyers, that circumstance would not provide a basis for any relief, let alone the extreme relief requested here. Hwang has identified no law—and there is none—that requires the Government *sua sponte* to update a defense attorney as to his client's DOJ grand jury investigative status. Simply put, the facts contained in the defendant's attorney's declaration do not give rise to any inference of any misconduct under any law, much less any form of misconduct for which relief is available.

### 1. There Is No Basis for Dismissal Under the Court's Limited Supervisory Power Over the Grand Jury Process

The SDNY prosecution team did nothing to merit sanction in voluntarily interviewing Hwang, pursuant to a proffer agreement and in the presence of counsel, and in later listening to Hwang's counsel's advocacy about why the Government should not seek charges against Hwang. This is true even if the Government had viewed Hwang as "target" instead of "subject" at the time of the Fall 2021 call—which it did not, *see* Podolsky Decl. ¶ 2; Rossmiller Decl. ¶ 2; Thomas Decl. ¶ 2—because classifying Hwang as a "subject" violated no Constitutional right, statutory provision, or grand jury rule.

As the Supreme Court has repeatedly explained, a district court has limited supervisory authority over the grand jury process, though it is not remotely comparable to the power it has over its own proceedings. *Williams*, 504 U.S. at 50 ("any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings"). The Supreme Court has made clear that "the supervisory power can be used to dismiss an indictment because of misconduct before the

grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" *Williams*, 504 U.S. at 46. In practice, this means that a district court may dismiss an indictment for prosecutorial misconduct "if the grand jury was misled or misinformed, or possibly if there is a history of prosecutorial misconduct spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process." *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990).

"Dismissal is not appropriate, however, unless errors prejudiced the defendant." *United States v. Walters*, 910 F.3d 11, 23 (2d Cir. 2018). The Supreme Court has explained that prejudice in this context refers specifically to prejudice in the process of obtaining the indictment: "Under this standard, dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256.

For all his characterizations of the unfairness of the USAO's conduct, Hwang does not—and, indeed, could not—allege any irregularity in the presentation of evidence to the grand jury or the grand jury's return of the Indictment. After all, Hwang did not appear before the grand jury; Hwang's counsel did not present to the grand jury; and nothing about Hwang's understanding of his investigative "status" in Fall 2021 has any bearing on a grand jury's decision to return an indictment in Spring 2022. Everything Hwang complains about occurred outside of the grand jury process and during voluntary interactions with the U.S. Attorney's Office. Accordingly, even in Hwang's telling, he has failed to establish any violation of routine grand jury process at all, let alone a violation that "substantially influenced the grand jury's decision to indict" or that raises "grave doubt that the decision to indict was free from the substantial influence of such violations." *See Bank of Nova Scotia*, 487 U.S. at 256. The Court can and should deny the motion on this basis alone.

Hwang fares no better when he recasts his argument to suggest the existence of "a systematic and pervasive pattern of misconduct that undermines the fundamental fairness of the process that generated the indictment." Hwang Br. 22 (citing *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at \*25 (S.D.N.Y. Dec. 11, 2017)); *id.* at. 22 n.13 (Hwang arguing that he need not make such a showing). In employing hyperbolic rhetoric of this sort, Hwang aims to suggest his plight is akin to "a history of prosecutorial misconduct spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process," which, if true, would be a circumstance the Second Circuit has imagined that could "possibly" justify relief. *See Brito*, 907 F.2d at 394. But Hwang's allegations do not describe "a history of prosecutorial misconduct spanning several cases"; to the contrary, the core of Hwang's attack is that the Government misinformed his lawyers about their client's status on one occasion in Fall 2021 and never corrected that misstatement. *See* Hwang Br. 3-4, 15-16, 29-30; Lustberg Decl. ¶ 9. Even that allegation is false, *see infra* Part B, but, for purposes of this motion, it would not matter if it were true, because that alleged conduct would not remotely resemble a "systematic and pervasive" history of misconduct or an accusation that raised "substantial and serious doubts" about the fairness of the grand jury process.

Hwang's argument otherwise is a poor facsimile of the claim made by two defendants in *United States v. Percoco*. 13 F.4th 158, 179 (2d Cir. 2021). Like Hwang, the defendants in *Percoco* argued that the indictment should be dismissed because they had been misinformed by Government counsel regarding their investigative "status" before an interview. But the district court and the Second Circuit rejected that argument, noting that a witness does not have a constitutional right to a warning that he or she is a target. *Id.* That was true even though the defendants in *Percoco* were indicted for statements they made following the purported misclassification. Here, of course, Hwang has not been indicted for false statements made during his proffers, and Hwang's proffers occurred months after the Government supposedly misdescribed Hwang as a subject. The argument that Hwang is entitled to more extreme relief based on a more distant, theoretical injury than the defendants in *Percoco* defies reason.

Tellingly, Hwang cites no case in which any district court has dismissed an indictment based on the allegation that Government counsel misdescribed an individual as a subject (rather than target) before a voluntary interview—let alone where that supposed misclassification occurred months before the interview. Rather, Hwang attempts to support his motion by citing numerous cases in which the district courts and circuit courts *refused* to provide the relief Hwang asks this Court to supply. *See* Hwang Br. 20-22; *United States v. Myers*, 123 F.3d 350 (6th Cir. 1997) (refusing to suppress grand jury testimony where government failed to comply with relevant DOJ manual provisions regarding grand jury witnesses). *United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992) (refusing to exercise supervisory powers to suppress defendant's grand jury testimony in light of government's failure to provide perjury warnings to defendant and noting the "clear limits on our authority to exercise our supervisory powers as a means of imposing preferred policies in the absence of any constitutional or congressional imperative"); *United States v. Pacheco-Ortiz*, 889 F.2d 301, 310 (1st Cir. 1989) (recognizing that "the Supreme Court has articulated clear limits on the exercise of judicial supervisory powers as a means for imposing preferred policies where there is no constitutional imperative" and refusing to grant suppression of evidence or new trial for alleged misconduct); *United States v. Babb*, 807 F.2d 272, 278-80 (1st Cir. 1986) (refusing to exercise supervisory powers to suppress evidence because government's failure to warn defendant before his grand jury testimony did not cause the defendant's perjury and subsequent conviction); *United States v. Crocker*, 568 F.2d 1049, 1056 (3d Cir. 1977) (finding that government counsel misled a putative defendant's counsel "by suggesting that his client was not a target at the time of the second appearance" before a grand jury, but rejecting argument that government counsel's misleading statement, made "in circumstances in which according to the Supreme Court he need not have said anything, can be held to be a due process violation"), abrogated on other grounds by *United States v. Gaudin*, 515 U.S. 506 (1995); *United States v. Drake*, 310 F. Supp. 3d 607, 636 (M.D.N.C. 2018) (concluding the prosecutor told an individual and counsel that the witness was a fact witness when the individual was a target, but nevertheless declining to dismiss the indictment, in part, because of "the absence of a constitutional violation

mandating a remedy or a constitutional violation sufficiently prejudicing the defendant to justify use of the court's supervisory powers."); *United States v. Russell*, 916 F. Supp. 2d 305, 313 (E.D.N.Y. 2013) (holding that any purported violation of the U.S. Attorneys' Manual's policy with respect to advising a grand jury witness of his or her rights could not provide the district court with a basis to exercise its supervisory powers); *United States v. Fish*, No. 05 Cr. 228, 2006 WL 3731292, at *12 (W.D.N.Y. Dec. 18, 2006) (holding, in a case where the AUSA elicited grand jury testimony from a witness without advising the witness that counsel could be appointed for her, that "[t]he AUSA's failure to comply with DOJ directives provides no basis for suppressing testimony where no constitutional violation occurred.").

Hwang instead rests support of his argument for dismissal of the Indictment on *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976). But *Jacobs* is entirely inapposite. There, a special "Strike Force" prosecutor appointed by the U.S. Attorney General did not warn the defendant of her status as a target before the defendant testified in a federal grand jury sitting in the Eastern District of New York. *Id*. at 774. Because "the uniform practice of prosecutors in our circuit" is to warn targets before they testify in the grand jury, and the Second Circuit sought to "make the practice of the Task Force conform to that of the United States Attorney in the same district," *id*. at 773-76 (emphasis in original), the Court exercised its "supervisory power . . . in a circumscribed manner" by dismissing a perjury charge against the defendant that was based on her unwarned grand jury testimony, *id*. at 775. The Second Circuit emphasized that the dismissal was an "ad hoc sanction" meant to bring the practices of the Strike Force in line with those of the United States Attorney's Office. *Id*. at 778. Indeed, after the Second Circuit dismissed the perjury charge in *Jacobs*, the Supreme Court vacated the Second Circuit's opinion, since "the fact that the prosecutor may have erred in failing to give a grand jury witness adequate warnings does not lead inexorably to the conclusion that the witness cannot be prosecuted for perjury." *United States v. Jacobs*, 429 U.S. 909, 909-10 (1976) (Stevens, J., concurring in summary disposition). On remand, the Second Circuit reaffirmed its dismissal of the perjury charge, but emphasized repeatedly that its intent was "to impose a one-time sanction to encourage uniformity of practice (whatever the practice might

be) between the Strike Force and the United States Attorney in the same district," and for its "opinion to have no prospective application as precedent for the District Courts on the constitutional issue." *Jacobs*, 547 F.2d at 773, 775.

As a result, *Jacobs* has no application to the instant case. Hwang did not testify before a grand jury. Instead, he voluntarily answered questions posed by federal officers. He did so after being earlier warned (through counsel) that he was a subject of the government's investigation, and so was on notice that he had possible criminal exposure. Moreover, Hwang was represented by counsel at all times during his interviews, which was a protection unavailable to the *Jacobs* defendant when she testified in the grand jury. *See* Fed. R. Crim. P. 6(d) (limiting attendees at grand jury proceeding to government attorneys, testifying witness, interpreters, and stenographers); *see also United States v. Mandujano*, 425 U.S. 564, 581 (1976) (plurality opinion) ("Under settled principles the witness may not insist upon the presence of his attorney in the grand jury room."). And there is no count of the Indictment premised on Hwang's proffer statements. In short, the "one-time sanction" imposed in *Jacobs* to enforce uniformity in grand jury practice between Strike Force attorneys and AUSAs in the Eastern District of New York has no relevance whatsoever to Hwang's motion.

Bereft of decisional law to support his position, Hwang invites the Court to make new law to help him avoid trial. Hwang argues that he is entitled to relief because he has alleged "actionable misrepresentations" by the Government, citing *Gillespie*, *Babb*, and *Pacheco-Ortiz*. None of those cases articulates a doctrine of "actionable misrepresentations," however, nor does any of them support his arguments for judicial sanction. *Gillespie* and *Pacheco-Ortiz* merely recognize that a district court may not dismiss an indictment for an error that would be harmless within the meaning of Rule 52 of the Federal Rules of Criminal Procedure, and so counsel against any sanction here at all. *See Gillespie*, 974 F.2d at 802 (concluding that defendant's conviction was "not the product of manifestly improper conduct by federal officials" and that "the error was, under the totality of the circumstances, harmless"); *Pacheco-Ortiz*, 889 F.2d at 310 (noting Supreme Court's command that federal courts may not invoke supervisory authority to circumvent harmless error inquiry

under Rule 52(a) and concluding that there had been no showing in the case before it that the grand jury's decision to indict was influenced in any manner by prosecutor's failure to give warnings to witness). And *Babb*, which was decided before *Bank of Nova Scotia*, observed that the First Circuit "would have been willing to exercise our supervisory powers" if the defendant's conviction had been the product of the prosecutor's improper conduct. *See Babb*, 807 F.2d at 279 n.6. That theoretical application of judicial power is neither persuasive authority nor relevant here; neither Hwang, who provides the Court with no affidavit whatsoever, nor his counsel, set forth any basis to conclude that if Hwang were convicted at trial his conviction will have been "the product of the prosecutor's improper conduct."

### 2.   Hwang's Motion Cannot Be Supported by Other Constitutional Doctrines

Without the support of any decisional law addressing similar allegations of misconduct, Hwang tries instead to mix-and-match various legal doctrines in his motion to achieve in aggregation what none of these principles or laws would do alone. None of them help him.

### a.   Substantive Due Process

Hwang repeatedly alludes to "fundamental fairness," and cites cases addressing substantive Due Process violations. *See, e.g.*, Hwang Br. 15, 29. But none of Hwang's accusations resembles the "conscience-shocking conduct" that the Second Circuit has identified as the sort "egregious invasions of individual rights" that may warrant dismissal. *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (citing, as an example, breaking into a suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without consent). Examples of such violations "range[] from an invasion into the integrity of the body to an extraordinarily coercive interrogation." *United States v. Alexandro*, 675 F.2d 34, 40 (2d Cir. 1982); *see also, e.g., United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (having sex with the defendant to seduce her into a conspiracy to distribute cocaine, in violation of her constitutional right to privacy).

Even construed as a Due Process argument, Hwang's allegations have no merit. Indeed, a defendant made and lost a similar claim in *United States v. Ash*, 19 Cr. 780 (S.D.N.Y.) (LAK).

There the defense argued that prosecutors violated the defendant's substantive Due Process rights during two voluntary, uncounseled interviews because the government did not warn the defendant in advance that she was a "target" of the investigation. *See* ECF Doc. 13-14, 19 Cr. 780 (S.D.N.Y.). Judge Kaplan rejected that argument because, even assuming that the government had violated DOJ policy to warn her about her status, "[f]ailure to adhere to this DOJ policy does not rise to the level of government misconduct that is 'so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction.'" ECF Doc. 47 at 15 (quoting *United States v. Al-Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)). Judge Kaplan noted that the fact the defendant "had even been advised by the AUSA to retain counsel," among other things, meant that "She could have been under no illusion that she was not at some risk of criminal exposure." The Government provided far more—and far graver—remarks to Hwang's counsel here. *See* Lustberg Decl. ¶ 21.

### b.  Sixth Amendment

Hwang next invites the Court to analogize his allegations to a Sixth Amendment violation. *See, e.g*., Hwang Br. 23-24, 35-37. Hwang asserts that the "the Sixth Amendment right to counsel is violated not only when the government or its agents elicit incriminating statements, but also when they take inappropriate action to obtain information regarding defense strategy." Hwang Br. 24. At times, Hwang likens the fact that he was interviewed by the Government to using "an informant to surreptitiously elicit incriminating statements from the defendant without the presence of counsel," Hwang Br. 23 (citing *United States v. Henry*, 447 U.S. 264, 274 (1980) and *Massiah v. United States*, 377 U.S. 201, 202-05 (1964)), and at other times, Hwang accuses the Government of using a ruse to obtain "Mr. Hwang's and his attorneys' views of the facts and law of the case, *i.e.*, to obtain 'confidential defense strategy information.'" Hwang Br. 36.

Hwang's Sixth Amendment arguments are flawed in all respects. First, as Hwang had not been charged at the time of his voluntary interviews or his attorneys' presentations, the Sixth Amendment right to counsel had not attached. *See Moran v. Burbine*, 475 U.S. 412, 428 (1986) (stating that the right to counsel attaches after the first formal charging proceeding). Accordingly,

nothing the Government did, or did not do, before it charged Hwang deprived him of a Sixth Amendment right that he possessed.

Moreover, the Government's conduct as alleged by Hwang did not interfere with Hwang's legal representation during either his voluntary interview or during his counsel's presentations. First, with respect to the interview, Hwang ignores the fact that the Government interviewed Hwang in the presence of counsel, on topics that had been identified to the defense team in advance, pursuant to a written proffer agreement that counsel reviewed and signed. These circumstances are very nearly the opposite of the surreptitious, post-charge fact-gathering that occurred in *United States v. Henry*, which Hwang cites to support his position. Indeed, Hwang interacted with the Government exclusively in the presence of his counsel and under circumstances where the Government agents introduced themselves as such, and argument that the SDNY prosecution team can be likened to spies in the defense camp is simply preposterous. *See* Hwang Br. 23-24 (citing *Hoffa v. United States*, 385 U.S. 293, 306-07 (1966)).

Second, with respect to counsel's presentations, Hwang accuses the Government of soliciting presentations from Hwang's counsel to obtain confidential defense strategy information. *See* Hwang Br. 36. Given that Hwang and his counsel chose to make the presentation, and knew they were making it to the Government, they cannot now claim that its substance was "confidential" defense information. Nor can they support the extraordinary hypothesis that the Government obtained the final presentation under "the false pretense" that no charging decision had been made. Neither Hwang nor Hwang's counsel offer any basis to conclude that Government had made any promises to Hwang's team in advance of any of the presentations about the status of its investigation, the internal assessment of the evidence, or the likelihood of being persuaded by Hwang's counsel. Moreover, Hwang's counsel admits that the Government informed Hwang's team in advance of the presentation that the USAO intended to conclude its decision-making promptly and that it could not assure counsel any opportunity to present beyond April 25, 2022. *See* Lustberg Decl. ¶¶ 25-26.

It is enough to note that, as in many cases, it was the defendant through his lawyers from the outset who sought an opportunity to convince the Government not to bring charges. *Id.* ¶ 8. The notion that it was the Government that was attempting to trick the defendant into making such presentations is fanciful at best, and in truth a cynical ploy to use the very fact that the advocacy failed as a weapon against Government attorneys who afforded defense counsel the opportunity to advocate in the first place.

### c. Right Against Self Incrimination

At times, Hwang also appears to argue that questioning him represents a Fifth Amendment violation of the Hwang's right against self-incrimination. *See* Hwang Br. 17 (citing *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)). This argument fails from the start because all questioning of Hwang occurred on a voluntary basis, outside of custody, and in the presence of his counsel. These aspects place his statements entirely beyond the constitutional concerns of compelled self-incrimination, in which "[i]t is the extortion of information from the accused himself that offends our sense of justice." *Couch v. United States*, 409 U.S. 322, 328 (1973); *see also Minnesota v. Murphy*, 465 U.S. 420, 430-33 (1984) (discussing significance of custodial interrogation to *Miranda* analysis); *United States v. Maxwell*, 545 F. Supp. 3d 72, 78 (S.D.N.Y. June 25, 2021) (reviewing elements of Fifth Amendment violation and rejecting claim that the government's use of civil deposition testimony constituted a violation).

Hwang's arguments that the Government "induced" him to participate in interviews appear calculated to suggest that his statements to the Government were involuntary because they were the result of trickery and deception. *Cf. Beckwith v. United States*, 425 U.S. 341, 348 (1976) ("We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where the behavior of law enforcement officials was such as to overbear petitioner's will to resist and bring about confession not freely self-determined."). To prevail on such a claim, however, a defendant "must produce clear and convincing evidence that the agents affirmatively misled him as to the true nature of the investigation." *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987). Given that the

Government presented Hwang with the Proffer Agreement expressly setting forth how and when the Government could use Hwang's statements against him, *see* Ex. C to Thomas Decl., including that the Government intended to use Hwang's statements to make prosecutive decisions and that untruthful statements could subject him to a prosecution for perjury, Hwang cannot credibly claim he was duped into participating in an interview without knowledge that his answers might be used by the Government to form impressions about his guilt or innocence. The absurdity of this claim is further underscored by the fact that the Government apprised Hwang of the topics of the interview in advance and even specifically identified beforehand most of the documents that he would be shown. *See* Lustberg Decl. ¶ 20 (recounting that Government counsel shared in advance 20 of 24 documents show during interview). Thus, even under the circumstances described by Hwang's counsel—who, of course, were present for the interview and could have stopped the questioning at any time—there is no basis for the Court to conclude that Hwang's will to remain silent had been overborne by Government trickery.

In any event, Government counsel's views of a person's investigative "status" do not have Constitutional significance. As the Supreme Court has explained, a person has the same right against self-incrimination whether he was a subject, target, or witness. *See United States v. Washington*, 431 U.S. 181, 189 (1977) (noting that a grand jury witness's status as a target does not enlarge or diminish the constitutional protection against compelled self-incrimination). So neither the existence nor the extent of Hwang's Fifth Amendment right to silence turns on whether Hwang was a "subject" or a "target" by the SDNY prosecution team, or at what moment he transitioned from one to the other. The fact that Hwang understood he had no obligation to speak to the Government during the interviews and did so anyway suffices to dispel the possibility of a violation of Hwang's right against self-incrimination under the circumstances. *See Colorado v. Spring*, 479 U.S. 564, 576-77 (1987). That result is not undermined by the fact that the Government did not inform Hwang of all of the investigative efforts it had made in its inquiry into the affairs of his business and its employees, as he claims. Hwang Br. 29 (observing that the Government sought search warrants and pen register/trap-and-trace orders, but "none of which were brought to

Mr. Hwang's attention before he commenced the process of presenting or proffering to SDNY").
After all, the Supreme Court has "never read the Constitution to require that the police supply a
suspect with a flow of information to help him calibrate his self-interest in deciding whether to
speak or stand by his rights." *Spring*, 479 U.S. 564 at 576-77.

### d.  Standards of Government Conduct

Hwang similarly makes sweeping statements about the Government's *Brady* obligations,
its duties to respect the right to counsel, counsel's obligation to correct false evidence introduced
through a witness, and litigants' responsibilities of candor with the court. *See, e.g.*, Hwang Br. 33-
34. Hwang purports to offer these examples to illustrate that "courts have the inherent authority to
remedy [prosecutors'] misconduct, even when it does not specifically violate the Constitution."
Hwang Br. 26.

But the Supreme Court has rejected the argument that a federal court can fashion rules of
prosecutorial conduct in the name of supervising the grand jury process. In *Williams*, for example,
the Supreme Court expressly denied that "the courts' supervisory power could be used, not merely
as a means of enforcing or vindicating legally compelled standards of prosecutorial conduct before
the grand jury, but as a means of *prescribing* those standards of prosecutorial conduct in the first
instance." *Williams*, 504 U.S. at 46-47 (emphasis original). Indeed, the Supreme Court flatly held
that "no such 'supervisory' judicial authority exists." *Id*. at 47. And, though this Court has
considerable discretion to manage the proceedings before it, *see United States v. Hasting*, 461 U.S.
499, 505-506 (1974), Hwang cannot seriously contend that pre-charge interactions between
defense counsel and Government counsel can be regulated in the name of the Court's control of
its own proceedings; that proposition, too, has been rejected by the Supreme Court, *see Williams*,
504 U.S. at 45-46 ("*Hasting* and the cases that rely upon the principle it expresses, deal strictly
with the courts' power to control their *own* procedures.").

### 3.  Hwang's Allegations Do Not Entitle Him to Any Relief

Hwang's remaining legal arguments assume that if Government counsel misdescribed
Hwang as a "subject" or if the Government failed to convey its investigative progress to Hwang's

counsel then Hwang must be entitled to relief. Hwang principally argues that relief should be in the form of the dismissal of the indictment or, in the alternative, some type of suppression. Once again, however, Hwang misstates the applicable law and invites error.

### a.   Hwang Does Not Allege Actual Prejudice

The Second Circuit has held, "[e]ven where a defendant can establish outrageous or systemic Government misconduct, dismissal of an indictment is improper where a defendant cannot demonstrate prejudice as a result of that misconduct." *See Walters*, 910 F.3d at 23; *United States v. Gonzalez*, 529 F.3d 94, 98 (2d Cir. 2008) ("supervisory powers are not to be used to circumvent the harmless error rule"); *United States v. Magassouba*, 544 F.3d 387, 410 (2d Cir. 2008) ("[A] harmless error certainly would not warrant the relief Magassouba seeks: dismissal of the indictment.").

As to errors related to the grand jury process, the prejudice contemplated by the doctrine is " 'that the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring in the judgment)). Hwang therefore is incorrect to assert that he is entitled to relief so long as he identifies misconduct in the grand jury process; even assuming that Hwang could prove "outrageous" or "systemic" government misconduct, Hwang would still have to show that the Government's conduct interfered with the operation of the grand jury to obtain relief. He has not even attempted to make such a showing.

As to a Constitutional violation, which Hwang also does not allege, Hwang would not be automatically entitled to dismissal, either. As court have observed, dismissal "should not even be considered unless it is otherwise 'impossible to restore a criminal defendant to the position he would have occupied but for the misconduct.'" *United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *7 (S.D.N.Y. Aug. 15, 2014) (quoting *Artuso*, 618 F.2d at 196).

Though Hwang asserts that the prejudice to him is "manifest," he fails to identify any disadvantage that has befallen him. Rather, Hwang, through counsel, merely observes that he

"shared his thought processes with prosecutors from SDNY, discussing every aspect of his role at Archegos in great detail and giving the Government unique information about his factual and legal position." That, of course, is no different than saying that Hwang participated in an interview at all. Given that the strategy to engage with the SDNY prosecution team originated with Hwang's defense team, *see* Lustberg Decl. ¶ 8, as did the offer to provide information to the Government, *see* Ex. A to Podolsky Decl., the consequences of Hwang's choices cannot be "prejudice" caused by the Government.

Hwang's alternative request for the suppression of his statements is similarly baseless. Indeed, to the extent Hwang seeks to prevent all uses of his proffer statements, Hwang seeks greater relief than would be afforded a defendant whose Constitutional rights had been violated. *United States v. Havens*, 446 U.S. 620 (1980) (exclusionary rule does not bar use of evidence to impeach defendant at trial). Here, Hwang's counsel asked for, and the Government agreed to provide, proffer protection for Hwang's statements during his interviews with the USAO. *See* Ex. C to Thomas Decl. Thus, the USAO agreed from the outset to significantly constrain its use of Hwang's statements during its case-in-chief, so the Government obtained no particular evidentiary benefit from listening to Hwang, and the Government's permissible uses of the information were the subject of contractual agreement between the Government and Hwang in advance of the interview. Notably, in that agreement Hwang already waived his right to make a challenge—like this one—that some Constitutional or statutory rule made his statements inadmissible. Proffer Agreement ¶ 5. Perhaps the most significant consequence to Hwang from participating in the proffer is that his proffer statements may become admissible at trial if he takes a contrary factual position before the Court or jury, or if he testifies. Proffer Agreement ¶ 3. But if Hwang seeks the freedom to tell the trial jury something different than what he told the Government, the law gives him no such advantage. After all, "[i]t is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury . . . ." *United States v. Washington*, 431 U.S. 181, 189 (1977).

**b.  None of Hwang's Allegations Reveals Anything Unfair About the Government's Pre-Charge Interactions with Him**

Without the ability to allege the sort of prejudice that could merit relief, Hwang instead asserts that the Government's actions led him to make unfavorable tactical choices. For example, Hwang suggests that he would never have agreed to speak to the Government at all if he knew he had criminal exposure. *See* Hwang Br. 30 ("It goes without saying that these sessions would not have occurred if Mr. Hwang or his legal team had been truthfully informed that he was actually a target of the investigation."). But even this counterfactual finds no support in the record. For one thing, Hwang himself does not substantiate that assertion in a personal affidavit. For another, the position rests in tension with Hwang's counsel's suggestion—raised on the very first substantive call with the SDNY prosecution team—that Hwang may be interested in speaking to the Government. Further still, the Proffer Agreement itself acknowledges that the Government would use the information Hwang provided to make "prosecutive" decisions, so Hwang's counsel cannot seriously contend that they did not know Hwang's statements could be used by the USAO in its evaluation of whether to charge Hwang. *See* Ex. C to Thomas Decl. at 1. Finally, if the issue of Hwang being a "target" as opposed to a "subject" were of such importance to Hwang, one wonders why counsel did not address the issue immediately before either or both interviews.

The related suggestion that Hwang was somehow prejudiced by making presentations to the USAO is facially preposterous. First, each of those presentations was voluntary. Second, though SDNY conveyed its topics of interest to defense counsel, whether and how to present information was up to Hwang. Third, two of the presentations that Hwang made to the USAO occurred after the investigative team informed Hwang's counsel that (a) USAO had developed serious concerns about the lawfulness of Hwang's conduct and the credibility of his interview statements, (b) the Government intended to make its charging decision by the end of the month, and (c) the Government insisted that Hwang's counsel take possession of Hwang's passport. *See* Ex. D to Thomas Decl.; Ex. B & Ex. C to Podolsky Decl. In other words, defense counsel had a

far more granular understanding of the Government's position than it was entitled to or than would be conveyed by any discussion of the witness, subject, and target categories, which, of course, defense counsel did not ask about, given all of the information they were provided. Moreover, the second of those presentations was made to the Deputy U.S. Attorney, who was (accurately) described to Hwang's counsel as the relevant decision-maker for purposes of authorizing charges. Lustberg Decl. ¶ 25. That counsel could have drawn any conclusion other than that USAO was seriously considering charging Hwang is not credible. In any event, the Court can be assured that Hwang's counsel, in fact, understood the meetings to concern potential charges against Hwang because counsel used those meetings to advocate against a decision to charge Hwang and marked its presentation materials as plea negotiation materials pursuant to Rule 410.

For another thing, the more generalized argument that USAO somehow obtained an unfair advantage by listening to counsel's presentation on behalf of their client runs counter to common sense and prevailing professional practice. For example, one of many incredible assertions in Hwang's brief is that the Government engaged in a "elaborate ruse" to obtain "confidential" defense strategy. This is apparently a reference to Hwang's final presentation to the Government, on April 25, 2022. Notably, this presentation did not reveal trial strategy of any kind but instead argued against the appropriateness of charges. Moreover, the idea that Hwang's attorneys—who requested from the start to present to the USAO on reasons not to charge Hwang—would have opted not to continue that advocacy upon finding out that the evidence had developed in a manner that made it more likely that Hwang would be charged defies logic. And the absurdity of such a position is made manifest by the fact, noted above, that the USAO *did* tell Hwang's lawyers in advance of those presentations that it had serious concerns about the lawfulness of Hwang's conduct, and, to punctuate just how grave those concerns were, insisted that Hwang's attorneys take possession of Hwang's passport before the Government could agree to any further opportunity

for advocacy by Hwang's lawyers (a fact entirely omitted from Hwang's motion and attached declaration).[2]

### B. Hwang's Motion Rests on Factually Erroneous Assumptions

The Court need not scrutinize Hwang's factual allegations because the legal deficiencies of Hwang's motion require the Court to deny it. But, in light of Hwang's bold accusations, the Government notes that Hwang's motion rests on an astonishing series of unfounded assumptions. Specifically, Hwang's motion appears to spring from his belief that the USAO had decided to charge him well before it sought an indictment but that the USAO withheld its charging decision from Hwang to induce him to agree to a voluntary interview and to make arguments against prosecution through counsel. *See* Hwang Br. 31. Hwang's assumption is false: The USAO made its charging decision with respect to Hwang only after Hwang had been interviewed and only after the USAO had entertained four separate presentations Hwang's legal team made on his behalf. *See* Garnett Decl. ¶¶ 3-4. Accordingly, Hwang's repeated and varied assertions that the Government induced Hwang to provide information to the USAO as part of a sham, pre-ordained process is wrong.

The related assertion that the Government falsely described Hwang as a subject in Fall 2021 is equally meritless. Though the Indictment was not returned until nearly five months later—a period, during which the Government reviewed many thousands of records and interviewed dozens of witnesses—Hwang asserts that the Government intentionally misdescribed Hwang as a subject during a Fall 2021 phone call.[3] Neither Hwang nor Hwang's counsel has personal

---

[2] Were the Court to entertain Hwang's suggestion that his voluntary pre-charge advocacy could be the basis to dismiss the indictment or to limit the Government's proof, the predictable consequence will be that the U.S. Attorney's Office will cease to entertain pre-charge advocacy on behalf of potential defendants. A defendant's ability to use unsuccessful pre-charge advocacy as a basis to dismiss an indictment will chill pre-charge interactions between potential defendants and prosecutors, to the detriment of all parties.

[3] Hwang's counsel recounts that the prosecution team described Hwang as a subject on a call on or about November 15, 2021 call. *See* Lustberg Decl. ¶ 9. Unlike the October 22, 2021 call, the

knowledge of the Government's views of Hwang at that time. So, they rest this accusation on the fact that the Government had taken steps to investigate Hwang's conduct (among the conduct of others) by the time it described Hwang as a "subject." Hwang Br. 3, 29. For example, Hwang attributes significance to the fact that Hwang (and others) were identified in a July 2021 pen register application as persons that were being investigated by the FBI. Ex. A to Lustberg Decl. Similarly, Hwang points to a September 27, 2021 warrant affidavit to show that the Government believed at that time that probable cause existed to conclude that Hwang's email accounts (and others) would contain evidence of a crime. Hwang Br. 3-4, 28. But these facts do not support Hwang's conclusion that he was a "target" from the start of the investigation, let alone substantiate his accusation that the Government deliberately deceived him about his status during the Fall 2021 phone call.

To the contrary, Hwang's arguments reveal his idiosyncratic and erroneous belief that only the conduct of "targets" can be investigated by the Government.[4] By DOJ definition, a subject is a person whose conduct is within the scope of the grand jury investigation: that is, their conduct is being investigated. Justice Manual § 9-11.151. So Hwang misapprehends what it means to be a "target" or "subject" when he claims that a person's inclusion in a warrant signals his or her status as a "target."[5] Indeed, the same pen register and warrant applications that Hwang points to here as

---

government attorneys have no recollection that the topic of Hwang's grand jury investigative status came up on November 15, 2021, or, indeed, that a November 15, 2021 call occurred at all. (The Government does have a calendar appointment and record of a November 17, 2021 call.) But Government counsel has no reason to dispute Hwang's counsel's memory that Government counsel described Hwang as a "subject" on a November 15, 2021 call as the Government would have, accurately, described Hwang as a "subject" of the investigation in November 2021.

[4] Whether that belief is genuinely held rather than a litigation tactic is perhaps signaled by the fact that, during their first call with the USAO, Hwang's attorneys both acknowledged that Hwang was a subject and at the same time sought "to demonstrate why any potential charges would be without merit." Lustberg Decl. ¶ 8.

[5] Hwang at times also uses other gradations of status, such as "prime target" or "mere subject." The Justice Manual does not refer to such categories. *See* Justice Manual § 9-11.151.

proof of Hwang's definitive target status also relate to numerous other persons, many of whom have not been charged with any wrongdoing.

Hwang's additional accusation that the Government never "revised" Hwang's status is both meaningless and misleading. It is meaningless in the sense that it implies the breach of a duty that does not exist: the Government has no legal obligation at all to inform a person of his status with respect to a criminal investigation, so there can be no duty to continually update a person of changes with respect to his status. *See, e.g., Spring*, 479 U.S. at 858-59. Nor does the Government have a responsibility to keep an individual apprised of developments in an investigation or the Government's evaluation of the evidence. *Id.* Nor does DOJ's internal guidance impose such a duty. *See generally* Justice Manual § 9-11. The DOJ policy that Hwang does cite only imposes on prosecutors an obligation to inform a grand jury witness of his or her rights before testifying before the grand jury if he or she is target or subject of the investigation. That policy does not impose a continuing duty to update a witness on his or her status, even if it were to apply outside the grand jury process, which it does not. And, even if DOJ policy could be read to impose such an obligation, DOJ policies "provide no substantive rights to criminal defendants." *United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994).

And Hwang's assertion that the Government never "revised" his status is misleading because it implies that Hwang was caught unaware that the Government might be charging him. Indeed, Hwang goes so far as to assert that "[n]ever once, over months of an investigation . . . did the prosecutors demonstrate the candor or decency to disclose to the defense that Mr. Hwang was not only a target of their investigation, but was about to become a defendant." Hwang Br. 15-16. The assertion is incorrect in every material respect. Hwang's counsel concedes, for example, that on April 1, 2022, the SDNY prosecution team conveyed to him that it had serious concerns about the "lawfulness" of Hwang's conduct and the truthfulness of his responses. *See* Lustberg Decl. ¶ 21. So whether or not Government counsel used the word "target" during that conversation, the Government alerted defense counsel that Hwang may be charged and described broadly the concerns weighing in favor of a charge. Moreover, during a follow-up call on April 9, 2022, the

USAO insisted that Hwang's counsel take possession of Hwang's passport and expressly conveyed that senior leadership at USAO intended to make a charging decision by the end of the month. *Cf.* Ex. D to Thomas Decl. *with* Lustberg Decl. ¶¶ 25-26. Of course Hwang's team understood these comments to signal that Hwang may be charged—after all, that is why Hwang's April 2022 presentations to the USAO advocated that the USAO not seek charges against Hwang.

By April 9, 2022, the Government had armed Hwang's counsel with the subject matter of the criminal investigation, the nature of its concerns about Hwang's personal conduct and explanations, a selection of documents important to Government's assessment of Hwang's credibility, the timeline for a charging decision, and the opportunity to present and advocate on his behalf. Neither the Constitution nor any rule of law requires the Government to provide Hwang with any of those insights or advocacy opportunities. Hwang now imagines these interactions as a "deeply disturbing" pattern of conduct. But it is what it purports to be: evidence of professional courtesy Government counsel extended to the defense.

### C.  No Additional Factfinding Is Warranted

For the reasons set forth above, the existing record compels the denial of Hwang's motion. The relief he seeks is not supported by the law, as he has shown neither a violation of his rights nor any way in which he was prejudiced by the misconduct he alleges. And his characterization of the Government's actions is predicated on both a distortion of those undisputed facts about which he has personal knowledge, and bald assumptions regarding the Government's thinking and processes.

The law is clear that to obtain a hearing on claims of Government misconduct, it is the defendant's burden to make a substantial preliminary showing that he is entitled to the relief that he seeks on each prong of the relevant legal standard. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978) (holding that to obtain a hearing on the inaccuracy of a warrant affidavit the "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine," allegations of deliberate falsehood or reckless disregard for the truth "must be accompanied by an offer proof," and "affidavits or sworn or otherwise reliable statements

of witnesses should be furnished, or their absence satisfactorily explained"); *Wade v. United States*, 504 U.S. 181, 186 (1992) (defendant claiming that Government's refusal to file a 5K motion was based on an unconstitutional motive must make a "substantial threshold showing" before he can obtain an evidentiary hearing); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983) (defendant seeking an evidentiary hearing on a claim of selective prosecution bears the burden of establishing prima facie both elements of the relevant legal standard); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (same in the context of a claim of vindictive prosecution); *United States v. Gel Spice Co., Inc.*, 601 F. Supp. 1214, 1218 (E.D.N.Y. 1985) (In the context of a claim that the Government conducted a pretextual regulatory investigation, "before obtaining evidentiary hearing on the issue of the government's good faith, defendants must make a substantial preliminary showing of bad faith.")

Hwang has fallen far short of meeting this standard. Notably, Hwang himself does not swear to the many inflammatory allegations of his brief, nor does Hwang describe the purported prejudice he suffered; indeed, Hwang submits no affidavit at all. Nor do the sensational claims about Government counsel's alleged deception appear in the sworn declaration of counsel that Hwang supplies, which largely concerns a chronology of communications. Hwang instead makes his accusations only in the memorandum of law. And certainly Hwang has made no substantial preliminary showing of bad faith. Such conclusory assertions would not suffice to obtain a hearing in *Franks* or *Wade* challenge, or in a selective prosecution claim, and do not suffice here.

There is also nothing for a hearing to decide. Even if Hwang's rhetoric were accepted as fact, he would still fail to make out a basis for relief because his allegations do not relate to a violation of any right he has been afforded by statute or by the Constitution. Moreover, the supposed central fact question that a hearing would address—how long after the Government "had made the decision to indict" him did the Government engage with Hwang and his counsel, Hwang Br. 1—has now been definitively answered. Garnett Decl. ¶¶ 3-4. No evidence Hwang could present at a hearing could call that fact into question because neither Hwang nor his counsel had

any role in the U.S. Attorney's Office's internal deliberations, and because the Court now has a sworn statement from the person who made the final and governing decision on this issue.

## CONCLUSION

Hwang makes pointed accusations of prosecutorial misconduct and demands this Court spare him a criminal trial as a remedy for his alleged mistreatment. But Hwang's accusations, even if credited, do not describe a constitutional or procedural violation, let alone a transgression so serious as to warrant relief through the dismissal of the Indictment. Hwang makes no claims that would permit the Court to conclude that the grand jury's operation had been affected by the alleged misconduct; nor that any Fifth or Sixth Amendment right of his has been infringed; nor that some outrageous violation of liberty has occurred. Without any of those circumstances, there is no basis whatsoever to dismiss the Indictment.

In fact, the correspondence and declaration Hwang's counsel has supplied the Court demonstrates that throughout its investigation, Government counsel engaged professionally and fairly with Hwang's legal team. And although it had no obligation to do so, the Government afforded Hwang's counsel with multiple opportunities to advocate on behalf of their client and accepted Hwang's offer to explain himself in voluntary interviews. The Government did not owe Hwang or his counselors any assurance that their presentations would persuade the Government to reach a favorable result for him, or that Government would take any particular amount of time to consider the advocacy before determining whether to seek charges.

The SDNY investigation lasted for more than a year and involved an extraordinary amount of fact-gathering and analysis. In the end, the USAO did not find the presentations of Hwang's legal team to be persuasive, and it found certain of Hwang's statements during his interviews to be incredible. It is unfortunate that Hwang reasons backwards from this outcome to conclude that the USAO acted in bad faith from the start. It did not. And it is similarly unfortunate that in a circumstance where the Government extended its good faith and trust to share information with defense counsel and to permit defense advocacy before charge, as defense attorneys consistently request, defense counsel would abuse that trust for strategic gain. Hwang's team's further decision

to advance his claim through an escalating series of assumptions and insinuations, and often rank speculation, does not entitle Hwang to any relief and ought to be beneath the dignity of distinguished practitioners of law.

       For these and all the foregoing reasons, the defendant's motions should be denied.

Dated: New York, New York
      January 12, 2023

                          Respectfully submitted,
                          DAMIAN WILLIAMS
                          United States Attorney

By: _____
                          Matthew Podolsky
                          Alexander Rossmiller
                          Danielle Sassoon
                          Andrew Thomas
                          Assistant United States Attorneys
                          (212) 637-1947/2415/1115/2106