**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    v.

SUNG KOOK (BILL) HWANG AND
PATRICK HALLIGAN,

        Defendants.

Criminal Action No. 22-240 (AKH)

*Document Electronically Filed*

---

**DEFENDANT SUNG KOOK (BILL) HWANG'S**
**REPLY BRIEF**
**IN FURTHER SUPPORT OF DEFENDANTS' OMNIBUS PRETRIAL MOTION**

---

Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
Andrew J. Marino
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
*Attorneys for Defendant*
*Sung Kook (Bill) Hwang*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ..................................................................................................................... 3

    I.    THE COURT SHOULD DISMISS THE INDICTMENT FOR FAILURE TO CHARGE AN OFFENSE. ..................................................................................... 3

        A.    Legal Standard ...................................................................................... 3

        B.    The RICO Conspiracy Count (Count One) Must Be Dismissed Because the Indictment Does Not Allege Predicate Acts that Amount to a RICO Violation. ............................................................................................... 7

        C.    The Manipulation Counts (Counts Two Through Nine) Should Be Dismissed For Failure to Charge A Market Manipulation Offense Under Either Section 10(b) or 9(a)(2) ................................................................ 12

            1.    Deceptive Conduct That Creates an Artificial Price is Required to Sustain a Manipulation Charge under Sections 10(b) and 9(a)(2). 12

            2.    The Indictment Alleges No Deceptive Conduct by Mr. Hwang That Created an Artificial Market Price ...................................... 18

            3.    The Section 9(a)(2) Claims Also Fail Because the Indictment Does Not Allege that Mr. Hwang Traded With The Requisite Purpose. 22

            4.    Alternatively, the Indictment's Allegations of Market Manipulation Under Sections 10(b) and 9(a)(2) are Unconstitutionally Vague (Counts Two through Nine) ............... 23

        D.    The Misrepresentation Count (Count Ten) Should Be Dismissed For Failing to Charge an Offense For Securities Fraud Under Section 10(b) of the Exchange Act. ................................................................................. 25

            1.    The Opposition Misconstrues Binding Case Law Interpreting "In Connection With." ........................................................................ 25

            2.    The Opposition Does Not Save The Fatally Flawed Claim for "Maker" Liability Under Rule 10b-5 .......................................... 29

            3.    The Opposition Does Not Save the Fatally Flawed Claim for "Scheme" Liability Under Rule 10b-5(a) and (c). ....................... 31

        E.    The Court Should Defer Ruling Upon the Wire Fraud Count (Count Eleven) Pending the Outcome of a Likely Dispositive and Fully Briefed Supreme Court Case. ............................................................................. 32

        F.    The Forfeiture Allegations of the Indictment Fail to State an Offense ..... 34

    II.    THE COURT SHOULD STRIKE FROM THE INDICTMENT ALL REFERENCES TO CRIMINAL AND CIVIL CHARGES BROUGHT AGAINST TIGER ASIA MANAGEMENT TEN YEARS AGO. ...................... 36

i

Table of Contents (continued)

**Page**

III.     THE COURT SHOULD SUPPRESS EVIDENCE SEIZED PURSUANT TO
         SEARCH WARRANTS ISSUED TO MR. HWANG'S ELECTRONIC
         ACCOUNTS BECAUSE THE AFFIDAVIT FAILS TO ESTABLISH
         PROBABLE CAUSE THAT A FEDERAL CRIME HAD OCCURRED AND
         THAT EVIDENCE OF THE CRIME WOULD BE FOUND IN MR. HWANG'S
         ACCOUNTS. .................................................................................................... 39

IV.      THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS
         *BRADY* OBLIGATIONS. .................................................................................. 42

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrash v. Fox*,
805 F. Supp. 206 (S.D.N.Y. 1992) .......................................................................26

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005)............................................................................................24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)............................................................................12, 14

*Calderon Serra v. Banco Santander Puerto Rico*,
747 F.3d 1 (1st Cir. 2014)....................................................................................28

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014)............................................................................................29

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018).............................................................................26, 28

*Chemical Bank v. Arthur Andersen & Co.*,
726 F.2d 930 (2d Cir. 1984)....................................................................... *passim*

*Ciminelli v. United States*
21-1170 .....................................................................................................32, 33, 34

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010).............................................................13, 16

*Crane Co. v. Westinghouse Air Brake Co.*,
419 F.2d 787 (2d Cir. 1969)...........................................................................14, 15

*Dekalb Cnty Pension Fund v. Transocean Ltd.*,
817 F.3d 393 (2d Cir. 2016)................................................................................15

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)......................................................................................12, 17

*GFL Advantage Fund, Ltd. v. Colkitt*,
272 F.3d 189 (3d Cir. 2001)................................................................................21

*Hamling v. United States*,
418 U.S. 87 (1974)................................................................................................3

*Janus Capital Group v. First Derivatives Traders*,
    564 U.S. 135 (2011) ................................................................................29, 30, 37

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ..........................................................................................24

*Maryland v. Garrison*,
    480 U.S. 79 (1987) ............................................................................................41

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*,
    No. 02-CV-0767(LBS), 2003 WL 21507294 (S.D.N.Y. June 20, 2003) ................14

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ..........................................................................12, 17

*In re Par Pharmaceutical, Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ....................................................................11

*Prousalis v. Moore*,
    751 F.3d 272 (4th Cir. 2014) ............................................................................30

*Romano v. Kazacos*,
    609 F.3d 512 (2d Cir. 2010) ............................................................................26

*Russell v. United States*,
    471 U.S. 858 (1985) ............................................................................................5

*Russell v. United States*,
    369 U.S. 749 (1962) ..........................................................................................10

*S.E.C. v. Drysdale*,
    785 F.2d 38 (2d Cir. 1986) ........................................................................27, 28

*Salinas v. United States*,
    522 U.S. 52 (1997) ..............................................................................................7

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ..........................................................................................13

*Schreiber v. Burlington Northern, Inc.*,
    472 U.S. 1 (1985) ..............................................................................................24

*SEC v. Lek Securities Corp.*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................................................14

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992) ..............................................................14, 20

*SEC v. Masri,*
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)..............................................................................14, 15

*SEC v. Rio Tinto,*
    41 F.4th 47 (2d Cir. 2022) ......................................................................................................32

*SEC v. Vali Mgmt. Partners,*
    No. 21-453, 2021 WL 4788523 (2d Cir. Oct. 12, 2021).........................................................14

*SEC v. Zandford,*
    535 U.S. 813 (2002).........................................................................................................28, 29

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018)............................................................................................................24

*Set Capital LLC v. Credit Suisse Grp. AG,*
    996 F.3d 64 (2d Cir. 2021).........................................................................................14, 16, 17

*Sullivan & Long Inc. v. Scattered Corp.,*
    47 F.3d 857 (7th Cir. 1995) ....................................................................................................13

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.,*
    No. 13-CV-7204 (PAE), 2014 WL 3900565 (S.D.N.Y. Aug. 8, 2014)..................................29

*United States v. Abboud,*
    16-CR-396 (ENV), 2018 WL 4922903 (E.D.N.Y. Oct. 10, 2018).........................................39

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012)..............................................................................................3, 4, 6

*United States v. Almaleh,*
    No. 17-CR-25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) .........................................34

*United States v. Bercoon,*
    No. 15-CR-22, 2018 WL 11252065 (N.D. Ga. Jan. 10, 2018) ...............................................30

*United States v. Bershchansky,*
    788 F.3d 102 (2d Cir. 2015)...................................................................................................41

*United States v. Blaszczak,*
    308 F. Supp. 3d 736 (S.D.N.Y. 2018)....................................................................................43

*United States v. Bonventre,*
    646 F. App'x 73 (2d Cir. 2016) .............................................................................................36

*United States v. Cain,*
    671 F.3d 271 (2d Cir. 2012).....................................................................................................8

*United States v. Carey*,
    152 F. Supp. 2d 415 (S.D.N.Y. 2001) ...........................................................36, 37

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011) ...............................................................................40

*United States v. Comite*,
    No. 6-CR-70, 2006 WL 3360282 (E.D. Pa. Nov. 17, 2006) .........................39

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012) .............................................................................35

*United States v. Davis*,
    No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ....................10

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021) ..............................................................................4

*United States v. Deeb*,
    175 F.3d 1163 (9th Cir. 1999) .......................................................................9, 11

*United States v. DeFrance*,
    577 F. Supp. 3d 1085 (D. Mont. 2021) ...........................................................24

*United States v. Delgado*,
    972 F.3d 63 (2d Cir. 2014) ...............................................................................31

*United States v. Falso*,
    544 F.3d 110 (2d Cir. 2008) .............................................................................41

*United States v. Fama*,
    758 F.2d 834 (2d Cir. 1985) .............................................................................42

*United States v. Georgiou*,
    742 F. Supp. 2d 613 (E.D. Pa. 2010) ..............................................................21

*United States v. Greebel*,
    No. 15-CR-637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017) ..............36

*United States v. Gupta*,
    848 F. Supp. 2d 491 (S.D.N.Y. 2012) .........................................................43, 44

*United States v. Hall*,
    48 F. Supp. 2d 386 (S.D.N.Y. 1999) ...........................................................13, 17

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012) ............................................................4, 6

*United States v. Jiau,*
    624 F. App'x 771 (2d Cir. 2015) ..........................................36

*United States v. Juwa,*
    508 F.3d 694 (2d Cir. 2007).................................................4

*United States v. Laurent,*
    861 F. Supp. 2d 71 (E.D.N.Y. 2011) ..................................7

*United States v. Martin-Escobar,*
    --F. Supp. 3d--, 2022 WL 3586447 (N.D. Ok. 2022) ............24

*United States v. Martoma,*
    990 F. Supp. 2d 458 (S.D.N.Y. 2014)...........................43, 44

*United States v. McLaughlin,*
    565 F. App'x 470 (6th Cir. 2014) ......................................35

*United States v. Mennuti,*
    639 F.2d 107 (2d Cir. 1981).............................................5, 6

*United States v. Mergen,*
    No. 06-CR-352 (NGG), 2010 WL 142345 (E.D.N.Y. Apr. 9, 2010) ....................39

*United States v. Middendorf,*
    No-18-CR-36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) ....................43

*United States v. Minaya,*
    395 F. Supp. 2d 28 (S.D.N.Y. 2005)...................................34

*United States v. Mulheren,*
    938 F.2d 364 (2d Cir. 1991)...............................................15

*United States v. Neumann,*
    No. 21-CR-439 (NSR), 2022 WL 3445820 (S.D.N.Y. Aug. 17, 2022)...............3, 11

*United States v. Nicolo,*
    523 F. Supp. 2d 303 (W.D.N.Y. 2007) ...............................23

*United States v. Ostrander,*
    999 F.2d 27 (2d Cir. 1993)................................................26

*United States v. Pacione,*
    738 F.2d 567 (2d Cir 1984)..................................................5

*United States v. Perez,*
    575 F.3d 164 (2d Cir. 2009)..................................................4

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000)..........................................................................5, 10

*United States v. Rajaratnam*,
   No. 13-CR-211 (NRB), 2014 WL 2696568 (S.D.N.Y. May 12, 2014)................................38

*United States v. Raniere*,
   384 F. Supp. 3d 282 (E.D.N.Y. 2019) ...............................................................8

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir. 1996), *on reh'g*, 91 F.3d 331 (2d Cir. 1996).......................................41

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008).......................................................................14, 21

*United States v. Ruffin*,
   613 F.2d 408 (2d Cir. 1979).......................................................................31

*United States v. Rutherford*,
   71 F. Supp. 3d 386 (S.D.N.Y. 2014)...............................................................40

*United States v. Scarpa*,
   913 F.2d 993 (2d Cir. 1990).......................................................................37

*United States v. Shkreli*,
   779 F. App'x 38 (2d Cir. 2019) ...................................................................36

*United States v. Simon*,
   425 F.2d 796 (2d Cir. 1969).......................................................................18

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014), *aff'd sub nom. United States v.*
   *Halloran*, 664 F. App'x 23 (2d Cir. 2016)............................................................23

*United States v. Stein*,
   456 F.2d 844 (2d Cir. 1972).......................................................................14

*United States v. Swinton*,
   No. 19-CV-65-1, 2020 WL 1940744 (D. Conn. Apr. 22, 2020) ...........................................36

*United States v. Torres*,
   703 F.3d 194 (2d Cir. 2012).......................................................................35

*United States v. White*,
   7 F.4th 90 (2d Cir. 2021) .........................................................................8

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978)...............................................................................40

## Statutes

15 U.S.C. § 78i(a)(2) ............................................................................................22

15 U.S.C. § 78j ..............................................................................................9, 24

18 U.S.C. § 981(a)(2)(B) ....................................................................................35

18 U.S.C. § 1504 .................................................................................................6

18 U.S.C. § 1961(1) .....................................................................................8, 9, 11

26 U.S.C. § 7206(1) .............................................................................................5

28 U.S.C.§ 1658(b) ...........................................................................................16

## Other Authorities

Charles Mills & Karen Dildei, *The Necessity of Price Artificiality in Manipulation
    and Attempted Manipulation Claims*,
    37 No. 8 Futures & Derivatives L. Rep. NL 1 (2017) ............................................13

Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in
    Financial Markets?*, 105 Harv. L. Rev. 503, 509 (1991) ......................................20

Stanislav Dolgopolov, *The Doctrinal Quandary of Manipulative Practices in
    Securities Markets: Artificial Pricing, Price Discovery, and Liquidity
    Provision*, 45 J. Corp. L. 1, 10 (2019) ..................................................................13

## Rules

F.R.E. 403 ....................................................................................................38, 39

F.R.E. 404(b) ................................................................................................38, 39

Fed. R. Crim. P. 7(c)(1) .................................................................................3, 23

Fed. R. Crim. P. 7(d) .........................................................................................38

## Regulations

17 C.F.R. § 240.10b-5.................................................................................... *passim*

## Treatises

20 A.L.R. Fed. 3d Art. 10 § 2 (2017)......................................................19, 31, 34

BLACK'S LAW DICTIONARY 11th ed. 2019....................................................................16

## PRELIMINARY STATEMENT

The Omnibus Brief in support of the pretrial motions by Sung Kook (Bill) Hwang and Patrick Halligan sets forth multiple legal grounds for dismissal of the Indictment.  Most centrally, they are predicated on the Government's failure to sufficiently charge criminal securities fraud— whether based on alleged market manipulation, false statements, or "scheme" liability—consistent with decades of Second Circuit law.  The Government's theories of prosecution, with regard to each of the counts or sets of counts alleged, are evident from the Indictment.  But even assuming that the facts set forth in the Indictment are true, none of these theories constitutes a crime.  In particular, the Government's unprecedented theory of securities fraud and market manipulation, one that repeatedly seeks to criminally punish entirely lawful conduct, can and should be rejected now, at the pretrial stage of this matter.

Counts Two through Nine allege that Mr. Hwang "manipulated" eight different stocks by engaging in otherwise purely legal trading activity—trading voluminous swap contracts over a 15-month period with various private counterparties at various times of day—because he purportedly had the "intent" to raise the market prices of the stocks that corresponded to those swaps.  The Government contends that this is enough:  even if the trading conduct alleged is otherwise lawful, an indictment charging securities fraud is sufficient whenever there is "manipulative intent."  But the Government ignores the well- established law that defines "manipulation" to require deceptive actions that send false signals to the market and thus create artificial prices.  As set forth below, and earlier, other than parroting the language of the statute, the Government does not allege facts that satisfy those elements; indeed, its theory, which is squarely presented to the Court for disposition on this motion, is that it does not have to.  Respectfully, that theory is wrong, and dangerous, threatening as it does entirely legitimate investment conduct.

The remaining charges also present concrete issues of law, and Defendants' motions addressing each one of them test Government theories that are defective, as matter of law.  Count Ten, the Government's securities fraud charge based upon alleged misrepresentations, fails because those misrepresentations, according to the Indictment, pertained to the concentration, liquidity, and composition of Archegos's portfolio and, because they did not involve the value, nature, or investment characteristics, or consideration paid for, any securities, they were not— again as a matter of well-established Second Circuit law—made "in connection with" the purchase or sale of securities, as the Exchange Act requires.  Similar deficiencies—strictly matters of law— plague both the RICO conspiracy charge (Count One) and the wire fraud charge (Count Eleven): the former because (among other reasons) only fraud in the sale of securities, not their purchase, is a predicate act under the plain language of the RICO statute, and this case is all about purchases; and the latter because the wire fraud count is explicitly based on a "right to control" theory that the Government no longer even attempts to defend.  In sum, this is a prosecution that, even after considering the Government's response, is simply not sustainable under the law, and should not be allowed to proceed.  The other relief sought, which the Court need not reach if it dismisses the case, as it should, seeks only to assure that if there are additional proceedings, they are full, fair, and consistent with the Rules.

The Defendants' pretrial motions should be granted.

<u>**ARGUMENT**</u>[1]

**I.    THE COURT SHOULD DISMISS THE INDICTMENT FOR FAILURE TO CHARGE AN OFFENSE.**

**A.    Legal Standard**

The law on determining the sufficiency of an indictment is clear.  Under the Federal Rules of Criminal Procedure, the indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" *and* must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1). Therefore, "[a]lthough the language of the statute may be used in the description of the offense, the description 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged.'"  *United States v. Neumann*, No. 21-CR-439 (NSR), 2022 WL 3445820, at *3 (S.D.N.Y. Aug. 17, 2022) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)).  An indictment that fails to allege the essential facts constituting the offense is "legally insufficient." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012).

---

[1] Unless otherwise indicated, citations and quotations are omitted in case citations throughout this brief.  Citations to the Indictment are in the form "(¶ __)."  Hereinafter, citations to ECF 48 (the "Moving Brief") appear as "Br." and citations to ECF 53 (the "Opposition Brief") appear as "Opp."

Additionally, Mr. Hwang incorporates as if fully set forth herein any arguments in Mr. Halligan's Reply Brief not contained in Mr. Hwang's with respect to Point I (introduction and legal standard); Points I.A.1 and 2 (addressing the RICO charge); and Point III (requesting a Bill of Particulars). With regard to the Bill of Particulars, it is no small irony that while the Government insists that a barebones charging instrument is legally sufficient, it then exalts the "speaking" nature of the Indictment here for its advantage in this context. Opp. at 59.  Really, however, in this prosecution based upon months-long trading in multiple issuers and misrepresentations allegedly made to numerous counterparties over that same time period, the particulars that Mr. Hwang needs in order to prepare his defense have not been—and should be—provided, as set forth in the Moving Brief and in Mr. Halligan's Reply.

The Government nevertheless claims it has met its obligations by "track[ing] the relevant statutory language and provid[ing] the approximate times and places of the alleged offenses," Opp. at 11, and asserts that "[w]hen a charge contains the essential elements of the offense and gives notice of the core criminality at issue, as those in the Indictment do, nothing more is required to justify a trial on the merits." *Id.* at 2. But though it accuses the defense of raising factual issues prematurely, *id.* at 2, 18, 23, 36, 47, that is unfair and untrue: Mr. Hwang is not at this stage arguing that he did not commit the offense alleged. Rather, he is challenging the lawfulness of the prosecution because the factual allegations in the Indictment, even if correct, do not as a matter of law violate the statutes charged.

It is well settled that "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *Aleynikov*, 676 F.3d at 75–76; *see also* Br. at 21-22. Because "[t]he sufficiency of an indictment and the interpretation of a federal statute are both matters of law," *Aleynikov*, 676 F.3d at 76, consideration of a motion to dismiss on this ground is entirely proper. *See United States v. Heicklen*, 858 F. Supp. 2d 256, 262 n.5, 263 (S.D.N.Y. 2012) ("Whether or not the Indictment charges an offense squarely presents an issue of law determinable before trial."). As the cases cited in the Moving Brief make clear, an indictment is defective when its factual allegations, however broadly and generously interpreted, allege conduct that simply does not violate the statutes charged. *See* Br. at 22-23 (citing cases). In response, the Government fails to address, much less rebut, this controlling authority.[2] Opp. at 10-

---

[2] The cases the Government cites are unavailing. *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009), stands for the unremarkable proposition that defendants may not challenge the sufficiency of the Government's proof on a motion to dismiss. In *United States v. Dawkins*, 999 F.3d 767, 797 (2d Cir. 2021), the district court properly declined to evaluate the sufficiency of an indictment's factual allegations before trial. Finally, *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007), simply discusses the function of an indictment to provide notice to the defendant.

11.  But as the law discussed in Defendants' brief, and below, makes clear, where, as here, an indictment alleges facts that, even if true, would not constitute violations of the charged statutes as a matter of law, the indictment should be dismissed.

For example, in *United States v. Pirro*, the Second Circuit upheld the dismissal of a portion of a count charging the defendant with filing a false 1992 tax return for failing to disclose his ownership interest in an S corporation.  212 F.3d 86, 88, 91, 95 (2d Cir. 2000).  Although the indictment tracked the language of the statute, alleging that the defendant "willfully and knowingly made and subscribed a false 1992 tax return for [p]roperties in violation of [26 U.S.C. §] 7206(1)," the court concluded that the indictment failed to allege "a violation of a known legal duty."  *Id.* at 91.  That is because the Indictment did not allege the "crucial background fact" that defendant was a "shareholder" in the S corporation who would have had a duty to disclose his ownership interest. *Id.* at 90-91, 93.

Similarly, in *United States v. Pacione*, an indictment charging violations of the extortionate credit transactions statute was dismissed even though it recited the statutory elements, because the non-violent conduct on which the statutory violation was premised fell outside the scope of the statute.  738 F.2d 567, 572-73 (2d Cir 1984).  "Absent threats of violence or other extra-legal methods," the defendant's alleged threat to prepare and record a deed and mortgage that falsely recited the amount owed on the loan went beyond what Congress meant to proscribe, thus did not establish a violation of the statute, and was properly dismissed.  *Id*. at 568, 572-73.

The Second Circuit held an indictment insufficient on the same basis in *United States v. Mennuti*, 639 F.2d 107, 113 (2d Cir. 1981) ), *abrogated in part on other grounds by Russell v. United States*, 471 U.S. 858 (1985).  There, defendants were charged under a section of the Organized Crime Control Act for destroying two private residences in an arson-for-profit scheme.

*Id.* at 108, 113.   But because the statute's reach was limited "to property currently used in commerce or in an activity affecting it," which did not include "private residences," *id.* at 113, the Second Circuit concluded that Congress did not choose to "make it a federal crime to do what [the defendants] were charged with doing here," and thus the indictment was properly dismissed.   *Id.*

Similarly, in *United States v. Aleynikov*, the Second Circuit held that an indictment was "legally insufficient" because the defendant's conduct did not constitute an offense under either of the statutes charged: the National Stolen Property Act ("NSPA") and the Espionage Act of 1996 ("EEA").   676 F.3d at 76.   The court ruled that the source code the defendant was alleged to have unlawfully transferred, *id.* at 74, did not "constitute[] stolen 'goods,' 'wares,' or 'merchandise' within the meaning of the NSPA," *id.* at 76, because it was "purely intangible property embodied in a purely intangible format," and thus "[t]here was no allegation that [the defendant] physically seized anything tangible," *id.* at 78.   Because "the theft and subsequent interstate transmission of purely intangible property is beyond the scope of the NSPA," *id.* at 77, the indictment did not allege a criminal violation of the NSPA, notwithstanding its recitation of the language of the statute, *id.* at 76.   The factual allegations concerning the EEA were also "insufficient as a matter of law" because the source code was not "related to or included in a product that is produced for or placed in interstate or foreign commerce," as the statute requires.   *Id.* at 79, 82.   Accordingly, the Second Circuit held the charges should have been dismissed.   *Id.* at 82.

Finally, the court in *United States v. Heicklen* dismissed an indictment charging a defendant with attempting to influence the actions or decisions of a juror, in violation of 18 U.S.C. § 1504, on grounds that the conduct alleged was not prohibited by the statute as a matter of law.   858 F. Supp. 2d at 275-76.   The indictment charged that the defendant violated that statute by distributing pamphlets in front of the entrance to a courthouse.   *Id.* at 260.   But the court determined that as the

6

pamphlets only generically "discuss[ed] the role of juries in society and urge[d] jurors to follow their consciences regardless of instructions on the law," *id.* at 275, the charge was legally insufficient "[b]ecause the Indictment does not allege that [the defendant] attempted to influence a juror through a written communication made in relation to a specific case." *Id.* at 275-76.

As these cases clearly illustrate, an indictment that alleges facts that, taken as true, do not violate the statute charged must be dismissed, even if it tracks the language of the charged statute and conveys the relevant core of criminality. Thus, although the Indictment parrots the language of the applicable statutes, "[d]ismissal is required [because] the conduct alleged in the [I]ndictment as a factual basis for the offense is not actually prohibited by the language of the statute." *See United States v. Laurent*, 861 F. Supp. 2d 71, 109 (E.D.N.Y. 2011).

### B.   The RICO Conspiracy Count (Count One) Must Be Dismissed Because the Indictment Does Not Allege Predicate Acts that Amount to a RICO Violation.

The Government's response to Defendants' arguments for dismissal of the RICO conspiracy (Count One) is curious:  it argues that a "[r]acketeering conspiracy is its own crime"— which is true—but then leaps from the Supreme Court's observation that a "conspiracy may exist and be punished whether or not the substantive crime ensues," *Salinas v. United States*, 522 U.S. 52, 65 (1997), to the remarkable—and incorrect—proposition that a RICO conspiracy may be charged without pleading an agreement that would actually violate the substantive elements of RICO if it were carried out.  Opp. at 13.  But just because, for example, someone can be charged with conspiracy to commit murder without a murder taking place, the Government is not relieved from charging that the criminal agreement was, in fact, to commit a murder as opposed to doing something else.

The Indictment itself recognizes as much:  paragraph 68 charges that Defendants "agreed . . . to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section

1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Archegos Enterprise through a pattern of racketeering activity." Thus, case law cited by the Government, to the effect that the Supreme Court and Second Circuit have "rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed" misses the point. Opp. at 12-13. Indeed, on the very same page, where the Government makes this self-evident point, it admits Defendants' point that the alleged conspirators "must intend to further an endeavor which, if completed, *would satisfy all the elements of a substantive RICO offense*." Opp. at 13 (quoting *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012)) (emphasis added). The Indictment, however, does not allege, as it must, a RICO conspiracy that, if carried out, would satisfy "all the elements of a substantive RICO offense." That is fatal to Count One under *Cain*. Br. at 23.

To be clear, this is not a factual argument, but a straightforward legal one—that the predicate acts upon which the Government relies in the Indictment to support its RICO conspiracy claim must, but do not, qualify as RICO predicate acts under 18 U.S.C. § 1961(1). Br. at 25-28. And if Defendants did not conspire to commit crimes that qualify as RICO predicate acts, then under the case law above, the RICO conspiracy charge cannot stand. *See generally United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (holding that the "essence of a RICO conspiracy is the existence of an agreement to violate RICO's substantive provisions") (cleaned up).[3]

---

[3] Defendants appreciate that the Government did not charge them with any substantive RICO crimes. Opp. at 13-15. The fact remains, however, that Defendants are charged with "conspiring" to run a RICO "enterprise" that allegedly consisted of an agreement "to violate the racketeering laws" as charged in the Indictment, from "at least in or about 2020, up to and including in or about March 2021," ¶ 68—a 15-month time period. And yet that agreement does not constitute an agreement to run a RICO "enterprise" because such an enterprise in the Second Circuit must have either existed for more than two years or be capable of continuing to exist. The Government acknowledges, Opp. at 15 (citing *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019)), that "there is no Second Circuit ruling directly on point" as to whether the Indictment must plead such enterprise continuity as part of RICO's pattern requirement, but even *Raniere* noted that an indictment should at a minimum "specify predicate acts that evidence continuity and

As discussed in detail in Point I.A., it is not enough, as the Government claims, Opp. at 12, that the Indictment parrots the text of the RICO statute by alleging that Defendants committed "[o]ffenses involving fraud in the sale of securities" and "[a]cts . . . relating to wire fraud," ¶ 68(a)-(c), because the facts alleged, accepted as true, must make out the crime being charged.  *See supra*. Here, the facts alleged in the Indictment do not, even when fully accepted as true, allege an agreement to engage in fraud in the *sale* of securities to which the Indictment pays lip service, ¶ 68(a) & (b), but instead to fraud in the *purchase* of securities, which is not a predicate act under 18 U.S.C. § 1961(1)).[4]  In addition, the "right-to-control" theory of wire fraud upon which the Government relies is, as the Supreme Court appears poised to hold, not a viable predicate act either. *See infra* at Point I.E.

Perhaps in recognition of the disconnect in the Indictment between the predicate act asserted (fraud in the sale of securities) and the facts alleged, the Government argues for the first time in its Opposition that "for securities in which Archegos had a short position, Archegos aimed to depress the price of the stock" and that it "artificially altered the prices" of stocks in which it held short positions to be below "what otherwise would have been their market prices."  Opp. at 4-5.  Neither statement is followed by a citation to the Indictment, with good reason:  the

---

relatedness." 384 F. Supp. at 301.  The Government's fallback argument, that the "conspiracy's schemes" as alleged in the Indictment "threatened to continue indefinitely," Opp. at 16, and thus meet the "open ended" continuity requirement, is at odds with what the Indictment actually alleges—not a continuing conspiracy, but one of finite duration from "2020 up to and including in or about March 2021."  That is, the Indictment itself simply does not support the Government's contention in its brief that the RICO conspiracy charged in Count One was an open-ended one.

[4] The Second Circuit has never endorsed the premise that "fraud in the sale of securities" encompasses "fraud in the purchase of securities," which would be in contravention of the plain text of the RICO statute.  Moreover, the Opposition has no answer for why Congress failed to simply "insert the words 'or purchase' after 'sale' as it did in 15 U.S.C. § 78j" if it "intended to include fraud in the *purchase* of securities in RICO's definition of 'racketeering activity.'"  *United States v. Deeb*, 175 F.3d 1163, 1167 & n.6 (9th Cir. 1999) (emphasis in original).

Indictment never refers to Archegos depressing stock prices via sales, short or otherwise.[5]  Later in its Opposition, the Government contends that Mr. Hwang timed trades to push prices "down if he was seeking to depress a price in furtherance of a short position."  *Id.* at 30 (citing ¶ 28(a) & (b)).  But in fact, the Government charged exactly the opposite in the Indictment—that Mr. Hwang "manipulat[ed] the prices of certain securities in which Archegos held long positions," and that he intended to "drive up the price," "defend[] the price," and "prop[] up the stock price" of those positions by "buy[ing] heavily."  ¶ 28(a) & (b) (emphasis added).

In sum, reading the Indictment that was actually returned makes clear that the grand jury did not charge fraud in the sale of securities.  To the contrary, it claims that Archegos could not have sold its positions without "leading to a downward spiral" that would have unraveled its supposed conspiracy.  ¶ 5.

Equally unavailing is the Government's reliance on Paragraph 36 of the Indictment, Opp. at 18, where it is alleged that Archegos sold or sold short shares to free up capacity at certain counterparties.  Those sales are not alleged to be fraudulent or manipulative; they were simply

---

[5] Relying in its Opposition on facts that are not in the Indictment is not just improper but violates Defendants' constitutional rights. The Fifth Amendment prevents the Government from "fill[ing] in elements of its case with facts other than those considered by the grand jury." *United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240, at *27 (S.D.N.Y. Aug. 3, 2017); *see also Russell v. United States*, 369 U.S. 749, 770 (1962) (the possibility that "a defendant could . . . be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him" would "deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure").  For that reason, it is well-settled that "the indictment must be considered as it was actually drawn, not as it might have been drawn." *Pirro*, 212 F.3d at 92. Were the Government to prove facts at trial that are "materially different from those alleged in the [I]ndictment," or to "allege[ ] one theory of the case in the indictment but argue[ ] another at trial," it risks claims, respectively, for unconstitutional variance and constructive amendment. *Davis*, 2017 WL 3328240, at *28-29.

done to "make room" for further *purchases*, ¶ 36(a) & (b)—which, again, do not constitute RICO predicate acts.[6]  18 U.S.C. § 1961(1).

Finally, as to the supposed predicate act of wire fraud, the Government insists that because the words "right to control" are "exclusively found in Count Eleven," and are not included in Count One, the Court should pretend as if the predicate act of wire fraud in Count One is not premised on the same right-to-control theory set out in Count Eleven, despite there being no other allegation of wire fraud elsewhere in the Indictment, and no other wire fraud theory alleged.  Opp. at 17.  Just as with its exclusive reliance on the *purchase* of securities, the Government is bound by the Indictment that was returned.  If Count Eleven of the Indictment is legally deficient, as discussed in Point I.E., below, so too is a RICO conspiracy charge predicated on that wire fraud in the absence of any other viable predicate act as to which Defendants are put on notice.  *See Neumann*, 2022 WL 3445820, at *3 (description of offense "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged").  Count One should be dismissed.

---

[6] Significantly, as the Ninth Circuit concluded in *Deeb*, when "the Government does not contend that any of the sales of stock were illegal [and] only that the proceeds of the sales enabled the fraudulent scheme to continue," that does "not amount to 'fraud in the sale of securities' as required by 18 U.S.C. § 1961(1)(D)."  175 F.3d at 1168.  In addition, the Government's attempt to expand "fraud in the sale of securities" to encompass "fraud that occurs as part of the actual securities transaction," Opp. at 19, trying to distinguish *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990)), is suspect given that the court in *Par* rejected plaintiff's attempt to read the word "purchase" into 18 U.S.C. § 1961(1).  *Id*. at 683-84.

**C.**     **The Manipulation Counts (Counts Two Through Nine) Should Be Dismissed For Failure to Charge A Market Manipulation Offense Under Either Section 10(b) or 9(a)(2).**

**1.**     **Deceptive Conduct That Creates an Artificial Price is Required to Sustain a Manipulation Charge under Sections 10(b) and 9(a)(2).**

The Government contends that alleging trading with "manipulative intent" (a term it does not define), without any deceptive act that creates an artificial price, is sufficient to charge violations of Sections 10(b) and 9(a)(2). Opp. at 24-29. According to the Government, the only "deception" required is the "deception inherent in engaging in market transactions with the intent to deceive investors into believing that the price is set by natural market forces." *Id.* at 25. That circular theory is wrong as a matter of law. Instead, to charge market manipulation, the Government must allege "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). Thus, a manipulation scheme is actionable only if it includes an element of deception that injects some false information into the market and renders the market price artificial. Without such deception, real trades cannot transform a freely-traded security's market price into an "artificial" one that could support a claim of manipulation.

Contrary to the Government's mischaracterization, Opp. at 28-29, Mr. Hwang does not argue that real trades can never support a manipulation scheme. But Second Circuit case law demands that for real, executed trades to constitute criminal manipulation, they must be accompanied by some deceptive conduct that sends a false signal to the market and makes the price artificial. *See Hochfelder*, 425 U.S. at 199; *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) ("[T]he critical question is what activity 'artificially' affects a security's price in a deceptive manner. A court must ask whether a defendant injected inaccurate information into the marketplace.") (cleaned up); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d

Cir. 2007) ("[C]ase law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security."); *United States v. Hall*, 48 F. Supp. 2d 386, 387 (S.D.N.Y. 1999) (Chin, J) (deception or false information is required to create an "artificial" price).[7]

The acts that courts most often describe as "manipulative" are practices "such as wash sales, matched orders, or rigged prices" that create only the illusion of free-market buying and selling. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *see also Sullivan & Long Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (Posner, J) (affirming dismissal because there was no "false impression of supply or demand . . . . On the other side of all of the [defendant's massive short sale] transactions were real buyers, betting . . . however foolishly, that the price of LTV stock would rise."); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) (dismissing manipulation claim where complaint contained "no allegations of wash transactions, matched orders or other similar activity," and instead described "bona fide buyers and sellers trading at the reported price of the transaction"). Actionable manipulation cases thus share a common attribute: they involve either (1) deceptive acts that create the false appearance of trading, thus sending a false signal to the market and thereby creating an artificial price; or (2) collusion to "fix" or otherwise artificially distort a stock price. The Government's reliance solely on "manipulative intent," besides being incomprehensible and, as set forth below, unconstitutionally vague, *see infra* Point I.C.4, reads these indicia of fraud out of the securities laws entirely.

---

[7] *See also* Stanislav Dolgopolov, *The Doctrinal Quandary of Manipulative Practices in Securities Markets: Artificial Pricing, Price Discovery, and Liquidity Provision*, 45 J. Corp. L. 1, 10 (2019) (noting that the United States Supreme Court and other federal courts define "market manipulation as artificial pricing"); Charles Mills & Karen Dildei, *The Necessity of Price Artificiality in Manipulation and Attempted Manipulation Claims*, 37 No. 8 Futures & Derivatives L. Rep. NL 1 (2017) ("Although there is no statutory definition of manipulation . . . the courts for many decades have equated it with causing price artificiality.").

All of the cases cited by the Government involve some deceptive conduct resulting in artificial securities prices, and accordingly, none of them support the Government's theory that "manipulative intent" alone is sufficient to charge market manipulation. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84-85 (2d Cir. 2021) (deception in offering documents); *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (dissemination of misappropriated information); *United States v. Stein*, 456 F.2d 844, 845, 850 (2d Cir. 1972) (unlawful price pegging and secret payments to brokers to promote sales); Br. for Appellee at 13-15, *SEC v. Vali Mgmt. Partners*, No. 21-453, 2021 WL 4788523 (2d Cir. Oct. 12, 2021) ("layering" and "non-bona fide orders" that were not intended to be executed); *SEC v. Lek Securities Corp.*, 276 F. Supp. 3d 49, 55 (S.D.N.Y. 2017) ("layering"); *SEC v. Malenfant*, 784 F. Supp. 141, 145 (S.D.N.Y. 1992) (matched order).  Even in *SEC v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007), which might come closest to accepting the Government's view of the law by allowing a "marking the close" case to survive summary judgment in a civil action, the court noted that while the SEC has initiated and settled enforcement proceedings "based on its understanding that 'marking the close,' at least over a stretch of consecutive days, can by itself constitute market manipulation given the requisite manipulative intent . . . such an interpretation has not been endorsed by any Article III court, nor is it binding on this Court." *Id.* at 371.  Indeed, *Masri* noted that other judges in the Southern District had refused to allow a manipulation claim to proceed absent evidence of deceptive conduct. *Masri,* 532 F. Supp. at 369 (citing *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02-CV-0767(LBS), 2003 WL 21507294, at *9-10 (S.D.N.Y. June 20, 2003) (dismissing complaint alleging open-market trading that lacked any indication of deceptive conduct)).[8]

---

[8] *ATSI* is also no help to the Government, as the Second Circuit affirmed dismissal of the action. 493 F.3d at 87.  Additionally, the Government's reliance on *Crane Co. v. Westinghouse Air Brake Co.* is misplaced, as that matter involved allegations that the defendant engaged in the equivalent

To defense counsel's knowledge, there has been only one attempted prosecution based solely upon lawfully executed trades entered with alleged manipulative intent, and in that case, the Second Circuit overturned the conviction.  In *United States v. Mulheren*, the Court of Appeals expressed its "misgivings about the government's view of the law"—that violations of Section 10(b) and Rule 10b-5 could be based on allegations that a trader "engage[d] in securities transactions in the open market with the sole intent to affect the price of the security."  938 F.2d 364, 368-69, 372 (2d Cir. 1991).  That is, the Court expressly doubted—concededly without deciding—that lawfully executed trades coupled only with the intent to manipulate price could ever be sufficient to establish unlawful market manipulation.  *Id.* at 366.  Importantly, *Mulheren* is the last time the Second Circuit addressed a criminal market manipulation charge predicated on non-deceptive lawful trading.   And the Government's proclamation that "thirty years of development in the law . . . mak[e] clear that open-market transaction [*sic*] executed with manipulative intent suffices to prove market manipulation" is simply wrong, for all of the reasons described above and in Defendants' Moving Brief.  Opp. at 28.

Indeed, the Government appears to concede that *Mulheren* forecloses a conviction under Section 10(b) where there is no deceptive conduct that results in an artificial market price.  Opp. at 28.  However, the Government argues that that the Second Circuit condoned such a conviction under Section 9(a)(2).  *Id.*  This is false, as "Mulheren was not charged with violating § 9(a)(2)." *Mulheren*, 938 F.2d at 368.  Thus, the court in *Mulheren* merely noted that the Government did not have to prove the element of inducement as it would have if it brought charges under Section 9(a)(2).  *Id.*  The Government also ignores the fact that Section 9(a) is a fraud statute.  *See Dekalb*

─────────────────────

of wash sales to rig the stock price of a company it was acquiring in order to defeat a tender offer from another potential buyer.  419 F.2d 787, 790, 793 (2d Cir. 1969).  Obviously, nothing like that is alleged to have occurred here.

*Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 403 (2d Cir. 2016) (holding that private

right of action to enforce Sections 9(a)-(c) is subject to statute of repose under 28 U.S.C. § 1658(b),

which only applies to actions involving "fraud, deceit, manipulation, or contrivance").  Of course,

all fraud involves some "knowing misrepresentation or knowing concealment of a material fact

made to induce another to act to his or her detriment."  BLACK'S LAW DICTIONARY 11th ed. 2019.

And, while the text of Section 9(a)(2) does not use the word "deception," courts have held that like

Section 10(b), Section 9(a)(2) requires proof of deceptive conduct—that is, conduct that creates

an artificial price.[9]  *See Cohen*, 722 F. Supp. 2d at 424.

Nor does the Second Circuit's decision in *Set Capital* help the Government, as the matter

involved more much than non-deceptive conduct coupled only with "manipulative intent."  Opp.

at 28 (citing 996 F.3d at 77).  Although *Set Capital* permitted what it labeled an "open-market

manipulation" claim to proceed, the underlying factual allegations clearly included manipulative

acts that sent false pricing signals to the market, specifically, misstatements in offering documents

by Credit Suisse about the value of the notes it was selling.  The plaintiffs specifically alleged that

---

[9] As Judge Sweet explained:

> To state a claim for manipulation under Section 9(a)(1), plaintiffs
> must specifically identify particular wash sales or matched orders.
> Similarly, Section 9(a)(2) requires plaintiffs to identify transactions
> in a security creating actual or apparent trading in that security or
> raising or depressing the price of that security with the intent to
> deceive or defraud investors.  Likewise, to state a manipulation
> claim under Section 10(b) and Rule 10b–5, plaintiffs must identify
> wash sales, matched orders, rigged prices, or some other
> manipulative act intended to mislead investors by artificially
> affecting market activity.

*Cohen*, 722 F. Supp. 2d at 424 (citations omitted).

the offering documents "misled investors by repeatedly warning of 'risks' that [the defendant] knew were certain to occur"—because the defendants were planning to cause them to occur—and also by stating that the defendants "have no reason to believe that [their] . . . activities will have a material impact on the level of the" Index, which was false.  *Id.* at 84-85. The Second Circuit therefore did not confront a manipulation claim based solely upon actual trades coupled with "manipulative intent."   Instead, Credit Suisse allegedly engaged in an "undisclosed scheme to profit at their investors' expense" by lying about conduct they knew would deplete the value of the Notes.  *Id.* at 77.

The text of *Set Capital*, read as a whole, makes clear that the decision did not alter the requirement of deceptive conduct creating an artificial price.  To the contrary, the Second Circuit specifically instructed that "[w]hile a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required."  *Id.* at 76-77.  Subsequent language in the opinion suggesting that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent," *id.* at 77, is, therefore, unhelpful to the Government, as the opinion defines "manipulative" to require deceptive conduct that creates an artificial price.  *Id.* at 76 ("[T]he word 'manipulative' is virtually a term of art . . . .  It 'refers generally to practices . . . that are intended to mislead investors by artificially affecting market activity' and 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'").

In sum, market manipulation requires deceptive conduct that creates an artificial price. *Hochfelder*, 425 U.S. at 199; *Noto*, 35 F.4th at 106; *Hall*, 48 F. Supp. 2d at 387.  For the reasons set forth above and in Defendants' Moving Brief, real trades subjecting the buyer and seller to

genuine economic risk, such as the Indictment describes, do not send a false pricing signal to the market absent some deceptive element and do not create an artificial price.

### 2.   The Indictment Alleges No Deceptive Conduct by Mr. Hwang That Created an Artificial Market Price.

Defendants' Moving Brief set forth, in exacting detail, why the Indictment fails to allege the requisite deception by Mr. Hwang.  Br. at 43-51.  While the Government argues that the Indictment is "replete with allegations regarding deceptive practices and acts," it then points only to completely lawful conduct that sends no false pricing signal.  Opp. at 29-31.  Again, the Government relies upon its circular argument that the identified trading techniques, though lawful, are deceptive because "trades that might be lawful if not accompanied by manipulative intent can nonetheless form an unlawful market manipulation scheme when that intent is present."  Opp. at 31.  But, of course, saying that intent alone can make legal trading deceptive is just another way of arguing that charging intent alone is enough.[10]

The conduct identified in the Indictment, and again in the Opposition, cannot support a market manipulation charge under either Sections 10(b) or 9(a) because none of the conduct alleged could, as a matter of law, have sent to the market a false pricing signal that created an artificial price.  The Government first submits that Mr. Hwang deceptively used swap transactions with multiple counterparties to amass "enormous, price-altering market power" "while hiding

---

[10] The fallacy of the Government's argument becomes even more obvious when it cites to *United States v. Simon*, 425 F.2d 796, 805-08 (2d Cir. 1969), for the proposition that "accounting procedures that might otherwise be acceptable constitute fraud when undertaken with deceptive intent."  Opp. at 31.  In *Simon*, the Second Circuit did not hold that the defendant's intent rendered GAAP-compliant financial statements fraudulent, but instead that his conduct (issuing financial statements that were misleading even though GAAP-compliant) together with facts sufficient to infer fraudulent intent (including evidence that the defendant accountants knew of looting by a corporate president) was sufficient to sustain criminal fraud claims.  425 F.2d at 810.  Here, the Government relies upon intent alone to render conduct manipulative.

those positions from the market so that the market would not know that the price was being driven by a single actor." Opp. at 30 (citing ¶¶ 15-17, 24-26, 27, 28(a), 28(c), 29, 60-63). This argument is wrong on a number of grounds. First, swaps are perfectly legal and give rise to no applicable reporting requirements; therefore, the Government misconstrues the regulatory landscape by asserting that Mr. Hwang was "hiding" his positions. Second, swaps are private, synthetic transactions, which by themselves send no signal to the market whatsoever.[11] Only if one accepts as true (which Mr. Hwang does for purposes of this motion only) the dubious contention that for every swap purchased by Archegos the counterparty purchased a corresponding equal amount of the underlying security as a hedge, would any "signal" at all be sent to the market. But that signal would not be false—it would correctly reflect that the counterparty purchased the referenced security and reported its ownership in accordance with regulations; the market is never told anything about why the counterparty has decided to own the security, whether as a hedge on swaps, for investment, or for some other reason. For example, the Indictment alleges that "the swap Counterparty would appear as the owner of the shares" (as, indeed it was), "even though it only purchased the stock to offset its swap contract with Archegos."  ¶ 17. So what? Is it not a legitimate economic purpose for the banks to hedge their exposures? And, is not the market generally aware that at least some equity positions in a given security may be motivated by hedging activity in the derivatives market? This remains true even though Mr. Hwang contracted with

---

[11] The Indictment acknowledges that a swap is a private contract.  ¶ 15; *see also* 20 A.L.R. Fed. 3d Art. 10 § 2 (2017) ("A securities-based swap agreement is a private contract between two parties in which they agree to exchange cash flows that depend on the price of a reference security. A securities-based swap agreement is a separate and distinct financial instrument from the security it references.  . . .  Total-return swaps are contracts in which parties agree to exchange sums equivalent to the income streams produced by specified assets. Total-return equity swaps involve an exchange of the income stream from:  (1) a specified number of shares in a designated company's stock, and (2) a specified interest rate on a specified principal amount. These contracts do not transfer title to the underlying assets or require that either party actually own them.").

multiple counterparties.  Thus, the Government's argument simply does not, strictly as a matter of law, support a claim that an artificial price was created by Mr. Hwang's swap transactions.  Rather, it seems to support an argument, obviously not one for this or any other Court, that swaps should be prohibited or regulated differently than they are now.

Second, the Government argues that Mr. Hwang "caused others involved in his criminal activities to make false and fraudulent representations to counterparties to suggest a more diverse market and thereby to maintain and promote false price signals."  Opp. at 30 (citing ¶¶ 55-59).  But that is not what the Indictment alleges; rather, the alleged misrepresentations to counterparties concerned Archegos's portfolio, liquidity, and risk profile.   ¶¶ 41-59.   None of those misrepresentations were made to the market or have anything to do with the referenced securities, and could not therefore have sent the market a false pricing signal about those securities.

Third, the Government argues that trades were timed to drive prices up or down.  But this reflects yet another deep flaw of the Indictment as a whole:  over and over, it alleges that which is legal and labels it criminal, and trading, at any time, is deemed manipulation just because—purely from a simplistic view of supply and demand—it can have an effect on price.  That, of course, is just not the law.  *See, e.g.*, *Malenfant*, 784 F. Supp. at 144 (the "central purpose" of Section 9(a)(2) "is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price"); *see also* Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 509 (1991) ("If prices move in response to trades, the price cannot be said to be 'artificial' unless the trades are defined as illegitimate in some way.").[12]

---

[12] Similarly, with regard to the timing of trades, the Government argues that it has alleged "marking the close" as a form of manipulation to take advantage of the "daily calculation of excess margin." Opp. at 31-32 (citing ¶ 35(d)).  But trading at the close is legal, Br. at 48, and it constitutes only a

The Government's reliance on *Royer* for the proposition that "timing trades to impact the market" can alone establish market manipulation is clearly misplaced. *See* Opp. at 31. *Royer* did not merely involve strategically "timing trades," but rather a scheme predicated on selectively disseminating misappropriated information. 549 F.3d at 890-91 ("Royer would convey the misappropriated information to Elgindy, who would in turn convey the gist of it to subscribers to the AP site and instruct the AP site members to short the stock but not yet release the information to the public. Then, when Elgindy gave the signal, the AP site members would use the InsideTruth site and other media to disseminate the misappropriated information to the general public, and thereby profit from the resulting drop in the stock's price.").

Finally, the Government also argues, for the first time, that Mr. Hwang "engaged in coordinated trading with a former colleague to increase price impact." Opp. at 30 (citing ¶ 37). But that is not at all what the Indictment charges. Instead, Paragraph 37 states that, in an "effort to maximize trading capacity," Mr. Hwang asked a former colleague to move his position in GSX to another financial institution. ¶ 37. Far from demonstrating manipulation, the only thing that shows is that Mr. Hwang desired to invest in GSX, just as other buyers did. And, in any event,

---

tiny percentage of the trading at issue. Further, the cited paragraph in the Indictment does not explain how margin was calculated, "daily" or otherwise, by any particular counterparty. And while the Government cites *United States v. Georgiou*, 742 F. Supp. 2d 613, 624 (E.D. Pa. 2010), claiming that it "affirm[ed]" a guilty verdict following a jury instruction describing marking the close as a "form of market manipulation," Opp. at 32-32, it ignores that: (1) the opinion denied a post-trial motion for a new trial and thus did not "affirm" anything; and (2) the instruction also described wash sales, matched trades, and other common deceptive acts as examples of actionable manipulation, which was critical because the Third Circuit—where *Georgiou* was decided—like the Second, expressly requires some act of deception to establish market manipulation. *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (manipulation must involve "inject[ing] 'inaccurate information' into the market or creat[ing] a false impression of market activity" so as to distinguish it from "legitimate trading strategies").

there is no basis whatsoever to infer that this transfer of swap positions from one counterparty to another sent any false signal to the market, let alone that it created an artificial price for GSX.

In sum, the Government has failed to explain why any of the conduct alleged is deceptive. As explained above, and more fully in Defendants' Moving Brief, none of the trading activity alleged in the Indictment would, even if all of the Government's allegations are true, constitute deceptive conduct resulting in an artificial price and, thus, unlawful market manipulation.

### 3.    The Section 9(a)(2) Claims Also Fail Because the Indictment Does Not Allege that Mr. Hwang Traded With The Requisite Purpose.

The Government points to the charge in the Indictment that Mr. Hwang acted for the "purpose of inducing the purchase or sale" of securities by others, citing to Paragraphs 2, 35(b), and 78 of the Indictment.  Opp. at 33.  Paragraph 2, however, alleges not that Mr. Hwang traded to induce others but that alleged misrepresentations made by Mr. Halligan, Mr. Tomita, and Mr. Becker "were designed to fraudulently induce the Counterparties into trading with and extending credit to Archegos."  ¶ 2.  But the alleged misrepresentations to counterparties, of course, are not transactions at all, much less "a series of transactions" that raise or depress the price of any security.  Therefore, that allegation cannot support the Government's Section 9(a)(2) claims.  *See* 15 U.S.C. § 78i(a)(2).

Paragraph 35(b) alleges that Mr. Hwang traded during pre-market hours to "set the tone" for the day "to both artificially inflate the prices of stocks Archegos owned and to induce unsuspecting third parties to buy at those inflated prices."  ¶ 35(b).  If by trading in the pre-market the Government is referring to swaps executed before market open, Mr. Hwang has already explained that Section 9(a)(2) is addressed to circumstances where a defendant and the victim purchased *the same security*.  Br. at 54 (citing 15 U.S.C. § 78i(a)(2)).  The Government does not even try to respond to that argument.  And even if Paragraph 35(b) refers to equity positions Mr.

Hwang acquired in the pre-market, if any at all, then the claims still must fail because, as explained *supra*, Section 9(a)(2) requires some deceptive conduct that sends a false pricing signal and trading in the pre-market is not deceptive.[13]

And Paragraph 78 does nothing more than parrot the elements of Section 9(a)(2), which is necessary but not sufficient.  As discussed in Point I.A., above, under the Federal Rules, an indictment must contain both the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated" and "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  Certainly, Paragraph 78 alone is an insufficient basis upon which to charge a violation of Section 9(a)(2).

> ### 4. Alternatively, the Indictment's Allegations of Market Manipulation Under Sections 10(b) and 9(a)(2) are Unconstitutionally Vague (Counts Two through Nine).

Rather than respond to Defendants' argument as to why the Indictment's market manipulation claims are unconstitutionally vague, Br. at 55-64, the Government submits that the as-applied challenge is premature until after trial.  However, nothing prevents a court from considering an as-applied vagueness challenge at the motion to dismiss stage.  *See*, *e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 587, 593 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (deciding a pre-trial motion presenting as-applied vagueness challenge, as such a motion "requires that a court address only the application of the challenged statute to the person challenging the statute based on the charged conduct"); *United States v. Nicolo*, 523 F. Supp. 2d 303, 307-311 (W.D.N.Y. 2007) (considering both facial and as-

---

[13] Alternatively, because pre-market trading is the only factual contention that the Indictment charges was conducted with the purpose of inducing trades by others, the Section 9(a)(2) claims under Counts Three through Nine must necessarily be reduced to only those equity positions acquired during pre-market hours.

applied vagueness challenges before trial); *see also United States v. Martin-Escobar*, --F. Supp. 3d--, 2022 WL 3586447, at *2-4 (N.D. Ok. 2022) (same); *United States v. DeFrance*, 577 F. Supp. 3d 1085, 1102 (D. Mont. 2021) (same).  In any event, Mr. Hwang does not dispute—at this stage— any of the factual contentions in the Indictment.  Rather, Mr. Hwang submits that none of the conduct, as alleged, constitutes a crime under Sections 10(b) and 9(a).  And if Mr. Hwang were to be convicted on these exact facts, assuming them to be true on this motion, his conviction would be unconstitutional because he would have had no fair warning of the illegality of his actions.  *See* Br. at 55-64 (citing, among other cases, *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (Gorsuch, J., concurring in part and concurring in the judgment)).

The Government next argues that Section 10(b) provides fair notice that "open-market manipulation" is prohibited because (1) "[t]he very title of Section 10(b) is 'Manipulative and Deceptive Devices,'" and (2) "the statute explicitly prohibits 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device.'"  Opp. at 34.  This, of course, begs the question whether a person of ordinary intelligence would be put on fair notice that Section 10(b) criminalizes lawful behavior that sends no false pricing signal to the market based solely upon an undefined "manipulative intent."  The answer is no, especially since that title itself says deception is required.  Indeed, nowhere does Section 10(b) state that "manipulative intent" alone is enough to state an offense.  *See* 15 U.S.C. § 78j(b); *see also Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 7-8 (1985) ("manipulative" in the phrase "'manipulative or deceptive' in § 10(b)" is interpreted "to require misrepresentation" because "words grouped in a list should be given related meaning").

The Government also argues that its application of Section 9(a)(2) is not unconstitutionally vague because the statute proscribes trading to raise or depress the price and "[a] scheme wherein the defendant manipulates the price of a stock with the purpose of causing others to purchase or sell . . . is the very heartland of Section 9(a)(2)." Opp. at 35. The Government yet again ignores the context of the case law holding that manipulation requires deception, such that Section 9(a)'s use of the word "manipulation" (in the title) would leave a person of reasonable intelligence unaware that Section 9(a)(2) criminalizes non-deceptive conduct that does not create an artificial price. Put another way, no person of ordinary intelligence would have fair notice that non-deceptive trading that does not create an artificial price could support an offense under those statutes; as such, Counts Two through Nine must be dismissed.[14]

### D. The Misrepresentation Count (Count Ten) Should Be Dismissed For Failing to Charge an Offense For Securities Fraud Under Section 10(b) of the Exchange Act.

#### 1. The Opposition Misconstrues Binding Case Law Interpreting "In Connection With."

The Government goes to great lengths to try to weaken the force of the Second Circuit's precedential opinion in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), deriding its age, Opp. at 38, purporting to cabin its "reach," *id.*, and suggesting that it is out-of-step with more recent case law that has "broadly construed" the "in connection with" language of Section 10(b) and Rule 10b-5, *id.* at 37. But in the context of securities fraud claims premised on misrepresentations, *Chemical Bank*'s rule—that the "in connection with" nexus is satisfied only when the misrepresentations concern either the value, nature, or investment characteristics of the

---

[14] The Government's reference to Archegos's training manual is of no moment because, as the language quoted by the Government reveals, the manual did not define manipulation as including lawful, non-deceptive activity coupled only with the intent to affect price. *See* Opp. at 35 (citing ¶¶ 8, 10).

securities being purchased or sold, or the consideration received in exchange for those securities, 726 F.2d at 943—remains good law and is controlling here.  Indeed, in 2018, the Second Circuit specifically reaffirmed the *Chemical Bank* court's construction of Sections 10(b) and 17(a), repeating that "a claim fails where the plaintiff does not allege that a defendant misled him concerning the value of the securities he sold or the consideration he received in return."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018).  That binding precedent, echoing *Chemical Bank*, is dispositive here.

Notably, although *Charles Schwab* is never mentioned in the Opposition, it postdates every case cited by the Government in the "in connection with" section of its brief.  This manifests the futility of the Government's attempt to marginalize the Second Circuit's authority by resort to (pre-*Charles Schwab*) cases which supposedly stand for the proposition that "in connection with" can be satisfied merely by inducing a purchaser to buy the security at issue.[15]  Opp. at 37.  Indeed, it is simply untrue that "[t]here is no requirement . . . that there be misrepresentations directed toward the nature or value of the securities where the defendants fraudulently induce the victim to engage in a securities transaction," as the Government asserts.  *Id.*  Rather, as *Chemical Bank* made absolutely clear, "[s]uch but-for causation is not enough."  726 F.2d at 943; *see also Abrash v. Fox*, 805 F. Supp. 206, 208 (S.D.N.Y. 1992) ("[E]ven when there is a clear causal connection between the misrepresentations and the investment decision, there is no securities law violation

---

[15] The misrepresentations in *Romano v. Kazacos*, 609 F.3d 512, 523-24 (2d Cir. 2010), Opp. at 37, were held to be in connection with the securities transactions under review because those transactions (purchasing securities with retirement savings that declined in value) are what rendered the statements (about the returns plaintiffs would receive) false.  *United States v. Ostrander*, 999 F.2d 27, 32-33 (2d Cir. 1993), Opp. at 37, also fails to support the Government's argument, as the court there was interpreting not the Exchange Act at issue here, but the Investment Companies Act and on facts far afield from those alleged in the Indictment.

unless the misrepresentations or omissions involved in a securities transaction pertain to the securities themselves.").

The Indictment fails the *Chemical Bank* test.  The misrepresentations it alleges relate to neither the value nor the characteristics of the swaps (or the referenced stocks underlying the swaps) that Archegos purchased from counterparties, or to the consideration those counterparties were paid.  Rather they purportedly concerned three attributes of Archegos's portfolio:  its concentration, its liquidity, and its composition.  ¶ 48.  The Indictment does not charge that any of those attributes involve the value of, or consideration paid for, any securities—and plainly they do not.  Instead, the Indictment charges that the misrepresentations were made "to conduct swap transactions and obtain margin lending," ¶ 41, and that the consideration Archegos paid in its swap transactions with counterparties was cash, in the form of transaction fees and, possibly, the counterparty's side of an exchange of cash flows dependent on price movements in the underlying stock, ¶¶ 15, 16.  Never is it alleged that there were any misrepresentations about the referenced security, the fees, or the value of that cash flow exchange.

The Government's reliance on *SEC v. Drysdale*, 785 F.2d 38 (2d Cir. 1986), Opp. at 38-39, to try to limit *Chemical Bank*'s reach is unavailing.  *Drysdale* is consistent with *Chemical Bank*'s (and *Charles Schwab*'s) requirement as to what must be alleged to satisfy the "in connection with" element.  *Drysdale* found that misrepresentations related to the financial health of defendant's affiliate (DGSI) were "in connection with" its repo transactions because "part of the consideration offered by DGSI was a promise—in repos to repurchase and in reverse repos to resell—that its insolvency rendered worthless."  785 F.2d at 42.  In other words, from the moment the defendant made the promise that formed the consideration for the securities it purchased—*i.e.*, that it would repurchase securities—it was incapable of performing that promise and providing the

promised consideration.  *See id.  Drysdale* thus fits squarely within the "consideration received" prong of the *Chemical Bank* formulation and in no way restricts its continuing applicability.

In contrast to those in *Drysdale*, the misrepresentations alleged here did not "directly involve the consideration for a securities transaction," 785 F.2d at 41, because the only consideration to be paid to counterparties, other than the cash flows exchanged under the swaps themselves, were the fees charged by the counterparties, as the Indictment itself so clearly alleges. ¶ 16 ("[T]he Counterparties generally did not enter into swap contracts with Archegos in order to bet on the increase or decrease of the stock price. Rather, the Counterparties did so to profit from the financing fees charged on the transaction.").  Moreover, the margin rates and capacity terms that Archegos allegedly obtained via the misrepresentations were not themselves securities transactions, *see* Br. at 71, nor did they obligate a counterparty to execute any swap.[16]

Nor does *SEC v. Zandford*, 535 U.S. 813, 820 (2002), cited by the Government for its observation that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of" Section 10(b) save Count Ten.  Opp. at 39.  *Zandford* obviously did not overturn *Chemical Bank* because numerous decisions since—none more significant than *Charles Schwab*—have reiterated *Chemical Bank*'s formulation of the "in connection with" requirement approvingly.  Further, the Second Circuit's holding in *Charles Schwab*—like its holding in *Chemical Bank*, both of which bind this Court—extends not only to misrepresentations about the "value" of a security but also to

---

[16] The Government's assertion that "fraud relating to margin lending also satisfies the 'in connection with' requirement," Opp. at 38, finds no support in the lone, out-of-Circuit case it cites. In *Calderon Serra v. Banco Santander Puerto Rico*, a defendant bank failed to advise customers that the purchase of securities on margin would violate a Federal Reserve Board regulation.  747 F.3d 1, 7 (1st Cir. 2014).  That case does not stand for the idea that procuring margin through lies is an actionable Section 10(b) violation.

those about the consideration received, and thus sweeps more broadly than the quoted text from *Zandford*.[17]  In short, *Zandford* furnishes no basis on which to deny this Motion.

Finally, the Supreme Court's 2014 opinion in *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), undermines the Government's assertion that the misrepresentations alleged here can meet the "in connection with" requirement because they "went directly to the expected return and value to the Counterparties of the swaps."  Opp. at 40.  To the contrary, in *Troice*, the Supreme Court reasoned, by way of example, that "a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock," does not constitute conduct that is "in connection with" a securities transaction.  571 U.S. at 391.  So too here.  The Indictment alleges that misrepresentations by Defendants "regarding significant aspects of Archegos's portfolio" were made to enhance the creditworthiness of the fund from the counterparties' perspective "in an effort to conduct swap transactions and obtain margin lending." ¶ 41.  But according to the Supreme Court, such misrepresentations are not "in connection with" the purchase or sale of securities, as a matter of law.

> **2.**   **The Opposition Does Not Save The Fatally Flawed Claim for "Maker" Liability Under Rule 10b-5.**

The Government argues that the Indictment adequately alleges "maker liability" because *Janus Capital Group v. First Derivatives Traders*, 564 U.S. 135 (2011)—in which the Supreme Court held that liability under Rule 10b-5 can only attach to one who "made" a putative

---

[17] The Government makes a similar omission in claiming that "judges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold."  Opp. at 39 (quoting *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, No. 13-CV-7204 (PAE), 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014)).  The very next sentence of that opinion states: "They have consistently held that fraud pertaining to assets given as consideration for securities satisfied the 'in connection with' requirement."  *Uni-World Cap. L.P.*, 2014 WL 3900565, at *9.

misstatement, Br. at 72-73—does not apply in criminal cases and, in any event, Defendants made misrepresentations.  Opp. at 40-42.  The Government is wrong in both respects.

As predicted in the Motion, Br. at 75-76, the Government relies exclusively on the Fourth Circuit's decision in *Prousalis v. Moore*, 751 F.3d 272 (4th Cir. 2014), to contend that *Janus* is limited to private rights of action.  But nowhere in the Opposition does the Government square that contention with the fact that *Janus* has been applied to SEC enforcement proceedings within the Second Circuit, Br. at 76, and to criminal prosecutions in other jurisdictions, *see, e.g.*, *United States v. Bercoon*, No. 15-CR-22, 2018 WL 11252065, at *2 (N.D. Ga. Jan. 10, 2018); nor does it explain how the same word "make," within the same Section 10(b), can take on varied meanings depending on whether the Rule 10b-5(b) case being brought is civil or criminal.  The more principled conclusion is that there is a single meaning of "make" that applies in all Rule 10b-5 cases, including to Count Ten here.

Further, the Opposition confirms that the only misrepresentation that the Indictment alleges was made by Mr. Hwang was in a contract (not a "certification," as the Government wrongly characterizes it) that he signed on behalf of Archegos with one of the counterparties, Opp. at 42, and is not even alleged to have read.  Thus, allegedly "knowing that, in fact, Archegos's positions exceeded the warranted thresholds," Opp. at 42 n.10 (quoting ¶ 59), is of no consequence—and falls well short of satisfying the Government's burden to allege the essential facts constituting the offense—because Mr. Hwang is not alleged to have been aware that he was agreeing not to exceed any such thresholds, Br. at 74.  Additionally, this putative misrepresentation does not satisfy the *Chemical Bank* standard either as it also does not concern the value or nature of a security or any consideration received in exchange therefor.

At worst, the Government contends, it has a claim against Mr. Hwang for aiding and abetting a violation of Rule 10b-5(b) under 18 U.S.C. § 2. Opp. at 42. But "a person is liable under § 2 for aiding and abetting a crime," as a matter of law, "if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *United States v. Delgado*, 972 F.3d 63, 73 (2d Cir. 2014). Far from alleging this essential element—intent—the paragraphs to which the Government points allege only that Mr. Hwang "directed his subordinates to obtain more trading capacity," ¶ 46, which is in no way illegal; gave "implicit and, at times, explicit approval" to others' lies, ¶ 47, which is entirely vague; and at his "direction, Tomita provided 'dummy' or 'decoy' names when discussing Archegos's portfolio and investment interests with" a potential future counterparty, ¶ 56, which is not alleged to be at odds with industry norms and overlooks both that the real name of the company whose stock was at issue would be disclosed in any actual securities transaction and that on-boarded counterparties were free not to execute any given swap transaction with Archegos.[18] In short, Count Ten is insufficient to impose liability on Defendants under Rule 10b-5(b).

### 3. The Opposition Does Not Save the Fatally Flawed Claim for "Scheme" Liability Under Rule 10b-5(a) and (c).

Finally, the Opposition treats scheme liability under Rule 10b-5(a) and (c) just as it does maker liability: the Government tries to argue that it is not bound by dispositive precedent and then, as a fallback, points to allegations in the Indictment that it (erroneously) claims support the charge. Once again, these efforts fail.

---

[18] In addition, it is hornbook law that "a defendant charged with aiding and abetting the commission of a crime by another cannot be convicted in the absence of proof that the crime was actually committed." *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir. 1979). Thus, if the Section 10(b) claim is legally deficient for failure to satisfy the "in connection with" element, then neither is a claim for aiding and abetting such a violation viable as a matter of law.

The Government cites no authority for its assertion that "it does not appear that *Rio Tinto* provides any useful guidance for evaluating the sufficiency of a criminal indictment." Opp. at 42. Indeed, there is no credible basis for that assertion, as the holding in *SEC v. Rio Tinto plc*—itself an SEC enforcement proceeding—that "an actionable scheme liability claim also requires something *beyond* misstatements and omissions," 41 F.4th 47, 49 (2d Cir. 2022), is every bit as applicable in the criminal enforcement realm as in the civil. *See also id.* at 54 (finding "no credible basis for [the] argument" that the *Rio Tinto* rule should apply "only in cases brought by private litigants"). Because nothing in the Second Circuit's opinion states otherwise, there is no basis to not apply *Rio Tinto* here.

Also contrary to the Opposition, the Indictment does not adequately allege the "something more" that *Rio Tinto* demands for scheme liability. Even accepting that "[t]he defendants . . . created lists of 'dummy' or 'decoy' names to provide to Counterparties," Opp. at 43 (citing ¶ 56) and "worked together to create false numerical profiles and descriptions of Archegos's portfolio for dissemination to Counterparties during credit checks," *id.* (citing ¶¶ 43-45, 52, 59), the law is clear that "participation in the preparation of [alleged] misstatements" does not create primary scheme liability. *Rio Tinto*, 41 F.4th at 54. Moreover, the Government's attempt to convert that which is perfectly legal—Archegos's use of swaps and engagement with multiple counterparties— into sinister aspects of a scheme does not withstand scrutiny. The Government's scheme liability claim, like its maker liability claim, should be dismissed.

### E.   The Court Should Defer Ruling Upon the Wire Fraud Count (Count Eleven) Pending the Outcome of a Likely Dispositive and Fully Briefed Supreme Court Case.

The Supreme Court's decision in *Ciminelli v. United States*, No. 21-1170, likely will dramatically alter the legal landscape for the wire fraud charged in Count Eleven. During oral argument in *Ciminelli*, even the United States Solicitor General did not defend the right-to-control

theory that is the express basis for the wire fraud charge in this case, *see* ¶ 82 (Defendants "engaged in a scheme to defraud Archegos's trading counterparties of their rights to control their assets"). Rather, the Solicitor General "urge[d] the Court . . . to explain that the Second Circuit may not be thinking about [the right-to-control theory] in the most precise way and the most traditional way." Transcript of Oral Argument, *Ciminelli v. United States* (21-1170), at 48:201-234.  More directly, in answer to a question from the Chief Justice, the Solicitor General stated that "we would be fine with the Court explaining that that's not the right way for the Second Circuit to be going about thinking about these cases." *Id.* at 33:4-7.  And in response to the Solicitor General's concession that "the right to control assets in a manner that doesn't expose the victim to tangible harm isn't itself something that Congress would have conceived of as property and can be prone potentially to abuse," Justice Gorsuch commented, "I think we're all . . . in radical agreement about that." *Id.* at 39:24-40:12.  In short, neither the Supreme Court nor the Government appears to believe that the theory of wire fraud featured in Count Eleven has future viability.

Seeing the handwriting on the wall, the Government now pivots, contending in a footnote that its wire fraud charge can be sustained based on depriving counterparties of money or property in the form of margin terms and capacity.  Opp. at 44 n.11; ¶¶ 52(b), 71, 74(b).  Putting aside the (dubious) legal merits of this contention—which the Government agrees should not be tested until after a decision in *Ciminelli*, Opp. at 44—it continues the Government's pattern, including in the Indictment, of recasting the nature of Tomita's and Becker's misrepresentations to suit whichever statutory requirement underlies the charge being leveled.  For example, in the context of securities fraud, the Government portrays the purported misstatements at issue as being designed to induce swap transactions so as to satisfy the "in connection with" requirement of Sections 10(b) and 17, *see id.* at 36 (citing ¶¶ 2, 15-16, 18-19, 21(c), 41-59, 64-66; for scheme liability, though, the same

purported misrepresentations about the concentration, liquidity, and positions of Archegos's portfolio were allegedly for the purpose of gaining more trading capacity, *id.* at 43; and then with regard to wire fraud, the identical statements are refashioned in service of depriving counterparties of the right to control their assets and, suddenly now, obtaining money or property, *id.* at 43-44. The objects of this same set of alleged misstatements cannot be so varied, and even contradictory, but still provide notice to the defendants of the essential facts establishing the charged offenses, as an indictment must do.

Likewise, with respect to the aiding and abetting charge in the wire fraud count, the Government seemingly admits that Mr. Hwang made no misstatements himself, declaring that proof that he did is "not even something the Government will be required to [adduce] at trial." Opp. at 45. This only heightens the argument that the Indictment fails to set forth any alleged bases for aiding and abetting liability. *See* Br. at 83. Nor do the cases cited in the Opposition excuse the Government from its obligation to disclose this information, as neither *United States v. Minaya*, 395 F. Supp. 2d 28, 36 n.4 (S.D.N.Y. 2005), nor *United States v. Almaleh*, No. 17-CR-25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022), confronted or addressed a defendant's entitlement to know the action(s) proscribed by 18 U.S.C. § 2 with which he was being charged. Here too, the lack of notice alone warrants dismissal. Br. at 83-84.

In light of the significant impact that the pending decision in *Ciminelli* will have on Count Eleven, Defendants renew their request that the Court hold in abeyance any ruling on the wire fraud charge until that opinion is issued.

### F.     The Forfeiture Allegations of the Indictment Fail to State an Offense.

That the Government claims a rational basis to allege forfeiture in the Indictment— supposedly to provide notice to Defendants, Opp. at 47—does not render the allegation legally sufficient to survive dismissal. In fact, the Indictment itself makes clear that there are no proceeds

subject to forfeiture:  nowhere is it alleged that any defendant took profits from the run-up in stock prices during the relevant period or otherwise withdrew funds from Archegos for his personal benefit; instead, Archegos's collapse indisputably wiped out billions of Mr. Hwang's personal fortune.  Br. at 85-86.

The Government does not argue to the contrary or even vaguely identify what possible proceeds it has in mind to confiscate.  Opp. at 50.  At most, the Indictment alleges that Archegos amassed trading capacity, but that is certainly not the type of "money acquired through the [asserted] illegal transactions," 18 U.S.C. § 981(a)(2)(B), to which the forfeiture statute is addressed.[19]  Accordingly, there can be no forfeiture for the Government to ever establish.  *See United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) ("Moreover, we are not aware of, and the government has not cited, any decision standing for the proposition that a defendant may be required to forfeit funds never acquired by him or someone working in concert with him."); *see also United States v. McLaughlin*, 565 F. App'x 470, 475 (6th Cir. 2014) ("It is well-established that a defendant cannot be ordered to forfeit profits that he never received or possessed.").  The forfeiture allegations can and thus should be dismissed, as a matter of law.

The Government also fails to refute the defense argument that the forfeiture statute does not extend to the securities fraud charged in Counts Two through Ten of the Indictment.  Br. at 86-88.  Not one of the unpublished cases the Government cites in support of its contention that the Second Circuit has "repeatedly upheld" forfeiture orders premised on Title 15 securities fraud

---

[19] In its attempt to expand the type of "proceeds" subject to forfeiture to include gross receipts, Opp. at 48 n.12, the Government disregards case law holding that forfeiture premised on securities fraud and wire fraud, as charged in Counts Two through Eleven, is governed by Section 981(a)(2)(B), which extends only to net profits, Br. at 85 n.55.  *See also United States v. Torres*, 703 F.3d 194, 201 (2d Cir. 2012) (noting Section 981(a)(2)(B)'s definition of "proceeds" is narrower than that in subsection (A)).

offenses, Opp. at 49-50, actually held that forfeiture is possible for every securities fraud claim; they all merely assumed its applicability because the defendants did not argue otherwise. Equally significant, none involved the use of swaps.[20] Swaps, of course, are integral to the securities fraud alleged here and, importantly, are not encompassed by the "fraud in the sale of securities" upon which forfeiture pursuant to Section 981(a)(1)(C) would have to rely. Br. at 87-88. That forfeiture is not authorized by the swaps-based securities fraud charged in Counts Two through Ten is, then, another reason why the forfeiture allegations in the Indictment should be dismissed.

## II.     THE COURT SHOULD STRIKE FROM THE INDICTMENT ALL REFERENCES TO CRIMINAL AND CIVIL CHARGES BROUGHT AGAINST TIGER ASIA MANAGEMENT TEN YEARS AGO.

Notwithstanding the applicable law cited in the Moving Brief, the Government complains that the motion to strike from the Indictment all references to the decade-old case against Tiger Asia Management is "premature" and not "ripe." Opp. at 70. Although it is certainly true that some courts await trial before ruling on certain motions to strike, many courts in this Circuit have not hesitated to strike language from an indictment that, on its face, includes irrelevant, prejudicial, and inflammatory surplusage. *See* Br. at 92-97 (citing *United States v. Swinton*, No. 19-CV-65-1, 2020 WL 1940744 (D. Conn. Apr. 22, 2020); *United States v. Greebel*, No. 15-CR-637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017); *United States v. Carey*, 152 F. Supp. 2d 415 (S.D.N.Y. 2001)). As in those cases, this Court need not delay in striking from the Indictment references to Tiger Asia because, under the standard set forth by the Second Circuit, they are "not

---

[20] Moreover, unlike here, the fraud alleged in each of the cases cited by the Government resulted in actual gains to the defendant. *See United States v. Shkreli*, 779 F. App'x 38, 41-42 (2d Cir. 2019); *United States v. Jiau*, 624 F. App'x 771, 773 (2d Cir. 2015); *United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016).

relevant to the crime[s] charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990).

The Government argues that the SEC's prior allegations against Tiger Asia are relevant for three reasons:  (1) to "provide[] context for the creation of Archegos"; (2) "to understand why Hwang no longer invested outside funds"; and (3) to provide "evidence of Hwang's knowledge, intent and state of mind with respect to the charged crimes."  Opp. at 70.  But none of these weak rationales renders the references to Tiger Asia relevant to the presently charged crimes, and none of them justifies the obviously and deliberately inflammatory nature of these allegations.

*First*, there is no need to provide "context" for the creation of Archegos.  Its creation has nothing to do with the current charges; and the Government does not contend that it or its employees engaged in any misconduct whatsoever for at least the first seven years since its founding.  ¶¶ 1, 20.  Moreover, providing "historical context" has been rejected as a reason to inject prejudicial material into an indictment.  *See, e.g., Carey*, 152 F. Supp. 2d at 429-30 (in case involving misuse of union funds, striking references to organized crime and the phrase "La Cosa Nostra" notwithstanding Government's argument that such references "provide historical context and demonstrate that [defendant] was motivated to remain in control of the union").

*Second*, the Tiger Asia references are unnecessary to explain why Mr. Hwang invests his own funds.  It is undisputed that Archegos was a family office, and in any event that fact, and more specifically how that came about, is simply "not relevant to the crime charged."  *Scarpa*, 913 F.2d at 1013.  More pointedly, the Government's argument is flatly wrong—nothing in the Consents and Final Judgments of Tiger Asia Management LLC, Tiger Asia Partners, LLC or Mr. Hwang, prohibited him from seeking to register as an investment advisor and manage third party funds at the time of the activity alleged here, in 2020-21.  ECF 51, Lustberg Declaration ("Decl.") Exs.

DD-II.  Mr. Hwang has chosen not to do so, but in any event, what occurred with respect to Tiger Asia more than a decade ago is of no consequence to what occurred here and is included for one, transparent reason—to cast Mr. Hwang in a negative light.

*Finally*, the allegations against Tiger Asia are not relevant to Mr. Hwang's knowledge, intent, or state of mind with respect to the presently charged crimes.  The misconduct alleged against Tiger Asia terminated in February 2009 and the crimes alleged here did not begin until "in or about June 2020."  ¶ 39.  An 11-year-and-3-month gap is hardly indicative of Mr. Hwang's state of mind or "intent" regarding the conduct alleged.  Perhaps most importantly, not only was Mr. Hwang never charged with any crime, Mr. Hwang and Tiger Asia entered into Consents "[w]ithout admitting or denying the allegations in the complaint" and none of the allegations contained in the Tiger Asia Complaint were ever adjudicated, let alone proven.  Lustberg Decl. Exs. DD-II.  Under those circumstances, it is difficult to ascertain how this sequence of events could possibly be relevant to Mr. Hwang's state of mind in this case.

The Government responds that because the SEC's  civil allegations were never admitted or proven, "these facts carry far less potential prejudice than the fact of a prior criminal conviction . . . ."  Opp. at 71.  This argument defies logic and common sense:  unproven, never admitted, and therefore, potentially false allegations are less relevant and thus potentially more prejudicial than those that are supported by either a conviction or admission of guilt.  And because they are unproven, they raise the prospect of a mini-trial on the facts of what occurred those many years ago—yet another form of prejudice under Federal Rules of Evidence 403 and 404(b), and another reason to strike them under Federal Rule of Criminal Procedure 7(d).  *See United States v. Rajaratnam*, No. 13-CR-211 (NRB), 2014 WL 2696568, at *3 (S.D.N.Y. May 12, 2014) (precluding evidence of defendant's prior unrelated trading activity in a securities fraud case

because it would require a "mini-trial" to "educat[e] the jury on the complicated concepts of short selling and covering"); *United States v. Abboud*, 16-CR-396 (ENV), 2018 WL 4922903, at *1 (E.D.N.Y. Oct. 10, 2018) (evidence aimed at establishing intent was precluded under F.R.E. 403 and 404(b) because defendants were not charged with crimes relating to that evidence and it "could result in a mini-trial, diverting the jury's attention from the charged crimes"); *United States v. Mergen*, No. 6-CR-352 (NGG), 2010 WL 142345, at *3 (E.D.N.Y. Apr. 9, 2010) (precluding evidence of a prior burglary because it would "cause jury confusion as to what issues are actually on trial" and would create a "mini-trial"); *United States v. Comite*, No. 6-CR-70, 2006 WL 3360282, at *4 (E.D. Pa. Nov. 17, 2006) (prohibiting under F.R.E. 404(b) the use of allegations that were not the subject of any count in the indictment and were over six years prior to the indictment because it "would be collateral, and w[ould] unduly lengthen the trial, because the Court would have to allow Defendant to introduce her own evidence in defense of these . . . claims").

Defendants' motion to strike should be granted.

## III. THE COURT SHOULD SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS ISSUED TO MR. HWANG'S ELECTRONIC ACCOUNTS BECAUSE THE AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE THAT A FEDERAL CRIME HAD OCCURRED AND THAT EVIDENCE OF THE CRIME WOULD BE FOUND IN MR. HWANG'S ACCOUNTS.

The search warrants at issue here violated the Fourth Amendment to the Constitution, and they permitted the Government to rummage through Mr. Hwang's accounts and seize evidence connected to his lawful trading activities, notwithstanding the lack of probable cause that he committed any federal crime. Contrary to the Government's arguments, Opp. at 52-55, Mr. Hwang does not here seek to resolve any facts or contest whether, as a factual matter, he committed the offenses alleged. He recognizes that those are matters for trial. Instead, his argument is that the Government's theory, set forth in the warrant affidavit and echoed in the Indictment, simply does

not amount to a violation of any federal law and, thus, cannot support a finding of probable cause to justify the search warrants.

To be lawful under the Constitution, a search warrant must set forth evidence establishing "that probable cause exists to believe a federal crime has been committed." *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978). But absent a showing of deceptive conduct that created an artificial price, the *bona fide* trading activity alleged in the search warrant affidavit does not amount to a cognizable crime under applicable precedent. *See* Point I.C. Thus, for the same reasons that the Indictment fails, so do the search warrants, obtained based upon the Government's invalid theory of criminal liability, which also cannot, therefore, have been executed in good faith, as is briefly discussed below.

Nor can the search warrants, which are for Mr. Hwang's property, be supported by the purportedly misleading statements that other Archegos employees made to counterparties. Opp. at 53. Other than the wholly conclusory allegation that Mr. Hwang "directed" others, which itself "is insufficient to establish the existence of probable cause sufficient to support the issuance of a search warrant," *United States v. Rutherford*, 71 F. Supp. 3d 386, 392 (S.D.N.Y. 2014), nothing in the affidavit ties Mr. Hwang to these purported misstatements or otherwise supports the Government's conclusory claim. *See United States v. Clark*, 638 F.3d 89, 97 (2d Cir. 2011) (conclusory allegation that defendant had "full control" of multi-unit apartment building was insufficient without factual support to establish that defendant actually controlled the building).

More alarming, but equally unpersuasive, is the Government's insinuation that probable cause can be inferred from the very return of the Indictment in this case and from Becker's and Tomita's guilty pleas—assertions the Government makes, even as it contends it is "leaving [them] aside." Opp. at 52. Obviously, those events all took place after the issuance of the search warrant,

and the Government does not explain, with case law or otherwise, how they could contribute to a probable cause finding.   Indeed, if an Indictment could retroactively cure a search warrant unsupported by probable cause, then no motion to suppress would ever be allowed.   This is obviously not the law.   *See, e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("[I]tems of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued."); *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (facts to support a probable cause finding "must be contained within the four corners of a written affidavit given under oath").

Nor can the Government save these intrusive searches by insisting that it was acting in good faith.   Opp. at 55-56.   The good faith exception to the exclusionary rule is not without limitation.   *See United States v. Bershchansky*, 788 F.3d 102, 112-13 (2d Cir. 2015).   "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble," as the Second Circuit has noted.   *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996), *on reh'g*, 91 F.3d 331 (2d Cir. 1996).   "For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts."   *Id.*   Where, as here, the theory underlying an affidavit is so lacking in legal merit, reliance on the warrant cannot be considered objectively reasonable and the good faith exception cannot apply; after all, under those circumstances, the essential requirement of a warrant, that there be "probable cause to believe a crime has been committed," is lacking.   And no reasonably well-trained officer, especially one expert in securities law who worked this case,[21] could believe that a warrant to search four business

---

[21]   *See* Lustberg Decl. Ex. B at ¶ 1 ("I am and have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 14 years.   I am assigned to a squad that focuses on securities and investment frauds in the FBI's New York Field Office.   I have participated in numerous investigations involving fraud, including those concerning hedge funds, insider trading,

and personal accounts based on an allegation that Mr. Hwang engaged in lawful trading on the open market, without any alleged deceptive conduct that sent a false signal to the market thereby creating an artificial price, could be valid.  *See United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (considering agent's experience as a factor in assessing whether or not the good faith exception applied).  The fruits of the Government's unconstitutional searches through Mr. Hwang's accounts should be suppressed.

## IV.  THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS *BRADY* OBLIGATIONS.

The *Brady* Order entered at Defendants' arraignment is crystal clear:  the Government has "an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, *or investigation that led to the prosecution*, of the offense or offenses with which the defendant is charged."  Br. at 119 (quoting ECF 4 at 2) (emphasis added).  The Government makes no mention of the *Brady* Order in its Opposition, much less squares its refusal to produce *Brady* material created by the SEC and CFTC in the course of their joint investigations of Defendants with that plain text.

The argument pressed by the Government that it did not jointly investigate the facts of this matter with the SEC and CFTC borders on frivolous, and is disturbing coming from the Government.  In truth, there is no question at all that this was a joint investigation, as Defendants have shown.  That fact is, for example, evidenced by the joint press conference on April 27, 2022, at which the U.S. Attorney himself extolled the "invaluable" "dedication and hard work on *this investigation*" that the Government's "partners" at the SEC and CFTC provided.  Br. at 119 & n.62

---

and market manipulation, I am familiar with the use of computers, cellphones, email accounts, instant message services, and cloud-based accounts in connection with criminal activity.").

(emphasis added).  The Government now seeks to interpret his words as a mere thank-you, *see* Opp. at 72-73 ("the Government, the SEC, and the CFTC have all publicly thanked one another for their assistance in the investigation"), but those words speak for themselves and admit the collaborative investigative efforts in which all three entities engaged.  No case cited by the Government involves such a pointed admission; to therefore contend that courts have "routinely rejected" arguments that premise the existence of a joint investigation on facts like these, Opp. at 73, is simply false, in the service of limiting the Government's sacrosanct *Brady* obligations.

In *United States v. Gupta*, Judge Rakoff ordered the Government to disclose to the defendant any *Brady* material contained in SEC memoranda related to 44 joint witness interviews, distinguishing a "joint investigation," which encompasses joint fact-gathering and "trigger[s] a *Brady* obligation," from a "joint prosecution."  848 F. Supp. 2d 491, 494, 497 (S.D.N.Y. 2012). Viewed through the lens of that case, the Government's attempt to eschew its *Brady* obligations because the SEC and CFTC "are not part of the prosecution team," Opp. at 72, and did not participate in grand jury-related proceedings, *id.* at 75, is of no moment.[22]  Moreover, as acknowledged in its Opposition, at 77, the Government has requested and received some records from the SEC and CFTC that it then appropriately produced to Defendants, thereby undermining its attempt to distinguish *Gupta* on the ground that the Government there had easy access to the *Brady* materials being sought, *id.* at 75.  Similarly, as the Opposition, at 76, also readily admits, in *United States v. Martoma*, the court found that because, just like here, the SEC provided the

---

[22] To the extent the Government urges a different result based on *United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018), that unpublished opinion does not grapple with the joint fact-gathering principles articulated in *Gupta* and did not disagree with that prior published decision.  So too with respect to *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742 n.36 (S.D.N.Y. 2018), another case upon which the Government relies, in which the court expressly declined to weigh in on *Gupta*.

Government with documents obtained as part of its investigation, and because, again like here, the agencies jointly conducted interviews and conferred about their investigations, a "joint investigation" existed sufficient to require production by the Government of *Brady* material in the SEC's possession.  *See* 990 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2014).  While the Government calls the facts in *Martoma* "unusual," Opp. at 76, they are identical to the pertinent facts of this matter and should lead to the same outcome.  Finally, *Gupta* rejected the contention in the Opposition, at 77, that disclosure by the Government of its own notes of witness interviews satisfies its *Brady* obligation.  848 F. Supp. 2d at 495 ("[E]xculpatory disclosures made during these joint interviews that are reflected in the notes or memoranda of either agency must be disclosed to the defense.").  And it rebuffed the Government's concern about invading the SEC's and CFTC's work product privilege, Opp. at 77.  *See id.* at 496 (concluding that "receiving *Brady* material to prepare for the criminal case is a 'substantial need' that overcomes work product protection").

In sum, as Judge Rakoff observed, "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense, but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all."  *Id.* at 492.  Accordingly, and consistent with the *Brady* Order, Defendants are entitled to any *Brady* material contained in the records and information that the SEC or CFTC created as part of the investigative fact-gathering in which they jointly participated with the Government in this matter.[23]

---

[23] The parties are still in the process of meeting and conferring with regard to certain open discovery issues, which may encompass potential *Brady* material related to market trading and hedging data.  Thus, Defendants again respectfully reserve the right to move for relief at a later date with regard to that information, if necessary.  *See* Br. at 120 n.63.

## <u>CONCLUSION</u>

For these reasons, and as set forth more fully in Defendants' Moving Brief, Defendant Sung Kook (Bill) Hwang respectfully requests that the Court enter an Order dismissing the Indictment in its entirety.  Alternatively, the Court should enter an Order striking prejudicial allegations from the Indictment referencing Tiger Asia, suppressing evidence unlawfully seized from certain electronic accounts, and compelling the Government to provide a bill of particulars and to comply with its *Brady* obligations.

Dated:  January 27, 2023                                    Respectfully submitted,

s/Lawrence S. Lustberg
Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
Andrew J. Marino
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com