# EXHIBIT G

AO 89B (07/16) Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 22 Cr. 240 (AKH) |
| Sung Kook (Bill) Hwang, et al, ) | |
| *Defendant* ) | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CRIMINAL CASE**

To: Mizuho / Jeffrey J. Resetarits, Esq. and John F. Cove, Jr., Esq.
Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022-6069

*(Name of person to whom this subpoena is directed)*

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:
See Schedule A, attached.

| Place: Barry H. Berke<br>Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas, New York, NY 10036 | Date and Time: Returnable before trial. |
|---|---|

Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

*(SEAL)*

Date: _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Sung Kook (Bill) Hwang , who requests this subpoena, are:

Barry H. Berke, Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas, New York, NY 10036, bberke@kramerlevin.com, 212.715.7560

**Notice to those who use this form to request a subpoena**

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

Case No. 22 Cr. 240 (AKH)

# PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | Reset |

## Federal Rule of Criminal Procedure 17 (c), (d), (e), and (g) (Effective 12/1/08)

**(c) Producing Documents and Objects.**

    **(1) In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

    **(2) Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

    **(3) Subpoena for Personal or Confidential Information About a Victim.** After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**(d) Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

**(e) Place of Service.**

    **(1) In the United States.** A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

    **(2) In a Foreign Country.** If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service.

**(g) Contempt.** The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. § 636(e).

## SCHEDULE A

## DEFINITIONS

A. "Archegos" refers to Archegos Capital, LLC, Archegos Capital Management, LP, Archegos Fund LP, and Archegos Capital Partners LLC and any other subsidiaries, parent companies, affiliates, officials, officers, employees, volunteers, or agents of Archegos.

B. "At-Issue Security" or "At-Issue Securities" refers to the following securities:

    a) ViacomCBS (Ticker: VIAC)

    b) Discovery Communications, Inc. (Tickers: DISCK and DISCA)

    c) GSX Techedu Inc. (Ticker: GSX)

    d) iQIYI, Inc. (Ticker: IQ)

    e) Tencent Music Group (Ticker: TME)

    f) Vipshop Holdings Ltd (Ticker: VIPS)

    g) Baidu (Ticker: BIDU)

    h) Farfetch (Ticker: FTCH)

    i) Texas Capital Bancshares Inc. (Ticker: TCBI)

    j) Futu Holdings (Ticker: FUTU)

    k) Rocket Companies, Inc. (Ticker: RKT)

C. "Mizuho" refers to Mizuho Bank and Mizuho Financial Group, Inc. and any other subsidiaries, parent companies, affiliates, officials, officers, employees, volunteers, or agents of Mizuho, including but not limited to Mizuho Capital Markets LLC.

D. "ISDA Agreement" refers collectively to any ISDA Master Agreement, Credit Support Annex, Portfolio Swaps Annex, and any other schedules, annexes, exhibits, and subsequent amendments thereto, between Mizuho and Archegos or Tiger Asia Management, that was operative at any point between January 1, 2020 and March 31, 2021. All definitions contained within the ISDA Agreement are incorporated herein by reference.

E. "Issuer" refers to any person who issued any security with respect to which Archegos purchased or for which Archegos entered into a Swap Transaction that referenced such security.

F. "Swap Transaction" refers to any Share Swap Transaction, Share Basket Swap Transaction, Index Swap Transaction or Index Basket Swap Transaction entered into pursuant to the ISDA Agreement.

## INSTRUCTIONS

A.  Unless otherwise specified, for each Request you must produce all documents created during, or concerning, the period January 1, 2020 through March 31, 2021.

## REQUESTS

To the extent such documents have not been produced by Mizuho to the United States Attorney's Office for the Southern District of New York:

1. An electronic blotter reflecting all of Mizuho's transactions with respect to the At-Issue Securities, in both swaps and equities.  Among other things, the blotter should reflect the parent order and time, any changes to the order, such as increases to the limit price, and the time of the changes, and the child orders and times that were used in the execution of the transaction. The blotter should also reflect the algorithmic trading strategy used in execution of the trade.

2. For any Swap Transaction with Mizuho, documents and communications, including but not limited to trade blotters, data dictionaries or other non-aggregated transaction level data, position reports, chats, emails, and text messages, reflecting:

    a) The part, department, desk, or other subgroup of Mizuho that hedged Swap Transactions;

    b) The types of instruments used by Mizuho to hedge its exposure to Swap Transactions;

    c) How the initial prices on the Swap Transactions were determined;

    d) The order entry, route, and execution time stamps (including date), limit price, price, currency, price denomination (*e.g.*, dollars, $100s of dollars, etc.), number of lots, shares or contracts transacted of any instrument used to hedge or to determine the price of the Swap Transaction, including information for both the initial order and any modifications from the initial order;

    e) The transaction history of any position acquired or maintained as a hedge to a Swap Transaction, including when the position was closed, sold, modified or re-entered;

    f) Any algorithmic trading methodologies Mizuho used in connection with hedging Swap Transactions and/or used to order, route, or execute hedges for Swap Transactions;

    g) How Mizuho unwound hedges; and

    h) How and when Mizuho marked each hedge position on its books each day.

3. Documents and communications, including but not limited to chats, emails, and text messages, reflecting Mizuho's lending of any securities purchased in connection with

hedging a Swap Transaction (including the timing of the loan and the number of shares loaned, and fees received).

4. Documents and communications, including but not limited to chats, emails, and text messages, concerning any of Mizuho's loans of the underlying securities that correspond to the Swap Transactions.

5. Documents reflecting policies that governed how Mizuho hedged Swap Transactions, including but not limited to:

    a) The types of hedges that were permitted by Mizuho;
    b) How often Mizuho evaluated the effectiveness of its hedges with Archegos;
    c) Whether Mizuho required hedges to be put on simultaneously with the Swap Transaction and, if not, what the requirements were; and
    d) The circumstances under which customers, clients or proprietary positions in the opposite direction can be considered hedges for each other.

6. Documents reflecting how margin requirements were calculated for Swap Transactions, including:

    a) Documents reflecting Mizuho's margin requirements for Archegos for each Swap Transaction, including how often, whether and how those requirements changed for each At-Issue Security and for different types of swaps;
    b) Information on whether Mizuho used a dynamic and/or static margin framework (or some other framework) for Swap Transactions;
    c) Documents reflecting any changes in how margin was calculated for Swap Transactions during Mizuho's relationship with Archegos; and
    d) Documents reflecting how Mizuho calculated the amount of variation margin and/or excess cash Archegos was allowed to withdraw.

7. Documents and data related to Archegos's available capacity at the Counterparty, including the algorithms and formulas used to determine same.

8. All documents concerning the diligence, monitoring, surveillance, or investigative efforts used by Mizuho for Archegos.

9. Documents sufficient to show how Mizuho managed its risk exposure to Archegos's trading activity with Mizuho including, but not limited to, any data used by Mizuho in connection with stress tests or similar risk management assessments done by Mizuho to assess the risk of doing business with Archegos.

10. Documents concerning any limitations placed by Mizuho on Archegos's trading with Mizuho.

11. Documents and communications, including but not limited to chats, emails, and text messages, reflecting what Mizuho knew about Archegos's positions with any other institutional holder, prime broker or bank.

12. Documents, including any written policies, reflecting how any information provided by Archegos was verified during onboarding and on an ongoing basis.

13. All communications, including but not limited to chats, emails, and text messages, between Mizuho and other Archegos counterparties in March 2021 relating to Archegos.

14. Documents concerning any research-side files maintained by Mizuho as it related to each Issuer, including but not limited to research on each stock, price targets, and recommendations, for any Issuer in which Archegos held a corresponding swap position with Mizuho.

15. Documents reflecting the payments charged and received by Mizuho from Archegos in connection with any transaction between Mizuho and Archegos, including but not limited to fees charged and collected in connection with:

    a) Archegos's purchases and sales of securities;
    b) Clearing and custodian services;
    c) Swap interest payments received from Archegos;
    d) Lending services including fees for any margin loans to Archegos; and
    e) Prime brokerage fees.

16. Documents reflecting the payments received by Mizuho in connection with any activity related to hedging Swap Transactions, including but not limited to payments and fees charged and collected in connection with:

    a) The sale or lending of securities, including securities originally purchased to hedge Swap Transactions;
    b) Clearing and custodian services;
    c) Swap interest payments received from Archegos;
    d) Lending services including fees for any margin loans; and
    e) Prime brokerage fees.

17. Documents sufficient to show the identity and relative placement of Mizuho's top ten clients for the purchase and sale of total return swaps each month between January 1, 2020 and March 31, 2021, and the fees that Mizuho earned from each of those clients in connection with total return swaps.

18. Documents sufficient to show the total number of clients who purchased total return swaps from Mizuho, and the total notional value of total return swaps purchased from Mizuho each month between January 1, 2020 and March 31, 2021.

19. Documents sufficient to show all uncollected fees billed to Archegos but not received as of March 31, 3021.

20. Documents and communications, including but not limited to chats, emails, and text messages, showing any analyses or discussion of the profitability of Archegos's trading/ relationship to Mizuho or the potential profits from expanding its trading with Archegos.