UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                                    :
UNITED STATES OF AMERICA
                                                                    :
            - v. -                              No. 22 Cr. 240 (AKH)
                                                                    :
SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,                                                    :

                        Defendants.                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR THE ISSUANCE OF RULE 17(c) SUBPOENAS**


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Matthew Podolsky
Alexander Rossmiller
Alexandra Rothman
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

PROCEDURAL BACKGROUND.................................................................................. 3

ARGUMENT ................................................................................................................. 5

I.      Legal Standard ................................................................................................. 5

II.     The Court Should Deny the Defendants' Requests for Rule 17(c) Subpoenas ................. 7

   A. The *Nixon* Standard Applies .......................................................................... 7

   B. The Proposed Subpoenas Do Not Seek Specifically Identified Evidence .......................... 8

   C. The Proposed Subpoenas Do Not Seek Relevant and Admissible Evidence ................... 14

CONCLUSION.............................................................................................................. 19

# TABLE OF AUTHORITIES

Cases                                                                                          Page(s)

*AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17 Civ. 598 (BKS/CFH),
    2022 WL 2643583 (N.D.N.Y. July 8, 2022) ................................................................ 16

*Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951) ............................................ 5

*In re Lyondell Chem. Co.*, No. 9-10023, 2016 WL 6108526 (Bankr. S.D.N.Y. Oct. 19, 2016) .. 16

*Morisseau v. DLA Piper*, 532 F. Supp. 2d 595 (S.D.N.Y. 2008) ................................. 16

*Neder v. United States*, 527 U.S. 1 (1999) ..................................................................... 17

*United States v. Avenatti*, No. 19 Cr. 373 (PGG),
    2020 WL 508682 (S.D.N.Y. Jan. 31, 2020) ...................................................... 11, 12, 14

*United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 24, 2022) ............... 13

*United States v. Barnes*, No. 04 Cr. 186 (SCR),
    2008 WL 9359654 (S.D.N.Y. Apr. 2, 2008)............................................................ passim

*United States v. Bergstein*, 788 F. App'x 742 (2d Cir. 2019)....................................... 8

*United States v. Bergstein*, No. 16 Cr. 746 (PKC),
    2018 WL 9539846 (S.D.N.Y. Jan. 24, 2018) ............................................................ 7, 15

*United States v. Blondet*, No. 16 Cr. 387 (JMF),
    2022 WL 485031 (S.D.N.Y. Feb. 16, 2022)............................................................... 7, 8

*United States v. Brown*, No. 95 Cr. 168 (AGS),
    1995 WL 387698 (S.D.N.Y. June 30, 1995) ........................................................... 16, 19

*United States v. Carn*, No. 13 Cr. 346 (APG) (GWF),
    2016 WL 128138 (D. Nev. Jan. 11, 2016)..................................................................... 15

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2019 WL 6647871 (S.D.N.Y. Nov. 8, 2019)...... 5

*United States v. Chastain*, No. 22 Cr. 305 (JMF) (S.D.N.Y. Oct. 27, 2022)................................ 7

*United States v. Cherry*, 876 F. Supp. 547 (S.D.N.Y. 1995)..................................... 5, 6

*United States v. Cole*, No. 19 Cr. 869 (ER), 2021 WL 912425 (S.D.N.Y. Mar. 10, 2021)........... 8

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980).......................................... 6

*United States v. Ferber*, 966 F. Supp. 90 (D. Mass. 1997)........................................... 16

*United States v. Frenkel*, 682 F. App'x 20 (2d Cir. 2017) ............................................ 17

*United States v. Goel*, No. 22 Cr. 396 (PKC) (S.D.N.Y. Apr. 27, 2023) ............................... 7, 13

*United States v. Isola*, 548 F. App'x 723 (2d Cir. 2013) ............................................ 17

*United States v. Kaufman*, 617 F. App'x 50 (2d Cir. 2015) ............................................ 17

*United States v. Kaufman*, No. 13 Cr. 411 (JMF),
  2014 WL 2048198 (S.D.N.Y. May 19, 2014) ...................................................... 6, 18

*United States v. Marchisio*, 344 F.2d 653 (2d Cir. 1965) ............................................ 6

*United States v. Maxwell*, No. 20 Cr. 330 (AJN),
  2021 WL 2292773 (S.D.N.Y. June 4, 2021) ...................................................... 6, 18

*United States v. Nixon*, 418 U.S. 683 (1974) ................................................ passim

*United States v. Rajaratnam*, 753 F. Supp. 2d 317 (S.D.N.Y. 2011) ............................................ 9

*United States v. Sawinski*, No. 00 Cr. 499 (RPP),
  2000 WL 1702032 (S.D.N.Y. Nov. 14, 2000) ...................................................... 6, 8, 9

*United States v. Shah*, No. 19 Cr. 833 (SHS),
  2022 WL 1422252 (S.D.N.Y. May 5, 2022) ...................................................... 1, 9, 12

*United States v. Shea*, No. 20 Cr. 412 (AT), 2022 WL 13847351 (S.D.N.Y. Oct. 24, 2022) ........ 8

*United States v. Skelos*, No. 15 Cr. 317 (KMW),
  2018 WL 2254538 (S.D.N.Y. May 17, 2018) ...................................................... 5, 6, 14

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ............................................ 18

*United States v. Tucker*, 249 F.R.D. 58 (S.D.N.Y. 2008) ............................................ 7, 8

*United States v. W.R. Grace*, 434 F. Supp. 2d 869 (D. Mont. 2006) ............................................ 9

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ............................................ 17, 19

*United States v. Weigand*, 520 F. Supp. 3d 609 (S.D.N.Y. 2021) ............................................ 7

*United States v. Weisberg*, No. 08 Cr. 347 (NGG),
  2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ...................................................... 8, 9

## PRELIMINARY STATEMENT

Defendants Sung Kook "Bill" Hwang and Patrick Halligan ask the Court to issue Rule 17(c) subpoenas to eleven financial institutions (the "Counterparties") for documents, data, and communications responsive to more than twenty requests (the "Proposed Subpoenas"). ECF Doc. Nos. 79 and 80. The breadth of the Proposed Subpoenas reflects the defendants' aim to discover anything and everything the defendants' Counterparty victims may possess that the defendants might imagine they want, with little regard for what materials actually exist and with scant consideration of how the requested records might actually relate to the issues the jury will decide. The defendants appear to hope the Court will permit them now to gather as many records as possible and figure out later whether any of their defense theories can be supported by evidence.

But Rule 17 does not empower the defendants to conduct broad discovery, let alone afford the defendants a right to explore freely the files of their victims in search of a defense strategy; as the Supreme Court held in *United States v. Nixon*, 418 U.S. 683 (1974), Rule 17 subpoenas can seek only relevant, admissible, and specific evidence—in other words, identified evidence that the defendants intend and are able to introduce as exhibits at trial. Here, the Subpoenas are replete with requests for irrelevant and inadmissible evidence, including, among other things, requests for documents and communications designed to shift the focus of trial from the crimes of the defendants to the actions of the Counterparties. Because the defendants' requests fail to satisfy the "strict standard" set forth in *Nixon*, *see United States v. Shah*, No. 19 Cr. 833 (SHS), 2022 WL 1422252, at *3 (S.D.N.Y. May 5, 2022), Hwang's motion should be denied and the Proposed Subpoenas should not be issued.

1

## FACTUAL BACKGROUND

From early 2020 through March 2021, Hwang, the founder and principal of Archegos Capital Management, L.P. and its affiliated funds and entities ("Archegos"), and Halligan, its Chief Financial Officer, operated Archegos through systematic fraud. During that time, Archegos's capital increased from approximately $1.5 billion to more than $35 billion, while the total size of Archegos's market positions, including investments made with money borrowed from the Counterparties, grew from approximately $10 billion to more than $160 billion.

The defendants' frauds rested on two interrelated criminal schemes involving manipulative trading in the marketplace and false and misleading statements to Archegos's Counterparties. *First*, the trading scheme aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio. To achieve his plans, Hwang developed and deployed a variety of techniques to affect the price of stocks, such as purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. Moreover, and in addition to specific days of price manipulation, Hwang caused Archegos to dominate the securities of multiple stock issuers, causing significant artificial increases in the prices of the securities underlying Archegos's long swaps.

To accomplish this scheme, Hwang and his conspirators made use of derivatives known as total return swaps. Transacting in swaps conferred the advantage of concealing the size and extent of Archegos's positions from the Counterparties and from the market as a whole because, unlike equity holdings, Archegos did not have to report large swap positions publicly. At the same time, transacting in swaps allowed Archegos to manipulate the equities markets because, as Hwang knew, the Counterparties themselves typically purchased the stock underlying the swap as a hedge. The defendants' manipulative and fraudulent schemes altered and created artificial prices of various securities linked to Archegos's swap positions and trading.

*Second*, Hwang's trading schemes were enabled and furthered by lies and misrepresentations made to the Counterparties. With Hwang's knowledge, approval, and participation, Halligan and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to the Counterparties. Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. These false and misleading statements were designed to fraudulently induce the Counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos.

In late March 2021, a decline in the prices of a handful of stocks in Archegos's portfolio prompted significant margin calls from the Counterparties. Aware that closing Archegos's positions to raise cash to meet the margin calls would worsen the price pressure that caused the margin calls in the first place, Hwang directed Archegos's traders to engage in a desperate buying spree in an attempt to reverse the price declines of stocks constituting Archegos's core long positions. To support them, Halligan and others attempted to, and at times succeeded in, misleading the Counterparties about Archegos's financial condition and portfolio in order to fund the last-ditch trading effort.

But Hwang's buying spree was not enough; Archegos defaulted on its agreements with the Counterparties. The Counterparties sold the stocks they held in connection with their agreements with Archegos, and the prices that had been artificially supported by the trading directed by Hwang, and funded by lies told to the Counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days.

## PROCEDURAL BACKGROUND

Within days of the collapse of Archegos in March 2021, the U.S. Attorney's Office for the Southern District of New York, in conjunction with the Federal Bureau of Investigation, opened

an investigation of Archegos and its employees for possible criminal wrongdoing. As part of that investigation, and among other materials, the Government obtained records from Archegos's Counterparties, including corporate entities associated with each of the Counterparties named in the Proposed Subpoenas. The Government also obtained trading records from Archegos itself and from Archegos's fund administrator, Citco, as well as trade data from the New York Stock Exchange and NASDAQ.

On April 25, 2022, a grand jury sitting in this District returned an eleven-count indictment charging Hwang and Halligan with violations of Title 18, United State Code, Section 1962(d) (Racketeering Conspiracy) (Count One); Title 18, United State Code, Section 1343 (Wire Fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Ten); and charging Hwang with violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Two); and Title 15, United States Code, Sections 78i(a)(2) and 78ff (Market Manipulation) (Counts Three through Nine). Counts Three through Nine related to securities with the ticker symbols VIAC, DISCA, DISCK, GSX, IQ, TME, and VIPS. The conspiracy alleged in the Indictment also noted that Hwang employed various strategies to manipulate the securities with the ticker symbols, BIDU, FTCH, TCBI, FUTU, and RKT, in addition to those referenced in Counts Three through Nine. *See* Indictment ¶ 21.

The Government subsequently produced in discovery the records it obtained during the investigation from the Counterparties, Archegos, Citco, NYSE, and NASDAQ, among others.

On July 27, 2023, Hwang filed a motion for the issuance of the Proposed Subpoenas. ECF Doc. No. 79. On August 10, 2023, Halligan joined in the motion. ECF Doc. No. 80. The Proposed Subpoenas appended to Hwang's motion related broadly to the securities referenced in the Indictment, which it defined in the Proposed Subpoenas as the "At-Issue Securities." *See, e.g.,* ECF Doc. No. 79, Ex. A.

Trial is set to begin on February 20, 2024.

4

**ARGUMENT**

## I.    Legal Standard

Federal Rule of Criminal Procedure 17(c)(1) authorizes subpoenas for "any books, papers, documents, data, or other objects." "Rule 17(c) was not intended to provide an additional means of discovery." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951); *see also United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018) ("a criminal subpoena should not be used as a discovery device, but instead should be used only as a mechanism for obtaining specific admissible evidence" (citations omitted)). "Because of this, 'courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Rule 16.'" *United States v. Barnes*, No. 04 Cr. 186 (SCR), 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) (citing *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995)). Rule 17 subpoenas are therefore held to a "strict standard" announced by the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974):

> In order to obtain documents prior to trial, the party making the request must demonstrate that:
>
> (1) the documents sought are evidentiary and relevant;
>
> (2) the materials are not otherwise procurable in advance of trial by the exercise of due diligence;
>
> (3) the party seeking documents cannot properly prepare for trial without such production and inspection in advance of trial and the failure to obtain such inspection may tend unreasonably to delay the trial; and
>
> (4) the application is made in good faith and is not intended as a general fishing expedition.

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2019 WL 6647871, at *1 (S.D.N.Y. Nov. 8, 2019) (quoting *Nixon*, 418 U.S. at 699-700 (citation omitted)).

To show that the documents are "evidentiary and relevant," *Nixon* held that the party requesting the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."

5

*Nixon*, 418 U.S. at 700. "This test is the hallmark of Rule 17(c)(2) analysis, and courts in this jurisdiction and elsewhere have repeatedly and consistently applied it to determine whether third-party subpoenas served by defendants must be quashed as unreasonable or oppressive." *Barnes*, 2008 WL 9359654, at *2 (collecting cases); *Skelos*, 2018 WL 2254538, at *1 ("courts in the Second Circuit have almost unanimously applied *Nixon* to subpoenas served on third parties"). Under this test, "[t]he defendant has the burden of specifically identifying the materials sought, and showing that they are relevant and admissible." *Barnes*, 2008 WL 9359654, at *3. "[T]he document[s] sought must *at that time* meet the tests of relevancy and admissibility." *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir. 1965) (emphasis added).

"In order to satisfy the specificity requirement of *Nixon*, the party seeking production of the materials must 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hope that something useful will turn up." *Id.* at *4 (quoting *United States v. Sawinski*, No. 00 Cr. 499 (RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000) (cleaned up)). In other words, the subpoena must be targeted at obtaining "identified evidence" rather than serve as a "general fishing expedition." *Id.* (quoting *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980)). The documents sought cannot "merely be potentially relevant or admissible." *Barnes*, 2008 WL 9359654, at *3.

Importantly, "Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds or would otherwise be inadmissible as evidence at trial." *Skelos*, 2018 WL 2254538, at *2. Thus, "[i]t is well established . . . that Rule 17(c) does not provide a basis for pre-trial 'production of materials whose evidentiary use is limited to impeachment."" *United States v. Kaufman*, No. 13 Cr. 411 (JMF), 2014 WL 2048198, at *10 (S.D.N.Y. May 19, 2014) (quoting *Cherry*, 876 F. Supp. at 553); *see also United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 2292773, at *1-2 (S.D.N.Y. June 4, 2021) ("the potential impeachment of a witness does not provide grounds for issuance or enforcement of a Rule 17(c) subpoena because such materials would only become relevant *after* a witness has testified").

## II.       The Court Should Deny the Defendants' Requests for Rule 17(c) Subpoenas

The Court has a duty to ensure the propriety of Rule 17(c) subpoenas. *See United States v. Bergstein*, No. 16 Cr. 746 (PKC), 2017 WL 6887596, at *3 (S.D.N.Y. Dec. 28. 2017) (collecting cases). The Court should deny the defendants' motion for the issuance of Rule 17(c) subpoenas because the Proposed Subpoenas run afoul of *Nixon*'s requirements that the requested evidence be specifically identified, relevant, and admissible at trial.[1]

### A.   The *Nixon* Standard Applies

As an initial matter, the Court should apply the *Nixon* standard in considering the defendants' request for the issuance of the Proposed Subpoenas. The defendants ask the Court to apply a more relaxed standard set forth in *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), and followed in *United States v. Weigand*, 520 F. Supp. 3d 609, 613 (S.D.N.Y. 2021). ECF Doc. No. 79 at 4-5. But "the Second Circuit and district courts in this Circuit have almost unanimously deviated from *Tucker* and applied the *Nixon* standard to Rule 17(c) subpoenas requested by a defendant." *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2022 WL 485031, at *1 n.2 (S.D.N.Y. Feb. 16, 2022) (internal quotation marks and citations omitted); *see United States v. Goel*, No. 22 Cr. 396 (PKC) (S.D.N.Y.), Apr. 27, 2023 Conf. Tr. 34:14-23 (noting "the overwhelming majority of district courts in the Second Circuit have instead applied the *Nixon* analysis to 17(c) subpoenas because the relaxed *Tucker* standard is not the prevailing law, and there's no compelling reason to reject the prevailing law of the circuit regarding defense subpoenas to nonparties"); *United States v. Chastain*, No. 22 Cr. 305 (JMF) (S.D.N.Y.), Oct. 27, 2022 Conf. Tr. 7:15-22 (applying *Nixon* standard of review and rejecting defendant's argument that *Tucker* applied); *United States v. Shea*, No. 20 Cr. 412 (AT), 2022 WL 13847351, at *2 (S.D.N.Y. Oct. 24, 2022) (same); *United States v. Cole*, No. 19 Cr. 869 (ER), 2021 WL 912425, at *3 (S.D.N.Y. Mar. 10, 2021) (applying the *Nixon* standard of review to a trial subpoena served on a third party

---

[1] As discussed herein, the Court should refuse to issue the Proposed Subpoenas pursuant to *Nixon*. For the Court's awareness, however, several of the Counterparties have indicated to Government counsel that they anticipate moving to quash or limit the Proposed Subpoenas if the Court grants the defendants' requests to issue and serve them.

"[c]onsistent with the overwhelming majority of courts in this District, along with the Second Circuit's statement in [*United States v. Bergstein*, 788 F. App'x 742, 746 (2d Cir. 2019)]"). Accordingly, because *Tucker* is inconsistent with the standard set forth in *Nixon* and at odds with the law of this Circuit, the Court should "decline[] to follow *Tucker* and appl[y] *Nixon* itself." *Blondet*, 2022 WL 485031, at *1 n.2.[2]

### B.  The Proposed Subpoenas Do Not Seek Specifically Identified Evidence

The Proposed Subpoenas do not seek specifically identified materials, as they must. "In order to satisfy the specificity requirement of *Nixon*, the party seeking production of the materials must 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hope that something useful will turn up.'" *Barnes*, 2008 WL 9359654, at *4 (quoting *Sawinski*, 2000 WL 1702032, at *2). The defendants' Proposed Subpoenas, however, include no such specificity and instead demand the production of materials responsive to expansive categories.

Indeed, rather than contend with the specifics, Hwang denies he needs to supply them: he argues instead that the "standard" for specificity "is a low one." ECF Doc. No. 79 at 16. But he offers no authority for this assertion, and courts in this District have routinely held otherwise. *See, e.g.*, *Shah*, 2022 WL 1422252, at *3 (describing *Nixon* as a "strict standard"). Moreover, Hwang's related contention that he may supply adequate specificity even without describing the contents of particular documents rests on cases where courts considered requests far more specific than those proposed here. *See* ECF Doc. No. 79 at 16 (citing *Sawinski*; *United States v. Weisberg*, No. 08 Cr. 347 (NGG), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011); and *United States v. Rajaratnam*, 753 F. Supp. 2d 317 (S.D.N.Y. 2011)). For instance, the subpoena in *Sawinski* sought records for a single case involving the DEA Office of Professional Responsibility. *See* 2000 WL 1702032, at *2. The

---

[2] Even under the *Tucker* standard, the Court should deny the defendants' motion for the issuance of the Proposed Subpoenas because, as explained below, the materials requested are not relevant to the issues at trial, and in any event, the Government expects the Counterparties would find the volume of material sought unduly oppressive.

subpoena in *Weisberg* sought billing records, time entries, invoices, and related records drafted by specific people, for work performed by specific individuals, and as limited by a specific time period. *See* 2011 WL 1327689, at *7. And the subpoena in *Rajaratnam* was similarly specific, seeking communications between specifically identified individuals and requests for particular tax returns. *See* 753 F. Supp. 2d at 322-23. Perhaps the only case on specificity cited by Hwang that bears any resemblance to the instant case is *United States v. W.R. Grace*, 434 F. Supp. 2d 869, 874-85 (D. Mont. 2006), where the court still almost exclusively denied the requests for subpoenas, finding the defendants "fail[] to provide any indication that [they] even know the documents sought exist, let alone that they contain relevant information," and instead were "seeking to ascertain the existence of documents within broad catch-all categories," which "Rule 17(c) does not allow."

Here, each of the categories in the Proposed Subpoenas aims to discover into matters of interest to the defendants without regard to whether the materials sought exist and what form they may take. For example:

**Requests 1 through 5.** Requests 1 through 5 collectively seek "all" transaction data for the Counterparties with respect to the At-Issue Securities between January 1, 2020 and March 31, 2021, as well as "documents and communications, including but not limited to chats, emails and text messages" reflecting the hedging activity of the Counterparties with respect to the Archegos swap transactions. ECF Doc. No. 79 at 5. As drafted, these requests do not identify any specific record, memo or communication; the requests are not tailored to Archegos's transactions with each Counterparty (or even with consideration of whether Archegos transacted in each At-Issue Security at any particular Counterparty); and the requests are not tethered to the general period— let alone the precise occasions—when Archegos traded in each of the securities with each Counterparty. Indeed, the "specifics" supplied by Hwang amount to a list of At-Issue Securities and a roughly 15-month time frame. As a result, the defendants' Proposed Subpoenas call for the production of records they ought to know do not exist—such as demanding hedging records from

Goldman Sachs beginning in January 2020 even though Archegos began its Counterparty relationship with Archegos in November 2020, or demanding records of trading in all At-Issue Securities from MUFG even though Archegos only transacted swaps in certain names through MUFG's entities. The defendants propose a one-size-fits-all sweep of the Counterparties' records; *Nixon* demands far more specificity.

Hwang seeks to justify the breadth of the Proposed Subpoenas by asserting that the records generally "are critical to determining whether the swap transactions led to hedging that affected the price of the securities in the way the Government claims" because they may show that the Counterparties "hedged in ways other than purchasing the underlying stock," or that a "Counterparty hedged through multiple transactions over the course of a day," which the defendants claim would undermine the Government's theory. ECF Doc. No. 79 at 6. As discussed below, the requests are not tailored to those objectives. But the defendant's discussion of potential scenarios also makes clear that these requests for hedging records and communications are based on defense theorizing about what kinds of materials may be helpful and not based on some understanding of what records can be found within a Counterparty's files. Indeed, given that the Government has obtained and produced significant volumes of materials from the Counterparties, there is reason to doubt the defendants' various hypotheses will be reflected in the Counterparty files. And the most specific request—for "an electronic blotter reflecting all of [a counterparty's] transactions with respect to the At-Issue Securities, in both swaps and equities"—appears to call for the creation and production of a master record of trades that, based on the Counterparty's responses to grand jury subpoenas, almost certainly does not exist at all.

In short, the defendants' requests "sweep[] too broadly" and "ha[ve] the earmarks of a fishing expedition premised on a mere hope that something useful will turn up." *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 508682, at *5-6 (S.D.N.Y. Jan. 31, 2020) (the defendant's request "seeking all communications that reference [him] over a nine-month period

following [his] arrest" was based on "only speculation" as to what two witnesses "might have said about [the defendant] in text messages and emails" and was therefore improper).

**Requests 6 and 7.** Request 6 seeks documents reflecting how margin requirements were calculated for swap transactions. Request 7 seeks documents related to Archegos's available capacity at the Counterparties. The defendants state that the Government's theory that Archegos "artificially raised stock prices at the end of the trading day in order to obtain excess margin . . . depends on the theory that the Counterparties set margin requirements based on a stock's daily closing price," and thus, evidence "that this was not the case . . . is highly relevant." ECF Doc. No. 79 at 7. The defendants' motion makes no effort to describe what sort of files or records exist that they do not already have. In fact, Hwang's concession that this evidence "is not contained in the agreements produced in discovery," ECF Doc. No. 79 at 7, makes clear that these requests are based on speculation, and not an understanding that the Counterparties possess records that support the defendants' theory.

The defendants further state that they need this margin and capacity information because "if," for example, a Counterparty's "algorithm for setting capacity focused entirely on Archegos's holdings at that bank, without regard for its broader holdings at other banks, that is strong evidence that at least one of the alleged misrepresentations at issue was not, in fact, material." ECF Doc. No. 79 at 8. But Hwang's inclusion of terms like "if" in the motion only emphasizes the speculative nature of these requests. *See Avenatti*, 2020 WL 508682, at *5-6.

**Requests 8 through 14.** Requests 8 through 14 seek broad categories of information related to the Counterparties' risk management and customer onboarding procedures. The defendants seek, among other things, "all" documents concerning the "diligence, monitoring, surveillance or investigative efforts" of the Counterparties for Archegos, and "all communications" between the Counterparties and Archegos in March 2021. The defendants, however, fail to identify the specific documents they seek. Moreover, a request for "all" documents or communications will certainly sweep in entirely irrelevant materials. For that reason, courts in

this Circuit routinely quash subpoenas that "blindly seek[] 'all' documents" like this one. *Barnes*, 2008 WL 9359654, at *4 ("[s]uch a blanket request implicates all of the problems associated with a classic 'fishing expedition'"); *Shah*, 2022 WL 1284550, at *2 ("The request for 'all' such documents and communications without a whiff of specificity as to why she requires them is nothing more than an impermissible 'fishing expedition.'"); *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y.), Jan. 24, 2022 Tr. 68:9-13 ("[I]n seeking 'any and all communications' . . . [the defendant] sweeps too broadly" and "[h]is request has the earmarks of a fishing expedition premised on a mere hope that something useful will turn up.").

**Requests 15 through 20.** Requests 15 through 20 seek documents and communications concerning the revenues and fees that the Counterparties earned through their swap transactions. The defendants seek, among other things, documents reflecting payments the Counterparties received from Archegos related to "any transaction," as well as payments from any party (none of which are specifically identified by the defendants in the Proposed Subpoenas or motion) related to hedging swap transactions. The defendants also seek documents reflecting the "identity and relative placement" of the Counterparties' "top ten clients" and the "total number of clients who purchased total return swaps" for "each month between January 1, 2020 and March 31, 2021," in addition to documents and communications "showing any analysis or discussion of the profitability of Archegos's trading." These requests are simply civil interrogatories disguised as document requests; the appropriate manner to obtain this information is to ask a witness at trial.

In any event, as drafted, these requests suffer from the same deficiencies as Requests 1 through 5—they are insufficiently specific and significantly overbroad. These requests once more assume the existence of records without endeavoring to demonstrate any likelihood that they do. The requests also seek financial data reflecting the Counterparties' dealing with both Archegos and non-Archegos entities alike during a 15-month period when, as noted above, Archegos was not even transacting with certain Counterparties (for example, Goldman Sachs). Moreover, these requests seem to imply falsely that it is necessary for the defendants to obtain records of the

financial relationship between Archegos and the Counterparties from the Counterparties. But the defendants overlook that Hwang owns Archegos and ran it with Halligan's assistance, and in such capacity, was paying the transaction fees associated with his Counterparty trading. If Hwang wishes to know what the Counterparties charged him or what he paid, he need look no further than his own records. In any event, what Hwang really wants to obtain is information about how Archegos compared to other bank clients for use in cross-examining bank witnesses about their potential personal motives to overlook Archegos's fraud, itself an improper basis to demand materials. *See, e.g.*, *United States v. Goel*, No. 22 Cr. 396 (PKC) (S.D.N.Y.), Apr. 27, 2023 Conf. Tr. 33:21-22 ("Documents are not evidentiary for [R]ule 17(c) purposes if their use is limited to impeachment."). Moreover, the Government has gathered financial records from the Counterparties and produced those materials to the defendants as part of its voluminous discovery productions in this case. Thus, Hwang has not carried his burden to demonstrate why the Proposed Subpoenas are "necessary" as required by *Nixon*.

**Request 21.** Request 21 seeks from two Counterparties—Goldman Sachs and Morgan Stanley—documents and communications "concerning any Block Trade, or potential Block Trade of the At-Issues Securities between March 23, 2021 and March 31, 2021." The basis for this request seems to be second-hand reporting of law enforcement investigations into block sales of securities. ECF Doc. No. 79 at 9-10. As the Government conveyed to the defendants by letter on August 16, 2023, the public reporting that underlies the defendant's assumptions contains significant inaccuracies. Moreover, Hwang supplies no reason derived from the evidence in this case to believe any bank personnel improperly tipped short-sellers in connection with the unwinding of Archegos's swaps, and, because doing so would have risked depressing the bank's own recoveries, it is illogical to suspect that bank personnel would have done so.

In any event, the defendants have failed to identify any specific documents or communications sought by this request. Rather, their request, as drafted, seems to contemplate the production of every document and communication "concerning" the sale of 10,000 or more shares

of the At-Issue Securities during an eight-day period in March 2021. Thus, their request bears all the hallmarks of a "fishing expedition" "premised on a mere hope that something useful will turn up." *Avenatti*, 2020 WL 508682, at *5-6 (S.D.N.Y. Jan. 31, 2020). Moreover, that the Counterparties may "have already gathered some of these documents" in response to investigative requests in other matters, as Hwang claims in this motion, ECF Doc. No. 79 at 11, does not transform the defendants' overbroad request into a "sufficiently specific" one, as is required under *Nixon*. *See Skelos*, 2018 WL 2254538, at *3 ("The fact that compliance with a subpoena is easy . . . does not make it sufficiently specific.").

Finally, it is also worth noting that the defendants' theory that Morgan Stanley and Goldman Sachs misbehaved in connection with the sale of blocks of stock impliedly concedes that the Counterparties had blocks of stock to sell to unwind Archegos's swaps, which rests in tension with Hwang's hypothesis that the Counterparties hedged the transactions in other ways.

**Request 22.** Request 22 seeks from Counterparty Morgan Stanley documents and communications "concerning the Viacom Secondary Offering" in March 2021. The defendants state that "[e]vidence showing Morgan Stanley's views on the Viacom stock price and its expectations for the secondary offering" is relevant to the Government's allegation that Archegos's trading created an artificial price in the Viacom stock. ECF Doc. No. 79 at 10. As drafted, however, this request is also overbroad. By its terms, it casts too wide of a net and risks sweeping in documents and communications that arguably "concern" the Viacom Secondary Offering, but have no relevance to the issue of stock price, which is the only theory of relevance presented by the defendants.

### C.  The Proposed Subpoenas Do Not Seek Relevant and Admissible Evidence

The Proposed Subpoenas should also be denied because the defendants cannot satisfy *Nixon*'s relevance and admissibility requirements. *See Barnes*, 2008 WL 9359654, at *3 ("The items sought cannot merely be potentially relevant or admissible."). The Proposed Subpoenas are replete with requests for irrelevant and inadmissible evidence.

14

Once again Hwang aims to relax the *Nixon* standard in his favor, contending that "relevance" is "low burden." ECF Doc. No. 79 at 12. But the cases Hwang cites for this proposition involve much narrower and specific requests, not the type of wide-sweeping and speculative fishing expeditions at issue here. *See, e.g.*, *Bergstein*, 2018 WL 9539846, at *2 (authorizing subpoena, as narrowed by the court, for bank records and a specific final agreement, while denying requests for correspondence as "overbroad fishing expeditions"); *United States v. Carn*, No. 13 Cr. 346 (APG) (GWF), 2016 WL 128138, at *2 (D. Nev. Jan. 11, 2016) (authorizing subpoena to law enforcement agencies for records relating to defendant's property confiscated from a safe on a particular day where defendant alleged the safe contained records showing proof of ownership of a firearm, which, if true, would have exonerated the defendant of firearm charges).

Because Hwang does not describe the records he seeks with specificity, the evidentiary implications of the precise records cannot be assessed with precision. As phrased, however, the Proposed Subpoenas appear likely to return abundant inadmissible materials. For example:

**Requests 1 through 5.** As noted above, Requests 1 through 5 collectively seek all trading data for the Counterparties as well as "documents and communications, including but not limited to chats, emails, and text messages," reflecting the Counterparties' hedging of swap transactions.

Notwithstanding the defendants' claim that these requests are intended to yield evidence relating to whether Hwang "could have affected, or did affect, the market in the manner alleged in the Indictment," the requests as drafted cast a far wider net. The request for "all" transaction data for the Counterparties with respect to the At-Issue Securities would capture the trading of the Counterparties' other clients and proprietary trading of the Counterparties themselves, among other economic activity unrelated to Archegos; the request would also capture trading at times and in stocks and swaps that have nothing to do with the Counterparty's business with Archegos.

In addition to the requests' over-inclusiveness, the requests for "communications," including "chats, emails and text messages," are likely to capture inadmissible hearsay. *See United States v. Brown*, No. 95 Cr. 168 (AGS), 1995 WL 387698, at *10 (S.D.N.Y. June 30, 1995) (noting

15

that interview "memoranda would, of course, be hearsay, and inadmissible as evidence at trial"). The defendants claim that "all of the documents sought would very likely be admissible as business records." ECF Doc. No. 79 at 13. They are mistaken: the case law is clear that "[a]n email 'created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule.'" *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17 Civ. 598 (BKS/CFH), 2022 WL 2643583, at *16 (N.D.N.Y. July 8, 2022) (quoting *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008)). Otherwise, "virtually any document found in the files of a business which pertained in any way to the functioning of that business would be admitted willy-nilly as a business record." *United States v. Ferber*, 966 F. Supp. 90, 99 (D. Mass. 1997). For emails to be admissible as business records, there must be an indication that the particular "activity occur[red] regularly," such as "weekly update" emails, and not "one-off" statements, like those that would likely be at issue here. *In re Lyondell Chem. Co.*, No. 9-10023, 2016 WL 6108526, at *2-5 (Bankr. S.D.N.Y. Oct. 19, 2016). Thus, the materials sought through this request, among others, would be inadmissible at trial.

  **Requests 6 and 7, and 8 through 14.** Requests 6 and 7 seek broad categories of documents relating to how the Counterparties calculated margin requirements and Archegos' capacity levels. Requests 8 through 14 seek broad categories of documents relating to the Counterparties' risk management and customer onboarding procedures. These requests should be denied as irrelevant because, as the defendants concede, the defendants are requesting these records to show the Counterparties did not "actually rel[y]" on the defendants' misrepresentations, and that the Counterparties were to blame for the Archegos collapse, ECF Doc. No. 79 at 13—both of which are improper.

  It is well-settled that reliance is not an element of fraud. *See United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017). Thus, the defendants' argument that Requests 6 and 7 would allow the defendants to "assess the extent to which Counterparties actually relied on the alleged misrepresentations in setting trading capacity limits and calculating margins" should be rejected.

ECF Doc. No. 79 at 8. The defendants further argue that these records will provide "strong evidence" that the alleged misrepresentations were "not, in fact, material," but this argument conflates reliance and materiality in a way the Supreme Court and Second Circuit have rejected. *See Neder v. United States*, 527 U.S. 1, 24-25 (1999) (holding that "materiality" is evaluated under an "objective test, in which the Court must examine the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." (internal quotation marks omitted)); *United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (quoting *Neder* and holding that "common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal fraud statutes").

For similar reasons, Requests 8 through 14 which focus on the purported lapses in "due diligence" performed by the Counterparties also seek irrelevant information. It is black-letter law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to a fraud charge. *Frenkel*, 682 F. App'x at 22 (rejecting defendant's argument that district court erred in precluding him from arguing victim bank's negligence in failing to conduct sufficient diligence in connection with issuing loan because "a victim's negligence is not a defense under the federal fraud statutes"); *United States v. Kaufman*, 617 F. App'x 50, 52 (2d Cir. 2015) (in bank fraud and bank fraud conspiracy case, upholding instruction that victim negligence, carelessness, or gullibility is no defense); *United States v. Isola*, 548 F. App'x 723, 724-25 (2d Cir. 2013) (district court properly excluded allegedly habitual negligence of financial institutions that were victims of fraud; evidence of a particular lender's unreasonableness irrelevant to materiality of false statements, which is an objective question); *see also United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (adopting rule that victim's lack of reasonableness or negligence is no defense to fraud). Thus, in addition to being overbroad and fishing expeditions, the defendants' request for records concerning the "onboarding procedures" and "due diligence" performed by the Counterparties should be denied as irrelevant.

**Requests 15 through 20.** As noted above, Requests 15 through 20 seek documents concerning the revenues and fees that the Counterparties earned through their swap transactions. These requests similarly seek to shift the blame to the Counterparties and argue, impermissibly, that the Counterparties engaged in the swap transactions, not because of Archegos's misrepresentations, but because of the "lucrative fees earned by the Counterparties." ECF Doc. No. 79 at 9. But, as explained above, reliance is not an element of fraud, *see Weaver*, 860 F.3d at 96, and thus, the extent to which the Counterparties were motivated to continue their relationship with Archegos because of any "lucrative fees" is irrelevant to materiality.

**Request 21.** As noted above, Request 21 seeks from Goldman Sachs and Morgan Stanley documents and communications concerning any "Block Trade, or potential Block Trade of the At-Issues Securities from March 23, 2021 through March 31, 2021." Hwang supplies no reason to believe this conduct occurred in connection with the unwinding of Archegos's swaps, and, indeed, the Government has informed him by letter that his assumptions about the accuracy of public reporting on the Government's investigation is mistaken. But even if this material did exist, its theoretical use would be as impeachment material for certain Counterparty witnesses who allegedly engaged in this conduct, not as proof of any defense or counterproof to any element of any charged offenses. Because Rule 17 is not the correct mechanism for obtaining these materials in advance of trial, these requests are improper. *See Maxwell*, 2021 WL 2292773, at *1-2 ("the potential impeachment of a witness does not provide grounds for issuance or enforcement of a Rule 17(c) subpoena"); *see Kaufman*, 2014 WL 2048198, at *10 (same).

**Request 22.** Finally, Request 22 seeks from Morgan Stanley documents and communications concerning the Viacom Secondary Offering. As noted above, this request is overbroad. In addition, in seeking communications, as well as investor and board presentations regarding "how the deal would affect the stock price," this request calls for the production of inadmissible hearsay, and thus should be denied on that basis as well. *See Brown*, 1995 WL 387698, at *9-10.

18

**CONCLUSION**

*Nixon* holds that Rule 17 may be used to gather specific, admissible evidence. The defendants' Proposed Subpoenas are broad and blunt, and they fall well below the "strict" standard that controls in this Circuit. Accordingly, the Government respectfully requests that the Court deny the defendants' motion to issue the Rule 17(c) subpoenas.

Dated: New York, New York
September 13, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____

Matthew Podolsky
Alexander Rossmiller
Alexandra Rothman
Andrew Thomas
Assistant United States Attorneys