UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                              :

UNITED STATES OF AMERICA

                              :

        - v. -                        :         No. 22 Cr. 240 (AKH)

                              :

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,                 :

           Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EVIDENCE AND COMPEL DISCOVERY

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    A.   Hwang's Trades through EMSX ................................................................................. 3

    B.   The Government Obtains Order and Execution Data ................................................. 5

    C.   The Government's Discovery Productions .................................................................. 8

    D.   The Defendants' Requests for Data ......................................................................... 10

    E.   The Government Refers to EMSX Data .................................................................... 13

    F.   The Government Identifies Its Production Error ....................................................... 14

DISCUSSION ............................................................................................................................... 15

    A.   Applicable Law ........................................................................................................ 15

    B.   The Motion to Preclude Should Be Denied .............................................................. 16

        1.   The Government Did Not Act in Bad Faith .................................................. 17

        2.   Any Prejudice Can Be Cured by an Adjournment ....................................... 25

    C.   No Further Inquiry Is Warranted .............................................................................. 30

CONCLUSION ............................................................................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hudson v. Michigan*,
  547 U.S. 586 (2006)..................................................................................... 21, 32, 33
*Pennsylvania Bd. of Probation and Parole v. Scott*,
  524 U.S. 357 (1998).............................................................................................. 21
*United States v. Ahuja*,
  No. 18 Cr. 328 (S.D.N.Y.) ................................................................................... 26
*United States v. Alvarez*,
  987 F.2d 77 (1st Cir. 1993) .................................................................................. 19
*United States v. Calandra*,
  414 U.S. 338 (1974).............................................................................................. 21
*United States v. Chang*,
  574 F. Supp. 3d 94 (E.D.N.Y. 2021) ................................................................... 34
*United States v. Euceda-Hernandez*,
  768 F.2d 1307 (11th Cir. 1985) ...................................................................... 20, 33
*United States v. Graham*,
  No. 99 Cr. 271 (CFD), 2000 WL 1902425 (D. Conn. Dec. 21, 2000) ............ passim
*United States v. Guerrero*,
  No. 09 Cr. 339 (RWS), 2010 WL 1790400 (S.D.N.Y. Apr. 30, 2010) ..... 20, 21, 29
*United States v. Leon*,
  468 U.S. 897 (1984).............................................................................................. 21
*United States v. Marshall*,
  132 F.3d 63 (D.C. Cir. 1998)................................................................ 20, 21, 29, 33
*United States v. Mason*,
  No. 06 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008)...................... 26
*United States v. Miller*,
  116 F.3d 641 (2d Cir. 1997).................................................................................. 20
*United States v. Monsanto Lopez*,
  798 F. App'x 688 (2d Cir. 2020) ........................................................ 20, 21, 29, 33
*United States v. Nejad*,
  487 F. Supp. 3d 206 (S.D.N.Y. 2020)............................................................. 26, 27
*United States v. Pineros*,
  532 F.2d 868 (2d Cir. 1976)................................................................... 20, 29, 33
*United States v. Sanchez*,
  912 F.2d 18 (2d Cir. 1990).................................................................................. 29
*United States v. Steiner*,
  No. 19 Cr. 295 (HG), 2022 WL 2390943 (E.D.N.Y. July 1, 2022)...................... 33
*United States v. Tomasetta*,
  No. 10 Cr. 1205 (PAC), 2012 WL 896152 (S.D.N.Y. Mar. 16, 2012).................. 34
*United States v. Wynder*,
  No. 20 Cr. 470 (S.D.N.Y.) ................................................................................... 26

Rules

Rule 16 ................................................................................................................................ *passim*

## PRELIMINARY STATEMENT

The Government respectfully writes to oppose the defendants' motion to suppress two files obtained from Archegos's execution management system, Bloomberg EMSX (ECF Docs. 110-112, 114 ("Mot.")).

The Government made a mistake: it failed to produce two Bloomberg EMSX files at the start of the case. The Government possessed the Bloomberg EMSX files at the time of its initial discovery productions and it omitted those files from the set of Bloomberg search warrant material it provided to the defense. But the Government intended to produce those files and erroneously believed the data had been produced. If the Government had appreciated at any point that the defense did not have the two Bloomberg EMSX files, Government counsel would have done precisely what they did when they recognized the error last week: produce the files immediately.

The defendants aim to transform this inadvertent discovery error into an evidentiary advantage and a distorted trial. If granted, the defendants' motion would deprive the jury of relevant facts concerning Archegos's trading, resulting in an incomplete and misleading factual presentation. If granted, the defendants' motion would deprive the Government of the opportunity to offer meaningful portions of its anticipated expert testimony. And if granted, the defendants' motion would deprive the public of a verdict in this case based on the merits. The decisional law of this Circuit provides no support for such an extreme outcome, and though the Federal Rules of Criminal Procedure empower the Court to fashion relief when discovery lapses occur, fairness and authority counsel that a brief adjournment, if requested by the defense, would suffice to resolve any prejudice.

The Government's error, while unfortunate, does not undermine the defendants' opportunity to fairly try their case. For one thing, the Government caught and corrected the error

1

more than six weeks before trial is scheduled to begin and, in all likelihood, more than twelve weeks before any defense case would commence. The defense, therefore, has substantial time to make use of the files. For another, the defense exaggerates the volume and novelty of the data, essentially double-counting it. Not only do the two Bloomberg EMSX files substantially overlap with each other and relate to the very same orders and executions, they include data about orders in multiple stocks beyond those at issue in this trial. One set of the Bloomberg EMSX data for the stock tickers at issue in this case totals about 4.4 gigabytes of data—less than a third of the number put forth by the defense. Finally, significant pieces of even that data have been previously produced in other forms.

Government counsel regret the error in failing to timely produce the Bloomberg EMSX files. But the error was inadvertent, it was fixed within hours of its discovery, and it took the form of two discrete files that the defense can use immediately—and, indeed, were apparently able to make use of over the span of a weekend. Though the defendants do not seek an adjournment— presumably because they hope for the windfall of avoiding a trial on the evidence—that is the remedy the law favors in this circumstance. Suppressing the files, on the other hand, would punish the United States for a mistake of counsel, unjustly reward the defendants, and undermine the jury's ability to fairly and justly try the defendants on the Indictment's serious charges.

## BACKGROUND

From early 2020 through March 2021, the defendants operated Archegos Capital Management, L.P., and its affiliated funds and entities ("Archegos") through systematic fraud. In late March 2021, Archegos collapsed, causing more than $100 billion in apparent market value for nearly a dozen companies to disappear within a matter of days and causing billions in losses to Archegos's trade counterparties. Just days after the collapse, the U.S. Attorney's Office for the

Southern District of New York, along with the Federal Bureau of Investigation, opened an investigation into Archegos and its employees for possible criminal wrongdoing.

## A.        Hwang's Trades through EMSX

The EMSX records at the center of the defendants' motion concern a discrete, but significant, piece of evidence of Hwang's trading. The Government expects to prove at trial that Hwang directed swaps trades that led to immediate and observable impacts in the American stock market. The EMSX records relate to data captured in the middle of Hwang's trading activity:

Hwang, typically by Instant Bloomberg message, would direct traders to place swap trades by giving them instructions to buy or sell certain stocks. As reflected in a February 25, 2021 Instant Bloomberg exchange, Hwang's instructions at times included sizes and price limits.

---

02/25/2021 14:45:40 UTC BILL HWANG (BHWANG@Bloomberg.net) posted: PETER BUY $50 MIL. TME WITH 26.4 LIMIT PLEASE.

02/25/2021 14:45:46 UTC PETER DESANTO (PDESANTO@Bloomberg.net) posted: got it

02/25/2021 14:49:20 UTC BILL HWANG (BHWANG@Bloomberg.net) posted: PETER ON VIPS LET'S BE MORE AGGRESSIVE TO BUY MORE WITH 36.8 LIMIT. :-)

02/25/2021 14:49:27 UTC PETER DESANTO (PDESANTO@Bloomberg.net) posted: got it

02/25/2021 14:52:05 UTC PETER DESANTO (PDESANTO@Bloomberg.net) posted: +$17mm

02/25/2021 14:53:30 UTC BILL HWANG (BHWANG@Bloomberg.net) posted: PETER THANKS. TME TO 26.5

---

(*See* Exhibit A to the January 12, 2024 Declaration of AUSA Andrew Thomas ("Thomas Decl.") (February 25, 2021 Instant Bloomberg).

After receiving Hwang's directions, Archegos traders would enter those trades into a computer program called EMSX, which offered Archegos the ability to electronically communicate orders to its counterparties. To place an order, the Archegos traders would create a "parent order" in EMSX that included the various criteria Hwang had decided for the trade, such as the ticker symbol, whether it was a swap or equity, the quantity of the order, applicable limits,

and any algorithmic execution requests, and would assign either all or part of that "parent order" to a particular counterparty for execution. Once the order was placed, the counterparty would electronically confirm it had received the order and would begin to try to fill the order by transacting in equities in equal proportion to the swap order.[1] For large orders—and thus for the typical Archegos order—the counterparties' algorithms would divide up the "parent order" into smaller "child orders" that would become bids or offers in the stock market. Although these equity transactions constituted hedges to the eventual swaps, Archegos determined whether and how they would be executed by electronically directing the trades through EMSX.

When equity trades occurred in the stock market, the exchange that cleared the trade would electronically confirm the trades to the broker that had introduced the trade, which, in turn, would electronically notify Archegos through EMSX that a part of the order had been filled at a specific time and size. As a result of this electronic order confirmation process, Archegos's traders—including Hwang—followed along in real time as a specific broker traded equity shares, pursuant to Hwang's directions, and reported back their progress. Indeed, as a practice, Hwang had his traders provide him with summary updates about how his orders were being filled during the course of the day, based on the activity reflected on their EMSX screen.

---

[1]     Witnesses from multiple counterparties will testify at trial that, for Archegos's swaps, a precondition to filling a swap order was that the bank first purchased an equivalent amount of equity on an exchange like Nasdaq or NYSE; only if the bank first purchased an equity share would it then confirm the swap, using the equity execution to price the swap.

For example, a January 26, 2021 Instant Bloomberg thread reflects Hwang's requests:

```
01/26/2021 15:44:38 UTC BILL HWANG (BHWANG@Bloomberg.net) posted: Daiki, trade update now and
every hour on the half hour please. so now then 11:30 next.

01/26/2021 15:44:48 UTC DAIKI TANIGUCHI (DTANIGUCHI2@Bloomberg.net) posted: Got it, sounds
good

01/26/2021 15:46:06 UTC DAIKI TANIGUCHI (DTANIGUCHI2@Bloomberg.net) posted: **Orders
Update**
Side Stock Limit Last Px Filled Order Size
B FUTU MKT 105.78 $ 45.9mn $ 107mn Working
SS FUTU MKT 105.78 $ 0mn $ 21mn
B GSX 100.00 98.42 $ 59.3mn $ 88mn Working
B DISCK 35.30 34.85 $ 8.1mn $ 30mn Working
B VIPS 28.60 28.53 $ 7.1mn $ 31mn Working
B VIAC 49.80 50.16 $ 2.3mn $ 31mn off limit
B TME 26.90 27.00 $ 10.9mn $ 30mn off limit
B FTCH 61.00 60.71 $ 7mn $ 30mn Working
B TCBI 64.00 64.17 $ 1.9mn $ 5mn off limit
```

(*See* Exhibit B to the Thomas Decl. (January 26, 2021 Instant Bloomberg)).

At the end of every day, Archegos's operations staff would export certain execution information from EMSX to their order management and bookkeeping systems. Archegos's daily blotter would summarize the daily trading that had occurred in each ticker but would not include a record of each "child order" execution that had occurred in connection with its "parent order," though that information was available to it. Finally, banks would send swap confirmations that would confirm the existence of a swap based on the market executions, and note other details, such as duration and fees, that applied based on the parties' contractual agreements.

## B.    The Government Obtains Order and Execution Data

In its investigation, the Government sought records from every point in the lifecycle of Archegos's trades. The Government obtained Instant Bloomberg messages that reflected Hwang's trading instructions. The Government obtained records from Archegos's counterparties relating to trades with Archegos. The Government obtained stock exchange data from Nasdaq and NYSE for the relevant stocks, and in the lead-up to trial obtained various national stock trade datasets that captured every equity execution occurring through the National Market System for a particular

time period. The Government obtained Archegos's own records of its trading, including its trade blotter. And the Government received copies of EMSX data Archegos furnished to the Securities and Exchange Commission, which Archegos's counsel represented it "generated from Bloomberg's EMSX order entry system with the fields responsive" to the SEC's request. (Exhibit C to the Thomas Decl. (Nov. 8, 2021 Letter from King & Spalding to the SEC)).

In addition to those records, on September 27, 2021, the Government sought and obtained a search warrant for Bloomberg EMSX data relating to EMSX activity by Hwang and Archegos's traders. (Ex. A to the Estes Decl., ECF Doc. 111, at 5). The same warrant sought Bloomberg communications to or from the defendants and others, from January 1, 2020 through September 27, 2021. (*Id.* at 4-5).

Bloomberg produced two files in response to the EMSX data request. First, on November 12, 2021, Bloomberg produced an approximately 7.42 gigabyte file. Second, on November 23, 2021, Bloomberg produced an approximately 6.45 gigabyte file. Bloomberg produced each file in "comma separated value" format, which is a database spreadsheet format readable by various computer programs. The Government has since learned that the first file represented a "route view" of Archegos's orders and executions and the second file represented a "parent order view" of Archegos's orders and executions, but that the two files relate to the same orders and executions and capture substantially identical information. These "parent view" and "route view" files are the subject of the defendants' motion.

In their original form, the Bloomberg EMSX files each contained all of Archegos's order and execution data for every stock associated with Archegos trades for the specified time period. On or about November 16, 2021, the Government requested and received the assistance of a vendor to divide the information by stock ticker, so that the Government could evaluate trading in relation

to specific stocks. The vendor split the "route view" file into approximately 200 smaller spreadsheets, such that each smaller spreadsheet generally corresponded to Archegos's trading in one security.

The Bloomberg EMSX files relate to the same swap trades reflected in Archegos's trade blotter and in the EMSX records Archegos supplied to the SEC. The various records include differing amounts of detail but those details relate to the same swap orders. The Bloomberg EMSX files contain many more entries than the EMSX files produced by Archegos because they include data on how the pieces of Archegos's orders were filled in real time: An order for 1 million shares of VIAC, for example, may have been filled through 10,000 executions of 100 share lots. Nearly all of those individual executions can be found, in anonymized form, in the National Market System data, too.[2] By associating the small market orders reflected in the National Market System data to the larger parent orders reflected in Archegos's trade blotter, however, the Bloomberg EMSX data highlights what Hwang could see and access about his orders and how his orders accumulated to the totals reflected in Archegos's other recordkeeping. The Bloomberg EMSX data also reflects order handling instructions, such as the use of particular algorithms, and certain execution metadata, such as the execution venue.

The Bloomberg EMSX data is not the only data set produced in discovery that reflects "child order" executions. For example, order and execution data obtained from Morgan Stanley, one of Archegos's counterparties, reflects substantially similar information as that in the Bloomberg EMSX files and connects Archegos parent orders to market executions. (*See* Ex. D to the Thomas Decl. (reflecting sample comparison of the two datasets)). The Government estimates

---

[2]     The Government currently expects expert testimony to show that approximately 95% of Archegos's EMSX orders can be connected to executions shown in the market data.

that the Morgan Stanley execution data accounts for approximately 21% of the Bloomberg EMSX files in the relevant tickers. Other counterparties produced trading records with varying levels of detail, supplying additional information about Archegos orders but typically without including "child order" execution data.

## C.     The Government's Discovery Productions

The Government's extensive investigation resulted in terabytes of information obtained from a wide array of sources, in addition to records of dozens of interviews. The Government took its obligation to produce Rule 16 material seriously and, in anticipation of any future discovery obligations, the Government separately tracked (a) incoming productions obtained by subpoena or information request; (b) data and items obtained from search warrants; and (c) witness interview notes. Further, as a default practice, the Government systematically transferred the data it received to a document review platform for evaluation and later production to the defense, and the Government logged and organized records of witness interviews in digital folders.

The Government's efforts to catalog its evidence caught almost all discoverable materials but missed the Bloomberg EMSX files. As of January 2022, an excel file used by personnel at the U.S. Attorney's Office to track the status of search warrant materials reflected that Bloomberg communication returns had been sent to the Government's document review platform. The tracker, however, omitted any reference to Bloomberg EMSX data. Accordingly, even as the Government made use of the file to track other search warrant returns, the Government failed to recognize that the Bloomberg EMSX data had not been uploaded to the review platform. Instead, the EMSX data remained where it had been saved when a paralegal, who has since left the U.S. Attorney's Office, downloaded the EMSX data to the Government's electronic case file in a folder called "2021.09.27 Bloomberg Warrant (21 MAG 9335) (Full Communications Return -- PP)." The folder name did

not accurately describe the folder's contents, as the spreadsheets from Bloomberg did not contain "communications" and were not "potentially privileged" as the notation "PP" would indicate.

After the April 25, 2022 indictment in this case, the Government began to assemble and produce discovery. To do so, AUSAs and paralegals assisting in the case requested exports of discoverable materials from the document review platform, including responsive search warrant results and grand jury materials. Because not every item obtained by the Government could be transferred to the document review platform—such as portions of cellphone extractions—the Government also endeavored to identify and collect any materials outside of the review platform that needed to be produced.

The Government subsequently made more than twenty discovery productions, many of which have included trade order and execution information. For example:

- On May 5, 2022, the Government produced, among other things, the warrant and supporting affidavit for the Bloomberg EMSX data and communications, which reflected that the Government had sought, "All Bloomberg Execution Management Data associated with the Subject Accounts or any archegoscapital.com account, including but not limited to records of stock, option, and swaps trades with broker-dealers." The Government production also included market data from Nasdaq and the NYSE for the relevant stocks at issue in this case. (Estes Decl., Ex. A at 5).

- On May 23, 2022, the Government produced nearly a terabyte of data that included, among other things, records from Archegos's counterparties relating to trades with Archegos, as well as Archegos's own records of its trading, which in turn included its trade blotter and its collection of EMSX data.

- On June 24, 2022, the Government produced additional records from Archegos and its counterparties, which included updated versions of Archegos' collection of EMSX data.

- On August 4, 2022, the Government produced roughly 24 gigabytes of data that included, among other things, the responsive communications from the Bloomberg search warrant, as well as supplemental records from Archegos's counterparties relating to trades with Archegos. (Estes Decl., Ex. C at 1-3). Of particular note, this production included ten Excel files that had been produced by Morgan Stanley to the Government on June 29, 2022, and which reflected detailed records of Archegos's trading with Morgan Stanley, as described above. (*Id.* at 3).

- On December 8, 2023, in connection with its disclosure of expert reports, the Government produced, among other things, national stock trade datasets that captured every equity execution occurring through the National Market System for a particular time period, which had been obtained in connection with work on expert notices.

- On December 13, 2023, the Government facilitated the defendants' access to the NYSE integrated feed, which had been obtained in connection with work on expert notices, and which captured order and execution information for trades on the NYSE.

- On December 20, 2023, the Government made a supplemental production of national stock trade datasets, which had been obtained in connection with work on expert notices.

As discovery progressed, the Government tracked what it had done and what remained to be done. To this end, the Government maintained a production log and a spreadsheet that reflected the status of search warrant materials. As of July 2022, the Government's search warrant spreadsheet reflected that the "Bloomberg SW" had been "Included in Export One," referring to a particular request to the Government's database vendor to create a production set of materials on the platform. But, as with the earlier tracker, this entry was only partially correct—only the Bloomberg communication materials had been uploaded to the platform and thus only Bloomberg communication materials had been included in the export.

## D.    The Defendants' Requests for Data

The Government has reviewed its emails and notes of calls with defense and has not identified any email or note of a defense request for Bloomberg EMSX data or any inquiry about whether the Government had obtained EMSX data as called for by the Bloomberg search warrant. The Government observes this fact, not to cast blame on the defense, but to underscore that the Government had no reason to question the information in its records indicating that the files had been produced.

The Government acknowledges that, from the start of the case, the defendants requested Rule 16 discovery. In particular, they made specific requests for trade and hedging data obtained from counterparties. For example:

- In an October 18, 2022 letter, the defense wrote:

> [W]e note that the Archegos-related trading data that the Government obtained from the Banks and has produced to us provides varying levels of detail. For instance, at least one Bank (Goldman Sachs) appears to have provided only monthly position reports. Other Banks provided daily trade data, but some without differentiating between cash and swap trades, others without including order-level transaction times and/or lots, and, in at least one case, without specifying the security being traded. Moreover, we have not located any trade data at all from Bank of Montreal, Jefferies, or Wells Fargo. Accordingly, please clarify whether the Government has provided all trading data in its possession, and, if there is more, please supplement the production accordingly. Of course, we reserve all of Mr. Hwang's rights to seek relief from the Court, including, if necessary, subpoenas to the Banks to compel production of a more complete set of trading data.

(Estes Decl., Ex. D at 2).

- In a December 22, 2022 email, the defense wrote:

> Regarding **trading data**, it would be helpful to know precisely what the Govt subpoenaed from the counterparties. To be completely transparent, and as I am sure you understand, we need counterparty trade execution data, including order lots and times, for all Archegos-related trades and for all hedging transactions related to those trades. As best we can tell from the CPs' cover letters, we only have hedging data from MUFG and UBS. And as to Archegos-related trades, there is no consistent set of data across banks; by way of example, some data is missing order-level lots and times; no differentiation is made between cash and swap trades in some instances; some data is provided on a monthly instead of a daily level; and in at least one case, the name of the security being traded is missing. We would appreciate knowing whether there is or will be a uniform set of Archegos-related trading data and, if not, whether, as you said in your correspondence, you "may be willing to re-engage with counterparties to request additional or clarifying material to assist your preparations for trial.

(Estes Decl., Ex. H at 1 (emphasis in original)).

- On a February 28, 2023 call, the defense stated, in substance and in part, that they were continuing to have trouble making sense of the trade data, and they wondered whether they had received any Nasdaq data. (Estes Decl., Ex. K at 2).

The Government took the defendants' requests seriously and at various points, in response to defense questions, reconfirmed the completeness of various aspects of its productions. For example, in October 2022, after a defense request regarding certain counterparty records, the Government identified limited gaps in its production of counterparty materials, namely, materials that the Government had obtained after the case was charged. An AUSA working on the matter wrote the paralegals for assistance in comprehensively gathering remaining discovery items and in assuring that any future items were identified and produced as they were received:

> [I]t looks like at least two sets of documents that we received during the summer were never put in a queue for production. We're addressing those per the below, but going forward we need to make absolutely sure that *anything* we receive in that case is foldered as an incoming production (or agent report, or evidence, or whatever) **and also** *presumptively put in a to-be-produced folder* that we check regularly. To the extent we receive productions that go into [the document review platform] and don't substantively exist on the share drive, whoever sends the materials to [the document review platform] should also please send the AUSAs an email noting that that's been done, and then save a copy of that email in the to-be-produced file so we don't lose track of the relevant materials. I think there was kind of a gap where we had produced a bunch of stuff but hadn't yet transitioned to the kind of post-charge system where everything gets saved or logged both in incoming and to-be-outgoing.

(Ex. E to Thomas Decl. (emphasis in original)). The Government thereafter attempted to confirm that it had produced every record it had received from the counterparties and from other investigative agencies and to produce any it had missed in its initial productions. That project culminated in Government productions on November 10, 2022 and November 23, 2022. And, more recently, defense counsel requested that the Government confirm with the SEC and CFTC

that those agencies had provided the Government all the relevant records they had gathered. The Government did so and, in the process learned that the CFTC had obtained certain Financial Industry Regulatory Authority ("FINRA") records that the CFTC had not shared—and would not share—with the Government. Though the Government had no obligation to do so, it then sought the FINRA records from FINRA directly and produced them to the defense.

As reflected by the defense's own notes and correspondence (*see* Estes Decl., Ex. H), the parties' interactions in 2022 and 2023 about discovery of trading records centered on two categories: "market data," such as that from the NYSE, and trade and hedging records from counterparties, such as those from Morgan Stanley. The defense repeatedly expressed its view that the counterparties must have more records and that the defense would seek them through Rule 17 subpoenas if the Government did not possess them. But the Government had no further records from counterparties to supply: the Government timely produced complete sets of materials corresponding to those categories and accurately and honestly represented to defense counsel that it had done so. The defense ultimately moved for the issuance of such subpoenas on July 27, 2023. Notably, the defense did not include in its requested subpoenas a subpoena directed to Bloomberg.

## E.     The Government Refers to EMSX Data

The Government's disclosures and communications with defense counsel demonstrate that Government counsel believed, in good faith, that the EMSX data had been produced. Based, in part, on the mistaken understanding that the defense had the EMSX records, Government counsel has repeatedly remarked that the records in the case demonstrate that Hwang's swap trading directly led to equity transactions in the market and that Hwang's swap counterparties traded in equities in equal proportion to Hwang's swaps. Most explicitly, the Government referenced the Bloomberg EMSX data in its December 8, 2023 expert disclosures. The Government noted, for instance, that its expert's data sources included "Archegos Order and Execution Records," which

consisted of, among other things, "the Archegos order information captured by EMSX, the Bloomberg order execution management system." (*See* Battalio Disclosure, Exhibit F to the Thomas Decl., at 2). The Government further disclosed that two of its experts, Professor Battalio and Dr. Taveras, would opine that Archegos's swap transactions "can be associated with equity transactions" by "matching" information such as price, quantity, time, order handling, and routing information, "from the Archegos Order and Execution Records to market trade data." (Battalio Discl. ¶ 5; Taveras Disclosure ¶ 5, Exhibit G to the Thomas Decl.). Certain of these fields—that is, order handling and routing information—were present only in the Bloomberg EMSX data (and not the EMSX data Archegos produced to the SEC). Had the Government known that it had not produced that data, this disclosure would not have made sense.

## F.    The Government Identifies Its Production Error

The Government first recognized it might have failed to produce the Bloomberg EMSX data on the evening on January 4, 2024. That evening, Government counsel endeavored to mark a subset of the EMSX trade data as a potential Government trial exhibit. Counsel, however, could not readily locate an outgoing production Bates number that corresponded to the Bloomberg EMSX data. Because the Government had, it believed, previously uploaded the Bloomberg search warrant data to its electronic database, the Government contacted the database manager assigned to this case to provide the Bates number for the Bloomberg EMSX data or confirm it was not present in the database. The following morning, on January 5, 2024, the database manager reported that the Bloomberg EMSX data was not in the database. The Government had a prescheduled call with the defense for noon that day and advised on that call that the Government could not confirm that it had produced the Bloomberg EMSX files and thus was going to produce that data to the defense that day. Shortly after that call, the Government produced to the defense the two

Bloomberg EMSX files. As a courtesy, the Government produced the derivative, ticker-by-ticker files its vendor had created as well.

## DISCUSSION

### A.    Applicable Law

Rule 16 of the Federal Rules of Criminal Procedure requires the Government to permit the defense, upon request, "to inspect and to copy or photograph" any "books, papers, documents, data, photographs, [or] tangible objects" in the Government's possession, custody or control, that are "material to preparing the defense," that the "Government intends to use . . . in its case-in-chief," or that "was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii). Similarly, upon a defendant's request, the Government must "disclose to the defendant, and make available for inspection, copying, or photographing, . . . any relevant written or recorded statement by the defendant" within the Government's possession, custody, or control, or that the Government knows (or could, through "due diligence," know) exists. Fed. R. Crim. P. 16(a)(1)(B)(i). Rule 16's requirements "are intended to contribute to the fair and efficient administration of criminal justice by providing the defendant with sufficient information upon which to base an intelligent [] plea; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact finding process." *United States v. Alvarez*, 987 F.2d 77, 84-85 (1st Cir. 1993) (citing Fed. R. Crim. P. 16 advisory committee's note).

If the Government fails to comply with its disclosure obligations under Rule 16, the district court "has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997); *see also* Fed. R. Crim. P. 16(d)(2). Preclusion of evidence is a disfavored and extraordinary remedy when there are delays in the Government's Rule 16 disclosures. *United States v. Monsanto Lopez*, 798 F. App'x 688, 690-91 (2d Cir. 2020) (affirming district court's order of a brief continuance rather than preclusion, and holding that

defendant suffered no prejudice where he "received the materials he argues were untimely produced over a month before trial ultimately began"); *see also United States v. Guerrero*, No. 09 Cr. 339 (RWS), 2010 WL 1790400, at *1 (S.D.N.Y. Apr. 30, 2010) ("Absent bad faith on the part of the Government, the preclusion of evidence is rarely an appropriate sanction for discovery delay."); *United States v. Graham*, No. 99 Cr. 271 (CFD), 2000 WL 1902425, at *2 (D. Conn. Dec. 21, 2000) (preclusion of evidence not appropriate where government did not act in bad faith and where "any prejudice to the defendant would be cured by granting her a continuance of the trial . . . . A continuance is the least severe remedy necessary to preserve the defendant's right to a fair trial, promote the fair and efficient administration of justice, and ensure full compliance with Rule 16(a)."). Rather, a continuance is the preferred remedy "because it gives the defense time to alleviate any prejudice it may have suffered from the late disclosure." *United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998) (citing *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985)); *see also United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976) (the court should consider, inter alia, "'the feasibility of rectifying [any] prejudice by a continuance'" (quoting Advisory Committee Notes on Rule 16(g))).

## B.    The Motion to Preclude Should Be Denied

The Government produced the Bloomberg EMSX data approximately six weeks prior to the start of trial. Certainly, the Government intended to produce it far earlier and regrets having failed to do so, however inadvertently. But there is no basis to impose the extreme remedy of preclusion of evidence. The Government has acted at all times in good faith. And the defense has more than enough time before trial—let alone before the Government's experts testify or any defense expert testifies—to make use of the data. Notably, despite the defense's assertion that "[t]he prejudice to the defense cannot be overstated" (Mot. 1) and is "grave[ ]" (Mot. 13), the defense fails to identify any actual prejudice, particularly prejudice of the sort with which the law

is concerned, which is prejudice attributable to the "untimely disclosure of evidence" and not "prejudice attributable to the evidence itself." *United States v Lee*, 834 F.3d 145, 158 (2d Cir. 2016). And even if there were prejudice, there is no basis to think that it cannot be remedied by a brief adjournment to provide additional time to use the data however the defense would like. Finally, the remedy that the defense seeks—preclusion—would produce a fundamentally unfair trial in which the jury would be denied the benefit of the facts. This result would be inconsistent with the purposes of Rule 16 and the law.

### 1.    The Government Did Not Act in Bad Faith

The law is clear that preclusion is an extreme and undesirable remedy for a Rule 16 violation and not appropriate in the absence of bad faith. *See, e.g.*, *Monsanto Lopez*, 798 F. App'x at 690-91; *Marshall*, 132 F.3d at 70; *Guerrero*, 2010 WL 1790400, at *1; *Graham*, 2000 WL 1902425, at *2. This approach is consonant with the general principle that "suppression of evidence . . . has always been our last resort, not our first impulse," and that, due to the "exclusionary rule's costly toll upon truth-seeking and law enforcement objectives," it is "applicable only where its remedial objectives are thought most efficaciously served." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984); *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998); and *United States v. Calandra*, 414 U.S. 338, 348 (1974)) (internal quotation marks and brackets omitted).

There was no bad faith here. To the contrary, while managing voluminous and complex discovery, the Government made searching efforts to comply with its discovery obligations and provide additional information to assist the defense in its preparation for trial. As noted above, the Government proactively attempted to track what it received and what it had produced and conducted follow-up quality-control in response to defense inquiries. As a result, the Government did produce complete sets of records from more than a dozen banks, the contents of multiple search

17

warrants, hundreds of thousands of communication records, and numerous data sets. Against that backdrop, missing a handful of files—however important—does not demonstrate anything other than human error.

Further, the Government's conduct, once it identified the error in failing to produce the Bloomberg EMSX files, evidences the Government's good faith and forthright efforts to furnish the defense with discovery and be transparent with the defense. The Government identified its error during a call with the defense at noon the day following the evening when the error was first suspected and produced the data the same day as the call. In addition, the Government provided derivative spreadsheets that the Government thought might assist the defense in quickly interpreting and using the data.

Nor does the defense claim otherwise. Instead, the defense argues that the Government "could" have uncovered the mistake sooner. (Mot. 15). Certainly, the Government wishes it had identified the error sooner—indeed, that the error had never occurred—but the Government made a mistake, which is not evidence of bad faith. And the defense's recounting of events it claims should have caused the Government to have noticed the error sooner, at a minimum, is lacking in context.

As an initial matter, in its first production of discovery in this case, the Government produced to both defendants the warrant served on Bloomberg and supporting affidavit. (*See* Estes Decl. Ex. A). The warrant specifically required the production of "[a]ll Bloomberg Execution Management Data associated with the Subject Accounts or any archegoscapital.com account, including but not limited to records of stock, option, and swaps trades with broker-dealers." (*Id.* at 2). Neither defendant ever specifically requested that the Government produce or permit inspection of this data—that is, the Bloomberg EMSX data now at issue. That is not to say, of course, that

the defense is responsible for the Government's oversight in failing to produce the data—the Government seeks to produce all records subject to Rule 16 regardless of whether the defense makes a specific request for a particular item. It is to say, however, that the various events the defense points to in its motion occurred after the Government had produced notice that it had collected this data and, in none of these instances did the defense make a request for this information, despite, as discussed below, making specific inquiry for other sources and categories of trading data.

In particular:

- The defense points to its October 2022 letter "ask[ing] the prosecution to 'clarify whether the Government has provided all trading data in its possession.'" (Mot. 15 (quoting Estes Decl., Ex. D)). While it is true that that language appears in the letter, the subject of the letter was not trading data from Bloomberg, Archegos, or EMSX, but rather specifically whether the Government had produced trading data from "certain bank counterparties." (Estes Decl., Ex. D at 1). Indeed, the sentence quoted by the defense was in the middle of a paragraph discussing trade data produced by various bank counterparties and was immediately preceded by the statement that, "we have not located any trade data at all from Bank of Montreal, Jefferies, or Wells Fargo." (*Id.* at 2). In other words, it is clear from context that defense counsel was inquiring about counterparty trade data specifically—which is entirely separate from Bloomberg EMSX data. In fact, the Government timely produced all such counterparty trade data that it received.

- The defense next refers to a letter written to the Government from Hwang's then-counsel in November 2022 as "request[ing] clarification on the trading records," along with the Government's response. (Mot. 15 (citing Estes Decl., Exs. F & G (ECF Docs. 111-6, 111-7))). But again, the request for clarification was specific; the defense sought "clarification whether the Government has produced all of the Archegos-related trading data *obtained from the counterparties*." (Estes Decl., Ex. F at 2 (emphasis added)).[3] The request did not, on its terms, implicate Bloomberg EMSX data. And the Government did make timely and complete productions of data obtained from the counterparties.

---

[3]     The defense also sought additional information regarding "market data" obtained by the Government from NYSE and Nasdaq and produced to the defense. (Estes Decl., Ex. F at 1-2)). This "market data" reflects all activity in the market as recorded by the NYSE and Nasdaq and is entirely separate from records of Archegos's trading, as reflected in either the Archegos or Bloomberg versions of the EMSX data. The defense received timely productions of all the market data the Government obtained.

- The defense points to its December 2022 email as stating that the defense "did not have a 'consistent set of data across banks,' 'including order lots and times, for all Archegos-related trades' and ask[ing] whether there 'is or will be a uniform set of Archegos-related trading data.'" (Mot. 15 (quoting Estes Decl., Ex. H). The defense again omits the context of these statements. These quotations do not reflect free-standing requests for Archegos trade data that might be reflected in the Bloomberg EMSX data. To the contrary, the paragraph from which these quotes are drawn contain a specific request "to know precisely what the Govt subpoenaed from the counterparties," because the defense "need[ed] *counterparty* execution data." (Estes Decl., Ex. H at 1 (emphasis added)). While it is true that, ultimately, the Bloomberg EMSX data showing the execution of *Archegos*'s swap transactions reflected the counterparties' hedging transactions because the swaps were hedged one-to-one, the defendant's request at this time was for *counterparty* execution data, which is to say, as the defense made explicit at the time, information obtained from counterparties. What the counterparties provided the Government, the Government provided the defendants.

- The defense also states that the Government could have noticed the discovery error when the defense announced its intention to seek Rule 17(c) subpoenas to obtain trading data. (Mot. 15 (citing Estes Decl., Ex. K). But this notice added nothing to the dialogue pertinent here—it was merely a continuation of the defense's statements that it was seeking additional information from the counterparties. (Estes Decl., Ex. K at 2).

- The defense points to its Rule 17(c) motion itself, filed on July 27, 2023, as alerting the Government to the possibility that the defense did not have the Bloomberg EMSX data. (Mot. 7, 15). However, the defense cherry-picks its own submission. The Rule 17(c) motion, as echoed at oral argument, in fact emphasized that the defense sought from the counterparties evidence (1) demonstrating the full-life of a particular hedge *after* the time of purchase to undermine the claim that Hwang effectively dominated the market for certain securities, and (2) showing that the counterparties hedged the swap transactions in ways other than by purchasing the underlying securities. (ECF Doc. 79 at 10-11). Neither of these categories of evidence relate to the Bloomberg EMSX data.[4]

---

[4]     The Government's Rule 17(c) brief stated that a blotter containing all of a given counterparty's transactions in the relevant tickers, as requested by the defense, almost certainly does not exist. The defense characterizes that factual assertion as somehow "mocking the defense" and attempts to cast it as some sinister suggestion on the part of the Government that the Bloomberg EMSX data did not exist. (Mot. 8). That makes no sense—the Government would hardly suggest the nonexistence of data that it intended to use at trial and believed it had produced to the defense. And, in point of fact, the Government was *correct* that a blotter showing all transactions by a counterparty in a particular security does not exist, as the defense has learned through its discussions with the counterparties. (*See* Jan. 3, 2024 Tr. at 8 (defense counsel explaining that "the counterparties' counsel have told us that the banks, the principal banks do not track and could not track what happened to those hedges")). Moreover, such a blotter showing the life of a share that was purchased as a hedge has no relevant relation to the Bloomberg EMSX data.

Certainly, the Rule 17(c) motion contained references to parent and child orders and other aspects of order execution, and it would have been preferable for the Government to have identified the discovery error at this time. But the Rule 17(c) motion focused specifically on counterparty hedging practices (including after execution of the swap), not on data showing initial trade executions as reflected in the Bloomberg EMSX data.

- The defense refers to the November 14, 2023 oral argument on the Rule 17(c) subpoena motion, when, according to the defense, "defense counsel argued that the trading data, and in particular the detailed order information, was critical and likely consisted of spreadsheets." (Mot. 9, 15). It is true that during that conference, defense counsel stated that he was seeking information regarding "the timing of the purchase." (Nov. 14, 2023 Tr. 26). But what defense actually asked for was counterparty data showing when the particular counterparty purchased a share. (*Id.*) It is also true, as noted above, that functionally, the Bloomberg EMSX data conveys that information because the swap is written only based on the counterparty's purchase of the underlying shares. However, defense counsel stated in argument that "we know the timing of the [swap] contracts," explaining that the contract "is just a bet, which doesn't translate into an immediate share." (*Id.*) In other words, defense counsel stated that he was seeking counterparty data regarding the counterparty's share purchases to match with the data regarding Archegos's swap orders. (*Id.*) Indeed, the Government responded that "to the extent that the defendants want to confirm that the banks have produced that swap transaction and the corresponding purchase of a stock, that seems reasonable." (*Id.* at 27). Thus, it appeared and appears that the defense was seeking the counterparty's transaction data to confirm from the counterparty's side that they purchased a corresponding share, rather than the data from Archegos's side reflected in the EMSX data.

- Elsewhere in its motion, the defense intimates that the Government should have identified its discovery error following the exchange of *Daubert* motions and the Court's directives regarding supplemental disclosures. (Mot. 9-11). But that is precisely what happened: even as the defendants characterize the timeline, it was during the period following these exchanges, and as the Government continued to prepare for trial, including for expert disclosures and testimony, that the Government discovered that it could not verify that the Bloomberg EMSX data had been produced to the defense, and promptly disclosed the issue to defense counsel and produced the material.

In short, the various events on which the defense focuses did not cause the Government to realize that the Bloomberg EMSX data had not been produced, and for an understandable reason: while the Government believed it had produced the data, and the defense had notice that the Government had sought the data, the defense made specific requests for other trading records. While it is no doubt true that the Government *could* have discovered the error at any time, the fact is that, unfortunately, it did not discover the error until the evening of January 4, 2024. The timing of that

discovery, however, was not for want of effort, much less due to bad faith. Instead, as described above, the Government has gone to great lengths to ensure prompt and fair disclosures—often going well beyond its obligations—and has been forthright when identifying an error. These are not circumstances where suppression of evidence is warranted.

Indeed, the sole case on which the defense relies to support its request for suppression—*United States v. Mason*, No. 06 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008)—does not support its motion; rather, the differences between the circumstances in that case and here throw into relief why suppression would be inappropriate in this case.[5] In *Mason*, as relevant here, the Government initially charged several defendants with a drug conspiracy that ran from 1997 through 2004 based on overt acts that took place exclusively in New York. *Id.* at *1. The defendants were arrested in 2006, some of them, including Anthony Patterson, at a Florida residence from which law enforcement seized, in connection with the arrests, guns, ammunition, drug paraphernalia, and various documents. *Id.* In May 2007, Patterson wrote the Government a

---

[5]     The defense also refers generally to *United States v. Nejad*, 487 F. Supp. 3d 206, 207-08 (S.D.N.Y. 2020); *United States v. Ahuja*, No. 18 Cr. 328 (KPF) (S.D.N.Y.); and *United States v. Wynder*, No. 20 Cr. 470 (PKC) (S.D.N.Y.). (Mot. 2-3). The defense does not appear to suggest that the rulings in those cases are applicable here, however—and for good reason. The circumstances of those cases have no relevance to the unintentional failure of the Government to more timely produce the two Bloomberg EMSX files. In *Nejad*, for example, Judge Nathan found that, in that case, "federal prosecutors have by their own admission repeatedly violated their disclosure obligations and, at best, toed the line with respect to their duty of candor," and ultimately "made a misrepresentation to the Court." 487 F. Supp. 3d at 207. Judge Nathan observed, by contradistinction, however, that "[i]n the near decade the Undersigned has sat on the bench in the Southern District of New York, the vast majority of Assistant United States Attorneys before the Court have embraced their disclosure obligations, worked diligently to meet them, and forthrightly admitted when they did not." *Id.* So too here. Similarly, the defense's reliance on Rule 5(f) of the Federal Rules of Criminal Procedure is misplaced and inappropriate. (Mot. 2, 4). That Rule concerns disclosure of exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The Bloomberg EMSX data is not exculpatory, and the defense does not contend otherwise.

letter requesting the documents seized from the Florida residence. *Id.* The Government did not respond to that letter and did not produce the documents. *Id.* In January 2008, one month before trial, the Government produced to the defense a copy of a fingerprint analysis, which had been conducted in February 2007, that linked Patterson to a box of ammunition from the Florida residence. Patterson had no "prior notice of physical evidence linking him to the weaponry found at the scene of his arrest or that the government intended to introduce such evidence at trial." *Id.*

Several days later, the Government obtained a superseding indictment that extended the time of the conspiracy to 2006 and that added as an overt act Patterson's possession of ammunition in Florida. *Id.* Two days after that superseder, "the government revealed that they had not yet obtained the [original] fingerprint image and documents from the relevant federal and state agencies in Florida and, thus, were unable to immediately produce copies of the evidence." *Id.* at *2. Thereafter, in response to a court order, the Government produced the documents from the Florida residence, and it was not until eighteen days before trial that the Government finally produced "[t]he original fingerprint image necessary for evaluation by Patterson's expert." *Id.* "Patterson object[ed] to the belated disclosure because he s[ought] the opportunity to challenge the government's fingerprint analysis and potentially to interpose a multiple conspiracy defense." *Id.*

In precluding the fingerprint evidence, Judge Buchwald emphasized a circumstance of that case that is not present here. There, the belatedly produced evidence coincided with new charges that the defense had no notice of. *E.g.*, *id.* ("There was little reason to investigate these defenses prior to [the superseding indictment] because the [earlier indictment] charged a conspiracy that was concluded in 2004 and was predicated on overt acts occurring only in New York."); *id.* at *3 ("the issue has become critical because of the filing of the superseding indictment which has

transformed the withheld evidence from the status of potential Rule 404(b) evidence to direct evidence of a newly charged conspiracy"); *id.* at *4 ("Without the precluded evidence, it is not clear that the government can establish a conspiracy lasting until 2006 as alleged for the first time in the [superseding indictment]. However, nothing in this decision prevents the government from fully prosecuting the [earlier indictment], which it was prepared to do for nineteen months." (footnote omitted)). Here, by contrast, nothing has changed with respect to the charges, the dates, or the locations—the notice issue that motivated the reasoning in *Mason* simply is not an issue here.

The defense seizes on Judge Buchwald's emphasis that "the government knew of the existence of the withheld documents from the time of seizure and yet ignored a specific request from defense counsel for those documents." *Id.* at *3. But that only makes the Government's point here. For one thing, in *Mason*, the Government *knew* that it had *not* produced the specifically requested documents because the prosecutors themselves did not yet possess those documents. Here, the opposite is true—the Government believed (erroneously) that it *had* produced all trade data. Furthermore, in *Mason*, the Government ignored the defense's request in that the defense requested evidence and the Government truly did not respond at all. Here, by contrast, the defense does not contend that the Government completely ignored a request from the defense. Finally, in *Mason*, the request truly was "specific," as Judge Buchwald highlighted, in that it asked for the documents seized from a particular place at a particular time. The equivalent here would be if the defense had asked specifically for Bloomberg EMSX data. But despite the fact that the Bloomberg warrant sought "Bloomberg Execution Management Data," the defense did not ask for that data.[6]

---

[6] Because the defense received on May 5, 2022 the warrant that sought "Bloomberg Execution Management Data," it is inaccurate for the defense to argue that they "had no way of knowing the prosecution had obtained and failed to produce trade data from Bloomberg."  (Mot. 6).

Instead, the defense made requests for other trade data, which the Government either supplied or confirmed it did not possess, and so the defense can hardly contend that the Government here ignored a discovery request of the kind that led to Judge Buchwald's ruling.

In sum, the Government produced the Bloomberg EMSX data to the defense far later than it intended to or believed it had. But there is no evidence of bad faith, and suppression is not warranted. *Monsanto Lopez*, 798 F. App'x at 690-91; *Marshall*, 132 F.3d at 70; *Guerrero*, 2010 WL 1790400, at *1; *Graham*, 2000 WL 1902425, at *2.

## 2. Any Prejudice Can Be Cured by an Adjournment

To determine what, if any, remedy is appropriate for a Rule 16 violation, "the district court should consider, *inter alia,* whether the defendant was prejudiced by the government's delay in disclosing the evidence in question." *United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir. 1990); *see also Guerrero*, 2010 WL 1790400, at *1 ("'Substantial prejudice' to the defendant is a relevant consideration in determining whether belatedly disclosed evidence ought to be excluded."). Where there is prejudice, because courts should select the "least severe remedy necessary," courts should address any prejudice through a continuance of trial where possible. *Graham*, 2000 WL 1902425, at *2; *see also Marshall*, 132 F.3d at 70; *Pineros*, 532 F.2d at 871.

Although the defense asserts that "[t]he prejudice to the defense cannot be overstated" and "the defense will suffer substantial prejudice if the documents are introduced" (Mot. 1, 13), the defense provides no concrete explanation for what that prejudice is. The defense received the Bloomberg EMSX data forty-six days before the start of trial, and even longer before any expert testifies. That is sufficient time for the defense to make effective use of the Bloomberg EMSX data in preparing for trial, and the defendant does not claim otherwise. Moreover, the Government is already working to prepare supplemental expert notices, as directed by the Court during the January 3, 2024 conference, which will provide the defendants with specific notice of when, to

what extent, and how the Bloomberg EMSX data will factor into each expert's analysis, in addition to 3500 material that has already been produced. And the additional suggestion that the Bloomberg EMSX files represent the first time Hwang could work with facts that showed the timing of his orders is wrong: Among other things, Hwang's Instant Bloomberg messages reflect the times and substance of his trading orders, and certain counterparty data, including the sizable production from Morgan Stanley, reflects the same.

Instead, the defense hopes the fact that the two spreadsheets contain voluminous data will compensate for the absence of actual prejudice. But the defense substantially overstates the volume of data at issue. For one thing, the two spreadsheets are substantively duplicative of one another, which means that the Bloomberg EMSX data is only approximately half as voluminous as the defense represents it to be. (*See, e.g.*, Mot. 1 (referring to "14 gigabytes" of data)). For another thing, only certain aspects of the Bloomberg EMSX data are relevant to this case. For example, the Bloomberg EMSX data contains information about all of Archegos's trades, across roughly 200 tickers, from January 1, 2020, through September 27, 2021, but the manipulation counts in this case concern Archegos's trades in only 12 tickers from March 2020 through March 2021. In fact, whereas the Bloomberg EMSX data, when de-duplicated, is roughly 7 gigabytes, the data for the tickers of interest reveals that the *relevant* Bloomberg EMSX data is only roughly 4 gigabytes. Moreover, even the aspects of the Bloomberg EMSX data that are relevant to this case are not entirely new to the defense. As described above, some of that relevant information is contained in trading data that the Government gathered from Archegos's counterparties and produced in 2022. In fact, one of the Government's consultants has advised that roughly 21% of the Bloomberg EMSX data is reflected in the trade data that the Government obtained from Morgan Stanley and produced to the defense long ago. That would bring the size of the new Bloomberg EMSX data

down to roughly 3.16 gigabytes. And that number would be further reduced by the overlap between the Bloomberg EMSX data and the EMSX data produced by Archegos, which the Government produced to the defense in 2022.

But perhaps more importantly, the number of bytes in a file or rows in a spreadsheet is simply not a useful measure of the time or effort it takes to make use of these materials.[7] The data contained in the Bloomberg EMSX spreadsheets is not the sort of material that will be reviewed manually; rather, as is clear from the defense's motion, and the nature of the data, it will be fed into models used by an expert. Indeed, it is notable that the defense appears to have been able to understand and make ample use of the data that was produced on a Friday prior to the filing of the defense's motion the following Monday morning. (*See, e.g.*, Mot. 11 ("According to the defense's experts, the Undisclosed Trade Data [*i.e.*, the Bloomberg EMSX data] is over 1,000 times larger than the previously produced Archegos Trade Data [*i.e.*, the Archegos EMSX data].")).

In fact, a substantial tension in the defense's motion proves that the defense is well situated to make use of the Bloomberg EMSX data in time for trial. Even while the defense claims substantial prejudice from receiving the Bloomberg EMSX data at the beginning of January, it also argues that the data it continues to seek from the counterparties through Rule 17(c) subpoenas is the very same data. Indeed, Hwang's attorneys recently informed the Court that, although he has not received records yet from the counterparties, he is continuing to negotiate with the counterparties to obtain additional trade data from them for use at trial, noting that discussions with the counterparties "are continuing and, again, moving in a very positive direction." (Jan. 3, 2024 Tr. 4). Hwang's counsel did not report concerns that the defense would be unable to make

---

[7] The defense produced to the Government approximately 59.2 gigabytes of data with its expert disclosures on December 8, 2023, but presumably believes that the Government can be ready for trial on February 20, 2024.

use of any data that the banks may provide in the future—the fact that the defense continues to maintain that it should receive such information via Rule 17(c) indicates the opposite. The defense can hardly argue that it can make effective use of the counterparty trade data—which the defense characterizes as the same as the Bloomberg EMSX data—while at the same time claiming that the defense has no effective way to use the Bloomberg EMSX data produced by the Government. The dissonance is magnified by the fact that instead of one or two files, the data sought by the Rule 17(c) subpoenas will presumably take different formats with different data points.

In an effort to shield the Bloomberg EMSX data from the jury, the defense proves too much. The defense asserts that the "data is critical . . . to defend allegations that Archegos's orders moved stock prices." (Mot. 17). But this is precisely why suppression of the data is a wholly unsuitable remedy—both sides should be able to use the data regarding Archegos's trades, put that evidence before the jury, and ensure a fair and just verdict. *See Hudson*, 547 U.S. at 591 (noting the "costly toll" of exclusion on "truth-seeking and law enforcement objectives"). For this reason, the defense's claim that the Government is seeking to "gain a tactical advantage" (Mot. 17) rings hollow. So long as both parties have access and ability to analyze the data, there is no advantage, and even without any adjournment, the defense will have had more than six weeks before even the start of trial to analyze the data. In fact, it is the defense that—far from the "fair trial" it claims to desire (*id.*)—seeks improper advantage. As the defense says explicitly, "the prosecution should be forced to rely on the more limited trade data originally produced to the defense." (*Id.*). In other words, apparently, the Government should be forced to rely on incomplete data in presenting its case to the jury, while the defense can pick and choose from the more complete data set to tailor the evidence to its whim. This would hardly be a "level[ ] . . . playing field." (*Id.*).

Even if there were any prejudice to the defense from having this particular dataset forty-six day prior to trial, there is no plausible basis—and the defense has advanced none—upon which to argue that the prejudice cannot be addressed by a brief continuance. A continuance is the preferred remedy when there are delays in the Government's Rule 16 disclosures "because it gives the defense time to alleviate any prejudice it may have suffered from the late disclosure." *Marshall*, 132 F.3d at 70 (citing *Euceda-Hernandez*, 768 F.2d at 1312); *see also Monsanto Lopez*, 798 F. App'x at 690-91 (continuance of trial after Government's late disclosure of evidence was sufficient to cure any prejudice, even if Rule 16 violation occurred); *Pineros*, 532 F.2d at 871 (the court should consider, inter alia, "'the feasibility of rectifying [any] prejudice by a continuance'" (quoting advisory committee notes on Rule 16(g))); *Graham*, 2000 WL 1902425, at *2 ("A continuance is the least severe remedy necessary to preserve the defendant's right to a fair trial, promote the fair and efficient administration of justice, and ensure full compliance with Rule 16(a).").

If it is the case that the defense lacks sufficient time to analyze and make use of the data contained in the Bloomberg EMSX files, the solution is apparent: provide that time. A modest continuance here would be commensurate with the approach taken in other cases where discovery is produced late; any other remedy would be far out of step with the case law. *See, e.g.*, *United States v. Steiner*, No. 19 Cr. 295 (HG), 2022 WL 2390943, at *2 (E.D.N.Y. July 1, 2022) (defendant "complains that the Government provided the latest batches of discovery less than a month before trial. While that argument may have had some purchase in April when the issue was first raised, it no longer does now because of the continuance of the trial date. Defendant nowhere suggests that the extra time afforded by the continuance is insufficient to review the new discovery." (citations omitted)); *United States v. Chang*, 574 F. Supp. 3d 94, 99 (E.D.N.Y. 2021)

("The Court concluded that the Harrell Memorandum was *Giglio* material and should have been disclosed by the government to Defendant earlier rather than on the eve of trial. To remedy this delay, the Court postponed the trial to provide the Defendant additional time to investigate this evidence further." (citations omitted)); *United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152, at *7 (S.D.N.Y. Mar. 16, 2012) (two-month adjournment for late production of 43 boxes of materials); *Graham*, 2000 WL 1902425, at *2 ("[A]lthough the Court concludes that the statements and other relevant wiretap information may be important to Ms. Graham's defense, preclusion of the statements is not warranted in this case. It is likely that any prejudice to the defendant would be cured by granting her request for a continuance of the trial in order to allow her to review the statements and, if necessary, file a motion to suppress or other motions.").

In short, although the defense has sufficient time with the Bloomberg EMSX data to prepare for trial, the Government would have no objection to a request for a modest adjournment to provide the defense with additional time to consider and analyze those records.

**C.      No Further Inquiry Is Warranted**

The defense, without any relevant authority, asserts that it is "entitled" to discovery. (Mot. 18). Not so. The defendants are entitled to Rule 16 materials—and perhaps a brief adjournment—but inadvertent errors do not give criminal defendants a right to an invasive inquiry simply because they want one. The defendants' request serves no proper purpose and should be denied.

**CONCLUSION**

For the foregoing reasons, the motion should be denied.

Dated:  New York, New York
          January 12, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                              By: _____
                                        Matthew Podolsky
                                        Alexandra Rothman
                                        Samuel P. Rothschild
                                        Andrew Thomas
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-1947/-2580/-2504/-2106

31