# Kramer Levin



## FRIEDMAN KAPLAN

**Barry H. Berke**
Partner
T 212.715.7560
F 212.715.7660
bberke@kramerlevin.com

1177 Avenue of the Americas
New York, NY 10036
T 212.715.9100
F 212.715.8000

**MARY E. MULLIGAN**
mmulligan@fklaw.com
212.833.1123

**March 19, 2024**

**VIA ECF & EMAIL**

Hon. Alvin K. Hellerstein
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007

*[handwritten note]* The conf. of March 20, 2024 is adjourned. If a conference before the final PTC is required, either party may so request. 3/19-24 [signature]

Re: *United States v. Sung Kook (Bill) Hwang, et al.*, No. 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

On behalf of defendants Bill Hwang and Patrick Halligan, we write to provide additional updates regarding the significance of defendants' Rule 17(c) motion in advance of the conference set for March 20, 2024. (ECF No. 152). In light of the documents and information that we have received from the Counterparties, we do not believe that any further action is required by the Court with regard to the defendants' Rule 17(c) motion. The materials and information that have been provided as a result of Your Honor's directive in connection with the Rule 17(c) proceedings have now confirmed that the assumptions underlying the prosecution's market domination allegations are false.

As set forth in our March 1, 2024 letter (ECF No. 150), the information provided by the Counterparties shows that Archegos did not "effectively control[]" a percentage of the float of the securities through its swaps, as alleged in the Indictment. *See* Superseding Indictment ¶¶ 26, 27. Instead, after any initial hedges were put in place, the majority of the Counterparties maintained the hedges on a portfolio- or book-wide basis, often selling the hedges if offsetting swaps existed or lending the stocks out to short sellers.[1] Selling the hedges or enabling short selling would of course put downward

---

[1] For example, data produced by one Counterparty shows that the primary account where Archegos's swaps were booked often held only a small fraction of Archegos's swap exposure to certain At-Issue Securities in the form of physical equity shares. *See* SDNY_P031_0000000003.

March 19, 2024



pressure on the stock price, making it far less feasible that Archegos could artificially control any stock prices.

The Indictment ignores all of this. It misleadingly suggests that any initial hedges purchased by the Counterparties were taken out of the market entirely and "effectively controlled" by Archegos. Superseding Indictment ¶ 26. It further alleges—incorrectly—that "the dwindling supply of freely trading shares . . . led to significant artificial appreciation in the price of each stock." *Id.* at ¶ 21.a. Indeed, the Indictment even references specific share-count figures, *id.* at ¶ 26 ("By in or about 2021, Archegos's total position in the securities of certain companies equated to more than approximately 30%, 40%, and 50% of the freely traded stock shares, or 'float,' of those companies."), along with a misleading chart depicting the "VIAC % Float Held by Archegos." *Id.*

These allegations rest on the assumption that each of the Counterparties bought and held equity hedges for Archegos's swaps on a one-to-one basis for the duration of the swap's lifetime. That assumption and these allegations are refuted by the evidence from the Counterparties on hedging, which demonstrates that the hedges were not all removed from the market such that the free float began to "dwindl[e]." *Id.* at ¶ 21.a. To the contrary, the hedges were often sold back into the market or lent to short sellers for that purpose.

Despite this irrefutable evidence, the prosecution contends the evidence and information received from the Counterparties are somehow "irrelevant to the issues at trial," without any explanation. *See* March 1, 2024 Joint Letter (ECF No. 150) at 3. That is a remarkable claim since its own allegations equate the size of Archegos's synthetic swap holdings with the corresponding number of shares in the underlying security. In fact, the Indictment goes so far as to allege that Archegos "effectively controlled" the float of these stocks. For this reason, the evidence is highly relevant because it shows the prosecution cannot prove that Archegos controlled any percentage of the float of these stocks, let alone that it "effectively controlled" the float. *Id.* at ¶ 26. Unless the prosecution can expressly link each long swap purchased by Archegos to particular equity shares that the short counterparty (1) bought as a hedge for the swap and (2) held as a hedge for the duration of the swap, the prosecution cannot equate Archegos's long swap positions with ownership or control of *any* percentage of the float.

March 19, 2024



     Because we now know that this cannot be proven and is not true, defendants intend to move in limine to preclude the prosecution from making any argument equating the size of Archegos's swap holdings to the corresponding number of shares in the underlying company.  It is particularly troubling that the prosecution repeated these allegations in the Superseding Indictment, despite knowing by then that they were unsupportable.  Regardless of the outcome of that motion, the fact that the majority of the Counterparties did not hold onto their equity hedges on a one-to-one basis throughout the duration of the Archegos synthetic swap transactions is directly relevant to the prosecution's claim that Archegos swap transactions artificially impacted the prices of the underlying securities.

     Respectfully submitted,

Barry H. Berke
Dani R. James
Jordan Estes
Michael Martinez

Mary E. Mulligan

cc:    Counsel of record

3