**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
            v.                                :        22 Cr. 240 (AKH)
                                              :
SUNG KOOK (BILL) HWANG and                    :
PATRICK HALLIGAN,                             :
                                              :
            Defendants.                       :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**DEFENDANT BILL HWANG'S OMNIBUS MOTIONS *IN LIMINE***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................... 2

   I.   This Court Must Preclude Evidence and Argument Regarding the Price Decline of The At-Issue Securities ................................................................................ 2

      A.  The Prosecution's Stock Price Evidence and the Purpose of Event Studies ............... 3

      B.  Second Circuit Precedent Prohibits Admission of Stock-Price-Decline Evidence Without an Event Study ....................................................................... 4

   II.  This Court Must Preclude Evidence and Argument Characterizing Archegos's Swap Positions As a Percentage of "the Float" ........................................................... 6

   III. This Court Must Preclude Argument of Manipulative Intent Based on Swap Purchases Alone, Even in High Volumes That Impact Price ........................................ 11

   IV. This Court Must Preclude Exhibits or Testimony Including Speculation Regarding Mr. Hwang's State of Mind in Executing Trades .................................................... 14

   V.  This Court Must Bar the Prosecution From Introducing Evidence Incorporating Legal Conclusions Regarding Manipulative Trading ................................................ 17

   VI. This Court Must Preclude Evidence or Argument Regarding Archegos's Compliance with the "Wash Sale" Rule of the Internal Revenue Code ................................ 20

CONCLUSION .............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................................11, 12, 13, 17

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)........................................................................4

*Caiola v. Citibank, N.A. New York*,
  295 F.3d 312 (2d Cir. 2002)........................................................................................9

*Cameron v. City of New York*,
  598 F.3d 50 (2d Cir. 2010)..................................................................................19, 20

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010).......................................................................13

*Colson v. Cupp*,
  449 F.2d 730 (9th Cir. 1971) .....................................................................................14

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969).......................................................................................18

*CSX Corp. v. Children's Inv. Fund Management (UK) LLP*,
  654 F.3d 276 (2d Cir. 2011).........................................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).....................................................................................................6

*Davis v. City of New York*,
  959 F. Supp. 2d 427 (S.D.N.Y. 2013).......................................................................19

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)..............................................................................11, 17, 18, 21

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001)................................................................................12, 13

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir. 1999).........................................................................................18

*Hester v. BIC Corp.*,
  225 F.3d 178 (2d Cir. 2000).......................................................................................16

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*,
  No. 02 Civ. 0767, 2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ...........................................13

*Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ............................................................................................9

*Praxair, Inc. v. Hinshaw & Culbertson*,
  235 F.3d 1028 (7th Cir. 2000) .........................................................................................8

*Rotman v. Progressive Ins. Co.*,
  955 F. Supp. 2d 272 (D. Vt. 2013) ....................................................................................6

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977) ...............................................................................................17, 18

*SEC  v. Lek Sec. Corp.*,
  276 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................................................................21

*SEC v. Malenfant*,
  784 F. Supp. 141 (S.D.N.Y. 1992) ............................................................................12, 18

*Set Capital LLC v. Credit Suisse Group. AG*,
  996 F.3d 64 (2d Cir. 2021) .............................................................................12, 13, 15, 18

*Smith v. New York and Presbyterian Hospital*,
  440 F. Supp. 3d 303 (S.D.N.Y. 2020) ...............................................................................16

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) ............................................................................................13

*United States v. Awadallah*,
  401 F. Supp. 2d 308 (S.D.N.Y. 2005) ...............................................................................16

*United States v. Barnwell*,
  No. 15 Cr. 620 (NSR), 2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) ....................................20

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) ....................................................................................2, 3, 5, 6

*United States v. Hoffner*,
  777 F.2d 1423 (10th Cir. 1985) .......................................................................................16

*United States v. Kaplan*,
  490 F.3d 110 (2d Cir. 2007) ......................................................................................16, 17

*United States v. Martoma*,
  993 F. Supp. 2d 452 (S.D.N.Y. 2014) ................................................................................4

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991)..........................................................................13

*United States v. Phillips*,
    No. 22 Cr. 138 (LJL) (S.D.N.Y. Sept. 29, 2023), ECF No. 41.............................1, 6

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992)................................................................16, 17

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1988)..........................................................................11

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988)................................................................19, 20

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017)..........................................................................14

*United States v. Valentine*,
    820 F.2d 565 (2d Cir. 1987)..........................................................................10

**Statutes and Rules**

15 U.S.C. § 78ff ..........................................................................................19

15 U.S.C. § 78i..................................................................................18, 19, 21

15 U.S.C. § 78j...........................................................................................19

15 U.S.C. § 78m..........................................................................................12

26 U.S.C. 1091............................................................................................21

17 C.F.R. § 240.10b-5..................................................................................19

Fed. R. Evid. 401.......................................................................................23

Fed. R. Evid. 402 ..................................................................7, 10, 20, 21

Fed. R. Evid. 403 .....................................................................*passim*

Fed. R. Evid. 701 .......................................................................................14

Fed. R. Evid. 801 ...............................................................................16, 18

Fed. R. Evid. 802 .......................................................................................16

Treas. Reg. § 1.1091-1................................................................................21

**Other Authorities**

Garrett M. Fischer, *New Twists on an Old Plot: Investors Look to Avoid the Wash Sale Rule by Harvesting Tax Losses with Exchange-Traded Funds*, 88 WASH. U. L. REV. 229, 234 (2010) ....................................................................................................22

Lewis R. Steinberg, *Selected Issues in the Taxation of Swaps, Structured Finance and Other Financial Products* FLORIDA TAX REV. 263, 282 (1993) ........................................9

## PRELIMINARY STATEMENT

This unprecedented prosecution stretches market-manipulation law to convert lawful and carefully regulated swap transactions into instruments of fraud and deceit. To buttress its untested legal theory, the prosecution misrepresents Mr. Hwang's trading impact on the market in two ways that are clearly improper. First, the prosecution seeks to prove that Mr. Hwang's trading caused stocks to plummet after Archegos collapsed. But Second Circuit case law prohibits such evidence when not supported by an event study that excludes industry, market, or other company-specific factors, which the prosecution has failed to provide. Such after-the-fact evidence is also irrelevant and "*highly likely to mislead the jury,*" as this same prosecutor's office argued less than six months ago in opposing the introduction of such evidence. Prosecution Mot. *in Limine* at 12, *United States v. Phillips*, No. 22 Cr. 138 (LJL) (S.D.N.Y. Sept. 29, 2023), ECF No. 41 ("After-the-fact price evidence is irrelevant and *highly likely to mislead the jury.*"). Second, the prosecution seeks to present the legally invalid and factually incorrect claim that Mr. Hwang controlled and dominated the freely traded stock of certain companies. The prosecution makes this claim by falsely equating swaps and equity, contrary to Second Circuit law and the prosecution's own knowledge that counterparties did not maintain one-to-one stock hedges for the duration of their Archegos swaps.

In addition, the prosecution seeks to establish Mr. Hwang's allegedly manipulative intent with arguments and evidence that are likewise improper. Mr. Hwang and his family suffered the largest losses on account of Archegos's collapse, and the prosecution's theory that Mr. Hwang intended to pump the price of the stocks underlying Archegos's swaps – without ever dumping them – as part of a "pump and brag" scheme defies logic and common sense. *See* Transcript of Oral Argument at 34 (Mar. 21, 2023) ECF No. 67. To try to overcome this inherent flaw, the prosecution points to lawful investments and the impact of making them in large volumes as

evidence of manipulative intent.  But the law is clear that the purchase of swaps, even in large volumes, is not proof of manipulative intent.  Nor is simply knowing that a price may rise as a result of a swap purchase.  As a result, this Court should preclude the prosecution from arguing that the use of swaps, which are not required to be disclosed, or the price impact of swap purchases are tantamount to market manipulation.  Furthermore, the prosecution seeks to shore up its case with rank hearsay, speculation, and legal conclusions about Mr. Hwang's intent and trading.

Finally, this Court should preclude the prosecution from confusing the jury with evidence of lawful tax-related "wash sales" disguised as unlawful market-manipulation "wash sales"—*i.e.*, transactions involving no change in beneficial ownership.

## ARGUMENT

### I.  This Court Must Preclude Evidence and Argument Regarding the Price Decline of The At-Issue Securities

This Court must preclude the prosecution from offering evidence or argument—including in the form of charts, graphs, or expert witness testimony—that the decline in the prices of the securities at issue in the indictment in the months following Archegos's collapse was caused by Archegos's trading.  Second Circuit precedent prohibits the admission of stock-price-decline evidence in the absence of an event study establishing that the stock-price declines were caused by the alleged conduct in question, as opposed to other industry, market, or company-specific factors.  *See United States v. Ferguson*, 676 F.3d 260, 274-75 (2d Cir. 2011).  Without an event study linking stock-price declines to Mr. Hwang's trading, such evidence is inadmissible and also poses an unduly high risk of misleading the jury that those stock-price declines were caused by Mr. Hwang's trading as opposed to other industry and market factors, such as the Viacom secondary offering and the announced regulation on Chinese companies.  Because the

prosecution failed to provide an event study as part of its expert disclosures or otherwise, this Court should preclude the prosecution from introducing stock-price-drop evidence or argument.

A.     The Prosecution's Stock Price Evidence and the Purpose of Event Studies

The indictment alleges that "[t]he trading by BILL HWANG, the defendant, had a stark impact upon market prices."  Superseding Indictment ¶ 31.  To highlight this point, the prosecution includes the following chart illustrating that after "the collapse of Archegos, and the sale of its positions, the stock prices fell precipitously:"



*Id.*  To drive this point home, the prosecution seeks to introduce the testimony of not one, but two, experts to opine—without the evidentiary foundation of an event study—that Mr. Hwang's trading caused certain stock price drops after Archegos collapsed.  *See* Battalio Discl. ¶ 6.d (opining that "stock price data in the months following Archegos's collapse further evidences an explanatory relationship between Archegos's orders in [certain stocks] and changes in prevailing

stock prices for those securities")[1]; Taveras Supp. Discl. ¶ 40 (opining that "following Archegos's liquidation, market prices for the Archegos Top Long Positions remained depressed and did not recover to their March 2021 levels by at least May 1, 2021" and that "this prolonged depression of market prices for the Archegos Top Long Positions is consistent with the market prices having been inflated during the time period when Archegos was buying the Top Long Positions").

But "a drop in a company's stock value may be the result of a wide variety of factors other than fraud." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 909 F. Supp. 2d 259, 269 (S.D.N.Y. 2012). For this reason, "[e]vent studies are used to determine whether the price changes at issue in [a] case were [related or] unrelated to the representations in dispute by eliminating other factors, such as the effects on stock price of market and industry information." *United States v. Martoma*, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) (internal quotation marks and citation omitted) (alterations in original). They are a form of "regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price." *Id.* at 457 (internal quotation marks and citations omitted). They "focus on individual events and analyze whether those events can be linked in a statistically significant way to variations in stock price." *Id.* at 458.

B.   Second Circuit Precedent Prohibits Admission of Stock-Price-Decline Evidence Without an Event Study

Because the prosecution's experts did not conduct an event study, the prosecution cannot invite the jury to conclude that the stock-price declines were caused by Mr. Hwang's trading.

---

[1] Battalio's supplemental disclosure did not withdraw this opinion. *See* Battalio Supp. Discl. at 1 (Battalio "does not intend to relinquish any subject or anticipated testimony previously described," except where specifically noted).

*See United States v. Ferguson*, 676 F.3d 260, 274-75 (2d Cir. 2011).  In *Ferguson*, the Second

Circuit held that the district court abused its discretion by admitting stock-price charts suggesting

that an allegedly fraudulent transaction between AIG and Gen Re "caused the price of AIG

shares to plummet 12% during the relevant time period," and vacated the defendants' criminal

convictions.  *Id.* at 274-75.  The Court found that the charts' admission was "without foundation"

because there had been no expert testimony excluding confounding factors that contributed to the

price decrease.  *Id.* at 275 & n. 11 (citing *United States v. Schiff*, 538 F. Supp. 2d 818, 836

(D.N.J. 2008) (stock-price-drop evidence was not probative because prosecution expert's event

study failed to control for certain confounding factors).

      To make matters worse, the prosecution in *Ferguson* "exploited" the purported

materiality evidence "to emphasize the losses caused by the transaction," even though the

charged fraud offenses did not require proof of loss causation.  676 F.3d at 274.  During its

rebuttal summation, the prosecution argued that "behind every share of [AIG] stock is a living

and breathing person who plunked down his or her hard-earned money and bought a share of

stock." *Id.* at 275 (citation omitted) (alteration in original).  The prosecution thereby improperly

used the charts to "convey[ ] the impression that the transaction had a palpable financial impact

and that stockholders were hurt—and hurt seriously." *Id.*

      Here, the prosecution proposes to commit the same *reversible* error as in *Ferguson*, but

on a more egregious scale.  Without an event study, the prosecution proposes to introduce a stock

price chart showing that Viacom's and Discovery's stock prices dropped by more than 76

percent and 61 percent, respectively, following Archegos's collapse.  Those percentage plunges

dwarf the 12 percent drop in *Ferguson* and create an even greater risk of misleading the jury that

the stock-price declines were due solely to Mr. Hwang's trading.  Compounding this error, the

prosecution seeks to impose the imprimatur of two experts—Professor Battalio and Ms. Taveras—on this unfounded and speculative stock-price-drop evidence. *See Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 283 (D. Vt. 2013) (noting that "permit[ting] an expert to merely *speculate* as to a cause . . . poses the risk of confusing and misleading the jury as it lends the imprimatur of the expert's qualifications and a stamp of credibility to what is otherwise rank speculation") (emphasis in original); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993) (explaining that expert testimony reflecting "unsupported speculation" must be excluded).

Such evidence is also inadmissible because of the highly misleading impact of this after-the-fact price evidence, as the prosecution is fully aware.  Less than six months ago, this same prosecutor's office argued against the introduction of such evidence because it is "highly likely to mislead the jury."  Prosecution Mot. *in Limine* at 12, *United States v. Phillips*, No. 22 Cr. 138 (LJL) (S.D.N.Y. Sept. 29, 2023), ECF No. 41 ("After-the-fact price evidence is irrelevant and *highly likely to mislead the jury*.") (emphasis added).  Indeed, the prosecution confirmed that such evidence is inadmissible without expert testimony and is "beyond the ken of a fact witness." *Id.*  The mere introduction of the stock-price-decline evidence poses an unfairly prejudicial risk that "jurors would attribute the full [after-the-fact] decline to [Mr. Hwang's alleged manipulative transactions]."  *Ferguson*, 676 F.3d at 274.

For all these reasons, this Court must preclude the prosecution from introducing any stock-price-drop evidence or argument.

## II.     This Court Must Preclude Evidence and Argument Characterizing Archegos's Swap Positions As a Percentage of "the Float"

This Court must preclude the prosecution from offering evidence or argument characterizing Archegos's swap positions as a percentage of the total equity shares outstanding

(*i.e.*, "the float").  Contrary to Second Circuit law, the prosecution treats Archegos's long swap positions as if they were equity shares and incorrectly calculates that Archegos controlled 30, 40, or even 50 percent of the freely traded stock in the market.  The prosecution then exacerbates its error, claiming—again incorrectly—that Archegos's swaps led to a "dwindling supply of freely trading shares."  Superseding Indictment ¶ 21a.  But an untold number of equity shares purchased by hedging counterparties in connection with Archegos's swaps were returned to the market through offsetting swaps and short-sale loans, and the trading volume did *not* "dwindle." Because swaps are not equivalent to equites—as the prosecution falsely suggests—evidence or argument suggesting otherwise should be excluded as irrelevant under Federal Rule of Evidence 402 and unduly misleading under Federal Rule of Evidence 403.  It also must be precluded under well-established precedent that bars the prosecution from making arguments it knows to be factually untrue.

The prosecution alleges that Mr. Hwang, through swaps, effectively controlled substantial percentages of the equity shares of the companies in which he traded.  *See* Superseding Indictment ¶ 26 ("By in or about 2021, Archegos's total position in the securities of certain companies equated to more than approximately 30%, 40%, and 50% of the freely traded stock shares, or 'float,' of these companies.").  It illustrates that allegation with the following misleading chart, in which Archegos's swap position in ViacomCBS (blue) takes up more and more of the float (orange) as it grows:



*Id.*

But this allegation rests on a demonstrably false assumption:  that the counterparties bought equity shares equal to the number of long swaps they sold to Archegos and held those shares for the duration of the swap agreement.  In fact, discovery has shown that the counterparties did *not* maintain one-to-one hedges on their swaps with Archegos for the duration of the swap.  Rather, Archegos's swap exposure to the at-issue companies often exceeded the counterparties' physical holdings of underlying equity shares, in some instances nearly doubling them.  *See*, *e.g.*, Declaration of Michael Martinez, Ex. A (email in Nomura production noting that counterparty owned 5.5% of a company's equity shares but gave Archegos "exposure to 9.50% of the company").[2]  In addition, the counterparties told the prosecution in no uncertain

---

[2] This follows the general principle that counterparties do not always hedge their short swaps by purchasing and holding the reference asset for the duration of the swap.  Sometimes, for example, the hedge takes the form of *another* swap in which the counterparty takes an offsetting long position.  *See*, *e.g.*, *Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1030 (7th Cir. 2000) (counterparty bank hedged its short swap by entering into long swap with another bank).

terms that they "believed approximately 90% of Archegos's positions were" either "s[old]-off [sic]" to the market, or "pledg[ed]" to a "lender as collateral." *See* Martinez Decl., Exs. B at 2 (excerpt of April 25, 2022 Interview of Scott Pecullan (Morgan Stanley), 3557-001), and C at 6 (excerpt of December 14, 2023 Interview of Andrew Vaccaro (Jefferies) 3577-001) (stating that the counterparty's "goal was to organically offset its book" and "move positions away"). These documents and information provided by counterparties confirm they were not holding equity shares anywhere near a one-to-one basis.

    None of this is surprising. For starters, the legal character of swaps makes clear that there is no necessary one-to-one correlation between a swap executed by Archegos and a hedge held by the swap counterparty: these swaps, in and of themselves, "do not transfer title to the underlying assets or require that either party actually own them." *CSX Corp. v. Children's Inv. Fund Management (UK) LLP*, 654 F.3d 276, 279 (2d Cir. 2011); *see also* Lewis R. Steinberg, *Selected Issues in the Taxation of Swaps, Structured Finance and Other Financial Products*, 1 FLORIDA TAX REV. 263, 282 (1993) (where *A* owns equity shares and enters into an equity swap with *B* referencing those shares, "it is hard to see how B could be treated as the owner of the stocks for tax purposes, or A could be treated as having ceased to be the owner of those securities."). Indeed, swap transactions themselves do not "involve actual transfer[s] of shares" at all. *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 206-07 (2d Cir. 2014). Thus, swaps are not bought or sold out of the float and do not inherently change its composition—they are designed to leave no "footprint" on the market. *Caiola v. Citibank, N.A. New York*, 295 F.3d 312, 316 (2d Cir. 2002) (swaps enable "the purchase of large volumes of options in stocks without affecting their price").

Accordingly, unless the prosecution can expressly link each long swap purchased by Archegos to particular equity shares that the short counterparty (1) bought as a hedge for the swap, and (2) held as a hedge for the duration of the swap, then the prosecution must not be permitted to equate Archegos's long swap positions with ownership or control of *any* percentage of the float. And we already know that the prosecution cannot make that showing. Indeed, the prosecution's view is that whether and for how long a counterparty holds a hedged stock is "irrelevant" to this case:

> MS. ROTHMAN: So, your Honor, prying into what banks, the counterparties do thereafter to manage the risk of their book and their desks is *irrelevant* for a couple of reasons. First, it's not the swap transaction at issue here. And second, there is no link between that transaction and what they're doing thereafter. There could be a host of reasons why a counterparty may choose to lend out shares, may choose to further hedge. It is not the question in this case[.]

November 14, 2023 Tr. at 23:14 (ECF 93) (emphasis added).

That is a remarkable position by the prosecution, since the only basis for their claim that Archegos dominated and controlled the float of certain securities is premised on whether and how the Counterparties hedged Archegos swap positions. Accordingly, the float percentage on which the prosecution relies is not the relevant measure of Archegos's control of the float and must be excluded. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Not only is the prosecution's float percentage irrelevant, but it would misleadingly suggest that Mr. Hwang "dominate[d] the marketplace for these securities," Superseding Indictment ¶ 27, without any evidence that Archegos's swap purchases dictated the counterparties' free economic choices. For this reason, Rule 403 also demands exclusion.

Finally, the prosecution must abandon its theory of Mr. Hwang's market domination now that it knows its factual assumption is incorrect. *See United States v. Valentine,* 820 F.2d 565,

570 (2d Cir. 1987) ("A prosecutor commits misconduct by making an argument he or she knows to be factually untrue"); *United States v. Salameh*, 152 F.3d 88, 133 (2d Cir. 1988) (internal citations omitted) ("[T]he prosecutor has a special duty not to mislead; the government should … never make affirmative statements contrary to what it knows to be the truth.").

### III.   This Court Must Preclude Argument of Manipulative Intent Based on Swap Purchases Alone, Even in High Volumes That Impact Price

This Court must preclude the prosecution from arguing that swap purchases alone, even in high volumes that impact price, tend to prove manipulative intent. The case law makes clear that derivatives, like swaps, are lawful transactions and not evidence of manipulation, regardless of their size or impact on the underlying stock price. In addition, the purchase of swaps in securities are not required by the securities laws to be disclosed publicly. The prosecution, therefore, cannot argue unlawful intent from wholly lawful activity such as the purchase of swaps, their non-disclosure or the consequences of those purchases. Not only is such an argument legally improper, but it creates a danger that the jury will mistake the lawful use of swaps or the natural consequences of large-scale, legally sanctioned purchases with evidence of manipulative intent.

"Manipulative" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). "It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or *artificially* affecting the price of securities." *Id*. (emphasis added). The Second Circuit explained that "*artificially*" means that "an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007). "The deception," the Court elaborated, "arises from the fact that investors are misled to believe "'that prices at which they purchase and sell

securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'" *Id.* (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *accord SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) ("The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price.") (citation omitted).  In other words, an act is manipulative if it is designed to deceive or defraud others by "send[ing] a false pricing signal to the market." *Set Capital LLC v. Credit Suisse Group. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quoting *ATSI Communications*, 493 F.3d at 100).

The purchase of swap derivatives alone is not probative of manipulative intent.  To the contrary, such purchases are perfectly lawful, carefully regulated by the SEC, and not required to be disclosed to the public.  *See* 15 U.S.C. § 78m(d) & (g).  Indeed, the indictment itself acknowledges that Mr. Hwang "conducted most of his trading through derivative securities that had no public disclosure requirement."  Superseding Indictment at ¶ 4.  Thus, the prosecution cannot reasonably argue that Mr. Hwang's lawful lack of disclosure in connection with swap purchases tends to prove manipulative intent.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) ("it is unreasonable to infer unlawful intent from lawful activity") (internal quotes and citation omitted); *Id.* at 211 (trading "is neither deceptive nor manipulative when carried out in accordance with SEC rules and regulations").  But that is exactly what the prosecution seeks to do in this case.  *See* Superseding Indictment ¶ 4 ("At least in part to hide the extent of his market power from other investors, BILL HWANG, the defendant, conducted most of his trading through derivative securities that had no public disclosure requirement.").

The same result holds true even when an individual trades derivative securities in massive volumes. *See, e.g.*, *ATSI Communications*, 493 F.3d at 101 ("[S]hort selling—even in high volumes—is not, by itself, manipulative."); *GFL Advantage Fund*, 272 F.3d at 209 ("[S]hort selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation."); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (rejecting argument that defendant's "unprecedented massive short selling" violated § 9(a)(2) of the Exchange Act, because no "false impression of supply or demand" was created when there "were real buyers, betting against [the defendant]" and "there is as yet no rule barring persons with a pronounced taste for risk from trading on stock exchanges"); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 0767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Unusually large sales, without a doubt, cannot be the basis for a market manipulation claim after *ATSI*."). Thus, the prosecution cannot ask the jury to infer manipulative intent based solely on the size of Mr. Hwang's swap transactions.

And simply knowing that prices may rise or fall as a result of a swap derivative transaction is not evidence of manipulative intent. *See Set Capital,* 996 F.3d at 77 (open-market trading "is not, by itself, manipulative . . . even when it impacts the market price for a security"); *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991) ( "When the transaction is effected for an investment purpose, the theory continues, there is no manipulation, even if an increase or diminution in price was a foreseeable consequence of the investment."); *GFL Advantage Fund*, 272 F.3d at 209 (potential to impact prices is a "natural consequence[] of a lawful and carefully regulated trading practice" and "not evidence of unlawful market manipulation"); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 426 (S.D.N.Y. 2010) (trading not manipulative "even assuming that the effect of such trading was to depress the price" of a security). As this Court

correctly noted, "[e]very purchase, every sale can affect the market."  March 21, 2023 Tr. at

17:19-20.  Accordingly, the prosecution cannot argue manipulative intent based on the natural

consequence of swap transactions impacting the price of a security.

For all these reasons, this Court must preclude the prosecution from arguing that evidence

of undisclosed swap transactions, even large swap transactions that impacted stock price, proves

manipulative intent.  Such an argument not only misstates the governing law, but it encourages

the jury to draw the unfair conclusion, in violation of Federal Rule of Evidence 403, that Mr.

Hwang intended to manipulate the market because he knew that his swap transactions would not

be disclosed or that they could have price impact.  *Cf. Colson v. Cupp*, 449 F.2d 730, 731 (9th

Cir. 1971) ("When the lawfulness of an act depends upon the guilty intent with which the act was

done, it is patently wrong to tell a jury that it can infer the requisite intent simply from proof that

a defendant did the act."); *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (vacating

conviction where jury received overbroad instruction that improperly "captured lawful conduct"

and thus "could not have received a correct interpretation of the law").  This Court must not

countenance any prosecutorial attempt to bootstrap its manipulative intent argument with wholly

lawful conduct or its consequences.

## IV.   This Court Must Preclude Exhibits or Testimony Including Speculation Regarding Mr. Hwang's State of Mind in Executing Trades

The prosecution's exhibit list includes text messages containing speculation from

Archegos analysts *with no responsibility for trading* about Mr. Hwang's state of mind in

conducting trades.  This Court must exclude these exhibits or any witness testimony

incorporating such speculation.  First, these speculative opinions are inadmissible hearsay

because they are not authored by employees alleged to be part of the conspiracy.  Second, should

any of these analysts testify, their speculative opinions must be excluded under Federal Rule of

- 14 -

Evidence 701 because they are untethered to any first-hand knowledge or observations from which to reliably infer Mr. Hwang's state of mind, and they are in no way helpful to the jury's determination of the critical element in this case:  Mr. Hwang's intent.[3]  They do precisely what Rule 701 is designed to avoid:  tell the jury what result to reach.  Third, and finally, given the analysts' lack of personal knowledge regarding Mr. Hwang's state of mind with respect to trading strategy, their speculation regarding Mr. Hwang's intent must also be excluded under Federal Rule of Evidence 403.

As background, Archegos had a team of analysts responsible for analyzing the value of particular companies and a team of traders responsible for executing trades.  During the work-from-home environment of COVID, the analysts and traders had little interaction.  The analysts were not involved in trading strategy; they did not participate in Zoom sessions or chats regarding trading; and they did not have visibility into Archegos's trading as it occurred throughout the day.  In short, they had no firsthand knowledge of what trades were ordered, when they were ordered, or the strategy behind the trades.

Despite the analysts' lack of relevant knowledge, the prosecution marked several exhibits reflecting analyst speculation about Archegos's trades.  For example, the prosecution's exhibit list includes messages from analysts expressing their unfounded and speculative lay opinion that Mr. Hwang intended to commit "market manipulation" or intended to "defend" certain company stocks.  *See*, *e.g.*, Martinez Decl., Exs. D (GX-2946) and E (GX-2918).  None of these analysts executed trades, observed Mr. Hwang execute trades, or saw or heard what Mr. Hwang

---

[3] *See Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 77 (2d Cir. 2021) ("In some cases . . . 'scienter is the only factor that distinguishes legitimate trading from improper manipulation.'") (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)).

communicated to traders in executing trades.  Because these exhibits are offered to prove the

truth of the statements asserted in them, these speculative statements are hearsay that must be

excluded.  *See* Fed. R. Evid. 801(c), 802; *Smith v. New York and Presbyterian Hospital*, 440 F.

Supp. 3d 303, 338-39 (S.D.N.Y. 2020) (text messages of former employee were inadmissible

hearsay because they were out-of-court statements and were not made within the scope of an

employment relationship).

Next, should any of these analyst witnesses testify at trial, Rule 701 would bar their

speculative lay opinions regarding Mr. Hwang's state of mind.  Under Rule 701, a witness may

not testify about a defendant's knowledge, intent, or motive, unless rationally based on the

witness's firsthand knowledge or observation.  *United States v. Kaplan*, 490 F.3d 110, 118 (2d

Cir. 2007); *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992).  Even then, the witness's

opinion about a defendant's state of mind "will often not be 'helpful' within the meaning of Rule

701."  *Rea*, 958 F.2d at 1216; *see id.* at 1215 ("Rule 701's helpfulness requirement is designed to

provide 'assurance[ ] against the admission of opinions which would merely tell the jury what

result to reach.'") (citing Fed. R. Evid. 704 Advisory Committee Note on 1972 Proposed Rules);

*see*, *e.g.*, *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("Rule 701(b) bars lay opinion

testimony that amounts to a naked speculation concerning the motivation for a defendant's

adverse employment decision"); *United States v. Hoffner,* 777 F.2d 1423, 1425 (10th Cir. 1985)

(affirming district court's decision to bar lay opinion testimony about defendant's intent in

prescribing controlled substances when no witness observed defendant prescribe unlawful

prescriptions to patients); *United States v. Awadallah*, 401 F. Supp. 2d 308, 314 (S.D.N.Y. 2005)

("Mere unfounded speculation about [defendant's] state of mind . . . would not be admissible.").

Finally, such speculative analyst lay opinions suffer an additional fatal flaw: they are unhelpful to the jury. Even assuming that these lay witnesses could "fully describe[ ] what [Mr. Hwang] was in a position to observe," which they cannot, their opinions about Mr. Hwang's state of mind would be unhelpful "because the jury w[ould] be in as good a position as the witness to draw the inference as to whether or not the defendant knew." *Rea*, 958 F.2d at 1216. Moreover, all such testimony presents a danger of unfair prejudice, misleading the jury, and waste of time that substantially outweighs any de minimus probative value. *See* Fed. R. Evid. 403; *Kaplan*, 490 F.3d at119-122 .

For all these reasons, this Court must exclude any exhibits or testimony incorporating analyst speculation about Mr. Hwang's state of mind in executing trades.

## V.      This Court Must Bar the Prosecution From Introducing Evidence Incorporating Legal Conclusions Regarding Manipulative Trading

The key question for the jury at trial will be whether Mr. Hwang manipulated the market. "Manipulative" is a term of art in the law and is defined with precision. The definition of manipulative is indisputably within the province of this Court and not within the ken of any layperson (or expert for that matter). For this reason, this Court must bar the prosecution from injecting any improper legal conclusions regarding manipulative trading through documents or testimony. Not only does such evidence invade the Court's province, but it invades the jury's too, attempting to substitute the speaker's judgment for that of the jury.

The statutory term "manipulation" is "virtually a term of art when used in connection with securities markets." *Santa Fe Indus. v. Green*, 430 U.S. 462, 475 (1977); *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 199 (1976). Manipulation occurs when a person engages in market activity aimed to deceive investors about how other market participants have valued a security. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007). "The term

refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus.*, 430 U.S. at 476 (citing, among other examples, Section 9 of the 1934 Exchange Act, 15 U.S.C. § 78i, and *Ernst & Ernst*, 425 U.S. 185 (1976), a Section 10(b) of the 1934 Exchange Act case).   It requires proof that a person engaged in intentional and willful conduct designed to deceive or defraud investors by artificially distorting the prices of the securities in question, such that the prices of those securities were not governed by the natural interplay of supply and demand.  *Ernst & Ernst*, 425 U.S. at 199; *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2021); *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999); *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969); *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992).

Notwithstanding the precision with which "manipulative" is defined in the law, the prosecution included documents in its exhibit list that use a variation of the statutory term to communicate legal conclusions about Mr. Hwang's guilt.  *See*, *e.g.*, Martinez Decl. Ex. F (GX-2915) (Archegos analyst commenting that "[t]his seems like the old swashbuckling days of 1920s trading where a few guys *manipulate the stock*.") (emphasis added); GX-2946 (Archegos analyst speculating that "[t]hey were *manipulating the market*.") (emphasis added).  These documents are classic hearsay—*i.e.*, out-of-court statements offered to prove the truth of the matter asserted, Fed. R. Evid. 801(a)-(c), and must be excluded.  *See supra* at Section IV. Furthermore, because lay-opinion evidence must not communicate legal conclusions, and because the admission of such opinion evidence creates a high risk of unfair prejudice and misleading the jury about the ultimate legal conclusion in this case, this Court must preclude any lay-opinion testimony expressing a legal conclusion that Mr. Hwang manipulated the market.

"Witnesses may not present testimony in the form of legal conclusions." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (internal quotation marks and citation omitted). This prohibition applies to both lay and expert witnesses. *Id.* at 62 n.5 ("The cases laying out this rule have focused on *expert* witnesses. But the impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer.") (emphasis in original); *Davis v. City of New York*, 959 F. Supp. 2d 427, 436 (S.D.N.Y. 2013). The harm from such lay-opinion evidence is twofold: first, it "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law," *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *Davis*, 959 F. Supp. 2d at 436; and second, it usurps the jury's role by "tell[ing] the jury what result to reach, and thus attempt[ing] to substitute the [witness's] judgment for the jury's," *Cameron*, 598 F.3d at 62; *Davis*, 959 F. Supp. 2d at 435-36.

The indictment charges Mr. Hwang with manipulating the prices of certain securities as a substantive count and as one of the predicate racketeering acts that were intended to be committed as part of the RICO conspiracy, in violation of 15 U.S.C. § 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and with manipulation of securities prices, in violation of 15 U.S.C. § 78i(a)(2). Superseding Indictment ¶¶ 68a, 76, 78. Here, the potential lay witness testimony from Archegos employees would invade the province of the Court by expressing the legal conclusion that Mr. Hwang "manipulate[d] the stock" or "w[as] manipulating the market."

Moreover, the Second Circuit prohibits the use of such statutory language connoting guilt, and no testifying witness should be permitted to use the term "manipulation." *Scop*, 846 F.2d at 140-42 (holding that witness's statements embodying legal conclusions, including "manipulation," were improperly admitted, and commenting that "[n]one of our prior cases . . . has allowed testimony similar to [witness's] repeated use of statutory and regulatory language

indicating guilt").  Such legal-conclusion evidence is not helpful to the jury; it is nothing more

than an attempt "to tell the jury what result to reach" and "to substitute the [witness's] judgment

for the jury's."  *Cameron*, 598 F. 3d at 62; *Scop*, 846 F.2d at 140 ("[B]ecause his opinions were

calculated to invade the province of the court to determine the applicable law and to instruct the

jury as to that law, . . . they could not have been helpful to the jury in carrying out its legitimate

functions.") (internal quotation marks and citation omitted).

      Finally, admitting Archegos employees' lay opinions creates an unduly high risk that the

jury will believe that such witnesses are better equipped to determine whether Mr. Hwang

manipulated the market and unfairly substitute those lay witness conclusions for its own.  *See*

Fed. R. Evid. 403; *United States v. Barnwell*, No. 15 Cr. 620 (NSR), 2017 WL 1063457, at *5

(S.D.N.Y. Mar. 20, 2017) (granting motion *in limine* to redact legal terms connoting potential

guilt, finding that lay witness and documentary evidence embodying legal conclusions "runs the

risk of misleading the jury, unfairly prejudicing Defendant, and invading the province of the jury

to decide the ultimate issues in this case" under Rule 403).

      For all these reasons, this Court must preclude any evidence expressing a legal

conclusion that Mr. Hwang manipulated the market.

## VI.    This Court Must Preclude Evidence or Argument Regarding Archegos's Compliance with the "Wash Sale" Rule of the Internal Revenue Code

      This Court must preclude the prosecution from offering evidence or argument regarding

Archegos's compliance with the "wash sale" rule of the Internal Revenue Code ("IRC").  This

evidence should be excluded under Federal Rule of Evidence 402, because IRC wash sales are

simply legal transactions ineligible for certain tax deductions and are irrelevant to the

prosecution's market manipulation claims.  Furthermore, there is significant risk that the jury

would confuse the IRC's use of "wash sale" with the Security Exchange Act's distinct use of the

same phrase to describe certain *illegal* conduct—a confusion that would unfairly prejudice Mr.

Hwang.  Accordingly, even if this Court finds that evidence of IRC wash sales is relevant,

Federal Rule of Evidence 403 nevertheless counsels its exclusion, because the danger that it will

mislead the jury and create unfair prejudice far outweighs its minimal probative value.  Finally,

if this Court does *not* preclude this evidence or argument, then this Court should give a curative

instruction whenever the prosecution mentions Archegos's IRC "wash sales" to remind the jury

that tax-related wash sales are neither manipulative nor otherwise illegal.

The prosecution's exhibit list suggests that it intends to offer, in support of its *market*

*manipulation* case, evidence suggesting that Archegos engaged in *tax-related* wash sales.  But

this evidence is irrelevant and must be excluded under Rule 402.  *See* Fed. R. Evid. 402

("Irrelevant evidence is not admissible.").

Market manipulation cases have "traditionally encompassed practices such as wash

sales."  *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017).  In that context, "wash

sale" is a term of art that refers to specific criminal conduct:  illegal sales of securities that

"involve[] no change in the beneficial ownership" of the securities sold and that are intended to

"creat[e] a false or misleading appearance of active trading" in those securities or in the market

for those securities.  15 U.S.C. § 78i(a)(1).  *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185,

205 n.25 (1976) ("'Wash' sales are transactions involving no change in beneficial ownership.").

The indictment does not allege that any of Mr. Hwang's trading constituted such a wash sale.

But "wash sale" is also used in an unrelated context:  the Internal Revenue Code.  There,

a wash sale occurs when a taxpayer sells a security and, within thirty days before or after the

sale, purchases a "substantially identical" security.  26 U.S.C. § 1091(a); Treas. Reg. § 1.1091-

1(a).  Significantly, the IRC does not criminalize wash sales, but rather simply eliminates the

availability of a tax deduction for which they might otherwise qualify: while taxpayers may typically deduct capital losses they realize by selling securities, they may *not* take that deduction for losses incurred as part of a wash sale. *See id.* Thus, the rule prevents taxpayers from two bites at the apple—*i.e.*, benefitting from a deduction enabled by selling a security at a loss, then repurchasing an identical security to "benefit from future increases in price." Garrett M. Fischer, *New Twists on an Old Plot: Investors Look to Avoid the Wash Sale Rule by Harvesting Tax Losses with Exchange-Traded Funds*, 88 WASH. U. L. REV. 229, 234 (2010).

The prosecution appears poised to submit evidence and argument that Archegos engaged in IRC wash sales. For example, in prosecution exhibit GX-0102 (Martinez Decl. Ex. G), an April 8, 2020 email chain, William Tomita advises Mr. Hwang that, because Archegos has "unwound a bunch of positions" at one counterparty, its "IQ position is now largely concentrated." To mitigate the risk of that concentration, Tomita suggests that they "move ~$50mm" to two other counterparties. This will result in "a small wash sale," he explains, but it will also allow Archegos to take advantage of a better margin rate offered by the new counterparties. Mr. Hwang appears to approve. Tomita then advises Patrick Halligan of the strategy, and Halligan replies that "the wash sale won't be relevant to worry about – it's been laundry day these days!" And in prosecution exhibit GX-3070 (Martinez Decl. Ex. H)—a copy of a June 22, 2020 Bloomberg Chat—David Hohlman tells Scott Becker that he has "adjusted the cost basis" of a portion of Archegos's holdings in TSLA (a security that is not at issue in this case) after a "wash sale." The updated basis "results in an unrealized loss of 4m." Without the wash sale rule, he continues, it "[w]ould've been a gain of ~90k."

These exhibits, and similar evidence and argument, are irrelevant to the prosecution's market-manipulation case because they do not tend to prove or disprove any fact "of

consequence" to it.  Fed. R. Evid. 401(b).  Indeed, they are not evidence of *manipulative* wash sales within the meaning of the Securities Exchange Act at all:  they show only strategic investment decisions with a tax consequence that Archegos chose to absorb.  Archegos's efforts to comply with tax law have no bearing on the prosecution's allegations that Mr. Hwang manipulated the stock market.  Accordingly, this Court should exclude evidence or argument regarding Archegos's IRC wash sales as irrelevant.

Such evidence and argument must also be excluded under Rule 403 because the jury could become confused that these references to "wash sales" reflect manipulative trading, not perfectly legitimate conduct governed by the IRC.  The jury is exceedingly unlikely to have prior knowledge of the distinction between these two types of wash sales, and if the prosecution proceeds as its exhibit list suggests, there is a significant danger that the jury will improperly conflate the two different meanings of the phrase.

In short, evidence of tax-related wash sales helps the prosecution simply because it *sounds* bad, even though it is entirely legitimate.  The prosecution should not be permitted to proceed by prejudicial homonym.  To avoid the risk of juror confusion and unfair prejudice that this evidence and argument would cause, this Court should exclude them under Rule 403.[4]

---

[4] In the event that the prosecution is permitted to offer this evidence and argument, Mr. Hwang respectfully requests that this Court issue a limiting instruction to remind the jury that tax-related wash sales, as defined by the Internal Revenue Code, are not illegal, and are not the same as market-manipulation-related wash sales, as defined by the Securities Exchange Act.

## **CONCLUSION**

For the above-stated reasons, Mr. Hwang respectfully requests that the Court grant his motions *in limine* and preclude the prosecution from offering (1) evidence or argument regarding the price decline of the at-issue securities; (2) evidence or argument characterizing Archegos's swap positions as a percentage of the float; (3) argument of manipulative intent based on swap purchases alone; (4) exhibits or testimony including speculation regarding Mr. Hwang's state of mind in executing trades; (5) evidence incorporating legal conclusions regarding manipulative trading; and (6) evidence or argument regarding Archegos's compliance with the "wash sale" rule of the Internal Revenue Code.

Dated:   New York, New York
         March 21, 2024

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: */s/ Michael Martinez*_____
      Barry H. Berke
      Dani R. James
      Jordan Estes
      Michael Martinez
      1177 Avenue of the Americas
      New York, NY 10036
      Telephone: (212) 715-9100
      MMartinez@kramerlevin.com

      *Attorneys for Defendant Bill Hwang*