

U.S. Department of Justice

United States Attorney
Southern District of New York

*The Jacob K. Javits Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 4, 2024

**VIA ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   **Re:**  *United States v. Hwang and Halligan*,
      **S1 22 Cr. 240 (AKH)**

Dear Judge Hellerstein:

  The Government respectfully writes in opposition to defendant Bill Hwang's letter motion (Dkt. 215) seeking reconsideration of the Court's May 6, 2024 ruling regarding the testimony of Steven Cahall. Consistent with the Court's May 6, 2024 ruling, the Government intends to call Mr. Cahall, a sell-side analyst at Wells Fargo, to testify to his observations and actions, namely that he published research reports in response to observed changes in the stock prices of Viacom and Discovery.

  By way of background, during the May 6, 2024 conference in this matter, the defense argued that Mr. Cahall's testimony was inadmissible. (May 6, 2024 Tr. 34-35). Specifically, the defense argued, as it does now, that it would be improper for Mr. Cahall to testify regarding "Mr. Hwang's intent" because Mr. Cahall "had no direct dealings with Archegos" and "had no dealings with Mr. Hwang." (May 6, 2024 Tr. 34-35). The defense also argued that the Government sought "to present [Mr. Cahall] as an expert witness in an improper way," and that the Government "cherrypicked" Mr. Cahall as a sell-side analyst "who agrees with [the Government's] view." (May 6, 2024 Tr. 35). The Government responded, noting that Mr. Cahall "is a percipient witness," not an expert, "who will describe the impact that the trading had on his recommendations to the market." (May 6, 2024 Tr. 34). The Government argued that Mr. Cahall's testimony was relevant "to prov[ing] up an element of the market manipulation charge." (May 6, 2024 Tr. 34). Having heard from the parties, the Court ruled: "[Mr. Cahall] can tell what he did. I am not sure he can tell what he thought." (May 6, 2024 Tr. 35). Thereafter, when the defense offered to "put a letter in," the Court again stated: "I'm telling you right now. He can testify what he did." (May 6, 2024 Tr. 35).

  The Court's May 6, 2024 ruling was correct, and the defense offers no persuasive reason why the Court should reconsider it mere hours before Mr. Cahall is expected to testify. Counts Three, Four, and Five of the Superseding Indictment charge Mr. Hwang with market manipulation

with respect to ViacomCBS, Discovery Communications, Inc., share class A, and Discovery Communications, Inc., share class C, respectively, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United State Code, Section 2. (Dkt. 134 at 39-40). For those Counts, one of the elements that the Government must prove is that the defendant acted for the purpose of inducing the purchase or sale of Viacom and Discovery by others. *See, e.g.*, *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991). Mr. Cahall's testimony is directly relevant to the jury's consideration of this element. The Government anticipates that Mr. Cahall will testify that he has covered Viacom and Discovery as a sell-side analyst since 2016. Mr. Cahall will testify that, in late 2020 and early 2021, he observed that the prices of Viacom and Discovery increased, he observed that the prices of Viacom and Discovery increased notwithstanding the absence of new information about the companies and their financial performance, and that the disconnect between the companies' fundamentals and the increases in their stock prices led Mr. Cahall to author and publish analyst reports in which he raised price targets for those companies and recommended that investors not short sell those companies.

When combined with expert testimony about Archegos's trading, the anticipated testimony will show that Hwang's trading decisions caused sell-side analysts, like Mr. Cahall, to recommend that others purchase the stock. Put differently, the Government will demonstrate that sell-side analysts' recommendations were impacted by the meteoric rise in Viacom's and Discovery's stock prices during the charged time period, which, the Government alleges, the defendant's actions caused. The Government anticipates a targeted direct examination of Mr. Cahall consistent with that purpose. In light of the Court's May 6, 2024 admonition that Mr. Cahall "can testify what he did," but not "what he thought" (May 6, 2024 Tr. 35), the Government will center the direct examination of Mr. Cahall around a handful of sell-side analyst reports about Viacom and Discovery that Mr. Cahall authored during the relevant period. Those reports are "what he did."

Contrary to the defense's arguments (Dkt, 215 at 3), Mr. Cahall's anticipated testimony is not expert testimony. It is proper fact testimony from a percipient lay witness who, as part of his employment, authored reports with recommendations for investors in Viacom and Discovery. Indeed, Mr. Cahall will testify about the contemporaneous observations he made and the actions he in fact took. That testimony will concern sell-side reports that he prepared during the relevant time period, recommending that investors take or not take certain actions concerning Viacom and Discovery.

Moreover, that testimony is directly probative of whether Mr. Hwang's trading induced the purchase or sale of Viacom and Discovery by others, and thus is relevant circumstantial evidence of whether Mr. Hwang acted *for the purpose* of so inducing others. In arguing against the relevance of Mr. Cahall's testimony, the defense takes an unduly cramped view of evidence relevant to intent. (Dkt. 215 at 2). On the defense's view, Mr. Cahall's testimony could be relevant to intent only if the Government could prove that Mr. Hwang saw Mr. Cahall's reports.[1] (Dkt. 215 at 2). That

---

[1] In fact, email evidence demonstrates that Mr. Hwang was indeed on Mr. Cahall's email distribution list, though the relevance of Mr. Cahall's testimony does not depend on that fact.

argument misunderstands the Government's theory of relevance here. The Government does not contend that Mr. Hwang adjusted his trading in response to Mr. Cahall's reports; instead, the Government contends that Mr. Cahall adjusted his reports in response to Mr. Hwang's trading, and that other traders adjusted their trading in response to Mr. Cahall's reports. To be sure, Mr. Cahall's anticipated testimony will not, on its own, be conclusive proof of Mr. Hwang's intent. But such conclusive proof rarely exists, and the Government is entitled to marshal relevant, circumstantial evidence from which it can argue intent.[2]

The defense efforts to preclude Mr. Cahall's testimony stand in stark contrast with the defense's repeated efforts to question witnesses regarding sell-side research reports, news articles, and internet posts regarding VIAC and other companies. Indeed, much of yesterday's cross-examination of Dr. Taveras revolved around suggestions that Archegos's portfolio benefited from the "meme stock" phenomenon, (*e.g.*, Tr. 2317-2318), and the suggestion that other buyers purchased the same stocks at the same or higher prices, (*e.g.*, Tr. 2287), so Mr. Hwang's purchases could not have been improper. But Mr. Cahall's testimony will demonstrate to the jury how stock price changes can and do alter the behavior of other market participants, like those recommending stocks. Mr. Cahall's testimony will show that others in the market were deceived by, and reacted to, Hwang's conduct, though they did not know it at the time. Specifically, Hwang's trading led Mr. Cahall to author reports raising his price targets for those securities and changing his recommendation to investors. Through other witnesses, including the Government's expert witnesses and Archegos employee witnesses, the Government will establish that this sort of change to the market is exactly what Hwang intended to achieve.

---

[2] The defendant's reliance on Judge Gardephe's decision in *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2021 WL 2809919, at *25 (S.D.N.Y. July 6, 2021), is misplaced. In that case, the defendant sought to introduce text messages between other people, which the defendant never saw, as evidence that reflected the defendant's own state of mind—that is, whether he believed the extortionate threats that he made were wrongful. In that context, Judge Gardephe correctly ruled that the text messages could not reflect the defendant's state of mind, inasmuch as he never saw them. That conclusion has no application here, where the question is whether the defendant's trading caused others to buy or sell particular securities.

For the foregoing reasons, the Government respectfully requests that the Court deny the defense's motion for reconsideration of the May 6, 2024 denial of their request to preclude the testimony of Mr. Cahall.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/_____
Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
Tel.: (212) 637-1947/-2580/-2504/-2106

Cc: Counsel of Record (via ECF)