

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

<small>The Jacob K. Javits Building
26 Federal Plaza, 37th Floor
New York, New York 10278</small>

June 21, 2024

**<u>VIA ECF AND EMAIL</u>**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Hwang and Halligan*,
              **S1 22 Cr. 240 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully writes to provide notice to the Court regarding the anticipated testimony of DeLeassa Penland, a Special Agent at the United States Attorney's Office for the Southern District of New York. The Government anticipates that Special Agent Penland will offer testimony in two areas: (i) she will present three charts, which summarize voluminous admitted evidence, each of which she prepared; and (ii) she will publish several exhibits that the Government will offer into evidence by reading certain emails and other communications written by the defendants.

    **I.**    **Summary Charts**

      Special Agent Penland prepared three summary charts that the Government intends to offer into evidence. One of the charts, GX 9067, depicts Archegos's cash over time, and the other two charts, GX 9066 and GX 9068, depict information about phone calls made to and from cooperating witness Scott Becker's phone during Archegos's final week. Special Agent Penland's summary charts are appended to this letter.[1]

      **GX 9067**: During the Government's direct examination of Jesse Martz, a member of Archegos's operations team, the Government introduced many exhibits that reflected Archegos's cash at various points in time. The Government published some of those exhibits during Martz's testimony, and the Court stated, "If these numbers are important, it will be useful to have a summary chart." (Tr. 410). Taking the Court's direction, the Government requested that Special Agent Penland prepare a chart summarizing Archegos's cash on 24 days, from October 30, 2020 through March 25, 2021. Archegos's cash over time is important to the Government's case in at least two ways. First, the increasing cash levels in the run up to March 23, 2021 are probative of defendant Bill Hwang's motive for his market manipulation scheme; by pushing up the securities' prices, Hwang was able to increase Archegos's cash. Second, that Hwang continued to purchase

---

[1] GX 9068 is a Microsoft Excel spreadsheet, which the Government will email to the Court.

the securities he had been manipulating in late-March 2021, even as Archegos was running out of cash, is probative of his intent to manipulate the prices of those securities.

**GX 9066 and GX 9068**: The other two charts that Special Agent Penland prepared summarize information about calls to and from Becker's phone from Monday, March 22, 2021 through Friday, March 26, 2021. Special Agent Penland reviewed the toll records from Verizon for Becker's phone number during that period. GX 9066 summarizes the frequency of phone calls that week between Becker and defendant Patrick Halligan. GX 9068 summarizes the records of Becker's phone calls during that final Monday through Friday by color-coding those calls into five categories: (i) calls with Halligan; (ii) calls with cooperating witness William Tomita; (iii) calls with particular counterparties of Archegos; (iv) calls with other numbers; and (v) calls to a conference server (of which there is one). The frequency with which Becker spoke to Halligan during Archegos's final week, both on an absolute basis and a relative basis, as well as the proximity of Becker's calls with Halligan in relation to Becker's calls with Archegos's counterparties, are probative of Halligan's knowledge of Becker's misstatements to counterparties and of Halligan's and Becker's joint participation in a conspiracy and racketeering enterprise.

Special Agent Penland's summary charts provide an efficient, helpful, and consistently approved presentation of voluminous, admitted evidence to the jury and are therefore admissible. The Second Circuit has "regularly affirmed" the use of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records." *United States v. Yousef*, 327 F.3d 56, 157-58 (2d Cir. 2003) (upholding admission of telephone summary charts); *see also United States v. Thiam*, 934 F.3d 89, 96-97 (2d Cir. 2019) (upholding admission of summary chart showing defendant's luxury purchases and text exchange involving defendant); *United States v. Casamento*, 887 F.2d 1141, 1149, 1151 (2d Cir. 1989) (upholding admission of summary charts consisting of "graphs, maps or brief written descriptions" summarizing evidence such as "the testimony of government agents regarding observations made during surveillance, transcripts of intercepted telephone conversations, and seized items such as guns or money"); *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (upholding admission of summary charts that "included the names of identified participants in . . . telephone conversations, the numbers used by conspirators and the addresses of several conspirators' residences, where calls were placed or received"); *United States v. Goldberg*, 401 F.2d 644, 647-48 (2d Cir. 1968) (upholding admission of charts that were constructed "from the testimony of the government's witnesses and from . . . voluminous business records"). Relatively recently, in *United States v. Ho*, the Second Circuit rejected a defendant's challenge to summary charts "created for the purpose of generating a narrative supporting the prosecution's theory of the case," citing a long line of precedent holding that such charts are useful to the jury and permitted by Rule 1006 of the Federal Rules of Evidence. 984 F.3d 191, 209-10 (2d Cir. 2020).[2]

---

[2] In affirming the charts' admission, the Circuit noted the importance of the usual limiting instruction "that the charts themselves did not constitute independent evidence and that it was the jury's duty to first determine that they accurately reflected the evidence on which they were based." *Ho*, 984 F.3d at 210. The Government consents to the same instruction here.

Following such Second Circuit authorities, courts in this District regularly admit summary charts like Special Agent Penland's. *See*, *e.g.*, *United States v. Garelick*, No. 23 Cr. 307 (LJL), Tr. 828-30 (S.D.N.Y. May 3, 2024) ("[T]he Court concludes that the probative value of the charts far outweighs any prejudicial impact and the waste of time that would occur if the government were forced to go through the underlying records item by item"); *United States v. Milton*, No. 21 Cr. 478 (ER), Tr. 2261-68 (S.D.N.Y. Sept. 29, 2022) (overruling objections to summary chart); *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022) (rejecting defense argument that charts that "summarized communications among defendants" and "summarized financial evidence" were inadmissible because they were "misleading" and "took evidence out of context"); *United States v. Cole*, No. 19 Cr. 869 (ER), Tr. 2005-06 (S.D.N.Y. Oct. 22, 2021) (admitting summary charts offered by SEC witness over defense Rule 403 objection); *United States v. Calk*, No. 19 Cr. 366 (LGS), Tr. 2-5 (S.D.N.Y. June 22, 2021) (overruling defendant's objection to summary charts that put exhibits in chronological order); *United States v. Blakstad*, No. 19 Cr. 486 (ER), Tr. 400-04 (S.D.N.Y. June 16, 2021) (admitting summary charts of trading data); *United States v. Skelos*, No. 15 Cr. 317 (KMW), Tr. 2252-57, 2262 (S.D.N.Y. 2015) (rejecting defense argument that summary charts were "argument presented through an FBI agent" and "in effect summation," finding "it is precisely the type of information that has been allowed to be used in charts").

Because revisions to the summary charts would be time consuming, the Government seeks an advance ruling on the admissibility of those charts in order to ensure efficient use of the Court's and the jury's time, as well as counsel's.

## II.   The Defendants' Messages

Independent of Special Agent Penland's testimony regarding the summary charts she prepared, the Government also anticipates offering into evidence thirteen exhibits that include the defendants' written words, and publishing those exhibits. For nine of the thirteen exhibits, the Government anticipates asking Special Agent Penland to publish the exhibit to the jury by reading brief portions of the exhibits; for the remaining four exhibits, the Government anticipates displaying them for the jury to read silently. The thirteen exhibits in question, which are attached to this letter, are GX 148, GX 227, GX 1151, GX 2921, GX 2923, GX 2930, GX 2943, GX 2960, GX 2963, GX 2982, GX 2983, GX 3745, and GX 3793.[3]

The parties have stipulated to the authenticity of all thirteen exhibits. Additionally, under Federal Rule of Evidence 801(d)(2)(A), the defendants' written messages "[are] not hearsay" because "[t]he statement[s] [are] offered against an opposing party and . . . w[ere] made by the party in an individual or representative capacity." Notably, Rule 801(d)(2)(A) removes from the definition of hearsay *any* such statements by opposing parties, and not just statements that "had so great a tendency . . . to expose the declarant to . . . criminal liability," which Rule 804(b)(3)(A)

---

[3] The Government has redacted from the publicly filed versions of those exhibits phone numbers and personal email addresses. The Government will email the Court unredacted versions of those exhibits.

separately excepts from the hearsay rule for unavailable declarants. Not only are the thirteen exhibits authentic and non-hearsay, but also they are relevant. To take just a few representative examples:

- GX 3793 is an Instant Bloomberg Message thread between Halligan and Becker from March 16, 2021—the same day that Halligan joined Becker for a call during which Bank of America representatives were provided materially misleading information about Archegos's portfolio. Ahead of that phone call, in the Instant Message, Halligan asked whether Tomita would be joining Becker for the call, and, when Becker responded that Tomita would not be joining, Halligan wrote:

  > [M]aybe a good idea for me to be on with you then . . . . More as a passive participant. . . . I think as we get through this one, if you have calls lined up, it would be good to have either [Tomita] or me on with you… Makes everyone internally here see we are doing all we can… Makes them over here know we are focused on it.

  (GX 3793). Halligan's intent with respect to, and knowledge of, Becker's misrepresentations to Archegos's counterparties is a central issue in dispute in this trial, and GX 3793 bears directly on that issue. To the extent that it was Becker who provided Bank of America with materially misleading information during the March 16, 2021 phone call, Halligan's messages suggest that Halligan was aware that the purpose of Becker's having done so was to get access to additional capacity—a central focus of Hwang's at the time that Halligan wanted to project his team was taking seriously ("Makes everyone internally here see we are doing all we can… Makes them over here know we are focused on it.").

- GX 1151 includes an August 7, 2017 email that Halligan sent to a Credit Suisse representative, copying, among others, Becker. In response to Credit Suisse's written question about Archegos's portfolio, "Top single position as a % of NAV? Top 5 positions as a % of NAV?," Halligan wrote, "15-20%." (GX 1151). In fact, as of the time that Halligan sent his email, Archegos's top single position was 45.82% of NAV. Whether Halligan trained and directed Becker to mislead Archegos's counterparties about certain aspects of Archegos's portfolio, including its concentration, is a key issue in dispute, and GX 1151 bears directly on that issue. Halligan's email demonstrates that Halligan provided counterparties with misleading information about the concentration of Archegos's portfolio, and that he did so in a way that was visible to Becker.

- GX 2963 is a July 14, 2020 text message that Hwang sent to an acquaintance, in which Hwang wrote, among other things, "I am one of the top shareholders of TME [thumbs up emoji]." (GX 2963). TME is one of the tickers that Hwang is charged with having manipulated. The majority of Hwang's exposure to TME was through

swaps, rather than cash equities. Accordingly, contrary to Hwang's message, he was not, in fact, one of the top shareholders of TME. But Hwang's message demonstrates that he understood that, in many respects, owning the swap was equivalent to owning the stock. Hwang's intent with respect to, and knowledge of, the consequences of his trading on swap is an important, contested issue, and GX 2963 bears directly on that issue.

Finally, Rule 403 does not stand in the way of publishing these limited exhibits during the testimony of Special Agent Penland. For any exhibit longer than one page, the Government proposes to have Special Agent Penland assist in reading only selected portions (while the full exhibit is displayed to the jury). And again, the Government does *not* propose to ask Special Agent Penland to read from all thirteen of the exhibits. Accordingly, there is no "danger of . . . undue delay [or] wasting time." Fed. R. Evid. 403.

                                              Respectfully submitted,

                                              DAMIAN WILLIAMS
                                              United States Attorney

                                     By: s/_____
                                          Matthew Podolsky
                                          Alexandra Rothman
                                          Samuel P. Rothschild
                                          Andrew Thomas
                                          Assistant United States Attorneys
                                          Tel.: (212) 637-1947/-2580/-2504/-2106

Cc: Counsel of Record (via ECF and email)