



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Jacob K. Javits Building
26 Federal Plaza, 37th Floor
New York, New York 10278

June 25, 2024

**VIA ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Hwang and Halligan*,
                **S1 22 Cr. 240 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully submits this letter in reply to defendant Patrick Halligan's June 24, 2024 opposition (Dkt. 234) to the Government's June 21, 2024 letter (Dkt. 230) regarding the anticipated testimony of DeLeassa Penland, a Special Agent at the United States Attorney's Office for the Southern District of New York. For the reasons set forth below and in the Government's June 21, 2024 letter, Special Agent Penland's summary charts are admissible, as are the communications containing the defendants' written words that the Government seeks to offer into evidence.[1] The Court should reject Halligan's contrary arguments and receive into evidence the summary chats and the defendants' written communications.

    **I.**    **Summary Charts**

      **GX 9067**: Archegos's cash over time is relevant both because the increasing cash levels in the run up to March 23, 2021 are probative of defendant Bill Hwang's motive for his market manipulation scheme, and because Hwang's continued purchases of securities even as Archegos was running out of cash is probative of his intent to manipulate the prices. None of Halligan's four arguments justifies excluding GX 9067.

      Halligan's first argument—that the chart reflects one metric (cash) and not another metric ("the value of Archegos's assets" (Dkt. 234 at 2))—is a point that he is welcome to raise on cross-examination and may furnish a reason for him to offer a different chart in his case-in-chief. But the Government, in its case-in-chief, seeks to focus the jury on Archegos's cash, because it was with Archegos's cash, not with "the value of Archegos's assets," that Hwang was (or was not, as

---

[1] The summary charts and written communications were attached to the Government's June 21, 2024 letter. Since that letter was filed, GX 9067 and GX 9068 have been updated. Updated versions of those charts were previously produced to the defendants and are attached to this letter. GX 9068 is a Microsoft Excel spreadsheet, which the Government will email to the Court.

it turned out) able to pay for his last-ditch efforts at saving the manipulation scheme in Archegos's final week.

Halligan's second argument—that the chart is misleading because the cash numbers are projections (Dkt. 234 at 2)—fails because the chart does not purport to represent the cash numbers as anything else. In fact, the second page of the chart—which Halligan does not address, but which is depicted below—lists verbatim the label that each of the source exhibits used to describe the cash number.

| Date | Cash Number | Label | Government Exhibit | Trial Transcript |
|---|---|---|---|---|
| 10/30/2020 | $790,000,000 | "Cash Est Completed" | GX 6620, 6620A | n/a |
| 11/30/2020 | $1,203,000,000 | "Cash Est Completed" | GX 6621, 6621A | 405-06 |
| 12/31/2020 | $1,451,000,000 | "Cash Est Completed" | GX 6622, 6622A | n/a |
| 1/29/2021 | $6,635,000,000 | "Cash Est Completed" | GX 6623, 6623A | n/a |
| 2/26/2021 | $5,592,000,000 | "Cash Est Completed Orders" | GX 6624, 6624A | n/a |
| 3/1/2021 | $6,356,000,000 | "Cash Est Completed Orders" | GX 6625, 6625A | n/a |
| 3/2/2021 | $5,588,000,000 | "Cash Est Completed Orders" | GX 6626, 6626A | n/a |
| 3/3/2021 | $5,431,000,000 | "Cash Est Completed Orders" | GX 6627, 6627A | n/a |
| 3/4/2021 | $4,480,000,000 | "Cash Est Completed Orders" | GX 6628, 6628A | n/a |
| 3/5/2021 | $4,786,000,000 | "Cash Est Completed Orders" | GX 6629, 6629A | n/a |
| 3/8/2021 | $5,440,000,000 | "Cash Est Completed Orders" | GX 6630, 6630A | n/a |
| 3/9/2021 | $4,510,000,000 | "Cash Est Completed Orders" | GX 6631, 6631A | n/a |
| 3/10/2021 | $4,477,000,000 | "Cash Est Completed Orders" | GX 6632, 6632A | n/a |
| 3/11/2021 | $5,438,000,000 | "Cash Est Completed Orders" | GX 6633, 6633A | n/a |
| 3/12/2021 | $7,137,000,000 | "Cash Est Completed Orders" | GX 6634, 6634A | n/a |
| 3/15/2021 | $7,409,000,000 | "Cash Est Completed Orders" | GX 6635, 6635A | n/a |
| 3/16/2021 | $7,546,000,000 | "Cash Est Completed Orders" | GX 6636, 6636A | n/a |
| 3/17/2021 | $6,389,000,000 | "Cash Est Completed Orders" | GX 6637, 6637A | n/a |
| 3/18/2021 | $6,145,000,000 | "Cash Est Completed Orders" | GX 6638, 6638A | n/a |
| 3/19/2021 | $6,035,000,000 | "Cash Est Completed Orders" | GX 6639, 6639A | n/a |
| 3/22/2021 | $6,047,000,000 | "Cash Est Completed Orders" | GX 6640, 6640A | n/a |
| 3/23/2021 (10:05 am) | $2,411,000,000 | "BofA balance/broker excess after calls" | GX 6562, 6562A | 3481-84 |
| 3/23/2021 (8:07 pm) | -$75,000,000 | "BofA balance/broker excess after calls" | GX 6564, 6564B | 418-19, 1107-09, 3117-19, 3515-18 |
| 3/24/2021 (10:37 am) | -$6,951,000,000 | "True Excess Cash" | GX 6657 | 3525-26 |
| 3/24/2021 (7:32 pm) | -$13,518,000,000 | "True Excess Cash" | GX 6650, 6650B | 420-22, 1125-26 |
| 3/25/2021 | -$15,092,000,000 | "True Excess Cash" | GX 6656 | 3557-58 |

The majority of those labels include the abbreviation "Est" for "estimate," and the chart includes citations to pages of the trial transcript that support the proposition that the cash numbers that were assigned different labels in later exhibits correspond to the same type of number as those labeled "cash estimate" in the earlier exhibits. In other words, the chart prominently displays for the jury that these cash numbers are estimates (or, as Halligan prefers, "projections"). To avoid unnecessary litigation or the suggestion that the chart is somehow misleading, however, the updated version of GX 9067 adopts Halligan's proposed title: "Archegos's Cash Projections."

Halligan's third argument—that the chart's x-axis is not scaled (Dkt. 234 at 2)—provides no reason to exclude the chart. To avoid unnecessary litigation or the suggestion that the chart is somehow misleading, however, the updated version of GX 9067 draws attention to the changes in scale by breaking up the different parts of the chart.

Halligan's fourth argument—that the chart's color scheme is "inflammatory" (Dkt. 234 at 3)—is meritless. He entirely fails to explain how displaying positive numbers in green and negative numbers in red—a color scheme so commonplace as to require no explanation at all—could possibly "amplify" any purported defects in the chart.

**GX 9066 and GX 9068**: The frequency with which Scott Becker spoke to Halligan during Archegos's final week, both on an absolute basis and a relative basis, as well as the proximity of Becker's calls with Halligan in relation to Becker's calls with Archegos's counterparties, are probative of Halligan's knowledge of Becker's misstatements to counterparties and of Halligan's and Becker's joint participation in a conspiracy and racketeering enterprise.

Against those charts, Halligan essentially makes a single argument—that the charts are unhelpful because the jury "is fully capable of reviewing the underlying Verizon phone logs and assessing the frequency of phone calls between Mr. Halligan's and Mr. Becker's phone numbers" and "the jury is equally capable of reviewing the underlying phone logs and drawing whatever inferences they credibly support." (Dkt. 234 at 3). Just because the jury might be capable of doing something that would be incredibly time intensive and laborious, such as sifting through thousands of entries on a spreadsheet to find instances where certain phone number connected to one another, does not whatsoever imply that the jury would not be helped by visual depictions of the frequency and timing of such calls. Quite the contrary. Indeed, there is no doubt that thousands of rows of phone logs, which must be filtered for relevant numbers and matched up to identify the relevant timing of calls are something "that cannot be conveniently examined in court," as required by Rule 1006. That is why courts regularly admit charts that summarize phone logs, which, by their nature, are voluminous. *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 157-58 (2d Cir. 2003) (upholding admission of telephone summary charts). In *United States v. Blackwood*, for example, in upholding the admission of such charts the Second Circuit gave three reasons that apply equally here:

> *First*, the government's summary charts set forth detailed information concerning well over 100 telephone calls spanning three days between four individuals. In other words, the charts summarized information that otherwise would have been difficult for the jury to synthesize and evaluate, thus falling well within the purview of Rule 1006. *Second*, the summaries were helpful to the jury in its evaluation of the evidence because they showed the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy. Third, the charts were based upon and fairly represent competent evidence already before the jury.

366 F. App'x 207, 212 (2d Cir. 2010) (internal quotation marks omitted).

Halligan's related suggestion—that the Government forewent the opportunity to elicit testimony from Becker about his calls with Halligan during Archegos's final week (Dkt. 234 at 3)—is both incorrect and beside the point. The Government, in fact, did elicit testimony from Becker about his calls with Halligan during the final week. *See, e.g.*, Tr. 1524 (discussing how Halligan and Becker were in touch by phone throughout the final week); *see also id.* at 1116 (discussing direction Halligan gave Becker during the day on Wednesday, March 24, 2021); *id.* at 1519-20 (discussing conversation between Halligan and Becker that Wednesday); *id.* at 1153

(discussing call Becker had with Halligan that Wednesday night); *id.* at 1164 (same); *id.* at 1167 (same); *id.* at 1171 (discussing Becker and Halligan being in contact throughout Thursday, March 25, 2021); *id.* at 1173 (same).  Moreover, the testimony that Becker did or did not give has no bearing on the permissibility, under Federal Rule of Evidence 1006, of the Government's use of a chart to summarize for the jury voluminous phone records.[2]

## II.     The Defendants' Messages

The defendants' written communications that the Government seeks to offer are authentic, non-hearsay, and relevant.  With respect to GX 3745, GX 148, and GX 3793, Halligan does not argue otherwise.  Instead, as to each of those exhibits, Halligan advances arguments unmoored from any Rule of Evidence.

As to GX 3745, Halligan points out that the Court sustained Halligan's objection to the Government's application to admit the document during the Government's direct examination of Becker. (Dkt. 234 at 4 (citing Tr. 1097)).  Consistent with the Court's prior ruling, during the direct examination of Scott Becker, the Government elicited information about this discussion from Becker himself.  The defense has since vigorously contested Becker's credibility.  The Government should be permitted to offer the document, which contains the defendant's own words and provides corroboration of Becker's testimony.  The defense should not be permitted to call into question a witness's credibility but simultaneously force the Government to offer the defendant's words—which he wrote down at the time—only through that witness.  In that Bloomberg message from Tuesday, March 23, 2021, Halligan asked Becker, "Are we going to be able to pay for these trades today? . . .  I don't see how we can."  In particular, the parts of GX 3745 that the Government seeks to highlight for the jury are the five messages from 16:10:15 UTC through 16:11:33 on pages 1-2 of the document.

Against the admission of GX 148 and GX 3793 Halligan advances the same arguments that the Court rejected in denying Halligan's application to preclude the Government from introducing evidence of the March 16, 2021 misrepresentations to Bank of America.  (*Compare* Dkt. 234 at 4, *with* Tr. 3241-45).  The Court ruled that the Government may introduce evidence of such misrepresentations, which were made to Bank of America representatives on a phone call in which Halligan and Becker participated.  GX 148 and GX 3793 corroborate aspects of the testimony that the Government anticipates the jury will hear about that phone call.

---

[2] Halligan's footnote argument—that Special Agent Penland's charts should be excluded because the Court "declined to admit into evidence demonstrative charts offered by Mr. Hwang's counsel" (Dkt. 234 at 3 n.2)—draws a false equivalence.  During Hwang's cross-examination of William Tomita, Hwang's counsel created and modified a demonstrative in real time—using, for example, a stock price chart as a backdrop timeline onto which counsel plotted stock purchases that Tomita made in his own account.  That project, which the Court properly recognized was argument for summation, is nothing like the summaries supplied by Special Agent Penland's charts.

GX 148, for example, is a March 16, 2021 email from Halligan to Andy Mills, Tomita, and Becker.  The Government seeks to highlight for the jury the first three sentences of that email, which state:  "Just a quick note to let you know that we had a 30min call with credit/risk at BofA.  Scott painted a nice picture of who we are and what we do, as he always does.  I think it was enough to get things rolling."

GX 3793 is a March 16, 2021 Bloomberg message thread between Halligan and Becker.  The Government seeks to highlight for the jury two parts of the thread.  *First*, the six messages from 12:23:31 UTC through 12:29:25 UTC on pages 1-2; and *second*, the ten messages from 12:48:34 UTC through 12:55:30 UTC on pages 2-3.  The first segment corroborates the anticipated testimony regarding the misrepresentations to Bank of America because Halligan suggested that it might be "a good idea" for Halligan to join Becker for the Bank of America call so that people at Archegos would see that Halligan and Becker were "focused" on the issue of getting additional capacity for Archegos to trade.  And the second segment corroborates testimony that the jury has heard from both Becker and Tomita about how some combination of Halligan, Tomita, and Becker discussed how to respond to UBS's questions about how long it would take to unwind Archegos's portfolio.  To that end, in the message, Becker wrote, "The UBS guy just came back, I just sent my suggested reply to you and Will," later adding, "Will just called him," to which Halligan replied, "Sounds good."

That leaves GX 1151 and GX 2943.  As to GX 1151, Halligan contends that it "should be excluded under Rules 401 and 403." (Dkt. 234 at 5).  Halligan is wrong.  To be sure, the Court has policed unnecessary digressions into events predating 2020, but GX 1151 is not one of them.  To the contrary, Becker testified that, in around 2017, the same year that Halligan sent the email in GX 1151, Becker began to join Halligan's calls with counterparties and Becker began to observe Halligan lie to counterparties about aspects of Archegos's portfolio. (*E.g.*, Tr. 891-93).  In short, the jury has heard testimony that Halligan trained Becker to lie to Archegos's counterparties starting around 2017.  Again, Halligan has vociferously attacked Becker's credibility, and GX 1151 both demonstrates Halligan's intent that misleading information about the concentration of the portfolio be given to counterparties and corroborates Becker's testimony by offering an example from 2017 where Halligan provided misleading information to a counterparty in writing.  The "ambiguity and confusion" that Halligan sees in that document are illusory. (Dkt. 234 at 5).  In fact, Credit Suisse posed a simple question:  "Top single position as a % of NAV?  Top 5 positions as a % of NAV?"  And Halligan offered a simple response:  "15-20%." (GX 1151).  Whether Halligan intended to convey that Archegos's top position was 15% of NAV, or that each of Archegos's top five positions was 15% of NAV, his response was false.  At that time, Archegos's top single position was 45.82% of NAV.  Halligan complains that there is no "indication of the numerator or denominator in this percentage" (Dkt. 234 at 5), but, based on the question and answer alone, it is clear that the numerator is the size of Archegos's largest position, and the denominator is Archegos's NAV—in other words, the very same concentration ratio that numerous witnesses have described during this trial.

Finally, as to GX 2943, upon further reflection and to avoid unnecessary litigation, the Government has decided to withdraw its application to admit the document.

\* \* \*

For the foregoing reasons and those set forth in the Government's June 21, 2024 letter, the Government respectfully requests that the Court permit the Government to introduce Special Agent Penland's summary charts and certain of the defendants' written communications.

    Respectfully submitted,

    DAMIAN WILLIAMS
    United States Attorney

By: s/_____
    Matthew Podolsky
    Alexandra Rothman
    Samuel P. Rothschild
    Andrew Thomas
    Assistant United States Attorneys
    Tel.: (212) 637-1947/-2580/-2504/-2106

Cc: Counsel of Record (via ECF and email)