

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

The Jacob K. Javits Building
26 Federal Plaza, 37th Floor
New York, New York 10278

June 28, 2024

**VIA ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Hwang and Halligan*,
              S1 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

      On June 27, 2024, the defendants for the first time identified 36 documents that they seek to offer into evidence absent a witness—12 from defendant Bill Hwang and 24 from defendant Patrick Halligan.[1] The Government respectfully writes to preclude all 12 of Hwang's proposed exhibits and to preclude 22 of Halligan's 24 proposed exhibits.[2] As explained below, the challenged exhibits run afoul of the Federal Rules of Evidence. Many contain hearsay for which there is no exception. Others are irrelevant or likely to mislead the jury. Still others are cumulative of other evidence in the record. For the reasons set forth below, the challenged exhibits should be excluded.

      **I.**    **Hwang's Proposed Exhibits**

      Hwang's 12 proposed exhibits fall into 3 categories: (i) messages purporting to show Hwang's investment thesis; (ii) Bloomberg chats involving trading instructions; and (iii) emails regarding compliance. The exhibits in all three categories should be precluded.

---

[1] Given the number of exhibits, the fact that some of them include personally identifiable information, and the fact that some of them are Microsoft Excel spreadsheets, the Government will email the Court copies of the defendants' 36 proposed exhibits.

[2] The Government does not object to two of Halligan's proposed exhibits—namely, two May 28, 2020 DocuSign emails (DX 3102 and DX 3504).

### A. Investment Thesis Messages

Hwang seeks to admit messages to prove that he had a nonmanipulative reason for his trading. But the messages contain hearsay and are cumulative of other evidence in the record. The Court should preclude them.

#### 1. DX 3111

DX 3111 is a June 11, 2020 email from Hwang attaching a June 11, 2020 analyst report on Viacom. In the cover email, Hwang wrote, "I enjoyed reading this short report," and "since I talked about the company with many of you, I am sending it to you as well." The analyst report contains several pages of commentary on Viacom, including that "CBS All Access IP, model and experience [are] under-appreciated," and that Viacom presents "an attractive opportunity for the long-term risk tolerant investor."

DX 3111 should be excluded as hearsay. This email contains statements by Hwang that are being offered for their truth, including that Hwang, in fact, read the analyst report. The analyst report is also full of statements, about Viacom and its offerings, which are being offered for their truth.

But even if this exhibit did not contain hearsay, it should be precluded as cumulative of other evidence Hwang has put into the record about his "fundamental basis for trading [Viacom]." (Tr. 3851-52). During Hwang's cross-examination of Will Tomita, Hwang offered no fewer than ten emails (DX 3055, DX 3067, DX 3204, DX 3243, DX 3261, DX 3357, DX 3384, DX 3387, DX 4282, DX 5481), each purporting to establish Hwang's purported investment thesis for Viacom. Any further evidence on this point would be cumulative. The Court recognized as much during the cross-examination of Tomita, remarking that Hwang had already put in evidence to argue to the jury that Hwang had "a fundamental basis to buy." (Tr. 3852). Thus, DX 3111 should be excluded.

#### 2. DX 3370-R

DX 3370-R is a February 6, 2021 text message exchange between Hwang and an associate about Viacom. The associate told Hwang about Viacom's Nickelodeon offering, and Hwang wrote, "This will help VIAC multiple to expand!" The associate added, "Don't tell me VIAC doesn't have strong brands! They have so many brands that cut across language barriers!" These messages about Viacom's offerings are out-of-court statements being offering for the truth of the matters asserted. To the extent that Hwang seeks to prove his state of mind for buying Viacom, the record is riddled with messages and testimony on this point, and thus the admission of this message would be cumulative.

#### 3. DX 3410

DX 3410 is a March 12, 2021 email to Hwang from Dave Park that attached a Citibank analyst report for Viacom. The report itself is filled with hearsay, as is Park's cover email. The

substance is also cumulative of the dozen other Viacom emails Hwang has already put into evidence.

Moreover, on this email in particular, principles of fairness make exclusion appropriate. The Court previously precluded the Government from offering Park's statements to a fellow analyst, *just three days later,* on March 15, 2021, that, "Bill's target price for VIAC is $150 and for DISCK (vs. DISCA) is $90 (unchanged). Let's help him justify it." (Tr. 3025 (citing GX 178)). To permit Hwang now to offer the March 12, 2021 analyst report and Park's associated statement that "the sellside and buyside are still catching up," where the March 15, 2021 message was excluded, would prejudice the Government and present the jury with a one-sided narrative of the research function at Archegos. Thus, DX 3410 should be excluded.

### 4. DX 3129-R

DX 3129-R is a June 25, 2020 email in which Hwang wrote, "My bet is Farfetch is going to be strong even when this pandemic is over." Hwang has offered evidence of his investment thesis for Farfetch several times over through exhibits and testimony. (*See, e.g.*, DX 3072, DX 3255, DX 3424, DX 3426, DX 4286; Tr. 4005 (Q: "You understood that he liked Farfetch even before these investments; do you recall?" THE COURT: "You made the point."); Tr. 4012 ("Bill [said] that [Farfetch] was a good investment.")). Thus, DX 3129-R should be excluded as a cumulative attempt to prove Hwang's investment thesis for Farfetch.

### 5. DX 3335

DX 3335 is a December 31, 2020 email from Charlie Shi, a consultant at Archegos, to Hwang and others about the "investment thesis" for FUTU. The email contains hearsay statements from Shi and is cumulative of other evidence in the record. Thus, DX 3335 should be excluded.

**B. Bloomberg Messages with Trading Instructions**

Hwang seeks to admit three Bloomberg message threads involving trading instructions. These too should be precluded.

### 1. DX 4280-R

DX 4280-R is an excerpt from a Bloomberg chat between Tomita and Hwang from January 6, 2021, in which Hwang wrote, "The stock [referring to Viacom] is so cheap even here at 7 time PE next year! using GS numbers!" Hwang's purported belief that the manipulated securities were at "great prices" has already been the subject of direct and cross-examination (Tr. 3680; Tr. 3969), and thus admitting this message is cumulative of other evidence in the record.

### 2. DX 5138-R

DX 5138-R is an excerpt from a January 26, 2021 Bloomberg chat between Daiki Taniguchi (an Archegos trader) and Joseph Monahan (a Goldman Sachs trader), in which

Taniguchi provided trading instructions to Monahan. Hwang is offering Taniguchi's words for their truth, and thus DX 5138-R is inadmissible under Rules 801 and 802. That Taniguchi is an agent of and a coconspirator of Hwang's is beside the point because the Rules of Evidence preclude Hwang from offering these statements into evidence. *See* Fed. R. Evid. 801(d)(2)(D) and (E) (coconspirator and agency statements admissible only when "offered *against* an opposing party" (emphasis added)).

### 3. DX 5263

DX 5263 is an excerpt from a January 20, 2021 Bloomberg chat between Tomita and Brian Avery (a trader at Nomura). DX 5263 contains the irrelevant, hearsay statements of Avery that "with these sharp moves [regarding GSX] I can't blame you for trading around it a bit." The statements of a Nomura trader about GSX and Archegos's trading in GSX are irrelevant to Hwang's intent and have no bearing on the issues at trial. Thus, DX 5263 should be excluded.

### C. Compliance Emails

Finally, Hwang seeks to admit two emails relating to Archegos's compliance program. These emails contain hearsay, are likely to mislead and confuse the jury, and should be precluded.

### 1. DX 7374

DX 7374 is an email between Tomita and Fernanda Piedra (who was one of Archegos's two compliance personnel, and who testified at trial) about Archegos's trades in LI and XPEV, two securities that are *not* at issue in this case. It appears that Hwang will use the email to attempt to show that Archegos's compliance function in fact reviewed all of Archegos's trades. But the email proves nothing of the sort and instead is likely to confuse or mislead the jury. If introduced, the email will leave the jury with the false impression that, because Piedra asked Tomita about two trades on one day in November 2020, the compliance function reviewed all of Archgos's trades. Hwang had the opportunity to cross-examine both Piedra and Tomita on this document; he elected not to. Thus, DX 7374 should be excluded.

### 2. DX 7403

DX 7403 is an email from Tomita responding to a question from Michael Satine (Archegos's other compliance officer) regarding the price movements of Discovery A and Discovery C on January 28, 2021. There is no relevant or permissible basis for offering this email. Tomita's response to Satine is hearsay; it is an out-of-court statement being offered by Hwang for the truth of the matter asserted—*i.e.*, that Tomita thought "there are arb funds driving the name…they trade around the discount and premium." (DX 7403 (emphasis in original)). But Hwang cannot offer Tomita's out-of-court statements for that purpose. To the extent that Hwang wished to impeach Tomita with this statement, the time to do that was when Tomita was on the witness stand. That time has passed, and thus DX 7403 is inadmissible.

### II.   Halligan's Proposed Exhibits

The 22 of Halligan's proposed exhibits that the Government challenges fall into 6 categories: (i) an Archegos LP sheet; (ii) audit materials; (iii) ISDAs; (iv) a transcript of Grand Jury testimony; (iv) communications already used at trial; (v) communications about Becker's credibility; and (vi) other communications. These exhibits should be precluded.

### A. Archegos LP Sheet (DX 7996)

Halligan seeks to offer Archegos's August 2017 LP sheet (DX 7996).[3] That document is irrelevant and cumulative. The Government offered evidence that, on August 7, 2017, in response to a question from a representative of Credit Suisse about the size of Archegos's top single position, and top five positions, as a percentage of Archegos's net asset value ("NAV"), Halligan wrote, "15-20%." (GX 1151). The Government also offered into evidence Archegos's 2017 combo sheet, which showed that, on August 7, 2017, Archegos's largest position was in fact 45.82% of NAV, corresponding to Archegos's short position in Tesla. (GX 432).

The document that Halligan seeks to admit, Archegos's August 2017 LP sheet, includes the same information as Archegos's 2017 combo sheet (which is already in evidence), except that the LP sheet, unlike the combo sheet, displays the counterparties at which Archegos's positions were held. (DX 7996). Halligan presumably seeks to offer the LP sheet to show that part of Archegos's Tesla short position, corresponding to 21.24% of NAV, was held at Credit Suisse. But that is irrelevant. It is the size of Archegos's overall short position in Tesla, not the size of the portion of that position held at a particular counterparty, that renders false the information that Halligan provided the Credit Suisse representative. In all relevant respects, therefore, DX 7996 is cumulative of GX 432 and should not be admitted.

### B. Audit Materials (DX 59, DX 3635, and DX 7986)

Halligan seeks to offer Archegos's audited financial statements for the years 2018 and 2019, which Halligan has marked as DX 3635 and DX 59, respectively. Those very documents are already in evidence as GX 2174D and GX 1525A. Accordingly, the Government objects to the admission of DX 3635 and DX 59 as cumulative in the most literal sense. *See* Fed. R. Evid. 403.

Halligan also seeks to offer an engagement letter, dated January 11, 2021, for Archegos's auditor to audit Archegos's 2020 financials. (DX 7986). That document should be excluded as irrelevant and under Rule 403. That Archegos signed an engagement letter for its auditor to audit its 2020 financials has no tendency to make more or less probable any fact of consequence. *See* Fed. R. Evid. 401. Separately, any probative value that the engagement letter might have is substantially outweighed by a danger of misleading the jury because it appears that Archegos's auditor did *not*, in fact, audit Archegos's 2020 financials. On Monday, March 29, 2021 (that is,

---

[3] DX 7996 is a password-protected Microsoft Excel spreadsheet. The password is "perf".

the Monday after Archegos's collapse), Becker emailed Halligan a copy of the very engagement letter that Halligan seeks to offer, and Becker wrote in his email, among other things: "I spoke to [a representative] at [Archegos's auditor], he is . . . [p]utting the audit on full pause (they haven't really started anyway)." (SDNY_SWR_0001409708). Given that Archegos's auditor did not, in fact, audit Archegos's 2020 financials, it would mislead the jury to admit the engagement letter.

### C. ISDAs (GX 311 and GX 334)

Halligan seeks to offer two Government exhibits: a December 6, 2013 ISDA between Archegos and Goldman Sachs (GX 311), and a November 25, 2020 amendment to that ISDA (GX 334). The Government objects under Rule 403 because those documents are cumulative of other documents already in evidence. Specifically, the record already contains Archegos's ISDAs with five of its counterparties: Bank of Montreal (GX 340, GX 341), Jefferies (GX 315), Mizuho (GX 333), MUFG (GX 319, GX 320), and UBS (GX 325, GX 328, GX 331). As the Court has seen during the course of this trial, Archegos's ISDAs with its counterparties were materially similar. Archegos's ISDA with Goldman Sachs would not meaningfully add to the evidence already in the record, and GX 311 and GX 334 should not be admitted.

### D. Transcript of Grand Jury Testimony (DX 7989)

Halligan seeks to offer several pages of the transcript of the April 11, 2022 testimony of FBI Special Agent Thomas McDonald, one of the primary agents involved in investigating this matter, before the Grand Jury that returned the Indictment. Specifically, setting aside some introductory testimony, the substantive testimony that Halligan seeks to offer consists of the following statement of Special Agent McDonald: "Mr. Becker remembered Mr. Halligan telling him at some point when Mr. Becker was taking over those responsibilities [*i.e.*, the responsibilities of providing Archegos's counterparties with information about Archegos's portfolio] that he [*i.e.*, Becker] should always just say that the fund's largest position was 35 percent of capital, even if that was not actually the truth." (DX 7989 at 3).

The Government objects on a number of grounds. Presumably Halligan seeks to introduce Becker's statement to Special Agent McDonald as a prior inconsistent statement under Rule 613(b). But Becker's statement to Special Agent McDonald is not inconsistent with anything that Becker said in Court. In Court, Becker testified that Halligan "stated that when we have these calls [meaning calls with Archegos's counterparties] . . . we shouldn't say that the largest position was any larger than 35 percent, even if it was higher." (Tr. 893-94). That is not inconsistent with Becker's statement to Special Agent McDonald.

Additionally, even Becker's statement to Special Agent McDonald were somehow inconsistent with Becker's trial testimony, under Rule 613(b), "[e]xtrinsic evidence of" Becker's statement to Special Agent McDonald would be admissible "only if" Becker were "given an opportunity to explain or deny the statement" and the Government were "given an opportunity to examine" Becker about his statement to Special Agent McDonald, "or if justice so requires." Here, during Halligan's cross-examination of Becker, Halligan could have given Becker the

"opportunity to explain or deny the statement," and that would have given the Government on redirect-examination the "opportunity to examine" Becker about the statement, but Halligan did not do so. Accordingly, Halligan has not satisfied the requirements of Rule 613(b).

Nor should Halligan be heard to argue that "justice so requires" the admission of Becker's statement to Special Agent McDonald under Rule 613(b). As discussed above, Becker's statement to Special Agent McDonald is not inconsistent with any statement Becker made in Court. And, as discussed next, even if it were, the transcript of Special Agent McDonald's grand jury testimony is inadmissible hearsay.

Finally, even if Halligan could satisfy the strictures of Rule 613(b), he could at best seek to admit Becker's statement. Halligan cannot, however, admit Special Agent McDonald's statement about Becker's statement. Special Agent McDonald's statement to the Grand Jury about Becker's statement was an out of court statement. And Halligan would be offering it for its truth (in other words, to prove that Becker in fact said what Special Agent McDonald told the Grand Jury that Becker said). That makes Special Agent McDonald's statement hearsay under Rule 801(c) and inadmissible under Rule 802.

### E. Communications Already Used at Trial

Halligan seeks to offer a number of exhibits consisting of communications that he has already used at trial. Those exhibits should be excluded because they are irrelevant, contain hearsay, and would be cumulative.

#### 1. DX 3601 and DX 7997

DX 3601 is a December 16, 2020 email thread involving Becker, Tomita, and representatives of Goldman Sachs. In the thread, Tomita connected Becker to the Goldman Sachs representatives, and told the Goldman Sachs representatives that they could contact Becker about credit issues; Tomita also expressed that the Goldman representatives could contact him (Tomita). Subsequent emails in the thread show that Goldman representatives set up a time to talk to Becker.

DX 7997 is a December 16, 2020 Bloomberg chat between Halligan and Becker showing that Halligan gave Becker some advice on what Becker should say to Goldman Sachs on the same phone call that was discussed in DX 3601.

During Halligan's cross-examination of Becker, Becker was shown DX 3601 and, although he was not shown DX 7997, he was shown DX 6758, which is the same December 16, 2020 Bloomberg chat as what Halligan now proposes to offer as DX 7997. (Tr. 1443-44). Significantly, Halligan did not attempt to offer DX 3601, DX 6758 (or DX 7997) at the time. Most importantly, Becker already gave Halligan via testimony everything that Halligan might hope to get from these exhibits: In fact, through the questions and answers on this score, the significant parts of the exhibits were recited into the record nearly verbatim. (Tr. 1443-47).

### 2. DX 7906

DX 7906 is an October 20, 2020 Bloomberg chat between Becker and Tomita. Tomita pasted into that chat some Bloomberg communications that Tomita had had with a representative of MUFG, in which Tomita and the MUFG representative had discussed that an upcoming credit call between Becker and MUFG might lead to increased capacity for Archegos at MUFG. Tomita asked Becker to accelerate the call, and Becker agreed to try to do so. Becker later reported to Tomita that he had been able to schedule the call with MUFG.

Tomita's and Becker's statements are hearsay, the pasted statements of the MUFG representative add a further layer of hearsay. Just as importantly, DX 7906 would be cumulative because Halligan already used this very exhibit during his cross-examination of Tomita, and, in doing so, already obtained testimony that supports the argument Halligan wishes to make:

> Q. You would often tell Mr. Becker to try to move his calls earlier in the calendar when he could, right, to make the calls happen sooner?
>
> A. Do you have like specific examples? I don't really remember.
>
> Q. Sure. How about this one for example? If we could look at 15:06:02 [part of DX 7906]? Do you see that?
>
> A. Yes, I see it.
>
> Q. And does this refresh your recollection of an instance in which you asked on October 20, 2020, for Mr. Becker to move a call with MUFG's credit team up in the calendar?
>
> A. This doesn't refresh for this particular incident, but it does make me remember more that *on occasion, I would ask him to push up the calls for these types of calls*.

(Tr. 4175 (emphasis added)).

### 3. DX 6877

DX 6877 is a February 2, 2021 Bloomberg chat between Tomita and a Jefferies representative. In the chat, Tomita pressed Jefferies about increasing capacity for GSX, and, when Jefferies asked Tomita for a call, Tomita recommended that they call Becker, adding that Tomita's understanding was that Becker had in fact talked to a Jefferies representative the day before.

Halligan used DX 6877 to attempt to refresh Tomita's recollection on cross-examination. (Tr. 4195). When Tomita's recollection was not refreshed, Halligan offered DX 6877, the Government objected, and the Court sustained the objection. (Tr. 4195). The Court's ruling was

correct at the time and remains correct now. Tomita's statements to the Jefferies representative are hearsay, and Tomita's relaying of Becker's statements adds another layer of hearsay. Moreover, as reflected above, Halligan elicited from Tomita on cross-examination testimony that Tomita would invoke Becker's relationships and efforts with the counterparties to aid Tomita's aim of securing capacity from the counterparties. Thus, DX 6877 is cumulative as well.

### 4. DX 6860

DX 6860 is an email thread from March 2021 including Becker and representatives of Bank of America. The thread shows that, on March 16, 2021—the day of the phone call that included Bank of America, Halligan, and Becker about which the jury heard testimony from Bank of America representative Adam Lipsky—Becker emailed Bank of America to provide certain written information, and that, on March 26, 2021, Back of America replied to Becker, asking to setup a call to address certain questions that Bank of America itemized in their email to Becker.

In addition to its hearsay issues, DX 6860 should be excluded as entirely cumulative of testimony that Halligan elicited using this very exhibit during his cross-examination of Lipsky:

> Q. After the March 16 phone call, you did not want to go forward, correct?
>
> A. Correct.
>
> Q. And your colleague, though, Mr. Acoca, he suggested a follow-up call with Archegos to confirm the numbers provided during the March 16 call were accurate, isn't that right?
>
> A. Among other things, yes. We wanted to confirm what was said during the call.
>
> Q. And that's because those oral conversations are sometimes not reliable, isn't that right?
>
> A. I wouldn't say that.
>
> Q. Well, he emailed Mr. Becker on March 26, isn't that correct?
>
> A. I don't recall.
>
> MS. MULLIGAN: Mr. McLeod, if you could please put up Defense Exhibit 6860.
>
> Q. Mr. Lipsky, if you could look at this, it's from your colleague, Richard Acoca, and it's to Scott Becker, correct?
>
> A. Yes.

> Q. And you're copied on this email, right?
>
> A. I am.
>
> Q. Along with your colleague Darren Gaffney, isn't that right?
>
> A. Correct.
>
> Q. Mr. Acoca is asking for written confirmation of certain information concerning the portfolio construction, isn't that right?
>
> A. Yes, that's correct.
>
> Q. And he specifically is asking for information concerning how concentrated the portfolio is in terms of top five and top 10 positions, isn't that right?
>
> A. Yes. Asking for some guidance on limitations as well, yeah.

(Tr. 4346-47).

### 5. DX 7368

DX 7368 consists of August 2020 emails between Tomita and Archegos's compliance personnel. In addition to presenting relevance and hearsay issues, the exhibit is cumulative because Hwang showed the exhibit to Tomita during cross-examination and elicited from Tomita testimony that renders the exhibit itself unnecessary. (Tr. 4117-19). Notably, neither Hwang nor Halligan sought to offer DX 7368 while Tomita was on the stand.

### 6. DX 6829

DX 6829 is a January 29, 2021 Bloomberg chat involving Becker and the rest of Archegos's operations team. The document is filled with hearsay, but, equally importantly, Halligan used it to refresh Becker's recollection during cross-examination and got the testimony that Halligan sought. (Tr. 1419-21). In fact, the parts of the document that Halligan is focused on were essentially read into the record. (*See* Tr. 1420-21). Halligan did not seek to offer the document then, and there is no reason for it to be admitted now.

### F. Communications on Exhausted Issues of Becker Credibility (DX 3609 and DX 6820)

Halligan seeks to offer two exhibits whose only utility would be to add to the record on topics of Becker's credibility that the Court has already ruled Halligan has thoroughly exhausted. DX 3609 is an August 20, 2020 Bloomberg chat among Becker and the rest of the operations team in which Becker wrote, "2020 has been the best work year of my life," in reference to not being in the office with Halligan. (DX 3609). And DX 6820 is a May 12, 2020 Bloomberg chat among

Becker and the rest of the operations team in which the team, including Halligan, discussed what to do about the fact that a cash estimate number was "over by $12,400,000." (DX 6820).

Halligan spent ample time on cross-examination of Becker eliciting testimony about how Becker did not like working for or with Halligan and about how the operations team would sometimes "hide" information from Halligan. In fact, during Halligan's cross-examination, the Court ruled, "Again, you've already brought out that he hid things and that he didn't like Mr. Halligan and that it was hard working for Mr. Halligan and Mr. Halligan would get into fits of anger. Can we move on to something else?" (Tr. 1425-26). And when Halligan asked Becker on cross-examination, "Isn't it true, Mr. Becker, because you were working remotely and Mr. Halligan was not around, you said 2020 was the best work year of your life?," essentially reading from DX 3609, the Court ruled, "I think we're finished with this. Come on, Ms. Mulligan. Move to another subject. You don't have to use every note he took." (Tr. 1426).

The Court's rulings were proper when issued, and there is no reason for the Court to revisit them now.

### G. Other Communications That Are Irrelevant, Cumulative, and/or Hearsay

The balance of Halligan's proposed exhibits consist of additional communications that should be excluded because they are irrelevant, cumulative, and/or contain hearsay statements.

**DX 7995** is an email thread from July 2017 through September 2017 in which Halligan and Becker both provided certain information to Credit Suisse. (DX 7995). **DX 7909** is an email thread, from June through October 2020, showing that both Halligan and Becker provided information to UBS at times. (DX 7909). That Halligan sometimes provided information to counterparties, that Becker sometimes provided information to counterparties, and that both Halligan and Becker sometimes were on the same correspondence with counterparties adds nothing to the existing record. DX 7995 and DX 7909 are irrelevant, cumulative, and there is no exception for the hearsay statements that comprise them.

**DX 3590** is an October 14, 2020 email thread between Becker and Archegos's compliance personnel in which Becker told compliance that UBS representatives wanted to set up a routine check-in with Archegos's compliance personnel, and in which Becker added that the idea of the check-in had come up on an earlier call between Andy Mills and "some other senior folks at UBS." Halligan is not on the email thread. Presumably Halligan seeks to offer DX 3590 to support the following assertions made in his opening statement:

> Patrick Halligan understood the role of the compliance department at Archegos. You will learn that Patrick Halligan believes that the compliance department was reviewing the trades. Patrick Halligan had every reason to believe that the compliance people were doing their jobs. You'll also learn, as Mr. Berke pointed out, that Andy Mills was the CEO of Archegos. Andy Mills was Patrick Halligan's

boss. The evidence will show that Andy Mills regularly communicated with the top executives of the banks.

(Tr. 85-86). But the statements of interest to Halligan in DX 3590 are hearsay statements, and there is no exception for their admission.

**DX 3611** is an October 30, 2020 email thread involving back-and-forth between Halligan and Becker. In response to Becker telling Halligan that Becker did not think they would end up using Wells Fargo "unless we run out of capacity" (due to noncompetitive margin rates at Wells Fargo), Halligan responded, "Yes. I told Will [Tomita] to circle back with you on the issue before he makes promises we can't keep to Bill." (DX 3611). That email thread is not relevant to the issues on trial, and, in any event, Halligan's statement is hearsay without an exception.

**DX 3592** is a February 17, 2021 Bloomberg chat between Halligan and Becker. Becker wrote, "I never tell the credit guys, 'you are X% of our book' but the math is easy once they have the exposure." Halligan responded, "It's just math." This exhibit should be excluded because it contains hearsay statements but also under Rule 403 because it is likely to mislead the jury. There has been overwhelming evidence that the misrepresentations that Halligan and Becker made to counterparties about the concentration of Archegos's portfolio (*i.e.*, that the largest position was never more than 35%) were misrepresentations about the largest position as a percentage of NAV, or capital, and not as a percentage of gross exposure. Nevertheless, Halligan has sought to sew confusion on the issue by asking witnesses whether, counterfactually, concentration might be measured by reference to gross exposure rather than NAV. DX 3592 does not contain a statement about the concentration of Archegos's portfolio. Rather, the discussion in DX 3592 about "X% of our book" and about "exposure" is a discussion about the portion of Archegos's portfolio at a particular counterparty. There is a substantial danger that a juror who has heard Halligan's questions about concentration being calculated based on exposure would be misled by DX 3592.

Finally, **DX 7990** is a March 24, 2021 Bloomberg chat between Halligan and Tomita in which Halligan wrote things such as, "Selling for a loss is fine," "that gets complicated as those would be older, lower cost lots," "those block trades could wind up costing us tax expenses." (DX 7990). Halligan seeks to offer this exhibit to support his opening statement that, "you will learn in the midst of all that chaos the final week, Patrick Halligan was thinking about Archegos' tax considerations. Ask yourselves, who thinks about next year's taxes if your company is in the midst of going under?" (Tr. 93). But the statements in DX 7990 are hearsay statements without an exception, and the exhibit should be excluded on that basis alone.

* * *

For the reasons set forth above, the Government respectfully requests that the Court preclude the defendants from offering the above-listed exhibits.

      Respectfully submitted,

      DAMIAN WILLIAMS
      United States Attorney

By:  s/_____
      Matthew Podolsky
      Alexandra Rothman
      Samuel P. Rothschild
      Andrew Thomas
      Assistant United States Attorneys
      Tel.: (212) 637-1947/-2580/-2504/-2106

Cc: Counsel of Record (via ECF)