# Kramer Levin



**Barry H. Berke**
Partner
T 212.715.7560
F 212.715.7660
bberke@KRAMERLEVIN.com

1177 Avenue of the Americas
New York, NY 10036
T 212.715.9100
F 212.715.8000

**July 3, 2024**

**BY ECF**

Hon. Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: <u>United States v. Sung Kook (Bill) Hwang, et al.</u>, No. 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

On behalf of defendant Bill Hwang, we respectfully write to object to the Court's new proposed charge on market manipulation, laid out in its July 2, 2024 order, *see* ECF No. 246, and in the Court's draft charge shared with the parties by email later that day (the "Draft Charge"). This new charge wrongly suggests that if Mr. Hwang "employ[ed] chicanery to accumulate his holding[s]," he committed market manipulation. Such a charge misinterprets and misapplies Second Circuit case law, including *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), and therefore must be revised to correctly state the law. To do so, the defense respectfully requests that the Court amend the market manipulation charges in Count One – Predicate Act One and Count Two (Section 10(b) Market Manipulation), and Counts Three through Nine (Section 9(a)(2) Market Manipulation), as described below.

Whether this Court adopts the sole intent standard from *Mulheren*, the "primary purpose" standard in the Court's original draft charge, or the one-of-many-intents standard requested by the prosecution,[1] *what* a defendant must intend to be found guilty of market manipulation is not in dispute. The Second Circuit has ruled that a defendant must intend to "'to send[ ] a false pricing signal to the market' or otherwise distort[ ] estimates of the 'underlying economic value' of the securities traded." *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2001) (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007)).

---

[1] June 28, 2024 Government Letter at 9, ECF No. 243.

Contrary to the Draft Charge's description of "an exception," there is no exception to the Second Circuit's rule. The prosecution must prove beyond a reasonable doubt that Mr. Hwang intended to send a false pricing signal to the market or otherwise distort estimates of the underlying economic value of the at-issue securities. *See Set Capital*, 996 F.3d at 76; *ATSI*, 493 F.3d at 100. If the prosecution fails to do so, either because the evidence lacks in quality or in quantity, or because it reveals that Mr. Hwang had some other intent in sending price signals to the market, the jury must acquit. The grounds for acquittal are not limited to a single "exception" of whether Mr. Hwang's purpose in trading "was to accumulate a position for long-term investment."

Not only is there no exception to the Second Circuit's rule, but—by logical extension—there is no "exception to the exception." Whether Mr. Hwang employed "chicanery" "to induce counter-parties to extend margin loans or to enter or remain in counter-party arrangements" relates to the separate charge of material misrepresentations under Section 10(b) or 18 U.S.C. Section 1343 and not to manipulative intent. In other words, the only relevant question for market manipulation is whether Mr. Hwang's trades "sen[t] a false pricing signal to the market." *See Set Capital*, 996 F.3d at 76; *ATSI*, 493 F.3d at 100. Accordingly, the insertion of the "exception to the exception" language is an improper statement of the law, and carries an unduly high risk of misleading the jurors to find Mr. Hwang guilty of market manipulation if they find evidence of the wholly separate crime of material misrepresentations.

*Mulheren*, to be sure, does not dictate a different result. There, the prosecution advanced the legal theory that an investor could be found guilty of market manipulation under Section 10(b) where he engaged in open-market transactions "with the sole intent to affect the price of the security." 938 F.2d at 368. Although the court "harbor[ed] doubt" about this theory of prosecution, *id.* at 366, it adopted it for the purpose of its sufficiency-of-the-evidence review. "Taking the view [of the evidence] most favorable to the government," the Court concluded that even under a "sole intent" standard, the prosecution failed to prove that the defendant traded "with the intent to raise [the at-issue security's] price, rather than with the intent to invest," *id.* at 368-369.

In reaching this conclusion, the *Mulheren* Court did not craft any "exceptions" to the sole intent rule. Rather, it merely reviewed the various pieces of evidence put forward by the prosecution in support of its argument that the defendant traded with manipulative intent. *One* of the pieces of evidence from which "manipulative intent c[ould] be inferred," according to the prosecution, was that the defendant had traded in large volume. *Id.* at 371. But the Court rejected that notion, finding that the defendant's trading lacked "other indicia of manipulation," or "chicanery," that would have supported an inference of manipulative intent. *Id.* at 372. In making this finding, the Court did not elevate one category of evidence over another, much less create an exception to the sole intent rule, but rather considered all the evidence in the light most favorable to the prosecution and reversed the convictions.

I.     **Count One – Predicate Act One and Count Two: Section 10(b) Market Manipulation**

For the reasons outlined above, the defense submits that the Court should replace the sentence on page 26 of the Draft Charge, "I will define manipulation later in the charge," with the instruction requested by the defense in its Joint Proposed Requests to Charge, which has been copied below.  *See* ECF No. 125 at Request No. 31.  (Because Count Two of the Draft Charge refers back to the instructions for the predicate acts in Count One, no additional revisions are required.)

We repeat our request to include a "sole intent" definition of market manipulation.  The record is replete with testimony that large-volume trades affected stock prices.  But as the Second Circuit in *ATSI* warned, large-volume trading of derivative securities, such as swaps, "is not, by itself, manipulative," *ATSI*, 493 F.3d at 101, and "[u]nusually large sales, without a doubt, cannot be the basis for a market manipulation claim after *ATSI*," *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 076, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008); *see also Set Capital*, 996 F.3d at 77 (open-market trading "is not, by itself, manipulative . . . even when it impacts the market price for a security"); *GFL Advan*tage *Fund, Ltd. v. Colkitt*, 272 F.3d 189, 209 (3d Cir. 2001) (potential to impact prices is a "natural consequence[ ] of a lawful and carefully regulated trading practice" and "not evidence of unlawful market manipulation"); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (rejecting argument that defendant's "unprecedented massive short selling" violated Section 9(a)(2) because no "false impression of supply or demand" was created when there "were real buyers, betting against [the defendant]" and "there is as yet no rule barring persons with a pronounced taste for risk from trading on stock exchanges").  Without the safeguard of a "sole intent" definition, the repeated price-impact testimony creates an unduly high danger that the jury will mistake the natural consequences of large-scale purchases of swaps with evidence of manipulative intent.

To be clear, the Second Circuit has never rejected the "sole intent" standard.  But it was understandably reluctant to endorse it as the law for the circuit because it was not strict enough to ensure due process.  Such reluctance, as Judge Holwell in *SEC v. Masri* commented, "may be explained by the fact that it is unusual in American law to impose liability based solely only on the intent of the actor," given that "it is hornbook criminal law that one is not punished solely for a criminal state of mind (mens rea), but only where one's action is prohibited as well (actus rea)."  *SEC v. Masri*, 523 F. Supp. 2d 361, 367 & n.11 (S.D.N.Y. 2007).  "Because the Second Circuit accepted the government [sole intent] theory only with 'misgivings,' then *a fortiori*, it would find problematic a theory under which an investor could be found liable for market manipulation when only one of the investor's purposes was to alter the price."  *Id.* at 373.

To the extent the Court rejects our requested instruction that the prosecution must prove that a defendant's "sole intent" was to manipulate, we repeat and preserve our objection here, but respectfully request in the alternative that the Court remove the single word "sole" from the final paragraph of the instruction below and instruct the jury simply as to "intent":

> With respect to the first element of securities fraud, the government alleges that the defendants manipulated the prices of the At-Issue Securities.  The word

"manipulation" is virtually a term of art when used in connection with securities markets. Manipulation occurs when a person engages in market activity aimed to deceive investors about how other market participants have valued a security. The government must prove that the defendants engaged in intentional and willful conduct designed to deceive or defraud investors by artificially distorting the prices of the At-Issue Securities, such that the prices of those securities were not governed by the natural interplay of supply and demand. In other words, an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market.

To be manipulative, the act must also be material. Material information in this context is information that a reasonable investor would have considered significant in deciding whether to buy, sell or hold securities, and at what price to buy or sell securities. Put another way, there must be a substantial likelihood that the information at issue would have been viewed by the reasonable investor as having significantly altered the total mix of information available.

Your consideration of the element of materiality must be based on the facts existing at the time the actions alleged by the government were committed; materiality cannot be judged in hindsight. In determining whether certain information is material, you must consider this issue from the perspective of a reasonable investor, and not from the perspective of individuals who may possess information and perspectives different than a reasonable investor. Any testimony that you may have heard with respect to whether a particular fact would or would not have been important to that witness or to investors in general reflects that witness's individual views. Although you may consider such testimony, it is not controlling. It is for you to determine whether a particular fact would have been significant to a reasonable investor in making an investment decision.

Of course, the sale of any security, or securities-based swap, may be engaged in for investment reasons, and the mere fact that a transaction affected market prices does not render it manipulative. The fact that a purchaser of a securities-based swap is not required under Securities and Exchange Commission regulations to publicly disclose its swap positions does not render those transactions manipulative. Accordingly, the government must prove beyond a reasonable doubt that the defendant engaged in the sale of any security, or securities-based swap, with the sole intent to (1) create a false impression of market activity regarding the At-Issue securities, and (2) artificially distort the prices of the At-Issue securities, rather than for investment purposes. If you conclude that the defendants purchased or sold any security, or securities-based swap, for any investment reason, then you cannot find that the defendants committed a manipulative act or device.

## II.   Counts Three Through Nine: Section 9(a)(2) Market Manipulation

As with the Court's Section 10(b) instruction, the defense submits that the Court should give the instruction requested by the defense in its Joint Proposed Requests to Charge, which has

been copied below.  *See* ECF No. 125 at Request No. 51.  We respectfully request that the Court delete the text on page 46 of the Draft Charge starting with "The key phrase is 'market manipulation'" and ending on page 47 of the Draft Charge with "that is, market manipulation can be the intentional byproduct of otherwise lawful trading activity," and insert our requested instruction there.  To the extent the Court rejects our requested instruction that the prosecution must prove that a defendant's "sole intent" was to manipulate, we repeat and preserve our objection here, and respectfully request in the alternative that the Court remove the word "sole" from the third paragraph of the below instruction and simply instruct the jury as to "intent":

> Like Section 10(b) of the Exchange Act, Section 9(a)(2) of the Exchange Act is designed to create securities markets where prices are based on the free and honest balancing of supply and demand.  Section 9(a)(2) does not prohibit all transactions that tend to raise or lower the price of a security or that cause other investors to trade in a security.  Rather, Section 9(a)(2) outlaws only those series of transactions used to deceive the public into believing that activity in a security is the reflection of genuine supply or demand, when instead it is a mirage.  The essence of manipulation under Section 9(a)(2) is the creation of a false impression of supply and demand.
>
> You should use the definition of manipulation that I have already given you.  As I outlined previously, the word "manipulation" is virtually a term of art when used in connection with securities markets.  Manipulation occurs when a person engages in market activity aimed to deceive investors about how other market participants have valued a security.  The government must prove that the defendants engaged in intentional and willful conduct designed to deceive or defraud investors by artificially distorting the prices of the securities in question, such that the prices of those securities were not governed by the natural interplay of supply and demand.  In other words, an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market.
>
> The government must prove beyond a reasonable doubt that Mr. Hwang engaged in a series of transactions with the sole intent to create a false impression of supply and demand by creating actual or apparent active trading, or raising or depressing the price of the At-Issue Securities, for the purpose of inducing the purchase or sale of the At-Issue Securities, rather than for investment purposes.  Specifically, if you conclude that Mr. Hwang directly or indirectly affected a series of purchases or sales of any of security for any investment reason, then you cannot find that Mr. Hwang committed a violation of Section 9(a)(2).
>
> If you find that Mr. Hwang directly or indirectly effected a series of transactions to create a false impression of supply and demand as described earlier, you must be unanimous as to whether the series of transactions (1) created actual or apparent trading in a security, or (2) raised or depressed the price of the security, or (3) did both.

\* \* \*

For the foregoing reasons, Mr. Hwang respectfully requests that the Court provide the above proposed instructions with respect to Count One – Predicate Act One and Count Two (Section 10(b) Market Manipulation), and Counts Three through Nine (Section 9(a)(2) Market Manipulation). We are of course available at the Court's convenience to discuss these issues in person or telephonically prior to summations on Monday, July 8.

                                          Respectfully submitted,

                                          */s/ Barry H. Berke*

                                          Barry H. Berke
                                          Dani R. James
                                          Jordan Estes
                                          Michael Martinez

cc:      Counsel of record