# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
UNITED STATES OF AMERICA,                :
:
v.                               :          22 Cr. 240 (AKH)
:
SUNG KOOK (BILL) HWANG,                   :
:
Defendants.                    :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## SENTENCING MEMORANDUM ON BEHALF OF BILL HWANG


Barry H. Berke
Dani R. James
Jordan Estes
Michael Martinez

GIBSON, DUNN & CRUTCHER
200 Park Avenue
New York, New York 10166
(212) 351-3860

*Counsel for Defendant Bill Hwang*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

I.  MR. HWANG'S PERSONAL BACKGROUND, EXTRAORDINARY GOOD
    WORKS, AND SUPPORT OF OTHERS ............................................................ 4

    A.  Mr. Hwang's Personal and Family History ........................................... 5

        1.  Mr. Hwang's Upbringing ................................................................ 5

            a.  Mr. Hwang's early life reflects the man he would later
            become: hard-working, determined, and a servant to others. ......... 5

            b.  When Mr. Hwang unexpectedly lost his father as a young
            immigrant far from home, he stepped up to help support his
            family. ............................................................................................. 7

            c.  As Mr. Hwang worked to establish himself in his career, he
            remained committed to his earliest value of service to others. ....... 9

        2.  Mr. Hwang's Commitment to Family ........................................... 11

            a.  Mr. Hwang met Becky Chang in 1991 and they have since
            structured their lives together with their two daughters
            around their shared commitment to faith, family and service. ..... 11

            b.  Mr. Hwang has been the loving patriarch of both his and
            Becky's extended families. ........................................................... 13

        3.  Mr. Hwang's Character ................................................................. 15

    B.  Mr. Hwang's Lifetime Commitment to Philanthropy & Service ........................ 20

        1.  Mr. Hwang's Early Philanthropy ................................................. 21

        2.  Mr. Hwang & G&M's Charitable Giving ................................................ 24

        3.  G&M's Public Reading of Scripture & Just Show Up Book Clubs ......... 31

    C.  Mr. Hwang's Support of Friends and Their Families ........................................ 33

II. THE SENTENCING GUIDELINES ........................................................................ 40

    A.  The Prosecution Fails to Establish that Mr. Hwang's Conduct Caused Any
        Loss ....................................................................................................... 41

        1.  The Prosecution Fails to Prove Market Manipulation Loss .................... 41

        2.  The Prosecution Fails to Prove Any Loss Resulting From Mr.
            Hwang's Participation in a Misrepresentation Scheme ............................ 44

    B.  If the Court Finds That There Was a Loss But It Cannot Be Reasonably
        Determined, the Loss Enhancement Should Still Be Zero .................................. 53

    C.  No Enhancement is Warranted for Ten or More Victims .................................... 54

    D.  No Enhancement is Warranted for Sophisticated Means ...................................... 54

|      | E.   | The Advisory Guidelines Calculation | 57 |

III.  A NON-CUSTODIAL SENTENCE IS APPROPRIATE ................................................ 57

A.    The Application of Section 3553(a) Warrants a Non-Custodial Sentence ........... 57

B.    Even if the Court Adopts Probation's Loss Calculation, a Variance is
      Necessary to Avoid Unwarranted Sentencing Disparities. .................................. 59

C.    Probation's Loss Calculation Results in a Guidelines Range that
      Substantially Overstates the Seriousness of the Offense. ................................... 62

D.    The Need for Specific and General Deterrence Does Not Warrant a
      Custodial Sentence. .......................................................................................... 64

      1.    Specific Deterrence ................................................................................. 64

      2.    General Deterrence ................................................................................. 66

E.    Mr. Hwang's Personal History Supports a Non-Custodial Sentence. ................. 67

F.    Mr. Hwang's Age and Health Support a Non-Custodial Sentence. ..................... 69

IV.   CONCLUSION ............................................................................................................ 71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007)..................................................................................................40

*Rita v. United States*,
551 U.S. 338 (2007)...........................................................................................40, 69

*United States v. Abiodun*,
536 F.3d 162 (2d Cir. 2008).................................................................................54

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) *aff'd* 301 F. App'x 93 (2d Cir. 2008)............63 n.22, 67

*United States v. Adepoju*,
756 F.3d 250 (4th Cir. 2014) ....................................................................55, 56, 57

*United States v. Alarcon Sanchez*,
972 F.3d 156 (2d Cir. 2020)................................................................................56

*United States v. Amico*,
416 F.3d 163 (2d Cir. 2005).................................................................................56

*United States v. Booker*,
543 U.S. 220 (2005)..............................................................................................40

*United States v. Carmona-Rodriguez*,
No. 04 Cr. 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ...................66

*United States v. Cooper*,
394 F.3d 172 (3d Cir. 2005)............................................................................67, 69

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) ............................................................... 63 & 63 n.22

*United States v. Deutsch*,
987 F.2d 878 (2d Cir. 1993)................................................................................41

*United States v Ebbers*,
458 F.3d 110 (2d Cir. 2006)................................................................................41

*United States v. Faibish*,
No. 12 Cr. 265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)...........63 n.22

*United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2011)...................................................................................42

*United States v. Fofanah*,
    765 F.3d 141 (2d Cir. 2014) (per curiam)..............................................................55

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd* 31 F.3d 73 (2d Cir. 1994).....................65

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd* 747 F.3d 111 (2d Cir. 2014)............65, 66, 68, 69

*United States v. Hart*,
    324 F.3d 575 (8th Cir. 2003) ................................................................................55

*United States v. Hernandez*,
    No. 03 Cr. 1257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ...................66, 70, 71

*United States v. Hodges*,
    No. 07 Cr. 706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009)......................66

*United States v. Jenkins*,
    854 F.3d 181 (2d Cir. 2017).................................................................................70

*United States v. Johnson*,
    567 F.3d 40 (2d Cir. 2009)..............................................................................58, 63

*United States v. Loles*,
    628 F. App'x 7 (2d Cir. 2015) .........................................................................55, 56

*United States v. Lumiere*,
    No. 16 Cr. 483 (JSR), (S.D.N.Y. Jun. 14, 2017) ............................................63 n.22

*United States v. MacCallum*,
    821 F. App'x 11 (2d Cir. 2020) ............................................................................55

*United States v. Mehta*,
    307 F. Supp. 2d 270 (D. Mass 2004) ...............................................................68, 69

*United States v. Montano*,
    250 F.3d 709 (9th Cir. 2001) ................................................................................57

*United States v. Ojemen*,
    465 F. App'x 69 (2d Cir. 2012) ............................................................................56

*United States v. Olis*,
    429 F.3d 540 (5th Cir. 2005) ...........................................................................41, 42

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ..........................................................63 n.22

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007)...................................................................................41

*United States v. Scott*,
   990 F.3d 94 (2d Cir. 2021)....................................................................................56

*United States v. Skys*,
   637 F.3d 146 (2d Cir. 2011)..................................................................................54

*United States v. Stewart*,
   590 F.3d 93 (2d. Cir. 2009)...................................................................................65

*United States v. Vaccarelli*,
   2021 WL 4805218 (2d Cir. Oct. 15, 2021)...........................................................55

*United States v. Williams*,
   247 F.3d 353 (2d Cir. 2001)..................................................................................41

*United States v. Zolp*,
   479 F.3d 715 (9th Cir. 2007) ................................................................................41

**Statutes**

18 U.S.C. § 3553(a) ...................................................................................... *passim*

U.S.S.G. § 1B1.1 cmt..............................................................................................69

U.S.S.G. § 2B1.1 ............................................................................................ *passim*

U.S.S.G. § 2B1.1 cmt 1(A) ...................................................................................54

U.S.S.G. § 2B1.1 cmt. 9(B) .............................................................................55, 56

U.S.S.G. § 2B1.1 cmt. 21(C) ...............................................................................62

U.S.S.G. § 2E1.1 ................................................................................................2, 57

**Court Documents**

*United States v. Omar Amanat*,
   15 Cr. 536 (RA) (S.D.N.Y. Sept. 4, 2021), ECF No. 1205, Sentencing Transcript ...............71

*United States v. Amanat*,
   15 Cr. 536 (RA) (S.D.N.Y. Oct. 1, 2021), ECF No. 1221, Sentencing Transcript...........61, 62

*United States v. Hild*,
19 Cr. 602 (RA) (S.D.N.Y. Jan 20, 2023), ECF No. 144, Gov't Sentencing Mem.................60

*United States v. Hild*,
19 Cr. 602 (RA) (S.D.N.Y. Mar. 13, 2023), ECF No. 156, Sentencing Transcript................61

*United States v. Milton*,
21 Cr. 478 (ER) (S.D.N.Y. Dec. 12, 2023), ECF No. 315, Gov't Sentencing Mem. .............60

*United States v. Milton*,
21 Cr. 478 (ER) (S.D.N.Y. Jan, 2, 2024), ECF No. 322, Sentencing Transcript ..................60

*United States v. Petit*,
19 Cr. 850 (JSR) (S.D.N.Y. Feb. 16, 2021), ECF No. 145, Gov't Sentencing Mem. .............61

*United States v. Petit*,
19 Cr. 850 (JSR) (S.D.N.Y. Feb. 23, 2021), ECF No. 249, Sentencing Transcript ..61, 63 n.22

## Other Authorities

American Bar Association, *A Report on Behalf of The American Bar Association
Criminal Justice Section Task Force on the Reform of Federal Sentencing for
Economic Crimes* (Nov. 10, 2014) .........................................................................................64

*Departure and Variance Primer*, Office of General Counsel, U.S. Sentencing
Commission, 2023 ..................................................................................................................69

Farah Acher Kaiksow et al., *Caring for the Rapidly Aging Incarcerated
Population: The Role of Policy*, J. Gerontol Nurs. (March 2023) .........................................70

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*,
61 Wayne L. Rev. 27 (2015).....................................................................................................66

Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67 (2005)...........................................66

U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal
Offenders* (Dec. 2017).......................................................................................................65, 66

U.S. Sentencing Commission, *Quick Facts: Securities and Investment Fraud
Offenses* (2022) ......................................................................................................................60

U.S. Sentencing Commission, *Statistical Information Packet Fiscal Year 2023
Southern District of New York* (2023) ...................................................................................62

We submit this memorandum on behalf of Bill Hwang, who is scheduled to be sentenced by this Court on November 20, 2024. We address in this submission the relevant sentencing considerations set forth in 18 U.S.C. § 3553(a) and endeavor, among other things, to provide the Court with a broader and deeper understanding of Mr. Hwang, and how he has led his life.

Bill Hwang's life is a testament to his humble roots and his unshakeable faith in the value of hard work and giving back to his community. Within months of moving to this country at the age of 19, Mr. Hwang stepped into the shoes of his father who had died suddenly from a stroke. While working as a line cook, a church cleaner, and even a seller of wholesale goods, he supported his widowed mother and his blind brother. And he never quit studying. He put himself through high school, college, and graduate school. He ultimately landed a job as a securities broker and, after years of hard work, caught the eye of Julian Robertson. Under the legendary investor's tutelage, Mr. Hwang developed the analytical skills and confidence to set off on his own and start his own successful fund.

All the while, his commitment to his family never wavered. It only grew. Mr. Hwang not only continued to support his mother and siblings, but he married the love of his life, with whom he has raised two daughters. He also took on the role of a father figure for his wife's family when her father passed away suddenly.

But his commitment to others did not stop with his family. The central organizing principle of his life is service to others. Nowhere is that better reflected than in the Grace & Mercy Foundation. He and his wife founded Grace & Mercy in 2006 with 90 percent of their personal wealth. Since then, Grace & Mercy has distributed grants to no fewer than 450 organizations that work to battle homelessness, poverty, and human trafficking, among many other philanthropic initiatives. And Bill's on-the-ground efforts in support of Grace & Mercy's

projects are nothing short of remarkable. He travels all over the country and beyond to launch, oversee, and participate in programs that assist sexual assault survivors, sex-trafficking victims, North Korean escapees, the homeless, the disabled, formerly incarcerated individuals, under-resourced school children, and foreign students accepted to U.S. universities, among so many others. It is fair to say that the fruit of Mr. Hwang's labor is, and has always been, service to others.

He now stands before this Court for sentencing and asks that this Court take into account his lifetime of service to others, the obstacles he struggled to overcome, and his extraordinary charitable work and giving. His life is so much more than the evidence presented at trial. In addition, Mr. Hwang was convicted in an unprecedented market-manipulation case. Indeed, the market-manipulation theory is so difficult to define, much less prove with any reasonable precision, that the prosecution abandoned all hope at sentencing to tie the market-manipulation charges to losses. The prosecution simply cannot meet its legal burden to exclude all losses attributable to causes other than the purported market manipulation.

Instead, the prosecution turns to the more traditional fraudulent-misrepresentation charges. Even then, however, the prosecution cannot prove that the big banks' losses were caused by misstatements made or known by Mr. Hwang. The prosecution is left to stitch together an admittedly eye-popping trading loss number from Archegos's big bank counterparties, but it cannot show that any of that tally was proximately caused by misrepresentations by anyone at Archegos, much less Mr. Hwang. Without that loss enhancement—as well as the equally inapplicable enhancements for number of victims and sophisticated means—Mr. Hwang faces a Guidelines range of 46 to 57 months under U.S.S.G. § 2E1.1—a range that is still far greater than necessary to accomplish the goals of sentencing.

2

Even if this Court were to accept the eye-popping loss number for purposes of the Guidelines calculation, courts in this Circuit have repeatedly and resoundingly confirmed that such loss amounts are often poor proxies for moral culpability and substantially overstate the seriousness of the offense.  Particularly in a case like this one, where parties trade hundreds of millions of dollars daily, a top-of-the-Guidelines loss amount is untethered to the actual conduct.  Mr. Hwang's case is illustrative.  The Guidelines range resulting from this misrepresentation case—for which there is no direct evidence against Mr. Hwang and no proof of proximate causation of loss—exceeds the average federal sentence for murder, kidnapping, sexual abuse, and national defense crimes.

To account for the disproportionate impact of Guidelines loss enhancements and avoid the unwarranted sentencing disparities that would otherwise ensue, sentencing courts in this circuit routinely grant downward variances of 55 percent to more than 96 percent to white collar defendants.  They do so even when those defendants knowingly and repeatedly lie, make substantial profits in doing so, and obstruct justice.  Of course, none of those aggravating circumstances exists here.  Thus, Mr. Hwang is deserving of an even greater downward variance.

And a custodial sentence is wholly unnecessary for specific deterrence here.  In the wake of Archegos's high-profile collapse and the criminal trial, Mr. Hwang will never realistically have the opportunity to operate an investment fund like Archegos again.  Plus, Mr. Hwang's risk of recidivism at his age is statistically very low.  Furthermore, a custodial sentence for general deterrence purposes is also unnecessary.  Judges and scholars have long known that more frequent enforcement, and not harsh penalties, deters business executives from white collar crime.

Finally, like his father, Mr. Hwang suffers from significant cardiovascular disease. His physicians have recommended that he undergo open heart surgery. A significant prison sentence would therefore likely hasten his deterioration and deprive him of necessary access to appropriate medical care.

In the end, the overarching goal of sentencing under § 3553(a) is to "impose a sentence sufficient but not greater than necessary" to accomplish the goals of sentencing. Here, when Mr. Hwang's lifetime of service to others, his personal resilience and triumph in the face of tremendous obstacles, and his extraordinary charitable work and giving is taken together with the need to avoid unwarranted sentencing disparities in the face of a substantially overstated offense, Mr. Hwang's low risk of recidivism, the satisfaction of general deterrence through the prosecution and trial of Mr. Hwang, and the life-threatening risk a prison sentence poses in light of his cardiovascular disease, a non-custodial sentence is "sufficient but not greater than necessary." And it is just.

## I.   MR. HWANG'S PERSONAL BACKGROUND, EXTRAORDINARY GOOD WORKS, AND SUPPORT OF OTHERS

Scores of friends, family members, colleagues, and employees, have submitted letters of support on Mr. Hwang's behalf. They describe a man who has lived his life generously, "consistently [seeking] opportunities to love and serve others." (Stephen Hwang Ltr.).[1] As the letters demonstrate, and as best articulated by his friend Su Lee,

> Bill's flaws, like those of any human, are part of who he is, but they pale in comparison to the overwhelming good he consistently brings in the world. He has a unique ability to invest in people, offering not just resources but his time, wisdom, and heart, always striving to lift others up. Bill is a force for good and his generosity, compassion, and dedication are just a few of his

---

[1]    The letters in support of Mr. Hwang are attached to this memorandum and designated as Exhibits A-1 to A-114. An Exhibit Table of Contents is included listing the letters in alphabetical order by last name and indicating the corresponding exhibit number.

> superpowers.  His imperfections make him more human, but they
> do not define him.

Rather, it is his "consistent drive to be a positive influence, to mentor, and to care deeply for those around him" that most accurately characterize Bill Hwang.  (Su Lee Ltr.).

We focus on three aspects of Mr. Hwang's personal history that we submit are most relevant for purposes of sentencing: (1) his family history and the substantial challenges he overcame; (2) his lifelong, profound and purposeful commitment to service and philanthropy; and, (3) his steadfast support of his community in everyday acts of generosity and grace.

### A.    Mr. Hwang's Personal and Family History

1.    Mr. Hwang's Upbringing

> a.    *Mr. Hwang's early life reflects the man he would later become: hard-working, determined, and a servant to others.*

Sung Kook Hwang was born 60 years ago in 1964, in Seoul, South Korea, the youngest son of a pastor and a missionary.  Presentence Investigation Report ("PSR") ¶¶ 147; 149.  Bill's father was beloved by his congregants, and his mother was a pillar of their church.  Many letters recount how Bill's kind heart is a credit to her, and his faith, a credit to them both.  (*See* J. Won Ltr.; David Yaejun Kim Ltr.; J. Jahng Ltr.; Sara Hwang Ltr.; Stephen Kim Ltr.).  Despite their modest means, Bill's parents gave what they had "joyfully and unconditionally," "always opening their home to those in need," including Bill's sister, "a young girl who had worked for them," whom they later adopted.  (B. Hwang Ltr.).  Supporting his father's parishioners was a family affair.  Their front courtyard—a typical feature of many Korean homes—was open to all.  They fed and cared for the homeless and hungry and visited congregants in need.  His parents'

"example shaped Bill into the man he is today—someone who actively seeks to help others."  (B. Hwang Ltr.).

As a young boy, Bill was compassionate, determined and a champion for those in need. Bill's older brother Stephen, who is legally blind, recalls how "[w]hen [he] was bullied as a child, Bill stood up for [him], addressed injustices fearlessly, and found ways to resolve such situations on [his] behalf."  (Stephen Hwang Ltr.; *see also* J. Won Ltr.; M. Kim Ltr. ("Despite being the youngest, Bill [] acted as his brother's eyes, always staying by his side and helping him at school.  [Bill] never once complained about his responsibility and considered it a blessing to have the capacity to take care of his brother.")).  Indeed, Bill was the kind of brother who would painstakingly play each of Stephen's friends to win back the marbles Stephen had lost, and who included Stephen in everything.  (Stephen Hwang Ltr.).

Bill also demonstrated "exceptional talent and leadership" from an early age.  (Stephen Hwang Ltr.).  He was in the "top of his class and beloved [by] his teacher[s] and friends."  (J. Won Ltr.).  "As the smartest student in all his classes, Bill naturally took on the role [of] tutor and mentor" to his classmates.  He was never "boastful or arrogant," was "always generous with his time," and "fostered an amicable learning environment," in which his peers felt comfortable asking him for help.  (J. Won Ltr.).  And while Bill excelled in school, "volunteer work was always his priority."  According to JK Won, one of Bill's oldest friends, even as a teenager, Bill's aspirations were "providing for [his family], volunteer work and faith."  (J. Won Ltr.). The two volunteered together at a local hospital on the weekends, "caring for terminally ill patients and [their] families."  (J. Won Ltr.).  Bill also "folded laundries and served food [to] marginalized communities after school, [and] on the weekends."  (J. Won Ltr.).  As Mr. Won put it, Bill "was always thinking of ways to spend time with those in need."  (J. Won Ltr.).

        b.       *When Mr. Hwang unexpectedly lost his father as a young immigrant far from home, he stepped up to help support his family.*

Bill was forced to grow up fast, when, at age 19, his father unexpectedly died just months after the family immigrated to America. Bill's triumph over tragedy in those early years in this country are a testament to his faith and resiliency, and his steadfast focus on helping others in need, a testament to his profound commitment to service.

In 1982, Bill's father moved his family to the United States in pursuit of a better life for his children—and in particular, his son Stephen. (PSR ¶ 149; Stephen Hwang Ltr.; M. Kim Ltr.). At that time, according to Bill's sister, Myungsoon, "Korea was still a developing country," and did not have "adequate social structure and policies" in place "to protect the disabled," like Stephen. (M. Kim Ltr.). Bill's father came to this country to find better treatment options and opportunities for his oldest child. Myungsoon stayed behind.

The family moved to Las Vegas, Nevada, where Bill's father had secured a job as a pastor at a Korean church. But just seventy-four days after their arrival, Bill's father had a stroke, "a devastating event compounded by the family's unfamiliarity with emergency services in the U.S." – they did not yet know to dial 911 and were not sure where to take him. (*See* Charles Kim Ltr.; Stephen Hwang Ltr.; David Yaejun Kim Ltr.). The delay in getting critical care for Bill's father no doubt contributed to his perilous condition, and the family could do nothing more than sit by his bedside as he slowly deteriorated over the following two months, and ultimately died.

It seemed the family's American dream would shatter. Bill's mother spoke no English at the time and did not work. (M. Kim Ltr.). The family had $3,000 to their name. Unable to enroll in regular high school in Nevada, because he was 19 years old, Bill worked as a line cook at McDonald's and at swap meets on the weekends, helping to set up and break down the stalls.

He then went to night school in the evenings for his GED.  After his father passed, Bill

interviewed for a job in the laundry department of the Tropicana hotel, so he could provide more

financial support for his family.  But his mother would not hear of it; she wanted him to finish

his studies and go to college.

Adrift in a foreign culture and a foreign language, Bill rose to the challenge and took on

the "role as [the] family caretaker."  (M. Kim Ltr.).  Because the Korean-American community

was larger in Los Angeles than Nevada, the family decided to relocate to Southern California.

Bill moved first and found housing and enrolled himself in school.  He managed to secure a

storage shed in the back of a church as housing.  His mother and brother joined him there three

months later.  Bill and Stephen got jobs with the church cleaning crew, and his mother found

work at a local dry cleaner.  She later started buying wholesale goods, which, with Bill and

Stephen's help, she would sell from a van to local factory workers in the garment district.

Bill was able to enroll at John Marshall High School in Los Angeles where his school

counselor placed him in regular classes even though he could not speak English and his reading

and auditory comprehension was low.  To keep up in his classes, Bill sat in the back and read

parallel books in Korean, while he continued to learn the language.  When Bill graduated from

high school, he wanted to go to college in Los Angeles so he could continue to help his mother

and brother.  When he found himself waitlisted at UCLA, Bill wrote a letter to the admissions

department successfully pleading his case.  After he was accepted, he continued to live at home,

taking classes during the day, driving his mother to and from seminary school at night, and

working with his mother on the weekends.

Bill graduated from UCLA with a Bachelor of Arts degree in economic-business in June

of 1988.  Two years later – in 1990 – he was awarded a Master of Science degree in industrial

administration from Carnegie Mellon University.  (PSR ¶¶ 157-158; *see also* Stephen Hwang

Ltr.).  All the while, Bill remained the same devoted brother and son—going with Stephen to the

social security office to help translate and fill out forms; driving his sister-in-law to the hospital

when she was in labor with her firstborn; and spending his school vacations at home, driving his

mother around downtown Los Angeles, helping her sell blankets and clothes to workers in the

garment district.  (Stephen Hwang Ltr.).

> c.   *As Mr. Hwang worked to establish himself in his career, he remained committed to his earliest value of service to others*.

While Bill's Carnegie Mellon cohort found their way to easy internships, as a more

recent immigrant without applicable work experience, Bill had difficulty finding someone

willing to take a chance on him.  Through grit and luck, Bill secured a summer position at

Hyundai Securities through the father of one of his classmates, and the firm hired him on as a

broker after graduation.  ES Kim, who worked with Bill at Hyundai, remembers his diligent,

"inquisitive nature, always asking 'why?' and 'how?'" and really listening to understand clients'

needs.  (E. Kim Ltr.).  For six years, first at Hyundai and next at Peregrine Securities, Bill

worked as a stock broker, assisting clients interested in Asian markets.  One of those clients was

Julian Robertson's legendary investment firm, Tiger Management.  Because of his diligence, Bill

won Tiger Management's award for best external contributor and Tiger subsequently invited Bill

to come work for them.  In 1996, at the age of 32, Bill joined the firm as an analyst.[2]

Tiger Management had a long-term investment approach, holding concentrated positions

in a select number of stocks.  Mr. Robertson taught Bill a key lesson when it came to investing:

---

[2]     C.J. Guinness recounts in his letter one of his favorite stories about Bill, who as a young man went to pitch Mr. Robertson on a few equities in which he thought it was worth investing. "When he finished describing his thesis, Mr. Robertson replied that he would like to invest in the stocks.  Apparently, for a moment, Bill couldn't think what to do next, since no one had ever said 'Yes' before."  (C. Guinness Ltr.).

to live with losses.  At one point, Tiger Management was losing a few billion dollars on a wrong-way bet and Mr. Robertson entered the room and assured the team, "Guys, keep calm. It's only work. We do our best."  In early 2000, at the peak of the dot-com bubble, Mr. Robertson returned all outside capital to investors.  He asked Bill and a handful of others to stay on after the fund closed to work directly with him.  After a year or so, Mr. Robertson encouraged Bill and others to open their own funds.  Bill was nervous about doing so, because he was an analyst, not an investor.  But with Mr. Robertson's encouragement and $15 million of seed money, Bill started Tiger Asia and became one of Julian Robertson's famed 'Tiger Cubs.'

Robert Butler remembers Bill in those early days and how he was inspired by Bill's overcoming "the disadvantages of his humble background to become one of the most respected, successful - and in [his] opinion, humble - of Tiger analysts."  (R. Butler Ltr.).  Roberto Mignone shared a large office space with Bill when they were both launching their own investment companies and recalls how, much like his mentor, Bill was notable for his mental fortitude.  Bill had the ability to "withstand the pressure of short-term market volatility"—the "very model of a patient, long term investor," who despite his success, "always maintained [his] humility."  (R. Mignone Ltr.).

While working to establish himself professionally, Bill stayed connected to what he valued most—family, faith and service.  (*See infra* pp. 11-15, 20-30).  Mr. Robertson proved a mentor to Bill not only in his investment style, but in his philanthropic pursuits as well.  Tiger Management had a philanthropic arm, the Tiger Foundation, which focused on large-scale, domestic, high-impact grants in education, environment, religion, and medical research.  Bill became a trustee of the foundation while working for Mr. Robertson and remained in that role for many years after.  No doubt inspired by Mr. Robertson's example, in 2006, Bill and his wife

Becky established their own foundation, Grace & Mercy, which, as discussed below, is dedicated to helping the poor and the oppressed and has touched the lives of thousands across the globe.

### 2. Mr. Hwang's Commitment to Family

a. *Mr. Hwang met Becky Chang in 1991 and they have since structured their lives together with their two daughters around their shared commitment to faith, family and service.*

Born into a close-knit, committed and service-oriented family, Bill has imbued those same values in the family he has forged over the years.  Bill met Becky Chang on a blind date in 1991, just after he finished graduate school.  They married seven months later and celebrated their 33rd wedding anniversary in October of this year.  (PSR ¶ 151; B. Hwang Ltr.).  Their lives together have been centered around their children, their church, and their charitable foundation.

Becky describes how Bill has been an extraordinary husband to her, "demonstrating unwavering love, boundless kindness, and exceptional steadfastness… [Bill] consistently prioritizes [her] well-being, making [her] feel loved, respected, and appreciated."  (B. Hwang Ltr.).  Bill shows up for her in the everyday with his "patience, understanding, and dedication," and their life together has been a "profound source of love and friendship."  (B. Hwang Ltr.).  Friends and family who have observed Bill and Becky together as a couple remark on the great respect and care Bill has for his wife.  They point to the simple gestures – Bill's engagement with her hobbies, and the fact that he slicks his hair back because he knows she likes it best that way, and he is always kind to her – as emblematic of his enduring commitment to her.  (*See, e.g.*, S. Huynh Ltr.; N. Wagner Ltr.; R. Frazee Ltr.).  And Becky notes that through life's most painful moments – the loss of loved ones, ███████████████, family illness – Bill's "support has been a source of immense comfort and solace."  (B. Hwang Ltr. ("My life would be utterly devastated if I had to navigate this world without Bill.")).

11

Bill has brought that same level of devotion to his children.  In 1999, Bill and Becky welcomed their first child, Joanne, and four years later, their youngest, Anna.  (PSR ¶ 151; B. Hwang Ltr.).  As a father, Bill "balanced a demanding career while actively participating in the care of [their] daughters from the very beginning.  During the challenges of [Becky's] ████████████ after [their] first daughter was born, Bill stepped in to care for [Joanne], allowing [Becky] some much-needed time to heal."  And when their eldest was "diagnosed with ████████████ at age nine, Bill attended workshops for weeks, tirelessly working to help her overcome this challenge."  (B. Hwang Ltr.).  Bill was "well known for scheduling meetings during the day time while his children were at [school], [as] dinner time was reserved for his wife and children."  (H. Yang Ltr.).  To this day, they have weekly family meals together, after which they watch movies or take walks outside when the weather is nice.  (B. Hwang Ltr.; J. Hwang Ltr.).

Bill's eldest, Joanne, describes a patient father—one who "never missed the important moments," and showed up for all the daily in-between – picking her and her sister up from school, coming to get her late night when she no longer felt comfortable at sleepovers, teaching her to drive.  He always took her calls while at work and made a point to be home for dinner.  (J. Hwang Ltr. ("Spending time together has always been a high priority for my dad, and he has always put us, his family, above everything else.")).  From feeding and rocking her so her mother could get some sleep, to reading alongside her in college to help her parse the material, Bill has been a father first.  (J. Hwang Ltr. ("In college, I struggled with a particularly challenging class—interest group politics.  The readings were dense, and I found myself lost.  My dad, true to form, sat down with me and read the material alongside me, page by page.  This wasn't a one-time thing; it became a bonding experience, much like those moments when he helped me with

my reading comprehension as a child.  His patience never wavered, and he made sure I understood the material, no matter how long it took.")).

Bill and Becky's hopes and dreams for their children are the same as any parent's—that Joanne and Anna forge their own paths through the world, based on hard work and self-reliance. Joanne, who works as a graphic designer, describes how her father helped her prepare for early job interviews after graduating college, offering her practical advice, and encouraged her when she transitioned from her first job to another opportunity to value herself and her skills.  (J. Hwang Ltr.).

Faith and service have always been important values in Bill and Becky's home.  In the first years of their marriage, Bill and Becky spent their weekends together teaching Sunday school at their church.  (*See infra* pp. 21-22).  And they have spent the last two decades building, growing and sustaining the work of their family foundation, a project that includes their children. As Becky describes, "Our foundation's work has taken us and our daughters to Cambodia, where we collaborated with World Vision on programs for street kids, and to South Korea, where we offered support in missionary cemeteries and a prison while sharing insights from our book clubs.  Bill, our younger daughter Anna, and I visited a women's and children's homeless shelter in downtown Los Angeles, supported by our foundation," meeting families benefiting from G&M's job training and housing programs.  (B. Hwang Ltr.).  Bill and Becky have worked to instill in their children the same commitment to faith and service that Bill's parents instilled in him.

        b.    *Mr. Hwang has been the loving patriarch of both his and Becky's extended families*.

Just as Bill was thrust into the role of patriarch for his family when his father died, Bill has taken on that role with respect to Becky's family.  Esther, Becky's youngest sister and Bill's

sister-in-law, was just 17 when their father passed suddenly. She recalls how devastating it was to lose him and how "Bill graciously stepped in as the patriarch of [their] family." (E. Bhandari Ltr.). In "every way possible," Bill has been "a trustworthy, responsible pillar of [their] family since." (L. Chang Ltr.). Bill walked Esther down the aisle when she married and helped send his sister-in-law, nieces, and nephews to college and graduate school. He bought his in-laws a home and his brother-in-law a studio space where he could work on restoring antiques. He convinced his mother-in-law to get treatment for her ███████ diagnosis and helped coordinate her care when she was diagnosed with ████████. He listened patiently to her detailed stories "despite [her] tendency to repeat herself," and brought food to the hospital staff who cared for her during her time of need. And he delivered her eulogy when she passed. (*See* E. Bhandari Ltr.; P. Bhandari Ltr.; L. Chang Ltr.; B. Hejtmancik Ltr.).

And, of course, Bill demonstrated that same enduring devotion to his own mother and siblings over the years. As Bill began to earn a stable income, he was able to buy his mother a house and support her missionary work; he helped his sister rebuild her home after it was destroyed in devastating floods; he sat steadfast at his mother's sickbed when she died; and he provided for her widowed husband after she was gone. (*See* R. Hwang Ltr.; Stephen Hwang Ltr.; David Yaejun Kim Ltr.; Myungsoon Kim Ltr.). Dr. Hee Yang recalls how dedicated Bill was to his mother, as he tended to her in the hospital: "He never left her bedside except for restroom, coffee breaks and to freshen up. I've never seen such a dedicated family member in my thirty years of practice. He treated all the hospital staffs respectfully with kindness and humility. After her hospital stay, the staff members expressed their admiration for his character, graciousness and loving dedication to his mother." (H. Yang Ltr.; *see also* J. Jahng Ltr. ("I had frequently observed [Bill] and his mother playfully teasing each other to slow down and go easy

in their lives.  The truth is, they were always up to their necks in all the difficult asks by various people in need, but they just did not want to or know how to slow down.  [Bill] and his mother had a beautiful relationship to the end.")).

### 3.    Mr. Hwang's Character

Letter after letter describes how Bill's only hobbies are faith, food, philanthropy, and books, and the project of his life is sharing them with everyone he meets.  (*See, e.g.*, Y. Choi Ltr.; P. Duff Ltr.; A. Forrester Ltr.; A. Kim Ltr.; Stephan Kim Ltr.; Sumi Kim Ltr.; Y. Kim Ltr.; S. Park Ltr.; K. Shin Ltr.).[3]  Bill is not boastful; he maintains a sense of humility.  (*See, e.g.*, P. Bhandari Ltr.; R. Butler Ltr.; L. Chang Ltr.; J. Jahng Ltr.; Stephan Kim Ltr.; Stephen Kim Ltr.; M. Labberton Ltr.).  And he has always lived a modest lifestyle, despite his great success.[4]

---

[3]    *See also* A. Moon Ltr. ("[Bill] has always advised me to do three things when meeting people: 'First, treat them to delicious food they want to eat.  Second, introduce them to people who can help them.  Third, give them good books that would benefit them.'  No matter how busy he is, if a young person requests a meeting, he always makes at least an hour for them.  Bill is someone who shares everything he has with others.  He is, inside and out, a person who lives according to the teachings of Jesus—the only person I have met like this in over 70 years of my life.").

[4]    All of the letters describe in some form or another his modest life, his humility, and his generosity.  *See, e.g.*, P. Duff Ltr. ("I remember reading about Bill's luxury apartment on Central Park South.  What wasn't stated was Bill was subletting the apartment from the owners who vacated the property because a high-rise tower was being constructed next door.  I also know a prime reason Bill rented the apartment was because his daughter was attending the Lincoln Center campus of Fordham.  He wanted to be close to her."); I. Hwang. Ltr. ("Bill and Becky also spend little money on themselves. … [T]hey live humbly, comfortably and joyfully, never ostentatiously, always in service of others.  They have always been more passionate about giving it all for good causes, to help others, to lift others up than on anything for themselves.  'We don't need any of this stuff; let's give it away for a better cause!'"); Hoon Kim Ltr. ("Bill is someone who has always been generous with his time and resources.  However, he does not seek recognition or public acknowledgment for his efforts.  Instead, he quietly and humbly supports organizations that work tirelessly to uplift marginalized communities."); Charles Kim Ltr. ("Despite his financial success, Bill lives a life marked by humility and frugality, channeling his resources to bless others rather than accumulating wealth for personal enjoyment."); *see also* S. Han Ltr.; B. Garjian Hiscoe Ltr.; S. Huynh Ltr.; S. Kang Ltr.; Chris Kim Ltr.; J. Kim Ltr.; Stephen Kim Ltr.; J. Ko Ltr.; W. Lie Ltr.; J. Nam Ltr.; D. Pae Ltr.; S. Park Ltr.; R. Rusaw Ltr.; S. Shuck Ltr.; J. Sung Ltr.; Y. Takai Ltr.; H. Whang Ltr.; B. Yu Ltr.

Indeed, Bill has lived in the same house in Tenafly, New Jersey for over 15 years, famously shops at outlet malls, and his flashiest purchase is a Jaguar he bought in 2020, but not without first negotiating down the price. As friends and family know well, "Bill lives by the value of the right price. He's always thinking about the right price for a product or service, and to this day, he shares the joy of finding a bargain." (R. Kim Ltr.).[5]

Whatever Bill can share of his life he does. His daughter Joanne recalls the year her cousin lived with them in New Jersey while he was attending graduate school. That same year, Bill and Becky took in friends whose house had been flooded during a storm. (J. Hwang Ltr. ("Our house became a temporary refuge for multiple people, and though it felt like a hotel at times, it brought so much joy to all of us.")). Many friends recount big gestures such as trips they have taken with him to Korea. (*See, e.g.*, P. Ahn Ltr.; A. Gee Ltr.; L. Gee Ltr.; B. Hejtmancik Ltr.; Stephan Kim Ltr.). Others recount simpler gestures, such as when he taught them how to use the Subway system. (V. Tsirmpas Ltr.). And then there is food. Hyungmo Kim once asked Bill "where food ranked among his priorities, given his enthusiasm for sharing good meals. He responded that the food itself wasn't the priority; it was about connecting with people, caring for them, offering guidance, and seeing how he could help." (Hyungmo Kim Ltr.). Bill often hosts meals of 10-20 people, a "purposefully and indiscriminately random

---

[5]     Bill's brother-in-law Bryce recalls: "The family were meeting in midtown Manhattan for lunch and there was no parking available even on the weekend. After Bill dropped off Becky and the kids at the restaurant, we went to park the car. When I asked why we were driving around looking for a space while there was a parking garage directly across the street, he explained, 'the prices are too high'. …The issue was not clearly about the money, but the principle as it was not a fair price." (B. Hejtmancik Ltr.). Pat Duff similarly shares a story of a time he and Bill ate lunch together at an omakase restaurant. While happy to treat Pat to a "fabulous lunch, [] [Bill] said he would never come for dinner, because it was too expensive." (P. Duff Ltr.).

composition of [] invitees; co-workers, partners, friends and even acquaintances, of different backgrounds of all types, ages, and professional status, locals and visitors, all gathering around a common meal."  (V. Tsirmpas Ltr.; *see also* J. Bland Ltr.; ("These gatherings are filled with laughter, joy, and meaningful conversations, offering opportunities for spiritual growth and connection.")).  Books too are a way in which Bill shows care and affection for others. Whenever friends, mentees, grantees, and new acquaintances meet with Bill, they leave with an armful of books, because Bill is passionate about sharing knowledge and instilling a love of learning in everyone he comes across.  (*See, e.g.*, Y. Choi Ltr.; P. Duff Ltr.; A. Forrester Ltr.; C. Guinness Ltr.; S. Huynh Ltr.; H. Im Ltr.; Sumi Kim Ltr.; M. Klus Ltr.; M. Labberton Ltr.; D. Ocasio Ltr.; K. Shin Ltr.; D. Suh Ltr.; T. Surh Ltr.; K. Wong Ltr.).[6]

The letters all express their gratitude for Bill, for tangible help he has offered; his spiritual and professional guidance; the example he has set by his own life, through his modesty, his faith, and his desire to serve; for his friendship, his warmth, his easy love.  (*See infra* pp. 33-40).  They describe a man who at first may appear stern and difficult to access, but who is in fact rich in his ability to connect and to bring people together.  If Bill appears reserved or "stiff," (Y. Kim Ltr.), it is because he "doesn't speak from his emotion," (R. Kim Ltr.).  Those who really know Bill understand that he is "warm and gentle, open to listening and ready to help."  (Y. Kim

---

[6]       When his sister-in-law developed ███████████, it was The Songs of Jesus, Daily Devotions in the Psalms, which he offered for her solace—a book she still turns to every morning.  Bill also "went out of his way to connect [Liz] to the right doctors who were able to help[.]  He was instrumental in [her] healing journey and assisted financially."  (L. Chang Ltr.; *see also* M. Jackson Ltr. ("Since my first meeting with Bill, I have been struck by his passion to help people and to see them grow in their overall knowledge and wisdom.  He has walls full of books, free for anyone to take, that he purchases specifically to give away."); Chris Kim Ltr. ("Common examples of Bill showing his support and care include gifting books pertinent to a specific conversation, introducing me to contacts that could be useful, sharing words of encouragement over a meal, and simply checking in to see how my family is faring.")).

Ltr.; *see also* Su Lee Ltr. ("Bill may often appear stoic, but those who know him understand that beneath that Wall Street exterior is a huge and warm heart.  His kindness and support aren't always expressed in grand speeches but are deeply evident in the quiet, thoughtful ways he shows up for those he cares about.")).  Bill is soft spoken, bold, and "naturally bullish on life, unaffected by volatility."  (C. Guinness Ltr.).

One of Bill's most admirable qualities is his capacity for self-reflection and, in that, his ability to apologize.  For example, Bill called Pastor Ahn to apologize when he worried his candid advice (advice that the Pastor had himself solicited), had overstepped, (P. Ahn Ltr.), just like he emailed friends to apologize when they disagreed about the matter of public versus private schooling, (Stephan Kim Ltr.), and like he reached out to colleagues who had different points of view, to say he was sorry, (J. Sheridan Ltr.).  Bill has been committed to "stay[ing] curious, ask[ing] questions, and giv[ing] someone the benefit of the doubt."  (J. Ko Ltr.).  Rather than give up on difficult employees for example, Bill has been willing to "stay compassionate, sort out messy situations, and work patiently to bring out the best in each person."  (J. Ko Ltr.).

Where Bill could have built a fortress around himself and used his wealth for luxuries, he "chose to lead a life where he is approachable," making himself available to anyone in need.  (J. Jahng Ltr.).  Bill has nurtured friendships of over 5, 10, 20, 30, 40 years, including across oceans, pre-email, corresponding by letter, (J. Won Ltr.; *see also* M. Hong Ltr.; L. Hong Ltr.; A. Moon Ltr.; K. Palau Ltr.; M. Shaw Ltr.; O. Sohn Ltr.; B. Yu Ltr.; R. Butler Ltr.; S. Choi Ltr.; D. Chun Ltr.; A. Forrester Ltr.; I. Hwang Ltr.; J. Jahng Ltr.), and all of them describe him as the same humble, generous, loving friend, unchanged by season or circumstance, "an exceptionally decent and consistent" human being.  (J. Jahng Ltr.; *see also* E. Chon Ltr. ("It is often said that people change when they become rich and famous-that they become arrogant, unapproachable,

and look down on those who are not deemed their equals.  However, despite his extraordinary

wealth and fame, Bill has not changed.  He remains the kind, thoughtful, gentle, and

approachable friend I met many years ago.  He is a friend I can turn to for advice, who will stand

by you in times of trouble, who will not only pray with you but will also share your burdens and

assist you in any way he can.")).

   Bill is the person who knows the cleaning staff and building security guards by name; is

as engaged with the juniors at a meeting as he as is with their superiors; takes the time on

business trips to visit with his former interns; rides with those in need when he travels so he can

listen to their concerns; holds the elevator door; and invites someone who he recognizes might

feel uncomfortable and outranked in the company of power brokers to sit right beside him at

dinner.  (J. Nam Ltr.; M. Jackson Ltr.; S. Kang Ltr. B. Hejtmancik Ltr.; J. Zhang Ltr.; Su Lee

Ltr.; *see also* D. Ocasio Ltr. ("Acts of kindness seem to flow effortlessly from Bill.  Recently,

while waiting for a ferry, Bill and I encountered a Nepalese man who appeared lost. Without

hesitation, Bill stepped forward to help.  He not only offered directions but also paid for the

man's fare when his ticket was invalid.")).  With Bill there are no "little people" in his world.

(O. Guinness Ltr.).  Bill "never forgets where he came from, and what he owes to his parents and

those who came before him.  He has a humble and generous spirit, and a great heart for the

people he is privileged to serve.  And he truly serves."  (O. Guinness Ltr.).

   Bill's faith has been the central organizing principle of his life.  His friends acknowledge

that he lives for an audience of One, (C. Guinness Ltr.), and in so doing has given of himself to

the many.  As his friend Roberto Mignone describes: "We New Yorkers can be jaded about

motivations … particularly when it comes to religious practice.  Bill's dedication to his faith,

however, is truly authentic and deeply personal.  Over the years, we have had many intimate

conversations about the role of faith in our lives.  I very much believe that Bill's primary focus

has been to use his talents for the greater good and a higher purpose, rather than for personal

gain. …His modest lifestyle, and his charitable support of others is a testament to this fact."  (R.

Mignone Ltr.).  Bill does not impose his faith on others—it is only ever an offering.  (*See, e.g.*,

B. Kim Ltr.; J. Hong Ltr.).  And Bill's prayers transcend creed, they include "petitions for []

family, a commitment to grow as a person who can coexist with the community, and a humble

request for wisdom to remain introspective."  (S. Han Ltr.).  As Bill's mentee Yejin Choi, who

refers to Bill as her 'New York Dad,' captures it best: "He taught me to lead with love, to share

generously, and to find peace in faith."  (Y. Choi Ltr.).

> **B.      Mr. Hwang's Lifetime Commitment to Service and Philanthropy**

While the central organizing principle of Bill's life has been his faith, the central vehicle

through which he has tried to live his faith has been in service.  Since boyhood he has been

steadfast in his orientation to uplifting others.  And as he became more successful over the years,

his giving – in both time and money – grew accordingly.  Indeed, a colleague of Bill's recounts

how her son once asked him, "How much do you give as a tithe?" to which Bill answered, "I

believe that everything I don't need to use for myself should be spent on others."  (A. Moon

Ltr.).  That is why, in 2006, Bill and Becky started the Grace & Mercy Foundation ("G&M"),

funding it with the majority of their personal wealth.  (Sumi Kim Ltr.).[7]  An elision of 'there but

---

[7]      As of March 2020, Bill has donated roughly $600,000,000 to Grace & Mercy through
cash and stock shares since inception.  *See* Grace & Mercy Foundation Form 990-PF, Schedule
B, for years 2006-2020, https://projects.propublica.org/nonprofits/organizations/208050779.  As
of early 2020, the value of Archegos was roughly $2-3 billion, which represented the vast
majority of Bill Hwang's personal wealth.  PSR ¶ 119.  *See also* A. Kim Ltr. ("Bill believed that
the wealth of Archegos was not his own, but ultimately belonged to God, and was to be used for
helping the needy through G&M."); J. Sung Ltr. ("He often said his success wasn't meant for
personal comfort but to serve others and God, and that was a lesson that rippled out to those

for the grace of God go I' and 'it is his mercy that sustains me,' G&M is a sustainable giving institution serving the world by supporting underserved communities.  Since its founding, Grace & Mercy has distributed grants to over 450 organizations that work to combat homelessness, poverty, and trafficking, and support refugees, education initiatives, prison rehabilitation, faith in work, youth initiatives, church networks, and more.  (*See* Sumi Kim Ltr.).  G&M has been Bill's primary focus for philanthropy and service over the past two decades, but that is not where his journey began.  G&M is a continuation of all the years of service that came before, and the many ways in which Bill has shared his life, energy and good fortune to help lift up others near and far.

      1.    *Mr. Hwang's Early Philanthropy*

When Bill moved to New York after graduate school to begin his career in finance, he remained committed to the life in which he'd grown up—church and service.  While working as a broker at Hyundai and Peregrine and in the early years of his marriage, Bill spent Fridays and Sundays ministering to church youth.  Many of the students were from immigrant families and faced challenges in a new country and culture, and Bill offered them guidance and support.  (H. Whang; *see also* J. Jahng Ltr. ("From 1993 to about 1996, I volunteered" with Bill and Becky "at a local church in Elmhurst, New York, where we taught bible study and consulted [troubled] youths on a weekly basis.")).

In 1996, Bill and his friend William Chon, helped Reverend Hakyun Whang establish his own church, the Korean Hope Evangelical Church of New York.  (E. Chon Ltr.; H. Whang Ltr.).  They gathered there every Saturday morning at 6:00 a.m. for a prayer service, followed by an

---

around him, including me.  His humility inspired all of us to live with more grace and moderation."); S. Han Ltr. ("While Bill practiced moderation in his personal spending, he generously extended substantial support to those in need, both through his philanthropic efforts and his hospitality toward others.").

additional Bible study, and then breakfast at a local diner—a ritual that continued for a decade. (E. Chon Ltr.).  During these gatherings, the three men talked about how best to serve their communities, and Bill expressed his strong desire to promote the public reading of Scripture and to serve those in need, both in their community and around the world – the two pillars of what ultimately became Grace & Mercy.  (E. Chon Ltr.).  Bill was later ordained as a Deacon in Pastor Whang's church, and a few years after that, as an Elder, which he remains to this day.  (E. Chon Ltr.; H. Whang Ltr.).  "As an elder, the congregation looked to Bill as a leader and he would attend home visits with [Pastor Whang] for members of the congregation [who were sick] to provide emotional and spiritual support."  (H. Whang Ltr.).

In 1996, Bill also joined Tiger Management and became a trustee of the Tiger Foundation, where he focused his time and attention on education and mentorship.  He performed onsite visits with potential grantee schools in Brooklyn and Harlem, analyzing their programs and spending time with the children, and reported to the board on a quarterly basis. And as Bill's income grew and he was able to save, he and Becky started donating their financial resources to various philanthropic efforts, including to the Tiger Foundation.  Bill also found time to mentor young professionals in finance.  Bill felt "one of his duties was to help as many young professionals as possible to be independent and succeed," and along with his friend, In Seon, Bill set up a mentorship series for younger Christians who had just graduated college and were working in the financial services industry.  (M. Kim Ltr.; I. Hwang Ltr.).  In addition, Bill helped establish the Korean American Finance Society and worked closely with the Korean American Community Foundation and the Network of Korean American Leaders.  And Bill also

served as an adjunct professor at Korea University, where he set up an internship program for students to come intern with him in the U.S.[8]

When Bill started attending the Redeemer Presbyterian Church in the mid-2000s, because his children preferred English-language services to the Korean services offered at Korean Hope Evangelical Church, that change presented another opportunity for service. Bill became involved in Redeemer's Faith and Work initiatives, speaking with and serving as a mentor to many young Christians starting out in their careers, just as he'd done for so many years before. And Bill also served as a trustee at the Fuller Foundation since the mid-2000s, and later served as a trustee to the Fuller Seminary as well.

In addition to his focus on education and mentoring, Bill supported his mother's missionary work in Mexico. Bill's mother had started doing missionary work in the country during Bill's time at UCLA. And in those early years, Bill would help his mother pack her van with supplies and drive her down to Tijuana to work with impoverished communities. As her work expanded, so did Bill's support. Bill's mother began to establish churches and seminaries in Mexico. Over the years, Bill and Becky have provided supplies to the various missions where Bill's mother and brother Stephen serve recovering addicts, former gang members, the hungry, the homeless and people in need of hospice care. On numerous occasions, Bill personally brought blankets and rice to the missions, and also helped to transport a dentist to the sites to

---

[8]     James Nam was selected as one of two undergraduate summer interns at Tiger Asia through a program Bill offered to students at Korea University who would not otherwise have had the same opportunities. (J. Nam Ltr.). "As a student who grew up in a small farming town and came to Seoul for college," James was one of the "weakest intern candidates," as compared with his peers who "had already completed multiple internships at bulge-bracket investment banks or consulting firms." (J. Nam Ltr.). Still, Bill gave James a chance because he "seemed to need help the most, whereas others would succeed without his assistance." (J. Nam Ltr.). For James, the internship "was a turning point in life, both professionally and personally." (J. Nam Ltr.).

serve those in need.  Bill was tasked with holding down patients while the dentist pulled their

teeth.  Pastor Woo Yong Lie, who was close to Bill's mother and often accompanied her and Bill

on missionary trips, recalls watching Bill serve meals to poor residents, with whom he would sit

down and pray.  (W. Lie Ltr.).

## 2.    *Mr. Hwang & G&M's Charitable Giving*

As Bill achieved greater professional success, his efforts to help the poor and oppressed

grew exponentially.  Having spent years dedicating time and resources to his faith community,

working with educational programs as a trustee of the Tiger Foundation, starting his own

mentorship programs and developing his own internship opportunities, helping his mother

establish and maintain mission centers in Mexico, donating to charitable foundations and

non-profits in New York and elsewhere, Bill and Becky decided to start their own family

foundation, the Grace and Mercy Foundation, in 2006.

Grace and Mercy funds organizations that bring tangible value to their communities, with

a specific focus on social justice, faith-based programs, and Asian American initiatives.  As one

friend and colleague put it, the G&M "team [is not] afraid to address tough issues."  (J. Ko Ltr.;

*see also* J. Sheridan Ltr.).  Through the foundation, Bill has sought to extend "his reach to those

society often forgets—recently released prisoners, single mothers, and young students, treating

them with [] respect and dignity."  (Charles Kim Ltr.).

Bill has been the "strategic steward" of Grace and Mercy since its inception, where his

focus is on "doing good rather than looking good."[9]  (J. Ko Ltr.).  He wants "to do philanthropy

---

[9]    Indeed, letter after letter describes how Bill eschews recognition and praise for the good
work that he does.  *See, e.g.*, Sumi Kim Ltr. ("Every year, Bill receives dozens of
invitations to gala events and splashy ceremonies.  Partner organizations celebrate his success
and want to recognize Bill's as a generous philanthropist.  When people want to express
accolades and recognition, he respectfully declines.  Yet, the number time Bill has rearranged
his schedule to visit a friend in the hospital or attend a funeral to support his friends and

right."  (R. Kim Ltr.; *see also* J. Nam Ltr. ("Having joined the foundation three years ago, I have

seen firsthand the impact the foundation is making, and I cannot be prouder of what G&M is

doing.  At the core is Bill, who works tirelessly around the clock. …I can confidently say that he

is the hardest-working person among our G&M colleagues.")).  That means doing far more than

just vetting an organization and writing a check.  Bill rolls up his sleeves and works hand in

glove with the foundation's grantees to help them develop their programming and expand their

reach.  And while it is difficult to capture the breadth and depth of the work Grace and Mercy

has supported over the past two decades, the following exemplars provide some sense of the

importance of the work, and the profound ways in which Bill has helped to transform lives

across the globe.

- **<u>Supporting Rehabilitation Programs for the Formerly Incarcerated</u>**: Cat
Jackson met Bill at a conference in 2010.  She was a keynote speaker and shared
her work providing holistic rehabilitation to the formerly incarcerated.  At the
time, her organization, Defy Ventures, was in its infancy and Bill offered to
provide advice on strategy and growth.  At Ms. Jackson's request, Bill also agreed
to have monthly mentoring meetings with her and serve on her National Advisory
Board.  Ms. Jackson credits Bill's guidance as instrumental in helping her scale
from a small start-up to a national organization.  In Ms. Jackson's words, Bill

---

colleagues is another reflection of commitment and care for his community."); R. Frazee Ltr.
("Last year we met up in Nashville for a large gathering of an organization that Grace and Mercy
had given a grant.  I spoke to the crowd of over sixteen hundred people on the mission and
passion of Grace and Mercy.  When I called out Bill's name to give him credit, he wouldn't raise
his hand to be acknowledge by the crowd.  He wasn't looking for that.  He wanted to see this
organization advance through the mission of Grace and Mercy - full stop.").  *See also* P. Ahn Ltr.
("In 2011, Bill invited me to join him on a trip to South Korea to minister to migrant works and
widowed pastors' wives and their families.  I was astonished to learn that Bill had been quietly
supporting several dozen pastors' wives and their children. . . .  In all the years I've known Bill,
he has never boasted about his philanthropy, often carrying out his charitable work in secrecy.");
J. Ko Ltr. ("Bill and the Grace & Mercy team often stayed under the radar and quietly did good
work.  I estimate that there are over a hundred grantees/individuals and hundreds of millions of
dollars of philanthropy done by Bill and the team that did not receive any attention because they
worked proactively to stay out of the spotlight."); D. Ocasio Ltr. ("I met Bill through the Grace
and Mercy Foundation, at their [PRS/JSU gatherings].  At first, I didn't know who Bill was—he
blended into the group with humility, never seeking to stand out.  It was only through a friend of
his that I learned Bill and his wife were the founders of this remarkable organization.").

stands apart from "other well-meaning philanthropists because" he is a "man of his word." If he promised to act on one of her requests or to introduce her to an influential person, "he followed through—every time, without fail, for years." (C. Jackson Ltr.).

In addition to helping Ms. Jackson grow her organization, Bill was a hands-on volunteer who worked directly with program participants. (C. Jackson Ltr.). For example, Bill "volunteered at a two-day intensive character development seminar," and served as a judge at several of the organization's "all-day Shark Tank-style pitch competitions, in which [] participants [] would share their business ideas. Bill was consistently among the participants' favorite judges, because he never beat around the bush." (C. Jackson Ltr.). Bill also invested significant additional time in mentoring graduates, including one who started a small painting company, and another who started a catering business. (C. Jackson Ltr.). And Bill hosted Bible studies for program participants and attended family reunification events in Central Park on weekends, "just to show the guys that he was truly there for them." (C. Jackson Ltr.; *see also* A. Moon Ltr. ("we had lunch scheduled at a steak restaurant . . . when I arrived, I saw Bill with over 20… recently released prisoners, [who] Bill was mentoring….When I asked him why he chose an expensive restaurant [], he replied, 'I wanted to show them that they deserve to be treated with dignity.'")).

Defy Ventures is just one example of the ways in which Bill has worked to support the formerly incarcerated. Grace & Mercy also supports Exodus Transitional Community, which in 2020-2021 alone provided living expenses and case management programs for 1,481 individuals released from Rikers Island, with the aim of reducing recidivism. Bill also connected Prison Fellowship International with Faith Comes by Hearing to distribute Proclaimer Bible listening devices. That project is expected to reach one million prisoners around the world by 2030. And Bill also supports Youth for Christ, a program that provides mentors to 150 juveniles in detention each month.

- **Assisting North Korean Escapees**: Hannah Song met Bill in 2007. He was so moved when he learned about her work assisting North Korean refugees that he wrote a check on the spot. (H. Song Ltr.). Jensen Ko recalls Bill introducing him to the "ragtag group of recent college graduates" who had big dreams "to bring 25 million forgotten North Koreans to freedom but was struggling mightily with a lack of strategy, funding, and impact." (J. Ko Ltr.). While Ms. Song's team at LiNK was passionate, they lacked experience. But instead of writing them off, Bill got Mr. Ko involved as an advisor and challenged the team to recruit credible board members and develop a specific strategy. Bill also agreed to cover health benefits and other critical expenses for LiNK employees so they could focus on doing the work. (J. Ko Ltr.; *see also* H. Song Ltr. ("His support early on made it possible [] to grow from a volunteer staff to a salaried staff. …Covering the cost of salaries, health insurance, and even staff retreats made it possible [] to focus on what was most important—the actual work of the organization.")). And Bill did

more than write a check; he was an advocate for LiNK, connecting them to others in his network, showing up at events and fundraisers, and using his influence to rally more support. (H. Song Ltr. (Hannah recalls one fundraiser where "50 out of 60 people in that room attended because" of Bill and they raised "over $300,000—enough to rescue 100 North Korean refugees.")).[10]

LiNK celebrated its 20th anniversary this year, and since its founding has "rescued over 1,300 individuals [], [and] provided resettlement assistance to thousands of refugees" – none of which would have been possible without Bill and G&M. (J. Ko Ltr.). Bill remains a steadfast advocate for North Korean escapees and LiNK's most generous and longest standing partner of 17 years. (H. Song Ltr.).

- **Assisting Survivors of Sexual Assault**: Lilada Gee, Executive Director of Defending Black Girlhood, first met Bill at a church retreat a decade ago. Since then, Bill has been a steadfast partner to her in her work supporting survivors of sexual trauma. He has sustained her through significant financial challenges. And he has shown up in person to help her do the work. For example, Bill travelled to Wisconsin to help her scout for the right location for a group home for teen mothers. Ms. Gee recounts that Bill once told her that whatever she would ask of her biological brother, she could ask of him—"and he has remained true to his word." As Ms. Gee faces a recent diagnosis of ████████████████ █████, Bill checks in on her regularly and is standing by her and her organization during one of the most challenging moments of her life. (L. Gee Ltr.).

- **Supporting Schools**: Bill continues to be a strong supporter of youth programs. By way of example, Paul Gojkovich met Bill while he was working as Executive Director of Manhattan Christian Academy (MCA), which educates children in one the lowest income areas in the city. When Bill learned the faculty was paid poverty-level wages, he said it was "unfair to fund a mission on the back of the missionaries." Bill focused on raising faculty salaries from 30% of the New York City public school scale to 80%. Bill's funding also inspired support from other foundations and MCA's program grew from 180 to 425 students. (P. Gojkovich Ltr.).

Bill also supports Pave Academy Charter School's school-wide Overcoming Racism initiatives, including academic assessment and data systems, a new curriculum to better serve 500 students from diverse backgrounds, and sessions for teachers related to diversity and equity. G&M likewise helps fund salaries for

---

[10]    Bill has also supported organizations that help provide food and aid to refugees from Afghanistan and Iran, (V. Tsirmpas Ltr.), as well as undocumented immigrants in South Korea, (H. Kim Ltr.). The organizations have used Bill's funding to host free medical clinics for undocumented immigrants who would otherwise have no access to healthcare, offer temporary housing for those with nowhere to turn, and provide meals and gathering spaces. (H. Kim Ltr.).

staff members, alumni engagement, and overall strategy for Fuller Theological Seminary, which serves 3,415 students and 30,000 alumni.

- **Sponsoring Mentorship Programs**: From his days at Tiger Management, Bill has been focused on providing educational and professional access for students from underserved communities, and he has continued that work through his sponsorship of the Liger Program at Columbia University.[11]  The program was born when Rainbow Chik, a student, met Bill at an MBA-student investment management industry fireside chat.  Bill invited Ms. Chik and other students to dinner a couple of weeks later during which they developed a plan for a more formal and sustainable mentorship program.  (R. Chik Ltr.; K. Wong Ltr.).  In designing the program, it was important to Bill that they specifically reserved space for students from underserved and underrepresented communities.  (R. Chik Ltr.).  The program launched with a cohort of twelve students, who meet monthly with Bill or his team for professional guidance and support.

- **Providing Scholarships**: Bill also provides scholarship funds for foreign students accepted to American universities.  (*See* W. Lie Ltr.).  One of those recipients is Lanyu Xu.  In typical fashion, however, Bill did not just write a check to fund her studies.  He invited her and another scholarship recipient to New York during a break from school, so that he could spend time with them and make introductions to others in his network.  Bill and Ms. Xu have kept in touch over the years and he has been instrumental in helping her pursue her passion for charitable work.  (L. Xu Ltr.).

- **Funding Jobs Programs**: Alex Forrester and Bill met almost two decades ago.  At the time his organization, Rising Tide Capital, was a tiny operation with two employees—they were a "hyper-local, grassroots initiative" focused on working with low-income communities, including immigrants, refugees, domestic violence survivors, veterans, the differently abled, and men and women returning from the criminal justice system.  With the support of Bill and G&M, Rising Tide Capital is now one of the largest education-focused nonprofits in the country focused on entrepreneurship.  In addition to providing funding, Bill has helped the organization expand its network and has volunteered, along with his daughter, to work directly with program participants.  (A. Forrester Ltr.).

- **Assisting Victims of Trafficking**: Benny Yu has known Bill for over 20 years.  He is the founder of El Pozo de Vida, a non-profit that works on trafficking prevention, intervention, and restoration.  Mr. Yu decided to move to Mexico and become a missionary after he took a trip to Mexico with Bill and his mother to build houses with Habitat for Humanity.  Reflecting back on that first trip they took together to Veracruz, Mr. Yu noted that Bill is "a man who is not afraid to get his hands dirty building homes for the needy."  Over the years, and with Bill's

---

[11]    The Liger Program at Columbia University was sponsored by Archegos rather than G&M.

support, El Pozo de Vida has "served thousands of beneficiaries, assisted in legislative reform to protect victims and reached over 11 million individuals through [their] campaigns." (B. Yu Ltr.).

El Pozo de Vida is just one of several anti-trafficking organizations Bill supports. G&M also supports Restore NYC, which in 2020-2021 alone, provided economic empowerment programs for over 125 survivors of sex trafficking; and International Justice Mission, which is focused on ending modern day slavery, by rescuing and supporting victims of trafficking, and has rescued approximately 66,000 trafficking victims globally over the last 20 years.

- **Providing for the Homeless**: Having been nearly homeless as a teen in Los Angeles, Bill has never forgotten those in need. He has been a longtime supporter of the Bowery Mission, which ministers to New York's homeless population. Bill met Ed Morgan, the former CEO of the Bowery Mission, more than 15 years ago and in the years since, helped Mr. Morgan design an alumni program for former homeless residents of the Bowery Mission, which has significantly lowered the rate of recidivism. (E. Morgan Ltr.). Bill has also provided consistent and substantial financial support for the Bowery Mission over the years. In fact, in 2020 alone, G&M's support enabled the Bowery to provide 429,531 warm meals, 1,965 pantry meals, 27,605 clothing articles, 60,398 nights of emergency shelter, and 1,553 medical exams to the homeless in New York City.

  Bill likewise supports dozens of missions across the country with equally impactful results. (E. Morgan Ltr.). In fact, with Bill's support, the Union Rescue Mission in Los Angeles constructed a 370-bed homeless shelter to provide safety and shelter for homeless women and children.

- **Funding Ministries Abroad**: No doubt influenced by his experience growing up with a disabled brother, Bill has been a major contributor to Korean missions that focus on the disabled. In 2010, Bill purchased the land for the Seoul Bethesda Mission to build a four-story welfare center for the disabled. He also helped the Busan Bethesda Mission build a disability welfare center in 2002. (Stephen Hwang Ltr.). And Bill has continued to support the missionary work his mother started decades ago in Mexico. For the past 27 years he has served the missions she founded in Tijuana, providing community support, including food and clothing, to those in need. (H. Whang Ltr.; Stephen Hwang Ltr.; J. Jahng Ltr.).[12]

---

[12]     In honor of his mother, another one of the causes Bill supports is helping families who are left behind after the death of a pastor or missionary. (R. Kim Ltr.). Pastor Ahn recalls a trip Bill invited him to join to South Korea in 2011 to "minister to migrant workers and widowed pastors' wives and their families," during which he was "astonished to learn that Bill had been quietly supporting several dozen" families. (P. Ahn Ltr.; *see also* R. Hwang Ltr.). Ryan Kim shared a story of how several years ago, the mother of one of the pastor's families that Bill supports wrote to G&M concerned about her daughter who was at risk of being trafficked. G&M typically supports institutions and Mr. Kim didn't think there was anything to do to help,

- **<u>Ensuring Access to Healthcare</u>**: Bill is a fervent supporter of efforts to provide health care to the underserved both at home and abroad.  With the support of G&M, Pastor Woo Yong Lie built a hospital deep in the mountains of the Chin State in Myanmar, which provides medical care to poor residents who would otherwise lack access.  (W. Lie Ltr.).  Bill likewise is a generous donor to a scholarship program sponsored by the Korean American Medical Association, (M. Hong Ltr.), and is the primary benefactor of the Asian Health Program at Holy Name Medical Center in Teaneck, New Jersey, helping to provide customized medical assistance to tens of thousands of members of the Asian community over the past 15 years, (H. Yang Ltr.; *see also* M. Maron Ltr.; P. Bhandari Ltr. (discussing how Bill connected him with the program and how in turn was able to further connect them with long-term care and assisted living programs, helping patients access these additional resources.)).

***

The accounts above are just a small slice of the communities Bill has championed and the organizations he has sustained over the past two decades—there are many more; for example, Inheritance of Hope, supporting 469 families facing the loss of a parent to terminal illness; Military Community Youth Ministries, supporting eight new staff members and two new ministry locations, aiding in MCYM's service of 7,860 military members stationed at bases across the world; Nuru International, helping to support populations at risk for illness, violence, and despair in Kenya, Ethiopia, and northeastern Nigeria, reaching 60,000 people during 2020 alone; Hope for New York, which supports sixty-plus smaller, community-based nonprofits around the city, offering services ranging from shelter, food security, after school programs, healthcare, and legal aid, (I. Hwang Ltr.); Faith & Community Empowerment, which helps advance economic development, leadership and racial solidarity initiatives, (H. Im Ltr.); Korean American Family Service Center, which works to end domestic violence, sexual assault, and relationship abuse, (S. Choi Ltr.; W. Lee Ltr.); Love for All Nations, which establishes medical

---

but Bill asked his team to please find a way.  Mr. Kim and a colleague met with the mother and were able to find a solution.  (R. Kim Ltr.).

clinics and farmlands for local communities abroad, including an AIDS clinic in Tanzania,

community medical clinics in Bangladesh, Myanmar, and Bolivia, and farmlands in China to

assist North Korean refugees, (E. Chon Ltr.); Korean American Campus Crusade for Christ,

supporting worship and faith among students, (E. Chon Ltr.); Korean KOSTA, which supports

people living with disabilities, (W. Lie Ltr.); Zimele, an organization that assists people living

with HIV/AIDS in rural South Africa, (P. Ahn Ltr.); Redeemer Presbyterian's Financial Services

Ministry, which produces videos used for faith and work groups, (P. Gojkovich Ltr.); the Seoul

Theological University, on which Bill has served as a board member, investing in educational

programming and facilities, (Stephen Hwang Ltr.); Hawaiian Islands Ministries, to help

individuals who are homeless or in need, such as for example, those who lost so much to the fires

in Maui last year, (D. Chun Ltr.).  There are nursing homes, (W. Chon Ltr.), and New York

non-profits that offer "home and care" to paralyzed children and serve veterans who fought in

the Korean War, (Michael Kim Ltr.), "scholarships to various universities such as Korea

University and SUNY Korea," as well as "international internship opportunities."  (R. Lee Ltr.).

       3.     *G&M's Public Reading of Scripture & Just Show Up Book Clubs*

Through G&M, Bill strives to lift people up not just through philanthropic giving and

volunteering, but also through the foundation's two signature programs:  The Public Reading of

Scripture ("PRS") and the Just Show Up book club ("JSU").  Three times a week, participants in

PRS, meet at the offices of Grace & Mercy, to listen to the Bible read aloud in English, Korean,

and Mandarin.  (*See e.g.*, Sumi Kim Ltr.; M. Morgan Ltr.; N. Wagner Ltr.; J. Won Ltr.).

Participants can also join by Zoom, expanding the reach of these programs.  PRS is about more

than just scripture.  It is a space for fellowship, where people can gather and cultivate

relationships and connectedness.  (L. Chang Ltr.; *see also* H. Im Ltr.; N. Kim Ltr.).[13]  The same

is true of the Just Show Up book clubs.  As the name implies, no advance reading is required to

participate:  You just show up.  And together with others, you listen to an audio recording of the

selected reading, while following along in the text.  Selected texts include books on faith,

investing and leadership – and the purpose behind the program is to make these materials

available to those who might not otherwise have the time, access, ability or inclination to explore

them.  Both PRS and JSU were designed to address the time and literacy constraints that can be

barriers to learning, and the hope is that they inspire members to learn, grow and serve.

Bill started teaching PRS and JSU at a soup kitchen in Elizabeth, New Jersey more than

15 years ago; and the programs have expanded exponentially since that time.  Currently offered

in more than 70 countries, there are thousands of PRS and JSU meetings that take place weekly

across the globe.  And as many letters accompanying this submission reflect, the programs have

had a profound impact on the lives of the participants.  (*See, e.g.*, S. Choi Ltr.; Charles Kim Ltr.;

---

[13]    In addition to the PRS gatherings in Manhattan, G&M works to make scripture accessible in a number of other ways, including through dramatized audio Bibles.  G&M has produced dramatized audio Bibles in English, Mandarin, Japanese, Korean, French, Spanish, Arabic, and Russian.  (*See e.g.*, B. Foresman Ltr.;N. Kim Ltr.; *see also* R. Hwang Ltr. ("I have heard from my aunt (not blood-related to Bill) that, during a period of physical illness and depression, she found great comfort and hope through the [Bible] app Bill helped create. …Although Bill is from my father's side and my aunt is from my mother's side, Bill frequently checked in to see how my aunt was doing and even supported her financially during a difficult period."); J. Bland Ltr. ("Thanks to Bill, I have personally observed how children in juvenile detention facilities and other challenging environments are finding hope by listening to the Scriptures alongside their mentors at no cost.")) As of November 2021, there were 1.2 million downloads across all of G&M audio Bible applications.

E. Kim Ltr.; L. Kim Ltr.; Stephan Kim Ltr.; Stephen Kim Ltr.; J. Ko Ltr.; D. Ocasio Ltr.; E. Olson Ltr.; S. Park Ltr.; S. Schuck Ltr.; K. Shin Ltr.; D. Suh Ltr.; N. Wagner Ltr.).

Bill's work through Grace & Mercy shows that, while he has traveled far from home – in both geography and his life's station – he has never forgotten those left behind. His whole life has been dedicated to philanthropy and service. Finding ways to give is at his core. Whether through grand gestures or little ones that often go unnoticed, Bill's commitment to impacting the lives of those around him has been unwavering and profound.

### C.    Mr. Hwang's Support of Friends and Their Families

Bill has not only been a steadfast supporter of causes across the globe, he has also been a steady source of support for friends closer to home. A warm and generous soul, Bill is the person to whom friends turn when their businesses fail, their marriages are in trouble, or they are in need of legal or financial help or just a friendly ear. No matter how busy, Bill is the friend who "always makes [the] time," "especially in the moments that matter." (J. Sung Ltr.). He always shows up to help his friends "regain [their] footing with honor and purpose." (S. Huynh Ltr.)

Bill never hesitates to step in when a friend is in need. When Kevin Palau's father received a terminal diagnosis, Bill was on the next plane to provide him with solace. (K. Palau Ltr.). And when David Kim's son fell gravely ill, Bill stepped up, becoming a "lifeline" for the family. (David Kim Ltr.). The hospital treating Mr. Kim's son did not have the capacity to provide the necessary care, and Mr. Kim was lost in a labyrinth of insurance and other obstacles. To Mr. Kim it seemed "no amount of financial resources or desperate pleas to hospital administrators could change the trajectory of [his] son's condition." But when Bill learned about the situation, he immediately flew to be by Mr. Kim's side. He made critical introductions to Holy Name Medical Center, where Mr. Kim's son ultimately received the care that saved his life,

and also helped Mr. Kim navigate the complicated insurance landscape. (David Kim Ltr.). Such is Bill's way. He never hesitates to use his vast network to help friends find the right care for their family members, and he always sits patiently in waiting rooms alongside them, providing emotional and other support.[14]

Bill has also been there for friends who ultimately lost family members to illness, with simple acts of kindness that cut through the fog of despair. On Sohn recalls, "in January 2021, in the midst of the pandemic, [she] suddenly lost [her] 89-year-old mother …. [she] was so shocked and sad that [she] cut all communication with everyone outside of [her] house. But on a cold and snowy night that month, [she] saw Bill standing in [her] yard with 4 bags of food. When [she] opened the door he just handed the bags and left. In each bag there were so many delicious Japanese foods. Even [her] favorite egg cake." (O. Sohn Ltr.).

When friends are in financial distress, they can count on Bill; but what he offers is far more than just financial support. When JK Won, Bill's childhood friend, immigrated to the United States with his family in 2001, Bill invited them to stay in his home for more than a year

---

[14]     *See, e.g.*, E. Chon Ltr. (recalling how Bill sat with him and his family in the hospital waiting room when a family member was in surgery); D. Park Ltr. (discussing how Bill changed their firm's health care package "to include a significant allocation of funds to cover items not covered by insurance" to support a colleague whose child was terminally ill); M. Dragovic Ltr., (explaining how he and Bill had plans to collaborate together through G&M on faith initiatives, and that when Bill learned that Father Milan and his family, recent immigrants to the U.S., were having trouble accessing basic health insurance, Bill "immediately sped up [those] plans and ideas of cooperation" so as to be able to provide for them); T. Gevorkian Ltr. (discussing how Bill helped him calm down when he learned of his son's medical diagnosis and would often check in; more so than many close friends); J. Yang Ltr. (recounting how he lost his job while supporting his wife who was battling ███████████ and raising his 8-year-old son who couldn't understand, and how he only had a "few trusted" friends, one of whom was Bill, who "went out of his way to comfort" Jay and to provide him with guidance); *see also* A. Gee Ltr. (describing how Bill connected Alex to medical professionals to help support both his mother and his sister with different diagnoses); H. Yang Ltr. (discussing how whenever Bill's friends need medical assistance, he takes it upon himself to contact Dr. Yang and others to find them necessary care).

while they worked to build their lives here.  (J. Won Ltr.).  And in 2015, when Mr. Won lost his

life savings, Bill stepped in to provide financial and emotional support as Mr. Won rebuilt his

business.  (J. Won Ltr.).  Bill similarly offered his home to Su Lee, when Mr. Lee was facing

hard times (Su Lee Ltr.), and when Mark Shaw's career stalled, Bill covered months of his living

expenses, so Mr. Shaw did not need to move his family overseas, (M. Shaw Ltr.).  Bill even

stepped up to help an acquaintance with whom he was only familiar in passing, when that friend

faced his own personal and financial crisis.  Bill offered him a desk at G&M, so he would have

someplace to go each day, and included him in the team's investment meetings so he could

continue to grow and learn.  As Mr. Shaw recounts in his letter, Bill's support "wasn't just about

writing a check; it was his compassion and quiet generosity that made a real difference in this

person's life.  Ultimately, this individual landed a great job that put him back on track."  (M.

Shaw Ltr.).

Bennett Kim had a similar experience with Bill, when his life was falling apart and he

was on the verge of filing for bankruptcy.  As Mr. Kim explains, "If this story were only about

money, it wouldn't really describe the condition of [Bill's] heart.  The thing is he kept checking

up on me in the following months. There was one point where he assembled a Bible study group

for five of us in Los Angeles and strongly encouraged we stay involved.  His actions were not

about [religion].… It was about providing me a close-knit group that could provide comfort and

hope."  (B. Kim Ltr. ("I knew he was busy, but he made the time for me.  He's always made time

for me. …Every interaction I have had with Bill since then has been the same.  In larger groups,

he's a no-nonsense person with a professional demeanor.  Bill Hwang has a serious image in the

world of finance, but in one-on-one interactions, he's all heart.")).

Bill likewise played an important role in Sukhee Kang's life, when he was fighting with

his employer in China who had refused to pay him for several months.  Bill stepped up to help

the family, including by making introductions to professionals who could help Mr. Kang resolve

the situation, and by paying for Mr. Kang's daughter who was struggling with cultural and

language differences to return to the U.S. to study.  (S. Kang Ltr.).  Dwayne Ocasio similarly

describes how Bill supported a mutual friend who fled the war in Ukraine, helping him find

employment and a sense of stability.  (D. Ocasio Ltr.).  These are just some of the many stories

of "Bill helping others to land new jobs or giving advice or making connections or providing

loans that he never expected [] to be paid back," (Stephan Kim Ltr.), while providing emotional

support along the way.[15]

Many more of Bill's friends and family describe how Bill's willingness to listen has

helped them find peace in painful and difficult moments.  (*See* J. Sung Ltr. (describing how her

older sister was smearing her name in the Korean press and how Bill frequently reached out to

---

[15]    *See also* S. Schuck Ltr. (describing how she did not know Bill particularly well but when
he learned her husband had been in a severe accident while she was in a legal battle with her
father's estate, he offered support and followed through, reviewing her paperwork and setting her
up with a professional who could assist; she also recalls Bill grabbing her car keys before church
one morning and moving her vehicle, lest she get a ticket); B. Foreman Ltr. ("Bill is a connector
of people.  There have been countless examples of Bill asking me to meet someone to give them
advice or assistance, and of Bill introducing me to someone in his extensive [network] to assist
me with various topics."); T. Surh Ltr. (describing how there have been many times Bill asked
her to meet with young professionals, and how she herself benefitted from Bill's help during a
time of professional transition); D. Ha Ltr. ("When I needed coaching on leadership, Bill
arranged for me to meet a former Fortune 500 CEO.  When I needed to get better at managing
people, Bill had me sit down with the best human resources executive he knew.  When I wanted
to benchmark my small, fledgling investment firm to a larger, well-established one, Bill invited
me to sit in on his team's meeting.  When I was developing a quantitative investment strategy for
the first time, Bill introduced me to someone who had built a career at a leading quantitative
investment firm, so that I could test my thesis.  When Bill suggested to me that I form a book
club with some friends to learn and grow together, he provided us with space every week for
three years for free….We once shared a subway ride together when Bill needed to run to his next
meeting but still wanted to catch up….[And] last year when my business was going through a
difficult time, Bill and I met and sat in a park.").

her, regularly meeting up to offer support in what was a very lonely and depressing time); E.

Dafni Ltr. (explaining how when he needed advice, Bill didn't just listen, he hopped in the car to

go sit with Eugene at the park and they spent the afternoon together, during which time Bill was

"carefully attentive and offered very real, practical thoughts."); P. Ahn Ltr. (explaining how Bill

counselled him through his father's illness and how "when [his] father passed in 2015, [he] was

touched to see Bill at the funeral, and [he] never forgot [Bill's] powerful words."); E. Bhandari

Ltr. ("Whenever I'm faced with a serious problem, I know I can count on [Bill] to share a word

of encouragement or a verse to point me back to God.  His faith has helped me and my family

get through some very difficult times."); P. Bhandari Ltr. ("He has been a sounding board for me

to discuss thoughts about my medical practice.  And although healthcare is not his industry, he

has connected me to several industry leaders, including hospital leadership teams, directors for

community outreach programs, and medical entrepreneurs…because he loves to spread

fellowship and community."); Y. Choi Ltr. ("I have a younger brother ███████████

████████████████████████████….. Bill listened to my

concerns with deep compassion.…His words brought me peace, and I found the strength to

forgive my brother…. Because of Bill, I now approach challenges with more grace….Inspired by

Bill's generosity, I started gifting books to my colleagues, serving meals to orphans in Korea,

and actively introducing good people to one another to help them grow.")).

        And Bill has extended that same time and attention to the families of his many friends,

touching their hearts with the care he showers on those they care about most.  (*See, e.g.*, J. Sung

Ltr. ("during a business trip [] I brought my son along…., Bill carved out time to meet us.  I'll

never forget him taking us to Shake Shack, chatting with my 13-year-old boy over burgers."); A.

Kim Ltr. ("I am also grateful for Bill's generosity to help my elderly parents get Covid shots

when information was scarce.  He not only offered this to me but to the entire Company and our respective families."); S. Huynh Ltr. ("My son refers to him as 'Uncle Bill,' and the bond they share has not only shaped Joshua's career but also helped him grow as a person."  When Joshua was struggling to find his place in the world, he "flew out to spend an entire week with Bill," who "generously gave Joshua a front-row seat into the world of finance. . . . Over the course of that week, Joshua gained a renewed sense of direction and purpose.  Bill encouraged him to go back to school to build the foundational knowledge he would need to become a successful analyst.  [And] Bill [] recommended several books to help Joshua develop his skills further."); I. Hwang Ltr. ("My 10-year-old daughter E███████.  As she was transitioning from her ████████████████████████, my wife and I were having a difficult time prioritizing within so many different considerations.  Bill and Becky have known our kids since they were young and have been to our home.  Both also provided such sound advice on what types of schools might be most appropriate for her.  That one conversation changed our decision, and my wife, E██ and I have been so happy ever since.  Bill continues to call and check in just to make sure that she's doing well and growing in her new school."); B. Foresman Ltr. ("I am grateful also for the personal attention and advice that Bill has given to several of my 5 children. When my children join me and my wife for a meal with Bill, he spends most of the time speaking directly with them, imparting his wisdom and challenging them to get out of their comfort zones and seek a higher purpose in their lives."); J. Bland Ltr. ("One particularly memorable experience occurred during a trip to New York City with my 8-year-old son, ██████ ████████████████████████████████████████████.  Bill hosted my son's first experience with sushi, and I will never forget seeing them sit together, warmly laughing as my son fumbled with the chopsticks and an inappropriately full mouth.  But it went

deeper than that.  Bill patiently engaged with my son's ███████████, quoting scripture together.")).[16]

Indeed, Bill's self-less devotion to his friends and family was on full display during his own trial.  While many of Bill's friends and family came to support Bill during the trial, what their letters recount is how Bill was focused on supporting them.  Not only did Bill check on the group each day at lunch to ensure they had whatever they needed, (Y. Takai Ltr.; *see also* E. Morgan Ltr.), he continued to be a bedrock of compassion and emotional support for them, even as his own future hung in the balance.  When his friend Rick Rusaw's wife Diane fell and ███████ ███████████ several weeks into the proceedings, Bill reached out immediately to see what he could do to help.  As Mr. Rusaw recounts, while some might see that as a small thing, "[f]rom [his] vantage point with all that [Bill] had going on [that] simple call spoke volumes as to the kind of man Bill is."  (R. Rusaw Ltr.).  And when Eric Olson came to court just five days after his 28-year-old daughter unexpectedly died, Bill's tears welled up when they locked eyes.  (E. Olson Ltr.).  Mr. Olson recounts his gratitude for the support Bill showed him during that unimaginably difficult time, writing: "It is impossible for me to really describe to you in a letter what a warm, caring, and deeply moral person Bill Hwang is… there are no words.  The only thing I can add is this, I would not have been able to recover in the way I now have if had it not been for Bill.  Bill has touched my life in such a profound way.")).[17]

---

[16]    Bill's kindness is not reserved for friends.  Charles Kim has known Bill since 2009.  The two served together on the board of the Fuller Theological Seminary.  Charles shared an anecdote about how while on the subway, "a young Korean single mother approached [Bill]….He attentively listened to her brief story.  He didn't ignore her.  Instead, Bill invited her and her mother to his office, offering support and connecting them into a community network that could assist her."  (Charles Kim Ltr.).

[17]    *See also* J. Kim Ltr. ("Bill's character is further exemplified by his readiness to prioritize the needs of others even during personal trials.  For instance, immediately following this

* * *

From his humble beginnings to where he stands now, Bill's life is a "profound narrative of overcoming adversity and transforming pain into a catalyst" for generosity.  (Charles Kim Ltr.).  The many ways in which Bill has been able to touch and transform the lives of others – in ways both large and small – is a testament to the "power of faith, the strength of community, and the boundless reach of a compassionate heart."  (L. Gee Ltr.).  As Bill stands before this Court for sentencing, we respectfully request the Court consider Bill's generosity of spirit and lifetime of service in fashioning an appropriate sentence.

## II.    THE SENTENCING GUIDELINES

With its decision in *United States v. Booker*, the Supreme Court invalidated the provisions of the Guidelines making them mandatory, reinstituted the broad discretion of district courts in imposing a sentence within a statutory range, and empowered district courts to tailor sentences in light of *all* the statutory factors provided in 18 U.S.C. § 3553(a), and not just the Guidelines range (*i.e.*, 18 U.S.C. § 3553(a)(4)).  *United States v. Booker*, 543 U.S. 220, 227, 233, 245 (2005).  In *Booker's* wake, the Guidelines are no more than a "starting point" or "initial benchmark," and in no way constrain a district court from "mak[ing] an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 49-50; *see also Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

The Presentence Investigation Report calculates an advisory guideline sentence of 2,400 months, based on a total offense level of 43 and a Criminal History Category of I.  This

_____

significant legal verdict, he still assisted a colleague (not associated with Bill's companies) with a pressing business challenge, demonstrating his commitment to helping others over his personal concerns.").

40

draconian Guidelines range is almost entirely the result of the § 2B1.1 loss enhancement. *See* PSR ¶ 129. As detailed below, this loss calculation is incorrect, because the prosecution has not shown that any losses are tied to market manipulation or that banks' losses were *caused* by misstatements made by Mr. Hwang or others at Archegos. And, in any event, this disproportionately high Guidelines range shows the fundamental flaw in the current Guidelines regime: regardless of a particular defendant's *actual* conduct, the offense level is driven by loss. As a result, in a case where the parties and the banks were regularly trading hundreds of millions of dollars a day, an offense level based on loss substantially overstates the seriousness of the offense.

### A. The Prosecution Fails to Establish that Mr. Hwang's Conduct Caused Any Loss

#### 1. *The Prosecution Fails to Prove Market Manipulation Loss*

The prosecution has the burden to prove loss by a preponderance of the evidence, *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001), and may not engage in "speculation" in establishing it, *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993). To prove stock-market losses, the prosecution must exclude losses attributable to causes other than the alleged fraud. *See United States v Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) ("Losses from causes other than the fraud must be excluded from the loss calculation."); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (excluding losses from causes other than the offense conduct is necessary because "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud"); *accord United States v. Zolp*, 479 F.3d 715, 719-21 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005) (remanding securities fraud conviction

for resentencing where district court "did not take into account the impact of extrinsic factors on [the at-issue security's] stock price decline."); *cf. United States v. Ferguson*, 676 F.3d 260, 274-75 & n.11 (2d Cir. 2011) (stock-price-drop evidence inadmissible at trial without expert testimony excluding "confounding factors" in order to "estimate the extent of the [stock-price-] drop attributable to the [offense conduct]"). Here, the prosecution makes no attempt to exclude losses from causes other than the alleged market manipulation. To the contrary, it concedes "the difficult[y] in determining actual loss amounts for identifiable market participants" with respect to the market-manipulation scheme. PSR ¶ 121. And for good reason: the prosecution cannot exclude all the confounding factors that could have had an effect on the rise and fall of the At-Issue Securities, separate and apart from any purported manipulative effect exerted by Archegos's trading activity.

Indeed, unrebutted trial testimony established numerous independent factors that, in all likelihood, caused the prices of the At-Issue Securities to rise, including significant company-specific news. For example, in December 2020, Discovery announced its new streaming platform, Discovery+, which it launched in early 2021. Trial Tr. 2556:24-2557:5; 3820:19-3821:18. Similarly, in February and March 2021, Viacom rebranded and relaunched its own streaming platform, Paramount+, and there was significant news in the market concerning its highly viewed interview of Meghan Markle and Prince Harry by Oprah Winfrey. Trial Tr. 337:24-338:16; 2544:18-2546:4; 3782:15-3785:22; 4741:8-4744:19. And in December 2020 and January 2021, multiple news sources reported that Baidu was considering producing electric vehicles. Trial Tr. 2422:1-2423:7; *see also* Trial Tr. 3591:17-3592:24 (cooperating witness William Tomita testifying to Baidu's "organic trajectory" upward during this period).

The At-Issue Securities were also affected by trading activity that was unrelated to

Archegos.  Even excluding all trades potentially related to Archegos, trading volume in many of the At-Issue Securities was higher (and in some cases significantly higher) from October 2020 to March 2021 compared to 2019.  Trial Tr. 4755:14-4758:9.  On average, the prices of the At-Issue Securities during this period increased even on days when Archegos was *not* trading.  Trial Tr. 4746:21-4749:22.  In fact, many of the stocks saw dramatic increases.  For example, between February 22 and March 15, 2021, Viacom's stock price increased even on days when Archegos bought very little or none at all, ultimately reaching an all-time high on March 22, 2021.  Trial Tr. 4741:10-4744:19.  And from July 27 to August 6, 2020, GSX increased more than 50 percent, even though Archegos conducted no trades.  Trial Tr. 4734:2-4737:9; Ex. B (DX-9158).  Farfetch, likewise, saw an increase of more than 58 percent in its stock price from October 26 to November 13, 2020, mostly on days when Archegos made no trades.  Trial Tr. 4738:8-4741:6; Ex. C (DX-9161).

Trial testimony also established why other investors, like Archegos, had reason to be optimistic about the At-Issue securities, which were well-positioned to take advantage of the circumstances of the COVID pandemic, including lockdowns and technological shifts in everyday life.  For example, GSX, as an online education company, benefitted from the closure of in-person schools, Trial Tr. 4733:5-18, while Farfetch and Vipshop, both online retailers, benefitted from more limited in-person shopping, Trial Tr. 2360:10-15.  And the low-interest-rate environment generally created more demand in the stock market, resulting in increasing stock prices.  Trial Tr. 2553:13-20.  In fact, two At-Issue Securities in which Archegos held large *short* positions, FUTU and Rocket, increased dramatically in price despite that Archegos had made a large bet that they would go down.  *See* Trial Tr. 2445:10-16; 2449:5-18; 3974:3-25; 4770:23-4771:14.

Finally, a major increase in retail trading activity and the trading frenzy around so-called "meme stocks" created significantly greater market volatility and especially affected stocks in which the hedge fund Melvin Capital held short positions, including the At-Issue Securities Viacom and GSX.  Trial Tr. 4726:1-4728:20.  GSX, in particular, saw an extraordinary increase in its share price in January 2021, more than doubling in a short time.  Trial Tr. 4758:11-4759:25.

2.    *The Prosecution Fails to Prove Any Loss Resulting From Mr. Hwang's Participation in a Misrepresentation Scheme*

Unable to prove any loss from the market-manipulation scheme, the prosecution now seeks to cobble together losses from a misrepresentation scheme that, as the evidence at trial showed, Mr. Hwang had virtually no involvement in.[18]  Trial testimony made clear that Mr. Hwang did not direct any material misrepresentations that led to a loss by a counterparty bank, nor did he have knowledge that others at Archegos were making such misrepresentations.  *See* U.S.S.G. § 2B1.1 n. (C)(i) (defining "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense").  Although Mr. Becker testified generally that he had an "understanding that it was [his] job to lie to the banks," when pressed, he testified that there was not a single instance in which Mr. Hwang had instructed him to lie to the banks.  Trial Tr. 803:13-17; 1190:10-20.  Mr. Becker also testified that he never told Mr. Hwang that Mr. Becker had lied to the banks.  Trial Tr. 1191:10-1192:1.  Similarly, Mr. Tomita made general statements about how he had been "instructed" to lie to banks, but on cross-examination, he clarified that he

---

[18] To be clear, Mr. Hwang does not believe that the evidence at trial was sufficient to convict him of the misrepresentation scheme, and he intends to challenge his conviction on appeal. Accepting the jury's finding of guilt for purposes of sentencing, however, the prosecution has still failed to prove a corresponding loss by a preponderance of the evidence, which is what Mr. Hwang challenges here.

made misrepresentations to banks *on his own*, not at Mr. Hwang's direction.  Trial Tr. 3039:3-12; 3409:24-3410:8.

Lacking evidence of Mr. Hwang's involvement in purported misrepresentations, on direct, Mr. Tomita testified that he had been "taught by Bill [Hwang], when necessary, to give misleading pictures about the fund and its positions," (Trial Tr. 3409:24-3410:19).  But the examples offered at trial fell apart under scrutiny.  For instance, with respect to the purported misrepresentation involving dummy portfolios, even counterparty witnesses agreed that the use of sample or dummy portfolios is a standard industry practice when onboarding potential clients; that such dummy portfolios are not meant to reflect a potential client's actual positions at that time; and that banks would certainly know the actual positions Archegos wished to trade prior to the bank deciding whether to accept or decline any actual trade order in any particular name. Trial Tr. 118:14-19; 285:15-20; 2635:11-18; 2661:9-22.

With respect to the purported misrepresentation to Morgan Stanley, when Mr. Hwang instructed Mr. Tomita to tell Morgan Stanley that Archegos needed to wait until year-end to move positions, Mr. Tomita acknowledged *that* was an accurate statement, and that Mr. Tomita decided, on his own, to embellish by telling the banks that tax issues were the reason they needed to wait.  Trial Tr. 4091:8-17; 4092:8-13; 4092:15-19; 4094:6-11.  There was also no evidence presented at trial to show that the purported misrepresentation was material to Morgan Stanley or contributed in any respect to losses.  In fact, the prosecution did not call a single witness from Morgan Stanley at trial.

Finally, there was no evidence at trial that Mr. Hwang saw, authorized, or circulated the compliance letter Archegos sent to the banks, and nothing was shown to be false or deceptive about the letter.  To that end, Archegos's compliance officer Fernanda Piedra testified she never

heard anyone make any misrepresentations to a counterparty about the role of compliance.  Trial Tr. 1801:20-24.

Mr. Hwang also did not directly interact with the banks and therefore would not have known about the lies told by Mr. Becker and Mr. Tomita.  While Mr. Tomita regularly dealt one-on-one with the banks with respect to trading, and Mr. Becker regularly dealt one-on-one with the banks with respect to margin and credit (Trial Tr. 4068:13-21), Mr. Hwang was not on the calls they regularly had with the counterparties.  Trial Tr. 4068:1-6.  Mr. Hwang told Mr. Tomita that he was "glad and grateful you are leading all of us" in dealing with the numerous banks.  Ex. D (DX-3250).  Mr. Hwang also instructed Mr. Tomita to be *fair* with the banks in his dealings. In February 2021, Mr. Hwang wrote to Mr. Tomita that he wanted "to work with our key partners in fair ways."  Ex. E (DX-4913 pp. 3–4).  Mr. Tomita, in turn, kept Mr. Hwang apprised of conversations with the banks at a "high level" and did not inform him of misrepresentations. Trial Tr. 3425:5-17.

Even if the prosecution suggests that Mr. Hwang would have understood that counterparties would not have extended margin to Archegos if they knew the size of Archegos's positions, or that Mr. Hwang sought to keep Archegos's positions confidential, there was no evidence that Mr. Hwang had direct knowledge of purported misrepresentations.  Limiting disclosure of information to counterparties is consistent with industry practice, as a former employee of UBS testified.  Trial Tr. 180:23-181:4.  Mr. Tomita confirmed that he would regularly tell banks that he did not talk about the positions that Archegos held with other counterparties.  Trial Tr. 4078:5-7.  While Mr. Tomita, unlike Mr. Hwang, crossed the line from non-disclosure to misrepresentations, he was not directed by Mr. Hwang to make specific

misrepresentations to banks and did not claim that Mr. Hwang was directly aware of these misrepresentations.

In light of the dearth of evidence regarding misrepresentations involving Mr. Hwang, the prosecution has focused on Mr. Hwang's actions in the week that Archegos collapsed. However, when Mr. Hwang joined calls with the counterparties during that week in March 2021, Mr. Hwang told them the truth: they learned from Mr. Hwang the *actual* amount of capital Archegos had, in contrast to the false number Mr. Becker had previously provided. Trial Tr. 1354:12-1355:19.

The PSR states that in the last week, beginning on March 24, 2021, "various Archegos personnel" attempted to "lull Counterparties into believing that Archegos had experienced an unexpected liquidity event and that it just needed time to orderly unwind some of its positions." PSR ¶ 98. But there was no evidence at trial that Mr. Hwang was in the internal meeting on March 24 when the talking point regarding liquidity was formulated. Trial Tr. 1122:9-1124:22. Mr. Hwang was not on the calls on March 24, 2021 with the Counterparties, Trial Tr. 1321:3-10, and was not alleged to have been on any calls with Counterparties when the purported misrepresentation at issue in this paragraph was made. In any event, the evidence presented at trial shows that Archegos did, in fact, suffer an unexpected liquidity event and that Archegos was still solvent on March 24, 2021. In fact, as of the end of the trading day on March 24, Archegos had almost $17 billion in net assets. Trial Tr. 1327:3-9; 4133:24-4134:24.

The PSR also alleged that Mr. Hwang made misrepresentations in a call with counterparty banks on March 25, 2021. PSR ¶ 89. However, in that call Mr. Hwang stated repeatedly that he was offering "guesses" or "estimates," not hard numbers. ("[I]n my best estimate;"– "our estimate;" "my best estimate right now." Ex. F (GX-2504T at 11)). In that call,

Mr. Hwang told six banks that Archegos's top two or three names traded between $2 and $3 billion in daily volume.   That was true for Archegos's two largest long positions, Baidu and Viacom; both traded in those levels when using 5-day, 10-day, or 20-day weighted averages. Ex. F (GX-2504T); Ex. G (DX-9160); Trial Tr. 4783:5-20.  Even the prosecution's expert, Dr. Taveras, testified that Archegos could have liquidated its positions at timeframes that were less than 2-3 weeks.  Trial Tr. 2348:2-20.  Additionally, as Mr. Hwang repeatedly stated on the call, at the time he made those representations, he believed the liquidations could include block trades that could speed up the liquidation of Archegos's positions, and Archegos did in fact use block trades.  Trial Tr. 2348:6-8; 4160:17-4163:25; Ex. F (GX-2504T at 10).  The prosecution presented no evidence that Mr. Hwang did not believe these statements to be true at the time he made them.

The statements in the March 25 call were also not made in service of obtaining trading capacity; nor would banks have provided capacity at that point.  The banks issued Archegos default notices and began liquidating their hedges the very next day.  Trial Tr. 1615:6-18.  For example, Bryan Fairbanks from UBS testified that, prior to the call with Mr. Hwang on March 25, 2021, "[UBS] had determined that we were going to default the client."  Trial Tr. 336:11-12. Indeed, not a single witness testified that Mr. Hwang's statements contributed in any way to the losses suffered by the counterparties.

Moreover, the prosecution has failed to prove that losses suffered by the counterparties were caused by purported misrepresentation by anyone at Archegos, let alone by Mr. Hwang. Specifically, with respect to following counterparties listed in PSR ¶ 102:

<u>Credit Suisse</u>.  The evidence at trial failed to show that any losses sustained by Credit Suisse were proximately caused by Mr. Hwang's actions.  The prosecution proffered no evidence

and called no witnesses from Credit Suisse who testified to any purported misrepresentations made by Mr. Hwang or anyone else from Archegos, let alone that Credit Suisse took any actions as a result of any purported misrepresentation by anyone at Archegos.  The only witness from Credit Suisse who testified, Joshua Lukeman, stated that Credit Suisse "lost approximately five and a half billion dollars."  Trial Tr. 1587:20-21.  However, Mr. Lukeman did not attribute these losses to purported misrepresentations made to Credit Suisse by Archegos employees nor did he testify to any purported misrepresentations made to him or anyone else at Credit Suisse.  That's because Lukeman stared working on the Archegos account only shortly before the collapse. Trial Tr. 1629:22-24.  Noticeably absent from trial were any Credit Suisse witnesses who worked on the account during the timeframe at issue.

Moreover, on July 29, 2021, Credit Suisse published its own report after an internal investigation by the law firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP.  Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management, https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/results/csg-special-committee-bod-report-archegos.pdf.  The report states that "[t]he Archegos-related losses sustained by CS are the result of a fundamental failure of management and controls in CS's Investment Bank and, specifically, in its Prime Services business." *Id.* at p. 6.  As such, the losses at Credit Suisse cannot and should not be attributed to Mr. Hwang's actions.

The Victim Impact Statement from Credit Suisse claims that its losses were caused, in part, because "Hwang personally signed the Archegos-Credit Suisse PSA for Archegos," which Credit Suisse claims misrepresented Archegos's total exposure to any securities as being less than 20% of the outstanding float of any security.  *See* Victim Impact Statement of Credit Suisse

International and Credit Suisse Securities (USA) LLC, at 11.  Credit Suisse claims that the

evidence at trial showed that Archegos's total exposure to some of the At-Issue Securities was

greater than 20% of the outstanding float on the date that the PSA was signed, December 15,

2020, due to its significant exposure to these securities on swap. *Id.*

Evidence of this claim was not presented at trial by the prosecution and with good

reason—Mr. Hwang has a strong defense to this claim.  First, the negotiation of this agreement

was conducted by Archegos's lawyers from Ropes & Gray in conjunction with Credit Suisse and

did not involve Mr. Hwang.  *See, e.g.*, Trial Tr. 1272:21-24 (Berke: "Am I correct, sir, that you

coordinated the ISDA negotiation for Credit Suisse in 2020?" Becker: "I coordinated the

negotiation between outside counsel and Credit Suisse."); Ex. H (3615-001) (Ropes & Gray

attorney stating that their "junior associate" had "day-to-day responsibility" for the Credit Suisse

ISDA and Archegos contacts for "ISDA issues" were Becker and Tomita).  Second, Mr. Hwang

was only shown the signature page of this agreement when he signed it and had no knowledge

that this provision was in it.  There is no evidence that Mr. Hwang knew that he was making any

misrepresentation when signing the PSA.  *See* Ex. I (GX-1110; GX-1110A) (email attaching

signature pages only and stating Hwang "just needs to sign"); Ex. J (DX-7063) (email attaching

the "signed signature pages" from Hwang only); Ex. K (3501-055 at p. 2) (Becker stating "sig

page" was sent for Hwang to sign and "Becker was not aware of terms violated"); Ex. H (3615-

001) (Ropes & Gray attorney stating that the at-issue provision "was not the subject of

negotiation").  Third, there is no evidence that Mr. Hwang knew that he was making any

misrepresentation when signing the PSA, and both Tomita and Becker suggested there was no

knowledge at Archegos of an intentional misrepresentation.  *See, e.g.*, *id.*; Trial Tr. 1277:4-6

(Berke: "Sir, am I correct that Mr. Hwang never directed you to make any misrepresentations in

any ISDA agreements, correct?" Becker: "That is correct."); Ex. L (3502-006 at p. 8) ("T[omita]

did not believe that [Archegos] ever signed any of the rep letters" capping ownership of

swaps). These facts explain why the prosecution chose not to include this claim at trial, and it

should not be accorded any weight here.[19]

     *Nomura*. The evidence at trial failed to show that any losses sustained by Nomura were

proximately caused by Mr. Hwang's actions. The prosecution did not call any witnesses from

Nomura. Accordingly, there was no evidence that any purported misrepresentations made to

Nomura caused any losses, or that Nomura took any action as a result of any purported

misrepresentations. Nor did either of the cooperating witnesses, Scott Becker or William

Tomita, testify to any specific purported misrepresentations made to Nomura prior to March 25,

2021.

     *Morgan Stanley*. The evidence at trial failed to show that any losses sustained by Morgan

Stanley were proximately caused by any purported misrepresentations made by Mr. Hwang or at

Mr. Hwang's direction. The prosecution called no witnesses from Morgan Stanley, and

accordingly, there was no evidence that purported misrepresentations by anyone at Archegos

caused any losses to Morgan Stanley.

     *Mitsubishi UFJ Financial Group ("MUFG")*. The evidence at trial did not show that

MUFG's claimed $250 million in losses was incurred as a direct result of purported

misrepresentations by Mr. Hwang or Archegos employees. Laxmi Kambhampati, the sole

witness from MUFG at trial, did not testify that MUFG took any actions as a result of a

---

[19] Indeed, in their response to the defense objections to the PSR, the prosecution stated that it
would not object to the inclusion of an additional sentence stating that "there is not direct
evidence that [Mr. Hwang] read the representations before signing them." October 30, 2024
Government Letter to Probation Office, p. 4.

purported misrepresentation made by Mr. Hwang. In fact, she testified that she never even spoke to Mr. Hwang. Trial Tr. 1695:14-17.

*Mizuho Financial Group ("Mizuho")*. The evidence at trial did not show that Mizuho incurred any losses as a result of Mr. Hwang or Archegos employees' actions. The prosecution did not present any witnesses from Mizuho to testify about the losses incurred by the bank or any actions they took as a result of Mr. Hwang or Archegos employees' misrepresentations. In fact, the prosecution called no witnesses from Mizuho at all.

*Jefferies Financial Group ("Jefferies")*. The evidence at trial failed to show that Mr. Hwang knew of or directed any purported misrepresentations made to Jefferies that contributed to Jefferies' losses. Trial Tr. 1190:10-20. At trial, the only witness from Jefferies, Jennifer Miranda, testified that she never spoke to Mr. Hwang and that she only spoke with Scott Becker. Trial Tr. 739:22-740:6. Mr. Becker testified that he lied to Ms. Miranda on March 24, 2021. Trial Tr. 1116:21-1117:6. But even accepting Mr. Becker's testimony as true, the prosecution fails to show how that lie caused Jefferies any loss

*Macquarie Group Limited ("Macquarie")*: The evidence at trial did not show that Macquarie incurred any losses as a result of Mr. Hwang's or Archegos employees' conduct. The prosecution did not present any witnesses from Macquarie, let alone any Macquarie witness, to testify about the losses incurred by the bank or any actions Macquarie took as a result of Mr. Hwang's or Archegos employees' alleged misrepresentations.

*UBS*. There was no evidence presented at trial showing that Mr. Hwang made, was aware of, or directed any purported misrepresentations to be made to UBS prior to allegations with respect to the end of the trading day on March 25, 2021. As discussed above at p. 47, Mr. Hwang did not make or know of any material misrepresentations in the week of March 22, 2021.

Bryan Fairbanks from UBS testified that he never spoke with Mr. Hwang prior to that time. Trial Tr. 265:10-15. And Mr. Becker testified that Mr. Hwang never instructed Mr. Becker to lie. Trial Tr. 1190:10-20.

Furthermore, any purported misrepresentations that were made on March 25, 2021 were immaterial to UBS's losses. Bryan Fairbanks from UBS admitted at trial that, prior to the call with Mr. Hwang on March 25, 2021, UBS had already decided to default Archegos. Mr. Fairbanks stated that "it showed no value to ask a ton of questions [on the call] because we had determined that we were going to default the client." Trial Tr. 336:11-12; *see also* Trial Tr. 276:5-13. There were no other witnesses nor any other evidence at trial showing that any purported misrepresentation made on March 25, 2021 was material or contributed in any way to the losses suffered by UBS.

**B.    If the Court Finds That There Was a Loss But It Cannot Be Reasonably Determined, the Loss Enhancement Should Still Be Zero**

For the reasons described above, the Court should find that the prosecution has failed to prove loss, and therefore no loss enhancement is appropriate. However, if the Court finds that there was a loss, but that the amount of that loss cannot be determined with reasonable certainty, then the loss enhancement should still be zero. That is because the Guidelines provide that where "there is a loss but it reasonably cannot be determined," the Court "shall use the gain that resulted from the offense as an alternative measure of loss." U.S.S.G. § 2B1.1(b)(1) n. B. Mr. Hwang, however, did not gain from the offense conduct. On the contrary, as was shown at trial, Mr. Hwang lost billions of dollars as a result of Archegos's collapse. Therefore, even under the alternative measure of unlawful gain, no loss amount enhancement is appropriate.

### C.    No Enhancement is Warranted for Ten or More Victims

The PSR and the prosecution propose a 2-level adjustment pursuant to U.S.S.G.

§ 2B1.1(b)(2)(A)(i) corresponding to the offense purportedly involving 10 or more victims. No

such enhancement is appropriate, however, because the prosecution has identified purported

losses for only eight financial institutions. The other four financial institutions that the PSR

claims are "victims" do not qualify for this enhancement because "[t]he Guidelines' adjustment

for the number of victims refers [only] to the victims who sustained losses as determined by the

loss calculation Guideline." *United States v. Abiodun*, 536 F.3d 162, 169 (2d Cir. 2008); *see also*

U.S.S.G. § 2B1.1 cmt 1(A) (defining "victim" for purposes of the number-of-victims

enhancement as, in relevant part, "any person who sustained any part of the actual loss

determined under subsection (b)(1)"). Yet the PSR concedes that "no losses were sustained by

those [four financial institutions] for guideline calculation purposes." PSR ¶ 103. Similarly, the

PSR identifies no losses for the "two additional victim categories related to the offense." PSR

¶ 104.[20] The 2-level adjustment is therefore inappropriate. *See United States v. Skys,* 637 F.3d

146, 154-156 (2d Cir. 2011) (finding that number-of-victims enhancement was not appropriate

where there was no "determined amount of actual loss" as to the purported victims).

### D.    No Enhancement Is Warranted for Sophisticated Means

The Court should also not apply a 2-level adjustment pursuant to U.S.S.G.

§ 2B1.1(b)(10)(C) for Mr. Hwang's purported use of "sophisticated means." The commentary to

the Guidelines defines sophisticated means as "especially complex or especially intricate offense

---

[20] The PSR separately notes that certain Archegos employees submitted victim impact statements
in connection with deferred compensation. PSR ¶ 122. However, any loss to Archegos
employees was downstream of the collapse of Archegos, which itself was caused by the decline
in the value of Archegos's investments (and not purported misrepresentations). As discussed
above at p. 41-42, the prosecution must exclude losses caused by stock price drops attributable to
causes other than the alleged fraud.

conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. 9(B).
"[T]he creation and use of false documents, and other tactics to conceal offense conduct, are
indicia of the sophistication of an offense." *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir.
2014) (per curiam). The Guidelines commentary itself offers, as an example of sophisticated
means, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious
entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1 cmt. 9(B).
"[S]ophistication," however, "requires more than the concealment or complexities inherent in
fraud," and "fraud per se is inadequate for demonstrating the complexity required for [the]
enhancement." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014); *see also United
States v. Hart*, 324 F.3d 575, 579 (8th Cir. 2003) ("The guidelines do not permit an enhancement
for any and all offense conduct that conceals an offense.").

      The conduct at issue here lacks all hallmarks of sophistication. In support of its
recommendation that the offense conduct involved sophisticated means, the PSR points merely
to the fact that Mr. Hwang "failed to disclose Archegos's counterparty bank agreements" to other
counterparty banks. PSR ¶¶ 105, 132. That is nothing more than an omission of information
that Archegos was under no legal obligation to disclose. Such an omission where there is no
duty to disclose bears no resemblance to the convoluted, fabrication- and forgery-related
schemes to which the Second Circuit routinely applies the sophisticated means enhancement.
*See, e.g.*, *United States v. Vaccarelli*, 2021 WL 4805218 at *2 (2d Cir. Oct. 15, 2021) (sum.)
(defendant used employer's forms to create fake investment agreements and convince victims to
invest in fraudulent scheme); *United States v. MacCallum*, 821 F. App'x 11, 13-14 (2d Cir.
2020) (defendant's scheme included "the creation and use of fake promissory notes and loan
documentation"); *United States v. Loles*, 628 F. App'x 7, 10 (2d Cir. 2015) (sum.) (defendant

concealed investment scheme from victims by creating "fake forms and account statements reflecting fictitious bond prices"); *United States v. Ojemen*, 465 F. App'x 69, 72 (2d Cir. 2012) (sum.) (defendant produced "forged paystubs, W-2 forms, and income tax returns" to "government entities and bank officials"); *United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005) (defendant's "highly complex" mortgage fraud scheme "included the creation of false bank documents…false appraisals…[and] false blueprints").

Moreover, to conclude that a mere omission of information constitutes sophisticated means risks transforming many run-of-the-mill securities-fraud offenses into sophisticated ones by default and would render meaningless the commentary's requirement of "*especially complex or especially intricate*" conduct in connection with the "execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. 9(B) (emphasis added); *cf. Adepoju*, 756 F.3d at 257 (finding that because "virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information, . . . the realm of especial complexities and intricacies [must] involve[] more than the forgeries, misrepresentation, and concealment inherent in bank fraud"). This would be the type of "absurd result[] contrary to Congress's purpose" that courts are loathe to create. *United States v. Scott*, 990 F.3d 94, 122 n.36 (2d Cir. 2021); *see also United States v. Alarcon Sanchez*, 972 F.3d 156, 165 (2d Cir. 2020) ("A court will not construe a statutory provision to render it 'insignificant, if not wholly superfluous.'") (citation omitted).  Mr. Hwang did not create any false documents, nor did he set up fictitious entities, corporate shell companies, or offshore financial accounts—rather, as the PSR states, he bought total return swaps from one counterparty and declined to broadcast those purchases to other counterparties, something he was not legally obligated to do.  PSR ¶¶ 105, 132.  If such everyday securities trading conduct constitutes sophisticated means, then the sophistication enhancement would be

rendered *superfluous*.  That cannot be.  *See Adepoju*, 756 F.3d at 257; *United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (finding, in the context of a smuggling conviction, that sophisticated means require more than what is necessary to commit the crime).

Further, substantial evidence at trial showed that the Counterparties accepted the risk of limited written disclosure of information about Archegos' portfolio to obtain Archegos's business; and in some cases, they simply responded by charging Archegos higher margin rates. Trial Tr. 179:7-181:4; 283:13-21; 284:11-24.  Counterparties could have negotiated for more written disclosure from Archegos but chose not to do so.  Trial Tr. 1890:14-1891:16.

### E.    The Advisory Guidelines Calculation

Under U.S.S.G. § 2E1.1, the base offense level for a racketeering offense is the greater of 19 or the offense level applicable to the underlying racketeering activity.  Because the enhancements for loss, number of victims, and sophisticated means do not apply, the offense level of 19 is greater than the offense level applicable to the underlying activity.  The four-point leadership enhancement, which Mr. Hwang does not contest, increases the offense level to 23. Based on Mr. Hwang's criminal history category of I, the resulting Guidelines range is 46 to 57 months' imprisonment.

## III.    A NON-CUSTODIAL SENTENCE IS APPROPRIATE

### A.    The Application of Section 3553(a) Warrants a Non-Custodial Sentence

Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The statute's overarching requirement is that the Court "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," to "provide just punishment for the offense," "to afford adequate

deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)–(D).  In other words, the Court must make "an individualized assessment" of all of the facts and circumstances.  *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (internal quotation marks omitted).

The § 3553(a) factors—whether individually, and certainly collectively—warrant a downward variance to a non-custodial sentence for Mr. Hwang.  First, a downward variance to a non-custodial sentence is necessary to avoid unwarranted sentencing disparities.  Even in cases where white-collar defendants knowingly and repeatedly lie to victims, make substantial fortunes in doing so, and obstruct justice through perjury or fabricating documents, sentencing courts in this circuit routinely vary downward from 55 percent to more than 96 percent.  And, as detailed above, Mr. Hwang did not knowingly or repeatedly lie to the purported victim banks, did not profit from Archegos's collapse, and did not obstruct justice in any way.  Thus, he is even more deserving of a greater downward variance.

Second, Probation's 30-level loss enhancement egregiously overstates the seriousness of the offense.  The formulaic and mechanistic application of the Guidelines here—in a misrepresentation case where the central misrepresentations were made by Mr. Becker, unbeknownst to Mr. Hwang—results in a sentence that exceeds the average sentence for *murder*, *kidnapping*, *sexual abuse*, and *national defense crimes*.  That is not justice.  To be sure, sentencing courts in this circuit, and even the American Bar Association, have repeatedly made clear that loss amount is a poor proxy for culpability.

Third, a custodial sentence is unnecessary for specific deterrence in this case.  Mr. Hwang's reputation in the investment community is irretrievably ruined, such that he will never have the opportunity to operate a fund like Archegos again.  And, given his age, Mr. Hwang's

risk of recidivism, as calculated by the U.S. Sentencing Commission, is exceedingly low.

Fourth, a custodial sentence is unnecessary for general deterrence. Judicial experience, academic research, and common sense reveal that more frequent enforcement, and not harsh penalties, serves to deter business executives from white-collar crime.

Fifth, Mr. Hwang's extraordinary charitable work throughout his life supports a non-custodial sentence. His hands-on good deeds, including mentoring students and young professionals, ministering to indigent people, designing programming for G&M, and assisting G&M grant recipients, not to mention taking care of family and friends through life's hardships and tragedies, are deserving of a substantial variance to a non-custodial sentence. And, importantly, a non-custodial sentence would allow Mr. Hwang to continue his good works at G&M.

Sixth, and finally, Mr. Hwang's age and cardiovascular problems support a non-custodial sentence. His physicians have already recommended that he undergo open heart surgery. A significant prison sentence would likely hasten his deterioration and simultaneously deprive him of necessary access to appropriate medical care.

### B.    Even if the Court Adopts Probation's Loss Calculation, a Variance Is Necessary to Avoid Unwarranted Sentencing Disparities.

Sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Courts routinely issue below-Guidelines sentences in securities fraud cases. According to data collected by the U.S. Sentencing Commission, in fiscal year 2022, 48.5 percent of securities and investment fraud offenders received downward variances. U.S. Sentencing Commission, *Quick Facts: Securities and Investment Fraud Offenses* at 2 (2022) (stating that 97.9 percent of the 49.5 percent of securities fraud offenders who receive a variance

receive a downward variance).  And in those cases, the average sentence was reduced 48.7

percent below the Guidelines range.  *Id.*

Additionally, in misrepresentation cases where loss enhancements dwarf other Guidelines

considerations, courts frequently impose sentences that are a mere fraction of the Guidelines

ranges, even when trial evidence establishes that the defendants themselves knowingly told

repeated lies and, in certain cases, profited immensely by doing so.  For instance:

- In *United States v. Milton*, a jury convicted the founder and CEO of a public electric
  vehicle company of misleading investors to inflate the company's stock price.  Gov't
  Sent'g Mem. at 1, *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Dec. 12, 2023),
  ECF No. 315 ("*Milton* Gov't Br.").  At sentencing, the court stated that the defendant
  knowingly made statements that were "materially wrong" "over and over" and "used
  [his] considerable social media talents to tout [his] company in ways that were materially
  false, whether it was the then current status of the development of the technology that
  would power [his] trucks or the number of binding orders or the state of [his] requisition
  for rights to build hydrogen generating facilities."  Sent'g Tr. at 92:16-24, *United States
  v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Jan. 2, 2024), ECF No. 322 ("*Milton* Sent'g Tr.").
  In particular, trial evidence showed that the defendant insisted that a company employee
  use footage of a vehicle prototype rolling down a hill to fabricate a video for the
  company's social media pages touting the car's ability to drive on its own power even
  though he knew the car was not functional at all.  *Milton* Gov't Br. at 5.  Additionally, the
  defendant repeatedly lied to investors about the functionality of various company vehicle
  prototypes, the size of the company's order book, and the costs related to company
  contracts, despite receiving repeated warnings from his executives to accurately
  characterize the company's business.  *Id.* at 6-7.  All the while, he sold a portion of his
  artificially inflated stock, indulging in purchases of luxuries over $83 million in just three
  months.  *Id.* at 6.

  At sentencing, the court found a loss amount that resulted in a 30-level enhancement.
  *Milton* Sent'g Tr. at 21:10-12, 25:20-16:3.  Despite a Guidelines range of 324 to 405
  months, the court varied downward by more than 85 percent, imposing a 48-month
  sentence.  "[E]ven though … the loss amount [wa]s immense," the court explained, "it
  would be ludicrous for [the defendant] to be sentenced in accordance with those
  guidelines," highlighting "the need to avoid unwarranted sentence disparities among
  similarly situated defendants."  *Id.* at 98:19-22, 100:21-22, 89:3-4.

- In *United States v. Hild*, the defendant, a founder and CEO of a company that originated
  and serviced mortgages, was convicted of defrauding lenders through a three-and-a-half-
  year scheme to inflate the value of the company's mortgage bonds to use as collateral for
  bond repurchase loans from various lenders.  Gov't Sent'g Mem. at 2-9, *United States v.
  Hild*, 19 Cr. 602 (RA) (S.D.N.Y. Jan. 20, 2023), ECF No. 144.  There, the offense

conduct involved repeated, knowing misrepresentations to lenders and directing others to conceal the fraud. The defendant lied to lenders about the value of the mortgage bonds, "supplying whatever values best suited his own interest, pulling numbers essentially out of thin air," instructed subordinates to "avoid triggering 'red flags'" by "buy[ing] bonds in tranches," and sought a "slimy dealer" to corroborate the lies. Sent'g Tr. at 29:18-30:7, *United States v. Hild*, 19 Cr. 602 (RA) (S.D.N.Y. Mar. 13, 2023), ECF No. 156. When the defendant realized the scheme might be discovered, he "transferred $17 million to an account in the name of his wife's business." *Id.* at 30:16-19. And at trial, he continued to lie, perjuring himself at least three times. *Id.* at 14:16-12.

The court found that a 24-level loss enhancement was proper, which resulted in a Guidelines range of 324 to 405 months. *Id.* at 8:15-16, 16:11-23; 16:19-21. Nevertheless, the court varied downward by more than 86 percent to impose a prison sentence of 44 months. *Id.* at 16:20-21, 33:1-11. In doing so, the court underscored that the 24-level loss enhancement was "Draconian," "plainly unwarranted," and "a particularly ill fit," despite the defendant's "egregious, systemic, and brazen conduct for 44 months." *Id.* at 31:17-18; 33:1-3; 33:10-11.

- In *United States v. Petit*, the defendant was convicted of misrepresenting the revenue of a publicly traded company to artificially inflate its stock price. Gov't Sent'g Mem. at 3, *United States v. Petit*, 19 Cr. 850 (JSR) (S.D.N.Y. Feb. 16, 2021), ECF No. 145. The offense conduct involved engaging in sales that the defendant knew violated revenue recognition rules and concealing the scheme from auditors by entering into sham distribution and loan agreements. *Id.* at 31. Probation argued that the defendant's total offense level was 43 due to a 30-level enhancement based on loss amount. Sent'g Tr. at 4:7-11, *United States v. Petit*, 19 Cr. 850 (JSR) (S.D.N.Y. Feb. 23, 2021), ECF No. 249 ("Petit Sent'g Tr."). The court agreed with Probation's Guidelines calculation, but found that a "guideline range of 30 years, 360 months to life . . . illustrate[d] how bizarre the guidelines are" in the area of securities fraud. *Id.* at 4:10-13, 4:24-25. The court varied downward by more than 96 percent to one year of imprisonment. Though the defendant's old age and poor health were key factors in the imposition of sentence, the court noted that absent those factors, the sentence would likely have been "three or four years," still just a fraction of the Guidelines range. *Id.* at 27:8-13.

- In *United States v. Irfan Amanat*, the defendant was convicted of engaging in two interrelated schemes with his brother, one involving misrepresentations to obtain investment funds and fabricated account statements to retain the investments, and another to artificially inflate the stock price of a publicly traded company by paying a coconspirator to purchase and hold shares. Sent'g Tr. at 16:14-17:18, *United States v. Irfan Amanat*, 15 Cr. 536 (S.D.N.Y. Oct. 1, 2021), ECF No. 1221. The court found that a 20-level enhancement was appropriate, resulting in a Guidelines range of 108 to 135 months imprisonment. *Id*. at 15:1-3; 23:13-15. The defendant was a "central figure" in two schemes that involved "highly culpable" and "blatantly and flagrantly wrong and illegal" conduct for over three years, yet the court varied downward by more than 55 percent, imposing a 48-month sentence. *Id.* at 40:13-14, 44:4-6, 47:5-6. The court highlighted that the defendant's sentence was not "going to be premised on loss amount,"

*id.* at 15:9-11, even though the SEC had previously issued an enforcement order against the defendant that "should have deterred him." *Id.* at 44:10-17, 45:12-15.[21]

Unlike the defendants described above, Mr. Hwang did not overtly and repeatedly lie, did not profit from his alleged offense, and did not perjure himself or fabricate sham documents. He accordingly deserves an even greater downward variance than the 55 to 96 percent variances that these defendants received for their loss-driven Guidelines ranges.

### C.    Probation's Loss Calculation Results in a Guidelines Range that Substantially Overstates the Seriousness of the Offense.

Probation's recommended 30-level enhancement for loss, which ultimately drives the total offense level of 43 and the corresponding Guidelines recommendation of life imprisonment, massively overstates the seriousness of the offense in this case. *See* U.S.S.G. § 2B1.1, cmt. 21(C) ("downward departure may be warranted" if the offense level determined under § 2B1.1 "substantially overstates the seriousness of the offense"). Simply put, a Guidelines range of life imprisonment premised entirely on misrepresentations made by Mr. Becker— is not commensurate with Mr. Hwang's purported level of culpability. To be sure, it far exceeds the average sentences imposed in the Southern District of New York in 2023 for murder (233 months), kidnapping (68 months), sexual abuse (154 months), and national defense crimes (120 months). U.S. Sentencing Commission, *Statistical Information Packet Fiscal Year 2023 Southern District of New York* at 11 tbl. 7 (2023), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/nys23.pdf.

---

[21] Likewise here, the prosecution argues that Mr. Hwang should be subject to a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(C) for violating a prior judicial order, namely, Mr. Hwang's 2012 consent judgment with the SEC for conduct relating to Tiger Asia Management. For all of the reasons discussed at length during trial, Mr. Hwang's conduct with respect to Tiger Asia Management is not relevant to offense conduct here and should not play a role in the Court's decision on sentencing. *See, e.g.*, ECF No. 220.

Naturally, courts in this circuit have criticized the loss amount enhancement as a poor measure of a defendant's moral culpability, emphasizing both its detachment from empirical data and common sense.[22]  In *United States v. Johnson*, for example, Judge Garaufis commented that § 2B1.1 enhancements "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."  No. 16 Cr. 475-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).  As a result, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that [the] guideline provides" in such cases.  *Id.* (quoting *Corsey*, 723 F.3d at 379 (Underhill, J, concurring)).  In *Milton*, Judge Ramos reached a similar conclusion, finding that "the amount of the fraud, whether it's a million dollars or under a million dollars or a hundred million dollars" is not a proxy for "moral culpability" in white collar criminal cases.  *Milton* Sent'g Tr. at 90:24-91:4.  This is all the more true here, where the prosecution failed to prove

---

[22] *See*, *e.g.*, *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J, concurring) (noting "the widespread perception that the loss guideline is broken" and "leaves district judges without meaningful guidance in high-loss cases"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512, 515 (S.D.N.Y. 2006) *aff'd* 301 F. App'x 93 (2d Cir. 2008) (summary order) (finding the loss enhancement "patently absurd" and describing "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic"); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (the "advisory guidelines regime where … [anyone] who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment" is a "black stain on common sense"); *United States v. Faibish*, No. 12 Cr. 265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime" that "unfairly balloon[s] [the defendant]'s sentencing range beyond any reasonable proportion to his crimes."); Sent'g Tr. at 28:6, 28:12, 28:23-24, *United States v. Lumiere*, No. 16 Cr. 483 (JSR), (S.D.N.Y. Jun. 14, 2017), ECF No. 115 (§ 2B1.1 enhancement resulted in Guidelines range that was "ridiculous, absurd, barbaric," "draconian," and "much more typical of a brutal regime than of a proud American legal system"); *Petit*, 19 Cr. 850 (JSR), Sent'g Tr. at 3:24-4:4 (the guidelines are "totally irrational … because they place inordinate weight on loss," requiring the court to "get into this sort of medieval controversy over exactly what the loss is and what factors should go into it, whether it's really calculable or not," which "leads to absurd results").

that Mr. Hwang directed or had knowledge of a misrepresentation that contributed to the purported loss amount for its Guidelines calculation.

Similarly, the American Bar Association has recognized that loss amount is a poor proxy for culpability and has published a set of alternative sentencing guidelines for economic crimes to account for that fact. *See generally* American Bar Association, *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014) ("ABA Guidelines"),

https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

. Specifically, the ABA commented that offenses that "are not specifically intended to cause loss," such as "false statements for the purpose of obtaining a bank loan that is intended to be repaid," are "generally less culpable than those where loss is specifically intended." *Id.* at 3. Such offenses result in far lower sentencing ranges under the ABA's alternative sentencing guidelines, and counsel heavily in favor of leniency here. *See id.* at 6-7.

> **D.    The Need for Specific and General Deterrence Does Not Warrant a Custodial Sentence.**

The Court is required to consider both specific and general deterrence and fashion a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C). We respectfully submit that a non-custodial sentence accomplishes these objectives.

> 1.    *Specific Deterrence*

The Court can have confidence that the conduct that led to Mr. Hwang's conviction will not recur. This highly publicized case has destroyed the reputation that Mr. Hwang spent a lifetime building in the investment world. Financial institutions will never again afford him the

opportunity to trade billions, millions, or even thousands of dollars on margin.  Nor would he

have the motivation to engage in such conduct again.  In cases where a defendant is unable to

repeat the conduct that led to a conviction, there is a decreased need for specific deterrence and

protection of the public.  *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("no

further punishment" was needed for the purposes of specific deterrence where the defendant

suffered a "blow to his reputation" making him "unlikely to repeat his transgressions"), *aff'd* 747

F.3d 111 (2d Cir. 2014); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993)

("Elimination of the defendant's ability to engage in similar or related activities—or indeed any

major business activity—for some time, and the substantial loss of assets and income . . .

constitutes a source of both individual and general deterrence."), *aff'd* 31 F.3d 73 (2d Cir. 1994);

*see also United States v. Stewart*, 590 F.3d 93, 171 (2d. Cir. 2009) (finding that a "lengthy

sentence of imprisonment would be an excessive one . . . for deterrence and protection of the

public" where the conviction removed the "occasion for offenses").

Mr. Hwang poses an unlikely risk of recidivism given his age.  Mr. Hwang is 60 years

old.  According to statistics collected by the United States Sentencing Commission, recidivism

rates for individuals with a Criminal History Category 1 who are age 60 or older at the time of

release is just 11.3 percent.  U.S. Sentencing Commission, *The Effects of Aging on Recidivism

Among Federal Offenders* at 25 fig. 22 (Dec. 2017), https://www.ussc.gov/research/research-

reports/effects-aging-recidivism-among-federal-offenders.  And, in fact, the Sentencing

Commission found that just 3.9 percent of individuals in the "other" race category, which

includes Asians, American Indians, and Alaskan Natives, aged 60 or older at the time of release

were rearrested.  *Id.* at 14 fig. 3.  Longer rates of imprisonment do not correlate with lower

recidivism rates for offenders age 60 or older.  *Id.* at 18, fig. 11.  Accordingly, courts have

declined to impose Guidelines sentences on defendants on account of older age. *United States v. Hernandez*, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (noting that "[t]his court and others have previously declined to impose Guidelines sentences on defendants who, like Hernandez, were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants" and imposing a non-Guidelines sentence); *United States v. Hodges*, No. 07 Cr. 706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting the "inverse relationship between age and recidivism" and "tak[ing] into account the defendant's age in fashioning his sentence"); *United States v. Carmona-Rodriguez*, No. 04 Cr. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citing the defendant's age and low probability of recidivism as grounds for imposing a below-Guidelines sentence).

### 2. *General Deterrence*

Though we recognize the importance of general deterrence in the context of white-collar criminal cases, "[c]ommon sense suggests that most business executives fear even a modest term to a degree that more hardened types may not." *Gupta,* 904 F. Supp. 2d at 355, *aff'd,* 747 F.3d 111. Research shows that more rigorous and frequent enforcement and prosecution of financial crimes, rather than longer sentences, are the most effective deterrents to would-be white-collar criminals. *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 48-49 (2015); Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").

###### E.    Mr. Hwang's Personal History Supports a Non-Custodial Sentence.

We respectfully submit that Mr. Hwang's extensive history of hands-on charitable work supports a non-custodial sentence.  As courts in this circuit have recognized, "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *Adelson*, 441 F. Supp. 2d at 513-14, *aff'd* 301 F. App'x 93 (summary order).  Such consideration is "plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"  *Id.* at 514.

Although many white-collar defendants can point to charitable donations and good deeds, few have engaged in the type of extensive, hands-on, and time-consuming work that Mr. Hwang has made a staple in his life.  Courts recognize that this type of "hands-on" work and "sacrifice of a personal nature" are distinguishable from the "impersonal writing of checks that is the norm for many wealthy individuals."  *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming a below-Guidelines sentence for a defendant who created a youth athletic organization in his community and paid for the high-school tuition of several boys he mentored).  In such cases, courts inside and outside the Second Circuit have sentenced defendants far below the Guidelines.

For instance, in *United States v. Collins*, the defendant, an attorney convicted of securities fraud, conspiracy to commit securities fraud, money laundering, and making false filings with the SEC in connection with his role in a $1 billion accounting fraud scheme, faced a Guidelines range of life imprisonment, capped by a statutory maximum of 95 years.  Sent'g Tr. at 20:23-21:1, No. 18 Cr. 1170 (LAP) (S.D.N.Y. Oct. 17, 2023), ECF No. 244.  At sentencing, the court found that the defendant's "lifelong good works and charity" "work[ing] for his church,

his family, his schools, and numerous other deserving organizations that work to better

individuals' lives," combined with collateral factors, including severe financial penalties and

reputational damage, supported a below-Guidelines sentence of a year and a day. *Id.*

Similarly, in *United States v. Gupta*, the defendant faced a Guidelines range of 78-97

months for insider trading, but was given a 24-month sentence in light of his extensive charitable

works, which evidenced "an extraordinary devotion, not only to humanity [at] large, but also to

individual human beings in their times of need." 904 F. Supp. 2d at 354, *aff'd* 747 F.3d 111.

The court noted that "the Guidelines must take second place to section 3553(a), which requires a

court to take account of a defendant's character in imposing sentence," asking, "how could it be

otherwise, for on this day of judgment, must not one judge the man as a whole?" *Id.*

In another instructive case, *United States v. Mehta*, the court provided a below-

Guidelines sentence for a defendant convicted of tax evasion and mail fraud due to his

"extraordinary life" or "charitable and community works." 307 F. Supp. 2d 270, 270-71, 284 (D.

Mass 2004). There, the defendant spent "substantial amounts of time and personal attention"

helping members of his religious community, providing "personal support" when they fell ill,

struggled to get their businesses off the ground, or even fell behind on mortgage payments. *Id.* at

271, 279-80. The court recognized that the personal nature of these acts, which involved a

"considerable amount of time" and went "far beyond writing checks," was what warranted a

downward departure from the Guidelines. *Id.* at 282.[23]

---

[23] The analysis for downward departures is similar to that for non-Guidelines sentences. Courts may depart downward so that they have the "flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." *Departure and Variance Primer*, Office of General Counsel, U.S. Sentencing Commission, 2023 at 1, https://www.ussc.gov/sites/default/files/pdf/training/primers/2023_Primer_Departure_Variance.pdf (quoting 28 U.S.C. § 991(b)(1)(A)). Similarly, courts have discretion to vary from the

Here, as in *Collins*, *Gupta*, *Mehta*, and other cases, the court should consider Mr. Hwang's good deeds and extraordinary charitable work, which have been a consistent thread throughout his life. Mr. Hwang has remained steadfast in his pursuit of helping others and empowering his community, even while attaining professional success and growing his family. His hands-on deeds—including mentoring scholarship students and young financial professionals, ministering to indigent people, designing programming for G&M, partaking strategy meetings for the recipients of G&M grant recipients, creating supportive communities for people in his religious community, among innumerable other acts—have involved "sacrifice of a personal nature" that has "had a dramatic and positive impact" on the lives of thousands of individuals. *Cooper*, 394 F.3d at 177-78. All the while, as his family and friends attest, Mr. Hwang has helped those around him at every turn, taking care of friends and family when they are sick, struggling personally or financially, or require professional advice. These acts are emblematic of Mr. Hwang's character and support a non-custodial sentence.

**F.    Mr. Hwang's Age and Health Support a Non-Custodial Sentence.**

"When determining an appropriate sentence, the district court is permitted to consider the defendant's "age, education, mental or emotional condition, [and] medical condition." *Rita,* 551 U.S. at 364 (Stevens, J. concurring). Mr. Hwang is 60 years old and has "severe blockages in his heart arteries" and "high cholesterol" that require him to take multiple medications and "to be evaluated by cardiology regularly to prevent complications." PSR ¶ 153. The blockages are so severe that Mr. Hwang's physicians have recommended open heart surgery, though Mr. Hwang has elected to monitor the condition instead. *Id.* If given a lengthy prison sentence, it is likely

---

Guidelines after considering all the factors set forth in 18 U.S.C. § 3553(a), including the individual history and characteristics of the defendant. *Id.* at 35-38; *see also* U.S.S.G. § 1B1.1 cmt. background.

that Mr. Hwang will not receive the regular evaluations his cardiovascular condition requires.

One evaluation of the Bureau of Prisons found that "limited availability of Correctional Officers restricts aging inmates' access to medical care at outside instructions," resulting in "waitlists to send inmates to outside medical specialists." *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, U.S. Department of Justice, Office of the Inspector General, February 2016 ("OIG Aging Report") at 18, https://oig.justice.gov/reports/2015/e1505.pdf. At one facility, the average wait time to see an outside cardiologist, neurosurgeon, pulmonologist, or urologist was 256 days for routine appointments. *Id.*

These conditions will surely worsen as Mr. Hwang ages in prison, due to the stressful prison environment and lack of access to regular medical care. Studies show that "[i]ncarcerated adults experience accelerated aging, the process in which exposure to incarceration speeds up biological aging." Farah Acher Kaiksow et al., *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy*, J. Gerontol Nurs. (March 2023) at 1, https://pmc.ncbi.nlm.nih.gov/articles/PMC10129364/pdf/nihms-1894051.pdf; *see also United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) ("[A]s a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration.") (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State*, 1989-2003, 103 Am. J. of Pub. Health 523, 526 (2013), https://pmc.ncbi.nlm.nih.gov/articles/PMC3673515/pdf/AJPH.2012.301148.pdf); OIG Aging Report at 1-2 ("an inmate's physiological age averages 10-15 years older than his or her chronological age," in part due to the "stress associated with incarceration"). The court should consider Mr. Hwang's medical challenges when imposing his sentence. *See Hernandez*, 2005 WL 1242344, at *6 (finding defendant's high blood pressure and high cholesterol "significant"

and holding that a non-Guidelines sentence was warranted in light of his "need for ongoing medical treatment" and low likelihood of recidivism); Sent'g Tr. at 36, *Omar Amanat*, No. 15 Cr. 536 (S.D.N.Y. Sept. 4, 2021), ECF No. 1205 (mitigating factors included the defendant's heart condition and lack of a criminal record).[24]

## IV.    CONCLUSION

For the foregoing reasons, Mr. Hwang respectfully requests that the Court fashion a sentence that does not include incarceration.  A non-custodial sentence is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).


Dated:        New York, New York        Respectfully submitted,
              November 8, 2024
                                        GIBSON, DUNN & CRUTCHER LLP

                                        By:  */s/ Michael Martinez*
                                        Barry H. Berke
                                        Dani R. James
                                        Jordan Estes
                                        Michael Martinez

                                        200 Park Avenue
                                        New York, New York 10166
                                        (212) 351-3860
                                        MMartinez2@gibsondunn.com

                                        *Counsel for Defendant Bill Hwang*

---

[24]        Mr. Hwang will file a separate brief addressing potential restitution claims against him.

71