UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                        :

UNITED STATES OF AMERICA
                                                         :

               - v. -                              :               No. 22 Cr. 240 (AKH)

                                                         :

SUNG KOOK (BILL) HWANG,
                                                         :

                 Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................................ 1

II.  PROCEDURAL HISTORY .................................................................................. 3

III. STATEMENT OF FACTS .................................................................................... 4

    A.  Origins of the Archegos Enterprise ............................................................. 4

    B.  Tiger Asia ................................................................................................... 4

    C.  The Early Days of Archegos ....................................................................... 6

    D.  Hwang and Halligan Operate the Archegos Enterprise Through Fraud ...... 7

    E.  Archegos's Collapse ................................................................................... 10

    F.  After the Collapse ....................................................................................... 13

IV. GUIDELINES CALCULATION ......................................................................... 14

    A.  The Applicable Guidelines ......................................................................... 14

    B.  The Evidence Supports the Government's and Probation's Guidelines Calculation . 15

        1.  The Offense Involved an Actual Loss in Excess of $550 Million ....... 15

            a.  Legal principles ........................................................................ 15

            b.  Counterparty Losses ................................................................ 16

            c.  Archegos and Employee Losses .............................................. 27

            d.  Market Losses .......................................................................... 28

            e.  Gain .......................................................................................... 30

        2.  The Offense Included More than 10 Victims ..................................... 32

        3.  Sophisticated means ........................................................................... 34

        4.  Gross receipts .................................................................................... 35

        5.  Violation of a Prior Judicial Order .................................................... 36

        6.  Leader or Organizer .......................................................................... 37

        7.  Sentencing Range .............................................................................. 37

    C.  There Are No Applicable Departures. ........................................................ 37

V.  THE SENTENCE ............................................................................................... 38

    A.  The Nature and Circumstances of the Offense Warrant a Lengthy Sentence ............ 38

    B.  Specific Deterrence Is Required. ................................................................ 42

    C.  A Meaningful Sentence Is Necessary for General Deterrence. ................... 43

    D.  Hwang's Personal Characteristics and Charitable Work Do Not Justify a Sentence of Less Than Twenty-One Years. .................................................................... 45

E.  A Twenty-One Year Sentence Will Avoid Unwarranted Sentencing Disparities. ..... 48

F.  Forfeiture Order ................................................................................................ 51

    1.  Legal principles ........................................................................................ 51

        a.  Racketeering Forfeiture ....................................................................... 51

        b.  Fraud Forfeiture ................................................................................. 52

    2.  Application ................................................................................................ 52

        a.  Hwang Must Forfeit his Interest in the Archegos Entities. ...................... 52

        b.  Hwang Must Forfeit the Proceeds of his Offense. .................................. 53

G.  Restitution Order ............................................................................................... 55

H.  Surrender Date .................................................................................................. 56

VI. CONCLUSION ....................................................................................................... 60

## I.    PRELIMINARY STATEMENT

The Government respectfully submits this memorandum to assist the Court in determining the appropriate sentence for defendant Sung Kook (Bill) Hwang. Hwang, an unrepentant recidivist, led one of the largest securities fraud schemes in history and caused billions in losses. For the reasons set out at length below and summarized here, the Court should sentence him commensurate with his wrongdoing by imposing a term of twenty-one years of imprisonment, ordering him to forfeit his criminal proceeds, and directing him to pay restitution to his victims.

First, as the Court learned over two months of trial, Hwang pursued a multi-billion fraud that altered the American stock market and inflicted extraordinary losses on his business counterparties. Hwang transformed his private hedge fund, Archegos, into an instrument of crime and used lies and manipulative trading strategies to rig the stock market in his favor. For a time, it succeeded. Hwang's personal wealth grew from around $2 billion to more than $30 billion. The scheme so distorted market prices for a handful of securities, however, that its predictable collapse led to economic calamity: billions in losses for Archegos's counterparties, the destruction of Archegos, the precipitous fall of stock prices, and a national conversation about the need for Wall Street reforms for so-called "family offices."

Second, Hwang's fraud was neither fleeting nor aberrant. Hwang labored for months to control the markets, personally directing hundreds of manipulative trades and training, encouraging, and expecting his subordinates to use deceit to obtain financing from counterparties to enable still more trading. Hwang's conduct represents his second effort to cheat his way to personal success. In 2008 and 2009, Hwang worked with his trading team to manipulate stocks to benefit his portfolio. Hwang got caught and he and his fund were punished in multiple jurisdictions around the world. Indeed, Archegos as a brand and as a family office exists because Hwang's prior

firm, Tiger Asia, pled guilty to wire fraud in the District of New Jersey and Hwang thereafter changed Tiger Asia's name to "Archegos." Few have committed fraud at the scale Hwang achieved here; virtually none have done so after a previous sanction for wrongdoing.

Third, Hwang does not accept responsibility for his actions. He denies he did anything wrong at Tiger Asia. He denies he did anything wrong at Archegos. He denies any role in the billions in losses suffered by his business counterparties, his former employees, or the market as a whole. He denies he ever misled anyone or agreed with others to mislead. Through counsel, he continues to decry the very fact that he was prosecuted as "unprecedented." (Hwang Sentencing Mem. at 2). And he even denies the jury's verdict, choosing to repeatedly characterize the charges of conviction as "alleged" and maintaining that the "does not believe that the evidence was sufficient to convict him of the misrepresentation scheme." (Hwang Sentencing Mem. at 44 n.18). Perhaps most troublingly, he has at no time and in no manner expressed any remorse or regret for the harm that his trading caused others. Hwang shows no sympathy for individuals who purchased stock at inflated prices and lost money when the value collapsed, for the employees of banks across Wall Street (many of whom saw themselves as colleagues and peers of Hwang and his traders) who were blamed and disciplined or even fired for trusting Hwang and his team and trading with them, or for his own employees who were pressured to place their savings in Hwang's investments and who suffered greatly when those investment turned valueless. Here, on the eve of sentencing, Hwang has reflected on what happened and has judged himself blameless.

Fourth, rather than reckon with what he has done, Hwang urges the Court to focus on his philanthropy. Of course, the Court must consider Hwang's personal works and circumstances, along with all the Section 3553(a) factors. But Hwang's philanthropy—enabled, as with Hwang's offenses, only by virtue of Hwang's extraordinary wealth—does not justify a noncustodial

sentence or show his crimes to be inexplicably out of character. Indeed, Hwang's respect for his charity proved secondary to his participation in the offense: Hwang overwhelmingly spent his time and resources to pursue fraud during this scheme; Hwang used his foundation's office space and corporate apartments to commit the crime; and Hwang hired his co-conspirators to cushy jobs at his foundation after Archegos collapsed.

In the end, the Court must satisfy the purposes of sentencing set forth in 18 U.S.C § 3553(a) by imposing a sentence that delivers just punishment for what Hwang has done and promotes respect for the law. A significant sentence will be required to deter Hwang—a recidivist and unrepentant fraudster—and to signal to even the most hubristic investors that their grand schemes will be met with serious sentences. Here, balancing Hwang's extraordinary crime, his personal works and circumstances, his prior offense, and his refusal to accept responsibility, and consistent with the recommendation of the Probation Office, such a sentence would be twenty-one years' imprisonment.

## II.    PROCEDURAL HISTORY

On April 25, 2022, a grand jury sitting in this District returned an eleven-count indictment charging Hwang and Patrick Halligan with violations of Title 18, United State Code, Section 1962(d) (Racketeering Conspiracy) (Count One); Title 18, United State Code, Section 1343 (Wire Fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Ten); and charging Hwang with violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Two); and Title 15, United States Code, Sections 78i(a)(2) and 78ff (Market Manipulation) (Counts Three through Nine).

3

Beginning in May 2024, the Court held a jury trial. After hearing two months of evidence, the jury convicted Hwang and Halligan of conspiring to conduct the affairs of Archegos through a pattern of racketeering activity, committing securities fraud and wire fraud, and further convicted Hwang of scheming to—and succeeding in—manipulating the prices of Viacom, Discovery, GSX, TME, and VIPS. The jury acquitted Hwang of manipulating the price of IQ.

On November 8, 2024, Hwang filed a sentencing memorandum arguing for a non-custodial sentence. In it, Hwang continues to deny any involvement in the crimes that the jury found he committed and contends, among other things, that because "[t]his highly publicized case has destroyed" his reputation and because the "central organizing principle of his life is service to others," he should not have to serve a prison term. (Hwang Sentencing Mem. at 1, 3, 58, 64 ("Mr. Hwang did not knowingly or repeatedly lie to the purported victim banks, did not profit from Archegos's collapse, and did not obstruct justice in any way.")).

III.    STATEMENT OF FACTS

A.    Origins of the Archegos Enterprise

What became the Archegos Enterprise began with Hwang's prior hedge fund, Tiger Asia. At Tiger Asia, Hwang established the business entities that would later take the Archegos name, and Hwang employed many of the people that would later form the core of the racketeering conspiracy established at trial, including Patrick Halligan, William Tomita, and Scott Becker.

B.    Tiger Asia

Hwang ran Tiger Asia as a hedge fund that purported to focus on Asian equities. (PSR ¶ 110). In 2008, however, Hwang lost approximately two billion dollars shorting Volkswagen, the European car manufacturer. (*Id.*). Hwang blamed the losses on Goldman Sachs and, in particular,

Goldman Sachs's demand for more margin as the Volkswagen trade moved against him. (*Id.*). In the aftermath of that loss, Hwang turned to fraud, including market manipulation and insider trading, that—at least temporarily—enabled him to demonstrate gains to his investors. (*Id.*).

Regulators in multiple countries eventually discovered Hwang's misconduct, the result of which made crystal clear to Hwang that these manipulative practices were wrongful and unlawful. (PSR ¶ 113). In 2012, Tiger Asia pled guilty to wire fraud in a case before the U.S. District Court for the District of New Jersey. (*Id.*).[1] The guilty plea related to Tiger Asia's 2008 and 2009 insider trading conduct. During the plea allocution, Hwang, speaking on behalf of his fund, admitted that, contrary to the firm's promises otherwise, Tiger Asia Management traded on confidential information it had obtained from UBS and, separately, Morgan Stanley. (*See, e.g.*, GX 2701, 22:18-22 (Court: "Did Tiger Asia Management violate Raymond Park's agreement with UBS to keep the information concerning China Construction Bank stock confidential and not to trade on it?" Hwang: "Yes, Your Honor."); *id.* at 24:04-08 (Court: "Did that violate Raymond Park's agreement with Morgan Stanley H.K. to keep the information concerning Bank of China stock confidential and not to trade on it?" Hwang: "Yes, Your Honor.")).

Hwang also engaged in market manipulation at Tiger Asia. (PSR ¶¶ 113-14). Indeed, as the Government was prepared to prove at trial, through the testimony of William Tomita and contemporaneous email communications, Hwang, in order to inflate the value of Tiger Asia's portfolio before reporting results to investors, engaged in open-market manipulation. Specifically, over multiple months in 2008 and 2009, Hwang directed his then-head trader and Tomita to mark the close, that is, move the prices of certain securities at the close of trading to inflate the value of Tiger Asia's positions at month end.

---

[1] *See United States v. Tiger Management, LLC*, 12 Cr. 808 (SRC) (D.N.J. 2012).

The Securities and Exchange Commission filed a complaint against Hwang alleging, among other things, that he manipulated the market using these open-market trades (GX 2708), and Hwang entered into a no-admit, no-deny settlement with the Securities and Exchange Commission on the insider trading and market manipulation conduct and accepted a multi-year bar from managing outside investments (PSR ¶ 114). Tiger Asia also entered into a settlement with a Hong Kong regulator, acknowledging in a stipulation of fact, through counsel that, "Hwang and Park . . . engaged in false trading within the meaning [of Hong Kong law]" when "Park carried out and instructed Tomita to assist him to carry out [certain trades] on 6 January 2009 with the intention of creating a false or misleading appearance with the respect to the market for, or the price for dealings in," a specific security. (GX 2706).

In the aftermath of the felony conviction and the SEC order, Hwang returned outside investor money, changed Tiger Asia's name to "Archegos," and committed to operate Archegos as "family office" that managed Hwang's wealth. (PSR ¶ 115).

### C.    The Early Days of Archegos

Once it rebranded, Archegos began to tell its counterparties that it had entered a new era and moved beyond its Tiger Asia issues. (PSR ¶ 116). Hwang hired additional senior executives, such as Andy Mills and Diana Pae, and gave them big titles, such as Co-CEO and Co-President, respectively. (*Id.*). Hwang hired a compliance executive, Michael Satine, and the firm instituted training that periodically reminded all employees—including Hwang—that insider trading and market manipulation were wrong. (*Id.*). To assuage concerns by counterparties about dealing with Archegos following the conduct at Tiger Asia, Archegos represented to multiple counterparties that "All trades are reviewed daily" by compliance. (*E.g.*, GX 1002A). To maintain, and later to increase, the number of banking counterparties Archegos worked with, Archegos began sending

its brokers a letter summarizing these changes and implying that Hwang, although the final investment authority, operated within the constraints of an ordinary, compliance-minded fund run, in part, by independent executives. (PSR ¶ 116).

But these changes were illusory. Hwang remained the ultimate authority on any matter he took an interest in; Hwang continued participating in the stock markets with no meaningful oversight by Archegos's compliance personnel, who, for the most part, policed the personal trading of the firm's analysts; and Hwang continued to be supported by the same senior people who had enabled him at Tiger Asia, including Halligan, Becker, and Tomita. Halligan, for his part, took to repeatedly and deliberately misleading counterparties with respect to important information about Archegos's portfolio and, at times, intentionally withheld information about the portfolio's performance. (PSR ¶ 117). Specifically, in conversations with Archegos's counterparties, Halligan would repeatedly understate the relative size of the firm's largest positions. (PSR ¶ 118). In addition, in or about 2017, when Becker took over the role of liaising with the credit teams at the counterparties, Halligan instructed Becker, in substance, to tell the counterparties that Archegos's largest position was 35% of Archegos's capital, even if that was not the truth. (*Id.*). Relatedly, Halligan at times would purposefully withhold information from counterparties regarding Archegos's monthly performance and assets under management. (*Id.*) Halligan explained, in part, that the banks were too ignorant to understand the information anyway.

### D.    Hwang and Halligan Operate the Archegos Enterprise Through Fraud

In 2020, Archegos's misleading practices developed into pervasive fraud: the defendants pursued two interrelated criminal schemes, one involving manipulative trading in the marketplace and the other involving false and misleading statements to Archegos's trading counterparties.

The schemes picked up in the months that followed the start of the COVID-19 pandemic. (PSR ¶¶ 44-46). Archegos's portfolio, which had been worth approximately $2.7 billion at the end of February 2020, fell to less than $1.5 billion by March 12, 2020, as the U.S. markets declined and lockdowns began. Hwang, however, soon began to talk about not being afraid of a "war scare" and the need to "play offense." (*See, e.g.*, GX 235).

As with many organizations, COVID-19 shifted Archegos's workplace and routines. Employees left the office. Remote work became the norm. Soon, Hwang took to working in a Central Park apartment leased by Grace & Mercy, his foundation, with one analyst and no senior executives. (Trial Tr. 619 (Jones)). In the months that followed, Hwang became obsessed with trading, and specifically with using his trading power to influence the prices of the stocks that underlay his positions. By autumn, Hwang spent much of every day on a continuous Zoom with his traders and on a parallel Instant Bloomberg chat, dictating trade orders down to limit prices and timing. At times, Hwang would "raise his voice and yell at [the traders] for not being aggressive enough." (Trial Tr. 3187 (Tomita)). Archegos continued to hold itself out as an investor focused on company fundamentals with a three- to five-year investment horizon, but Hwang spent his time—and nearly all the firm's capital—on constant trading in the same core names. Hwang began deploying strategies aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio, including techniques he had used at Tiger Asia. (PSR ¶ 50). These techniques included purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. (PSR ¶ 64).

Hwang found that his trading could pay for itself. Based on the margin rules in place at the time, daily price moves would typically result in a change in how much margin Archegos owed

the bank or, conversely, the bank owed Archegos. For the stocks where Hwang bet the prices would go up, a daily price increase would mean that variation margin moved in his favor, too, permitting him to access more cash. (PSR ¶ 65). Hwang took that cash and used it to fund additional buying, further driving up the prices of the stocks, and thus freeing up still more cash. (Trial Tr. 3040-41 (Tomita)). As position sizes—and thus margin impact—grew over 2020 and into 2021, the margin framework became both an engine for fraud and a liability: a decrease in prices would trigger a margin call and potentially threaten to unwind the price inflation Hwang had achieved. To avoid this, Hwang began to focus much of Archegos's trading at the end of day, in large sizes and in relatively outsized proportions of the market. (*E.g.*, Trial Tr. 2834-40 (Battalio)).

Hwang's trading schemes were sustained and furthered by lies and misrepresentations made to Archegos's counterparties. As Hwang's trading led to large position sizes, Archegos encountered risk, capacity, and margin lending limits at its counterparties. To enable Hwang to continue to trade the same names at larger sizes, Halligan, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to Archegos's counterparties. (PSR ¶ 78). Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. These false and misleading statements were designed to fraudulently induce the counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos. (PSR ¶ 78).

Hwang further accomplished his manipulative trading by structuring it to avoid any public reporting requirements that would reveal Archegos's concentration. Most significantly, Hwang used derivatives known as total return swaps that, unlike traditional equity securities, did not have a public reporting requirement. (PSR ¶¶ 33-36). The Archegos conspirators, however, treated their swaps as the functional equivalent of purchasing or selling the equity itself. To trade swaps at all, Archegos understood that its counterparties would first buy or sell a corresponding security in the market to price and hedge the swap for Archegos. In fact, Archegos in most circumstances electronically instructed the counterparty on how it should buy or sell the stock that would underlie the swap. Accordingly, Hwang and the traders could and did place orders for swaps and then get "instantaneous feedback" as their orders hit the equities markets. (Trial Tr. 3046 (Tomita)). And they also followed along as their counterparties became the top holders of the equities underlying their swaps.

Hwang's trading strategies and use of multiple counterparties led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in fact, they were the artificial product of Hwang's manipulative trading and deceptive conduct that caused trading by others.

### E.    Archegos's Collapse

By March 2021, Hwang's manipulative trading scheme—which relied in part on continually increasing the size of Archegos's positions in a handful of equities—had profoundly reshaped Archegos's portfolio and risk profile. Though Archegos often had concentrated positions in the past, those positions typically had been in highly liquid stocks, such as Amazon or Netflix. (PSR ¶ 44). Now Archegos had concentrated its investments in a grab bag of stocks with markets that Hwang found he could distort, including ViacomCBS, Discovery, and VIPS. Archegos's

internal reporting estimated that it would take months to unwind these positions without crashing the markets. (GX 962A). At the same time, individual counterparty banks began charging higher margin rates because even the slices of the Archegos portfolio they could see appeared to be large and concentrated in a handful of names. Because it was essential to the scheme to continue buying the same stocks, Archegos was forced to do so at margin rates of 30%, 50%, and even 100%. (*E.g.*, Trial Tr. 3462 (Tomita)). The combined effect of these trends was that Archegos's portfolio became highly vulnerable to external events that might deflate the artificial prices Hwang had created and it sapped Archegos of the liquidity or cash to respond to such a development.

Hwang began to explore ways to extract money from his scheme. Among other things, he investigated block sales. He considered advocating for corporate takeovers, such as convincing Apple to acquire Viacom. But he did not act quickly enough. In late March 2021, the markets exposed Hwang's price manipulation. On March 22, 2021, ViacomCBS announced a seasoned equity offering. (PSR ¶ 93). Immediately, the conspirators perceived that the announcement threatened to unwind their work by depressing the prices of Viacom stock. Halligan, for example, remarked, "get ready for a ride" (GX 3745), and the traders prepared for a wild trading day. What followed was a brazen attempt to overpower the markets: On March 23, Hwang directed nearly a billion dollars in additional Viacom purchases, even as Halligan, Becker, and Tomita acknowledged that the firm may not have the cash to cover the trading.  (PSR ¶ 95). When the day ended, the conspirators understood that the following day the firm would face margin calls it could not meet. The problems compounded on March 24, 2021, when the SEC announced new disclosure requirements that would apply to some of the foreign issuers in Archegos's portfolio, which had the effect of further depressing their stock price. On March 24, 2021, using what cash and capacity remained, Hwang made one final attempt to reverse market forces but he failed. (PSR ¶ 96). As he

did so, Halligan and Becker strategized about how best to ignore and mislead counterparties that were inquiring about the situation. (PSR ¶ 98). When the markets closed, Archegos faced substantial margin calls that it could not meet.

Archegos's senior executives pleaded with the firm's counterparties for more time to meet the margin calls. In a series of late-night phone calls seeking forbearance, Archegos asserted that it faced a "liquidity" problem, not a "solvency" problem, and that its portfolio comprised "household names" that it knew well. (*E.g.*, GX 2537). But Archegos refused to provide the banks with specific details about its positions or its plan to unwind positions to cover the margin calls. As the situation became dire, Hwang himself addressed the banks. During a March 25, 2021 phone call, Hwang falsely described Archegos's portfolio by misrepresenting the liquidity of its top names and how long it would take to unwind its positions. (GX 2504). Soon thereafter, however, the counterparties lost patience and declared a default. In the following days, the counterparties sold the stocks they held in connection with their agreements with Archegos. The prices that had been artificially supported by the trading directed by Hwang, and funded by lies told to the counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days. (PSR ¶ 99).

Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized a wide swath of market participants, including banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit, ordinary investors who purchased and sold the relevant securities at artificial prices, and securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

### F.        After the Collapse

By Friday, March 26, 2021, Archegos was no longer a viable business. Mills convened an all-hands video conference and announced that Archegos would be winding down. (Trial Tr. 558 (Jones)). For some employees—most of whom had limited access to portfolio performance data—this was the first they had heard that Archegos was in distress. The news that the fund was closing arrived as a shock and carried with it the prospect that they would lose both their jobs and their deferred compensation, which was invested in the fund.

Hwang quickly pivoted to damage control. The firm interviewed public relations professionals with experience in crisis management. Archegos senior leaders convened a series of firmwide meetings. In at least one of these meetings, Mills demanded that nobody attempt to resign and thereby trigger the payout of their deferred compensation based on pre-collapse values because doing so would be disloyal. (*See, e.g.*, Trial Tr. 562-63 (Jones)). And during at least one meeting, Hwang informed Archegos employees that if they remained loyal to him, he would take care of them.

In the months that followed, Hwang did take care of many of those that had been closest to him. As regulatory authorities and the Government began to demand documents about the collapse, Hwang "hired" certain senior Archegos personnel at Grace & Mercy, such as the traders Tomita and Daiki Taniguchi, Archegos's compliance head, Michael Satine, and Archegos's co-president and human resources officer, Diana Pae. Hwang made efforts to hire others, too, but his offers were ignored or declined. At the same time, those that had previously done part-time work for Grace & Mercy, like Halligan and Mills, suddenly received massive pay increases.[2] As a result,

---

[2]        In Grace & Mercy's publicly filed Form PF for Tax Year 2019, Halligan was identified as treasurer, was reported to work an average of five hours per week, and received no compensation. In Tax Year 2020, Halligan was identified as treasurer and was reported to have worked five hours

Grace & Mercy has spent millions of its purportedly charitable funds on the salaries of the people who witnessed Hwang's crimes at Archegos.

## IV.    GUIDELINES CALCULATION

The Government and Probation Office agree that the applicable Guidelines sentence is 2,400 months' imprisonment, based on an offense level of 43, a Criminal History Category of I, and a maximum statutorily authorized sentence of 200 years' imprisonment. (PSR ¶¶ 43, 185-86).

### A.    The Applicable Guidelines

Though the Government agrees with Probation that Hwang's offense results in a total adjusted offense level of 43, the Government and Probation differ slightly in how they reach that result. The Government respectfully requests that the Court adopt the following computation:

- Base offense level of 7, pursuant to § 2B1.1(a);
- An increase of 30 levels because the offense involved losses in excess of $550 million, pursuant to § 2B1.1(b)(1)(k);
- An increase of 2 levels because the offense involved 10 or more victims, pursuant to § 2B1.1(b)(2);
- An increase of 2 levels because Hwang committed the offense in violation of a prior judicial order, pursuant to § 2B1.1(b)(9);
- An increase of 2 levels because the offense used sophisticated means, pursuant to § 2B1.1(b)(10);
- An increase of 2 levels because Hwang received gross receipts in excess of $1,000,000, pursuant to § 2B1.1(b)(17)(A); and
- An increase of 4 levels because Hwang played a leadership role in the offense, pursuant to § 3B1.1.

---

per week, and received no compensation. In Tax Year 2021, Halligan was again identified as treasurer, but now purportedly worked 40 hours per week and received base pay of more than $400,000.

The adjusted offense level of 49 becomes a total adjusted offense level of 43, the maximum offense level, by operation of Chapter 5, Part A (cmt. 2). Based upon these calculations, Hwang's advisory Guidelines imprisonment range is life. (PSR ¶ 186). However, because the statutorily authorized maximum sentence is 200 years' imprisonment, which is less than life imprisonment, so the applicable Guidelines sentence is the statutory maximum: 200 years' (2,400 months) imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

### B.    The Evidence Supports the Government's and Probation's Guidelines Calculation

The trial proof, record evidence, and PSR support the Government's and Probation's Guidelines calculation and an offense level of 43. Hwang argues that no enhancements apply to his conduct other than the leadership enhancement and thus, by operation of U.S.S.G. § 2E1.1, the offense level is 19. As set forth below, however, Hwang misconstrues the law and the factual record and his Guidelines calculation is incorrect.

#### 1.    The Offense Involved an Actual Loss in Excess of $550 Million

As the Court heard from multiple witnesses at trial, Hwang's offenses caused losses to banks and counterparties and caused extraordinary distortions of market prices for numerous securities. Whatever reasonable estimate the Court may choose to employ to compute the harm of Hwang's schemes, the total losses exceed $550 million and, in fact, number in the billions of dollars. Because Hwang's offense resulted in losses exceeding $550 million, his Guidelines offense level increases 30 levels. U.S.S.G. § 2B.1(b)(2)(P).

##### a.    Legal principles

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i). And "reasonably foreseeable pecuniary harm" is

defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, cmt. 3(A)(iii), (iv). "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," and includes any "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.*, cmt. 3(A)(ii). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt. 3(c); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

### b.    Counterparty Losses

Hwang's racketeering conspiracy and fraud offenses directly and proximately caused billions of dollars to Archegos's counterparty banks. Hwang and his conspirators used counterparty banks to facilitate their market manipulation schemes and systematically lied to those banks in order to obtain the trading relationships, capacity, and margin loans necessary to advance the scheme. When Hwang's trading scheme collapsed, the economic harm fell sharply on Archegos's counterparties who had been misled about the risk of doing business with Archegos. Based on the trial record, evidence supplied by various victims, and additional documentary proof in the record (including those attached to the submissions of the parties), the Court can easily determine by a preponderance of the evidence that Hwang's offenses resulted in actual losses totaling billions.

Hwang contends that his Guidelines may not be adjusted for any losses suffered by the counterparties. Hwang principally claims that he "had virtually no involvement" in the

misrepresentation scheme, so he cannot be responsible for any losses that flowed from it. (Hwang Sentencing Mem. at 44). To reach this conclusion, however, Hwang indulges in fantasy: he dismisses the cooperator testimony as conclusory ("Mr. Tomita made general statements"), recalls the cross-examinations to be definitively exonerating ("the examples offered at trial fell apart under scrutiny"), and assumes the jury accepted his factual arguments ("Trial testimony made clear that Mr. Hwang did not direct any material misrepresentations that led to a loss by a counterparty bank"). (Hwang Sentencing Mem. at 44, 44-48). Hwang continues the counterfactual by ignoring proof regarding his awareness and encouragement of the deceptions undertaken by others, his participation in crafting misleading statements to share to the banks during the week of Archegos's collapse, and the lies he personally uttered in a last-ditch effort to keep his scheme alive. (Hwang Sentencing Mem. at 44-48). But Hwang's narrative was decisively rejected by the jury, which convicted Hwang not just of participating in the securities fraud and wire fraud schemes related to the effort to mislead Archegos's counterparties but also of conspiring to run Archegos through a pattern of fraud. (ECF Doc. 249 (verdict form)).

Hwang's arguments against accountability also run counter to the Guidelines' legal framework. First, the relevant inquiry under the Guidelines is not, as Hwang would have it, whether he specifically directed a particular misrepresentation that itself caused a loss. Rather, the question is whether there was reasonably foreseeable pecuniary harm—that is, "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of *the offense*." U.S.S.G. § 2B1.1(b)(1)(C). Hwang's offenses included manipulating the market for a number of publicly traded stocks and inducing counterparties to make trades that furthered the market manipulation. As discussed further below, as part of those schemes, Hwang caused his counterparties to take positions in certain stocks which led to losses

to the counterparties. There is simply no plausible argument, and certainly Hwang does not advance one, that the losses caused by those positions constituted a pecuniary harm that Hwang knew or should have known was a potential result of his offense conduct.

Second, the Guidelines instruct that a defendant is responsible for specific offense characteristics based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1). As relevant here, that means Hwang is responsible for the losses caused by conduct he committed as well as the conduct he aided or abetted or directed. The trial proof—including the testimony of two of Hwang's senior employees and conspirators—demonstrated that Hwang trained his employees to engage in deception and expected them to do what it took to achieve his goals. Among other things, Becker described how it "was part of my job" to lie to Archegos's counterparties, an understanding he obtained from Tomita, Halligan, and Hwang. (Trial Tr. 803-04). Tomita, for his part, recounted how he lied to banks because "I was instructed to do so by my former boss," Hwang. (Trial Tr. 3039). Accordingly, the Guidelines hold Hwang responsible for the consequences of Becker's and Tomita's misrepresentations because Hwang directed and aided and abetted those lies.

In addition, and in the alternative, Hwang is also responsible for specific offense characteristics based on the acts and omissions of others when they are (i) within the scope of jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3(a)(1)(B). Here, that means Hwang is responsible for counterparty losses caused by the conduct of other participants in the conspiracy. There can be no serious dispute that the specific lies told by Becker, Tomita, and Halligan to Archegos's counterparties were in furtherance of jointly undertaken criminal activity. Tomita testified that he was "telling lies and materially misleading information to banks in

exchange for them to finance our trades and lend us money," that is to enable Hwang's trading. (Trial Tr. 3040). Similarly, Becker testified that he was "directed to lie to banks so that they would increase additional capacity for Archegos." (Trial Tr. 848). The conspirators' lies to Archegos's counterparties were told for Hwang's benefit—not the personal benefit of any Halligan, Becker, or Tomita—and the lies were calculated to achieve Hwang's desired arrangement: more counterparties, more trading capacity, and lower margin rates. Accordingly, even if the losses resulted exclusively from misconduct of others within the conspiracy, Hwang bears legal responsibility for them as losses that flow from jointly undertaken criminal conduct.

Faced with blackletter law that supports the loss enhancement, Hwang is left to argue that his conspirators' lies were unforeseeable to him because he expected his employees to treat counterparties "fairly" and because his conspirators did not apprise him of every lie they told. (*E.g.*, Hwang Sentencing Mem. at 46). The jury, however, rejected Hwang's head-in-the-sand theory of the defense. Indeed, by convicting Hwang of the substantive wire fraud and securities fraud counts regarding the misrepresentation scheme, the jury necessarily found that Hwang knew of, and shared in, the scheme's goal to mislead Archegos's counterparties by defrauding them. Recognizing that the danger the guilty verdict poses to his continued assertions of innocence, Hwang simply argues that no rational jury could have convicted him. (Hwang Sentencing Mem. at 44 n.18 (challenging the verdict on sufficiency grounds). But, of course, the jury heard that Hwang himself joined in on the lying, particularly during a March 25, 2021 conference with numerous counterparties when he falsely told Archegos's counterparties they could be made whole in two to three weeks and that Archegos's top positions were highly liquid. (GX 2504 (recording of March 25, 2021 call)). Hwang dismisses that episode as causally irrelevant to the banks' losses, but, as the Government argued to the jury, Hwang's behavior on the call shows Hwang knew of

19

and endorsed the scheme to mislead Archegos's counterparty banks just as the cooperating witnesses said he had. And the jury also saw evidence in the form of emails written by Hwang himself directing Tomita to engage in conduct designed to mislead a counterparty. (GX 133). Accordingly, Hwang cannot claim now that his conspirators' conduct was unforeseeable to him.

Under Second Circuit law, one measure of loss attributable to the racketeering conspiracy is the total amount of lending or investment the counterparty banks were induced to make following the onset of the conspiracy, less the value of collateral. *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 748-51 (2d Cir. 2010) (holding that unpaid principal amounts were foreseeable loss in mortgage fraud). Moreover, in the context of restitution, the Circuit has considered and rejected the notion that losses must be adjusted for subsequent declines in the value of collateral attributable to other causes. *United States v. Paul*, 634 F.3d 668, 676-78 (2d Cir. 2011). Where "the making of the loan" leads to the loss, it is irrelevant that "independent market forces may have contributed" to the degree of loss by depressing the value of collateral. *Id.* at 677-78.

The Archegos conspirators' conduct resulted in losses to Archegos's counterparty banks by inducing margin lending and trading relationships that led to loss. Based on the Circuit's guidance in *Turk* and *Paul*, the counterparty's losses are attributable to Hwang and his conspirators because none of the loans or trades would have been made but for the fraud and because the fraud concealed the very risk that materialized. *Turk*, 626 F.3d at 748; *Paul*, 634 F.3d at 677-78. The Government introduced evidence that Archegos's counterparties expected to receive truthful information, relied on the information they received from Archegos to begin, continue, and expand their counterparty financing and trading relationships, and would not have done business with Archegos if they had received accurate and complete information. (*E.g.,* Trial Tr. 116, 119, 184 (Fairbanks); Trial Tr. 707 (Miranda); Trial Tr. 1815 (Boccuzzi)). The conspirators themselves

understood this dynamic. As Tomita explained, "if the banks knew the full picture of the level of risk and the size of our positions, they would have essentially fired us as a client immediately and liquidated the portfolio." (Trial Tr. 3052).

To take one specific example from the trial: A UBS credit risk officer testified that Archegos's portfolio composition, liquidity, and concentration mattered to the bank's decisions about doing business with Archegos. (*See* Trial Tr. 101-94, 205-63 (Fairbanks)). The credit officer further testified that he would have been "horrified" to learn that Archegos's portfolio was more heavily concentrated in its positions than Becker had described and that UBS "probably would have hit the panic button" if it had discovered the truth, adding that in such a circumstance "[w]e would raise margins on the client and potentially ask them to leave, and we'd fire the client." (Trial Tr. 184; *see also* Trial Tr. 160 (Fairbanks: "We would have rejected the increase because that would be too much risk.")). Another UBS risk employee testified similarly, explaining that if the Archegos had a concentrated portfolio "[t]he margin framework would have determined that there be no lending here, that his portfolio overall would not be financeable." (*See* Trial Tr. 1913 (Salcedo)). Each of the witnesses explained that Archegos's portfolio concentration and liquidity statistics directly related to assessments of whether Archegos could repay UBS on its margin loans by selling collateral and hedge its swaps by trading in the market, including by evaluating whether other counterparties would likely be selling the same hedges and depress their value. (Trial Tr. 149 (Fairbanks) ("I wanted to make sure that there wasn't ten other banks selling the same name."); Trial Tr. 1896 (Salcedo) ("We were lender to Archegos. And the concentration mattered because . . . at their size, it stated to become a liquidity concern")). The fact that Archegos's misrepresentations misled the banks' assessments of this risk was their purpose to begin with: As

Tomita explained, the lies "big picture were concealing the level of risk of the Archegos portfolio." (Trial Tr. 3052).

The very scenario that UBS had sought to avoid—where Archegos's portfolio concentration and liquidity subjected UBS to market losses—is precisely the scenario that materialized in March 2021. Witnesses explained how the value of Archegos's positions fell precipitously and UBS was unable to unwind its swaps with Archegos without incurring substantial losses. (Trial Tr. 1744 (Tropper)). The witness, who personally handled aspects of the Archegos unwind activity at UBS, estimated those losses to be around $860 million. (*See* Tr. 1749-53 (Tropper)). UBS also recorded its loss calculation in a detailed spreadsheet, which the Government also offered into evidence. (*See* GX 2189). That spreadsheet, too, demonstrates losses of approximately $860 million. UBS has since supplied additional loss information, further confirming losses of approximately $860 million. (*See*, *e.g.*, September 30, 2024 Decl. of A. Brudner).

Taken together, the trial proof and record evidence show that (a) Hwang's conspiracy and schemes caused pecuniary harm to UBS, (b) the harm that resulted from the schemes was entirely foreseeable to Hwang and, in fact, was the likely harm that the scheme sought to conceal in the first place, and (c) the losses amounted to approximately $860 million. Accordingly, even if UBS's losses were the only losses that resulted from Hwang's offenses—and they are not—they would suffice to trigger the 30-level loss adjustment because they exceed $550 million.

Though the total amount of counterparty losses is not necessary to determine the application of the 30-level loss enhancement, the Court should nevertheless make additional loss findings because they bear on the number-of-victims enhancement and restitution. Specifically, the Court should find as follows:

**Table 1 - Counterparty Losses**

| Victim Group | Approximate Losses | Selected Record Evidence |
|---|---|---|
| Credit Suisse (Credit Suisse International; Credit Suisse Securities (USA) LLC) | $5,325,169,922 | Testimony of Will Tomita; Testimony of Scott Becker; Testimony of Joshua Lukeman; Declaration of K. Fletcher dated September 30, 2024 |
| Nomura (Nomura International PLC; Nomura Securities International, Inc.; Nomura Global Financial Productions Inc.) | $2,308,422,273.45 | Testimony of Will Tomita; Testimony of Scott Becker; Letter from P. Neiman to USAO, dated September 9, 2004, citing NSI-ACM-00038001 through NSI-ACM-0038008. |
| UBS (UBS AG; UBS Securities LLC) | $860,268,783.00 | Testimony of Will Tomita; Testimony of Scott Becker; Testimony of Giselle Tropper; Testimony of Brian Fairbanks; Testimony of Chris Salcedo; Declaration of A. Brudner, dated September 30, 2024; Letter from A. Brudner to USAO dated September 30, 2024; GX 2189. |
| Morgan Stanley (Morgan Stanley & Co. LLC, Morgan Stanley Capital Services LLC, and Morgan Stanley & Co. International Plc.) | $911,000,000 | Testimony of Will Tomita; Testimony of Scott Becker; November 14, 2024 Letter from T. Martins; November 14, 2024 Declaration of P. Kouch. |
| MUFG (MUFG Securities EMEA Plc.; MUFG Securities Americas) | $263,632,638 | Testimony of Will Tomita; Testimony of Scott Becker; Letter from W. Reckler to USAO, dated September 16, 2024, citing MUFG-Archegos0006302 and MUFG-Archegos0006309. |

| Macquarie (Macquarie Bank Ltd.) | $35,558,531.06 | Testimony of Will Tomita; Testimony of Scott Becker; Letter from R. Park to USAO, dated October 24, 2024; MACQ_0025923-24. |
|---|---|---|
| Mizuho (Mizuho Capital Markets LLC, Mizuho Securities USA LLC, Mizuho Americas) | $149,305,810 | Testimony of Will Tomita; Testimony of Scott Becker; Exhibit D to Thomas Decl, MIZU-0048047 . |
| Jefferies (Jefferies LLC and Jefferies Financial Products LLC) | $39.947,756.84 | Testimony of Will Tomita; Testimony of Scott Becker; Testimony of Jennifer Miranda; Declaration of J. Miranda, dated October 4, 2024 |
| BMO Capital Markets | $5,647,545.87 | Testimony of Will Tomita; Testimony of Scott Becker; Testimony of Joseph Boccuzzi; Exhibit I to Thomas Decl, BMO00005026. |
| **TOTAL** | **$9,859,005,504** | |

As with UBS, every other counterparty bank tabulated the losses that resulted from the trading relationship with Archegos, essentially representing what they loaned to Archegos less what they were able to recover from the sale of collateral. As set forth in Table 1, above, those losses approach $10 billion and the losses of four counterparty groups (Credit Suisse, Nomura, Morgan Stanley, and UBS) each independently suffered losses in excess of $550 million, thus each independently justifying the application of the loss enhancement.

Hwang attempts to go bank-by-bank to explain why he should not be held responsible for these losses. The Court should reject each of Hwang's arguments. For the most part, Hwang simply renews his legal claim that he cannot be responsible for any losses because he personally did not

induce the banks to do business with Archegos through fraud. This argument is wrong no matter how many times Hwang repeats it. *See generally* U.S.S.G. § 1B1.3; *see also United States v. Marino*, 654 F.3d 310, 321-24 (2d Cir. 2011) (holding, in the context of restitution, that defendant's essential role in a securities fraud scheme was a direct and proximate cause of victim losses notwithstanding that his conduct was less serious than other conspirators).

To the extent Hwang challenges the nexus between a particular bank's losses and Hwang's conspiracy, it is typically to point out that the Government did not call witnesses from every bank to testify. That, of course, is not a prerequisite for a loss finding. Moreover, while the Government stands ready to present witnesses from each and every bank at a *Fatico* hearing should the Court desire it, the record already permits the Court to make loss findings as to each bank by a preponderance. Multiple witnesses described—and Hwang does not dispute—that each of the counterparties was in fact an Archegos counterparty. Nor is there any serious dispute that each counterparty suffered economic losses in the approximate amount they have identified. Rather, Hwang seeks to break the link between his schemes and the counterparties' losses. The trial proof does not allow it.

Hwang's fraud and manipulation schemes caused the victim losses. Multiple bank employees testified generally about client due diligence and risk assessments and why information about liquidity and concentration played an essential role in business assessments for swap counterparties and primer brokers. (*E.g.*, Trial Tr. 116, 119 (Fairbanks); Trial Tr. 707 (Miranda); Trial Tr. 1815 (Boccuzzi)). Multiple witnesses described how, if presented with accurate information, they would have terminated their business with Archegos. (*E.g.*, Trial Tr. 184 (Fairbanks); Tr. 3052 (Tomita)). One witness even described how BMO had initially refused to onboard Archegos, only to reverse after received false assurances about its business practices.

(Trial Tr. 1830-1837 (Boccuzzi)). Documentary and witness testimony showed that Hwang's conspirators systematically lied to Archegos's counterparties precisely to obtain the trading relationships and capacity the truth would have denied them. (*E.g.*, Trial Tr. 804 (Becker admitting that he lied to "all of Archegos's counterparties"); Trial Tr. 897 (Becker explaining that Halligan instructed him to lie about concentration and the portfolio); Trial Tr. 3052 (Tomita acknowledging banks would not have done business with Archegos if they knew the truth); Trial Tr. 3429 (Tomita describing how the lies concealed Archegos's portfolio risk from counterparties)). And many witnesses described how Archegos's positions—the same positions Hwang had artificially manipulated—collapsed in March 2021, directly precipitating the banks losses. The totality of this evidence enables the Court to find the required nexus between the conspiracy's conduct and the bank's losses for the purposes of the Guidelines enhancement. Indeed, as the Second Circuit has observed in the context of establishing loss, "circumstantial evidence will do." *United States v. Mensah*, 110 F.4th 510, 532 (2d Cir. 2024). Here, similar to the Second Circuit's reasoning in *Paul*, where the margin "loans were admittedly a significant part of the greater fraud" and the "brokerage houses would not have made the loans" had they known how they would be used, the entire value of the unrecovered principal is "loss." *See* 634 F.3d at 677.

Hwang also makes one last effort to blame the victims for their losses. Without citing any law whatsoever, Hwang contends that he cannot be responsible for losses his victims were not savvy enough to avoid. (Hwang Sentencing Mem. at 49 (citing report of Credit Suisse special committee, which identified internal risk management failures)). But the Guidelines provide defendants with no contributory negligence theory, speaking instead of accounting for "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 Notes to Loss Table, and the Second Circuit has rejected an argument for the use of contributory negligence theory in

the context of restitution awards. *See United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008) ("Nothing in the detailed provisions of the [Restitution Act] contemplates that a defendant guilty of criminal fraud can escape mandatory restitution by requiring district courts to conduct mini-trials on the possible contributory negligence of the very persons victimized by the defendant."); *see also United States v. Agnew*, 171 F. App'x 376, 379 (2d Cir. 2006) ("We additional reject Agnew's claim that the Department of Labor had a duty to mitigate its damages once a criminal investigation was underway against Agnew.").

### c.    Archegos and Employee Losses

In addition to the Counterparties, Hwang victimized the Archegos entities, namely Archegos Fund L.P. and Archegos Capital Management, as well as Archegos's innocent employees.

In the context of RICO, the law recognizes that "the enterprise itself is often a passive instrument or victim of the racketeering activity." *Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir. 1985). Here, Hwang's criminal activity cannibalized Archegos's assets to advance Hwang's criminal designs and ultimately destroyed them. Indeed, Hwang himself concedes these losses. (Hwang Sentencing Mem. at 53 ("[A]s was shown at trial, Mr. Hwang lost billions of dollars as a result of Archegos's collapse.")). The proof at trial demonstrated that Archegos's net capital, as of April 1, 2020 stood at approximately $1,418,431,946 and, by March 29, 2021 exceeded negative $5,782,285,151 billion. (*Compare* GX-464 (April 2020 Combo Sheet) *with* GX- 475 (March 2021 Combo Sheet)).[3] Accordingly, the Court can find that Archegos's losses totaled approximately $7.3 billion, and, in any event, exceeded $550 million. On this basis,

---

[3] By taking a starting figure shortly after the COVID-related market sell-off, and by taking an ending figure before Archegos had received loss information from each bank, this figure is a conservative estimate of Archegos's losses.

Hwang's Guidelines must reflect a 30-point loss increase regardless of whether any Archegos counterparty also suffered losses.

The Archegos entities' losses also encompass the loss of deferred compensation amounts due to individual employees. As Brian Jones testified at trial, Archegos required its employees to defer a portion of their annual compensation. Archegos Capital Management had an obligation to provide that compensation, as it set forth in annual letters to its employees. (*See, e.g.*, Exhibits A and B to September 5, 2024 Letter from R. Lawler). When Archegos Fund collapsed into insolvency, so, too, did Archegos Capital Management's ability to deliver on its deferred compensation guarantees. The result was that dozens of Archegos employees suffered pecuniary harm in the form of lost deferred compensation, much of which the employees had no choice but to leave in Hwang's care. (*See, e.g.*, September 5, 2024 Letter re Cindy Huang; Tr. 698 (Jones); November 13, 2024 Letter re Brendan Sullivan)). Based on Archegos's own records of the plan value as of September 30, 2020, the total amount of mandatory deferred bonuses by all employees was $61,857,761.17. (*See* Exhibit F to Thomas Decl.). The amount is approximately $33,068,780.91 taking only mandatory deferrals and excluding conspirators. (*See* Exhibit G to Thomas Decl.).

### d.    Market Losses

Hwang's conduct also caused losses to participants in the securities markets. Because Hwang manipulated the prices of securities, a circumstance anticipated by the Guidelines to require special consideration in fixing loss, the Court may use any method appropriate and practical under the circumstances to estimate the appropriate loss. Note 3(E)(ix) to U.S.S.G. § 2B1.1. Here, one potential method would be to take the change in the value of Archegos's assets during the scheme as a measure of the amount of inflation. Indeed, the Second Circuit has held that "a sentencing court's methodology was not 'too crude' when it calculated a loss amount based

on two factors: the total profits of the scheme and testimony as to the underlying percentage that was fraudulent." *United States v. Rainford*, 110 F.4th 455, 476 (2d Cir. 2024). Using that approach based on Archegos Combo sheets, which are in evidence, results in a figure in excess of $30 billion (*compare* GX 464 (April 2020 Combo sheets) *with* GX 475 (March 2021 combo sheets)). Even if the Court assumed that only 5% of the increase could be attributable to Hwang's trade strategies— a preposterously low estimate in light of the trial evidence regarding Hwang's control of the markets—the resulting inflation amount would still exceed $550 million and thus trigger the 30-level loss enhancement.

Additionally, the Guidelines themselves identify another possible method for computing the loss figure in a case involving manipulated securities prices. *See* Note 3(E)(ix) to U.S.S.G. § 2B1.1. Specifically, the Guidelines authorize "a method under which the actual loss attributable to the change in the value of the security" is the amount reflecting the difference in the average price of a security during the period the fraud occurred and the period after the fraud was disclosed to the market, multiplied by the number of shares outstanding. *Id.* The record already contains exhibits reflecting the share prices and shares outstanding for the various securities and from those exhibits the Court could apply the Note 3(E) method to compute billions in losses. (GX 4021B (Center for Research in Securities Prices Data)). Dr. Carmen Taveras, an SEC economist who testified at trial, has preliminarily applied the Note 3(E) method to the price movements in VIAC, DISCA, DISCK, GSX, and VIPS and estimated that the total losses from manipulation of those securities alone totals approximately $15.254 billion. Should the Court wish to hold a *Fatico* hearing on loss, the Government will be prepared to re-call Dr. Taveras to present her calculations.

Hwang preemptively assails any measure of market losses by arguing that any price movements in the manipulated securities cannot be disentangled from other market forces and so

cannot be calculated at all. As the jury concluded, however, Hwang did alter the prices of multiple securities as part of his scheme, including Viacom, Discovery, GSX, and VIPS. Indeed, Dr. Robert Battalio testified at length that Hwang's trading method distorted securities prices and, in fact, led to accumulated price changes over time. (*E.g.*, Trial Tr. 2886-91). The collapse of the prices of the manipulated securities once Hwang stopped buying them only further proves that his conduct was responsible for a substantial part of the price change. In any event, should the Court wish to hold a *Fatico* hearing on loss, the Government would also be prepared to elicit from Dr. Taveras testimony regarding various methods to conservatively value the portion of stock-drop loss attributable to Hwang. For example, Dr. Taveras would be prepared to present a regression analysis of the price-drop event that estimates market losses from Hwang's trading at approximately $3.5 billion. Because the trial proof demonstrated that Hwang manipulated other securities, too, such as FUTU and Rocket, this estimate will undercount the total distortion Hwang caused in the markets.

Using the change in value of Archegos's assets, using the Guidelines method described in Note 3(E), or using a conservative price-drop event analysis all lead to the same result: a loss in excess of $550 million.

### e. Gain

As set forth above, the Court can and should find actual losses and apply the 30-level Guideline enhancement accordingly. Were the Court to accept the defendants' arguments that no loss can reasonably be determined, then the Court should compute gain. *See* Note B to § 2B1.1 Loss Table ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). Notwithstanding Hwang's repeated claims that he did not profit from his scheme, he did gain from it: first, Hwang obtained margin loans from Archegos's counterparties and, second, Hwang used those margin loans—and

the profits of manipulative trading—to pay for additional trades. That Hwang's use of these gains eventually led to losses does not alter the fact they once existed and that he obtained them. One method to estimate Hwang's gains would be to take the value of the manipulated assets at the height of the scheme, such as follows:

**Table 2 – Gain Represented as Inflated Securities Prices**

| Ticker | Value as of March 23, 2021 (GX-475) |
|--------|-------------------------------------|
| VIAC | 26,968,575,055 |
| DISCA | 7,297,664,891 |
| DISCK | 6,055,870,820 |
| GSX | 7,350,687,006 |
| VIPS | 7,878,454,275 |
| *Total:* | *55,551,252,047* |

Alternatively, the Court could make gain findings from the amounts that the conspiracy withdrew from its counterparty accounts. (These amounts are discussed further below in connection with forfeiture and collectively total billions.) Taking UBS as an example, between October 1, 2020 and March 24, 2021, Archegos withdrew more than $831 million. (Exhibit E to Thomas Decl.). Indeed, a UBS witness described how Archegos withdrew hundreds of millions from UBS even as it recognized that insolvency loomed. (Trial Tr. 213-14 (Q: "Now, that 173 million increase, where did that come from? A: That was the gains that they had previously received.") (Fairbanks)). The amounts withdrawn from UBS alone exceed $550 million, thus

triggering the 30-level enhancement, and UBS is but one of many banks from which Archegos withdrew hundreds of millions of dollars of excess margin.

### 2. The Offense Included More than 10 Victims

As established by the trial proof and other record evidence, at least three categories of victims suffered losses because of the defendant: (a) financial institutions, (b) market participants, and (c) innocent Archegos employees. Any of those groups considered alone or taken together includes more than ten loss-suffering victims. Accordingly, Hwang's offense level must be increased by 2. *See* U.S.S.G. § 2B1.1(b)(2).

First, the offense victimized more than 10 counterparty business entities. As reflected in the trial proof and further detailed by the various victim impact statements so far received from financial institutions, multiple financial institutions suffered losses as a result of Hwang's offenses.

Hwang argues that only eight financial institutions suffered losses and therefore only eight victims of the offense exist. (Hwang Sentencing Mem. at 54). Hwang ignores, however, that certain institutional groups are composed of various distinct legal entities that each suffered losses. For example, Morgan Stanley had three business firms that suffered losses: Morgan Stanley & Co. LLC, Morgan Stanley Capital Services LLC, and Morgan Stanley & Co. International Plc. (*See* Decl. of P. Kouch.). Similarly, Jefferies had at least two entities suffer losses, Jefferies LLC and Jefferies Financial Products LLC. (*See* Declaration of J. Miranda). Counting each business victim individually, as required by the Guidelines, results in more than 10 victims with determined losses.

Second, Hwang's offense victimized dozens of Archegos employees and Archegos itself. As reflected in the trial proof and further detailed by the various victim impact statements so far received from former employees, multiple Archegos employees lost their deferred compensation as a result of Hwang's offenses. Indeed, the number of employee victims greatly exceeds ten. (*See,*

*e.g.*, Tr. 37 (Jones) (describing deferred compensation program and estimating the number of Archegos employees at 50); Exhibit G to Thomas Decl.). The Court can conclude, based on this category alone, that the number of victims of the offenses exceeds 10.

Hwang argues that these employees are not victims because they were "downstream of the collapse of Archegos, which itself was caused by the decline in the value of Archegos's investments (and not purported misrepresentations)." (Hwang Sentencing Mem. at 54. n.20). But Hwang cites no authority to support his view. And his claim that the collapse of Archegos was "caused by the decline in the value of Archegos's investments" ignores that the collapse of securities prices was the foreseeable and, perhaps, inevitable consequence of Hwang's manipulations and misrepresentations. Had Hwang not engaged in the schemes he did in 2020 and 2021, his employees would not have lost millions. More simply, Hwang did not set aside the funds he needed to guarantee the deferred compensation—he used those funds for the fraud.

Third, as reflected in the trial proof and discussed above, Hwang caused artificial increases and decreases in the prices of multiple publicly traded stocks. In so doing, Hwang caused losses to innumerable other traders who bought at artificially inflated prices through the marketplace. The trial proof included market transaction data that showed many thousands of transactions in the manipulated stocks during the scheme. (GX 4012A & 4012B (EMSX trade data); GX 4019A (TAQ trade data)). That proof, plus additional testimony that demonstrated a portion of the trading related to retail traders, that the number of loss-holding trading victims exceeds 10. Hwang's technical objection the Court cannot count as victims market participants without first finding "actual loss" for them ignores that such a finding can and should be made here, as discussed above. Notwithstanding Hwang's arguments to the contrary, the Second Circuit's guidance in *United States v. Skys* does not counsel otherwise. In *Skys*, the Circuit found error in the district court's

application of the number-of-victims enhancements when only intended loss, not actual loss, was found. 637 F.3d 146, 154-55 (2d Cir. 2011). The market losses here actually occurred and can be reasonably estimated. That the subset of those losses cannot be reasonably apportioned to individual victims does not mean that Hwang can escape the enhancement for having more than 10 victims; it means he has more victims that can be counted.

The PSR correctly applies the 2-level enhancement for 10 or more victims.

### 3.  Sophisticated means

Hwang also disputes the 2-level adjustment for sophisticated means provided in U.S.S.G. § 2B1.1(b)(9)(C). According to Hwang, the enhancement cannot be supported by the Guidelines or the law. (Hwang Sentencing Mem. at 57). But the trial evidence demonstrated that Hwang's schemes involved a "complex web of fraud" that requires the application of the 2-level enhancement. *See United States v. Ojemen*, 465 F. App'x 69, 72 (2d Cir. 2012).

The "sophisticated means" that trigger the offense level enhancement relate to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 App. N. 8(B). "[E]ven if each step in the scheme was not elaborate, the total scheme [may be] sophisticated [when] all the steps [are] linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003). Here, uncontroverted trial evidence revealed that Hwang's schemes involved multiple culpable participants, a dozen financial counterparties, leveraged financial transactions, bespoke derivative instruments, deliberate efforts to avoid transaction reporting requirements that would betray the existence of the scheme to counterparties and regulators, systematic lies to mislead counterparties about the conspirators' conduct, and numerous technical trading strategies. Hwang's assertion that "[t]he conduct at issue here lacks all hallmarks of sophistication" (Hwang Sentencing Mem. at 55) beggars belief.

Much of Hwang's objection appears to be premised, not on the actual circumstances of his conduct, but on the wording of two particular PSR paragraph that relate to the sophisticated means enhancement. (*See* Hwang Sentencing Mem. at 55 (citing PSR ¶¶ 105, 132)). The Government therefore proposes to amend those PSR paragraphs to describe more fully the sophistication employed here and to reflect the trial proof. Specifically, the Court should amend the PSR to state: "Hwang's schemes at Archegos made use of sophisticated means. Hwang and his subordinates used the resources and business relationships of a hedge fund to systematically mislead multiple counterparties, to access margin lending and trading capacity, to trade derivative instruments in purposefully calibrated ways to alter market prices for the benefit of the scheme, and to structure transactions to avoid regulatory reporting requirements." So described, the conduct is not merely "an omission of information that Archegos was under no legal obligation to disclose," (Hwang Sentencing Mem. at 55), but rather an elaborate and organized criminal scheme. Probation is correct that the sophisticated means enhancement applies.

### 4. Gross receipts

Hwang's offense level must be further increased by two levels by operation of Section 2B1.1(b)(17)(A), which applies when the defendant receives gross receipts in excess of more than $1 million. Without any discussion of law or evidence, Hwang merely asserts that he did not personally derive more than $1 million in gross receipts. (PSR at 69 (Hwang PSR Objections)). But abundant—and uncontested—trial evidence demonstrates that Hwang received billions in margin loans and trading profits from Archegos's counterparties. Indeed, the Government's very first witness at trial described the margin lending arrangement and even recounted a particular occasion near the end of the scheme when Archegos withdrew $173 million from its account. (Tr. 212-14 (Fairbanks); *see also* GX 2150 (email reflecting request for wire of $173 million)).

35

Hwang does not explain his objection, so it is difficult to identify his error with precision. If Hwang's objection rests on the notion that Hwang subsequently lost the receipts he obtained, so he did not receive $1,000,000 in profit, he is mistaken; the enhancement "is not limited to the defendant's net profit." *See United States v. Goberdhan*, 499 F. App'x 63, 65 (2d Cir. 2012). If Hwang's objection instead rests on the artifice that the receipts went to Archegos and not him individually, then it is without a legal basis. While it is true that the gross receipts relevant to the enhancement must be those received individually by the defendant, rather than by his co-conspirators, *see United States v. Millar*, 79 F.3d 338, 346 (2d Cir. 1996), that is what happened here: Hwang solely controlled Archegos and Hwang had complete discretion on how to dispose of the trading loans and profits. Archegos's receipts are his receipts. Hwang may not escape the application of the enhancement merely because he chose to receive the funds through his business entity alter ego rather than in a personal banking account.

## 5. Violation of a Prior Judicial Order

Hwang is subject to a two-level increase for "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." U.S.S.G. § 2B1.1(b)(9). Specifically, on December 14, 2012, the U.S. District Court for the District of New Jersey permanently enjoined Hwang from violations of Section 10(b) of the Securities Exchange Act. (*See* GX 2709). The jury in this case convicted Hwang of criminally violating that same law. Accordingly, the Section 2B1.1(b)(9) enhancement applies.

Hwang objects to the enhancement but offers no credible basis for his objection. Rather, he merely asserts in a footnote that his "conduct with respect to Tiger Asia Management is not relevant to the offense conduct here and should not play a role in the Court's decision on sentencing." (Hwang Sentencing Mem. at 62 n.21). Hwang does not dispute to the existence of the

prior judicial order, nor does he articulate any legal authority by which the Guidelines enhancement would not apply to him even though he did violate a prior judicial order. The enhancement applies.

### 6. Leader or Organizer

Finally, Hwang must receive the leader/organizer enhancement pursuant to U.S.S.G. § 3B1.1(a). The trial evidence demonstrated that he was the final authority on all matters business, criminal, or otherwise. Indeed, this one enhancement Hwang does not contest. (Hwang Sentencing Mem. at 57).

### 7. Sentencing Range

The PSR correctly computes the offense level to be 43. The offense level adjustments and role adjustments produce an offense level at or above 43, so the total adjusted offense level becomes 43. *See* Notes to Part A, U.S.S.G. Chapter Five. At Criminal History Category I, the Guidelines sentence is life imprisonment. However, as noted above, because the statutorily authorized maximum sentence is 200 years' imprisonment, which is less than life imprisonment, the applicable Guidelines sentence is 200 years' (2,400 months) imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

### C.    There Are No Applicable Departures.

The defense hints at, but does not expressly seek, a downward departure, based on the defendant's role, the loss amount relative to the defendant's conduct, and the defendant's personal philanthropy. (Hwang Sentencing Mem. 62, 68 n.23). While the Court may consider these arguments and the underlying facts in its Section 3553(a) analysis, the defense has not carried its burden to show that Hwang qualifies for any departure under the Guidelines. *See United States v. Cotto*, 347 F.3d 441, 445 (2d Cir. 2003) ("The defendant bears the burden of proving that he or

she is entitled to a downward departure.").

## V.    THE SENTENCE

The Government respectfully submits that the Court should sentence Hwang to a term of twenty-one years' imprisonment, forfeit his criminal proceeds, and order him to pay restitution to his victims. A lengthy sentence of imprisonment is necessary to reflect the severity of the offense, to deter Hwang and others from committing this crime, and to promote respect for the laws prohibiting market manipulation and fraud. The Government's and the Probation Office's proposed twenty-one-year sentence would also align with sentences in other cases involving extraordinary losses and sophisticated wrongdoing.

### A.    The Nature and Circumstances of the Offense Warrant a Lengthy Sentence.

Hwang led an audacious and multifaceted criminal scheme built on sustained deceptive conduct. He pursued his schemes out of personal ambition. His crimes distorted the markets and then collapsed, harming market participants, Archegos's counterparties, and Hwang's innocent employees. A sentence of twenty-one years is appropriate to punish such deliberate and consequential wrongdoing.

Hwang's schemes at Archegos were purposeful and persistent. Nothing about Hwang's crimes can be dismissed as a temporary error or diminished as improvident impulse. Hwang labored daily to manipulate the markets, personally directed thousands of trades designed to alter market prices, and he persisted in the work for months. Hwang involved multiple employees—some who recognized his scheme, many who did not—in achieving his ends, effectively reorienting an entire business firm to serve his goals. For a core group of employees, namely those in the trading and operations group, Hwang demanded obsessive, relentless focus on his trading schemes. Hwang deployed extraordinary amounts of capital in service of his plan and directed his

team to obtain still more, a feat they achieved only by engaging in systematic fraud. And Hwang's conduct ended only when the market ended it for him.

Hwang's conduct is blameworthy. The engine of Hwang's offense was deception, and his purposefully deceptive conduct merits substantial punishment. That deception took many forms. Most simply, Hwang's employees, with his encouragement and training, lied to Archegos's existing counterparties to get more and more accommodating trading terms and lied to new potential counterparties to get more capacity to trade. More broadly, however, Hwang's conduct deceived investors—and, as the jury found—was calibrated to do so. Hwang tried to "set the tone" of the stocks, to defend them from adverse price movements, and smashed huge volumes of trades through at the end of the day to drive up prices and, with them, his portfolio's performance. The accumulated magnitude of the deceptive trading eventually led to questions from Wall Street analysts about what was happening in the markets. (Trial Tr. 2503 (Cahall); GX 5503). It also led to questions internally within Archegos, from employees who saw the risk of concentration looming ever larger; questions to which Hwang responded with pique and false assurances. (Trial Tr. 3317 (Tomita); Trial Tr. 637-38 (Jones); Trial Tr. 2582 (Sullivan)).

Hwang, incredibly, argues for a significant downward variance because he "did not overtly and repeatedly lie, did not profit from his alleged offense, and did not perjure himself or fabricate sham documents." (Hwang Sentencing Mem. at 62). Almost every part of that assertion is wrong, however, and it minimizes the essential criminal role Hwang did play. As multiple witnesses testified—and the jury found—Hwang himself did lie and directed others to lie and he generated and used billions in trading gains to advance his scheme before losing them. The claim that he did not fabricate sham documents is true only insofar as one credits Hwang's claim that he did not read the document he signed that contained a false statement. (*See, e.g.*, Ex. 3 to K. Fletcher Decl.

39

(Credit Suisse-Archegos ISDA)). And Hwang did profit in the sense that he obtained billions from his trading counterparties and used those billions for fraud. Hwang's trading the week of March 22, 2021 provides a clear example of how Hwang valued his own success and wealth compared to that of his victims: when faced with the prospect that his scheme may collapse, Hwang used Archegos's remaining billions in an effort to continue his crime even when doing so predictably worsened the losses for everyone else.

More generally, however, Hwang fails to grapple with the core features of his conduct: the fact that he transformed Archegos into a criminal organization and that he manipulated the markets. Congress made it a crime to run business organizations through fraud in part out of concern that "money and power are increasingly used to infiltrate and corrupt legitimate businesses" risking "harm innocent investors" and "weaken[ing] the stability of the Nation's economic system." 84 Stat. 922, Pub. L. 91-452 (Oct. 15, 1970). The antiracketeering laws created a sanction for the act of running an organization through fraud, separate from and in addition to the sanction for committing fraud itself. *United States v. Boylan*, 620 F.2d 359, 361 (2d Cir. 1980). In repurposing a private hedge fund into an instrument of fraud, Hwang engaged in the very behavior that Congress identified as pernicious and burdensome to society.

Similarly, Hwang pays little attention to the fact that he distorted market prices for many securities and violated Section 9(a)(2) of the Exchange Act. The Second Circuit has described Section 9(a)(2) as the "very heart" of the Exchange Act and noted that Congress conceived it to "prevent an individual from dominating the market in a stock for the purpose of conducting a one-sided market at an artificial level for its own benefit and to the detriment of the investing public." *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969). Here, Hwang did just that and managed to do it in multiple stocks. Hwang's complaint that he stands to be punished for

what others have done shows how little responsibility Hwang takes for his own actions. *Cf.* (Hwang Sentencing Mem. at 62 (asserting that the "Guidelines range of life imprisonment premised entirely on misrepresentations made by Mr. Becker")). The Court should not punish Hwang for what others have done—it should punish Hwang for rigging the markets and corrupting a hedge fund.

Additionally, Hwang's ability to draw others into dishonest conduct for his benefit stands out as a distinctive feature of his crimes. As Hwang's letters of support reflect, Hwang commands great respect—even devotion—from his employees and mentees. The events at Archegos illustrate that Hwang was willing to use his personal influence to corrupt others and to corrode institutions. Indeed, the trial proof demonstrated that Hwang sought to cultivate a culture of reverence and obedience at Archegos, where employees learned they were to be "good followers" and where Hwang's orders were not to be questioned. (Trial Tr. 578 (Jones); Trial Tr. 3317 (Tomita)). Hwang hired many employees with little experience in finance outside of Archegos and thus little ability to judge Hwang's conduct against industry norms. Over time multiple Archegos employees working in different aspects of his business engaged in deception on Hwang's behalf, with conduct ranging from willful misdescription of Archegos's management structure to misleading statements about the independence of its compliance function to intentionally false representations regarding its portfolio and risk. That so many people came to lie and cheat and misdirect for Hwang speaks to the nature of Hwang's leadership.

Finally, Hwang's conduct had significant consequences. As discussed above, Hwang's actions directly led to billions in losses for market participants, billions in losses for Archegos's counterparties, and millions in losses for innocent Archegos employees. The losses at Credit Suisse proved so significant that they contributed to the bank's eventual distress, the shuttering of its

prime brokerage business, and its forced acquisition by UBS.[4] Archegos's collapse led dozens of people at banks and at Archegos to lose their jobs. Once Hwang's abuse of total return swaps had been recognized, the SEC began to consider regulatory changes to prevent others from following in his example.[5] And Hwang's manipulation altered the economic decision-making of at least one major corporation, Viacom, which pursued a seasoned equity offering because its share price had dramatically increased.

### B.    Specific Deterrence Is Required.

The need for specific deterrence also weighs heavily in favor of a lengthy custodial sentence. Hwang argues that he is too old to reoffend and that his poor reputation in the market will naturally frustrate him from trading on this scale again. (Hwang Sentencing Mem. at 64-65). These arguments ignore that Hwang already reoffended despite his age and prior reputational injury. Hwang entered the guilty plea on behalf of Tiger Asia, acknowledging his firm had committed fraud, and he acknowledged in settling with foreign regulators that he had improperly manipulated the markets. None of that prevented further misconduct here. If anything, Hwang's pique at the investment banks that abandoned him after Tiger Asia seems to have crystalized into Archegos's contempt for its counterparties.

Further still, Hwang accepts no responsibility for what he did, so the Court should have no confidence that Hwang has learned any lesson from this episode that would prevent him from returning to the markets. Indeed, after Archegos collapsed but before he was indicted, Hwang

---

[4] R. Davies, A. Isaac, and P. Inman, "UBS agrees to takeover of stricken Credit Suisse for $3.25bn," (The Guardian, March 19, 2023), available at:
https://www.theguardian.com/business/2023/mar/19/credit-suisse-bank-of-england-wont-object-to-takeover-as-ubs-considers-1bn-bid.

[5] *See* SEC Chairman Gary Gensler, Statement on Exchange Act 10B and Rule 9j-1, available at: https://www.sec.gov/newsroom/speeches-statements/gensler-10b-rule-9j-1-20211215.

simply retreated to his personal foundation, Grace & Mercy, and resumed trading. Hwang even hired many of his conspirators from Archegos to work beside him at Grace & Mercy. Thus, the lineage that began at Tiger Asia, where the fund pled guilty to fraud, continued at Archegos, where Hwang ran it through fraud, and continues now at Grace & Mercy, where once again Hwang has resources at his fingertips and loyal followers at his side.

### C.    A Meaningful Sentence Is Necessary for General Deterrence.

A twenty-one year sentence is also necessary to deter other traders from engaging in similar fraudulent market manipulation. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

Here, imposing a twenty-one year sentence will send a clear signal that fraud through market manipulation is no less blameworthy than other types of fraud and will be punished accordingly. That is particularly important for general deterrence in this case because the type of crime Hwang committed is difficult to detect and prosecute and because the case has been publicized within the relevant industry.

With respect to the difficulty of detection and prosecution, fraudulent market manipulation poses a particularly thorny challenge for regulators and prosecutors. On the surface, market manipulation appears only as an unusual shift in prices, coupled with an unusual trading pattern. Determining whether deceptive market manipulation occurs requires assessing whether the trading and price movement occurred because of an intent to send a false price signal to the market, instead of for other, legitimate reasons. Because traders often make huge numbers of trades and leave little written record of the reasons for those trades, getting to the truth is often difficult, and in many cases impossible. These difficulties have the unwelcome effect of making the crime more likely to occur, as traders may make the cost-benefit analysis that the financial benefits of wrongdoing outweigh the remote risk of prosecution.

This dynamic makes imposing a meaningful sentence exceptionally important for promoting general deterrence. As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*). The Second Circuit has recognized this principle in the context of insider trading, holding that significant sentences in the context of financial crimes are often necessary to ensure others understand that the crime is not "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (Rakoff, J.) ("As the Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").

Moreover, the publicity that this case has received in the securities industry makes imposing a multi-year term of imprisonment particularly necessary to act as a deterrent. Market participants are watching to see what happens.

### D.    Hwang's Personal Characteristics and Charitable Work Do Not Justify a Sentence of Less Than Twenty-One Years.

Hwang devotes a substantial portion of his sentencing submission to describing his good character and philanthropic work, primarily conducted through his personal foundation, Grace & Mercy. (Hwang Sentencing Mem. at 4-32). The fact that Hwang may have been a good son and brother or treated people well in some circumstances does not mean that he did not also willfully engage in conduct that was enormously damaging to swath of individuals not known personally to Hwang. Humans are complicated, and the capacity of one person to be generous while also committing heinous crimes is almost unexplainable. Famously, Bernard Madoff was described by several people as a "generous person" who paid for employees' honeymoons, purchased a machine to read to a blind man, arranged for medical care of an employee's mother after a stroke, and assisted another employee in her efforts to adopt a child. *See United States v. Bonventre*, No. 10 Cr. 228 (LTS) (S.D.N.Y.) (Trial Tr. 2649, 2850, 7550, 9501, 10198). Hwang, like many other defendants, could have been honest and supportive with his family while he lied to counterparties and distorted public markets for personal and private benefit; he could behave in a selfless manner with friends while being motivated by overweening desire for success and wealth in his business.

Moreover, the character that Hwang ascribes to himself in his sentencing submission at a minimum fails to account for what emerged at trial and during the Government's investigation. Hwang acted quite callously and cruelly to his employees—even the ones carrying out his manipulation scheme—and mocked and embarrassed employees in front of others. (*See, e.g.*, Trial Tr. 3163-64, 3184, 3207, 3314 (describing Hwang yelling at and "humiliating" traders and

preventing them from using the bathroom) (Tomita); *see also* Trial Tr. 2582 (Sullivan)). Perhaps most relevant to this sentencing, however, Hwang's description of his own character fails to account for the dishonesty he inculcated at Archegos; for his utter failure to take advantage of the second chance he was given—one many people are not afforded—when he was not individually prosecuted for his prior misconduct at Tiger Asia to turn to ethical and law-abiding behavior and instead to return to market manipulation and securities fraud; or for the startling and rapacious need to grow and protect his net worth to nearly incomprehensible levels despite the risks he put on others.

With respect to his philanthropy, Hwang contends that his "extensive history of hands-on charitable work supports a non-custodial sentence." (Hwang Sentencing Mem. at 67). Although Hwang's charitable giving is commendable, Hwang's sentencing submission does not fairly and fully describe the work that Grace & Mercy did, and in any event, what charitable work Hwang did undertake does not provide a basis for a non-custodial sentence.

As an initial matter, while Grace & Mercy may have been used to make charitable donations, it also became a vehicle for Hwang to maintain control over individuals with knowledge of his criminal schemes. After Archegos collapsed, Hwang offered positions at Grace & Mercy to certain individuals who had worked at Archegos, including Halligan, Tomita, Becker, Andy Mills, and Diana Pae. (Trial Tr. 1184-85, 3580-82). Hwang offered and did pay Tomita a salary of $400,000 to serve as a trader for Grace & Mercy, and offered Becker a salary of $250,000 to help manage Grace & Mercy's trading, even though Grace & Mercy in fact did no trading. (Trial Tr. 1184-85, 3580-82). This conduct was consistent with other efforts Hwang took to discourage others from cooperating with the Government, including directing Tomita to hire a lawyer who "is a team player." (Trial Tr. 3580).

In any event, prior charitable works, however commendable and extensive, by professionally successful defendants rarely, if ever, should be considered a materially mitigating factor because, as courts have previously recognized, it is not extraordinary for such individuals to be involved in charities. *See, e.g.*, *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) (a defendant's "good name and good works" should not serve as "the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught"); *United States v. Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *12-13 (S.D.N.Y. Oct. 21, 2005). Indeed, many defendants do not have the resources—in time, money, or social standing—to perform such deeds, and so the law is reluctant to show leniency to the few defendants who are fortunate enough to have such options. *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."). In short, the fact that Hwang was able amass such substantial personal wealth that he could create a private foundation to give to causes he believed in should not insulate him from just punishment for engaging in extensive fraudulent scheme—one that put at risk the livelihood and savings of an untold number of people all to expand and protect Hwang's own net worth.

47

E.    **A Twenty-One Year Sentence Will Avoid Unwarranted Sentencing Disparities.**

A twenty-one year sentence—and not the non-incarceratory sentence requested by the defendant—will avoid unwarranted sentencing disparities between Hwang and other defendants who have committed similar crimes. *See* 18 U.S.C. § 3553(a)(6) (among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."). Courts in this District have consistently imposed significant sentences for investment professionals who mislead others about performance or risk, particularly in cases involving defendants who, like Hwang, oversaw significant sums of money and made, and directed others to make, misrepresentations over an extended period of time.

One comparable case is Judge Cote's recent sentencing decision in *United States v. Velissaris*, 22 Cr. 105 (DLC). The defendant, James Velissaris, managed over $3 billion of investor money in funds that traded, among other thing, over-the-counter derivatives. Just as Hwang and others acting at his direction made misrepresentations to banks about the risks he was taking with their money, Velissaris lied about the performance of his investments and the process for valuing them. Specifically, Velissaris represented investors that his investment funds used a third-party group to value the derivatives he purchased, when in reality Velissaris played an active role in altering valuations to inflate the apparent performance of his investments. When that mismarking practice came to light, Velissaris's funds were forced to liquidate many of the investments for hundreds of millions of dollars less than the value Velissaris had reported to investors. Judge Cote ultimately sentenced Velisarris to 15 years' imprisonment.

Here, the losses Hwang caused were exponentially greater than those caused by Velissaris. In fact, when comparing this case to many of the financial fraud cases charged in this District in

recent years, Hwang's case stands apart from the rest because his crimes not only led to the collapse of his business, Archegos, but placed the financial security of major financial institutions in jeopardy as well. Where, as here, the magnitude of a defendant's crimes is truly extraordinary, a twenty-one year prison sentence is well-justified. *See, e.g., United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y. Mar. 28, 2024), ECF No. 426 (sentencing the defendant to 25 years' imprisonment for a multi-billion-dollar fraud scheme that led to the collapse of FTX).

Judges have also imposed substantial prison sentences in other cases where investment advisors defrauded others about performance or risk, even in cases involving substantially smaller harm than Hwang caused. For example, in *United States v. Hu*, 20 Cr. 360 (AKH) (S.D.N.Y. Apr. 11, 2022) ECF No. 151-1, this Court sentenced the defendant, David Hu, an investment advisor, to 12 years' imprisonment for a hundred-million-dollar scheme that involved overvaluing and falsifying information about loans that he traded on behalf of his clients. Hu had pleaded guilty to his crimes and expressed remorse for his conduct—entirely unlike Hwang who, to this day, denies any wrongdoing—and yet the Court still imposed a lengthy prison term in light of the significant "financial impact of the criminality" and the fact that Hu "got other people involved in [his] crimes." *Id.*; *see also United States v. Tagliaferri*, 13 Cr. 115 (RA) (imposing a six year sentence on an investment advisor who engaged in a scheme that involved misleading investors about the nature of his investments and certain fees he received).

The trend in this District of punishing significant financial crimes with significant prison sentences is consistent with national averages. The PSR notes that sentencing data from the last five years shows that the average sentence for a defendant sentenced under the fraud Guidelines with offense level 43 is approximately 16.4 years' imprisonment. (PSR at 50-51). This average is based on the sentences imposed on 34 defendants between 2019 and 2023. Just last year, however,

the average sentence for a defendant sentenced under the same fraud Guidelines with the same offense level was 24 years' imprisonment. Thus, a twenty-one-year sentence, which falls squarely in the middle of these two averages, would be consistent with national averages and avoid unwarranted sentencing disparities.

The defendant cherry-picks four recent fraud cases in this District where courts imposed sentences that were significantly below the Guidelines range. (Hwang Sentencing Mem. at 60-62). But none of these cases are apt comparisons to this case. None involved a recidivist defendant like Hwang. None were of the same financial scale as Hwang's crimes. And none roiled the entire U.S. stock market as Hwang did.

The defendant cites to Judge Ramos's 48-month sentence in *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Jan. 2, 2024), ECF No. 322, and Judge Abrams's 44-month sentence in *United States v. Hild*, 19 Cr. 602 (RA) (S.D.N.Y. Jan. 20, 2023), ECF No. 144. But both of those cases involved fraud schemes that affected a single company and its shareholders or lenders. Hwang, by contrast, artificially inflated the stock prices of a dozen companies, borrowed billions from close to a dozen banks, and nearly brought down the entire stock market when his scheme collapsed in March 2021. Thus, neither *Milton* nor *Hild* serve as relevant comparisons for the criminal conduct here.

The defendant also cites to Judge Gardephe's 48-month sentence in *United States v. Amanat*, 15 Cr. 536 (PGG), and Judge Rakoff's yearlong sentence in *United States v. Petit*, 19 Cr. 850 (JSR). But the defendants in both of those cases presented with particular mitigating circumstances that are not present here. In *Amanat*, for example, Judge Gardephe varied downward from the Guidelines after observing the "suffering the defendant has already endured," including the failure of his marriage, the inability to assist his father during his dying days, missing his

father's funeral, and spending 34 months in the MDC, including during the COVID-19 lockdown. 15 Cr. 536 (PGG) (S.D.N.Y. Oct. 1, 2021), ECF No. 1221. None of these mitigators apply to the defendant. In *Petit*, the defendant was 81-years-old and in poor health, which led the Court to impose a sentence lower than it otherwise would have imposed. 19 Cr. 850 (JSR) (S.D.N.Y. Feb. 23, 2021), ECF No. 249. Of course, Hwang is far younger and healthier than Petit was, even with Hwang's heart condition, which the Bureau of Prisons is fully capable of caring for. (*See* Exhibit H to Thomas Decl.).

At bottom, defendants like Hwang who are repeat offenders and who are in a position of trust and cause billions of dollars of harm to victims should be sentenced to lengthy prison terms. A twenty-one-year sentence is necessary here and would be in line with the sentences meted out to other defendants who engaged in similar conduct.

## F.    Forfeiture Order

The Indictment contained forfeiture allegations that placed the defendant on notice that various proceeds and facilitating assets would be subject to seizure upon conviction. At sentencing, the Court should order Hwang to forfeit, among other things, his interest in the Archegos entities that formed part of his racketeering enterprise, and the proceeds he obtained and used during the course of the fraud. A proposed forfeiture order is attached hereto as Exhibit A.

### 1.  Legal principles

#### a.    Racketeering Forfeiture

Section 1963 directs that a district court, in imposing sentence, "shall order" a defendant to forfeit the following property:

(1) any interest the person has acquired or maintained in violation of Section 1962;

(2) any (A) interest in; (B) security of; (C) claim against; or (D) property or contractual right of any kind affording a source of influence over . . . [the RICO] enterprise . . . and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. § 1963(a).

### b.    Fraud Forfeiture

Title 18, United States Code, Section 981(a)(1)(C) subjects to civil forfeiture: "Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) of Title 18, United States Code, in turn provides that the term "specified unlawful activity" includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under [31 U.S.C. §§ 5311 et seq.]." The list of offenses identified in 18 U.S.C. § 1961(1) are thus included within "any act or activity constituting an offense listed in section 1961(1) of this title." Among the offenses set forth in 18 U.S.C. § 1961(1) is violations of 18 U.S.C. § 1343, for which Hwang was convicted, and fraud in the sale of securities, for which Hwang was also convicted. Section 28, United States Code, Section 2461(c) authorizes the use of a civil forfeiture basis in criminal cases as part of a defendant's sentence.

### 2.    Application

The Court should forfeit Hwang's interest in the Archegos Enterprise, as well as his criminal proceeds.

### a.    Hwang Must Forfeit his Interest in the Archegos Entities.

As alleged in the Indictment and proven at trial, Hwang operated the Archegos Enterprise through a pattern of racketeering activity. Based on records produced by Archegos and by the

representations of Archegos's counsel during the investigation of this case, the Government understands Hwang to have an ownership interest in the following entities that formed part of the Archegos Enterprise:

- Archegos Capital, LLC
- Archegos Capital Management, LP
- Archegos Fund LP
- Archegos Capital Partners LLC
- Archegos Fund LLC
- Archegos FOF GP LLC
- Archegos Fund of Funds LP

*See also* GX-267 (Archegos corporate ownership schematic). Accordingly, pursuant to Section 1963(a)(2), Hwang must forfeit any interest he holds in each of these entities.

### b.    Hwang Must Forfeit the Proceeds of his Offense.

Hwang's scheme generated billions in proceeds through margin loans and trading profits that Hwang extracted, typically in the form of excess collateral and margin, which he then redeployed to further the scheme. As multiple witnesses explained, Archegos typically had the ability to withdraw so-called "excess margin" from its counterparties when its positions appreciated in value. (Trial Tr. 703-704, 779-80 (Miranda); Trial Tr. 364 (Martz); Trial Tr. 215 (Fairbanks); Trial Tr. 1742 (Tropper)). Archegos, in fact, did routinely withdraw excess collateral and usually redeployed it to finance other trades. (Trial Tr. 3449-51 (Tomita)). So when Hwang says he did not profit, he cannot mean Archegos did not receive billions from its counterparties; he simply means that after withdrawing funds from the banks he did not transfer them to his personal bank account.

Both as racketeering proceeds, under Section 1963(a), and fraud proceeds, under Section 981(a)(1)(C), Hwang must forfeit the value of the proceeds he extracted, even though Hwang spent those funds to further his frauds and ultimately lost them. *United States v. Robilotto*, 828 F.2d 940,

949 (2d Cir. 1987) (court may enter forfeiture money judgment for the amount of the illegal proceeds regardless of whether defendant retained the proceeds). Indeed, Hwang is subject to the sanction of forfeiture even if he has lost all of his assets. *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010) ("We join our sister courts of appeal in holding that § 853 permits imposition of a money judgment on a defendant who possesses no assets at the time of sentencing"; contrary interpretation would create an incentive for criminals to spend their proceeds to avoid forfeiture). The touchstone is simply that the funds were, "at some point," controlled by the defendant or his agents. *See Honeycutt v. United States*, 581 U.S. 443, 1632-34 (2017); *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012); *United States v. Capoccia*, 402 F. App'x 639, 640 (2d Cir. 2010). Here, it is beyond dispute that Hwang was Archegos's owner and manager with complete and final discretion to decide what to with its resources, including margin loan principal and excess collateral.

As to amounts withdrawn, the Court should forfeit $12,352,849,075.16 representing proceeds in the form of the following withdrawals:

**Table 3 - Withdrawn Proceeds**

| Counterparty | Amount | Selected Record Evidence |
|---|---|---|
| Credit Suisse<br><br>*(For the period Jan. 4 to March 26, 2021)* | $ 4,191,035,165 | K. Fletcher Declaration at Exhibit 4, page 97, Column B. |
| Deutsche Bank<br><br>*(For the period Oct. 1, 2020 to March 26, 2021)* | $6,086,381,811.83 | Exhibit A to Thomas Decl., collecting Deutsche Bank records. |
| Goldman Sachs | $560,000,000 | Exhibit B to Thomas Decl., collecting Goldman |

| | | |
|---|---|---|
| *(For the period Oct. 1, 2020 to March 26, 2021)* | | Sachs wire transfer records. |
| UBS<br><br>*(For the period Oct. 1, 2020 to March 26, 2021)* | $831,893,978.72 | Exhibit E to Thomas Decl. |
| MUFG<br><br>*(For the period Oct. 1, 2020 to March 26, 2021)* | $280,000,000 | Exhibit C to Thomas Decl., Column O. |
| Mizuho<br><br>*(For the period Oct. 1, 2020 to March 26, 2021)* | $155,538,119.61 | Exhibit D to Thomas Decl. "Amount" column. |
| Jefferies<br><br>*(For March 2021)* | $248,000,000 | October 4, 2024 Decl. of J. Miranda at 3-4. |
| **TOTAL:** | **$12,352,849,075.16** | |

## G.    Restitution Order

Under the MVRA, the Court must order restitution to Hwang's victims. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution," and need only make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States* v. *Milstein,* 481 F.3d 132, 137 (2d Cir. 2007).

Based on the trial proof, record evidence, and victim submissions, the Court should order restitution to two classes of victims: (a) Archegos counterparties that suffered losses from their

business dealings with Archegos and (b) innocent Archegos employees whose deferred compensation amounts Hwang gambled away as part of his scheme. The Government does not seek to compel Hwang to restitute all the market participants who suffered losses as a result of his manipulative trading schemes because the "number of identifiable victims is so large as to make restitution impracticable." 18 U.S.C. § 3663A(c)(3)(A). As set forth above in the discussion of the Guidelines losses, Hwang's conduct is the direct and proximate cause of both the counterparties' losses and the losses of the innocent Archegos employees.

The Government has received numerous victim impact and restitution submissions that it has forwarded to the Court. Understanding that victims may provide still further losses and that any restitution order drafted now may still need to be amended, the Government encloses a proposed order as Exhibit B, based on victim submissions received to date.

## H.    Surrender Date

Although the Government does not seek remand at the time of sentencing, the Court should set a surrender date and not permit Hwang to avoid serving his sentence pending the filing and resolution of any appeal.

The Bail Reform Act provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and that the appeal, in relevant respect, "is not for the purpose of delay and raises a substantial question of law or fact likely to result in (i) reversal, [or] (ii) an order for a new trial." 18 U.S.C. § 3143(b).

This provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or

even to permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985). After a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). It is the defendant's burden to "rebut that presumption with clear and convincing evidence." *Id.*

Under the second prong of the standard, a "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quotation marks omitted). "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Id.* (quoting *Miller*, 753 F.2d at 23). Notably, "the appeal must raise a substantial question that, if decided in defendant's favor, will likely result in a reversal or order for a new trial as to *all counts* for which a defendant has been sentenced to prison." *United States v. Silver*, 203 F. Supp. 3d 370, 377 (S.D.N.Y. 2016) (emphasis added). With respect to all of these issues, "the burden of persuasion rests on the defendant." *Randell*, 761 F.2d at 125.

To the extent that the defendant seeks to raise as a substantial question the sufficiency of the evidence supporting the jury's verdict against him, he faces a particularly high bar. Indeed, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United*

*States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (emphasis in original), and of course the burden to establish venue is by a preponderance of the evidence.

Hwang has promised to appeal his conviction relating to scheme to defraud Archegos's counterparties on the basis that the evidence adduced at trial was insufficient to support the jury's verdict. There is no reasonable possibility of success for such an argument. Among other things, Tomita testified to Hwang's participation in this conspiracy based on his first-hand knowledge, and that testimony alone provides a sufficient basis to uphold the jury's verdict. And the testimony was corroborated by recordings and emails in which Hwang himself provided false and misleading information to counterparties or directed Tomita to do so. There is no substantial question as to the sufficiency of the proof on any count of conviction relating to Hwang's involvement in defrauding counterparties—and even if there were, it would not provide a basis for bail pending appeal because Hwang was also convicted of conspiring to operate Archegos through a pattern of racketeering activity, securities fraud, and market manipulation.

With respect to the market manipulation counts, Hwang continues to attack his convictions as "unprecedented" and "difficult to define." (Hwang Sentencing Mem. at 2). Even if this case were unprecedented, that would not provide a basis for Hwang to appeal his conviction or remain on bail pending such an appeal. But of course, this case is not unprecedented—it is consistent with decades of precedent in this Circuit and indeed even since Hwang's conviction, judges in this District have continued observe the market manipulation of the kind that Hwang committed is unlawful. *See United States v. Mashinsky*, No. 23 Cr. 347 (JGK), 2024 WL 4728500, at *6 (S.D.N.Y. Nov. 8, 2024) (denying motion to dismiss market manipulation charges based on open-market transactions); *United States v. Larmore*, No. 24 Cr. 140 (PAE) (S.D.N.Y. Oct. 21, 2024), Trial Tr. 880 (instructing jury that "[a]n act can be manipulative even if it's conducted on the open

market or through ordinary market activity, such as by placing an order to buy or sell, or by actually buying or selling," and that, "[i]n some cases, a defendant's what we call scienter, that is, a defendant's intent to manipulate a stock price, is all that distinguishes legitimate trading from manipulative trading"). There is no close question in this case that, if resolved in favor of Hwang, would result in all of his convictions being vacated, and therefore he should be required to surrender and serve the sentence imposed for his crimes.

VI.    **CONCLUSION**

Bill Hwang used his personal hedge fund to commit a fraud that altered the American stock market and visited billions of dollars in losses on his trading counterparties. He pursued that fraud even after previously being ordered not to commit securities fraud. And even now he has no remorse for his conduct. For those and the foregoing reasons, the Government respectfully submits that the Court should sentence Hwang to a term of twenty-one years' imprisonment; forfeiture of his interest in, and proceeds obtained from, the racketeering activity; and order him to pay restitution to his victims.

Dated:  New York, New York
        November 15, 2024                        Respectfully submitted,

                                                DAMIAN WILLIAMS
                                                United States Attorney

                                        By:  _____
                                                Matthew Podolsky
                                                Alexandra N. Rothman
                                                Samuel P. Rothschild
                                                Andrew Thomas
                                                Assistant United States Attorneys