

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 19, 2024

**VIA ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**    ***United States v. Hwang*,**
              **S1 22 Cr. 240 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully writes in response to Bill Hwang's restitution memorandum filed November 18, 2024. (ECF Doc. 343 ("Restitution Br.")). Taken together with his principal sentencing submission, Hwang argues not only that he should receive no jail time but also that he should pay no restitution and forfeit no assets—in other words, there should be no punitive consequences of any kind for his conduct. Hwang's self-serving positions run contrary to law, and at times to each other.

      Hwang's submission largely proceeds from the false assumptions that the record does not contain sufficient evidence to ascertain the victims' losses and that, even if it did, those losses are so difficult to calculate that the Court should not even try. (Restitution Br. 8-10). In advancing these claims, Hwang ignores that the Government and Hwang's victims have supplied abundant evidence of the various losses, and, indeed, many victims have submitted letters describing precisely how the figures were computed, citing record evidence and providing tables. Hwang scarcely engages with any of the figures provided, preferring instead to claim ignorance of how the Government arrived at its proposed order and to attack causation. (Restitution Br. 11-32).

      The Mandatory Victim Restitution Act (the "MVRA") requires Hwang to pay back his victims. 18 U.S.C. § 3663A. A victim is "a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). "Regarding proximate cause, the Supreme Court has distilled the principle as follows: 'The basic question that [such a] requirement presents is whether the harm alleged has a sufficiently close connection to the conduct,'" which the Second Circuit has evaluated "based on whether that harm was 'foreseeable' to a defendant." *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021) (quoting *Robers v. United States*, 572 U.S. 639, 645 (2014)).

Hwang's causation arguments reduce to two incorrect assertions: first, that he was unaware that his conspirators were misleading Archegos's counterparties, and, second, that bank losses resulted from market movements and not from the conduct of his conspiracy. As the Government explained in its principal sentencing submission, however, the harm that befell the counterparties—that Hwang engaged in risky trades with borrowed funds and failed to pay the banks back what he borrowed—is the very harm that Hwang and his conspirators purposefully sought to conceal from the counterparties to pursue the scheme in the first place. (*See* ECF Doc. 340). When the jury convicted Hwang of participating in both a securities fraud scheme and a wire fraud scheme based on misrepresentations to the banks, and of conspiring to run Archegos through a pattern of fraud, the jury necessarily found, beyond a reasonable doubt, that Hwang had the guilty knowledge he continues to deny. And, in any event, the trial record amply establishes by a preponderance that Hwang was a knowing participant in the fraud, not least because witnesses testified that he directed others to lie, and emails and an audio recording show that he personally lied. (*See, e.g.*, Trial Tr. 803-04, 3039; GX 2504).

Hwang's additional argument that the banks' losses derive from market fluctuations has been foreclosed by *United States v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011). Similar to Hwang, the defendant in *Paul* artificially inflated the price of a security and then extracted funds through margin loans backed by the security. The defendant tried to avoid restitution by claiming, in part, that the subsequent decline in the value of a loan's collateral—that is, the artificially manipulated stock—led to the losses, not the defendant's securities fraud. *Id.* The District Court rejected that argument and the Second Circuit affirmed, reasoning that loss was caused, not by the decline in the stock price, but in extending the loans in the first place. What was true in *Paul* is equally true here: because Hwang and his co-conspirators caused the banks to extend loans as part of the fraud scheme, all the losses that followed are losses attributable to the fraud.

Much of Hwang's remaining objections aim to transform the restitution statutes into a series of roadblocks for victims rather than a process by which they can be compensated for their losses. For example, Hwang contends that he may not be ordered to pay restitution because, in his view, the Government did not timely advise the Court that each victim's losses could not be ascertained at least ten days before sentencing. (Restitution Br. 1-2). Here, of course, as the Court has seen, the Government has been supplying Probation and the Court with victim information as it has received it. Additionally, the MVRA does not forbid a Court from imposing restitution based on recently received records and does expressly permit the Court to set a deadline to finalize restitution within 90 days of sentencing. Further still, the Circuit has held that "the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets." *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004).

Hwang also argues that the Court should not impose restitution because the Government also seeks forfeiture—but then also contests the entry of a forfeiture order. (Restitution Br. 10-11, 32-34). Hwang intimates that the Court should not enter an order because Hwang does not have

the resources to pay a restitution award.[1] (Restitution Br. 10). Of course, the statute forbids that consideration. 18 U.S.C. § 3664(f). Hwang argues that the process of determining an award would itself cut into funds available for the victims and so should be avoided. (Restitution Br. 10). But Hwang wants the Court to order no restitution at all, meaning any windfall would be his.

Lastly, Hwang argues that the Court should decline to order forfeiture for two reasons. First, Hwang argues that an order of forfeiture would violate *Honeycutt v. United States*, 581 U.S. 443 (2017), because Hwang never personally took possession of the margin loans or profits of his manipulative trading. (Restitution Br. 32). Notably, Hwang took the opposite position at trial when he argued to the jury that he could take on as much investment risk as he wanted because all of the money at Archegos was "Bill Hwang's money." (*E.g.*, Trial Tr. 51, 54). In any event, where, as here, the evidence overwhelmingly established that Hwang made all of the trading decisions at Archegos, and thereby controlled the trading accounts, (Tr. 815), Hwang's argument under *Honeycutt* should be rejected. *See, e.g.*, *United States v. Mathieu*, 853 F. App'x 739, 742-43 (2d Cir. 2021) (rejecting *Honeycutt* argument that defendant did not exercise sufficient control over accounts where defendant was sole signatory on accounts into which the defendant deposited fraud proceeds and directed Medicare to deposit funds); *United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019) (reliance on *Honeycutt* was misplaced where the defendant had sufficient control over accounts and could transfer funds to shell companies and use funds for personal expenses).

Second, Hwang argues that the Court should decline to impose a forfeiture money judgment because the statutes under which the Government seeks forfeiture lack a textual basis for a money judgment. (Restitution Br. 33). But this argument has been foreclosed by *United States v. Kalish*, 626 F.3d 165, 168-69 (2d Cir. 2010). In *Kalish*, the Second Circuit upheld the District Court's denial of a similar request by a defendant to avoid entry of a personal money judgment in the amount of property to be forfeited. *Id.* The Court cited its prior decision in *United States v. Awad*, 598 F.3d 76, 79 n.5 (2d Cir. 2010), which held that 21 U.S.C. § 853 permits the imposition of a money judgment, and found that personal money judgments were proper whether based on

---

[1] Based on public tax return information and the PSR, Hwang's foundation has hundreds of millions in assets. (PSR ¶ 180). Whether victims or the Government can satisfy judgments against those assets may well be the subject of future proceedings.

Section 853 directly or on Section 853 "by way of 28 U.S.C. § 2461(c)." *Id.* Thus, Hwang's challenge to the imposition of a forfeiture money judgment is without any basis in law and should be denied.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

By:  s/_____
        Matthew Podolsky
        Alexandra Rothman
        Samuel P. Rothschild
        Andrew Thomas
        Assistant United States Attorneys
        Tel.: (212) 637-1947/-2580/-2504/-2106

Cc:    Counsel of Record (via ECF and email)