# CAHILL GORDON & REINDEL LLP

## 32 OLD SLIP

## NEW YORK, NY 10005

DANIEL AMATO
DANIEL R. ANDERSON
PETER J. ARMENIO
HELENE R. BANKS
ANIRUDH BANSAL
LANDIS C. BEST
CHRISTOPHER BEVAN
BROCKTON B. BOSSON
DONNA M. BRYAN
SARAH W. CHEN
EMEKA C. CHINWUBA
JAMES J. CLARK
CHRISTOPHER W. CLEMENT
LEWIS RINAUDO COHEN
AYANO K. CREED
SEAN M. DAVIS
STUART G. DOWNING
ADAM M. DWORKIN
ANASTASIA EFIMOVA
SAMSON A. ENZER
JAMES Z. FANG
GERALD J. FLATTMANN JR.
KIERSTEN A. FLETCHER

HELENA S. FRANCESCHI
JOAN MURTAGH FRANKEL
JONATHAN J. FRANKEL
SESI GARIMELLA
ARIEL GOLDMAN
PATRICK GORDON
JASON M. HALL
STEPHEN HARPER
CRAIG M. HOROWITZ
TIMOTHY B. HOWELL
COLLEEN TRACY JAMES
DAVID G. JANUSZEWSKI
BRIAN S. KELLEHER
ANDREW R. KELLY
RICHARD KELLY
CHÉRIE R. KISER ‡
JOEL KURTZBERG
TED B. LACEY
ANDREW E. LEE
ALIZA R. LEVINE
JOEL H. LEVITIN
MARK LOFTUS
JOHN MacGREGOR

TELEPHONE: (212) 701-3000
WWW.CAHILL.COM
————————
1990 K STREET, N.W.
WASHINGTON, DC 20006-1181
(202) 862-8900

221 W. 10th STREET, 3rd FLOOR
WILMINGTON, DE 19801
(302) 884-0000

CAHILL GORDON & REINDEL (UK) LLP
20 FENCHURCH STREET
LONDON EC3M 3BY
+44 (0) 20 7920 9800
————————
WRITER'S DIRECT NUMBER
(212) 701 3207

TRISTAN E. MANLEY
BRIAN T. MARKLEY
MEGHAN N. McDERMOTT
WILLIAM J. MILLER
EDWARD N. MOSS
JOEL MOSS
NOAH B. NEWITZ
WARREN NEWTON §
EDWARD C. O'CALLAGHAN
JULIANA OBREGON
JAVIER ORTIZ
DAVID R. OWEN
JOHN PAPACHRISTOS
LUIS E. PENALVER
SHEILA C. RAMESH
MICHAEL W. REDDY
OLEG REZZY
THOMAS ROCHER *
PETER J. ROONEY
MATTHEW E. ROSENTHAL
THORN ROSENTHAL
TAMMY L. ROY
ANDREW SCHWARTZ

DARREN SILVER
JOSIAH M. SLOTNICK
RICHARD A. STIEGLITZ JR.
GREGORY STRONG
SUSANNA M. SUH
SEAN R. TIERNEY
AMIT TREHAN
JORIN A. TRIPODORO
HERBERT S. WASHER
FRANK WEIGAND
MILES C. WILEY
PETER G. WILLIAMS
DAVID WISHENGRAD
C. ANTHONY WOLFE
ELIZABETH M. YAHL

* ADMITTED AS A SOLICITOR IN
ENGLAND AND WALES ONLY
‡ ADMITTED IN DC ONLY
§ ADMITTED AS AN ATTORNEY
IN THE REPUBLIC OF SOUTH AFRICA
ONLY

### <u>REQUEST TO FILE UNDER SEAL</u>

The Honorable Alvin K. Hellerstein
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

September 30, 2024

Re:    *United States* v. *Hwang and Halligan*, 22 Cr. 240 (AKH):
Victim Impact Statement of Credit Suisse International and
<u>Credit Suisse Securities (USA) LLC</u>

Dear Judge Hellerstein:

Credit Suisse International ("CSI") and Credit Suisse Securities (USA) LLC ("CSSU"; collectively with CSI, "Credit Suisse")[1] respectfully submit this victim impact statement in connection with sentencing in the above-referenced matter.  For the reasons set forth below, Credit Suisse is entitled to restitution from the defendants under the Mandatory Victims Restitution Act ("MVRA"), Title 18, United States Code, Section 3663A, in the amount of **$5,639,170,376.54**.[2]

---

[1] On May 31, 2024, Credit Suisse AG, then the parent company of CSSU and CSI, merged with and into UBS AG, with UBS AG surviving and succeeding to all of the liabilities and assets of Credit Suisse AG and its subsidiaries.  Accordingly, restitution for losses suffered by Credit Suisse should be made payable to UBS AG.

[2] As discussed below (§III(E) *infra*), this amount may require adjustment to account for a change in the prejudgment interest award, which is to be calculated based on a rate that is current as of the date of the restitution order.

CAHILL GORDON & REINDEL LLP

-2-

Credit Suisse suffered losses in this amount as a direct and proximate result of the massive fraud and market manipulation scheme perpetrated by Sung Kook ("Bill") Hwang and Patrick Halligan (the "defendants") through Hwang's family hedge fund which operated as Archegos Capital Management and Archegos Fund LP (collectively, "Archegos"). As the evidence at the trial of Hwang and Halligan made clear, the defendants and their co-conspirators William Tomita and Scott Becker lied to Credit Suisse about the makeup of Archegos's portfolio of stocks and total return swaps,[3] while simultaneously manipulating the prices of stocks in that portfolio, all to induce Credit Suisse to extend Archegos increased credit and trading capacity, and enter into additional swaps with Archegos.

In March 2021, the prices of key reference stocks in Archegos's swaps portfolio collapsed, and with it the value of Archegos's portfolio itself. Credit Suisse issued margin calls as the value of Archegos's portfolio continued to spiral, which Archegos did not meet; and by March 25, 2021 Archegos owed Credit Suisse billions of dollars in margin that Archegos never repaid. In other words, Hwang, Halligan, and their co-conspirators fraudulently induced Credit Suisse to extend Archegos billions of dollars in margin under the swaps, and hundreds of millions in other margin loans, and then failed to repay those amounts when Archegos's portfolio collapsed. Credit Suisse also sustained hundreds of millions of dollars in additional losses when unwinding its Archegos-related hedging positions. The defendants' fraudulent schemes were the direct, proximate, and foreseeable cause of Credit Suisse's harm, entitling Credit Suisse to restitution under the MVRA.

## I. Relevant Background

While this submission assumes the Court's familiarity with the trial evidence and the nature of the defendants' scheme, the below summarizes the key facts underlying the scheme and the billions of dollars in harm it caused to Credit Suisse.

### A.    The Relationship Between Archegos and Credit Suisse

Credit Suisse's trading relationship with Archegos was governed, in relevant part, by two agreements: (1) a December 5, 2008 Prime Brokerage Agreement (the "Prime Brokerage Agreement") between CSSU and Archegos; and (2) a December 15, 2020 ISDA Master Agreement between CSI and Archegos (the "ISDA Master Agreement"), with an accompanying Portfolio Swaps Annex ("PSA"). *See* Transcript of Trial, *United States* v. *Hwang, et al.*, 22 Cr. 240 ("Trial Tr.") at 806:8-18; Declaration of Kiersten A. Fletcher, dated September 30, 2024 ("Fletcher Decl."), Exhibits 1 (Prime Brokerage Agreement, listing parties as CSSU and Tiger Asia Fund, L.P., which was rebranded as Archegos in 2013); 2 (ISDA Master Agreement); 3

---

[3] A total return swap is a financial product that creates a synthetic position in an underlying security, such as a publicly-traded stock, which is known as the "reference stock." The terms require the seller to pay the buyer the equivalent of any increase in the value of the reference stock, and the buyer to pay the seller the equivalent of any decrease in the value of the reference stock.

CAHILL GORDON & REINDEL LLP

-3-

(PSA). Under these agreements, Credit Suisse entered into total return swaps with Archegos (governed by the ISDA Master Agreement and PSA), and provided brokerage services to Archegos in connection with stock trades (governed by the Prime Brokerage Agreement). In relevant part, the Prime Brokerage relationship involved Credit Suisse extending margin loans to Archegos, secured by equities in Archegos's Credit Suisse Prime Brokerage account, to allow Archegos to purchase additional equities.

By the time of its collapse in March 2021, Archegos's margin loan balance owed to Credit Suisse was over $510 million. But between December 2020 and March 2021, Archegos's portfolio at Credit Suisse came to be predominated by total return swaps, with reference stocks in a few select technology and China-based companies. *See* Trial Tr. at 1534:18-1536:10. As indicated (*see supra* at n.3), these swaps provided Archegos with the equivalent of long exposure to these stocks—also known as "synthetic" exposure—without having to purchase the stocks.

More specifically, if Archegos wanted long exposure to a particular stock, it would pay Credit Suisse a small percentage of that exposure as collateral, or "initial margin," and the parties would agree to pay each other "variation margin" according to whether the share price of the reference stock increased or decreased. For example, if Archegos wanted the equivalent of $1 billion in long exposure to shares of ViacomCBS, Inc. (VIAC), Credit Suisse would require Archegos to pay 10% of that amount—$100 million—as collateral, or initial margin. If VIAC's share price increased by 20%, Credit Suisse would owe Archegos $200 million (20% of $1 billion). On the other hand, if VIAC's share price *decreased* by 20%, Archegos would owe Credit Suisse $200 million. Credit Suisse and Archegos each tracked the variation margin owed between the parties based on a daily valuation of Archegos's portfolio. The party to which variation margin was owed could demand payment by making a margin call, or could leave the funds it was owed with the other party, in which case it would be called "excess margin."[4]

Hwang personally signed the Archegos-Credit Suisse PSA for Archegos, and in it explicitly represented that with respect to any swap transaction with Credit Suisse, Archegos's total exposure to the reference security would be less than 20% of the security's outstanding float, meaning the total number of publicly-traded shares. *See* Fletcher Decl., Exhibit 3 (PSA), §13(g) (representing that "the aggregate amount of all such [reference] Shares beneficially owned by [Archegos] ... when combined with the notional amount of Shares underlying any long derivative position, is less

---

[4] As is common, Credit Suisse typically hedged its exposure to the total return swaps by buying an equivalent number of shares of the reference stock. *See* Trial Tr. 1555:16-1557:25. Accordingly, in the example above, Credit Suisse would hedge its exposure to the VIAC swaps by purchasing $1 billion in VIAC shares; and if VIAC's share price increased by 20%, while Credit Suisse would have to pay $200 million to Archegos, the liability would be offset by the corresponding increase in the value of Credit Suisse's VIAC position. Occasionally, Credit Suisse hedged its Archegos-related positions through a stock loan or an offsetting swap position, either of which would have the same hedging effect as buying the shares. *See* Trial Tr. 1582:24-1584:18.

CAHILL GORDON & REINDEL LLP

-4-

than 20% of the outstanding Shares"). This would mean that, in the above example, Archegos's total exposure to VIAC shares—including what Archegos beneficially owned, and what it had synthetic exposure to through swaps with Credit Suisse and any other bank—was no more than 20% of the publicly-traded shares of VIAC. As was proven at trial, this representation was false and fraudulent with respect to numerous securities underlying the swaps Hwang and Halligan caused Archegos to enter into with Credit Suisse.

### B.    The Defendants' Fraud and Market Manipulation Schemes

As the evidence at trial showed, at the time Hwang personally signed the PSA with Credit Suisse on December 15, 2020, Archegos's exposure to several securities underlying the Archegos-Credit Suisse swaps was already well over 20% of their public float. For example, Archegos's exposure to GSX Techedu, Inc. (GSX) was approximately 40% of the outstanding float by December 2020, and reached 70% by March 2021. *See* Government Exhibit ("GX") 9005 at 14-17. Similarly, Archegos's exposure to VIAC was approximately 30% of the public float when the PSA was signed, and increased to 50% by March 2021. *Id.* As the trial evidence showed, Archegos's exposure to at least four other stocks underlying its Credit Suisse swaps exceeded 20% of the public float at the time the PSA was signed: IQIYI, Inc. (IQ), Texas Capital Bancshares, Inc. (TCBI), Tencent Music Entertainment Group (TME), and Discovery, Inc. Class A (DISCA). *See id.*; Trial Tr. 2078:7-2080:13. And Archegos's exposure to at least *another* four reference stocks—Vipshop Holdings Ltd. (VIPS), Discovery, Inc. Class C (DISCK), Baidu, Inc. (BIDU), and Farfetch, Ltd. (FTCH)—surpassed 20% in the following few months. *Id.*

Hwang, Halligan, and their co-conspirators told numerous other lies to Credit Suisse and other bank counterparties about key aspects of Archegos's portfolio, including its market-wide exposures to particular stocks, its concentration risk, position sizes, leverage, and liquidity. The testimony of Scott Becker, Archegos's former Director of Risk Management, made this clear:

> Q. At a general level, what did you lie to the banks about?
> A. I lied to them about general portfolio statistics.
> Q. And specifically what about the portfolio did you lie about?
> A. I understated the risk of the portfolio. So those statistics included concentration, the size of the largest positions in the portfolio, the exposure, or the leverage of the portfolio, I understated -- I overstated excess cash balances, and also lied about the liquidity or how quickly the positions in the portfolio could be sold.
> Q. ***How many banks did you lie to?***
> A. ***12, all of Archegos' counterparties***.

Trial Tr. 804:14-25 (emphasis added). As William Tomita, Archegos's former Head Trader, explained, "[t]hey were lies that big picture were concealing the level of risk of the Archegos portfolio and also lies that concealed the percent ownership of both cash and swap[s] that we had in [each] individual stock." Trial Tr. 3052:02-08.

CAHILL GORDON & REINDEL LLP

-5-

The defendants also lied to the bank counterparties, including Credit Suisse, about the speed at which Archegos could liquidate its positions. Becker testified that Halligan falsely told Archegos's bank counterparties, on phone calls starting in 2017, that the majority of Archegos's portfolio could be liquidated in two weeks, Trial Tr. 894:11-22, when in fact it would take "months, if not years." Trial Tr. 3429:13-3431:16 (Tomita recalling an agreement with Halligan to tell a bank that half of Archegos's portfolio could be unwound in two weeks with remainder unwound over four weeks, while in reality, "at that point in time there was maybe 10 or so of these large long positions, like Viacom and GSX, that were so big . . . that it would take months, if not years, to sell those positions in the market"); GX 9005 at 8 (showing it would take 179 days for Archegos to liquidate its position in TCBI).

Becker testified that when Archegos's bank counterparties began checking in more frequently during the COVID-19 pandemic (which caused market volatility), Halligan instructed Becker to lie "to understate the reality of Archegos's portfolio situation." Trial Tr. 896:21-898:6. For example, Becker recounted a January 2021 conversation with Sean Nicoll, a credit officer at Credit Suisse, during which, at Halligan's direction, Becker falsely represented that Archegos's largest position constituted 35% of its capital, when in fact the number was much higher. *See* Trial Tr. 893:5-18; 971:13-972:17. Becker repeated the same lie to UBS on March 8, 2021, at a time when Archegos's position in VIAC represented 84.2% of Archegos's capital. *See* Trial Tr. 905:4-906:10; GX 475.

Becker and Tomita lied to Archegos's bank counterparties because Hwang and Halligan told them to. When asked, "why did you lie to the banks?," Becker testified that "it was part of my job," and when asked, "[f]rom whom did you get that understanding that it was your job to lie to the banks?," he said, "[f]rom Mr. Hwang, Mr. Halligan, and Mr. Tomita." Trial Tr. 803:13-804:4. Tomita, in turn, testified that he lied to the banks because he was "instructed to do so by … Bill Hwang." Trial Tr. 3039:3-12. Tomita explained that "[t]hroughout [his] training at the company … [he] had been taught by Bill [Hwang], when necessary, to give misleading pictures about the fund and its positions," Trial Tr. 3409:24-3410:19, and he recalled "prior examples of interacting with Bill that I was not only not supposed to disclose to the counterparties our positions or what the portfolio looked like, but also to intentionally mislead the counterparties when necessary." Trial Tr. 3411:04-3412:02; *see* Trial Tr. 3416:08-3417:01 (Tomita describing an incident in which Hwang mocked him in front of others for being truthful to a counterparty, saying "Will just because you're an Eagle Scout doesn't mean you can go around telling the counterparties our positions").

The defendants and their co-conspirators told these lies to the bank counterparties to manipulate the banks' risk-assessment processes, and to induce Credit Suisse and the other banks to extend Archegos additional credit and trading capacity. Tomita explained that "[t]he counterparties, when they are allowing a client to trade on margin, they need to assess the risk that the client like runs out of money or defaults, because they are allowing—the bank is taking on risk

-6-

by allowing any client to trade. So this information is important to them because it determines not only if they should give the capacity, but also the terms of the capacity, meaning what margin rate, so it's very significant information." Trial Tr. 3435:20-3436:07. Put simply, the conspirators' lies were "in exchange for them [the banks] to finance [Archegos's] trades and lend us money." Trial Tr. 3039:03-08 (Tomita testimony). Becker similarly testified that the conspirators' lies induced the banks to loan Archegos tens of billions of dollars:

> Q. When you lied to the banks, what did Archegos get from the banks?
> A. It received loans from those banks.
> Q. What did Archegos use those loans for?
> A. To purchase securities.
> Q. Between 2020 and early 2021, approximately how much money did the banks lend to Archegos?
> A. Tens of billions of dollars.

Trial Tr. 805:1-8.

Becker also testified that when a bank approved more trading capacity for Archegos, a phrase he "heard on several occasions was 'if they only knew,' meaning if the counterparty only knew the reality of Archegos's portfolio." Trial Tr. 1040:17-21. When asked why he lied to the banks, Tomita testified, "[b]ecause this information was used by the banks to determine appropriate levels of money that they would loan us or capacity that they would give us. *And if the banks knew the full picture of the level of risk and the size of our positions, they would have essentially fired us as a client immediately and liquidated the portfolio*." Trial Tr. 3052:09-15 (emphasis added). In other words, the defendants and their co-conspirators understood and intended that the lies they told Credit Suisse and other banks would induce the banks to lend Archegos more money; and they knew that if the banks had not been deceived by the defendants' scheme, they never would have provided Archegos billions of dollars in margin for its swap trades.

At the same time that Hwang, Halligan, and others acting at their direction were telling these outright lies to Credit Suisse and the other bank counterparties, Hwang was directing his co-conspirators and other Archegos employees to engage in a broad-ranging market manipulation scheme. Hwang told Archegos's traders to trade massive volumes of securities at certain times of day, generally to increase the prices of securities underlying Archegos's swap positions.[5] *See, e.g.*, Trial Tr. 3094:2-3100:21 (in response to an October 2020 market selloff in GSX, which would negatively impact the value of Archegos's swap portfolio, Hwang instructed Archegos traders to buy 35-40 percent of the volume of other reference shares (IQ, VIPS, TME and VIAC) 10 minutes before market close in order to drive up their prices); Trial Tr. 3099:6-10 (Tomita received instructions to trade in this manner until the firm collapsed in March 2021); Trial Tr. 3100:5-

---

[5] In some cases, where Archegos held a synthetic short position, Hwang had Archegos sell shares to decrease the stock price.

CAHILL GORDON & REINDEL LLP

-7-

3102:12 (Hwang would give traders a price target for a given security, and say "you know what you need to do," and they would employ an aggressive trading technique or algorithm that generated enough volume to raise the stock price to that target). This manipulative scheme increased the value of the stocks underlying Archegos's swaps, which required the banks to pay inflated variation margin to Archegos.

As indicated, Credit Suisse and the other bank counterparties had hedged their exposures to Archegos's swaps by, among other things, purchasing the underlying reference stocks. But as discussed below, when the defendants' scheme collapsed in March 2021, the value of Credit Suisse's hedging positions also collapsed, and Hwang and Archegos refused to pay back the billions of dollars in variation margin now owed to Credit Suisse.

### C.    Archegos's Collapse – Unmet Margin Calls and Termination Notice

During the week of March 22, 2021, the value of Archegos's swap positions with Credit Suisse decreased precipitously, including its synthetic positions in VIAC, TME, VIPS, and IQ. Trial Tr. 1634:18-1536:10. Most notably, there was a sharp selloff in VIAC, Archegos's largest synthetic long position, following a secondary offering by the issuer. *See* Trial Tr. 223:6-19. While Archegos maintained some excess margin at Credit Suisse as of March 23, 2021, by March 24, the decline in the prices of various reference stocks caused Credit Suisse to issue a relatively modest margin call, which Archegos paid. *See* Fletcher Decl., Exhibit 4, row 56.

On March 25, 2021, as a result of the continued decline in the value of Archegos's synthetic positions, Credit Suisse issued additional margin calls, and Archegos indicated it had no cash to pay the margin calls. On the same day, Credit Suisse delivered to Archegos a Notice of Event of Default, terminating the swaps. *See id.*, Exhibit 5. By this time, Credit Suisse had paid Archegos $4,745,759,756 in variation margin, that was now due to be repaid to Credit Suisse. *See id.*, Exhibit 4. Archegos never repaid this variation margin to Credit Suisse. Also by March 25, 2021, this unpaid amount had accrued interest under the ISDA Master Agreement, raising the total to $4,745,794,439.

Over the next several months, Credit Suisse unwound its Archegos-related positions by selling the shares it held as hedges for its Archegos-facing swaps. Credit Suisse took steps to minimize its trading losses, but despite its best efforts, Credit Suisse lost $540,399,659, an amount reflecting the difference between the purchase prices of the securities, and the sale prices when the hedges were unwound. *See* Fletcher Decl., Exhibit 6.

In addition, as of March 25, 2021, Archegos owed Credit Suisse an outstanding margin loan balance of $510,142,916.32 under the Prime Brokerage relationship, which Archegos never repaid. Following Archegos's collapse, Credit Suisse foreclosed on and sold the equities posted as collateral in Archegos's Prime Brokerage account. By April 19, 2021, Credit Suisse had liquidated all of the shares in Archegos's Prime Brokerage account, which covered approximately

CAHILL GORDON & REINDEL LLP

-8-

$471 million of the outstanding loan balance, leaving an unpaid balance of $39,010,507.43. *See* Fletcher Decl., ¶ 8 & Exhibit 7.

From December 2021 to December 2023, as part of a negotiated settlement (that did not involve the defendants), Archegos paid Credit Suisse and the other bank counterparties pro-rated portions of its remaining assets (excluding reserves for operating and legal expenses), Credit Suisse's share of which was $409,351,547.65. As detailed below, Credit Suisse has subtracted this amount from its restitution claim.

### D.    The Defendants' Arrests, Trial and Convictions

On April 27, 2022, Hwang and Halligan were arrested, and charged in an Indictment with one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count One, against both defendants), two counts of securities fraud (one related to defrauding the bank counterparties (Count Ten, against both defendants), and one related to the market manipulation scheme (Count Two, against Hwang only)), one count of wire fraud related to the scheme to defraud the bank counterparties (Count Eleven, against both defendants), and seven counts of market manipulation, each related to a specific stock (Counts Three through Nine, against Hwang only). *See* Indictment, ECF No. 1. Hwang and Halligan were tried on these charges, and on July 11, 2024, both were found guilty on all counts in which they were charged, except Hwang was acquitted on one market manipulation count (Count Seven, in connection with IQ). *See* Redacted Jury Form, ECF No. 249.

## II.    Applicable Law

Under the MVRA, restitution to Credit Suisse and the other bank counterparties victimized by Hwang's and Halligan's fraudulent scheme is mandatory on the Title 18 counts of the Indictment (Counts One and Ten). *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit.[6] 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2); *see also United States* v. *Ekanem*, 383 F.3d 40, 42 (2d Cir. 2004) ("victims" under the MVRA can include corporate entities).

---

[6] It is of no moment to the restitution analysis that Hwang was acquitted on a single Title 15 market manipulation count, related to IQ. As discussed below, regardless of the impact of Hwang's manipulation scheme on the price of IQ, Credit Suisse and the other banks would never have entered into and continued their swaps relationships with Archegos had it not been for the fraud of which defendants were convicted (charged in Counts One and Ten), and all of the victim banks' losses flowed directly from that fraud. In any event, the manipulation of IQ was charged in the RICO count (Count One), on which both defendants were convicted. *See* ECF No. 1, ¶ 21.

-9-

Restitution must fully compensate the victim for its losses suffered as a result of the offense, without regard to the defendant's ability to pay.  *See* 18 U.S.C. § 3664(f)(1)(A); *United States* v. *Avenatti*, 81 F.4th 171, 203 (2d Cir. 2023), cert. denied, 144 S. Ct. 2598 (2024) ("The MVRA 'requires a court to order full restitution to the identifiable victims of certain crimes… without regard to a defendant's economic circumstances.'").  The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution," and need only make a "reasonable estimate" of the actual loss "based on the evidence before it."  *United States* v. *Milstein,* 481 F.3d 132, 137 (2d Cir. 2007).

Additionally, "the MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation 'in the full amount of each victim's losses.'"  *United States* v. *Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011) (district court acted within its discretion in granting prejudgment interest at a rate the victims would have received had they put the funds lost to "productive use," i.e., the typical rate of return on their investments).  Applying *Qurashi*, district courts in this Circuit have awarded prejudgment interest at a "rate equal to the weekly average 1-year constant maturity Treasury yield ... for the calendar week preceding the first day on which the defendant is liable for interest," which courts interpret as the date of the restitution order.  *See* 18 U.S.C. § 3612(f)(2)(B); *United States* v. *Smerling*, No. 21 Cr. 317 (DLC), 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022) (Cote, J.) (applying then-current 1 year Treasury yield rate to pre-judgment interest on restitution award); *United States* v. *Glencore Int'l A.G.*, No. 22 Cr. 297 (LGS), 2023 WL 2242469, at *9 (S.D.N.Y. Feb. 27, 2023) (Schofield, J.) (same).

## III. Discussion

The Court should impose restitution in the amount of **$5,639,170,376.54** representing Credit Suisse's losses from unreturned variation margin payments, trading losses, and unpaid margin loans, less certain credits described below, and including prejudgment interest.  As detailed above and discussed further below, the defendants lied, or instructed their co-conspirators to lie, about Archegos's portfolio to conceal the true risk it posed as a counterparty, and to induce Credit Suisse to extend Archegos credit and trading capacity.  And the evidence made clear that Credit Suisse would not have extended Archegos the credit and trading capacity it did had the defendants and their co-conspirators been truthful about the concentration, position sizes, and liquidity profile of Archegos's portfolio.

The defendants' scheme thus proximately harmed Credit Suisse in three ways.  First, Credit Suisse suffered massive losses when Archegos's over-leveraged and over-concentrated portfolio collapsed, and Archegos did not pay back the billions of dollars in variation margin Credit Suisse had paid Archegos under the swaps.  Second, Credit Suisse suffered trading losses when it

CAHILL GORDON & REINDEL LLP

-10-

unwound the hedges it had put on to manage Archegos-associated risk. And third, Credit Suisse suffered tens of millions of dollars in losses on Archegos's defaulted margin loans.[7]

### A.    Losses from Unreturned Variation Margin

As discussed above, at the time of Archegos's collapse, Credit Suisse had paid Archegos $4,745,759,756 in variation margin, which has not been returned. *See* Fletcher Decl., Exhibit 4. As the defendants and their co-conspirators correctly anticipated, Credit Suisse would not have been willing to extend Archegos the credit it did, and pay Archegos billions of dollars in variation margin, had the defendants not lied about the composition and risk profile of Archegos's portfolio. As Tomita succinctly admitted during his testimony, he and his co-conspirators lied to banks like Credit Suisse "in exchange for them [the banks] to finance [Archegos's] trades and lend [Archegos] money." Trial Tr. 3039:03-08. Becker similarly explained that he and his co-conspirators "understated the risk of the portfolio … [including] concentration, the size of the largest positions in the portfolio, the exposure, or the leverage of the portfolio." Trial Tr. 804:14-25. Credit Suisse had no idea that Archegos's portfolio was highly leveraged with multiple counterparties, highly concentrated in a small number of stocks, and that it would have taken months or years (not weeks as the conspirators represented) to liquidate in the event of a downturn. *See* Trial Tr. 804:14-25; 3052:02-08; 3429:13-3431:16. Nor could Credit Suisse know that the massive appreciation in Archegos's portfolio in early 2021 was caused by the defendants' manipulative scheme to drive up stock prices, in an effort to receive inflated variation margin payments and/or avoid margin calls.

The defendants and their co-conspirators fully understood that their fraud and manipulation scheme was necessary to get Credit Suisse to extend Archegos leverage; they knew that if Credit Suisse and the other banks "knew the full picture of the level of risk and the size of [Archegos's] positions, they would have essentially fired [Archegos] as a client immediately and liquidated the portfolio."[8] Trial Tr. at 3052:09-15.

---

[7] Credit Suisse also incurred approximately $550,000 in attorneys' fees while assisting in the criminal prosecution of the defendants, and would be entitled to restitution for these expenses. *See United States* v. *Afriyie,* 27 F.4th 161, 173 (2d Cir. 2022), *cert. denied,* 143 S. Ct. 326 (2022). However, Credit Suisse is not seeking restitution for these amounts, since they are modest relative to the billions of dollars in losses Hwang and Halligan even more directly caused to the bank.

[8] Accordingly, as indicated, Hwang's acquittal on Count Seven, the IQ manipulation count, does nothing to diminish the loss he and Halligan caused to Credit Suisse and the other banks. Whether or not the price of IQ was artificially inflated by Hwang, the fact remains that Credit Suisse would not have entered into the swaps, would have fired Archegos as a client immediately, and would not have paid Archegos *any* variation margin under the swaps, were it not for the *fraud*, which existed independently of any manipulation, and of which the defendants were convicted.

-11-

In reliance on the defendants' false representations, Credit Suisse agreed to extend Archegos credit to fund trading capacity, and paid Archegos billions of dollars in variation margin based on increases in prices of the reference stocks underlying its swaps. When those gains were erased in late March 2021, Archegos was required to return the variation margin to Credit Suisse, but it never did. On the date of Archegos's collapse on March 25, 2021, Archegos owed Credit Suisse $4,745,759,756 in variation margin, plus interest through March 25, 2021, resulting in a total amount due of $4,745,794,439. Apart from the credits described below (*infra* Section III(D)), Archegos has not returned this sum, and accordingly, Credit Suisse should be awarded **$4,745,794,439** to compensate for its losses from unpaid variation margin through March 25, 2021.

### B.    Trading Losses

As a result of the defendants' fraud and the ultimate collapse of Archegos, Credit Suisse was forced to unwind the hedges it put on to offset its exposure to Archegos's swaps positions. More specifically, where Archegos was synthetically long in a particular security, and Credit Suisse had purchased the security as a hedge, Archegos's collapse meant Credit Suisse needed to sell its equity hedge, or "close out" the position. As reflected in the closeout statement Credit Suisse sent Archegos on September 17, 2021, Credit Suisse lost $540,399,659 while unwinding its hedges, consisting of the difference in the sale prices of the shares, and the prices at which they were purchased. *See* Fletcher Decl. at Exhibit 6. Since the defendants' lies caused Credit Suisse to enter into the Archegos swaps, which naturally entailed Credit Suisse entering into the hedging transactions, the defendants should pay restitution in the amount of **$540,399,659** to compensate Credit Suisse for its foreseeable trading losses when unwinding the hedges.

### C.    Defaulted Margin Loans

The defendants' lies about the risks posed by Archegos's portfolio also induced Credit Suisse to extend Archegos hundreds of millions of dollars in margin loans, so Archegos could purchase equities. By the time Archegos collapsed, Credit Suisse had extended $510,142,916.32 in margin loans to Archegos. Credit Suisse was able to cover approximately $471 million of the outstanding loans by foreclosing on and liquidating the shares in Archegos's Prime Brokerage account (which were collateral for the margin loans), but still suffered $39,010,507.43 in losses on the loans.

### D.    Offsets and Credits

At the time of Archegos's collapse, Credit Suisse held variation margin on behalf of Archegos in the amount of $9,962,979, which had accrued interest in the amount of $1,698. *See* Fletcher Decl., Exhibit 6. Credit Suisse also maintained amounts to be paid to Archegos for early termination of the swaps, in the amount of $11,057. These credits result in a reduction of Credit Suisse's restitution claim in the amount of **$9,975,734**. *Id.*

CAHILL GORDON & REINDEL LLP

-12-

In addition, as indicated, Credit Suisse received **$409,351,547.65** from Archegos as part of a negotiated settlement.  Credit Suisse's restitution claim has been reduced accordingly.

### E.    Prejudgment Interest

Under the MVRA, Credit Suisse is entitled to prejudgment interest on the amounts owed to it as a result of the defendants' crimes.  *Qurashi*, 634 F.3d at 704.  The Court should calculate prejudgment interest, as other courts in this Circuit have done, using a rate "equal to the weekly average 1-year constant maturity Treasury yield ... for the calendar week preceding the first day on which the defendant is liable," which courts interpret as the date of the restitution order.  *See* 18 U.S.C. § 3612(f)(2)(B); *Smerling*, 2022 WL 1806300, at *2; *Glencore Int'l A.G.*, 2023 WL 2242469, at *9.  That rate is currently 3.908% per annum.  Applying that rate to Credit Suisse's variation margin losses, trading losses, and unpaid margin loans, Credit Suisse is currently entitled to **$733,293,052.76**[9] in prejudgment interest.  *See* Fletcher Decl., ¶ 9 (summarizing prejudgment interest calculation).[10]

### F.    Summary of Restitution Calculation

The below summarizes Credit Suisse's loss calculation, including applicable credits and prejudgment interest:

Unreturned variation margin payments and accrued interest (under ISDA Master Agreement) as of March 25, 2021:  **$4,745,794,439**

Trading losses associated with unwinding Archegos-related hedges:  **$540,399,659**

Losses on defaulted margin loans:  **$39,010,507.43**

Prejudgment interest on unreturned variation margin, trading losses, and unpaid margin loans:  **$733,293,052.76**

*Less* amounts due to Archegos (*see supra* § 3(D)):  **($9,975,734)**

*Less* payments made to Credit Suisse by Archegos **($409,351,547.65)**             

***Restitution Owed:  $5,639,170,376.54***

---

[9] Since the applicable interest rate is to be determined as of the date of the restitution order, this amount, and the total restitution award, may require adjustment.

[10] With respect to the amounts received under the negotiated settlement with Archegos, Credit Suisse is naturally seeking prejudgment interest only for the periods prior to the payments.

CAHILL GORDON & REINDEL LLP

-13-

## IV.     Conclusion

Accordingly, the Court should award Credit Suisse restitution in the amount of **$5,639,170,376.54.**

Respectfully submitted,


/s/ Anirudh Bansal

_____

Anirudh Bansal
Kiersten A. Fletcher

Cc:     U.S. Probation Office
        Counsel of Record

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SUNG KOOK (BILL) HWANG and<br>PATRICK HALLIGAN,<br><br>            Defendants. | 22 Cr. 240 (AKH)<br><br>**REQUEST TO FILE**<br>**UNDER SEAL** |

**DECLARATION OF KIERSTEN A. FLETCHER IN SUPPORT OF**
**CREDIT SUISSE'S VICTIM IMPACT STATEMENT**

I, Kiersten A. Fletcher, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am admitted to the bar of this Court and the bar of the State of New York, and am a partner in the law firm of Cahill Gordon & Reindel LLP, attorneys for Credit Suisse International ("CSI") and Credit Suisse Securities (USA) LLC ("CSSU"; collectively with CSI, "Credit Suisse"). I make this declaration to place before the Court certain documents and information referenced in Credit Suisse's September 30, 2024 victim impact statement in the above-captioned matter (the "Victim Impact Statement").

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the December 5, 2008 Prime Brokerage Agreement (the "Prime Brokerage Agreement") between CSSU and Tiger Asia Fund L.P., later rebranded as Archegos Capital Management (collectively with Archegos Fund LP, "Archegos").

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the December 15, 2020 ISDA Master Agreement between CSI and Archegos Fund LP (the "ISDA Master Agreement").

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the December 15, 2020 Portfolio Swaps Annex ("PSA") to the ISDA Master Agreement.

5.      Attached hereto as **Exhibit 4** is a spreadsheet detailing variation margin payments between Credit Suisse and Archegos during the period January 1, 2021 through March 25, 2021, as well as the net balance of variation margin paid by Credit Suisse to Archegos on every day during that period. This spreadsheet is sourced from and summarizes contemporaneous internal Credit Suisse records. Column A contains the date that the variation margin payment (based on the closing prices of the reference stocks on the prior day) and net variation margin balance was calculated. Column B reflects variation margin payments made by Credit Suisse to Archegos, and Column C reflects variation margin payments made by Archegos to Credit Suisse. Column D is the net balance of variation margin paid by Credit Suisse to Archegos. As reflected in Column D, as of January 4, 2021, the net balance of variation margin paid by Credit Suisse to Archegos was $941,919,641, and by March 25, 2021, the net balance of variation margin paid by Credit Suisse to Archegos was $4,745,759,756, which Archegos never returned (with the exception of $409,351,547.65 returned to Credit Suisse as part of a negotiated settlement between Archegos and its counterparty banks, discussed in Section III(D) of the Victim Impact Statement).

6.      Attached hereto as **Exhibit 5** is true and correct copy of the March 25, 2021 Notice of Event of Default sent by Credit Suisse to Archegos.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of an amended and restated closeout statement CSI sent to Archegos on September 17, 2021, reflecting amounts due to Credit Suisse from Archegos under the ISDA Master Agreement as of that date.[1] As shown in Annex I

---

[1] Exhibit 6 includes a line item for $168,742 in interest on unpaid variation margin between March 25, 2021 through June 25, 2021, calculated at a rate set by the ISDA Master Agreement. Credit

to the closeout statement, Credit Suisse unwound its Archegos-related hedges in a series of trades between March and June 2021.  The far-right column of the table in Annex I shows trading gains and losses from the trades identified in the far-left column.  As shown at page "Annex I-2," Credit Suisse incurred a net loss of $540,399,659 from these trades.

8.    Attached hereto as **Exhibit 7** is a spreadsheet detailing stock trades and margin loan balances in Archegos's Prime Brokerage account at Credit Suisse during the period January 1, 2021 through April 19, 2021.  As shown in Exhibit 7, as of March 25, 2021, Archegos owed $510,142,916.32 in margin loans to Credit Suisse.  As of April 19, 2021, after Credit Suisse sold the collateral in Archegos's Prime Brokerage account, Archegos's outstanding loan balance decreased to $39,010,507.43.

9.    Credit Suisse retained Cornerstone Research ("Cornerstone") to calculate prejudgment interest on the amounts owed to Credit Suisse, using the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of this submission, which is 3.908%.[2]  Applying this rate, compounded annually, Cornerstone calculated prejudgment interest for Credit Suisse's losses through September 30, 2024 as follows:

a.    $654,541,574.74 in prejudgment interest on $4,735,818,705 (an amount consisting of (i) $4,745,759,756 in unreturned variation margin, *see supra* ¶ 5 & Exh. 4; *plus* (2) $34,683 in interest on the unreturned variation margin accruing from March 1, 2021, to March 25, 2021, at the Standard Overnight Financing Rate ("SOFR") set by the ISDA Master Agreement; *less* (iii) $9,975,734 in amounts owed by Credit Suisse to Archegos as of March 25, 2021, *see*

---

Suisse is not seeking this amount as restitution in light of its request for prejudgment interest from March 25, 2021 to the date of the judgment.

[2]  As reflected in the accompanying Victim Impact Statement (p. 1 n. 2 and p. 12 n. 7), this rate must be current at the time of the restitution order, and therefore the rate, and the prejudgment interest calculation, may require adjustment.

Victim Impact Statement, § III(D) & Exh. 6 hereto), accruing from March 26, 2021, the first day after Credit Suisse served Archegos with the Notice of Event of Default (Exh. 5). This calculation also accounts for reductions in the principal amount of $4,735,818,705, based on the following payments to Credit Suisse by Archegos under the negotiated settlement described in Section III(D) of the Victim Impact Statement:

    i.  December 30, 2021: $51,962,235.30

    ii.  December 22, 2022: $124,636,653.01

    iii.  February 14, 2023: $214,199,711.58

    iv.  March 24, 2023: $9,423,331.70

    v.  December 29, 2023: $9,129,616.06

    b.  $73,231,768.57 in prejudgment interest on the $540,399,659 in trading losses referenced above in paragraph 7 and Exhibit 6 hereto, accruing from June 8, 2021, the date of the last trade by Credit Suisse to unwind its Archegos-related hedges.

    c.  $5,519,709.45 in prejudgment interest on the $39,010,507.43 defaulted margin loan balance referenced above in paragraph 8 and Exhibit 7 hereto, accruing from April 19, 2021, the date of Credit Suisse's last sale of collateral shares in Archegos's Prime Brokerage account.

Dated:    September 30, 2024
           New York, New York

                                    /s/ Kiersten A. Fletcher

                               _____

                                   Kiersten A. Fletcher

# EXHIBIT 1

CREDIT SUISSE

Account No. _____

**CUSTOMER AGREEMENT**
**Institutional, non-ERISA**

In consideration of CREDIT SUISSE SECURITIES (USA) LLC ("**CSSU**") opening and maintaining for the undersigned (the "**Customer**") pursuant to the terms of this agreement dated as of December 5, 2008 (the "**Customer Agreement**" and, together with any and all annexes attached thereto, this "**Agreement**", as well as any other agreement as to which Customer is a party, has any obligations or holds any rights (any such agreement, together with the Agreement, "**Contracts**"), one or more accounts (each, a "**Customer Account**") in Customer's name for the purpose of transacting business with CSSU on behalf of itself and as agent for any of the current and future subsidiaries, parents, affiliates, or divisions of CSSU, either collectively or individually, as the context requires (each, including CSSU, a "**CS Entity**" and collectively, the "**CS Entities**"), Customer agrees as follows:

**1.    Applicable Rules and Regulations.**
All transactions and positions in the Accounts shall be subject to all applicable laws, by-laws, rules, regulations and customs, including without limitation those of all U.S. and non-U.S. federal, state and local governmental authorities, self-regulatory organizations, markets, exchanges and clearing facilities ("**Applicable Law**").

**2.    Payment of Indebtedness.**
Immediately upon written or oral demand (unless otherwise agreed) by CSSU or any of the CS Entities that (i) maintains any deposit, custody, securities, commodity, or other accounts for Customer, including without limitation any Customer Account (each an "**Account**") or (ii) is a party to any Contract, Customer shall pay to the relevant CS Entity, in immediately available U.S. funds, any principal balance of, accrued but unpaid interest on, and any other obligation or liability owing in respect of, any Account or Contract, (which, for purposes of this agreement, shall be collectively referred to as "**Obligations**") including, without limitation:

(a)    all brokerage charges, commissions and service fees at the CS Entity's customary rates, unless otherwise agreed upon by Customer and the relevant CS Entity from time to time;

(b)    all contract market, exchange or clearinghouse fees or other charges and losses in any Account;

(c)    any advances made by any of the CS Entities to or for the benefit of Customer and any debit balance owing with respect to any Account, and interest and service charges on such debit balance at the rates then charged by the relevant CS Entity;

(d)    any deficiency in any Account;

(e)    any fees, fines, penalties or other charges imposed by any governmental or self-regulatory authority or any court of competent jurisdiction on any Account or transaction executed for Customer by any of the CS Entities, except to the extent caused by the gross negligence, fraud or willful misconduct of any CS Entity;

(f)    any applicable taxes imposed by any taxing authority or interest, penalties and additions, on any of the foregoing ("**Taxes**"), together with the CS Entities' reasonable costs and expenses, including, without limitation, reasonable attorney's fees and expenses, incurred in connection with the enforcement or collection by the CS Entities of its rights or claims against Customer hereunder, under any Contract with any of the CS Entities or otherwise; and

(g)    any and all Obligations or indebtedness, however evidenced, arising at any time and from time to time, whether or not mature or contingent, related to the purchase, sale, or loan of securities or other property, or under or in connection with any and all Contracts, and transactions executed in connection therewith, with any of the CS Entities, including, without limitation, payment and delivery obligations, obligations related to the extension of credit or to pay damages (including costs of

cover) and payment of reasonable legal and other expenses incurred in connection with the enforcement of such Contracts, whether now existing or hereafter arising.

CSSU will endeavor to confirm promptly in writing any oral demand, provided that any failure or delay in providing such written confirmation shall not invalidate the oral demand.

**3.    Security Interest and Lien.**
(a)    Customer hereby grants to the CS Entities a continuing first priority security interest in, a lien on and a right of set-off against all Collateral (as defined herein), and all such Collateral shall be subject to a general lien and a continuing first security interest and fixed charge in favor of the CS Entities, in each case securing the discharge of all Obligations, Contracts with the CS Entities and other liabilities of Customer to the CS Entities, whether now existing or hereafter arising; provided that, Collateral pledged to a CS Entity under any particular Contract shall secure first Customer's Obligations with respect to such Contract, and second, all other Obligations. Each CS Entity acknowledges the foregoing security interest and agrees to make payment under any Contract as instructed by any CS Entity exercising its rights as a secured party. Any Contract with any of the CS Entities is hereby amended to reflect and incorporate Customer's pledge of Collateral hereunder and the foregoing acknowledgement and agreement.

(b)    All Collateral delivered to any of the CS Entities shall be free and clear of all prior liens, claims and encumbrances (other than liens solely in favor of any of the CS Entities), and Customer will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature (other than liens created solely in the favor of any of the CS Entities). Collateral consisting of securities shall be delivered in good deliverable form (or the CS Entities shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market or markets for such securities.

(c)    Customer and the CS Entities acknowledge and agree that all Collateral held in or credited from time to time to any Account that is a securities account will be treated as "financial assets" under the Uniform Commercial Code as in effect in the State of New York (the "**NYUCC**"). Each CS Entity hereby represents and warrants that it is a "securities intermediary" within the meaning of the NYUCC and is acting in such capacity with respect to each and every securities account maintained by it for Customer. Notwithstanding anything in this Agreement or any Contract to the contrary, each CS Entity hereby agrees to comply with entitlement orders or other instructions originating from any CS Entity that is a secured party under any Contract with respect to any Account, and any financial asset credited to any such Account or other account or any security entitlement in

respect thereof, in each case without the consent of Customer, and Customer hereby consents to such agreement. In addition, Customer hereby consents to any agreement pursuant to which a CS Entity agrees to comply with entitlement orders or other instructions originating from any other CS Entity that is a secured party under any Contract or with respect to any Obligation with respect to Collateral held in or credited to any Account maintained by such CS Entity for Customer, or otherwise held by such CS Entity, including entering into control or similar agreements. Each CS Entity that is a secured party under any Contract agrees that it will only issue entitlement orders to the extent reasonably necessary to satisfy or secure an Obligation due and owing to such CS Entity and, provided, that no such transfer will create a margin deficit in the account maintained by Customer from which such Collateral is to be transferred. Each of the CS Entities represents and warrants that it has not agreed, and that it will not agree, to comply with entitlement orders or other instructions concerning the Collateral that originate from any person other than (i) Customer or (ii) a CS Entity. If such CS Entity receives notice from any other CS Entity that such CS Entity is exercising exclusive control or to the effect that Customer's rights with respect to the relevant Account have been terminated, then the CS Entity receiving such notice shall no longer comply with entitlement orders or other instructions originating from Customer. Customer shall execute such documents and take such other action as the CS Entities shall reasonably request in order to perfect the CS Entities' rights with respect to any such Collateral and, in the case of an investment property, grant the CS Entities control (within the meaning of the NYUCC) thereof. Customer hereby irrevocably appoints the CS Entities as Customer's true and lawful agent and attorney-in-fact, with full power to act in the name of Customer and on Customer's behalf to sign, seal, execute and deliver all documents, and do all such acts as may be required, to perfect (and, in the case of investment property, grant the CS Entities control thereof) the security interests created hereunder in, or realize upon all rights in, the Collateral.

(d)    The security interest, lien, and right of set-off granted herein shall (i) remain in full force and effect until the payment and performance in full by Customer of all of its Obligations and termination of this Agreement by the parties, (ii) be binding upon Customer, its successors and permitted assigns, and (iii) inure to the benefit of, and be enforceable by, the CS Entities and their respective successors, transferees and assigns.

(e)    For purposes of this Agreement, the term **"Collateral"** shall mean (i) each deposit, custody, security, commodity or other account maintained by Customer with any of the CS Entities, including, but not limited to any and all Accounts; (ii) any cash, securities, financial assets, security entitlements, commodities, commodities contracts, general intangibles and other property which may from time to time be deposited, credited, held or carried in any such Account, or that is delivered to or in the possession or control of any of the CS Entities or any of the CS Entities' agents for any purpose, including safekeeping; (iii) all of Customer's rights, title or interest in, to or under any Contract with any of the CS Entities, including obligations owed by any CS Entity; (iv) all of Customer's security interests (or similar interests) in any property of any CS Entity securing any CS Entity's obligations to Customer under any Contract; (v) any property of Customer in which any of the CS Entities is granted a security interest under any Contract or otherwise (howsoever held); (vi) all income and profits on any of the foregoing, all dividends, interest and other payments and distributions with respect to any of the foregoing, all other rights and privileges

appurtenant to any of the foregoing, including any voting rights and any redemption rights, and any substitutions for any of the foregoing; and (vii) all proceeds of any of the foregoing, in each case whether now existing or owned by Customer or hereafter arising or acquired.

4.    **Rehypothecation, Maintenance of Collateral.**

(a)    Any amount of Collateral may, from time to time and without notice to Customer, be carried in any CS Entity's general account to be held and re-registered in any CS Entity's own name or in another name other than Customer's and may be pledged, re-pledged, hypothecated or re-hypothecated, sold, lent, or otherwise transferred or used (in the case of cash Collateral, used or invested for its own risk and reward), separately or together with other amounts of Collateral, with all attendant rights of ownership (including the right to vote the securities), for the sum due to any of the CS Entities thereon or for a greater sum and for a period of time equal to, longer or shorter than the Obligations or Contracts with respect to which such Collateral was pledged, and without the CS Entities retaining in their possession and control for delivery a like amount of similar Collateral. For the avoidance of doubt, Customer hereby grants CSSU its consent to rehypothecate its securities (other than Customer's "fully paid" or "excess margin" securities) for purposes of Rule 15c2-1(a)(1) of the Securities Exchange Act of 1934. Further for the avoidance of doubt, CSSU shall not pledge, re-pledge, hypothecate, re-hypothecate, sell lend or otherwise transfer or use "fully paid securities" and "excess margin securities" as such terms are defined in Rule 15c3-3of the Securities Exchange Act of 1934. For the purposes of the return of any Collateral to Customer, the CS Entities' return obligations shall be satisfied by delivering securities of the same issuer, class and quantity as the Collateral initially transferred.

(b)    Customer and the CS Entities each acknowledge and agree that each CS Entity which holds Collateral does so both for itself and also as an agent and bailee for all other CS Entities which may be secured parties under any Contract or with respect to any Obligation. Customer agrees and acknowledges that the CS Entities, at any time and from time to time at any of the CS Entity's discretion and without prior notice to Customer, may use, apply or transfer any and all Collateral interchangeably between CS Entities in any accounts in which Customer has an interest. . With respect to Collateral pledged principally to secure Obligations under any Contract with any CS Entity, the CS Entity shall have the right, but in no event the obligation, to apply all or any portion of such Collateral to Customer's Obligations to any of the CS Entities under any other Contract, to transfer all or any portion of such Collateral to secure Customer's Obligations to any of the CS Entities under any other Contract or to release any such Collateral provided that no such transfer creates a margin deficit in the account maintained by Customer from which such Collateral was transferred. Nothing in this Agreement providing for a security interest in Collateral pledged in connection with a particular Contract with any CS Entity or Obligation shall affect any calculation of margin or right of any CS Entity to require additional margin or other Collateral to secure any other Contract with or Obligation to any CS Entity.

5.    **Margin Accounts.**

(a)    Upon written or oral demand by CSSU from time to time in its sole discretion, Customer shall transfer immediately to CSSU such funds, securities, commodities or other property ("Margin") as is required by Applicable Law and such greater amounts as the CS Entities may require from time to time and in

their sole discretion in connection with any Contract with any CS Entities and Obligations or potential Obligations of Customer to any of the CS Entities. If a demand for Margin is made before 10:00 a.m. New York time on a Business Day, the transfer shall be made by 5:00 p.m. New York time on the same Business Day, and if the demand for margin is made after 10:00 a.m. New York time on a Business Day, the transfer shall be made by 5:00 p.m. on the following Business Day (the "Margin Transfer Period").

(b) Any outstanding debit balance(s) in Customer Account(s) shall accrue interest, in accordance with CSSU's Credit Policy or amendments thereto. Any such interest unpaid at the end of a charge period (such period being determined by CSSU from time to time in its sole discretion) will be added automatically to the opening balance in such Customer Account(s) for the next charge period.

6. **Events of Default.**
The following events shall each constitute an **"Event of Default"**:

(a) Customer fails to make any payment or delivery as and when due or otherwise fails to fulfill or discharge any Obligations as required in Paragraph 2 hereof;

(b) Customer fails to provide margin to CSSU as and when required in Paragraph 5 hereof;

(c) any representation or warranty made by Customer under this Agreement or any Contract with any of the CS Entities shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or CSSU reasonably believes in good faith that the representations and warranties contained in Paragraph 10(a)(x) hereof are untrue or Customer has failed to provide notice as required under Paragraph 10(b) hereof;

(d) Customer fails to give adequate assurances of due performance, as set forth in Paragraph 8 hereof, which shall constitute a material and additional breach, repudiation, misrepresentation or default (howsoever characterized) under the terms of all Contracts with any of the CS Entities, or Customer states that it will not perform any of the Obligations;

(e) any material breach, repudiation, misrepresentation or the occurrence of a default, termination event or similar condition (howsoever characterized which, for the avoidance of doubt, includes the occurrence of an Additional Termination Event under any ISDA Master Agreement) by Customer under any Contract now or hereafter entered into and all debts or payments under such Contract become immediately due and payable before they would otherwise have become due and payable, taking into; or

(f) Customer (i) applies for, consents to or is the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar person of itself or of all or a substantial part of its property, (ii) files or is the subject of the filing or entry of a petition or order for relief under the United States Bankruptcy Code, Title 11 of the United States Code, or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency, or relief of debtors or of an application for a protective decree under the Securities Investor Protection Act of 1970, (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors, (iv) has a secured party take possession of any property or account of Customer or has a distress, execution, attachment, sequestration or similar legal process commenced with respect to any property or account of Customer, or (v) admits in writing its inability, or becomes unable, to pay its debts generally as such debts become due.

7. **Rights and Remedies.**
(a) Upon the occurrence of any Event of Default, any of the CS Entities may, in their sole discretion and with as much notice to Customer as is practicable under the circumstances (it being understood that the failure to provide such notice shall not prejudice the CS Entities' right to act under this Agreement), terminate, liquidate and accelerate any and all Contracts and exercise any right under any security relating to any Contract and any right to net or set off payments which may arise under any Contract or other agreement with any CS Entities or under Applicable Law, cancel any outstanding orders for the purchase or sale or borrowing or lending of any securities or other property, or sell any or all of the Collateral (either individually or jointly with others), or buy in any securities, commodities or other property of which any Account may be short. To the extent permitted by Applicable Law, such sale, purchase or cancellation may be made on the exchange or other market where such business is then usually transacted, or at public auction or at private sale, without advertising the same and without any notice of the time or place of sale to Customer or to the personal representatives of Customer, and without prior tender, demand or call of any kind upon Customer or upon the personal representatives of Customer, all of which are expressly waived. The CS Entities shall have the right to convert, in good faith and a commercially reasonable manner, sale proceeds into U.S. dollars to the extent such proceeds are denominated in another currency. To the extent permitted by Applicable Law and this Agreement, the CS Entities may purchase or sell the property to or from itself or third parties in whole or in any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency; provided, that the CS Entities will act in good faith and a commercially reasonable manner with respect to any such sale. A prior tender, demand or call of any kind from the CS Entities, or prior notice from the CS Entities, of the time and place of such sale or purchase shall not be considered a waiver of the CS Entities' right to sell or buy any Collateral at any time as provided herein. In addition to the rights provided herein upon the occurrence of any Event of Default, each CS Entity may exercise all the rights of a secured party under any applicable law and under the NYUCC (whether or not in effect in the jurisdiction in which such rights are exercised) with respect to any Collateral.

(b) Customer shall remain liable for any deficiencies in its Accounts or in respect of any Contract with any CS Entities or Obligation, including any loss or expense incurred in connection with the exercise of remedies under this Agreement following the termination of this Agreement or the exercise of any other remedies by the CS Entities.

8. **Adequate Assurances.**
If at any time any of the CS Entities has reasonable grounds for insecurity with respect to Customer's performance of any Contract or its Obligations, any of the CS Entities may demand, and Customer shall give, adequate assurances of due performance by Customer by the close of business on the business day following the date of such demand. The adequate assurance of performance may include, but shall not be limited to, the delivery by Customer to the CS Entities of additional Margin. Any failure by Customer to give such adequate assurance of due performance shall constitute an independent, material default under this Agreement.

9. **Netting and Set Off Rights.**
Without limiting the rights and remedies of the CS Entities hereunder, the CS Entities shall have the right and Customer

agrees that the CS Entities shall have the right, at any time and from time to time, to set off and otherwise apply any and all obligations of any of the CS Entities to Customer (whether mature or unmature, fixed or contingent, liquidated or unliquidated) against any and all Obligations of Customer to any of the CS Entities then due (whether at maturity, upon acceleration or termination or otherwise) and to foreclose on any Collateral for the purpose of satisfying any and all Obligations. Customer agrees that the fulfillment of the obligations of any of the CS Entities to Customer under any Contract is subject to there being no breach, repudiation, misrepresentation or default (however characterized) by Customer which has occurred and is continuing under any Contract with any CS Entity.

**10. Representations and Warranties.**

(a)   Customer represents and warrants as of the date hereof, which representation and warranties shall be deemed repeated on each date on which a transaction is effected for Customer's Account(s) or a Contract with any CS Entity is executed, that:

(i)   Customer is duly organized and validly existing under the laws of the jurisdiction of its organization;

(ii)   Customer has full power and authority to execute and deliver this Agreement (including any annex hereto) and each Contract and to perform and observe the provisions hereof and thereof and to enter into each transaction contemplated by this Agreement (including any annex hereto), and this Agreement and the Contracts constitute valid and binding agreements of Customer, enforceable in accordance with their terms, subject to applicable bankruptcy and similar laws affecting creditors' rights and general principles of equity;

(iii)   the execution, delivery and performance by Customer of this Agreement (including any annex hereto), the consummation of the Contracts, the fulfillment of the Obligations and any transaction hereunder do not result in a breach or violation of any Applicable Law or order or award binding on Customer or its property, or Customer's organizational documents, or any contract or other instrument binding on or affecting Customer or any material part of its property;

(iv)   the person signing this Agreement (including any annex hereto) on behalf of Customer is duly authorized to do so on its behalf (and on behalf of any such disclosed principal, all information contained on the signature page hereof is true and correct);

(v)   no consent of any person and no authorization or other action by, and no notice to, or filing with, any governmental authority or any other person is required that has not already been obtained (i) for the due execution, delivery and performance by Customer of this Agreement or for the consummation of the Contracts and the fulfillment of the Obligations; (ii) for the pledge by Customer of the Collateral or the perfection or maintenance of the first priority security interest created hereby; or (iii) for the exercise by any of the CS Entities of the rights or remedies provided for in this Agreement, including rights and remedies in respect of the Collateral;

(vi)   no person, other than Customer or any CS Entity, has an interest in the Customer Account or any Accounts or any Collateral or other assets or property held therein or credited thereto;

(vii)   Customer is the lawful owner of all Collateral, free and clear of all liens, claims, encumbrances and transfer restrictions, other than as are created under this Agreement and other liens solely in favor of one or more CS Entities, and Customer will not cause or allow any of the Collateral, whether now held or thereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than those solely in favor of the CS Entities;

(viii)   Customer's financial statements or similar documents previously or hereafter provided to the CS Entities fairly present the financial condition of Customer as of the date of such financial statements and the results of its operations for the period for which such financial statements are applicable, have been prepared in accordance with U.S. generally accepted accounting principles and, if audited, have been certified without reservation by a firm of independent public accountants, and since the date of its most recent audited or unaudited financial statements furnished to CSSU prior to the date hereof, there has been no material adverse change in the financial conditions or operations of Customer, and, if at any time since the date of its most recent audited financial statements delivered prior to the date hereof, there occurs a material adverse change in Customer's financial condition or results of operations, Customer agrees that it will inform CSSU of such material adverse change promptly in writing;

(ix)   no litigation, arbitration or administrative proceeding or claim is in progress, pending or, to Customer's knowledge, threatened which is reasonably likely by itself or together with any other proceedings or claims materially and adversely affect the legality, validity or enforceability of this Agreement or materially and adversely affect Customer's ability to perform the Obligations under this Agreement;

(x)   at all times during the existence of an Account, such Account shall not contain (i) plan assets subject to the provisions of Title I, Subtitle B, Part 4 of the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), (ii) assets of a governmental plan or other plan subject to restrictions similar or analogous to those contained in the foregoing provisions of ERISA or the Code or (iii) assets subject to restrictions that would otherwise be violated by the transactions and investments conducted by Customer in such Account; and

(xi)   unless Customer otherwise informs CSSU in writing, Customer is not an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933) of the issuer of any security held in the Account(s) or the securities that are the subject of any transaction.

(b)   Customer shall provide 30 business days prior written notice to CSSU if any of the representations and warranties contained in Paragraph 10(a)(x) hereof becomes incorrect at any time.   Customer agrees that it shall cease executing contracts of any kind in the Account(s) in the event Customer's assets include assets described in Paragraph 10(a)(x) hereof.

**11.   Long and Short Sales.**

Customer agrees to comply with all of the Applicable Law relating to short sales, including but not limited to the requirement that no short sale may be effected through CSSU or an executing broker unless Customer has first determined, either with CSSU or a third party, that the securities are available for delivery.   Pursuant to Applicable Law, Customer hereby undertakes and agrees to designate all sell orders as "long", "short", or "short exempt", or as otherwise required by Applicable Law, and that the designation by Customer of an order as a "long" sell order shall be a certification by Customer that the security ordered to be sold is owned by Customer and that unless the security to be delivered pursuant to the sale is carried in the account for which the sale is to be effected, it will deliver such security in good deliverable form to CSSU on or before the settlement date for such sale.   If there is carried in the account for

which the sale is to be effected a security which can be delivered in satisfaction of the sale, the CS Entities are authorized and directed to deliver such security from such account.

**12. Completion of Customer Transaction.**

If Customer is required, and fails, on a settlement date to make delivery of any securities, instruments, commodities or other property in connection with contracts executed or cleared by any CS Entity on Customer's behalf, the CS Entity is authorized, but not obligated, to borrow or purchase any necessary securities, instruments, commodities or other property and to complete such delivery on Customer's behalf with such securities, instruments, commodities or other property, and Customer shall indemnify the CS Entity for any and all losses suffered or expenses or liabilities incurred by or on behalf of the CS Entity in connection with such failure by Customer, whether or not the CS Entity borrows or purchases such securities, instruments, commodities or other property and completes such delivery on Customer's behalf, except for any loss, claim, damage or expense caused by a CS Entity's negligence, fraud or willful misconduct..

**13. Indemnification.**

Customer hereby releases and shall indemnify and hold harmless the CS Entities, their officers, directors, employees, agents and affiliated persons for any loss, claim, damage or reasonable expense (including reasonable attorneys' fees and expenses, reasonable accountants' fees and expenses, direct damages, fines and penalties) when and as incurred by, or asserted against, any of the CS Entities and such persons arising out of or in connection with this Agreement or any Contract or pursuant to authorized instructions received by the CS Entities from Customer or its agent, and to fully reimburse the CS Entities and such persons for any reasonable legal or other fees and expenses, including the cost of any investigation and preparation, when and as incurred by them in connection with any claim, action, proceeding or activities of the CS Entities and such persons in connection with this Agreement or any Contract, except for any loss, claim, damage or expense caused by a CS Entity's negligence, fraud or willful misconduct.

**14. Limitation of Liability.**

(a) None of the CS Entities, nor any of their respective officers, directors, employees, agents or counsel, shall be liable, except for their own gross negligence, willful misconduct or fraud, and no such party shall be liable for any error of judgment made by it in good faith for any action taken or omitted to be taken by any of them hereunder or in connection herewith.

(b) The CS Entities shall not be held liable for any acts, omissions or defaults of any subcustodian (other than another CS Entity) or other third party (including any executing broker or other agents, if applicable), subject to U.S. bank regulatory limitations applicable to U.S. bank offices of any of the CS Entities. In selecting and appointing subcustodians or other third parties, the CS Entities shall use reasonable care to ensure that they appoint only reportedly competent persons or entities and will be responsible to satisfy themselves as to the on-going suitability of such subcustodian or third party and for making appropriate inquiries periodically to ensure the obligations of such subcustodian or third party are being appropriately discharged. All transactions effected with a third party (including an executing broker) for Customer shall be for the account of Customer and the CS Entities shall have no responsibility to Customer or such third party with respect thereto. Customer

agrees that it is responsible, and liable to the relevant CS Entity, for all costs, losses and fees arising out of the settlement of Customer's orders with an executing broker selected by Customer (including, without limitation, the insolvency of any such party or the failure of any such party to fulfill its settlement obligations to such CS Entity.

(c) In no event shall the CS Entities be held liable (i) for indirect, consequential, punitive, or multiple damages or (ii) for any loss of any kind caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, or other conditions beyond the CS Entities' control. In the event that any communications network, data processing system, or computer system used by any of the CS Entities or Customer is rendered wholly or partially inoperable, the CS Entities will not be liable to Customer for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom, except to the extent caused by a CS Entity's gross negligence, fraud or willful misconduct.

**15. Reliance on Authorized Instructions.**

Customer agrees that the CS Entities may rely upon any authorized instructions or any notice, request, waiver, consent, receipt or other document which the CS Entities reasonably believe to be genuine and transmitted by authorized persons of Customer. The CS Entities shall be entitled to rely upon the identity and authority of the authorized persons designated pursuant to this Agreement until it receives an authorized instruction from Customer to the contrary.

**16. Taxes.**

Each payment by Customer and all deliveries of Collateral under this Agreement shall (except as required by law) be made, and the value of any Collateral shall be calculated, without withholding or deducting any Taxes. If any Taxes are required to be withheld or deducted, Customer shall pay such additional amounts as necessary to ensure that the actual net amount received by the CS Entities is equal to the amount that the CS Entities would have received had not such withholding or deduction been required. Customer will provide the CS Entities with any forms or documentation reasonably requested by the CS Entities in order to reduce or eliminate withholding tax on payments made to Customer with respect to this Agreement. The CS Entities are hereby authorized to withhold Taxes from any payment made hereunder and remit such Taxes to the relevant taxing authorities to the extent required by law. Customer will also be responsible for making any claims in relation to Taxes, whether for exemption from withholding taxes or otherwise, for filing all tax returns and for providing any relevant taxing authorities with all required information in respect of any payments by the CS Entities to Customer or any monies which the CS Entities hold on Customer's behalf.

**17. Agents.**

The CS Entities may execute any of their duties and exercise their rights hereunder by or through agents (which may include affiliates) or employees. In selecting and appointing agents, the CS Entities shall use reasonable care to ensure that they appoint only reportedly competent persons or entities, and will be responsible to satisfy themselves as to the on-going suitability of such agents that are CS Entities and for making appropriate inquiries periodically to ensure the obligations of

such agents that are CS Entities are being appropriately discharged.

**18. Financial Information.**

Customer will promptly furnish to the relevant CS Entity upon request relevant financial statements or similar documents and any other information as may be reasonably requested.

**19. CS Entities are not Providing Advice: Not Fiduciaries.**

Customer represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms and conditions set forth in this Agreement and any transaction or Contract it may undertake with the CS Entities. It is also capable of undertaking the obligations set forth in this Agreement. With respect to this Agreement or any transaction it may undertake with the CS Entities, Customer acknowledges that none of the CS Entities or their respective agents or affiliates is acting as a fiduciary for or an adviser to Customer; Customer understands that the CS Entities are not acting as investment advisers or soliciting orders, that the CS Entities are not performing any analysis, or making any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

**20. Successors and Assigns.**

The CS Entities may assign their rights hereunder or any interest herein to any U.S. affiliate and otherwise on thirty (30) days prior written notice to an unaffiliated entity in connection with the transfer of all or a substantial portion of their business. Customer may not assign its rights hereunder or any interest herein or under any other Contract with any of the CS Entities without the prior written consent of the respective CS Entity or Entities. Any attempted assignment by Customer in violation of this Agreement shall be null, void and without effect.

**21. Modification and Termination.**

Customer agrees that CSSU may modify the terms of this Agreement at any time to comply with changes in Applicable Law or due to an overall change in policy by CSSU upon thirty (30) days prior written notice. If the modifications are unacceptable, Customer agrees to notify CSSU in writing within ten (10) days of the transmittal of such written notice to Customer. CSSU may then terminate the Customer Account(s), after which Customer agrees to remain liable to the CS Entities for all existing liabilities or Obligations without giving effect to any such modifications. Customer further agrees that all transactions and Contracts entered into after such notification and ten (10) day period shall be subject to the modifications. Under no circumstances may a modification be made by Customer without CSSU's written consent. Either CSSU or Customer may terminate this Agreement upon delivery of written notice to the other party, provided that Sections 3, 4, 9, 12, 13, 14 and 25 shall survive any such termination.

**22. Single Agreement.**

CSSU and Customer acknowledge that they have entered into this Agreement and will enter into transactions under this Agreement in consideration of and in reliance upon the understanding that all such transactions constitute a single business and contractual relationship and have been made in consideration of each other. Customer agrees that any Event of Default hereunder shall constitute a default in all of Customer's

Obligations to the CS Entities under all Contracts with such CS Entities.

**23. Severability.**

If any provision of this Agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed modified or, if necessary, rescinded in order to comply with the relevant law, rule or regulation. All other provisions of this Agreement will continue and remain in full force and effect. To the extent that this Agreement is not enforceable as to any Contract, this Agreement shall remain in full force and effect and be enforceable in accordance with its terms as to all other Contracts.

**24. Governing Law.**

(a) This Agreement (including any annexes to this Agreement), its enforcement, and any dispute between the CS Entities and Customer hereunder, whether arising out of or relating to a Customer Account or otherwise (including, without limitation, the establishment and maintenance of the Accounts and all interests, duties and obligations related thereto), shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law rules, including but not limited to the NYUCC and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b) The parties hereto further agree that, in respect of any Account, the law applicable to all the issues specified in Article 2(1) of the "Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary (Hague Securities Convention)" is the law in force in the State of New York and agree that none of them has or will enter into any agreement to the contrary.

**25. Litigation in Court; Sovereign Immunity; Service.**

(a) Unless the parties otherwise agree in writing when any dispute arises, any litigation must be instituted in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York. Each party hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection, including, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any such action or proceeding in such courts. Each party hereby agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(c) Each party hereto, to the fullest extent permitted by Applicable Law, irrevocably waives with respect to itself and its revenues and assets (irrespective of their use or intended use) all immunity on the grounds of sovereignty or similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance, or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any actions or proceedings in such courts, and irrevocably agrees that it will not claim such immunity in any such actions or proceedings.

(d) Customer hereby consents to process being served by any CS Entity on Customer in any suit, action or proceeding of

the nature specified in this paragraph by the mailing of a copy thereof by registered or certified mail, postage pre-paid, to Customer at the address set forth after Customer's signature below; such service shall be deemed completed and effective as from 30 days after such mailing. Nothing contained herein shall affect the right to serve process in any other manner permitted by law.

**26. Notices and Communications.**

All notices and other communications provided hereunder shall be in writing and either posted onto the Internet in a form agreed to by the parties or mailed, electronically mailed, faxed, or delivered to the address of the intended recipient specified on the signature page or to such other address as such intended recipient may provide. All communications sent to Customer, i) through the Internet, electronic mail or messenger, shall be deemed given to Customer as of the date sent, (ii) by overnight mail shall be deemed given to Customer as of the business day following the date sent, and (iii) by regular first class mail shall be deemed given to Customer as of the fifth business day following the date sent, in each case whether actually received or not, and Customer agrees to waive all claims resulting from failure to receive such communication; provided, that (A) all Margin calls delivered through the internet will also be delivered by electronic mail or orally and (B) all notices with respect to an Event of Default will be sent by messenger to the address on the signature page hereof (or such other address provided by Customer to CSSU from time to time in writing) and by electronic mail to the following email addresses: trades@tigerasiafund.com and Patrick.Halligan@tigerasiafund.com. Any notice and other communication to CSSU provided under this Agreement shall be addressed to the manager of the CSSU department or office handling the Account(s). Any reports of CSSU's execution of Customer's orders and statements of Account(s) issued by CSSU shall be deemed to have been accepted by and shall be binding upon Customer if not objected to by Customer in writing within ten days after delivery thereof by CSSU to Customer by mail or otherwise.

**27. Miscellaneous.**

(a)   Each party to this Agreement acknowledges and agrees to the tape recording of conversations between the parties to this Agreement whether by one or other or both of the parties and each party hereby consents to such recordings being used as evidence in any proceedings.

(b)   Customer does not wish to have certain information pertaining to its beneficial ownership disclosed to a "registrant"

(as such term is defined in Rule 14b-1 of the Securities Exchange Act of 1934) pursuant to SEC Rule 14b-1. Customer objects to disclosure for the purposes of Rule 14b-1(b)(1)(ii).

(c)   No demand, call or notice that any of the CS Entities may have made in the past in any one or more instance shall be considered a waiver of such CS Entity's or CS Entities' right to act in the future without demand, call or notice. No failure or delay in exercising any right, or any partial exercise of a right will operate as a waiver of the full exercise of that right. The rights provided in this Agreement are cumulative and not exclusive of any rights provided by Applicable Law.

(d)   The CS Entities shall have the right to convert currencies in connection with the effecting of transactions and the exercise of any of their rights and remedies hereunder in such manner as any of them may determine, in its sole discretion, to be commercially reasonable.

(e)   Customer acknowledges receipt of the CSSU Statement of Credit Policy, the terms of which are incorporated herein by reference.

(f)   The parties hereto acknowledge that this Agreement is a "securities contract" within the meaning of the United States Bankruptcy Code (Title 11 U.S.C., Section 741(7)) ("Bankruptcy Code").

(g)   This Agreement is hereby incorporated into each Contract with any of the CS Entities that is a "swap agreement" under the Bankruptcy Code and any transfer hereunder shall be a transfer "under" and "in connection with" each such Contract.

(h)   This Agreement and any annex hereto may be executed by the parties hereto in any number of counterparts, each of which when so executed and delivered will be an original, but all of which counterparts will together constitute one and the same instrument.

(i)   This Agreement supersedes all prior agreements as to matters within its scope. To the extent this Agreement contains any provision which is inconsistent with provisions in any other Contract or agreement between Customer and any of the CS Entities, or of which Customer is a beneficiary, the provisions of this Agreement shall control except if such other Contract or agreement explicitly states that it is intended to supersede this Agreement in which case such other Contract or agreement shall prevail.

(j)   For purposes of any annex hereto, **"Business Day"** means any day other than a Saturday, Sunday or other day on which the New York Stock Exchange is closed. All references to time herein are to time in New York City.

[The remainder of this page is blank.]

Before signing, Customer acknowledges having read this Agreement and the Credit Suisse Securities (USA) LLC Statement of Credit Policy in their entirety and hereby consents and agrees to all the terms and conditions of these documents.

**BY SIGNING THIS AGREEMENT CUSTOMER AGREES THAT ANY SECURITIES HELD ON MARGIN MAY BE LOANED TO CREDIT SUISSE SECURITIES (USA) LLC OR LOANED OUT TO OTHERS.**

**CUSTOMER ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THIS AGREEMENT.**

Initial _SK_ Yes, we would if available like to receive electronic notification of our trade information rather than mailed, hard copy confirmations.

**Customer:**

Tiger Asia Fund, L.P.
_Name of Institution/Individual_

Delaware
_Jurisdiction of organization_

Limited Partnership
_Type of organization_

101 PARK AVE. 48TH FL , NEW YORK , NY 10178
_Place of Business / Chief Executive Office_

_____
_Organizational Identification Number_

SUNG KOOK HWANG
_Name of Authorized Officer_

MANAGING MEMBER OF GENERAL PARTNER
_Title of Authorized Officer_

_____
_Signature of Authorized Officer/Individual_

DEC 8, 2008
_Date_

**Customer's Address for Notices and Other Communications:**

TIGER ASIA MANAGEMENT, LLC
_Name_

101 PARK AVE - 48TH FLOOR
_Street Address_

NEW YORK, NY 10178
_City, State, Zip Code_

PATRICK HALLIGAN
_Attention_

212.984 2561
_Telephone_

212-984 8896
_Fax_

patrick_Halligan@tigerasiafund.com
_Email_

**Accepted and agreed to:**

CREDIT SUISSE SECURITIES (USA) LLC, on behalf of itself and as agent for the CS Entities

By: _____
        Vittorio Scialoja
        Vice President

8

3732859_4.DOC

## STATEMENT OF CREDIT POLICY*

This is to advise you of the terms and conditions under which interest will be charged with respect to accounts you maintain with **CREDIT SUISSE SECURITIES (USA) LLC ("CSSU")** from time to time.

Regulation T of the Board of Governors of the Federal Reserve System prohibits a broker-dealer from extending credit to a customer who maintains only a Special Cash Account. Should you establish a Margin Account, a broker-dealer is permitted to extend credit to you for the purpose of enabling you to purchase, sell, carry or otherwise trade in securities which the Federal Reserve Board has designated as "margin" securities.

**1.    Method of Determining the Debit Balance.**

If you have established a Margin Account with CSSU, you may purchase securities on margin and may sell securities you do not own (you may also sell short against the "Box"), contingent upon your prompt deposit of sufficient cash and/or eligible securities to enable you and CSSU to comply with the margin requirements of the Federal Reserve Board, the New York Stock Exchange, Inc. and other securities regulatory or self-regulatory body having jurisdiction. The difference between the aggregate transaction price and the amount you are required to deposit represents your debit balance. Credit is extended to you by CSSU to the extent that it must pay the party from whom you have purchased securities, the difference between the aggregate purchase price and the amount you have deposited or, alternatively, the amount CSSU must pay in those instances when CSSU is required to borrow securities to effect delivery to the purchaser in a transaction where you have sold such securities short (or short against the "Box").

**2.    Conditions Under Which an Interest Charge Will Be Imposed.**

Interest will be charged on the debit balance in your Margin Account commencing on the settlement date of the transaction creating such debit until the balance is paid in full in available funds. Additional purchases on margin, withdrawals of cash from your account (if permissible under Regulation T) or an increase in the market value of a security sold (or sold short against the "Box") may create or add to your debit balance as may interest charged on your account and any other charge which may be assessed to your account.

**3.    Annual Rate of Interest.**

An annual interest rate will be imposed on the debit balance in your account at a level no more than 2% above the prevailing broker's call money rate as determined by CSSU. This rate is subject to change without notice. In the event of any default, CSSU may charge interest as a rate fixed by it not greater than three times the prevailing broker's call money rate which shall not exceed the highest rate permitted by the laws of the State of New York.

**4.    Method of Computing Interest.**

Interest is calculated by CSSU on a daily basis employing a 360 day year. Starting with the balance as of the close of the previous interest period, for each day of the new period, CSSU calculates your new debit or credit balance from the previous day's closing balance taking into consideration both debits and credits which occurred that day. To compute interest, the resulting daily balance, if a debit, is multiplied by 1/360th times the daily interest rate. The charge shown on the monthly statements furnished to you runs from the first to the last calendar day of the previous month and will be posted on the first business day of the current month. CSSU reserves the right to waive interest charges under one dollar. For interest computation purposes, CSSU does not combine the balance in any Special Memorandum Account with the balance in any other account carried by it.

For monthly statement display purposes only, an average daily debit balance and an average interest rate is calculated by taking the day's balance if a debit and the interest rate that day which become components in the sums which equal the totals of all the resulting daily debit balances and interest rates for the period. These sums are divided by the number of calendar days to arrive at the average daily debit balance and interest rate for that interest period. For each interest period shown on your monthly statement, this monthly average balance and this monthly average interest rate and the number of calendar days for which a debit balance existed within an interest period are identified on your statement.

3732859_4.DOC

5.    **Credit for Balances in Cash Accounts.**

   For interest computations, CSSU combines balances in all your account types at CSSU, other than those arising as a result of short sales in a Margin Account and sales of securities not on deposit in your Special Cash Account.  This means any debit balance or available credit balance in such accounts will increase or decrease the average daily debit balance on which interest is computed as if there was just one combined account.

6.    **Other Charges.**

   In the case of the prepayment of the proceeds of a sale, interest (calculated as set forth above) is charged to the settlement date and is deducted from the prepayment disbursement.  Cash Accounts may be subject, at CSSU's discretion, to interest on any debit balances resulting from failure to make payment in full when due for securities purchased, from failure to timely deliver securities sold, from proceeds of sales paid prior to settlement date or from other charges which may be made to  such account.

7.    **Lien Retained by CSSU.**

   In connection with its extension of credit to you, CSSU, as pledgee, retains a lien in accordance with paragraph 3 of CSSU'S Customer Agreement.

   Any questions regarding CSSU's credit policy may be directed to your registered representative who will be pleased to provide further information.

*CREDIT SUISSE SECURITIES (USA) LLC, A REGISTERED BROKER-DEALER, IS REQUIRED TO DISCLOSE ITS CLIENT POLICY TO EACH CUSTOMER AT THE TIME THE CUSTOMER OPENS A MARGIN ACCOUNT IN ACCORDANCE WITH THE PROVISIONS OF RULE 10b-16 UNDER THE SECURITIES EXCHANGE ACT OF 1934

10

**Margin Disclosure Statement**

Credit Suisse Securities (USA) LLC ("CS") is furnishing this document to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review the CS Customer Agreement, which includes a section applicable to margin accounts. Consult your registered representative at CS regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from CS. If you choose to borrow funds from CS, you will open a margin account with CS. The securities purchased are CS's collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, CS can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with CS and its affiliates, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include, without limitation, the following:

\* **You can lose more funds than you deposit in the margin account.** A decline in the value of securities that are purchased on margin may require you to provide additional funds to CS to avoid the forced sale of those securities or other securities or assets in your account(s).

\* **CS can force the sale of securities or other assets in your account(s).** If the equity in your account(s) falls below the maintenance margin requirements or CS's higher "house" requirements, CS can sell the securities or other assets in any of your accounts held at CS and its affiliates to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.

\* **CS can sell your securities or other assets without contacting you.** Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Most firms, including CS will attempt to notify their customers of margin calls, but they are not required to do so. However, even if a firm has contacted a customer and provided a specific date by which the customer can meet a margin call, the firm can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

\* **You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call**. Because the securities are collateral for the margin loan, CS has the right to decide which security to sell in order to protect its interests.

\* **CS can increase its "house" maintenance margin requirements at any time and is not required to provide you advance written notice**. These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause the member to liquidate or sell securities in your account(s).

\* **You are not entitled to an extension of time on a margin call**. While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

11

# EXHIBIT 2

**(Multicurrency — Cross Border)**



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................**December 15, 2020**

### Credit Suisse International                    Archegos Fund LP

......…………….…………..….…...…..……. and ………...…………...…....……………………….........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)      *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

           (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)  *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  ***Default Interest*; *Other Amounts***. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations*.

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a **proceeding in equity or at** law)).

**ISDA® 1992**

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)     any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

DocuSign Envelope ID: AE0F4FE2-1470-4289-BEB7-591D8795469D

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **_Bankruptcy_**. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **_Merger Without Assumption_**. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    **_Termination Events_**. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)  *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)  *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)  *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

DocuSign Envelope ID: AE0F4FE2-1470-4289-85B7-5D1D8795469D

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    **Events of Default**. If the Early Termination Date results from an Event of Default: —

(1)    *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  ***Termination Events***.  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  ***Adjustment for Bankruptcy***. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  ***Pre-Estimate***. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.**    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.**    **Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.**    **Miscellaneous**

(a)    ***Entire Agreement***. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    ***Amendments***. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    ***Survival of Obligations***. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    ***Remedies Cumulative***. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    ***Counterparts and Confirmations***.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    ***No Waiver of Rights***. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    ***Headings***. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.**    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.**    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    ***Effectiveness***. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    ***Change of Addresses***. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    ***Governing Law***. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    ***Jurisdiction***. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    ***Service of Process***. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meanings specified in the Schedule.

**ISDA® 1992**

DocuSign Envelope ID: AE0F4F52-1470-4269-85B7-501D8795469D

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

**ISDA® 1992**

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CREDIT SUISSE INTERNATIONAL**                    **ARCHEGOS FUND, LP**

By:
Name: Steven J Reis
Title:    Authorized Signatory
Date:    December 16, 2020

By:
Name:  Sung Kook Hwang
Title:    Managing Member of the General Partner
Date:    December 15, 2020

By:
Name: Erica Hryniuk
Title:    Authorized Signatory
Date:    December 16, 2020

**Schedule**
to the
**ISDA 1992 Master Agreement**

dated as of __December 15__, 2020

between

| **Credit Suisse International** | and | **Archegos Fund, LP** |
| --- | --- | --- |
| An unlimited company incorporated under the laws of England and Wales | | a limited partnership organised and existing under the laws of the State of Delaware |
| **("Party A")** | | **("Party B")** |

**Part 1**
**Termination Provisions**

In this Agreement:

**(a) Specified Entity.** "Specified Entity" means

    (i)  in relation to Party A for the purpose of:

        Section 5(a)(v), Affiliates

        Section 5(a)(vi), not applicable

        Section 5(a)(vii), not applicable

        Section 5(b)(iv), not applicable

    (ii)  and in relation to Party B for the purpose of:

        Section 5(a)(v), not applicable

        Section 5(a)(vi), not applicable

        Section 5(a)(vii), not applicable

        Section 5(b)(iv), not applicable

**(b) Specified Transaction.** Specified Transaction will have the meaning specified in Section 14 and shall also include Equity Swap Transactions as defined in the Portfolio Swaps (Standard Terms) Annex attached hereto, if any.

**(c) Cross Default.** The "Cross Default" provision (Section 5(a)(vi)) will apply to Party A and Party B amended as follows:

    (i)  On the seventh (7th) line thereof, in regard to defaults, event of default or other similar conditions or events other than those related to payment and/or delivery failures (where delivery failures include, but are not limited to, collateral deliveries) the words "or becoming capable at such time of being declared," shall be deleted.

89383409_12

(ii)  The following words shall be added at the end of Section 5(a)(vi):

"Provided, the occurrence of a payment and/or delivery related event that would otherwise constitute an Event of Default hereunder shall not be considered an Event of Default if the Defaulting Party can demonstrate to the reasonable satisfaction of the Non-defaulting Party that (i) such occurrence is attributable solely to an error or omission of an administrative or operational nature; (ii) funds were available to the Defaulting Party to enable it to have made the relevant payment when due; and (iii) such default is remedied within two (2) Local Business Days following the Defaulting Party's receipt of notice of the occurrence of such event."

(iii) Specified Indebtedness:  Instead of the definition in Section 14 of this Agreement, "Specified Indebtedness" shall mean any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) (a) in respect of borrowed money, and/or (b) in respect of any Specified Transaction (except that, for this purpose only, the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" where they appear in the definition of Specified Transaction will be replaced with the words "and any other entity".

(iv) Threshold Amount:  With respect to Party A, the lesser of three percent (3%) of the shareholders' equity of Party A, as shown in the most recent audited financial statements of Party A, or USD25,000,000 including the United States Dollar equivalent of obligations stated in any other currency or currency unit), and with respect to Party B, the lesser of three percent (3%) of the Net Asset Value of Party B, as shown in the most recent audited financial statements of Party B, or USD 25,000,000 (including the United States Dollar equivalent of obligations stated in any other currency or currency unit).

**(d) Credit Event Upon Merger.**  The "Credit Event Upon Merger" provision (Section 5(b)(iv)) will apply to Party A and Party B restated as follows:

""Credit Event Upon Merger" means that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) of this Agreement but the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:

(i)  X consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Agreement) to, or reorganises, reconstitutes into or as, another entity;

(ii)  any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(iii) X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into, or

89383409_12

exchangeable for, debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest."

(e) **Automatic Early Termination.** The "Automatic Early Termination" provision of Section 6(a) of this Agreement will not apply to Party A and will not apply to Party B.

(f) **Payments on Early Termination.** For the purpose of Section 6(e), Second Method and Market Quotation will apply.

(g) **Termination Currency.** "Termination Currency" means United States Dollars.

(h) **Additional Termination Event.** The following Additional Termination Event(s) will apply:

(i) **Net Asset Value Decline.**

As of the last Local Business Day of any calendar month, the Net Asset Value of Party B declines by (1) twenty percent (20%) or more from the Net Asset Value of Party B (exclusive of withdrawals, redemptions, subscriptions, contributions and distributions) as of the immediately preceding calendar month-end; (2) thirty percent (30%) or more from the Net Asset Value of Party B (exclusive of withdrawals, redemptions, subscriptions, contributions and distributions) as of the third preceding calendar month-end; or (3) by forty percent (40%) or more from the Net Asset Value of Party B (exclusive of withdrawals, subscriptions, contributions and distributions) as of the twelfth preceding calendar month-end;

"*Net Asset Value*", means, as of any day, the total value of assets less the total value of liabilities of Party B on such day as calculated and determined in accordance with generally accepted accounting principles in the United States of America with appropriate adjustments being made to reflect fairly the effect of all off-balance sheet assets and liabilities not required to be reflected on the balance sheet in accordance with generally accepted accounting principles.

(ii) **Key Person.** One year from the date that Sung Kook Hwang is incapacitated, dies, or ceases to be a full-time employee of Party B or ceases to work or be employed on a full-time basis with at least the duties and responsibilities delegated to him as of the date of this Agreement and has not been promptly replaced by another investment advisor reasonably acceptable to Party A, provided, however that during such year, Party B may not enter into additional Transactions that would increase its exposure under the Agreement.

(iii) **Manager.** Archegos Capital Management, LP (the "**Investment Manager**") or any affiliate of the Investment Manager ceases to act at any time as investment manager on behalf of Party B in the same or similar capacity as on the date of this Agreement and a replacement investment manager reasonably acceptable to Party has not been named, which acceptance shall not be unreasonably withheld.

(iv) **Financials.** Party B shall fail to deliver within two (2) Local Business Days of Party A's notice to Party B of Party B's failure, any financial statements or financial information due annually or monthly pursuant to Part 3 hereof.

(v) **Event of Default under any of the Prime Broker Agreements.** The occurrence at any time, in respect of Party B, of an event specified as an Event of Default, default, potential default, termination event or similar event (however characterized) as defined in the relevant Prime Broker Agreement whether now existing or hereafter entered into.

21

89383409_12

For purposes of this Additional Termination Event, the term Prime Broker Agreement shall mean any of the following, as amended from time to time:

a.      the Customer Agreement (together with any and all annexes attached thereto) between Credit Suisse Securities (USA) LLC ("**CSSU**") and Party B.

Party B, in each such instance, shall be the sole Affected Party, and all Transactions shall be Affected Transactions.

**(i)    Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is amended by deleting "third" in the last line thereof and replacing it with "first".

89383409_12

DocuSign Envelope ID: AE0F4FE5-1470-4289-8BB7-5D1D8795469D

**Part 2**
**Tax Representations**

**(a) Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

(i)   The accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement;

(ii)  The satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii) The satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement;

Except it will not be a breach of this representation where reliance is placed on clause (ii) above, and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

**(b) Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement:

(i)   Party A makes the following Payee Tax Representations:

(1)   Party A is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of the United States Treasury Regulations) for United States federal income tax purposes.

(2)   Party A is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations) for United States federal income tax purposes and no payment received or to be received by it under such Transaction will be effectively connected with its conduct of a trade or business in the United States.

(3)   Party A has been approved as a Withholding Foreign Partnership by the United States Internal Revenue Service. Party A's Withholding Foreign Partnership Employer Identification Number is 98-0330001.

(4)   Party A is a "qualified derivatives dealer" within the meaning of section 1.1441-1(e)(6) of the United States Treasury Regulations for purposes of Sections 871 and 1441 of the Code and the United States Treasury Regulations promulgated thereunder ("QDD") and its Qualified Intermediary Employer Identification Number ("QI-EIN") is 98-0235072.

(5)   Party A is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Dividends" provision, the "Interest" provision or the "Other Income" provision, if any, of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in

89383409_12

DocuSign Envelope ID: AE0F4FE2-147D-4269-B5B7-501D8795469D

connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

"Specified Treaty" means the income tax treaty between the United Kingdom and the United States of America, if any.

"Specified Jurisdiction" means with respect to Party A, the United States of America.

(ii) Party B makes the following Payee Tax Representations:

(1)       Party B is a "US person" (as that term is used in Section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.

89383409_12

**Part 3**
**Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

**(a)** For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A & Party B | Any document required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, including but not limited to an IRS form e.g. W-8BEN-E, W-8IMY, W-9, as applicable. | (i) Before or upon execution of this Agreement and (ii) promptly upon reasonable demand by the other party. |

**(b)** For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A & Party B | Evidence reasonably satisfactory to the other party as to the names, true signatures and authority of the officers or officials signing this Agreement or any Confirmation on its behalf and the Credit Support Document referred to in Part 4(f) of this Schedule. | Upon execution of this Agreement and, if requested upon execution of any Confirmation. | Yes |
| Party A | A copy of the annual report for such party containing audited financial statements for the most recently ended financial year. | Upon request, as soon as publicly available. | Yes |
| Party B | A copy of the Investment Advisory or other agency agreement pursuant to which Party B authorises another party to act on its behalf in relation to this Agreement | Upon execution of this Agreement. | Yes |
| Party B | A copy of Party B's constitutive documents (certificate of incorporation, memorandum and articles of association, by-laws, statutes, commercial registration documents or other analogous document(s)). | Upon execution of this Agreement. | No |

89383409_12

| Party A & Party B | A duly signed copy of the Credit Support Document(s) referred to in Part 4(f) of this Schedule. | Upon execution of this Agreement. | Yes |
|---|---|---|---|

Additionally Party B agrees to deliver to Party A, c/o Credit Suisse Securities (USA) LLC, One Madison Avenue, New York, New York, 10010,   Attention: Hedge Funds - Credit Risk Management; email: hf.credit@creditsuisse.com

| (i) | A copy of its monthly financial statement (including as a minimum its closing Net Asset Value and monthly trading performance). | Within 20 calendar days after the end of each calendar month. | Yes |
|---|---|---|---|
| (ii) | A copy of its annual report containing audited or certified financial statements for the most recently ended financial year. | Upon request, as soon as made available, and in any event within 120 days after the relevant fiscal year end. | Yes |

26

89383409_12

DocuSign Envelope ID: AE0F4FE5-1470-4269-8BB7-591D8795469D

**Part 4**
**Miscellaneous**

**(a)** **Addresses for Notices.**  For the purpose of Section 12(a) of this Agreement:

Notwithstanding Section 12(a) of the Agreement all notices including those to be given under Section 5 or 6 may be given by facsimile transmission.

(i)    Address for notices or communications to Party A:

|          |                                                        |
| -------- | ------------------------------------------------------ |
| Address: | Credit Suisse International                            |
|          | One Cabot Square                                       |
|          | London E14 4QJ                                         |
|          | England                                                |

Attention:  (A)  Head of Credit Risk Management; and
            (B)  Global Head of OTC Operations - Operations Department; and
            (C)  Head of Client Management Team, General Counsel Division

Swift:        Credit Suisse International CSFP GB2L

Facsimile:  +44 (0) 207888 2686
Attention:  Head of Client Management Team, General Counsel Division

Telephone number for oral confirmation of receipt of facsimile in legible form under this Agreement:  +44 (0) 207888 2055.  Designated responsible employee for the purposes of Section 12(a)(iii):  Senior Legal Secretary.

With a copy to:

Facsimile:  +44 (0) 207888 3715
Attention:  Head of Credit Risk Management

With a copy to:

Facsimile:  +44 (0) 207888 9503
Attention:  Global Head of OTC Operations - Operations Department.

89383409_12

(ii) Address for notices or communications to Party B:

(1) Address for notices or communications to Party B:

Address:     Archegos Fund, LP
             888 Seventh Avenue, 38th Floor
             New York, NY 10018
Attention:   Patrick Halligan, Chief Financial Officer
Telephone:   (212) 984-2561
Email:       phalligan@archegoscapital.com

With a copy to: Scott Becker
Telephone:   (212) 984-2012
Email:       sbecker@archegoscapital.com

**(b) Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Credit Suisse Securities (USA) LLC, at Eleven Madison Avenue, New York, NY10010, United States of America (Attention:- General Counsel, General Counsel Division).

Party B appoints as its Process Agent: Not applicable.

Section 13(c) shall be amended by deleting the second sentence in its entirety and replacing it with the following:

"If for any reason any party's Process Agent is unable to act as such or such appointment is due to expire or terminate at any time on or prior to the Termination Date (as defined in the 2006 Definitions) of any Transaction, such party will promptly notify and renew that appointment or appoint a substitute process agent acceptable to the other at least 60 days prior to the expiration or termination of such appointment. Written evidence of such appointment and renewal shall be provided, upon request, to the other party."

Party B agrees that service upon itself or this Process Agent by registered first class mail or air courier constitutes effective service as if personally served pursuant to Section 311 of the New York Civil Practice Law and Rules or Rule 4 of the U.S. Federal Rules of Civil Procedure, or any successor section thereof. Party B waives any right to contest the effectiveness of the service if done in accordance with the previous sentence.

**(c) Offices.** The provisions of Section 10(a) will apply to this Agreement.

**(d) Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

**(e) Calculation Agent.**

The Calculation Agent is Party A unless otherwise agreed in a Confirmation in relation to the relevant Transaction.

In the case of an Event of Default with respect to Party A which has occurred and is continuing, Party B

28

shall be entitled to appoint a substitute Calculation Agent. In such event, Party B shall give written notice to Party A, detailing the relevant Event of Default, indicating its reliance on this Part 4(e) to appoint a substitute Calculation Agent and nominating three (3) Leading Dealers as a potential substitute Calculation Agent (the "**Substitute Calculation Agent Notice**"). Party A shall either remedy the Event of Default or select one (1) of the three (3) Leading Dealers nominated by Party B as the substitute Calculation Agent, within five (5) Local Business Days of Party A's receipt of the Substitute Calculation Agent Notice; provided that if Party A fails to choose a Leading Dealer by the end of such period then Party B shall choose the Leading Dealer from the three (3) Leading Dealers identified by Party B in the Substitute Calculation Agent Notice. If Party A cures the relevant Event of Default before Party B designates an Early Termination Date in accordance with Section 6(a) of this Agreement, and no other Event of Default has occurred (and not been cured) by such time, then Party A shall recommence acting as the Calculation Agent provided that nothing herein shall affect any calculations already produced by any substitute Calculation Agent duly appointed in accordance with this provision. The parties shall bear equally all costs and expenses in appointing a Leading Dealer for these purposes. All calculations or determinations made by the Calculation Agent shall be made in good faith and in a commercially reasonable manner.

If a party, acting in good faith, (the "**Disputing Party**") disputes the Calculation Agent's calculations with respect to a Liquid Transaction on a commercially reasonable basis, it shall deliver its written objection (the "**Dispute Notice**") to the Calculation Agent not later than the close of business on the Local Business Day following receipt of the Calculation Agent's calculation, specifying in reasonable detail (i) its objection, together with supporting calculations, (ii) its proposed calculation and (iii) the amount, if any, which is not in dispute (the "**Undisputed Amount**"). The parties, acting in good faith and in a commercially reasonable manner shall use commercially reasonable efforts to resolve such dispute by the close of business on the Local Business Day following the Calculation Agent's receipt of the Dispute Notice (the "**Informal Resolution Period**"). If the parties are unable to agree on a particular calculation during the Informal Resolution Period then by 10:00 a.m. in the city of the Calculation Agent on the following Local Business Day (the "**Dealer Identification Cut-off**"), the Disputing Party shall provide the Calculation Agent with the names of three (3) Leading Dealers and the Calculation Agent will select one (1) of such three (3) Leading Dealers by the close of business on such Local Business Day (the "**Leading Dealer Selection Date**") to opine on the commercial reasonableness of the relevant calculation; provided that (i) if the Disputing Party fails to identify three (3) Leading Dealers prior to the Dealer Identification Cut-off, the original calculation of the Calculation Agent shall be binding on the parties and the dispute will be deemed to have been resolved and (ii) if the Calculation Agent fails to choose a Leading Dealer prior to the expiration of the Leading Dealer Selection Date, then the Disputing Party shall choose the Leading Dealer from the three (3) Leading Dealers originally provided.

If the chosen Leading Dealer concludes that the Calculation Agent's calculation was commercially reasonable when made, then the Calculation Agent's calculation shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved. If the Leading Dealer concludes that the Calculation Agent's calculation was not commercially reasonable then such Leading Dealer shall (a) provide the basis for such conclusion and (b) provide its own calculation, which calculation shall be binding on the parties for purposes of the relevant Transaction, absent manifest error. Such Leading Dealer will have until close of business on the Local Business Day following the Leading Dealer Selection Date to opine on the commercial reasonability of the Calculation Agent's calculation and, if applicable, provide its own calculation. If the Leading Dealer fails to do so within such period then the Calculation Agent's original calculation shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved. The Disputing Party shall bear all

89383409_12

DocuSign Envelope ID: AE0F4FE5-1470-4359-BFB7-501D8795469D

costs and expenses in appointing the Leading Dealer for these purposes.

Notwithstanding a dispute, any Undisputed Amount shall be paid on the scheduled due date. Any amount due as a result of the resolution of a dispute shall be payable prior to the close of business on the first Local Business Day after such resolution.

For purposes of this clause:

"Leading Dealer" means Bank of America, Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan Chase, Morgan Stanley, Barclays Capital and UBS or any principal affiliate entity of such entities; provided that such entity is not an affiliate of Party A or Party B, does not act as Party B's prime broker or custodian and is a leading dealer in the relevant market.

"Liquid Transaction" means plain vanilla interest rate Transactions denominated in the currencies of the G7 countries, plain vanilla F/X Transactions denominated in the currencies of the G7 countries, plain vanilla "Covered Equity Transactions", and "Auction Settled CDS".

Where:

"Auction Settled CDS" shall mean a Credit Derivatives Transaction for which "Auction Settlement" has been specified as the Settlement Method as such term is defined in the 2003 ISDA Credit Derivatives Definitions as supplemented by the 2009 ISDA Credit Determinations Committees, Auction Settlement and Restructuring Supplement to the 2003 ISDA Credit Derivatives Definitions (published on July 14, 2009) or any such successor definitions published by the International Swaps and Derivatives Association, Inc.

"Covered Equity Transaction" means any Transaction that is an Equity Index Transaction or Equity Share Transaction, as such terms are defined below:

"Equity Index Transaction" means any Index Swap Transaction or Index Option Transaction that references one of the following indices: S&P 500, NASDAQ 100, FTSE 100, CAC 40, Dow Jones Eurostoxx 50, NIKKEI 225, or SMI.

"Equity Share Transaction" means any Share Forward Transaction or Share Swap Transaction on a share (excluding American Depository Receipts and Global Depository Receipts) issued by an Issuer of shares and not a fund or similar collective investment scheme. Such share must be publicly quoted, traded or listed on the following exchanges: NASDAQ National Market System, New York Stock Exchange, and American Stock Exchange LLC.

For the avoidance of doubt, the term "Liquid Transaction" does not include (i) Transactions involving or referencing collateralized debt obligations, synthetic or otherwise ("**CDOs**") or any index which references CDOs, mortgage backed securities including without limitation, asset backed securities, commercial mortgage backed securities or any index referencing such securities or (ii) any other type of Transaction not expressly listed in the definition of Liquid Transaction.

**(f)  Credit Support Document.** Details of any Credit Support Document:

In relation to Party A        The ISDA Credit Support Annex attached hereto and made an integral
and Party B:                  part hereof.

89383409_12

**(g) Credit Support Provider.** Credit Support Provider means:

In relation to Party A:          *Not Applicable.*

In relation to Party B:          *Not applicable.*

**(h) Governing Law and Jurisdiction.** This Agreement and, to the fullest extent permitted by applicable law, all matters arising out of or relating in any way to this Agreement will be governed by and construed in accordance with the laws of the State of New York. Section 13(b) of this Agreement is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word, "non-"; (ii) adding in the third line before the comma, "and each party irrevocably agrees to designate any Proceedings brought in the courts of the State of New York as 'commercial' on the Request for Judicial Intervention seeking assignment to the Commercial Division of the Supreme Court"; and (iii) inserting "in order to enforce any judgment obtained in any Proceedings referred to in the preceding sentence" immediately after the word, "jurisdiction," the first time it appears in the second sentence and deleting the remainder.

**(i) Netting of Payments.** Section 2(c)(ii) of this Agreement will apply to any Transactions from the date of this Agreement. Nevertheless, to reduce settlement risk and operational costs, the parties agree that they will endeavour to net across as many Transactions as practicable wherever the parties can administratively do so.

**(j) Affiliate.** Affiliate will have the meaning specified in Section 14 of this Agreement; provided however that Party B will be deemed to have no Affiliates.

*[Continued on next page]*

31

89383409_12

**Part 5**
**Other Provisions**

(a) **Scope of Agreement.**  Any Specified Transaction (whether now existing or hereafter entered into) between the parties, the confirmation of which fails by its terms expressly to exclude application of this Agreement, shall be governed by and be subject to this Agreement.  Any such confirmation shall be a "Confirmation", and any such Specified Transaction shall be a "Transaction", for all purposes of this Agreement.

(b) **Definitions.**  Unless otherwise specified in a Confirmation, each Transaction between the parties shall be subject to the 2006 ISDA Definitions (the "2006 Definitions") and the 1998 FX and Currency Options Definitions (including Annex A thereto), each as published by the International Swaps and Derivatives Association, Inc.  (collectively, the "Definitions"), and will be governed in all relevant respects by the provisions of the Definitions.  The provisions of the Definitions are incorporated by reference in and shall be deemed a part of this Agreement except that references in the 2006 Definitions to a "Swap Transaction" shall be deemed references to a "Transaction" for purposes of this Agreement.

(c) **Confirmations.**  Each Confirmation shall be substantially in the form of one of the Exhibits to the 2006 Definitions or in any other form which is published by the International Swaps and Derivatives Association, Inc. or in such other form as the parties may agree.

(d) **Additional Representation** will apply.  For the purpose of Section 3 of this Agreement, the following will constitute Additional Representations and marked as a new subsections (g) and (h).

"**(g)**    **Relationship Between the Parties.**  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

1.    *Non-Reliance.*  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation  to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

2.    *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

89383409_12

3.    *Status of Parties.*  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

4.    *No Agency.*  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity."

"**(h)    Private Placement Representations.**  Party B will be deemed to represent to Party A on each date on which a Transaction is entered into which constitutes the sale of any Security or Securities (as defined in the United States Securities Act of 1933 (the "**Securities Act**")) to Party B by Party A:

1.    Party B is acquiring such Securities for its own account as principal, for investment purposes only, and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part, and no other person has a direct or indirect beneficial interest in any such Securities acquired by Party B.

2.    Party B understands that the offer and sale by Party A of such Securities are intended to be exempt from registration under the Securities Act, by virtue of Section 4(a)(2) thereof.  In furtherance thereof, Party B represents and warrants that (i) it has the financial ability to bear the economic risk of its investment and has adequate means of providing for its current needs and other contingencies, (ii) it is experienced in investing in options and similar instruments and has determined that such securities are a suitable investment for it, and (iii) it is an institution that qualifies as an "accredited investor" as that term is defined in Regulation D under the Securities Act.

3.    Party B has been given the opportunity to ask questions of, and receive answers from, Party A concerning the terms and conditions of such Securities and concerning the financial condition and business operations of Party A and has been given the opportunity to obtain such additional information necessary in order for Party B to evaluate the merits and risks of purchase of such Securities to the extent Party A possesses such information or can acquire it without unreasonable effort or expense.

Party B acknowledges that it understands and agrees that disposition of any such Securities is restricted under the Agreement, the Securities Act and state securities law. For example, such Securities have not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they have been registered under the Securities Act and under the applicable laws of such states or an exemption from such registration is available."

**(e)  Recording of Conversation.**  Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction and (ii) agrees that the recordings may be submitted in evidence in any Proceedings to the extent  permitted by and subject to applicable law.

**(f)   Change of Account.**  Section 2(b) of this Agreement is hereby amended by the addition of the following after the word "delivery" in the first line thereof:

"to another account in the same legal and tax jurisdiction as the original account"

89383409_12

**(g) Set-off.** Section 6 of this Agreement is amended by addition of the following new subsection:-

> "**(f) *Set-off*.** Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set-off, counterclaim, or otherwise withhold payment) under applicable law:
>
> the Non-defaulting Party or the party that is not the Affected Party (in either case, "**X**") may, without prior notice to any person, set off any sum or obligation (whether or not arising under this Agreement, whether matured unmatured or contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "**Y**") to X or to any Affiliate of X, against any sum or obligation (whether or not arising under this Agreement, whether matured unmatured or contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y, and, for this purpose, may convert one currency into another. If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.
>
> Nothing in Section 6(f) shall be effective or deemed to create any charge or other security interest."

**(h) Transfer and Restructuring.** Notwithstanding any provisions of this Agreement to the contrary, the parties hereby agree that:

(i) Consent by Party B shall not be required in connection with the transfer by Party A of all its interests and obligations under any Transaction entered into pursuant to this Agreement to any Affiliate of Party A, and of any further such transfer by any such Affiliate (the "**Transferring Affiliate**") to any other Affiliate of Party A, so long as (x) the transferee (A) confirms that all of the transferor's covenants and representations under Sections 3(e), 3(f), 4(a)(i) and 4(a)(iii) of this Agreement are true and applicable as to the transferee, or (B) enters into new covenants and representations that are agreed to by Party B and (y) the Transaction is at the time of such transfer the legal, valid and binding obligations of the Affiliate or Transferring Affiliate;

(ii) If, as a matter of law, Party B's consent is required for the purposes of perfecting any transfer contemplated in (i) above by Party A, Party B shall give its consent to the transfer;

(iii) In the event of any transfer contemplated in (i) above by Party A, Party B will execute upon the demand of Party A the necessary documentation prepared by Party A;

(iv) Consent by Party B shall not be required in the event Party A requires a restructuring of any Transaction that will ensure the same economic effect for Party B by subdividing such Transaction into two or more parts (each a Transaction); and

(v) Party B will execute such revised documentation as Party A shall require to evidence any restructuring contemplated in (iv) above.

**(i) Incorporation of ISDA 2012 FATCA Protocol.** The parties to this Agreement agree that the amendments set out in the Attachment to the ISDA 2012 FATCA Protocol published by ISDA on

89383409_12

August 15, 2012 and available on the ISDA website (www.isda.org) shall apply to this Agreement. The parties further agree that this Agreement will be deemed to be a Covered Master Agreement and that the Implementation Date shall be the effective date of this Agreement as amended by the parties for the purposes of such Protocol amendments regardless of the definitions of such terms in the Protocol.

(j)   **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise) it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements.

(k)   **Commodity Exchange Act.**  The following representations are made on and as of the date hereof and will be deemed to be made on each date on which a Transaction is entered into:

(i)   Such party is an "eligible contract participant" as defined in the U.S. Commodity Exchange Act, as amended (the "**CEA**").

(l)   **Waiver of Right to Trial by Jury.**  Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document.  Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable by, among other things, the mutual waivers and certifications in this Section.

(m)  **Credit Suisse Securities (USA) LLC as Agent.** If Party A with respect to any Transaction hereunder, is relying on Rule 15a-6 ("**Rule 15a-6**") under the Securities Exchange Act of 1934 (the "**Exchange Act**") the following terms and conditions shall apply to such Transaction:

(i)   Credit Suisse Securities (USA) LLC, as a broker-dealer registered with the U.S. Securities and Exchange Commission ("**SEC**"), will arrange such Transaction as facilitating agent for each of the parties and will be responsible to the extent required under Rule 15a-6, for (a) effecting such Transaction, on behalf of Party A, (b) issuing all required confirmations and statements to Party A and Party B, (c) maintaining books and records relating to such Transaction as required by Rules 17a-3 and 17a-4 under the Exchange Act, and (d) if requested by Party A or Party B receiving, delivering and safeguarding such party's funds and securities in connection with such Transaction in compliance with Rule 15c3-3 under the Exchange Act.  Notwithstanding the foregoing, the parties agree that Credit Suisse Securities (USA) LLC shall not be deemed by virtue of its role as facilitating agent hereunder to be holding any Securities on behalf of either party.

89383409_12

(ii) Regardless of whether Party A is relying on Rule 15a-6 with respect to any Transaction hereunder, Credit Suisse Securities (USA) LLC is participating in such Transaction solely as facilitating agent for the parties. Credit Suisse Securities (USA) LLC shall have no responsibility or personal liability to either party arising from any failure by a party to pay or perform any obligations hereunder, or to monitor or enforce compliance by a party with any obligation hereunder, including, without limitation, any obligation to maintain margin. Each party agrees to proceed solely against the other to collect or recover any securities or moneys owing to it in connection with or as a result of such Transaction or otherwise hereunder. Credit Suisse Securities (USA) LLC shall otherwise have no liability in respect of this Agreement or such Transaction except for its gross negligence or wilful misconduct, or its failure to comply with applicable U.S. securities laws and regulations, in performing its duties as facilitating agent hereunder.

(n) **Amendment and Restatement of Prior Agreement.** This Agreement hereby amends, restates and supersedes the ISDA Master Agreement dated as of 4th February 2005 between the parties (the "Prior Agreement"). Every "Transaction" and/or "Swap Transaction" governed by the Prior Agreement will be deemed a Transaction, and the confirmations thereto a Confirmation, for the purposes of this Agreement and will be governed by this Agreement. Notwithstanding the above, where there is inconsistency between the terms of any confirmation under the Prior Agreement and the terms of this Agreement, the terms of such confirmation will apply to the extent of any such inconsistency.

(o) **ERISA Representations and Agreements by Party B.** Party B represents that it is not and will not be a Benefit Plan which, for the purposes of this Agreement, means (1) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (2) a 'Plan' within the meaning of Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "**Code**"), (3) an entity the underlying assets of which constitute assets of employee benefit plans or plans as a result of investments by such plans in the entity pursuant to Section 3(42) of ERISA or (4) assets of a governmental plan or other plan subject to restrictions similar or analogous to those contained in ERISA or the Code.

(p) **Investment Manager as Agent.** Party B represents and warrants (and such representation and warranty shall be deemed to have been repeated on each date that a Transaction is entered into) that Archegos Capital Management LP (the "Investment Manager") has the full power and authority to commit Party B to Transactions and conclude such Transactions on Party B's behalf on such terms and conditions as the Investment Manager may determine in its absolute discretion. Unless previously notified in writing by Party B, Party A may rely on all representations and warranties of and actions by the Investment Manager in relation to any such Transactions. For these purposes, Party B agrees to fully and unconditionally indemnify Party A for any and all losses, damages, costs and expenses directly sustained by Party A (including those incurred in unwinding any relevant hedging transactions) by reason of (i) its *bona fide* reliance on the appointment by Party B of the Investment Manager as Party B's agent to enter into Transactions on its behalf, irrespective of the invalidity, unenforceability, termination or revocation of such appointment (unless previously notified in writing by Party B) or breach by the Investment Manager of its terms or (ii) as a direct result of Party A's *bona fide* reliance upon the instructions, actions or ostensible authority of the Investment Manager.

(q) **Additional Agreements.** Section 4 of the Agreement is hereby amended in respect of Party B only by the addition of the following agreements:

89383409_12

"(f) Within seven (7) days of the entry into or other effectuation by Party B of any material amendment, alteration, modification or other change to any of its Core Documents, Party B shall provide Party A with a copy of the current version of such Core Document marked to show all changes from the prior version.  For the purposes of this provision, "Core Documents" shall include, without limitation, organizational documents (including, without limitation, articles of incorporation, partnership agreements, limited partnership agreements, and limited liability company agreements), investment management agreements, investor agreements, shareholder agreements, subscription agreements and disclosure documents (including, without limitation, offering circulars, private placement memoranda and prospectuses)."

**(r)  ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol**

(i)  Subject to the below, the parties hereby agree that the provisions set out in Parts I to III of the Attachment to the ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol (the "**PDD Protocol**") as published by the International Swaps and Derivatives Association, Inc. on 19 July 2013 are incorporated herein as if set out in full in this Agreement but with the following amendments:

a.  References:

References therein to:

(1)  the "Adherence Letter" shall be deemed to be references to this Part 5(r) of this Agreement;

(2)  the "Implementation Date" shall be deemed to be references to the date of this Agreement;

(3)  the "Protocol Covered Agreement" and "any ISDA Master Agreement" shall be deemed to be this Agreement; and

(4)  the definition of "Protocol" shall be deleted.

b.  For the purposes of the foregoing:

(1)  Portfolio reconciliation process status:

Party A shall be a Portfolio Data Sending Entity
Party B shall be a Portfolio Data Receiving Entity

(2)  Local Business Days:

Party A specifies the following places for the purpose of the definition of Local Business Day as it applies to it:  London

Party B specifies the following place(s) for the purposes of the definition of Local Business Day as it applies to it:  New York

89383409_12

    (3)   Contact details for Dispute Notices, Portfolio Data, and discrepancy notices:

        Notices to Party A:

        The following items may be delivered to Party A at the contact details shown below:

        Portfolio Data:  portfolio.recon@credit-suisse.com
        Notice of a discrepancy: portfolio.recon@credit-suisse.com
        Dispute Notice: portfolio.recon@credit-suisse.com

        Notices to Party B:

        The following items may be delivered to Party B at the contact details shown below:

        Portfolio Data: operationsarchegos@archegoscapital.com
        Notice of a discrepancy: operationsarchegos@archegoscapital.com
        Dispute Notice: operationsarchegos@archegoscapital.com

        Any notice given  by email in accordance with this Part 5(r), will be deemed effective on the date it is delivered unless the date of that delivery (or attempted delivery) is not a Local Business Day (in respect of the receiving party) or, subject to Part I(1)(a)(iv) of the Attachment to the PDD Protocol, that notice is delivered (or attempted) after the close of business on a Local Business Day (in respect of the receiving party), in which case that notice will be deemed given and effective on the first following day that is a Local Business Day (in respect of the receiving party).

    c.   Party A and Party B may use a Third Party Service Provider.

**(s)  Confirmation of EMIR Classification Status**

    (i)   Party B confirms that as of the date of this Agreement, it is a Third Country Entity and would be a Financial Counterparty if it were established in the European Union.

For purposes of the foregoing:

"***Financial Counterparty***" means an investment firm authorized in accordance with Directive 2014/65/EU of the European Parliament and of the Council; a credit institution authorised in accordance with Directive 2013/36/EU of the European Parliament and of the Council; an insurance undertaking or reinsurance undertaking authorised in accordance with Directive 2009/138/EC of the European Parliament and of the Council; a UCITS and, where relevant, its management company, authorised in accordance with Directive 2009/65/EC, unless that UCITS is set up exclusively for the purpose of serving one or more employee share purchase plans; an institution for occupational retirement provision, as defined in point (1) of Article 6 of Directive (EU) 2016/2341 of the European Parliament and of the Council; an alternative investment fund ("***AIF***") as defined in point (a) of Article 4(1) of Directive 2011/61/EU, which is either established in the European Union or managed by an alternative investment fund manager ("***AIFM***") authorised or registered in accordance with that

Directive, unless that AIF is set up exclusively for the purpose of serving one or more employee share purchase plans, or unless that AIF is a securitisation special purpose entity as referred to in point (g) of Article 2(3) of Directive 2011/61/EU, and, where relevant, its AIFM established in the European Union; and a central securities depository authorised in accordance with Regulation (EU) No 909/2014 of the European Parliament and of the Council.

"*Third Country Entity*" means an entity which is not established in the European Union and which is not a Financial Counterparty.

(t)  **Incorporation of the ISDA 2016 Bail-In Art 55 BRRD Protocol (Dutch/ French/ German/ Irish/ Italian/ Luxembourg/ Spanish/ UK entity-in-resolution version).**  The parties to this Agreement agree that the terms of the ISDA 2016 Bail-In Article 55 BRRD Protocol (Dutch/ French/ German/ Irish/ Italian/ Luxembourg/ Spanish/ UK entity-in-resolution version) (the "**ISDA Bail-In Protocol**"), as published by ISDA on July 14, 2016 and available on the ISDA website (www.isda.org), are incorporated into and form part of this Agreement.  The parties further agree that this Agreement shall be deemed to be a "Covered ISDA Master Agreement" and that the "Implementation Date" shall be the effective date of this Agreement, each for the purposes of such ISDA Bail-In Protocol, regardless of the definitions of such terms in such ISDA Bail-In Protocol. In the event of any inconsistencies between this Agreement and the ISDA Bail-In Protocol, the ISDA Bail-In Protocol will prevail.

(u)  **ISDA UK (PRA Rule) Jurisdictional Module.** The parties to this Agreement agree that the terms of the ISDA UK (PRA Rule) Jurisdictional Module to the ISDA Resolution Stay Jurisdictional Modular Protocol (the "**UK Jurisdictional Module**"), as published by ISDA on May 3, 2016 and available on the ISDA website (www.isda.org), are incorporated into and form part of this Agreement.  The parties further agree that this Agreement will be deemed to be a "Covered Agreement" and that the "Implementation Date" shall be the effective date of this Agreement. For the purposes of such UK Jurisdictional Module, Party B will be treated as a "Module Adhering Party" and Party A will be treated as a "Regulated Entity Counterparty" with respect to Party B as a Module Adhering Party. In the event of any inconsistencies between this Agreement and the UK Jurisdictional Module, the UK Jurisdictional Module will prevail.

(v)  **Limitation of Liability.**  Notwithstanding anything to the contrary contained in this Agreement or any Schedule, addendum, Confirmation, or other document issued or delivered in connection with any Transaction entered into under this Agreement, any amounts owed or liabilities incurred by Party B, in respect of any Transaction entered into under this Agreement, may be satisfied solely from the assets of Party B.  Without limiting the generality of the foregoing, in no event shall Party A have recourse, whether by set-off or otherwise, with respect to any such amounts owed or liabilities incurred, to or against (a) any assets of any person or entity (including without limitation, any person or entity whose account is under the management of the investment manager of Party B) other than Party B, (b) any assets of any affiliate of Party B (other than a Credit Support Provider), (c) any assets of the investment manager of Party B or any affiliate of such investment manager.  Notwithstanding the foregoing, nothing herein shall limit Party A's rights arising under applicable laws relating to fraudulent transfers or voidable preferences.

(w)  **Limitation on Rights to Withhold Performance.**  If a party ("**X**") (A), exercises its rights pursuant to Section 2(a)(iii)(1) of this Agreement and elects not to make any payment or delivery specified in a

89383409_12

Confirmation to be made by it for 30 calendar days, (B) X does not designate an Early Termination Date in connection with such condition precedent, and (C) Y has satisfied in full all of its payment, delivery and transfer obligations to X under this Agreement then due and owing (or such payment, delivery and transfer obligations could be fully satisfied by netting such obligations against the payments or delivery X has elected not to make), then Y shall have the right to, by not less than five Business Day's written notice (delivered to X in accordance with this Agreement) but not more than twenty Business Day's written notice (delivered to X in accordance with this Agreement), designate an Early Termination Date in connection with this Agreement upon mutual agreement between the parties with Y as the Defaulting Party. For the avoidance of doubt, as a result of this clause, X does not waive any of its rights under Section 5 or 6 of this Agreement or Paragraph 8 of the Credit Support Annex.

**(x)** **Form of Agreement.**  The parties hereby agree that the text of the body of the Agreement is intended to be the printed form of 1992 ISDA Master Agreement as published and copyrighted by the International Swaps and Derivatives Association, Inc.

**(y)** **Portfolio Swaps Standard Terms.**  Attached hereto as **Exhibit I** and made a part hereof is the "Portfolio Swaps (Standard Terms) Annex."

**(z)** **PRC Transactions.**  Attached hereto and made a part hereof is **Addendum 1** for any PRC Transactions as defined therein and entered into hereunder.

89383409_12

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CREDIT SUISSE INTERNATIONAL**

By:

Name: Steven J Reis

Title: Authorized Signatory

Date: December 16, 2020

By:

Name: Erica Hryniuk

Title: Authorized Signatory

Date: December 16, 2020

**ARCHEGOS FUND, LP**

By:

Name: Sung Kook Hwang

Title: Managing Member of the General Partner

Date: December 15, 2020

DocuSign Envelope ID: AE0F4FE2-1470-4289-85B7-591D8795469D

**Addendum 1**

**PRC QFII ADDENDUM**

1.      **Definitions**

The following terms are added to Section 14 of the Agreement in the appropriate alphabetical position:

"**A Shares**" means A-shares (A股) listed in PRC's stock exchanges.

"**Cut Off Date**" means the date which falls 7 years after the final valuation date of the relevant PRC Transaction or the PRC Property Transaction or where the relevant PRC Transaction is terminated early, 7 years after the early termination date).

"**Final Reference Level**" means the price in settlement currency (being the RMB price divided by the exchange rate between RMB and the settlement currency) used by Party A in computing the payout under a PRC Property Transaction.

"**Final RMB Reference Level**" means the RMB price used by Party A in computing the payout under a PRC Property Transaction.

"**Initial Reference Level**" means the price in settlement currency (being the RMB Price divided by the exchange rate between RMB and the settlement currency) used by Party A in pricing a PRC Property Transaction at the time that PRC Property Transaction was entered into.

"**Initial RMB Reference Level**" means the RMB price used by Party A in pricing a PRC Property Transaction at the time that PRC Property Transaction was entered into.

"**Legal Persons Registered in the PRC**" means an entity incorporated or organised in the PRC (excluding Hong Kong, Macau and Taiwan) and excludes foreign entities incorporated or organised in other jurisdictions even though they may have an office (i.e. branch) in the PRC.

"**PRC**" means The People's Republic of China.

"**PRC Citizen**" means any person holding a resident identification card of the PRC (excluding Hong Kong, Macau and Taiwan).

"**PRC Property Security**" means in respect of a PRC Property Transaction, a constituent stock of the SSE Real Estate Index (Bloomberg ticker "SHPROP") at the time of determination of the payout upon the termination of such PRC Property Transaction.

"**PRC Property Transaction**" means a PRC Transaction which is linked to a PRC Property Security.

"**PRC Securities**" means any shares, bonds, warrants or other securities listed on any stock exchange in the PRC (excluding Hong Kong, Macau and Taiwan), securities investment funds quoted in Renminbi or any other financial instruments in which a Qualified Foreign Institutional Investor may from time to time invest under the laws and regulations of the PRC (excluding Hong Kong, Macau and Taiwan).

89383409_12

"**PRC Transactions**" means any Transaction the payment/payments under which is/are linked to the performance of one or more PRC Securities.

"**Renminbi**" means the lawful currency of the PRC.

"**Qualified Foreign Institutional Investor**" means Qualified Foreign Institutional Investor (合格境外机构投资者) as defined in the Measures on the Administration of Domestic Securities Investments by Qualified Foreign Institutional Investors (合格境外机构投资者境内证券投资管理办法), as may be amended and supplemented from time to time.

"**trust**" includes a trust fund or any similar arrangement where the legal title to the trust assets are held by a trustee or legal representative but the beneficial interests in the trust assets are held by beneficiaries; and "**trustee**" shall be construed accordingly.


2.      **Representations**

Section 3 of the Agreement is amended by the addition of the following representations with respect to Party B. Accordingly, Party B makes the following representations to Party A that as at the date of this Addendum (which representations will be deemed to be repeated by Party B to Party A on each date on which a PRC Transaction is entered into):

(a)    it is not (1) a PRC Citizen resident in the PRC (excluding Hong Kong, Macau and Taiwan), (2) a PRC Citizen resident outside the PRC who is not a permanent resident of another country or a permanent resident of Hong Kong, Macau or Taiwan, or (3) a Legal Person Registered in the PRC, (each a "**Domestic Investor**");

(b)    in the case where the Transaction is entered into by Party B as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s).  For the avoidance of doubt, in the case only where a trust's investments are being managed on a discretionary basis by an investment manager, such investment manager shall not be deemed to control such entity for the purposes of this representation by reason only of it being able to control the decision-making in relation to the entity's financial, investment and/or operating policies; and

(c)    to the best of its knowledge and belief after enquiries that it reasonably deems necessary, all amounts paid or to be paid by it under the Transaction did not and will not involve moneys financed by or sourced from any Domestic Investor in contravention of the laws and regulations of the PRC.

(d)    To the extent that the Party B is incorporated, domiciled or resident in Taiwan or is owned or controlled by a person(s) or entity(ies), incorporated, domiciled or resident in Taiwan (collectively, a "**Taiwan Related Party**"), Party B:.

(i)        confirms that it (x) is not prohibited by any applicable Taiwan law, regulation, self regulatory guideline or policy applicable to dealings by Taiwan Related Parties with Mainland China ("**Cross Straits Rules**") from entering into the relevant PRC Transactions and (y) will, in entering such PRC Transaction, be in full compliance with any limitations under the Cross Straits Rules or otherwise on the amount, scope or nature of investments

89383409_12

DocuSign Envelope ID: AE0F4FE2-147D-4289-85B7-5D1D8795469D

by him/her/it in PRC Transactions;

(ii)    confirms that it is not entering into the PRC Transactions for the purpose of gaining or exercising control or influence, directly or indirectly, over the management of any company incorporated in the PRC; and

(iii)    acknowledges and understands that it is Party B's sole responsibility to determine, based on his/her/its own evaluation and advice from his/her/its professional advisors, that the entering by him/her/it of PRC Transactions complies with the Cross Straits Rules and that it/he/she shall place no reliance whatsoever on Party A in such regard.

(e)    It is aware and acknowledges that:

(i)    under the relevant PRC regulations, Domestic Investors are not permitted to purchase or acquire, whether directly or indirectly, actually or synthetically, inter alia, A Shares through any Qualified Foreign Institutional Investors in PRC;

(ii)    the State Administration of Tax of PRC may at any time, even subsequent to a PRC Transaction maturing or being terminated, impose withholding or other taxes on investments held, purchased, acquired, whether directly or indirectly, actually or synthetically, through a Qualified Foreign Institutional Investor with respect to such PRC Transaction ("**PRC Tax Liability**"), and the parties to a PRC Transaction may be affected as a result; and

(f)    Party A is not in any way responsible for determining, and will not determine, whether any Transaction (including but not limited to PRC Transaction) is appropriate or suitable for Party B, or is fully consistent with and does not breach, any of Party B's investment or other internal guidelines, investment restrictions, investment objectives, financial circumstances, or constitutional or other restrictions (even if Party A has been advised of these or even if the same may be apparent from Party B's trading history or documents provided by Party B); Party B hereby confirms that entering into any PRC Transaction by Party B (i) will not contravene any law, regulation, self regulatory guideline or regulatory policy applicable to Party B or any applicable law or regulation of the PRC; (ii) will not breach any of Party B's investment guidelines, restrictions, objectives or strategies; and (iii) is not for purposes of gaining or exercising control or influence over the management of the issuer of the relevant PRC Securities, and Party B fully understands that Party A relies on this confirmation to enter into any PRC Transaction with Party B.

**3.    Agreements**

Section 4 of the ISDA Master Agreement is amended by the addition of the following Party B agreements and undertakings.  Accordingly, Party B agrees that, so long as it has any obligation under the Agreement or under any Credit Support Document to which it is a party:

(a)    Party B acknowledges that Party A and/or any of its affiliates may be required to disclose information relating to, among other things, the identities of any party having a legal or beneficial interest in any PRC Transaction as may be required by any relevant governmental or

regulatory authorities or as may be required under any law, regulation, orders or other lawful request, Party B agrees to all such related disclosure and hereby waives confidentiality with regard thereto.

(b)  Party B agrees to promptly provide Party A and the relevant regulators with such additional information that Party A or its affiliates (as the case may be) may require in order to comply with regulations or requests of the relevant regulator from time to time; Where Party B is not able to provide this information to Party A or any of its affiliates, it will provide this directly to the relevant regulator, where permitted by such regulator, and confirm to Party A that the requested information has been provided.

(c)  Party B agrees that where such information is maintained by any third party on behalf of Party B, it shall ensure that appropriate procedures are implemented with such third party to enable the prompt disclosure of such information to Party A, its nominated affiliate and/or the relevant regulator upon request.

(d)  notwithstanding anything to the contrary in the Agreement, it will not transfer, novate or assign any PRC Transaction or any of its interest therein (including any amounts payable on or with respect to such interest and any other rights associated with such interest) to another party without the prior written consent of Party A.  To the extent such PRC Transaction or any of its interest therein (including any amounts payable on or with respect to such interest and any other rights associated with such interest) is transferred, novated or assigned by Party B in accordance with the terms of the Agreement, Party B undertakes to ensure that the transferee (i) is not a Domestic Investor, (ii) in the case where the Transaction is entered into by Party B as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s) (in accordance with paragraph 2(b)), (iii) to the extent that the transferee is a Taiwan Related Party, provides such confirmations and acknowledgements as set out in paragraph 2(d) above , and (iv) is not, to the best of its knowledge and belief after enquiries that it reasonably deems necessary, financing all or any part of  the PRC Transaction from PRC sources.

(e)  in the event that a PRC Tax Liability is imposed before the Cut-Off Date in respect of any PRC Transaction with Party B, whether or not such PRC Transaction has previously matured or been terminated, it agrees that it shall indemnify Party A and its nominated affiliate and keep them indemnified against any and all losses, claims, payments and expenses caused by or arising from such PRC Tax Liability suffered or incurred by Party A or its nominated affiliate to the extent attributable to the period before the Cut Off Date and arising from a hedge position of Party A in respect of the PRC Transaction with Party B.

(f)  Party B agrees that it will indemnify and hold harmless Party A and its affiliates, directors and officers against any and all losses, liabilities, claims, charges, expenses, actions or demands (including, but not limited to, all costs, charges and expenses (including legal costs) paid or incurred in disputing or defending any of the foregoing) that any of them may incur or that reasonably may be made against any of them arising out of, or relating to: (i) any breach by Party B of any of the representations, agreements or undertakings contained in clauses 2 and 3 of this Addendum; or (ii) Party A investigating, responding to or defending any allegation, claim, investigation, enquiry, or request from, or commencement of proceeding by, any relevant governmental or regulatory authority with respect to any of the matters or circumstances

89383409_12

referred to in the representations, agreements or undertakings of Party B contained in clauses 2 and 3 of this Addendum, provided that this sub-clause 3(f) shall not apply to any such losses, liabilities, claims, charges, expenses, actions or demands that arise as a result of the wilful default of Party A.

4.    **Additional Termination Event**

If a representation contained in this Addendum proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated; or if Party B fails to comply with or perform any agreement or obligation undertaken by it in this Addendum, it shall be an Additional Termination Event with all PRC Transactions being the sole Affected Transactions, and with Party B being the sole Affected Party.

89383409_12

# EXHIBIT 3

CREDIT SUISSE
PORTFOLIO SWAPS (STANDARD TERMS) ANNEX

Credit Suisse International ("CS") and Archegos Fund, LP (the "Counterparty") have entered into a 1992 ISDA Master Agreement dated as of _____December 15_____ 2020, including the Schedule and any annexes thereto (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Master Agreement"). This Portfolio Swaps (Standard Terms) Annex, including the Schedule attached hereto and made a part hereof (the "Standard Terms"), supplements and forms part of the Master Agreement and is intended to govern the parties' relationship when entering into an equity swap transaction through "Primeview" (or successor system) that the parties agree to be governed by the Standard Terms in relation to a single Share, a basket of Shares treated together (a "Custom Basket") a single Index or a basket of Indices treated together (a "Custom Index Basket") (each, an "Equity Swap Transaction"). Each Equity Swap Transaction shall be deemed a "Transaction" for the purposes of the Master Agreement.

The definitions and provisions contained in the 2006 ISDA Definitions (the "Swap Definitions") and in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., as amended and supplemented from time to time, are incorporated into these Standard Terms. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and the Standard Terms, the Standard Terms shall prevail. The confirmation applicable to each Transaction, which shall constitute a "Confirmation" for the purposes of, and will supplement, form a part of, and be subject to, the Master Agreement, shall consist of the Standard Terms (including the Schedule hereto), as supplemented by the trade details applicable to such Transaction as set forth in the Confirmation for that Transaction.

In order to enter into a Transaction, the Counterparty must notify (by telephone or as otherwise agreed between the parties) CS of its request for an offer, specifying the name of the relevant Shares, Custom Basket, Index or Custom Index Basket, and the proposed Number of Shares or the proposed Number of Units, as applicable, and whether the Counterparty wishes to act as Equity Amount Receiver/Synthetic Buyer or Equity Amount Payer/Synthetic Seller. If CS agrees to provide such offer, it must then notify (by telephone or as otherwise agreed between the parties) the Counterparty of the proposed Initial Price or formula for determining the Initial Price. Should the Counterparty wish to accept this offer, it must immediately notify CS (by telephone or as otherwise agreed between the parties) of its acceptance. This acceptance gives rise to a binding Transaction between the parties. An offer by CS that is not immediately accepted shall be deemed to lapse unless CS specifically states that it shall remain open.

A Confirmation will be prepared and either (i) posted by CS on its client access website or (ii) delivered by CS to the Counterparty by other electronic means, in each case, within one Business Day of the Transaction being entered into between the parties. The Counterparty shall be deemed to have accepted the terms of the Confirmation if it does not dispute its terms within one Business Day of such posting or delivery, as the case may be. Failure to dispute the terms within one Business Day shall constitute the Counterparty's full acceptance of the Transaction upon the terms, absent manifest error, and subject to the conditions, as set out in the Confirmation and within these Standard Terms. In the event of any inconsistency between the

DocuSign Envelope ID: AE0F4FE2-1470-4269-B5B7-501D8795469D

provisions of the Standard Terms and any Confirmation, the Confirmation shall prevail. In the event of any inconsistency between the provisions of the Standard Terms and the Master Agreement, the Standard Terms shall prevail for the purposes of the relevant Transaction.

The standard terms applicable to each Transaction to which these Standard Terms relate are as follows (unless otherwise specified in the relevant Confirmation):

## 1.    General Terms

Transaction Type:

For purposes of the Equity Definitions, the relevant Equity Swap Transaction constitutes:

(a)    a "Share Swap Transaction" if the relevant Confirmation specifies a single Share;

(b)    a "Share Basket Swap Transaction" if the relevant Confirmation specifies a Custom Basket;

(c)    an "Index Swap Transaction" if the relevant Confirmation specifies a single Index; and

(d)    an "Index Basket Swap Transaction" if the relevant Confirmation specifies a Custom Index Basket.

Trade Date:

As specified in the Confirmation.

Effective Date:

As specified in the Confirmation.

Termination Date:

Is the earlier of:

(i)  the Swap Termination Date; and

(ii) the Optional Termination Date,

in each case, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day, subject to the provisions of Section 6.6 of the Equity Definitions.

DocuSign Envelope ID: AE0F4FE2-1470-4289-B5B7-501D8795469D

| | |
|---|---|
| Final Settlement Date: | Is the earlier of: |
| | (i) one Settlement Cycle after the Swap Termination Date; and |
| | (ii) one Settlement Cycle after the Optional Termination Date. |
| Swap Termination Date: | As specified in the Confirmation. |
| Shares: | The shares as specified in the Confirmation (including quantity). |
| Custom Basket: | As specified in the Confirmation. |
| Index: | As specified in the Confirmation. |
| Custom Index Basket: | As specified in the Confirmation. |
| Number (quantity) of Units: | For a Custom Basket, Index or Custom Index Basket, the Equity Notional Amount divided by the Gross Price. |
| Gross Price:[1] | As specified in the Confirmation. |
| Weighting: | For a Custom Basket and in respect of each Share in such Custom Basket, the number of Shares per Unit in the Custom Basket and for a Custom Index Basket and in respect of each Index in such Custom Basket, the number of units of such Index per Unit in the Custom Index Basket, as agreed between the parties at the Trade Date and specified in the Confirmation, and as may be adjusted from time to time by the Calculation Agent as a result of the occurrence of a Potential Adjustment Event, Extraordinary Event or Index Adjustment Event, as the case may be. |
| Equity Notional Amount: | Initially, as specified in the Confirmation, as adjusted pursuant to Section 1.24 of the Equity Definitions. |

---

[1] Note: Swap fees will *either* be separate _or_ included in the Initial/Final Price, not both.  If swap fees are separate from the Initial Price, then Gross Price equals Initial Price, but if swap fees are included in the Initial Price, then Gross Price equals the Initial Price minus such swap fees.  Gross Price is only used to calculate the Number of Units for an Index, Custom Basket or Custom Index Basket.

89383415_8

Share Notional/ Index Notional for a
Custom Basket or Custom Index Basket:[2]

As of any date, (a) the Share Notional for any Share in a Custom Basket equals the product of (i) the Weighting of such Share and (ii) the Final Price of such Share as of the last Valuation Date or, in respect of the first Valuation Date, the Initial Price and (b) the Index Notional for any Index in a Custom Index Basket equals the product of (x) the Weighting of such Index and (y) the Final Price of such Index as of the last Valuation Date or, in respect of the first Valuation Date, the Initial Price.

Exchange:

Each exchange or quotation system, as specified in the Confirmation, if any, or, in respect of any multi-exchange Index or Custom Index Basket, for each component security of such Index or of any Index in such Custom Index Basket, the principal stock exchange on which such component security is traded, if any; subject to the successor or substitute provisions in Section 1.25 of the Equity Definitions.

Related Exchange:

The principal exchange or exchanges on which futures and options contracts related to the relevant Share, Shares, Index or Indices, as applicable, are traded; *provided* that if CS determines that its Hedge Positions in respect of any Transaction will not include futures or options contracts related to the relevant Share, Shares, Index or Indices, as applicable, then the Related Exchange for such Transaction will be "None;" subject to the successor or substitute provisions in Section 1.26 of the Equity Definitions.

Schedule:

The document substantially in the form attached hereto. The Schedule referred to in the Standard Terms is distinct from all other schedules incorporated into the Master Agreement.

---

[2] Applies only for a Custom Basket or Custom Index Basket and used only if Reinvestment of Dividends is applicable.

89383415_8

| | |
|---|---|
| Exchange Business Day: | Any Scheduled Trading Day on which each Exchange and Related Exchange, if any, are open for trading during their respective regular trading sessions, notwithstanding such Exchange or Related Exchange, if any, closing prior to its Scheduled Closing Time; *provided* that (i) for non-Exchange traded Shares, each day on which price quotations are available to (or provided by) CS in respect of such Shares, (ii) for an Index Swap Transaction or an Index Basket Transaction, it shall also mean each day the Index Sponsor(s) publishes the level of the Index or Indices and (iii) for a Share Basket Swap Transaction or Index Basket Swap Transaction, Exchange Business Day shall be determined on a per Share or per Index, as applicable, basis. |
| Settlement Currency: | As specified in the Confirmation. |
| Calculation Agent: | Notwithstanding any provision of the Master Agreement, CS shall be the sole Calculation Agent. |
| Depository Receipt Election: | Applicable with respect to any of the Shares that are depository shares or receipts, unless otherwise specified in the Confirmation. |
| | In the event that Depository Receipt Election is Applicable, the 2002 Definitions shall be supplemented by the 2007 Partial Lookthrough Depository Receipt Supplement to the Equity Definitions or the 2007 Full Lookthrough Depository Receipt Supplement to the Equity Definitions, as specified in the Confirmation. |

## 2. Equity Amounts

| | |
|---|---|
| Equity Amount Receiver: | The party specified as the Synthetic Buyer in the Confirmation. |
| Equity Amount Payer: | The party specified as the Synthetic Seller in the Confirmation. |
| Equity Amount Payment Date: | Unless otherwise specified in the Confirmation, in respect of each Valuation |

89383415_8

DocuSign Envelope ID: AE0F4FE5-1470-4289-B5B7-591D8795469D

|                                | Date, the date that is one Settlement Cycle after the relevant Valuation Date, or if such date is not a Currency Business Day, the next following Currency Business Day. On each Equity Amount Payment Date for a Transaction, an Equity Amount Payment shall be made. |

Valuation Date:     Each date specified as such in the Confirmation and the Termination Date, subject to the provisions of Section 6.6 of the Equity Definitions.

Averaging Dates:     In respect of each Valuation Date, each date specified or otherwise determined as provided in the Confirmation (or, if such date is not a Scheduled Trading Day, the next following Trading Day); *provided* that the Calculation Agent, in its reasonable discretion, may use a "weighted arithmetic mean" instead of the "arithmetic mean" provided in Section 6.7(b) of the Equity Definitions and the "weighting" for any applicable Share on any Averaging Date will be determined by the Calculation Agent, in its reasonable discretion, with regard to the daily trading volume of such Share on the applicable exchange on such Averaging Date.

Averaging Date Disruption:     Modified Postponement.

Equity Amount:     As calculated in respect of each Equity Amount Payment Date, (i) for a Share or an Index, an amount equal to Q x (P2 - P1) and (ii) for a Custom Basket or Custom Index Basket, an amount equal to $\sum (P2_i - P1_i) \times Q_i$, where:

$Q =$ the Number of Shares with respect to a Share or the Number of Units with respect to an Index;

$Q_i =$ the number of Shares of Share$_i$ in a Custom Basket or the number of Units of Index$_i$ in a Custom Index Basket;

$P1$ or $P1_i =$ the Final Price on the Valuation Date relating to the immediately preceding Equity Amount Payment Date or

in respect of the first Equity Amount Payment Date, the Initial Price; and

P2 or P2$_i$ =   the Final Price on the Valuation Date relating to such Equity Amount Payment Date.

Equity Amount Payment:

On the Equity Amount Payment Date, if P2 is greater than P1 (or, for a Custom Basket or Custom Index Basket, if $\sum$(P2$_i$-P1$_i$) is positive), then the Equity Amount Payer shall pay the Equity Amount to the Equity Amount Receiver; or

If P2 is less than P1 (or, for a Custom Basket or Custom Index Basket, if $\sum$(P2$_i$-P1$_i$) is negative), then the Equity Amount Receiver shall pay the absolute value of the Equity Amount to the Equity Amount Payer.

Equity Notional Reset:

Applicable/Not Applicable, as specified in the Confirmation.

Type of Return:

Total Return, unless otherwise specified in the Confirmation.

Initial Price:

In respect of a Share, the price per Share specified as such in the Confirmation; in respect of a Custom Basket, the price per Custom Basket specified as such in the Confirmation; in respect of an Index, the level of the relevant Index specified as such in the Confirmation; and in respect of a Custom Index Basket, the level of the Custom Index Basket specified as such in the Confirmation.

Final Price:

The product of (A) {One minus the Final Swap Fee Percentage (as defined in Section 4)}, if Applicable, and

(B): (a) In respect of a Share:

(i)      the price per Share as of the Valuation Time on the Valuation Date (or relevant Averaging Date), as reported in the official real-time price dissemination mechanism for the Exchange or, (ii) if agreed between the parties with respect to a particular Transaction, the volume

7

weighted average price per Share on the Exchange during its regular trading session on the Valuation Date (or relevant Averaging Date), as displayed on Bloomberg Page AQR (or any successor thereto) or, if no such page is available or appropriate for the relevant market, then as determined by the Calculation Agent.

if (A) for any reason no quotation as specified in (i) or (ii) above is available, (B) the Calculation Agent has reasonably concluded that the Final Price determined in accordance with (i) or (ii) above is not a fair reflection of the market value the Shares at the Valuation Time on the Valuation Date (or relevant Averaging Date) or (C) the Shares are specified in the Confirmation to be non-exchange traded Shares, then the "Final Price" shall be the price per Share as reasonably determined by the Calculation Agent as at the Valuation Time on the Valuation Date (or relevant Averaging Date).

(b) In respect of a Custom Basket, $\sum$ Final Price$_i$ X Weighting$_i$, where

Final Price$_i$ = the Final Price of Share$_i$ in the Custom Basket (determined in accordance with clause (a) above), as of the Valuation Time on the Valuation Date (or relevant Averaging Date); and

Weighting$_i$ = the Weighting of Share$_i$ in the Custom Basket.

(c) In respect of an Index, the official closing level of the Index as calculated and published by the relevant Index Sponsor on the Valuation Date (or relevant Averaging Date), *provided,* however, that if the Calculation Agent has reasonably concluded that such level is not a fair reflection of market value of the Index on the Valuation Date (or relevant Averaging Date) then the "Final Price" shall be the level of the Index as reasonably determined by the Calculation Agent as at the Scheduled Closing Time on the Valuation Date (or relevant Averaging Date).

89383415_8

(d)  In respect of a Custom Index Basket, $\sum$ Closing Level$_i$ X Weighting$_i$, where

Closing Level$_i$ = the Closing Level of Index$_i$ in the Custom Basket (determined in accordance with clause (c) above), on the Valuation Date (or relevant Averaging Date); and

Weighting$_i$ = the Weighting of Index$_i$ in the Custom Basket.

(e)  If the Number of Shares with respect to any Transaction, together with, at the election of CS, the number of shares of such Issuer under any other equity swap transaction between the parties hereto and for which the "final Valuation Date" occurs on the same day as the Valuation Date or first Averaging Date, as applicable, for such Transaction (the "Total Number of Shares"), exceeds the ADTV Limitation (as defined below), the Final Price determination described in paragraph (a) above will apply only with respect to the portion of the Total Number of Shares that the Calculation Agent determines will not exceed such ADTV Limitation.  The Final Price with respect to the remaining portion of the Total Number of Shares shall be determined on as many subsequent days as the Calculation Agent may require to adhere to the ADTV Limitation (each such day, an "Extended Day") and shall be determined in accordance with the procedures described in paragraph (a) and this paragraph (e).

The "ADTV Limitation" shall mean 20% of the most current 30-day trailing average daily trading volume, to the extent available, determined as of the final Valuation Date (or first Averaging Date, as applicable) as determined by the Calculation Agent acting in good faith and in a commercially reasonable manner.

(f)  Notwithstanding anything herein or in the Definitions to the contrary, if a Market Disruption Event with respect to any applicable Share occurs or exists on any day that, but for the Market Disruption

Event, would have been the final Valuation Date or any Extended Day, the Final Price for such Share shall be determined for such day with respect to a number of such Shares, which may be zero, as the Calculation Agent shall determine in its reasonable discretion exercised in good faith and the relevant Valuation Date for the remaining number of such Shares shall be postponed as provided in the Equity Definitions.

Futures Price Valuation:

Not Applicable, unless specified as "Applicable" in the Confirmation for an Index Swap Transaction. If Futures Price Valuation is specified as "Applicable," (i) Section 6.8(d) of the Equity Definitions is amended by replacing "Exchange" with "Related Exchange" and (ii) Section 6.8(b)(ii) of the Equity Definitions is replaced by "Official Settlement Price means the price at which the Exchange-traded Contract on the Relevant Exchange is settled."

Exchange-traded Contract:

If Futures Price Valuation is Applicable, the futures contract, or if there is no such futures contract, the options contract, on the relevant Index traded on the Related Exchange with an expiry date (or the date which would have been the expiry date but for such date being a Disrupted Day or not being a Scheduled Trading Day) that is the same date as the final Valuation Date, unless otherwise specified in the Confirmation, in which case, the futures contract, or if there is no such futures contract, the options contract, on the relevant Index traded on the Related Exchange with an expiry date (or the date which would have been the expiry date but for such date being a Disrupted Day or not being a Scheduled Trading Day) in the month and year as specified in the Confirmation.

Valuation Time:

In respect of a Share Swap Transaction or a Share Basket Swap Transaction, the Scheduled Closing Time; subject to the

provisions of Section 6.1 of the Equity Definitions.

In respect of an Index Swap Transaction or an Index Basket Swap Transaction, Not Applicable.

3.     **Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | The Equity Amount Receiver. |
| Floating Amount Receiver: | The Equity Amount Payer. |
| Calculation Amount: | Equity Notional Amount. |
| Floating Amount Payment Dates: | Each date specified in the Schedule and the Final Settlement Date; subject to adjustment in accordance with the Business Day Convention. |
| Business Day Convention: | As specified in the Confirmation. |
| Floating Rate Option: | As specified in the Confirmation. |
| Business Day: | As appropriate, based on the jurisdiction related to the specified Floating Rate Option and the jurisdiction related to the Settlement Currency. |
| Designated Maturity: | As specified in the Schedule or as otherwise specified in the Confirmation. |
| Spread: | The percentage specified in the Confirmation as such rate may be adjusted in accordance with the Equity Definitions or the terms hereof following the occurrence of a Potential Adjustment Event or Extraordinary Event (including, for the avoidance of doubt, any Increased Cost of Hedging). |
| Floating Rate Day Count Fraction: | As specified in Section 6.2(g) of the 2006 Definitions in respect of the relevant Floating Rate Option, unless otherwise specified in the Confirmation. |
| Reset Dates (Interest): | As specified in the Schedule. |
| Compounding: | Not Applicable, unless otherwise specified in the Confirmation. |
| Compounding Dates: | If Applicable, each day in the Calculation Period. |

89383415_8

DocuSign Envelope ID: AE0F4FE2-1470-4359-85B7-591D8795469D

4.    Swap Fees:

(a)  On the first Equity Amount Payment Date only, the Counterparty shall pay an amount equal to the Initial Swap Fee to CS. The Initial Swap Fee is calculated as $Q \times P_0 \times Z$, where:

| | |
|---|---|
| Q = | In respect of a Share Swap Transaction, the Number of Shares; in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction, the Number of Units; |
| $P_0$ = | the Initial Price; |
| Z = | Initial Swap Fee Percentage; and |
| Initial Swap Fee Percentage = | a percentage, represented in basis points, as agreed between the parties and as specified in the Confirmation. |

(b)  On the Termination Date, the Counterparty shall pay an amount equal to the Final Swap Fee, to CS.  The Final Swap Fee is calculated as $(Q \times P_3 \times Z)$, where:

| | |
|---|---|
| Q = | In respect of a Share Swap Transaction, the Number of Shares; in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction, the Number of Units, or, if such Transaction is terminated in part, then the Number of Shares or Number of Units, as applicable, being terminated; |
| $P_3$ = | the Final Price; |
| Z = | Final Swap Fee Percentage; and |
| Final Swap Fee Percentage = | a percentage, represented in basis points, as agreed between the parties and as specified in the Confirmation. |

(c)  If the Transaction is terminated, in whole or in part, before the scheduled Termination Date by the Counterparty, and the Breakage Option is Applicable, then CS (on the Termination Date) shall calculate the Breakage Amount, which shall be due from the Counterparty to CS.  The Breakage Amount is an amount equal to the Floating Amount for the Calculation Period beginning on and including the last Reset Date to and excluding the next scheduled Reset Date; *provided* that the Calculation Amount for such calculation is the Equity Notional Amount in respect of the Number of Shares for a Share Swap Transaction or the Number of Units for a Share Basket Swap Transaction, an Index Swap Transaction or an Index Swap Transaction being closed.

89383415_8

DocuSign Envelope ID: AE0F4FE2-1470-4289-BBB7-501D8795469D

Breakage Option =        Applicable/Not Applicable, as specified in the Confirmation.

5.      Payment Netting:

If, on any Equity Amount Payment Date, Floating Amount Payment Date or Dividend Payment Date (each, a "Payment Date"), as the case may be, the same amounts would otherwise be payable by each party to the other (with respect to any Equity Swap Transaction pursuant to the Standard Terms), then on such date, each party's obligation to make such payment shall be netted against each other, and automatically satisfied and discharged. If the aggregate amount otherwise payable by one party exceeds the aggregate amount payable by the other, then the party with the larger aggregate amount shall be obligated to pay the difference on the relevant Payment Date.

6.      FX Provisions:

If, with respect to a Transaction, the currency in which any Dividend Amount or Final Price is calculated or determined is different from the Settlement Currency, CS shall determine the value of that amount or price in the Settlement Currency.

7.      Dividend Amounts and Additional Amounts:

Dividend Period:                        As specified in the Confirmation.

Dividend Percentage:                    As specified in the Confirmation.

Dividend Option:                        As specified in the Confirmation.

Dividend Amount:                        (A)   In respect of a Share Swap Transaction, (i) the Dividend Option multiplied by (ii) the Number of Shares multiplied by (iii) the Dividend Percentage;

                                        (B)   In respect of a Share Basket Swap Transaction, the sum of the following products for each Share in the Custom Basket: (i) the Dividend Option for such Share multiplied by (ii) the Dividend Percentage multiplied by (iii) the Weighting of such Share in the Custom Basket;

                                        (C)   In respect of an Index Swap Transaction, the product of (i) the Number of Units multiplied by (ii) the Realized Index Dividend Points (as defined in the Schedule), on the relevant Ex-Dividend Date; and

                                        (D)   In respect of an Index Basket Swap Transaction, the sum of the following products for each Index in the Custom Index Basket: (i) the Realized Index Dividend Points on the relevant Ex-

|  | Dividend Date multiplied by (ii) the Weighting of such Index in the Custom Index Basket, expressed as a number of units. |
|---|---|
| Dividend Interest Accrual: | Applicable/Not Applicable, as specified in the Confirmation.  If Dividend Interest Accrual is Applicable, interest will accrue on each Dividend Amount at the Dividend Interest Rate Option from, and including, the day on which the Issuer of the applicable Shares pays the relevant gross cash dividend to holders of record of such Shares to, and excluding, the applicable Dividend Payment Date and such interest will be payable on such Dividend Payment Date. |
| Dividend Interest Rate Option: | As specified in the Confirmation. |
| Dividend Payment Dates: | As specified in the Confirmation. |
| Dividend Recovery: | If (a) the amount actually paid or delivered by an Issuer to holders of record of any applicable Share in respect of any gross cash dividend, or in the case of any Share included in any applicable Index, any Qualifying Dividend (as defined in the Schedule), in each case, declared by the applicable Issuer (a "Declared Dividend") to holders of record of such Share is not equal to such Declared Dividend (a "Dividend Mismatch Event") or (b) such Issuer fails to make any payment or delivery in respect of such Declared Dividend by the third Business Day following the relevant due date, the Calculation Agent shall determine any appropriate correction or repayment to be made by a party to account for such Dividend Mismatch Event or non-payment or non-delivery, as the case may be, and determine the date any such repayment should be made, together with interest on such repayment amount as determined by the Calculation Agent. |
|  | The parties expressly acknowledge and agree that these Dividend Recovery provisions shall apply and remain in full force and effect notwithstanding the termination of the relevant Transaction. |

DocuSign Envelope ID: AE0F4FE2-1470-4359-B5B7-591D8795469D

| | |
|---|---|
| Re-investment of Dividends: | If specified as applicable in the relevant Confirmation (for a Share Basket Swap Transaction or an Index Basket Swap Transaction): |

(i)     In respect of a Share Basket Swap Transaction or an Index Basket Swap Transaction, if Dividend Reinvestment Option is specified as Reinvest Specific Shares/Indices in the Schedule, the Calculation Agent shall adjust the Equity Notional Amount as of the Exchange Business Day immediately preceding the ex-dividend date for purposes of each subsequent Equity Amount Payment Date by adding the Dividend Amount to the Share Notional or Index Notional, as applicable, of the relevant Share or Index, as applicable, relating to such Dividend Amount.

(ii)    In respect of a Share Basket Swap Transaction or an Index Basket Swap Transaction, if Dividend Reinvestment Option is specified as Reinvest Equally in the Schedule, the Calculation Agent shall adjust the Equity Notional Amount as of the Exchange Business Day immediately preceding the ex-dividend date for purposes of each subsequent Equity Amount Payment Date by adding to each Share Notional or Index Notional, as applicable, the product of (x) the Dividend Amount and (y) the relative Weighting (expressed as a percentage) of such Share or Index, as applicable, in the Basket.

Notwithstanding anything in the foregoing to the contrary, in the case of each of (i) and (ii) above for a Share Basket Transaction, any adjustment to the Equity Notional Amount or Share Notional following the addition of the relevant Dividend Amount, as the case may be, shall be rounded down to the nearest whole number of Units, and any surplus Dividend Amount shall be paid by the relevant party to the other party on the Dividend Payment Date to which the Dividend Amount relates. In respect of an Index Swap Transaction or an Index Basket Swap Transaction, where the Confirmation specifies the Type of Return as Total Return, certain additional terms related to the Dividend Amount, which are listed and defined in the Schedule, shall apply.

Adjustment to Dividend Percentage:

If CS reasonably determines that there has been, within the term of a Share Swap Transaction or a Share Basket Swap Transaction or the 12 months following the date of a distribution, a change in any applicable law or regulation (or a change in the interpretation or application by any court, governmental or other authority of such law or regulation) that has had the effect of reducing or increasing the amount of the ordinary cash dividend per Share actually due to the holder of the Shares or any Shares in the Custom Basket in the jurisdiction of incorporation of CS or the Counterparty, CS may adjust the Dividend Percentage of such Share Swap Transaction or such Share Basket Swap Transaction, as applicable, with immediate effect by notice in writing to the Counterparty. Further, if any such change is to take effect prior to the date upon which CS gives such notice, CS may make such adjustments to the payment obligations of the parties in respect of any Equity Swap Transaction to which it considers such change applicable. In the case of any Equity Swap Transaction to which "Re-investment of Dividends" is applicable and any Dividend Amount that has been affected by such change has already been re-invested in accordance with the provisions above, CS may make such adjustments to the Equity Notional Amount and/or Share Notional (as applicable) as it deems necessary to account for the economic effect of such change on such Equity Swap Transaction. In the event that such Equity Swap Transaction shall have been previously closed, the Counterparty shall indemnify CS in respect of any such change on a full indemnity basis.

8.  **Index Adjustment Events (in respect of an Index Swap Transaction or an Index Basket Swap Transaction)**

| | |
|---|---|
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |

9.  **Adjustments and Extraordinary Events (in respect of a Share Swap Transaction or a Share Basket Swap Transaction)**

Method of Adjustment:                Calculation Agent Adjustment

Consequences of Merger Events:

| | |
|---|---|
| Share-for-Share: | Alternative Obligation |
| Share-for-Other: | Cancellation and Payment, in respect of a Share Swap Transaction, and Partial Cancellation and Payment, in respect of a Share Basket Swap Transaction. |
| Share-for-Combined: | Component Adjustment |

89383415_8

| | |
|---|---|
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Tender Offer: | Applicable |
| Consequences of Tender Offer: | |
|     Share-for-Share: | Modified Calculation Agent Adjustment |
|     Share-for-Other: | Modified Calculation Agent Adjustment |
|     Share-for- Combined: | Modified Calculation Agent Adjustment |
|     Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |
|     Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |

In a Share Basket Swap Transaction, if any Share is removed from the Custom Basket due to an Adjustment Event, Extraordinary Event or Additional Adjustment Event, then the Calculation Agent will adjust the Weightings of the remaining Shares accordingly; *provided* that, if the parties agree within one Exchange Business Day of such event, the removed Share may be replaced by a substitute Share and the Initial Price of the Custom Basket shall be adjusted as determined by the Calculation Agent.

## 10.    Additional Adjustment Events:

| | |
|---|---|
| Change in Law: | Applicable; *provided* that Section 12.9(a)(ii)(X) of the Equity Definitions is hereby amended by replacing the word "Shares" with the words "Hedge Positions"; *provided, further,* that the parties agree that for purposes of Section 12.9(a)(ii) of the 2002 Definitions, "any applicable law or regulation" includes the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (as may be amended or supplemented from time to time), any rules and regulations promulgated thereunder, any similar law or regulation and any adoption or promulgation of new regulations authorized or mandated by existing statute, and the consequences specified in Section 12.9(b)(i) of the 2002 |

Definitions shall apply to any Change in Law arising from any such act, rule or regulation.

| Insolvency Filing: | Applicable |

| Hedging Disruption: | Applicable; *provided* that (a) Section 12.9(a)(v) of the Equity Definitions is replaced with the following: |

"Hedging Disruption" means that the Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, cancel, unwind or dispose of any transaction(s) or asset(s) (including, without limitation, stock loans and other transactions (including pending transactions) that can be used to create a long or short exposure to the Shares or Index, as the case may be) it deems necessary to hedge the market risk (including, but not limited to the equity price risk, dividend risk, settlement risk and currency risk) of entering into and performing its obligations with respect to this Transaction (any such transactions or assets, a "Hedging Party Hedge"), including, for the avoidance of doubt, due to any legal, regulatory or compliance restrictions affecting the Hedging Party or the Hedging Party Hedge or (ii) freely and unconditionally realize, recover, receive, repatriate, remit or transfer the proceeds of the Hedging Party Hedge.

and (b) that Section 12.9(b)(iii) of the Equity Definitions is hereby amended by adding the following phrase after the phrase "to terminate the Transaction," as follows (new language shown in bold and underlined for convenience): "upon at least two Scheduled Trading Days' notice to the Non-Hedging Party **unless a shorter notice period is required given the rules, regulations and practices of a particular jurisdiction, specifying the date of such termination, which may be the same day that notice of termination is effective**, specifying the date of such termination,…"

| | |
|---|---|
| Increased Cost of Hedging: | Applicable, *provided* that Section 12.9(a)(vi) of the Equity Definitions is replaced with the following: |

"(vi) "Increased Cost of Hedging" means that the Hedging Party would incur a materially increased (as compared with the circumstances that existed on the Trade Date) amount of tax, duty, expense, collateral requirement, fee (other than brokerage commissions) (which amount of tax shall include, without limitation, any amount of tax due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position in relation to dividends) (a "Hedging Cost") to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of the Hedging Party Hedge or (B) freely and unconditionally realize, recover or remit the proceeds of the Hedging Party Hedge. However, any such materially increased amount that is (1) incurred solely as a result of the deterioration of the creditworthiness of the Hedging Party or (2) could be avoided by the Hedging Party, acting in a commercially reasonable manner based on prevailing circumstances applicable to the Hedging Party, shall not be an Increased Cost of Hedging."

| | |
|---|---|
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Hedging Party: | CS |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgements Regarding Hedging Activities: | Applicable |
| Additional Acknowledgements: | Applicable |
| Index Disclaimer: | Applicable |

DocuSign Envelope ID: AE0F4FE2-1470-4289-B5B7-501D8795469D

11.    **Optional Termination and Maturity**

(i)      Unless otherwise specified in the Confirmation for a particular Transaction, on any Exchange Business Day when CS or the Counterparty wishes to terminate any Transaction (whether in whole or in part), it shall give one (1) Exchange Business Day's notice of that fact to the other party (by telephone or as otherwise agreed between the parties) specifying the proportion of such Transaction it wishes to terminate; subject to Section 10 hereto.

(ii)     In respect of a Share Swap Transaction or a Share Basket Swap Transaction, if the Shares or any Shares included in the Custom Basket are registered pursuant to Section 12 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") or convertible into securities registered pursuant to the Exchange Act and, if at any time the aggregate number of such Shares beneficially owned by CS and its affiliates (the "Transaction Equity") exceeds or could exceed 8% of the number of outstanding, voting Shares of an Issuer at such time (such event, the "Partial Termination Event"), CS may notify the Counterparty of its desire to effect an early settlement with respect to a portion of the Transactions on such Shares or Custom Basket including such Shares, as determined by CS subject to the conditions set forth below, so that, after completion of the unwind related to the Partial Termination Event, the Transaction Equity would not exceed 8% of the number of outstanding Shares of such Issuer.

(iii)    Upon sending or receiving notice on any date as discussed in (i) or (ii) above, CS shall then calculate the Final Price on such date to the extent practicable and commercially reasonable, or the next Exchange Business Day, as determined by CS   (the "Optional Termination Date") and notify the Counterparty of the Final Price (by telephone or as otherwise agreed between the parties), which shall be binding upon the Counterparty.  CS shall then settle the portion of the Transaction to be terminated in accordance with these Standard Terms on the Final Settlement Date with respect to such portion.

(iv)    All payments due on the Final Settlement Date shall be netted against each other, and the balance shall be due on the Final Settlement Date, unless otherwise agreed between the parties.

(v)     If CS or the Counterparty gives notice to terminate only a portion of the Number of Shares in respect of a Share Swap Transaction or the Number of Units in respect of an Index Swap Transaction or an Index Basket Swap Transaction, then the provisions of this Section shall apply only to that portion of the relevant Transaction. In the event that a Transaction is terminated only in part, CS shall make any necessary adjustments to the Number of Shares in respect of a Share Swap Transaction or the Number of Units in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction.  The remainder of the Transaction shall continue to be governed by these Standard Terms.

89383415_8

12.     **Calculation and Settlement of Payments**

(i)     All payments made under a Transaction shall be made in accordance with the account details specified in the relevant Confirmation.

(ii)    All payments shall be in the Settlement Currency.

13.     **Additional Representations, Agreements and Transaction Terms**

(a)     Each party represents to the other party:

(1)     that such party is an "eligible contract participant" within the meaning of the CEA;

(2)     that neither these Standard Terms nor any Transaction has been executed or traded on a "trading facility" as such term is defined in the CEA;

(3)     the primary right and obligation of each party and any Transaction is to make or receive the respective payments referred to in the Confirmation; and

(4)     that each Transaction is a "swap agreement" within the meaning of Section 101 (53B) of the U.S. Bankruptcy Code entitled to the protection of Section 560 of the U.S. Bankruptcy Code.

(b)     CS and the Counterparty confirm and agree that it is an express term of each Transaction that:

(1)     neither party acquires any interest in or right to acquire or dispose of any Share or any right to vote or give any consent with respect to any Share by virtue of any Transaction; and

(2)     neither party is obliged to sell, purchase, hold, deliver or receive any Share by virtue of any Transaction.

(c)     The Counterparty represents that it is entering into these Standard Terms and any Confirmation in good faith and not with the intent or as a part of a plan to evade compliance with U.S. federal securities laws including, without limitation, Section 13(d) of and Rule 10b-5 promulgated under the Exchange Act.

(d)     The Counterparty represents that it is not entering into any Transaction with the purpose of changing or influencing control of the Issuer of the related Shares and, if the Counterparty does seek to change or influence control of such Issuer during the terms of the Transaction, it will immediately notify CS.

(e)     The Counterparty represents to CS on the date that the parties enter into a Transaction that the Counterparty is not in possession of any material non-public information regarding any Issuer of Shares, including any Shares included in a Custom Basket, underlying such Transaction. The Counterparty covenants that it will not seek to terminate, amend or otherwise modify such Transaction if the Counterparty is in possession of any material non-public information regarding the relevant Issuer.

(f)    The Counterparty represents to CS on the date that the parties enter into a Transaction that the Counterparty is not an "affiliate" of the Issuer of the Shares, including any Shares included in a Custom Basket, underlying a Transaction within the meaning of any securities law applicable to such Issuer or subject to the reporting requirements of Section 16 of the Exchange Act in respect of such Shares.  The Counterparty covenants that if it attains such status or becomes so subject during the term of the relevant Transaction and, if the Counterparty does attain such status, it will promptly notify CS.

(g)    The Counterparty represents to CS on the date that the parties enter into any Transaction that the Counterparty has made all public filings under the Exchange Act or other applicable law with respect to the related Shares as required by applicable law or regulation and, during the term of any Transaction, it will continue to make all public filings under the Exchange Act or other applicable law with respect to the related Shares.  The Counterparty further represents that if it beneficially owns 5% or more of any class of the Issuer's securities registered under the Exchange Act, it is eligible to file reports on Schedule 13G and it will notify CS immediately following any filing in respect of such securities on Schedule 13D.  The Counterparty represents that the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative position, is less than 20% of the outstanding Shares.

(h)    The Counterparty represents to CS that it will make all disclosures required by law or regulation in respect of its entry into any Transaction.

(i)    The Counterparty further acknowledges and agrees:

    (1)    that CS and its affiliates may, at the date of any Transaction or at any time thereafter, be in possession of information in relation to Shares that is or may be material in the context of any Transaction that is not publicly available or known to the Counterparty; and

    (2)    that the Master Agreement, these Standard Terms (and all related material, including but not limited to any relevant Schedule, Appendix, and Confirmations) create no obligation whatsoever on the part of CS or its affiliates to disclose to the Counterparty any such information (whether or not confidential).

(j)    For the purpose of facilitating any Transaction, Credit Suisse Securities (USA) LLC ("CSSU"), which is organized in the United States of America (the "Agent"), has acted as agent for CS.  The Agent is not a principal with respect to such Transaction and shall have no responsibility or liability to the parties as a principal with respect to such Transaction.

(k)    Each party agrees that: (i) CSSU is not acting as a principal with respect to these Standard Terms or any Transaction hereunder and (ii) shall have no responsibility or liability (including without limitation, by way of guarantee, endorsement or otherwise) to any party in respect of these Standard Terms or any Transaction hereunder, including without limitation, in respect of the failure of a party to pay or perform under these Standard Terms or any Transaction. The Counterparty hereby agrees that it will not proceed against CSSU in respect of any obligation owed to it under these Standard Terms or any Transaction hereunder.

(l)     Notwithstanding any other method of delivery, the Counterparty agrees to electronic access or delivery via the Internet, either by email or through any website designated for this purpose by CS, of Confirmations and any detailed transaction and account information.

(m)     <u>Advanced Execution Services (AES) Platform Terms</u>

   A.  Counterparty represents to CS that:

      (1) Each Equity Swap Transaction entered into pursuant to these Standard Terms and executed through the advanced execution services platform of CS or its affiliate (each such Equity Swap Transaction, an "AES Swap") is, to the best of its knowledge and belief upon due enquiry, permissible under and complies with all laws or regulations applicable to Counterparty.

      (2) On the date that the parties enter into any AES Swap, it is not subject to the reporting requirements of Section 13 or Section 16 of the Exchange Act with respect to the Shares underlying any AES Swap, and it covenants that it will not become subject to such reporting requirements with respect to Shares during the term of any AES Swap.

   B.  CS hereby notifies Counterparty that each of the following criteria (collectively, the "Criteria") will apply to any AES Swaps:

      (1) The aggregate AES Swaps on any trading day with respect to any underlying Shares will: (i) not exceed one percent (1%) of the outstanding underlying of such Shares for that Issuer's class of securities and (ii) not exceed fifteen percent (15%) of the average daily trading volume of such Shares based on the lesser of (x) the thirty (30) day trailing average daily trading volume of such Shares and (y) the projected trading volume of such Shares for such trading day and (iii) the resulting swap will have an Equity Notional Amount of less than USD$125,000,000, in each case as determined by CS.

      (2) Certain additional internal limits will apply to each AES Swap as well as the aggregate AES Swaps on all underlying Shares entered into by Counterparty on any trading day; in each case, such limits will be determined by CS.

      (3) The underlying Shares in respect of each AES Swap will (x) be listed on the New York Stock Exchange or the NASDAQ National Stock Market, (y) be a Regulation NMS stock and (z) have an average daily trading volume of at least 10,000 shares, in each of cases (x) through (z) as determined by CS.

      Counterparty understands that CS has the right to change the Criteria and will notify (which notice may be oral, electronic or otherwise) Counterparty of any changes in the Criteria.

14. **Costs and Expenses**

Each party shall bear its own costs and expenses in relation to these Standard Terms and to each Transaction thereunder.

15. **Independent Amount**

As specified in the Confirmation as a percentage of the Equity Notional Amount; *provided* that CS, acting in a commercially reasonable manner, may upon 3 Business Days prior notice to the Counterparty change the Independent Amount with respect to a Transaction to reflect the Independent Amount that CS determines in good faith and in a commercially reasonable manner would be applicable (as determined solely by reference to its internal sources used by it in the regular course of its business) to the Counterparty in respect of such Transaction as of the relevant date of determination if CS and such Counterparty had entered into such Transaction on such date of determination.

16. **Brazil Indemnification**

In the event that a liability for any tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) imposed by tax authorities of the Federative Republic of Brazil ("Taxes") at any time in respect of any Transaction or in relation to any assets held, purchased, acquired, whether directly or indirectly, actually or synthetically, relating to such Transaction or any connected hedging activity, including any payments made under or in respect of such Transaction or assets, whether or not such Transaction has matured or been terminated and regardless of the date on which such Taxes are imposed, Counterparty agrees that it shall indemnify CS and keep it indemnified against any and all losses, claims, payments and expenses caused by or arising from or in connection with such Taxes suffered or incurred by CS.

The parties agree that the provisions of this sub-clause and the indemnity provided herein shall survive termination of the Transaction until the applicable statute of limitations for recovery of taxes by the relevant tax authorities has run out.

Schedule to Portfolio Swaps (Standard Terms) Annex:

Dated ___December 15___ 2020 which supplements the Master Agreement dated as of
_December 15,_ 2020 between

Credit Suisse International
and
The Archegos Fund, LP (the "Counterparty")

Dividend Reinvestment Option:                Reinvest Equally
    (for a Share Basket Swap                 Reinvest Specific Shares/Indices
    Transaction or Index Basket
    Swap Transaction only)

Reset Date (Interest):                       Monthly

Designated Maturity:                         One Month

Floating Amount Payment Date:                Each Equity Amount Payment Date

In respect of an Index Swap Transaction or an Index Basket Swap Transaction, where the
Confirmation specifies the Type of Return as Total Return, references to Shares for purposes
of Article 10 of the Equity Definitions shall be deemed to be references to Shares within the
Index and the provisions of Section 7 shall apply and the following terms related to the
Dividend Amount shall apply:

Realized Index Dividend Points:        An amount determined by the Calculation Agent
                                       in accordance with the following formula:

$$\sum_t \sum_i \frac{n_{i_t} \times d_{i_t}}{D_t}$$

where:

$t$ means each day in a Dividend Period (each, a "Relevant Day$_t$");

$i$ means, in respect of each Relevant Day$_t$, each share that is comprised in the
Index on that Relevant Day$_t$ (each, a "Share$_i$");

$d_{it}$ means, in respect of each Share$_i$ and a Relevant Day$_t$:

(a) if an Ex-Dividend Date in respect of such $Share_i$ falls on such Relevant $Day_t$, an amount equal to the Relevant Dividend in respect of such $Share_i$ and such Relevant $Day_t$; and

(b) otherwise, an amount equal to zero;

$n_{it}$ means, in respect of each $Share_i$ and a Relevant $Day_t$, the number of shares of such $Share_i$ then comprised in one Unit of the Index, as calculated and published by the Index Sponsor (or if not published directly, a value implied by the Index Sponsor as determined by the Calculation Agent) on such Relevant $Day_t$, subject to the terms of the Failure to Publish provision set out below;

$D_t$ means, in respect of each Relevant $Day_t$, (a) the divisor, as calculated and published by the Index Sponsor on such Relevant $Day_t$, subject to the terms of the Failure to Publish provision set out below or (b) if the Index Sponsor does not apply any such divisor, a value implied by the Index Sponsor as determined by the Calculation Agent.

Relevant Dividend: In respect of a $Share_i$, a Relevant $Day_t$ and a Dividend Period, an amount per such share (as determined by the Calculation Agent) equal to:

the product of the Dividend Percentage and the relevant Qualifying Dividend whose Ex-Dividend Date falls on such Relevant $Day_t$ and which would have been received by a holder of record of such $Share_i$ from the Issuer of $Share_i$.

Qualifying Dividend: In respect of a $Share_i$:

(a) any cash dividend declared by the Issuer of such $Share_i$ before any withholding or deduction for or on account of any tax (but excluding any associated tax credit, refund or withholding or deduction on account of any tax on any such associated tax credit or refund), arising under the law of the jurisdiction of the Issuer which would have been made by or on behalf of the Issuer in respect of the Qualifying Dividend, and, provided that such $Share_i$ is priced in a currency other than the base currency of the Index, such amount shall be converted at the foreign exchange rate published by the Index Sponsor at the Valuation Time on the preceding Exchange Business Day or at other such value implied by the Index Sponsor to formulate the number of dividend points for the total return calculation of the Index; or

(b) in the case of any non-cash dividend, the cash value declared by the Issuer of such $Share_i$ of any such non-cash dividend (or, if no such cash value is declared by the relevant Issuer, the cash value of such stock dividend as determined by the Calculation Agent); *provided* that, in each case, any cash or non-cash dividend in relation to which the Index Sponsor makes corresponding adjustments to the Index will not be a Qualifying Dividend. If the Index Sponsor adjusts the Index

for part of a dividend, this Qualifying Dividend provision shall apply only to the unadjusted part.

Ex-Dividend Date:

In respect of a Share$_i$ and a Qualifying Dividend, the first day (following the declaration of such Qualifying Dividend) on which such Share$_i$ commences trading ex such Qualifying Dividend on the relevant exchange.

Failure to Publish:

If, for the purposes of determining n$_{it}$ or D$_t$ on any Relevant Day$_t$, the Index Sponsor fails (for whatever reason) to calculate and publish the number of shares in respect of any Share$_i$ or the divisor, respectively, then, subject to the provision under "Corrections" below, the Calculation Agent shall determine the number of shares in respect of such Share$_i$ or the divisor (as the case may be) in respect of such Relevant Day$_t$.

In making any such determination, the Calculation Agent may (but shall not be obliged to) make reference to the formula for and method of calculating the number of shares in respect of such Share$_i$ or the divisor (as the case may be) last in effect prior to the failure by the Index Sponsor to make the relevant calculation publication.

Corrections:

In the event that a number of shares in respect of any Share$_i$ or the divisor (as the case may be) is calculated and published by the Index Sponsor (or determined by the Calculation Agent pursuant to the provisions above (Failure to Publish)) and utilized for any calculation or determination made under the relevant Transaction is subsequently corrected (or, where there has been a Failure to Publish, published by the Index Sponsor) and the correction is published (or, where there has been a Failure to Publish, publication is made) by the Index Sponsor within thirty Scheduled Trading Days after the Dividend Payment Date on which a Dividend Amount has been paid, either party may notify the other party of that correction and the Calculation Agent will adjust the Dividend Amount, as required, to take into account such correction; *provided* that if such correction or subsequent publication occurs after the relevant Dividend Payment Date, the Calculation Agent shall, unless otherwise agreed by the parties determine any appropriate

DocuSign Envelope ID: AF0F4F53-1470-42B0-B5B7-E91D8795469D

repayment to be made by a party to account for such correction or subsequent publication, as the case may be, and determine the date any such repayment should be made, together with interest on such repayment amount as determined by the Calculation Agent. The parties expressly acknowledge and agree that the provisions of this paragraph (Corrections) shall apply and remain in full force and effect notwithstanding the fact that the Termination Date has occurred.

89383415_8

CREDIT SUISSE INTERNATIONAL

DocuSigned by:

_____
A0BFBEE2239813

Name Steven J Reis

Title: Authorized Signatory

December 16, 2020

DocuSigned by:

Erica Hryniuk

_____
5845F2D587F8435

Name Erica Hryniuk

Title: Authorized Signatory

December 16, 2020

**ARCHEGOS FUND, LP**

Name:  Sung Kook Hwang
Title:  Managing Member of the General Partner

# EXHIBIT 4

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Calculation Date | Variation Margin Paid by Credit Suisse | Variation Margin Paid by Archegos | Balance of Variation Margin Paid to Archegos |
| 2 | 1/4/2021 | | | -941,919,641 |
| 3 | 1/5/2021 | | 29,230,000 | -912,689,641 |
| 4 | 1/7/2021 | 50,000,000 | | -962,689,641 |
| 5 | 1/8/2021 | | | -962,689,641 |
| 6 | 1/11/2021 | 200,000,000 | | -1,162,689,641 |
| 7 | 1/12/2021 | | | -1,162,689,641 |
| 8 | 1/13/2021 | 50,000,000 | | -1,212,689,641 |
| 9 | 1/14/2021 | 50,000,000 | | -1,262,689,641 |
| 10 | 1/15/2021 | 150,000,000 | | -1,412,689,641 |
| 11 | 1/19/2021 | 100,000,000 | | -1,512,689,641 |
| 12 | 1/20/2021 | 250,000,000 | | -1,762,689,641 |
| 13 | 1/21/2021 | 50,000,000 | | -1,812,689,641 |
| 14 | 1/22/2021 | | | -1,812,709,588 |
| 15 | 1/25/2021 | 200,035,165 | | -2,012,744,753 |
| 16 | 1/26/2021 | 150,000,000 | | -2,162,744,753 |
| 17 | 1/27/2021 | 200,000,000 | | -2,362,744,753 |
| 18 | 1/28/2021 | | | -2,362,744,753 |
| 19 | 1/29/2021 | | | -2,362,744,753 |
| 20 | 2/1/2021 | | | -2,362,744,753 |
| 21 | 2/2/2021 | | | -2,362,744,753 |
| 22 | 2/3/2021 | | 166,060,000 | -2,196,684,753 |
| 23 | 2/4/2021 | | | -2,196,684,753 |
| 24 | 2/5/2021 | | | -2,196,684,753 |
| 25 | 2/8/2021 | 200,000,000 | | -2,396,684,753 |
| 26 | 2/9/2021 | 100,000,000 | | -2,496,684,753 |
| 27 | 2/10/2021 | | | -2,496,684,753 |
| 28 | 2/11/2021 | | | -2,496,684,753 |
| 29 | 2/12/2021 | | | -2,496,684,753 |
| 30 | 2/16/2021 | | | -2,496,684,753 |
| 31 | 2/17/2021 | | | -2,496,684,753 |
| 32 | 2/18/2021 | | 33,528,746 | -2,463,156,007 |
| 33 | 2/19/2021 | | | -2,463,156,007 |
| 34 | 2/22/2021 | | | -2,463,156,007 |
| 35 | 2/23/2021 | | | -2,463,156,007 |
| 36 | 2/24/2021 | | | -2,463,156,007 |
| 37 | 2/25/2021 | | | -2,463,156,007 |
| 38 | 2/26/2021 | | | -2,463,156,007 |
| 39 | 3/1/2021 | | | -2,463,156,007 |
| 40 | 3/2/2021 | | | -2,463,156,007 |
| 41 | 3/3/2021 | | | -2,463,156,007 |
| 42 | 3/4/2021 | | | -2,463,156,007 |
| 43 | 3/5/2021 | | | -2,463,156,007 |
| 44 | 3/8/2021 | | | -2,463,156,007 |
| 45 | 3/9/2021 | | | -2,463,156,007 |
| 46 | 3/10/2021 | | | -2,463,156,007 |
| 47 | 3/11/2021 | 740,000,000 | | -3,203,156,007 |
| 48 | 3/12/2021 | 650,000,000 | | -3,853,156,007 |
| 49 | 3/15/2021 | 200,000,000 | | -4,053,156,007 |

| | A | B | C | D |
|---|---|---|---|---|
| 50 | 3/16/2021 | 76,000,000 | | -4,129,156,007 |
| 51 | 3/17/2021 | 145,000,000 | | -4,274,309,756 |
| 52 | 3/18/2021 | 230,000,000 | | -4,504,309,756 |
| 53 | 3/19/2021 | 400,000,000 | | -4,904,309,756 |
| 54 | 3/22/2021 | | | -4,904,309,756 |
| 55 | 3/23/2021 | | | -4,904,309,756 |
| 56 | 3/24/2021 | | 158,550,000 | -4,745,759,756 |
| 57 | 3/25/2021 | | | -4,745,759,756 |

# EXHIBIT 5

**Notice of Event of Default, Additional Termination Event and Early Termination Date**

**BY EMAIL, FAX AND COURIER**

March 25, 2021

Archegos Fund, LP

888 Seventh Avenue, 38th Floor

New York, NY 10018

Attention: Patrick Halligan, Chief Financial Officer

Email: phalligan@archegoscapital.com

Facsimile: +1 (212) 984-8896


With a copy to: Scott Becker

Email: sbecker@archegoscapital.com


Dear Sirs:

**Re:    Events of Default and/or Termination Events under ISDA Master Agreements and Customer Agreement**

We refer to:

- that certain Customer Agreement dated December 5, 2008, entered into by Credit Suisse Securities (USA) LLC ("**CSSU**") and Archegos Fund LP (f/k/a Tiger Asia Fund, L.P.) (as amended, restated, supplemented or otherwise modified from time to time, the "**PB Agreement**");

- the ISDA Master Agreement dated December 15, 2020, entered into by Credit Suisse International ("**CSI**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSI ISDA**");

- the ISDA Master Agreement dated February 4, 2005, entered into by Credit Suisse Securities (Europe) Limited (f/k/a Credit Suisse First Boston (Europe) Limited) ("**CSSEL**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSSEL ISDA**");

- the ISDA Master Agreement dated June 17, 2009, entered into by Credit Suisse AG (f/k/a Credit Suisse) ("**CSAG**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSAG ISDA**");

Herein we refer to (1) the CSI ISDA, the CSSEL ISDA and the CSAG ISDA collectively as the "**ISDA Agreements** and (2) the ISDA Agreements and the PB Agreement collectively as the "**Agreements**"; and (3) CSSU, CSI, CSSE and CSAG as "**CS**".

We hereby notify you that it has come to our attention that the following have occurred:

- An "Event of Default" under Section 6(d) of the Customer Agreement as a result of Archegos Fund LP ("**Archegos**") stating that it would not perform certain

"Obligations", including but not limited to the delivery of required margin under the Agreements.

- An "Event of Default" under Section 6(b) of the PB Agreement as a result of Archegos failing to provide margin to CSSU when required.

- An "Additional Termination Event" under Part 1(h)(v) of the Schedule to the CSI ISDA as a result of the "Event of Default" under the PB Agreement;

- An "Event of Default" under the CSAG ISDA, with Archegos as the defaulting party, pursuant to Sections 5(a)(v) and 5(a)(vi) of such agreement;

- An "Event of Default" under the CSSEL ISDA, with Archegos as the defaulting party, pursuant to Sections 5(a)(v) and 5(a)(vi) of such agreement;

- An "Event of Default" under each of the ISDA Agreements, with Archegos as the defaulting party, pursuant to Sections 7 and 22 of the PB Agreement

In accordance with Section 6 of the CSI ISDA, CSI hereby notifies Archegos that CSI (a) hereby exercises its right to terminate all of the Transactions thereunder pursuant to Section 6(b) of the CSI ISDA; and (b) designates March 26, 2021, as the Early Termination Date for the Transactions.

In accordance with Section 6 of the CSSEL ISDA, CSSEL hereby notifies Archegos that CSSEL (a) hereby exercises its right to terminate all of the Transactions thereunder pursuant to Section 6(b) of the CSSEL ISDA; and (b) designates March 26, 2021, as the Early Termination Date for such Transactions.

In accordance with Section 6 of the CSAG ISDA, CSAG hereby notifies Archegos that CSAG (a) hereby exercises its right to terminate all of the Transactions thereunder pursuant to Section 6(b) of the CSAG ISDA; and (b) designates March 26, 2021, as the Early Termination Date for such Transactions.

In accordance with Section 7 of the PB Agreement, CSSU hereby notifies Archegos that, as a result of the "Event of Default" thereunder, it will exercise its rights and remedies under Section 7 of the PB Agreement.

In accordance with the provisions of Section 6(d) of the ISDA Agreements, a statement showing the calculations of CSI, CSSEL and CSAG, respectively, pursuant to Section 6(e) of the relevant ISDA Agreement will be provided to Archegos as soon as reasonably practicable.

Each of CSSU, CSI, CSSEL and CSAG hereby reserves all of its rights, remedies, powers and privileges under applicable law and in equity. For the avoidance of doubt, nothing herein shall preclude CS from declaring that any further default, event of default, material breach or termination event (howsoever characterized) has occurred under the terms of the Agreements or any other contract or from exercising any of their respective rights or remedies under the Agreements or otherwise. Nothing herein shall operate as a waiver or forbearance of any of such entities' respective rights, remedies, powers or privileges.

*[Signature Page Follows]*

□□□□□□□□□□□□□□□□□□□□□□□□ □□□ □□□□□□□□□□□□□□□□□□□□□ □□□ □ □□□□□□□□□

Archegos Fund, LP

Page 3

**Credit Suisse Securities (USA) LLC**

By:

Name: □□□□□□□□□□□□□□

Title: □□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

**Credit Suisse International**

By:

Name: □□□□□□□□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

By:

Name: □□□□□□□□□□ □□□□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□□

**Credit Suisse Securities (Europe) Limited**

By:

Name: □□□□□□□□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

By:

Name: □□□□□□□□□□ □□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

**Credit Suisse AG**

By:

Name: □□□□□□□□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

By:

Name: □□□□□□□□□□ □□□□□□□

Title: □□□□□□□□□□□□□□□□□□□□□□□□□
□□□□□□□□□□□□□□

# EXHIBIT 6

September 17, 2021

**Amended and Restated Section 6(d) Statement**
CREDIT SUISSE INTERNATIONAL
CREDIT SUISSE SECURITIES (EUROPE) LIMITED
CREDIT SUISSE AG

This statement amends and restates in its entirety the Close-Out Statement dated June 28, 2021, previously provided by the above-referenced entities.

Reference is made to:

- the ISDA Master Agreement dated December 15, 2020, entered into by Credit Suisse International ("**CSI**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSI ISDA**");

- the ISDA Master Agreement dated February 4, 2005, entered into by Credit Suisse Securities (Europe) Limited (f/k/a Credit Suisse First Boston (Europe) Limited) ("**CSSEL**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSSEL ISDA**");

- the ISDA Master Agreement dated June 17, 2009, entered into by Credit Suisse AG (f/k/a Credit Suisse) ("**CSAG**") and Archegos Fund LP (as amended, restated, supplemented or otherwise modified from time to time, the "**CSAG ISDA**");

Herein (1) the CSI ISDA, the CSSEL ISDA and the CSAG ISDA are referred to collectively as the "**ISDA Agreements**"; and (2) CSI, CSSE and CSAG, are referred to collectively or individually as the context requires, as "**CS**". Previous correspondence dated March 25 and June 28, 2021 are referred to herein as the "**Default Notice**" and the "**Close-Out Statement**", respectively.

Terms not otherwise defined herein shall have the meanings given to them in the relevant ISDA Agreement.

Close-out of CSI ISDA Transactions
Attached as Annex I is a revised statement specifying amounts owed in connection with the early termination of Transactions calculated by CS to be payable by Archegos to CSI in accordance with Section 6(d) of the CSI ISDA. In total, such amount is U.S. $540,399,659 ("**CSI Early Termination Amount**").

Amounts Under the Credit Support Annex to the Schedule to the CSI ISDA
Pursuant to Paragraph 8(b) of the Credit Support Annex to the Schedule to the CSI ISDA (the "**CSI CSA**"), Archegos Fund LP has been required to Transfer to CSI all Posted Collateral (VM) and applicable Interest Payments (VM). As of the Early Termination Date, Archegos Fund LP held Posted Collateral (VM) of U.S. $4,745,794,439 ("**CSI Unreturned Collateral**"). In addition, as of June 25 2021, collateral posted by CSI to you had accrued interest of U.S. $168,742 (the "**CSI Accrued Collateral Interest**").

Close-out of CSAG ISDA Transactions
Attached as Annex II is a revised statement specifying amounts owed in connection with the early termination of Transactions calculated by CS to be payable by CSAG to Archegos in accordance with Section 6(d) of the CSAG ISDA. In total, such amount is U.S. $11,057 ("**CSAG Early Termination Amount**").

<u>Amounts Under the Credit Support Annex to the Schedule to the CSAG ISDA</u>
As of the Early Termination Date, CSAG held Posted Collateral (VM) of U.S. $9,962,979 (the "**Archegos Unreturned Collateral**"). In addition, as of June 25, 2021, collateral posted by Archegos Fund LP to CSAG had accrued interest of U.S. $1,698 (the "**Archegos Accrued Collateral Interest**").

**<u>Total Amounts Owed to CS Under ISDA Agreements</u>**
As a result of the termination of the CSI ISDA, Archegos owes to CSI U.S. $5,286,362,840, which consists of the CSI Early Termination Amount *plus* CSI Unreturned Collateral *plus* the CSI Accrued Collateral Interest. ("**CSI Required Amount**"). As a result of the termination of the CSAG ISDA, CSAG owes to Archegos U.S. $9,975,734, which consists of the CSAG Early Termination Amount *plus* the Archegos Unreturned Collateral *plus* the Archegos Accrued Collateral Interest ("**CSAG Required Amount**").

Pursuant to Part 5(g) of the Schedule to the CSAG ISDA, on June 25, 2021, CSAG set off the CSAG Required Amount against the CSI Required Amount. As of the date of this statement, the total amount payable by Archegos to CSI is U.S. **$5,276,387,106**.

Pursuant to Section 6(d)(ii) of the CSI ISDA, interest at the Applicable Rate is owed on the Close-out Amount from (and including) March 26, 2021 to (and including) the date on which the Close-out Amount is paid. Please note that interest continues to accrue on amounts due to CSI in accordance with the CSI ISDA.

Please note that CS may, in due course, make a claim under the indemnity set forth in Section 11 of each of the ISDA Agreements for additional reasonable out-of-pocket expenses, including legal fees, incurred by reason of the enforcement and protection of CS's rights under the ISDA Agreements and/or by reason of the early termination of the Transactions, including, but not limited to, costs of collection.

CS's USD account payment instructions are as follows:-

      CREDIT SUISSE INTERNATIONAL
      USD Cash
      BANK OF NEW YORK, NEW YORK
      ABA# 021 000 018
      IRVTUS3N
      CREDIT SUISSE INTERNATIONAL
      CSFPGB2L
      ACCT# 890-0360-968
      Attn: Archegos Fund, LP

CS hereby notifies Archegos of its address details for notices under each ISDA Agreement and for purposes of communications relating to this notice:

> <u>CS Recovery Management</u>
> Leonora Daniel
> Managing Director – Global Head Recovery Management IB/APAC
> +44 20 7888 4599
> Leonora.daniel@credit-suisse.com
>
> Rizwan Merchant
> Director – Recovery Management IB/APAC
> (212) 325-8828
> Rizwan.merchant@credit-suisse.com
>
> <u>Credit Suisse Legal</u>
> Stacey Zyzyck, Director
> (212) 325-5038
> Stacey.Zyzyck@credit-suisse.com
>
> Christopher Pyfer
> (212) 538-3664
> christopher.pyfer@credit-suisse.com
>
> <u>External Counsel</u>
> Anirudh Bansal, Partner
> (212) 701-3207
> abansal@cahill.com
> Joel H. Levitin, Partner
> (212) 701-3770
> jlevitin@cahill.com
> Cahill Gordon & Reindel LLP
> 32 Old Slip
> New York, NY 10005

Without limiting anything herein, CS reserves the right to make any and all claims that it may now have or may have in the future against Archegos, including without limitation claims for interest (including default interest), additional attorney's fees and disbursements and other expenses arising or accruing on or after March 26, 2021 against such claims.

All of CS's rights and remedies are expressly reserved and not waived, including under any applicable agreement, at law or in equity. Nothing herein shall operate as a waiver or forbearance of any of CS's rights, remedies, powers or privileges.

This notice shall be governed by and construed in accordance with the applicable law governing the CSI ISDA.

**Annex I**

| **Unpaid Amounts** | | | **USD** |
| --- | --- | --- | --- |
| | Unpaid Amounts owing to Credit Suisse | | 0 |
| | Unpaid Amounts owing to Archegos | | 0 |

| **Early Termination Amount** | **USD** |
| --- | --- |
| | 540,399,659 |

| **Posted Collateral (cash)** | **USD** |
| --- | --- |
| Collateral posted by Credit Suisse | (4,745,794,439) |

| **Close-out Amount** | **USD** |
| --- | --- |
| | 5,286,194,098 |

| | Trade ID | Notional Amount | USD Equivalent (as of 6/21/2021) |
| --- | --- | --- | --- |
| 1. | Ext ID 16430354 | JPY 1,088,938,091.41 | 9,865,133 |
| 2. | Ext ID 16430353 | USD 28,059,859.12 | 28,059,859 |
| 3. | Ext ID 16430507 | USD (1,670,254.92) | (1,670,255) |
| 4. | Ext ID 16430510 | USD (5,618,903.71) | (5,618,904) |
| 5. | Ext ID 16430513 | USD (3,082,764.45) | (3,082,764) |
| 6. | Ext ID 16430519 | USD (770,865.05) | (770,865) |
| 7. | Ext ID 16430522 | USD (1,893,581.50) | (1,893,582) |
| 8. | Ext ID 16430525 | USD (1,992,962.45) | (1,992,962) |
| 9. | Ext ID 16430528 | USD (6,347,382.18) | (6,347,382) |
| 10. | Ext ID 16430534 | USD (1,141,338.86) | (1,141,339) |
| 11. | Ext ID 16430537 | USD (338,552.31) | (338,552) |
| 12. | Ext ID 16430540 | USD (1,229,142.89) | (1,229,143) |
| 13. | Ext ID 16430543 | USD (185,662.88) | (185,663) |
| 14. | Ext ID 16430552 | USD (1,236,582.28) | (1,236,582) |
| 15. | Ext ID 16430618 | USD 575,509,954.49 | 575,509,954 |
| 16. | Ext ID 16430624 | USD 25,000,862.45 | 25,000,862 |
| 17. | Ext ID 16430471 | USD (30,161,612.50) | (30,161,613) |
| 18. | Ext ID 16430352 | HKD 187,902,675.67 | 24,199,138 |
| 19. | Ext ID 16430444 | USD (7,461,202.87) | (7,461,203) |
| 20. | Ext ID 16430465 | USD (21,539,781.92) | (21,539,782) |
| 21. | Ext ID 16430504 | USD (7,968,621.34) | (7,968,621) |
| 22. | Ext ID 16430516 | USD (145,772.49) | (145,772) |
| 23. | Ext ID 16430531 | USD (221,232.80) | (221,233) |
| 24. | Ext ID 16430555 | USD (2,297,851.23) | (2,297,851) |
| 25. | Ext ID 16430627 | USD 121,035,215.02 | 121,035,215 |
| 26. | Ext ID 16430630 | USD (40,481,204.27) | (40,481,204) |
| 27. | Ext ID 16430633 | USD (2,109,384.96) | (2,109,385) |
| 28. | Ext ID 16430636 | USD 103,578,806.98 | 103,578,807 |
| 29. | Ext ID 16430347 | EUR (356,946.24) | (425,765) |

| 30. | Ext ID 16430355 | USD (7,641.75) | (7,642) |
|---|---|---|---|
| 31. | Ext ID 16430447 | USD (2,846,374.72) | (2,846,375) |
| 32. | Ext ID 16430450 | USD (7,219,595.47) | (7,219,595) |
| 33. | Ext ID 16430453 | USD (13,563,826.35) | (13,563,826) |
| 34. | Ext ID 16430456 | USD (4,903,666.89) | (4,903,667) |
| 35. | Ext ID 16430459 | USD (348,691.00) | (348,691) |
| 36. | Ext ID 16430462 | USD (13,016,692.94) | (13,016,693) |
| 37. | Ext ID 16430468 | USD (4,612,927.93) | (4,612,928) |
| 38. | Ext ID 16430474 | USD (112,939.46) | (112,939) |
| 39. | Ext ID 16430477 | USD (8,427,709.07) | (8,427,709) |
| 40. | Ext ID 16430480 | USD (9,448,474.52) | (9,448,475) |
| 41. | Ext ID 16430483 | USD (10,387,783.45) | (10,387,783) |
| 42. | Ext ID 16430486 | USD (606,690.67) | (606,691) |
| 43. | Ext ID 16430489 | USD (12,169,140.15) | (12,169,140) |
| 44. | Ext ID 16430492 | USD (6,564,699.24) | (6,564,699) |
| 45. | Ext ID 16430495 | USD 215,660.08 | 215,660 |
| 46. | Ext ID 16430498 | USD 1,481,471.18 | 1,481,471 |
| 47. | Ext ID 16430501 | USD (130,850.72) | (130,851) |
| 48. | Ext ID 16430546 | USD (50,403.27) | (50,403) |
| 49. | Ext ID 16430549 | USD (40,868.83) | (40,869) |
| 50. | Ext ID 16430558 | USD 970,526.99 | 970,527 |
| 51. | Ext ID 16430561 | USD 892,261.47 | 892,261 |
| 52. | Ext ID 16430564 | USD 33,568.52 | 33,569 |
| 53. | Ext ID 16430567 | USD (127,655.67) | (127,656) |
| 54. | Ext ID 16430570 | USD 1,070,116.30 | 1,070,116 |
| 55. | Ext ID 16430573 | USD (6,013,224.72) | (6,013,225) |
| 56. | Ext ID 16430576 | USD (7,900,279.41) | (7,900,279) |
| 57. | Ext ID 16430579 | USD (223,432.64) | (223,433) |
| 58. | Ext ID 16430582 | USD 2,060,882.69 | 2,060,883 |
| 59. | Ext ID 16430585 | USD 13,829.68 | 13,830 |
| 60. | Ext ID 16430588 | USD (10,726,757.04) | (10,726,757) |
| 61. | Ext ID 16430591 | USD 571,414.23 | 571,414 |
| 62. | Ext ID 16430594 | USD (15,199,394.86) | (15,199,395) |
| 63. | Ext ID 16430597 | USD (441,905.01) | (441,905) |
| 64. | Ext ID 16430600 | USD (4,292,688.15) | (4,292,688) |
| 65. | Ext ID 16430603 | USD (2,233,964.64) | (2,233,965) |
| 66. | Ext ID 16430606 | USD (6,370,172.94) | (6,370,173) |
| 67. | Ext ID 16430609 | USD (18,033,768.63) | (18,033,769) |
| 68. | Ext ID 16430612 | USD (479,096.06) | (479,096) |
| 69. | Ext ID 16430615 | USD (500,471.95) | (500,472) |
| 70. | Ext ID 16430621 | USD (36,189,412.08) | (36,189,412) |
| 71. | Ext ID 16444928 | USD 461,085.01 | 461,085 |
| 72. | Ext ID 16446270 | HKD (37,193,000.63) | (4,789,919) |
| 73. | Ext ID 16446272 | HKD 45,559,670.49 | 5,867,424 |
| 74. | Ext ID 16446275 | USD (14,186,008.51) | (14,186,009) |
| | | | 540,399,659 |

Annex I-2

**Annex II**

**CSAG FX Closeout**

| **Unpaid Amounts** | **USD** |
|---|---|
| | |
| Unpaid Amounts owing to Credit Suisse | 0 |
| Unpaid Amounts owing to Archegos | 0 |

| **Early Termination Amount** | **USD** |
|---|---|
| | (11,057) |

| **Posted Collateral (cash)** | **USD** |
|---|---|
| Collateral posted by Archegos | 9,962,979 |

| **Close-out Amount** | **USD** |
|---|---|
| | 9,974,036 |

| Type | Trade No. | ENTITY | FO REF | NET CONFIG | TRD. DATE | SET DT. | CUST NO. | CUST NAME | RATE | SAL CUR | PUR CUR | SAL AMOUNT | PUR AMOUNT | B/A | L/D |
|------|-----------|--------|--------|------------|-----------|---------|----------|-----------|------|---------|---------|------------|------------|-----|-----|
| FX | 180680352 | CSL | 28600 | G | 3/12/2021 | 4/9/2021 | 7P3230 | A/C ARCHEGOS FUND, LP | 108.9541 | USD | JPY | (2,347,449.77) | 255,764,277.00 | SAL | PUR |
| FX | 180680530 | CSL | 28673 | G | 3/30/2021 | 4/9/2021 | 7P3230 | A/C ARCHEGOS FUND, LP | 109.4697 | JPY | USD | (255,764,277.00) | 2,336,392.80 | SAL | PUR |
| | | | | | | | | | | | | | Difference: (11,056.97) | | |

Annex II-2

# EXHIBIT 7

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Trade Date | Description | Debit | Credit | Balance |
| 2 | | | | | (240,328,201.56) |
| 3 | Jan-04-2021 | Interest | (112,494.95) | | (240,440,696.51) |
| 4 | Jan-04-2021 | VIACOMCBS ORD SHS CLASS B | | 410,400.00 | (240,030,296.51) |
| 5 | Jan-04-2021 | Sell Trade - FX Forward | | 1,969,222.54 | (238,061,073.97) |
| 6 | Jan-06-2021 | Funds Paid By Wire | (22,955.73) | | (238,084,029.70) |
| 7 | Jan-07-2021 | DISCOVERY ORD SHS SERIES C | (9,090,510.00) | | (247,174,539.70) |
| 8 | Jan-08-2021 | GAOTU TECHEDU 3 ADR REPRESENTING 2 | | 14,483.04 | (247,160,056.66) |
| 9 | Jan-12-2021 | Funds Paid By Wire | (7,673,582.46) | | (254,833,639.12) |
| 10 | Jan-20-2021 | Sell Trade - FX Forward | | 792,252.41 | (254,041,386.71) |
| 11 | Jan-20-2021 | Funds Received By Wire | | 132.05 | (254,041,254.66) |
| 12 | Jan-20-2021 | Buy Trade - FX Spot | (57,004.63) | | (254,098,259.29) |
| 13 | Jan-22-2021 | Buy Trade - FX Forward | (580,373.68) | | (254,678,632.97) |
| 14 | Jan-25-2021 | Buy Trade - FX Forward | (1,081,355.81) | | (255,759,988.78) |
| 15 | Jan-26-2021 | Sell Trade - FX Forward | | 957,362.64 | (254,802,626.14) |
| 16 | Jan-28-2021 | GSX TECHEDU 3 ADR REPRESENTING 2 C | (6.00) | | (254,802,632.14) |
| 17 | Jan-28-2021 | BAIDU ADR REPTG 1/10 ORD SHS CLASS | (6,874.44) | | (254,809,506.58) |
| 18 | Jan-28-2021 | Cash Journal | | 6,880.44 | (254,802,626.14) |
| 19 | Jan-28-2021 | Cash Journal | (6,880.44) | | (254,809,506.58) |
| 20 | Jan-29-2021 | FOOT LOCKER ORD SHS | | 525.00 | (254,808,981.58) |
| 21 | Feb-01-2021 | Interest | (114,883.70) | | (254,923,865.28) |
| 22 | Feb-01-2021 | AT&T ORD SHS | | 17,472.00 | (254,906,393.28) |
| 23 | Feb-02-2021 | Buy Trade - FX Forward | (529,650.45) | | (255,436,043.73) |
| 24 | Feb-04-2021 | Funds Paid By Wire | (78,513.83) | | (255,514,557.56) |
| 25 | Feb-05-2021 | Buy Trade - FX Forward | (727,962.74) | | (256,242,520.30) |
| 26 | Feb-08-2021 | Buy Trade - FX Forward | (1,625,081.07) | | (257,867,601.37) |
| 27 | Feb-10-2021 | FUTU HOLDINGS ADR | (189,314,600.00) | | (447,182,201.37) |
| 28 | Feb-11-2021 | ONECONNECT FINANCIAL TECHNOLOGY AD | (312.73) | | (447,182,514.10) |
| 29 | Feb-11-2021 | Cash Journal | (312.73) | | (447,182,826.83) |
| 30 | Feb-11-2021 | Cash Journal | | 312.73 | (447,182,514.10) |
| 31 | Feb-12-2021 | Sell Trade - FX Forward | | 794,903.80 | (446,387,610.30) |
| 32 | Feb-12-2021 | Funds Paid By Wire | (19,683,642.75) | | (466,071,253.05) |
| 33 | Feb-17-2021 | Funds Paid By Wire | (58,934.41) | | (466,130,187.46) |
| 34 | Feb-17-2021 | Buy Trade - FX Forward | (2,443,203.25) | | (468,573,390.71) |
| 35 | Feb-19-2021 | Buy Trade - FX Forward | (1,152,711.07) | | (469,726,101.78) |
| 36 | Feb-19-2021 | Sell Trade - FX Forward | | 2,299,088.90 | (467,427,012.88) |
| 37 | Feb-23-2021 | Funds Paid By Wire | (357.40) | | (467,427,370.28) |
| 38 | Feb-25-2021 | INDEPENDENT BANK GROUP ORD SHS | | 15,000.00 | (467,412,370.28) |
| 39 | Feb-25-2021 | Funds Paid By Wire | (576,749.83) | | (467,989,120.11) |
| 40 | Mar-01-2021 | Interest | (162,325.41) | | (468,151,445.52) |
| 41 | Mar-03-2021 | Sell Trade - FX Forward | | 1,232,980.36 | (466,918,465.16) |
| 42 | Mar-04-2021 | Sell Trade - FX Forward | | 536,712.37 | (466,381,752.79) |
| 43 | Mar-11-2021 | Funds Received By Wire | | 40,000,000.00 | (426,381,752.79) |
| 44 | Mar-11-2021 | Funds Paid By Wire | (95,676,644.47) | | (522,058,397.26) |
| 45 | Mar-12-2021 | EVERCORE ORD SHS CLASS A | | 29,919.28 | (522,028,477.98) |
| 46 | Mar-12-2021 | Sell Trade - FX Forward | | 2,347,449.77 | (519,681,028.21) |
| 47 | Mar-12-2021 | Buy Trade - FX Forward | (2,345,404.75) | | (522,026,432.96) |
| 48 | Mar-16-2021 | Funds Received By Wire | | 76,000,000.00 | (446,026,432.96) |
| 49 | Mar-16-2021 | Funds Paid By Wire | (96,609,434.88) | | (542,635,867.84) |
| 50 | Mar-17-2021 | Transfer Of Funds | | 136,537.83 | (542,499,330.01) |
| 51 | Mar-17-2021 | Transfer Of Funds | (136,537.83) | | (542,635,867.84) |
| 52 | Mar-17-2021 | Funds Received By Wire | | 10,000,000.00 | (532,635,867.84) |
| 53 | Mar-24-2021 | Funds Received By Wire | | 19,030,000.00 | (513,605,867.84) |
| 54 | Mar-24-2021 | VIACOMCBS ORD SHS CLASS B | | 27,378,164.98 | (486,227,702.86) |
| 55 | Mar-24-2021 | VIACOMCBS ORD SHS CLASS B | (29,209,876.39) | | (515,437,579.25) |
| 56 | Mar-24-2021 | VIACOMCBS ORD SHS CLASS B | | 4,229,628.74 | (511,207,950.51) |
| 57 | Mar-24-2021 | VIACOMCBS ORD SHS CLASS B | | 777,596.03 | (510,430,354.48) |
| 58 | Mar-25-2021 | LIBERTY MEDIA FORMULA ONE ORD SHS | | 287,438.16 | (510,142,916.32) |
| 59 | Mar-25-2021 | INTERCONTINENTAL EXCHANGE ORD SHS | | 924,176.59 | (509,218,739.73) |
| 60 | Mar-25-2021 | NETFLIX ORD SHS | | 18,821,653.36 | (490,397,086.37) |
| 61 | Mar-25-2021 | SQUARE ORD SHS CLASS A | | 26,019,994.46 | (464,377,091.91) |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 62 | Mar-25-2021 | INDEPENDENT BANK GROUP ORD SHS | | 2,005,021.05 | (462,372,070.86) |
| 63 | Mar-25-2021 | FOOT LOCKER ORD SHS | | 192,910.96 | (462,179,159.90) |
| 64 | Mar-25-2021 | ALIBABA GROUP HOLDING ADR REPRESEN | | 13,408,568.11 | (448,770,591.79) |
| 65 | Mar-25-2021 | AT&T ORD SHS | | 1,008,760.93 | (447,761,830.86) |
| 66 | Mar-25-2021 | THE REALREAL ORD SHS | | 159,934.43 | (447,601,896.43) |
| 67 | Mar-25-2021 | FUTU HOLDINGS ADR | | 4,143,273.22 | (443,458,623.21) |
| 68 | Mar-25-2021 | MATCH GROUP ORD SHS | | 4,287,426.24 | (439,171,196.97) |
| 69 | Mar-25-2021 | MATCH GROUP ORD SHS | | 4,287,404.37 | (434,883,792.60) |
| 70 | Mar-25-2021 | EVERCORE ORD SHS CLASS A | | 5,790,248.72 | (429,093,543.88) |
| 71 | Mar-25-2021 | JETBLUE AIRWAYS ORD SHS | | 859,801.61 | (428,233,742.27) |
| 72 | Mar-25-2021 | MATCH GROUP ORD SHS | (4,287,426.24) | | (432,521,168.51) |
| 73 | Mar-25-2021 | LIBERTY MEDIA FORMULA ONE ORD SHS | (287,438.16) | | (432,808,606.67) |
| 74 | Mar-25-2021 | MATCH GROUP ORD SHS | (4,287,404.37) | | (437,096,011.04) |
| 75 | Mar-25-2021 | MATCH GROUP ORD SHS | | 4,287,404.37 | (432,808,606.67) |
| 76 | Mar-26-2021 | Mark To Market | | 3,175,513.36 | (429,633,093.31) |
| 77 | Mar-26-2021 | Mark To Market | (3,175,513.36) | | (432,808,606.67) |
| 78 | Mar-29-2021 | ONECONNECT FINANCIAL TECHNOLOGY AD | | 3,353.82 | (432,805,252.85) |
| 79 | Mar-29-2021 | FOCUS FINANCIAL PARTNERS ORD SHS C | | 2,256,337.26 | (430,548,915.59) |
| 80 | Mar-29-2021 | INDEPENDENT BANK GROUP ORD SHS | | 1,435,858.04 | (429,113,057.55) |
| 81 | Mar-29-2021 | ZILLOW GROUP ORD SHS CLASS C | | 813,566.40 | (428,299,491.15) |
| 82 | Mar-29-2021 | BAIDU ADS REPTG 8 ORD SHS CLASS A | | 86,076,385.42 | (342,223,105.73) |
| 83 | Mar-29-2021 | JOYY ADR | | 792,128.64 | (341,430,977.09) |
| 84 | Mar-29-2021 | FUTU HOLDINGS ADR | | 126,656,635.04 | (214,774,342.05) |
| 85 | Mar-29-2021 | TENCENT MUSIC ENTERTAINMENT GROUP | | 39,765,466.27 | (175,008,875.78) |
| 86 | Mar-29-2021 | FISERV ORD SHS | | 3,453,320.83 | (171,555,554.95) |
| 87 | Mar-29-2021 | EVERCORE ORD SHS CLASS A | (5,790,248.72) | | (177,345,803.67) |
| 88 | Mar-12-2021 | Sell Trade - FX Forward | | 2,347,449.77 | (174,998,353.90) |
| 89 | Mar-12-2021 | Buy Trade - FX Forward | (2,345,404.75) | | (177,343,758.65) |
| 90 | Mar-12-2021 | Cancel Buy Trade - FX Forward | | 2,345,404.75 | (174,998,353.90) |
| 91 | Mar-12-2021 | Cancel Sell Trade - FX Forward | (2,347,449.77) | | (177,345,803.67) |
| 92 | Mar-17-2021 | Transfer Of Funds | (2,345,404.75) | | (179,691,208.42) |
| 93 | Mar-17-2021 | Transfer Of Funds | (2,345,404.75) | | (182,036,613.17) |
| 94 | Mar-17-2021 | Transfer Of Funds | | 2,345,404.75 | (179,691,208.42) |
| 95 | Mar-17-2021 | Transfer Of Funds | | 2,345,404.75 | (177,345,803.67) |
| 96 | Mar-30-2021 | INDEPENDENT BANK GROUP ORD SHS | | 108,285.70 | (177,237,517.97) |
| 97 | Mar-30-2021 | FOCUS FINANCIAL PARTNERS ORD SHS C | | 667,200.74 | (176,570,317.23) |
| 98 | Mar-30-2021 | Buy Trade - FX Forward | (2,336,392.80) | | (178,906,710.03) |
| 99 | Mar-31-2021 | INTERCONTINENTAL EXCHANGE ORD SHS | | 2,722.83 | (178,903,987.20) |
| 100 | Mar-31-2021 | FOCUS FINANCIAL PARTNERS ORD SHS C | | 271,057.66 | (178,632,929.54) |
| 101 | Apr-01-2021 | Interest | (240,517.97) | | (178,873,447.51) |
| 102 | Apr-01-2021 | VIACOMCBS ORD SHS CLASS B | | 410,400.00 | (178,463,047.51) |
| 103 | Apr-01-2021 | VIPSHOP HOLDINGS SPONSORED ADS REP | | 14,156,480.51 | (164,306,567.00) |
| 104 | Apr-01-2021 | DISCOVERY ORD SHS SERIES C | | 9,981,281.04 | (154,325,285.96) |
| 105 | Apr-01-2021 | IQIYI ADS REPRESENTING 7 | | 7,613,805.52 | (146,711,480.44) |
| 106 | Apr-01-2021 | VIACOMCBS ORD SHS CLASS B | | 71,250,004.72 | (75,461,475.72) |
| 107 | Apr-05-2021 | Buy Trade - FX Spot | (495,302.27) | | (75,956,777.99) |
| 108 | Apr-05-2021 | Sell Trade - FX Spot | | 1,895,095.27 | (74,061,682.72) |
| 109 | Apr-05-2021 | Sell Trade - FX Spot | | 2,040,728.15 | (72,020,954.57) |
| 110 | Apr-05-2021 | EVERCORE ORD SHS CLASS A | | 5,790,248.72 | (66,230,705.85) |
| 111 | Apr-05-2021 | IQIYI ADS REPRESENTING 7 | | 6,557,609.60 | (59,673,096.25) |
| 112 | Apr-05-2021 | VIACOMCBS ORD SHS CLASS B | | 5,265,587.31 | (54,407,508.94) |
| 113 | Apr-05-2021 | DISCOVERY ORD SHS SERIES C | | 1,062,424.09 | (53,345,084.85) |
| 114 | Apr-05-2021 | VIPSHOP HOLDINGS SPONSORED ADS REP | | 12,701,942.40 | (40,643,142.45) |
| 115 | Apr-06-2021 | IQIYI ADS REPRESENTING 7 | | 574,730.90 | (40,068,411.55) |
| 116 | Apr-07-2021 | IQIYI ADS REPRESENTING 7 | | 35.66 | (40,068,375.89) |
| 117 | Apr-07-2021 | VIPSHOP HOLDINGS SPONSORED ADS REP | | 1,026,396.37 | (39,041,979.52) |
| 118 | Apr-09-2021 | Sell Trade - FX Spot | | 45,192.66 | (38,996,786.86) |
| 119 | Mar-12-2021 | Cancel Sell Trade - FX Forward | (2,347,449.77) | | (41,344,236.63) |
| 120 | Mar-30-2021 | Cancel Buy Trade - FX Forward | | 2,336,392.80 | (39,007,843.83) |
| 121 | Mar-30-2021 | Buy Trade - FX Forward | (2,336,392.80) | | (41,344,236.63) |
| 122 | Mar-12-2021 | Sell Trade - FX Forward | | 2,347,449.77 | (38,996,786.86) |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 123 | Apr-09-2021 | Transfer Of Funds | | 2,336,392.80 | (36,660,394.06) |
| 124 | Apr-09-2021 | Transfer Of Funds | (2,347,449.77) | | (39,007,843.83) |
| 125 | Apr-09-2021 | Transfer Of Funds | (2,336,392.80) | | (41,344,236.63) |
| 126 | Apr-09-2021 | Transfer Of Funds | | 2,347,449.77 | (38,996,786.86) |
| 127 | Apr-05-2021 | Cancel  Sell Trade - FX Spot | (1,895,095.27) | | (40,891,882.13) |
| 128 | Apr-05-2021 | Sell Trade - FX Spot | | 1,895,095.27 | (38,996,786.86) |
| 129 | Apr-05-2021 | Sell Trade - FX Spot | | 2,040,728.15 | (36,956,058.71) |
| 130 | Apr-05-2021 | Cancel  Sell Trade - FX Spot | (2,040,728.15) | | (38,996,786.86) |
| 131 | Apr-09-2021 | Sell Trade - FX Spot | | 45,192.66 | (38,951,594.20) |
| 132 | Apr-09-2021 | Cancel  Sell Trade - FX Spot | (45,192.66) | | (38,996,786.86) |
| 133 | Apr-05-2021 | Cancel  Buy Trade - FX Spot | | 495,302.27 | (38,501,484.59) |
| 134 | Apr-05-2021 | Buy Trade - FX Spot | (495,302.27) | | (38,996,786.86) |
| 135 | Apr-19-2021 | IQIYI ADS REPRESENTING 7 | (1,354.48) | | (38,998,141.34) |
| 136 | Apr-19-2021 | JOYY ADR | (166.08) | | (38,998,307.42) |
| 137 | Apr-19-2021 | IQIYI ADS REPRESENTING 7 | (12,200.01) | | (39,010,507.43) |
| 138 | Apr-19-2021 | Cash Journal | (13,720.57) | | (39,024,228.00) |
| 139 | Apr-19-2021 | Cash Journal | | 13,720.57 | (39,010,507.43) |