# Katten

**50 Rockefeller Plaza**
**New York, NY 10020-1605**
**+1.212.940.8800 tel**
**katten.com**

**ALAN J. BRUDNER**
alan.brudner@katten.com
+1.212.940.6362 direct
+1.212.940.8776 fax

September 30, 2024

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:**    **United States v. Sung Kook ("Bill") Hwang and Patrick Halligan,**
        **No. 22 Cr. 240 (AKH) – Victim Impact Statement on Behalf of UBS**

Dear Judge Hellerstein:

    On behalf of our client, UBS,[1] we respectfully submit this letter, the Declaration of Alan J. Brudner ("Brudner Decl.") and the Exhibits attached thereto as UBS's Victim Impact Statement ("VIS"), and request that the Court consider this VIS in connection with the sentencing of Defendants Sung Kook ("Bill") Hwang and Patrick Halligan. As this Court is aware, a victim of a federal crime has a right to be heard at the sentencing of the perpetrator. 18 USC § 3771(a)(4). UBS was one of the bank counterparties that Hwang and Halligan were convicted of defrauding by means of false and misleading statements made to UBS regarding Archegos's business, portfolio composition and liquidity, and assets. (*See, e.g., United States v. Sung Kook (Bill) Hwang and Patrick Halligan*, No. 22 Cr. 240, ECF No. 134 ("Superseding Indictment"), ¶¶ 48, 52(b)–(c), 54(a)–(b)(ii), 57, 66; Brudner Decl. Ex. 1 (*United States v. Hwang*, No. 22 Cr. 240, Trial Tr. ("Tr.") 1143–44; 1152–55 (Archegos Chief Risk Officer Scott Becker admits lying to UBS to hide the ongoing fraud)); Brudner Decl., Ex. 2 (Tr. 3426–32 (Archegos head trader Will Tomita admits to lying to UBS to obtain additional trading capacity))).

    There was significant evidence at trial concerning the Archegos fraud on UBS, including recorded conversations and meetings, trading records, email and text messages. Among other things, the government called three UBS witnesses to testify about Archegos's dealings with UBS. Two former UBS employees responsible for monitoring and managing the risk associated with the Archegos relationship, Bryan Fairbanks and Chris Salcedo, testified regarding the false and

---

[1] "UBS" as used herein includes UBS AG and its branches as well as its indirect wholly-owned subsidiary, UBS Securities LLC, a US broker-dealer engaged in investment banking. On July 1, 2024, UBS AG completed a merger with Credit Suisse AG ("CS"). This VIS is not submitted on behalf of CS, for which a separate VIS is being submitted.

KATTEN MUCHIN ROSENMAN LLP

CENTURY CITY    CHARLOTTE    CHICAGO    DALLAS    LOS ANGELES
NEW YORK    ORANGE COUNTY    SHANGHAI    WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

# Katten

September 30, 2024
Page 2

misleading statements Archegos made to them over the course of the relationship that made UBS comfortable with the risk. (*See, e.g.,* Brudner Decl., Ex. 3 (Tr. 101:25–102:4 (Fairbanks testified that "the information was lies, that all the information that they had shared with us was made up)); Brudner Decl., Ex. 4 (Tr. 1889, 2007:6-7 (Salcedo testified that information Archegos Chief Risk Office Scott Becker provided about its liquidity profile "was what gave us comfort in order to go ahead and make [the] risk-based decision" to allow Archegos to increase its positions, but it "turned out not to be true.")). Both Mr. Fairbanks and Mr. Salcedo testified that they would have exited Archegos as a client earlier in the relationship if they had had accurate information about Archegos's overall portfolio. (*See, e.g.*, Brudner Decl., Ex. 3 (Tr. 184:5–13); Brudner Decl., Ex. 4 (Tr. 2007: 1–7)). Mr. Fairbanks testified that if Mr. Becker had told him in March 2021 that Archegos's top position at that time was more than 75 percent of capital rather than 35 percent, he "probably would have hit the panic button, reached out to senior management to alert them of the –how much risk – how much more risk we were taking than we thought. We would raise margins on the client and potentially ask them to leave, and we'd fire the client." (Brudner Decl., Ex. 3 (Tr. 184:5–13)). Mr. Salcedo similarly testified that "we would have charged higher margin rates if we knew that our portfolio was replicated across other brokers, and that they weren't investing in highly liquid mega-cap stocks. And that rate probably would have been around 100 percent, and we would have exited the fund if we knew that, but we didn't know that." (Brudner Decl., Ex. 4 (Tr. 2007:1–5)).

Mr. Fairbanks testified that as of the date of Archegos's default, UBS had lost "a little more than $860 million." (Brudner Decl., Ex. 3 (Tr. 101)). Giselle Tropper, a current UBS employee, prepared the calculations set forth in UBS's Notice of Early Termination for Archegos, which was entered into evidence at trial as Government Exhibit 2189 and which compiled UBS's net loss. (Brudner Decl., Ex. 5 (Tr. 1749:19–24)). At trial, Ms. Tropper explained how UBS calculated its loss, which was $860,268,783 as of May 12, 2021 (the date when UBS terminated Archegos's swap agreements). (*Id.*, at 1747–53). First, UBS calculated the "Net Early Termination Amount" based on the UBS loss amount as of the default on March 27, 2021, plus UBS's costs of liquidating its hedge positions in the weeks following the default. (*Id.*, at 1750–54; Brudner Decl., Ex. 6 (UBS Notice of Early Termination Amount Due under 2002 ISDA Master Agreement, Liquidation of the PB Agreements Collateral and Application of Proceeds of Collateral Held in Accordance with the PB Agreements (including Annexes I, II and III) (GX 2189))). In sum:

- **$863,720,408** was the amount of UBS's loss on the day of Archegos's default (failure to meet a margin call) based on prior cash exchanges at swap resets and changes in the value of the swaps.  (Brudner Decl., Ex. 5 (Tr. 1748, 52)).

- **$710,614,923** was the "total closeout amount," the cost to UBS of liquidating the hedges following Archegos's default. (*Id.*, at 1751).

**Katten**

September 30, 2024
Page 3

- **$174,207,174** was "posted collateral," the excess margin withdrawn by Archegos on March 25, 2021, just before Archegos's default. (*Id.*, at 1752-53).

- Those three categories of losses to UBS totaled **$1,748,542,506**, which UBS referred to as the "Net Early Termination Amount" (*Id.*, at 1753:8–17).

From the Net Early Termination Amount, UBS then credited various amounts to Archegos. Ms. Tropper testified that these offsets were from collateral that Archegos had in various UBS accounts (*Id.*, at 1753–54):

- **$204,692,694** was the value of securities Archegos held in its prime brokerage account at UBS Securities LLC. As a result of Archegos's default, UBS took possession of these securities and sold them. This amount represents the proceeds of those sales. (Brudner Decl., Ex. 6 (GX 2189)).

- **$395,990,569** was the amount of other collateral held in the UBS Securities LLC prime brokerage account. (Brudner Decl., Ex. 6 (GX 2189)).

- **$287,590,460** was the value of collateral in Archegos's UBS account at UBS AG, the international account that held Archegos's swap positions. (Brudner Decl., Ex. 6 (GX 2189)).

Accordingly, UBS's net loss was **$860,268,783** as of May 12, 2021 (Brudner Decl., Ex. 5 (Tr. 1754:2–3); Brudner Decl., Ex. 6 (GX 2189)).[2]

Following the liquidation and termination of Archegos's swap account at UBS, UBS engaged in an informal dispute resolution process with Archegos, pursuant to which UBS recovered **$66,252,554.73** from Archegos. (Brudner Decl., ¶ 10). This amount was paid in various tranches on five dates between December 2021 and December 2023:

---

[2] UBS's losses all derive from securities positions it would not have held if it knew Archegos was providing it with the types of false and fraudulent information alleged in Counts One and Ten of the Superseding Indictment (¶¶ 68–74, 79–80) and proven at trial, because UBS would have stopped doing business with Archegos, as its witnesses testified. Accordingly, Hwang's acquittal on Count Seven, which charged market manipulation of the stock of iQIYI, should have no impact on UBS's loss amount for purposes of restitution; UBS would not have been holding the position if not for the Defendants' fraud.

**Katten**

September 30, 2024
Page 4

| Date | Amount |
|------|--------|
| 12/31/2021 | $8,404,033.29 |
| 12/22/2022 | $20,178,068.28 |
| 02/15/2023 | $34,667,703.58 |
| 03/30/2023 | $1,525,143.37 |
| 12/29/2023 | $1,477,606.21 |
| **Total USD** | **$66,252,554.73** |

In collecting these funds, UBS retained the right to obtain additional recovery, including via restitution in this criminal case. (*Id.*). In addition to recovery of losses, case law in the Second Circuit supports the discretion of the Court to award prejudgment interest to fraud victims. *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). That interest would be calculated on the loss amount at early termination, **$860,268,783**, adjusted for a reduction in the principal loss amount for each of the five payments that were made to UBS as of the dates when they were made. At our request, an economist at Cornerstone Research calculated the interest for the period between May 12, 2021 and September 30, 2024, and concluded that the amount is **$114,634,885.93**, using the rate "equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the first day on which the defendant is liable for interest." (Brudner Decl., ¶ 11 (quoting *United States v. Smerling*, No. 21 Cr. 317 (DLC), 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022) (Cote, J.); *United States v Glencore Int'l A.G.*, No. 22 Cr. 297 (LGS), 2023 WL 2242469, at *9 (S.D.N.Y. Feb. 27, 2023) (Schofield, J.))). The 1-year constant maturity rate for the week ending September 27, 2024, used by Cornerstone in this calculation, was 3.908%. (*Id.*) That rate may change by the time of sentencing.

We view the starting date of May 12, 2021, the date of UBS's Early Termination Notice, as conservative. Following the Archegos default on March 27, 2021, UBS worked to liquidate its positions following the default and had completed liquidation of all of its hedge positions associated with the Archegos portfolio by May 12, 2021. (Brudner Decl., Ex. 5 (Tr. 1747:3–9)). UBS is not proposing that interest be calculated at the time of each of its sales of securities, nor at the various earlier times it would have exited the relationship if it had been aware that Archegos was providing it with false and misleading information. UBS is also not seeking restitution for other expenses it incurred as a result of Archegos's default and criminal conduct, such as attorneys' fees.

Accordingly, UBS's claim for restitution is **$908,651,114.20**, comprised of its loss of **$860,268,783.00**, plus prejudgment interest of **$114,634,885.93,** minus recoveries totaling **$66,252,554.73**.

**Katten**

September 30, 2024
Page 5

Respectfully submitted,

Alan J. Brudner

Cc: Wendy Olsen
     Victim-Witness Coordinator
     United States Attorney's Office, SDNY

     Assistant United States Attorneys, SDNY:
     Alexandra Rothman
     Matthew Podolsky
     Andrew Thomas
     Samuel Rothschild

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

   UNITED STATES OF AMERICA,        :
                                        :
          v.                        :     **22 Cr. 240 (AKH)**
                                        :
   **SUNG KOOK HWANG and PATRICK**      :
   **HALLIGAN, Defendants.**                :
-----------------------------------------------------------------x

### Declaration of Alan J. Brudner in Support of
### Victim Impact Statement of UBS

**Alan J. Brudner** declares as follows pursuant to 28 U.S.C. § 1746:

1.       I am an attorney licensed to practice law in the State of New York. I am a partner at the law firm Katten Muchin Rosenman LLP ("Katten"), counsel for UBS AG (including its London Branch and its indirect wholly-owned broker-dealer subsidiary, UBS Securities LLC)("UBS") in this matter. I submit this declaration in support of UBS's Victim Impact Statement ("VIS").

2.       Matters stated herein are true to the best of my knowledge, information and belief, and are based on my personal knowledge, my review of the trial record, pleadings and documents filed in this case, documents and information provided to me by my client, and information provided to me by Cornerstone Research, which performed interest rate calculations on behalf of UBS.

3.       On March 19, 2023, UBS agreed to acquire Credit Suisse AG ("CS"). The merger was completed on July 1, 2024, and CS is no longer an independent legal entity. However, this VIS submitted on behalf of UBS is not intended to cover CS, for which a separate VIS is being submitted.

4.       Attached hereto as **Exhibit 1** is a true and correct copy of excerpted transcript pages of the trial testimony of Archegos Chief Risk Officer Scott Becker in the

above-captioned action.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpted transcript pages of the trial testimony of Archegos head trader William ("Will") Tomita in the above-captioned action.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpted transcript pages of the trial testimony of UBS former employee Bryan Fairbanks in the above-captioned action.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of the excerpted transcript of the trial testimony of UBS former employee Chris Salcedo in the above-captioned action.

8.      Attached hereto as **Exhibit 5** is a true and correct copy of the excerpted transcript of the trial testimony of UBS employee Giselle Tropper in the above-captioned action.

9.      Attached hereto as **Exhibit 6** is a true and correct copy of the "Notice of Early Termination Amount Due Under 2002 ISDA Master Agreement, Liquidation of the PB Agreements Collateral and Application of Proceeds of Collateral Held in Accordance with the PB Agreements" from UBS to Archegos, dated May 12, 2021 ("Early Termination Notice") and Appendices, introduced at trial in the above-captioned action as Government Exhibit 2189.

10.     Following the liquidation and termination of Archegos's swap account at UBS, UBS engaged in an informal dispute resolution process with Archegos, pursuant to which UBS recovered **$66,252,554.73** from Archegos. UBS retained the right to obtain additional recovery, including via restitution in this case. This amount was paid in various tranches on five dates between December 2021 and December 2023:

| Date | Amount |
|------|--------|
| 12/31/2021 | $8,404,033.29 |
| 12/22/2022 | $20,178,068.28 |
| 02/15/2023 | $34,667,703.58 |
| 03/30/2023 | $1,525,143.37 |
| 12/29/2023 | $1,477,606.21 |
| **Total USD** | **$66,252,554.73** |

11.    At my request on behalf of UBS, an economist at Cornerstone Research calculated the interest for the period between May 12, 2021 and September 30, 2024, and concluded that the amount is $114,634,885.93, using the rate "equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the first day on which the defendant is liable for interest." *United States v. Smerling*, No. 21 Cr. 317 (DLC), 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022) (Cote, J.); *United States v Glencore Int'l A.G.*, No. 22 Cr. 297 (LGS), 2023 WL 2242469, at *9 (S.D.N.Y. Feb. 27, 2023) (Schofield, J.). The 1-year constant maturity rate for the week ending September 27, 2024, used by Cornerstone in this calculation, was 3.908%. In calculating prejudgment interest of $114,634,885.93 for the period between May 12, 2021 through September 30, 2024, the economist applied this 3.908% interest rate to UBS's loss of $860,268,783.00, and accounted for the five distributions, and the consequent reductions in principal, referenced in paragraph 10, above. Accordingly, the economist calculated UBS's total restitution claim to be **$908,651,114.20**, comprised of UBS's loss of **$860,268,783.00**, plus prejudgment interest of **$114,634,885.93**, minus recoveries totaling **$66,252,554.73**. I was informed of this interest rate and these calculations as of the date of this Declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2024
New York, NY

<u>/s/ *Alan J. Brudner*</u>
Alan J. Brudner
Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, NY 10020-1605
alan.brudner@katten.com
212.940.6362

*Attorney for UBS*

# EXHIBIT 1

O5LVHWA1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                              22 CR 240(AKH)
4
     SUNG KOOK HWANG and PATRICK
5    HALLIGAN,
                    Defendants.                Trial
6    ------------------------------x
7                                              New York, N.Y.
                                               May 21, 2024
8                                              10:10 a.m.
     Before:
9
                     HON. ALVIN K. HELLERSTEIN,
10
                                               District Judge
11                                             -and a jury-
                          APPEARANCES
12
     DAMIAN WILLIAMS,
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW D. PODOLSKY
          ANDREW M. THOMAS
15        ALEXANDRA ROTHMAN
          SAMUEL ROTHSCHILD
16        Assistant United States Attorneys
17   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
          Attorneys for Defendant Halligan
18   BY:  MARY MULLIGAN
          TIMOTHY HAGGERTY
19        BONNIE BAKER
          ANIL VASSANJI
20        RUPITA CHAKRABORTY
21   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Defendant Hwang
22   BY:  BARRY H. BERKE
          DANI R. JAMES
23        JORDAN L. ESTES
          MICHAEL MARTINEZ
24        MICHELLE BEN-DAVID
          SHAKED SIVAN
25        DAYNA CHIKAMOTO
```

O5LVHWA1

APPEARANCES (Continued)


Also Present:   Anna Gamboa, USAO Paralegal
                Arjun Ahuja, USAO Paralegal
                Madeline Sonderby, USAO Paralegal
                Raymond McLeod, Defense Trial Consultant

1          If we can leave up what we have, and if you can just

2     scroll on the right side on to Page 3.

3          Mr. Becker's message to Mr. Halligan, starting on --

4     go back to where you were.  Thank you.  2:05 down to 2:05:46.

5     And, Ms. Gamboa, I'll ask you to highlight Mr. Becker's message

6     to Mr. Tomita.  Now it says 2:04, but with UTC, this is about

7     10:04 p.m., if it comes up with UBS, remember we gave them the

8     following liquidity recently:  50 percent in 10 days,

9     25 percent in 20 days, entire book in five weeks.  Mr. Tomita

10    says thanks.

11         THE COURT:  These are Becker's communication to

12    Tomita?

13         MS. ROTHMAN:  Yes, your Honor.  And at 10:05 p.m.

14    which is listed as 2:05, Mr. Becker writes to Mr. Halligan, "I

15    just gave Will the heads up.  This is the liquidity profile

16    we've given them recently, 50 percent in 10 days, 25 percent in

17    20 days, entire book in five to six weeks.  A few weeks back."

18    And Mr. Halligan writes, okay.

19    BY MS. ROTHMAN:

20    Q.  Why did you provide Mr. Halligan and Mr. Tomita with this

21    information in advance of the UBS call?

22    A.  I expected this may be a question that UBS would ask.  And

23    the mandate on any communications with brokers was for

24    information to be consistent.

25    Q.  Was this information false?

O5L6HWA2                        Becker – Direct

1    A.   This information was false, yes.

2              MS. ROTHMAN:  Your Honor, this might be a good time to

3    break for the day, with the Court's permission.

4              THE COURT:  Sure.

5              All right, members of the jury, we'll see you tomorrow

6    morning at 10:00 o'clock.  One minute.

7              (Pause)

8              THE COURT:  Come in at 10:15 tomorrow, I understand a

9    juror has a medical appointment, requiring us to stop at four,

10   so we'll stop at 4:00 tomorrow.  10:15 tomorrow morning, close

11   your book, give it to Ms. Jones, don't discuss the case, keep

12   an open mind.

13

14

15

16

17

18

19

20

21

22

23

24

25

O5MsHWA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                          22 CR 240(AKH)
4

5   SUNG KOOK HWANG and PATRICK HALLIGAN,

6               Defendants.
    ------------------------------x
7                                           New York, N.Y.
                                            May 22, 2024
8                                           10:15 a.m.
    Before:
9
                    HON. ALVIN K. HELLERSTEIN,
10
                                            District Judge
11                                          -and a jury-

12                          APPEARANCES

13  DAMIAN WILLIAMS,
         United States Attorney for the
14       Southern District of New York
    BY:  MATTHEW D. PODOLSKY
15       ANDREW M. THOMAS
         ALEXANDRA ROTHMAN
16       SAMUEL ROTHSCHILD
         Assistant United States Attorneys
17
    FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
18       Attorneys for Defendant Halligan
    BY:  MARY MULLIGAN
19       TIMOTHY HAGGERTY
         BONNIE BAKER
20       ANIL VASSANJI
         RUPITA CHAKRABORTY
21
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
22       Attorneys for Defendant Hwang
    BY:  BARRY H. BERKE
23       DANI R. JAMES
         JORDAN L. ESTES
24       MICHAEL MARTINEZ
         MICHELLE BEN-DAVID
25       SHAKED SIVAN
         DAYNA CHIKAMOTO

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5MsHWA1

1                         APPEARANCES (Continued)

2

ALSO PRESENT:
3  Anna Gamboa, USAO Paralegal
   Arjun Ahuja, USAO Paralegal
4  Madeline Sonderby, USAO Paralegal
   Raymond McLeod, Defense Trial Consultant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O58sHWA5                          Becker – Direct

1            (Jury present)

2            THE COURT:  Good morning, members of the jury.

3            THE JURY:  Good morning.

4            THE COURT:  Let's all be seated.

5            Mr. Becker remains on the stand.  I remind you you're

6    under oath.

7     SCOTT BECKER, resumed.

8            Ms. Rothman will continue with direct examination.

9            MS. ROTHMAN:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. ROTHMAN:

12   Q.  Mr. Becker, before we broke yesterday, you were talking

13   about messages you had sent to Mr. Halligan and Mr. Tomita with

14   information about Archegos' portfolio.

15           Do you remember that?

16   A.  Yes, I do.

17   Q.  And it was in advance of the call with UBS on Wednesday

18   night, right?

19   A.  Yes.

20   Q.  Focusing on that call, who from Archegos spoke to UBS?

21   A.  On that call, Mr. Mills had spoken substantially the same

22   statements that were made in the prior calls with brokers, and

23   there was some back and forth between UBS and primarily

24   Mr. Mills and Mr. Tomita.

25   Q.  After the call with UBS, did you speak with Mr. Halligan?

 1    A.  Yes, I did.

 2    Q.  Was that by phone?

 3    A.  Yes, it was by phone.

 4    Q.  While you were on the phone with Mr. Halligan, what

 5    happened?

 6    A.  While I was on the phone with him, I had an incoming call

 7    coming into my phone.  I didn't recognize the number, but I

 8    thought it could be Mr. Tomita.  So I hung up with Mr. Halligan

 9    and picked up the incoming call.

10    Q.  Who was the call from?

11    A.  It was from Scott Alpaugh, the relationship manager at UBS.

12    He was just on the call that we had.

13    Q.  What did Mr. Alpaugh ask you?

14    A.  He had asked me for some additional caller of what was

15    going on at Archegos.

16    Q.  What did you tell Mr. Alpaugh?

17    A.  I told him that I couldn't comment further than what was

18    already discussed.

19    Q.  While you were on phone with Mr. Alpaugh, were you in

20    communication with Mr. Halligan?

21    A.  Yes, I was, via Bloomberg chat.

22    Q.  What did you tell Mr. Halligan?

23    A.  I told him that Mr. Alpaugh had called.

24    Q.  Did you say anything else?

25              THE COURT:  One minute.

1          (Pause)

2          You were asked to recount the conversation on

3    BlackBerry with Mr. Halligan

4          MS. ROTHMAN:  Thank you, your Honor.

5    A.  So the Bloomberg chat between Mr. Halligan and I, I had

6    stated that I was deflecting.  And Mr. Halligan had said if

7    he's giving you a problem on calling back the excess cash, just

8    tell him that's what we do every day.

9    Q.  Can you remind us what Mr. Halligan was referring to when

10   he said calling back the excess cash?

11   A.  Yes.

12         So earlier in the day, in order for Archegos to meet

13   its margin calls, we had to call back the excess cash from

14   other counterparties that was out there, that substantially all

15   of that excess cash that was available in order to meet the

16   large calls that Archegos had to pay that day.

17   Q.  Was it accurate that Archegos' calling back the cash that

18   day was how it had typically interacted with its brokers?

19   A.  Not in the manner that with it was done that day.

20   Typically Archegos would -- the operations team would go

21   through a process where we would see the excess cash balances

22   that were out of brokers, depending on trade activity and

23   market movement on that particular day.  It would be more no

24   leave excess cash at those brokers, but it would not be normal

25   to call back substantially all of that excess cash, which is

1    what Archegos did that day.

2    Q.  I want to turn to Thursday morning, Mr. Becker.

3           Did you join a call with Macquarie on Thursday

4    morning?

5           THE COURT:  Thursday, March 25, members of the jury.

6           MS. ROTHMAN:  Thank you, your Honor.

7    A.  Yes, I did.

8    Q.  Around what time was the call?

9    A.  7:30 a.m.

10   Q.  Who from Archegos joined?

11   A.  On that call from Archegos, it was the same individuals

12   that were on the prior calls.  So it was Mr. Mills,

13   Mr. Halligan, Mr. Tomita, myself, and I believe David, Mr. Eun,

14   was also on the call.

15   Q.  Did you take notes of who said what?

16   A.  Yes, I did.

17   Q.  Were you in touch with Mr. Halligan that morning as well?

18   A.  Yes, I was, via Bloomberg chat.

19   Q.  Do you recall Mr. Halligan sent you messages during the

20   Macquarie call?

21   A.  Yes, he did.

22          MS. ROTHMAN:  If we can pull up what is in evidence as

23   Government Exhibit 2521-T just for a moment.  We already heard

24   this transcript, so we actually have not heard it.

25          So, your Honor, at this time, I'm going to offer 2521.

# EXHIBIT 2

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
               v.                           22 CR 240(AKH)
4
     SUNG KOOK HWANG and PATRICK
5    HALLIGAN,
                    Defendants.             Trial
6    ------------------------------x

7                                           New York, N.Y.
                                            June 17, 2024
8                                           10:00 a.m.
     Before:
9
                    HON. ALVIN K. HELLERSTEIN,
10
                                            District Judge
11                            -and a jury-
                            APPEARANCES
12
     DAMIAN WILLIAMS,
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW D. PODOLSKY
          ANDREW M. THOMAS
15        ALEXANDRA ROTHMAN
          SAMUEL ROTHSCHILD
16        Assistant United States Attorneys

17   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
          Attorneys for Defendant Halligan
18   BY:  MARY MULLIGAN
          TIMOTHY HAGGERTY
19        BONNIE BAKER
          ANIL VASSANJI
20        RUPITA CHAKRABORTY

21   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Defendant Hwang
22   BY:  BARRY H. BERKE
          DANI R. JAMES
23        JORDAN L. ESTES
          MICHAEL MARTINEZ
24        MICHELLE BEN-DAVID
          SHAKED SIVAN
25        DAYNA CHIKAMOTO
```

APPEARANCES (Continued)


Also Present:   Anna Gamboa, USAO Paralegal
                Arjun Ahuja, USAO Paralegal
                Madeline Sonderby, USAO Paralegal
                Raymond McLeod, Defense Trial Consultant

```
 1                MR. BERKE:  Objection, your Honor.

 2                THE COURT:  Overruled.

 3   A.  Yes.  It was like a daily -- during this October 2020

 4   through March 2021, it was a daily conversation multiple times

 5   throughout the day even.

 6   Q.  Now, in this time period was there -- do you recall any

 7   times where you spoke with someone at Archegos other than

 8   Mr. Hwang about providing misleading information to a

 9   counterparty?

10                MR. BERKE:  Your Honor, I would object to the way it's

11   phrased --

12                THE COURT:  Overruled.

13   A.  Yes.

14   Q.  Who?

15   A.  Patrick Halligan and Scott Becker.

16   Q.  Was that with respect to a particular counterparty?

17   A.  Yes.  The instance I'm thinking of, yes.

18   Q.  What counterparty?

19   A.  UBS.

20   Q.  And were you seeking capacity from UBS at that time?

21   A.  Yes, that is correct.

22                MR. PODOLSKY:  Can we pull up for the witness what's

23   already in evidence --

24                THE COURT:  What did you say to Mr. Halligan?

25                THE WITNESS:  With the conversation I'm thinking of,
```

1    it was a three-way conversation between -- on Zoom between

2    myself, Patrick Halligan, and Scott Becker about how to respond

3    to an information request from UBS.

4              THE COURT:  Elicit the conversation, please.

5              MR. PODOLSKY:  Sure.  Your Honor, I was going to help

6    put a time frame on it.

7    Q.  How did that conversation come to happen?

8    A.  It was -- Bill had directed us to get more capacity from

9    UBS, and subsequent to asking UBS for the additional capacity

10   increase, UBS had been communicating directly with Scott Becker

11   about a request for more information, and it was information

12   that we knew was very sensitive, so Scott, Patrick, and myself

13   convened on Zoom to discuss how to answer it.

14   Q.  Do you remember approximately when this was?

15   A.  This was early, mid March 2021.

16   Q.  We can look at a document.  Let's go through the

17   conversation.

18              What was the information that UBS was seeking at that

19   time from Archegos?

20   A.  They were asking us for, in substance, information about

21   the risk profile of Archegos, namely, how long it would take --

22   like information about unwinding about how long it would take

23   to unwind the portfolio.

24   Q.  What was the purpose of three of you discussing that answer

25   or that question, I should say?

1    A.   I'm sorry?

2    Q.   What was the purpose of the three of you, Mr. Halligan,

3    Mr. Becker and yourself, discussing together that question?

4    A.   Well, we knew per Bill's directive that we needed the

5    capacity.  UBS had presented us like with the requests for this

6    additional information in order to get the capacity.  I

7    certainly knew that if we had answered what they were looking

8    for truthfully that UBS would probably not only -- they

9    wouldn't even give us the capacity; they would probably like

10   fire us as a client and unwind the portfolio.  So it was a

11   conundrum of, what do we do so that we can get the capacity

12   without providing this information.

13   Q.   Why?  What was the truthful information --

14           THE COURT:  What was said to whom?  Did you say this

15   to anybody, what you just told us?

16           THE WITNESS:  Leading up to this conversation, we had

17   emailed back and forth.  What I just said specifically, I

18   didn't detail it that way.  I don't remember the exact exchange

19   of what we said.

20           THE COURT:  In substance, what did you say to

21   Mr. Becker and Mr. Halligan?

22           THE WITNESS:  Leading up to the conversation?

23           THE COURT:  During the conversation.  Leading up to

24   the conversation.

25           THE WITNESS:  Leading up to it.

1        I believe we did it on email and, essentially, from my

2    recollection, it was there is no way we can answer these

3    questions.

4        THE COURT:  Who said that?

5        THE WITNESS:  I don't know if it was myself or Patrick

6    or Scott.  But I don't remember.

7        THE COURT:  What was the answer?

8        Mr. Podolsky.

9    Q.  Let's just focus right now on the oral conversation and

10   then we can talk about the email.

11        In the Zoom between the three of you, what did you

12   say?

13   A.  So on the Zoom at this point we were discussing how do we

14   respond to this request for information about how long it would

15   take to unwind the portfolio.  I remember I broached the

16   subject of, well, what if we give them like liquidity tranches,

17   like a certain amount in two weeks, we could unwind X percent

18   of the portfolio and then after another amount of time X

19   percent, and then another amount of time.  I remember broaching

20   that idea to Scott and Patrick.

21   Q.  What did Mr. Halligan say?

22   A.  He responded like, there you go, we can try that.  And then

23   he proceeded to outline -- I remember him using his hands also

24   in the different tranches.  He outlined an unwind profile that

25   we could tell UBS -- I think I remember the details.  He said:

1    Half of the portfolio we could unwind in two weeks.  And then

2    the next 25 percent, that would take another two weeks.  Then

3    the remaining 25 percent, that could be unwind in an additional

4    two weeks.

5    Q.  Was that accurate?

6    A.  No, not at all.

7    Q.  Can you explain that.

8    A.  At this point --

9         THE COURT:  Before you do that, what did you say to

10   Mr. Halligan when he gave you the analysis?

11        THE WITNESS:  I remember I was looking -- because I

12   was in front of my computer, I was looking at the portfolio and

13   I remember thinking -- I said, I guess that makes sense if we

14   take into account the index hedges, which were very liquid and

15   easy to unwind, and if we do block trades.  I remember saying

16   that.

17   Q.  Then what happened?

18   A.  Then we all kind of -- we agreed that that's what we would

19   do.  I remember Scott looked very uncomfortable and he said,

20   OK.  And then that was the end of the conversation.

21   Q.  Was the three tranches with the figures you just said

22   relayed to UBS?

23   A.  I know that they were.  I don't know if I was -- I don't

24   think I was in that communication when it happened.

25   Q.  Why were those numbers inaccurate?

1          MR. HAGGERTY:  Objection.

2          THE COURT:  Overruled.

3          He said so before.

4          Were they inaccurate?

5          THE WITNESS:  They were inaccurate.

6          THE COURT:  Why were they inaccurate?

7          THE WITNESS:  Because at that point in time there was

8   maybe 10 or so of these large long positions, like Viacom and

9   GSX, that were so big and so many days volume that it would

10  take months, if not years, to sell those positions in the

11  market.  And then also when you're talking about -- there is a

12  very general industry standard.  When you're talking between

13  like risk people and unwind parameters, you're assuming your 10

14  percent of volume.  If you're taking that 10 percent of volume

15  into account, it would literally have taken months, if not

16  years, to sell down the portfolio.

17         THE COURT:  You mentioned index funds.  What was that

18  about?

19         THE WITNESS:  Yes.  In conjunction to get capacity at

20  the banks, I had discussed this ongoingly with Bill, but some

21  of the banks had wanted us to maintain certain level of short

22  exposure in order to get the long capacity.  And the way and

23  practice that we were achieving that was by shorting

24  broad-based indexes, like the S&P 500 or similar types of

25  products.  They are very, very easy to trade.  Like one of the

 1    ETFs, it's called Spy.  It's S&P 500 ETF.  It trades like

 2    billions -- like tens of billions of dollars a day, I believe,

 3    from my recollection.  Those index funds, those can be unwound

 4    very, very quickly.

 5          MR. HAGGERTY:  Objection, your Honor.  Move to strike

 6    the witness' testimony regarding the understanding of risk

 7    officers.

 8          THE COURT:  Overruled.

 9    Q.  Did UBS give additional capacity after that information was

10    relayed to them?

11    A.  Yes, they did.

12    Q.  And was that capacity used by Archegos to trade?

13    A.  Yes, it was.

14    Q.  Who directed that trading?

15    A.  Bill directed that trading.

16          MR. PODOLSKY:  Now I'd like to just step back for a

17    moment and pull up what's in evidence as Government Exhibit

18    2191.  Maybe just blow up the top half of this email.

19    Q.  Mr. Tomita, do you recognize this email exchange?

20    A.  Yes, I do.

21    Q.  Do you see that it's between you, Mr. Becker, and Mr.

22    Halligan?

23    A.  Yes.

24    Q.  Was this exchange the email exchange you had referenced a

25    few minutes ago as occurring before the Zoom call?

# EXHIBIT 3

O59sHWA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                         22 CR 240(AKH)

SUNG KOOK HWANG and PATRICK HALLIGAN,

              Defendants.
------------------------------x
                           New York, N.Y.
                           May 9, 2024
                           5:15 p.m.
Before:

                HON. ALVIN K. HELLERSTEIN,

                         District Judge
                         -and a jury-

                   APPEARANCES

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW D. PODOLSKY
     ANDREW M. THOMAS
     ALEXANDRA ROTHMAN
     SAMUEL ROTHSCHILD
     Assistant United States Attorneys

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
     Attorneys for Defendant Halligan
BY:  MARY MULLIGAN
     TIMOTHY HAGGERTY

KRAMER LEVIN NAFTALIS & FRANKEL LLP
     Attorneys for Defendant Hwang
BY:  BARRY H. BERKE
     DANI R. JAMES
     JORDAN L. ESTES

O59sHWA1

                              APPEARANCES (Continued)


ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant
Conor O'Shea, FBI Special Agent

O586HWA3                          Fairbanks – Direct

1    need to hear you.

2            THE COURT:  Can you all hear him in the back of the

3    room?

4            Proceed.

5            MR. ROTHSCHILD:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. ROTHSCHILD:

8    Q.  Good afternoon, Mr. Fairbanks.

9    A.  Good afternoon.

10   Q.  Mr. Fairbanks, where were you employed during 2020 and

11   2021?

12   A.  UBS.

13   Q.  What's UBS?

14   A.  UBS is a Swiss financial firm, investment bank, and wealth

15   manager.

16   Q.  In the course of your employment at UBS, did you interact

17   with a client of UBS's called Archegos?

18   A.  I did.

19   Q.  Approximately when was the last time you interacted with

20   anyone at Archegos?

21   A.  March 2021.  The end of the month.

22   Q.  How did UBS's relationship with Archegos come to an end?

23   A.  We lost a little more than $860 million through the

24   default.

25   Q.  Mr. Fairbanks, during the final week that you interacted

1    with Archegos, what, if anything, did you come to understand

2    about information that Archegos had previously provided to you?

3    A.   That the information was lies, that all the information

4    that they had shared with us was made up.

5    Q.   Okay.  Let's back up.

6          Mr. Fairbanks, where do you work presently?

7    A.   Bank of Montreal.

8    Q.   What do you do at Bank of Montreal?

9    A.   I'm the head of prime brokerage risk management.

10   Q.   And how long have you worked at Bank of Montreal?

11   A.   Just short of two years.

12   Q.   Where did you work before that?

13   A.   UBS.

14   Q.   And how long did you work at UBS?

15   A.   Almost 17 years.

16   Q.   What was your job at UBS?

17   A.   My last job was the Americas head of prime brokerage risk.

18   Q.   Is that effectively the same job that you do now at Bank of

19   Montreal?

20   A.   Yes.

21   Q.   You said you worked in prime brokerage at UBS?

22   A.   I did.

23   Q.   What does prime brokerage mean?

24   A.   Prime brokerage is just a group within a bank that allows,

25   for the most part, hedge funds, family offices, asset managers

1    to trade seamlessly to allow them to take leverage.  Similar,

2    if you had an E-Trade account, you're able to buy stock and

3    only put up some of the money, but a prime brokerage allows you

4    to trade with E-Trade, Charles Schwab, any other firm on the

5    street.  But we would end up taking all the trades and holding

6    them.

7    Q.  Now, we'll come back to a lot of those concepts later.

8            As it relates to the prime brokerage business, what

9    purpose does the risk function serve?

10   A.  My team's job is responsible, frankly, just to make sure we

11   don't take a loss dealing with our clients.

12   Q.  What do you mean by "take a loss"?

13   A.  As I mentioned earlier, we lost $860-plus million.  My team

14   is to build mathematical models, to build a lot of formulas, to

15   analyze a lot of data, to predict what could happen in a very

16   bad market, and make sure that we end up not taking a loss if

17   those bad markets occur.

18   Q.  So what sorts of products or services does prime brokerage

19   offer its clients?

20   A.  So UBS, we covered stocks, bonds, commodities, so gold,

21   oil, so futures, we did options.  You can do currencies,

22   foreign currencies.  There are yen, the British sterling,

23   pounds.

24   Q.  What's a stock?

25   A.  A stock is ownership of -- owning a stock allows you to own

1  A.  So at that point we -- I mean, he could have, you know,

2  couple percent to 5 percent of a company with UBS in some of

3  these names, but if he had those sized positions with everyone

4  else on the street, it would imply he had 20 to 50 percent

5  ownership of a lot of these companies.

6  Q.  What do you mean by "everyone else on the street"?

7  A.  If he had these positions with his other providers, his

8  other banks.

9  Q.  Why would that be significant if he did?

10  A.  You can't get out of a position that big.

11  Q.  Why not?

12  A.  Not too many people are willing to write a check for

13  $50 billion to buy half a company.  It's just too big.

14  Q.  Now, we heard in that call that Mr. Becker told you that

15  Archegos' top position was 35 percent of capital.  Right?

16  A.  Yes.

17  Q.  And we heard in that call that based on the information --

18          THE COURT:  35 percent of capital means 35 percent of

19  what?

20          THE WITNESS:  Equity.

21          THE COURT:  Of equity of one place or total?

22          THE WITNESS:  Total.

23          MR. ROTHSCHILD:  Thank you, your Honor.

24  BY MR. ROTHSCHILD:

25  Q.  And we heard in that call that based on the information

1    Mr. Becker provided you, you calculated that Archegos' top

2    position was about $7 billion, and you believed it was not a

3    name that UBS held.  Right?

4    A.  Other than Viacom, correct.

5    Q.  Mr. Fairbanks, how would it have mattered from a risk

6    perspective, if at all, if Mr. Becker had told you that

7    Archegos' top position at that time was actually more than

8    75 percent of capital rather than 35 percent?

9    A.  We probably would have hit the panic button, reached out to

10   senior management to alert them of the -- how much risk -- how

11   much more risk we were taking than we thought.  We would raise

12   margins on the client and potentially ask them to leave, and

13   we'd fire the client.

14   Q.  And how would it have been relevant from a risk perspective

15   if Mr. Becker had told you that on March 8, 2021, Archegos held

16   the equivalent of over $19 billion worth of Viacom?

17   A.  We would have been horrified because that would have been,

18   I don't know, 40 percent of the company.  I mean a big position

19   of owning a company is 5.  So to own 40 percent of a company is

20   monstrous.  And you're taking leverage.  Like most companies

21   that buy other companies, they don't use a lot of leverage to

22   do it, maybe ten percent, 20 percent, not 500 percent.

23          MR. ROTHSCHILD:  Ms. Gamboa, can you please pull up

24   only for Mr. Fairbanks what's been marked for identification as

25   Government Exhibit 2139?

# EXHIBIT 4

O5TRHWA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
              v.                           22 CR 240(AKH)
4
   SUNG KOOK HWANG and PATRICK
5  HALLIGAN,
              Defendants.
6  ------------------------------x
                                   New York, N.Y.
7                                  May 29, 2024
                                   10:00 a.m.
8  Before:

9            HON. ALVIN K. HELLERSTEIN,

10                                 District Judge
                                   —and a jury—
11                       APPEARANCES

12 DAMIAN WILLIAMS,
        United States Attorney for the
13      Southern District of New York
   BY:  MATTHEW D. PODOLSKY
14      ANDREW M. THOMAS
        ALEXANDRA ROTHMAN
15      SAMUEL ROTHSCHILD
        Assistant United States Attorneys
16
   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
17      Attorneys for Defendant Halligan
   BY:  MARY MULLIGAN
18      TIMOTHY HAGGERTY
        BONNIE BAKER
19      ANIL VASSANJI
        RUPITA CHAKRABORTY
20
   KRAMER LEVIN NAFTALIS & FRANKEL LLP
21      Attorneys for Defendant Hwang
   BY:  BARRY H. BERKE
22      DANI R. JAMES
        JORDAN L. ESTES
23      MICHAEL MARTINEZ
        MICHELLE BEN-DAVID
24      SHAKED SIVAN
        DAYNA CHIKAMOTO
25

O5TRHWA1

APPEARANCES (Continued)


ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant

 1    It is the difference between playing high school baseball and

 2    playing the World Series.

 3    Q.  So would the risk presented by a position that was, to use

 4    this one, 62.2 percent of capital, be different when the

 5    capital is 23 billion, to use your number, versus 2 billion?

 6    A.  Absolutely.  To use the analogy I just used, the players

 7    are different, the money is different and the gravity of the

 8    situation is different.  It would be different but it -- and

 9    the case of Amazon, at least it's a mega-cap stock.  And at

10    least we -- if there were $23 billion, we would want them

11    invested in these mega-cap stocks.

12    Q.  Why is that?

13    A.  Because if they were invested -- at $23 billion, if you're

14    not -- and with the amount of leverage Archegos took, if you're

15    not invested in the mega-cap stocks, then you run the risk of

16    having severe liquidity issues when you go to either monetize

17    those assets or as a lender when you go to liquidate those

18    assets to pay yourself back.

19         It's a significant risk, it's a risk we discussed

20    explicitly with Scott Becker on recorded conversations.  And he

21    explicitly told us he understood our concerns and that he

22    confirmed that he was, in fact, invested in these highly liquid

23    names in March of 2021.

24    Q.  So we'll get there.  Before we do, I want to just look at

25    one other set of information that was provided by Archegos to

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                           22 CR 240(AKH)
 4
     SUNG KOOK HWANG and PATRICK
 5   HALLIGAN,
                     Defendants.
 6   ------------------------------x
                                             New York, N.Y.
 7                                           May 30, 2024
                                             10:00 a.m.
 8   Before:

 9                    HON. ALVIN K. HELLERSTEIN,

10                                             District Judge
                                             -and a jury-
11                          APPEARANCES

12   DAMIAN WILLIAMS,
          United States Attorney for the
13        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
14        ANDREW M. THOMAS
          ALEXANDRA ROTHMAN
15        SAMUEL ROTHSCHILD
          Assistant United States Attorneys
16
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
17        Attorneys for Defendant Halligan
     BY:  MARY MULLIGAN
18        TIMOTHY HAGGERTY
          BONNIE BAKER
19        ANIL VASSANJI
          RUPITA CHAKRABORTY
20
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
21        Attorneys for Defendant Hwang
     BY:  BARRY H. BERKE
22        DANI R. JAMES
          JORDAN L. ESTES
23        MICHAEL MARTINEZ
          MICHELLE BEN-DAVID
24        SHAKED SIVAN
          DAYNA CHIKAMOTO
25
```

APPEARANCES (Continued)


ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant

1              And our portfolio was not replicated in other

2    brokerage --

3              THE WITNESS:  Across other brokers.

4              DEPUTY CLERK:  We can't hear you.

5              THE COURT:  And our portfolio was not replicated

6    across other brokers; is that right?

7              THE WITNESS:  Correct, your Honor.  Thank you.

8              MS. ESTES:  Mr. McLeod, can we pull up Government

9    Exhibit 2140?  And let's go to the second page.

10   BY MS. ESTES:

11   Q.  I think we looked at this earlier, this is your e-mail to

12   Mr. Becker where you're asking specifically about the positions

13   they have at UBS, correct?

14   A.  Yes.

15   Q.  And let's go to the e-mail above it.  And Mr. Becker tells

16   you expressly that they can't comment about position sizes away

17   from UBS, correct?

18   A.  Yes.

19             MS. ESTES:  And let's go to the page before that.

20             And let's actually zoom out, Mr. McLeod.  Zoom into

21   the bottom two.

22   BY MS. ESTES:

23   Q.  And when you try again to get color on the top names,

24   Mr. Becker tells you that if you have liquidity profile

25   concerns you could charge them higher margin rates, right?

1    A.  I assure you we would have charged higher margin rates if

2    we knew that our portfolio was replicated across other brokers,

3    and that they weren't investing in highly liquid mega-cap

4    stocks.  And that rate probably would have been around

5    100 percent, and we would have exited the fund if we knew that,

6    but we didn't know that.  We are actually told -- we were told

7    something completely else that turned out not to be true.

8             THE COURT:  Just hold on.

9             (Discussion off the record)

10            THE WITNESS:  Is this not close enough also?

11            THE COURT:  Just go ahead and testify.

12   BY MS. ESTES:

13   Q.  Mr. Salcedo, on this e-mail, Mr. Becker says he can't

14   provide you the color, right, he doesn't provide you the

15   written positions?

16   A.  I'm sorry, now I can't hear you.  Can you say that again?

17   Q.  In this e-mail, Mr. Becker refuses to provide you the

18   written positions, right?

19   A.  That's right.

20   Q.  And you could have fired him as a client at this point,

21   right?

22   A.  We -- he did provide other risk representations and risk

23   statistics that are in, I think in these call logs here as

24   well.

25   Q.  Let's look at another one of those, Government Exhibit

# EXHIBIT 5

O5TRHWA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                            22 CR 240(AKH)
 4
     SUNG KOOK HWANG and PATRICK
 5   HALLIGAN,
                     Defendants.
 6   ------------------------------x
                                              New York, N.Y.
 7                                            May 29, 2024
                                              10:00 a.m.
 8   Before:

 9                    HON. ALVIN K. HELLERSTEIN,

10                                            District Judge
                                              —and a jury—
11                            APPEARANCES

12   DAMIAN WILLIAMS,
          United States Attorney for the
13        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
14        ANDREW M. THOMAS
          ALEXANDRA ROTHMAN
15        SAMUEL ROTHSCHILD
          Assistant United States Attorneys
16
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
17        Attorneys for Defendant Halligan
     BY:  MARY MULLIGAN
18        TIMOTHY HAGGERTY
          BONNIE BAKER
19        ANIL VASSANJI
          RUPITA CHAKRABORTY
20
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
21        Attorneys for Defendant Hwang
     BY:  BARRY H. BERKE
22        DANI R. JAMES
          JORDAN L. ESTES
23        MICHAEL MARTINEZ
          MICHELLE BEN-DAVID
24        SHAKED SIVAN
          DAYNA CHIKAMOTO
25
```

O5TRHWA1

                    APPEARANCES (Continued)


ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant

O5TRHWA1                         Direct - Tropper

1    their swap agreements with us.

2              THE COURT:  It's dated May 12, 2021.

3              THE WITNESS:  Yeah, so this -- this is the full

4    agreement -- this is the full termination, not the initial

5    notice, so this will have the calculation of what it cost us

6    and how much they owe us in it.  So we had to know what it cost

7    us, first.

8              THE COURT:  So this is after all liquidations?

9              THE WITNESS:  Yes.

10             MR. PODOLSKY:  That's exactly what I was going to ask,

11   your Honor.  Thank you.

12   Q.  So just to be clear, May 12 was after UBS had sold the

13   hedges that remained on its books; is that right?

14   A.  Correct.

15   Q.  And can you just explain why you'd have to wait until those

16   hedges are sold to provide this document?

17   A.  The terms of the agreement state that when there's an early

18   termination that the client owes us any amount that was

19   outstanding plus any costs that it -- that we bore to unwind

20   the position or to liquidate the positions, the hedges.

21   Q.  Okay.  So I just want to make sure we understand those

22   terms.  I think you first referred to amounts outstanding?

23   A.  Yes.

24   Q.  What is that?

25   A.  Amount outstanding is -- so when we were describing before

1  with contracts where there's reset periods where you exchange

2  money, in between those reset periods, there's an outstanding

3  amount.  So there's a value on the swap contracts that kind of

4  build up, and then you exchange cash at resets.  In between

5  that, there's an outstanding amount.  So there would have been

6  an outstanding amount there because we were in between resets

7  and also because there was a default.

8  Q.  And when you say "default," are you referring to the fact

9  that Archegos failed to meet its margin call?

10  A.  Yes.

11  Q.  Okay.  And then you said there's a second amount that

12  Archegos also owed you?

13  A.  Yeah.

14  Q.  Explain what that was.

15  A.  That's what it costs us to liquidate our transactions.

16  Q.  So if we turn to the attachment --

17         THE COURT:  Isn't that double counting?

18         THE WITNESS:  No.  The first part is what they owed

19  us -- the first part is what they owe us up until today, let's

20  say.  So it's, you know, what has happened historically and

21  then today is the termination date.  The second part is after

22  the termination date.  So it's what it cost us to remove our

23  hedges from our books, basically.  So it's two periods in time.

24  BY MR. PODOLSKY:

25  Q.  Let's see if we can make this practical.  So if you have a

1    stock that starts at 100, drops to 50, there's a failed margin

2    call.  Does the client now owe you the $50?

3    A.  Yeah.

4    Q.  And now after that, if a default is called, UBS now has to

5    unwind its hedge itself, right?

6    A.  Yeah.

7    Q.  And so now, if the stock decreases another, say, $25 before

8    UBS can unwind, does the client now owe you essentially the

9    full $75 in loss?

10   A.  Yes.

11   Q.  And is that what you were referring to?

12   A.  Yes.

13   Q.  All right.

14          MR. PODOLSKY:  So if we can now flip to the

15   attachment, and maybe let's start just by blowing up the whole

16   page to make it a little bigger.  Don't worry.  We'll zoom in

17   so we can actually read it.

18   BY MR. PODOLSKY:

19   Q.  But do you recognize this attachment, Ms. Tropper?

20   A.  Yes, I do.

21   Q.  First of all, how do you recognize it?

22   A.  I made this document.

23   Q.  Okay.  What does this document reflect?

24   A.  It reflects what we just described, what Archegos owed us.

25          MR. PODOLSKY:  So Ms. Gamboa, if you could blow up

O5TRHWA1                         Direct – Tropper

```
 1    just the top half, the chart and then the number just below it.
 2    Perfect.
 3    Q.   Okay.  I just want you to teach us how to interpret this
 4    chart.  Can you explain what the chart portion reflects?
 5    A.   Yeah, so this is the amount.  So this is all the stocks
 6    that we had on the book that were outstanding after we closed
 7    the swap contracts.  So these were the hedges that were
 8    remaining.  So in the example before, it's that last $25
 9    essentially.  So the amounts are what it cost us from the price
10    that we closed the swap to the price that we achieved
11    liquidating the hedges.
12    Q.   So if you see at the top, it says -- and sorry, it's still
13    a little small, but positive number equals money owed to UBS.
14    Do you see that?
15    A.   Yes.
16    Q.   And then on the right-hand column -- first of all, what is
17    the right-hand column, close out amount.
18    A.   That's the amount per stock that it cost us to liquidate.
19    Q.   Okay.  And do you see that some of the numbers have a
20    parentheses around them and some don't?
21    A.   Yes.
22    Q.   Can you explain what the difference is?
23    A.   The positive numbers are -- the positive numbers are where
24    Archegos owed us money, and the negative numbers are where we
25    owed Archegos money.
```

O5TRHWA1                           Direct - Tropper

1    Q.  Just to be clear, parentheses means a negative number,

2    correct?

3    A.  Correct.

4    Q.  And then down in the corner it says "total closeout

5    amount."  Do you see that?

6    A.  Yes.

7    Q.  What does that reflect?

8    A.  That was the full amount across the entire portfolio that

9    it cost us to liquidate the hedges.

10   Q.  What was that amount?

11   A.  Just over $710 million.

12   Q.  Okay.

13            MR. PODOLSKY:  Ms. Gamboa, if we could now go to the

14   second chart and blow up just the second chart and just the

15   line below it.  Okay.

16   BY MR. PODOLSKY:

17   Q.  Okay.  What is this chart?

18   A.  This is the amount that was still outstanding on the swaps

19   when we closed them out.  So this is the amount that Archegos

20   owed us on the day of the default notice.

21   Q.  Okay.  And I didn't ask this about the chart above, but for

22   each row in the chart, have you called out how much they owe on

23   each particular position?

24   A.  Yeah.

25   Q.  Okay.  So, for example, on this part -- if we just look at,

O5TRHWA1                        Direct - Tropper

1    say, discovery A, the third line.

2    A.  Yeah.

3    Q.  How much did Archegos owe UBS with respect to that

4    position?

5    A.  It looks like $100 million.

6    Q.  We won't go through all of these, but the third from the

7    bottom, what position was that?

8    A.  Viacom.

9    Q.  And how much did Archegos owe UBS at the time of its

10   default on Viacom?

11   A.  Just under $318 million.

12   Q.  And then if you look at the -- on the right, below the

13   chart, it says "total unpaid amounts."  Do you see that?

14   A.  Yeah.

15   Q.  What does that number reflect?

16   A.  That's the full number across the entire portfolio that was

17   owed at the time of default.

18   Q.  And so how much was that?

19   A.  Just under $864 million.

20             THE COURT:  Was that the loss?

21             THE WITNESS:  Yes, that was what was owed.

22             THE COURT:  So UBS lost how much?

23             THE WITNESS:  Between those -- so there's a couple

24   more lines, I think, that describe the net amount because

25   there's a few more things that we have to calculate to add back

1    in.  The total loss was $860 million.

2                MR. PODOLSKY:  Your Honor, I'll just show how that

3    calculation was done quickly.

4                Ms. Gamboa, if you go down to the rows at the bottom

5    below the charts.  If you can blow that bottom right-hand

6    corner up.

7    BY MR. PODOLSKY:

8    Q.  So if you can just -- Ms. Tropper, we can do this quickly,

9    if you can just walk you through what this calculation is here?

10   A.  The top line is almost $1.6 billion.  That's the amount on

11   the swap that was owed.  So that's the sum of the liquidation

12   cost and what was owed on the swap at the time of default.  The

13   second line is posted collateral.  So earlier on in the week,

14   right before default, there was an amount of money that we owed

15   based on positive moves in their portfolio.  And Archegos

16   withdrew that.  So that was $174 million that was withdrawn.

17   So the net amount of that was $1.748 billion.

18               And then below that, there's a few lines of collateral

19   that they would have posted to us through various accounts and

20   various forms.  Those are the next three lines.  And at the

21   bottom is the sum of collateral that we took ownership of and

22   the losses that we had.

23   Q.  When you say "collateral that you took ownership of," were

24   those assets that UBS was holding for Archegos and took

25   possession of to pay down some of what Archegos owed it?

1    A.   Yes.

2    Q.   And so then what was the net?  How much was the -- what was

3    the ultimate loss according to this calculation to UBS?

4    A.   Just over $860 million.

5             MR. PODOLSKY:  Nothing further, your Honor.

6             THE COURT:  Cross, Ms. Estes?

7             MS. ESTES:  Thank you, your Honor.

8    CROSS-EXAMINATION

9    BY MS. ESTES:

10   Q.   Good morning, Ms. Tropper, my name is Jordan Estes, and I

11   represent Bill Hwang.

12   A.   Good morning.

13   Q.   I want to go back to the trading that you discussed earlier

14   in your examination.  So when a client of UBS puts on a swap,

15   it's -- the hedge is what's actually executed in the market; is

16   that right?

17   A.   Correct.

18   Q.   And the hedge is UBS's hedge; is that right?

19   A.   Correct.

20   Q.   Okay.  The swap itself is not traded on the New York stock

21   exchange, do I have that right?

22   A.   Correct.

23   Q.   And in terms of, I believe, Mr. Podolsky asked you a little

24   bit about market impact.  In terms of market impact, if there

25   is any, it's the hedge that has the impact, right?

# EXHIBIT 6



1285 Avenue of the Americas
8th FL
New York, NY 10019
www.ubs.com

**By UPS and Email**

May 12, 2021

Archegos Fund, LP
C/O Archegos Capital Management, LP
888 Seventh Avenue, 38th Floor
New York, NY 10019
Attention: Scott V. Becker

With a copy to:
King & Spalding
Attention: Arthur Steinberg

**Re: NOTICE OF EARLY TERMINATION AMOUNT DUE UNDER 2002 ISDA MASTER AGREEMENT, LIQUIDATION OF THE PB AGREEMENTS COLLATERAL AND APPLICATION OF PROCEEDS OF COLLATERAL HELD IN ACCORDANCE WITH THE PB AGREEMENTS**

Dear Sirs:

We are writing to you with respect to:

- the ISDA Master Agreement, dated as of February 4, 2020, between UBS AG and Archegos Fund, LP ("**Counterparty**" or "**you**"), as amended (the "**ISDA Master Agreement**");
- the Client Account Agreement ("**CAA**") between UBS Securities LLC ("**UBS LLC**") and Counterparty, and
- the Margin Loan, Securities Loan and Foreign Exchange Agreement ("**MLSLFX**") between UBS AG and Counterparty (together with the CAA, the "**PB Agreements**" and UBS AG and UBS LLC together "**UBS**" or "**we**" )

In each case, the forgoing includes all amendments, annexes, schedules, confirmations, and notices pertaining to the agreement.

**ISDA Master Agreement – Net Early Termination Amount and Application of Collateral**

All capitalized terms not otherwise defined in this section shall have the meanings set out in the ISDA Master Agreement.

You were notified on March 27, 2021 of the occurrence of one or more Event of Defaults under the ISDA Master Agreement, including on account of your failure to make margin payments on both March 25, 2021 and March 26, 2021 under the PB Agreements and the designation of March 29, 2021 as Early Termination Date.

Pursuant to Section 6(d) of the ISDA Master Agreement, you are hereby notified that the Net Early Termination Amount payable by you to UBS, following the close out of the ISDA Master Agreement, is $1,748,542,506. This amount consists of the Early Termination Amount, which was then adjusted, pursuant to Paragraph 8 of the Credit Support Annex to the Schedule to the ISDA Master Agreement, to reflect the Posted Collateral (VM) posted by UBS AG to Counterparty, as so adjusted, the "**Net Early Termination Amount**". In addition, we have exercised our remedies under the PB Agreements and applied the cash and proceeds of the securities collateral liquation to the Net Early Termination Amount, as more fully described below.

**GOVERNMENT EXHIBIT 2189**
22 Cr. 240 (AKH)

**CONFIDENTIAL TREATMENT REQUESTED BY UBS**

**UBSARCH0000041**

In accordance with Section 6(d) of the ISDA Master Agreement, Annex 1 hereto provides a statement detailing relevant calculations made, and specifies the Early Termination Amount and the Net Early Termination Amount.

**PB Agreements - Liquidation and Application of the Collateral**

All capitalized terms not otherwise defined in this section shall have the meanings set out in the PB Agreements.

You were notified on March 27, 2021 of the occurrence of a Default under the PB Agreements which resulted in UBS exercising remedies, including without limitation, pursuant to Section 3(c) of the CAA and the same Section incorporated by reference into the MLSLFX. Annex 2 hereto provides a statement detailing the proceeds UBS received from the liquidation of non-cash Collateral ("**UBS LLC Proceeds Amount**").

Pursuant to the terms of the PB Agreements, including without limitation Sections 2 and 3 of the CAA, and the same Sections incorporated by reference into the MLSLFX, UBS AG, as secured party, has applied the UBS LLC Proceeds Amount and other cash constituting Collateral[1] under the PB Agreements to the Obligations you incurred to UBS AG under the ISDA Master Agreement, as described above and reflected in the Net Early Termination Amount.

**ISDA Master Agreement and PB Agreements – UBS Termination Amount**

The amount so calculated and reflecting the exercise of UBS's close-out of the ISDA Master Agreement and the PB Agreements, but subject to interest charges and additional amounts noted in the immediately following section, is **$860,268,783** and is reflected in Annex 1 as the "**UBS Termination Amount**".

The UBS Termination Amount is due upon receipt of this Notice, pursuant to Section 6(d) of the ISDA Master Agreement. Payment details are provided in Annex 3 hereto.

**ISDA Master Agreement and PB Agreements – Additional Amounts**

This statement does not include amounts that we have incurred under Section 11 of the ISDA Master Agreement and Sections 3(d) and 18 of the CAA, and the same Sections incorporated by reference into the MLSLFX, including but not limited to legal fees and other reasonable out-of-pocket expenses incurred by reason of the enforcement and protection of our rights under the ISDA Master Agreement and PB Agreements and/or by reason of the early termination of the Transactions and liquidation of collateral, including, but not limited to, costs of collection.

The UBS Termination Amount will continue to accrue interest at the Default Rate until paid in full.

UBS and its affiliates hereby expressly reserve all other rights and remedies that we may have at law, in equity, under the ISDA Master Agreement and PB Agreements or any other agreement between you or any of your affiliates and UBS or any of our affiliates, or otherwise (including, without limitation, any rights of set-off, consolidation of accounts or netting) and nothing that we and/or our affiliates may have done constitutes a waiver of such rights and remedies. UBS reserves the right to supplement this notice with respect to additional amounts describe above.

---

[1] As reflected in Annex 1, such cash consists of UBS LLC other cash and UBS AG prime brokerage cash, in each case as held pursuant to the PB Agreements.

2

**CONFIDENTIAL TREATMENT
REQUESTED BY UBS**

If you have any questions regarding the foregoing please contact Richard Niemeyer at 212-713-8394 or Lisa Rosenthal at 212-821-2115.

Yours faithfully,

UBS AG

By: *Lisa Rosenthal*
    Name: Lisa Rosenthal
    Title: Executive Director & Counsel

UBS AG

By: *Richard Niemeyer*
    Name: Richard Niemeyer
    Title: Executive Director and Counsel

UBS Securities LLC

By: *Lisa Rosenthal*
    Name: Lisa Rosenthal
    Title: Executive Director & Counsel

UBS Securities LLC

By: *Richard Niemeyer*
    Name: Richard Niemeyer
    Title: Executive Director and Counsel

3

CONFIDENTIAL TREATMENT
REQUESTED BY UBS

UBSARCH0000043

SDNY_P001_0006730687

## Annex I

**Summary of Early Termination Amount**
**Archegos Fund, LP**

Positive number = money owed to UBS

### Outstanding Trades

| CBS Code | Swap ID | RIC | Currency | Close-Out Amount (USD) |
|---|---|---|---|---|
| 8394691 | 463666 | BIDU.OQ | USD | 187,302 |
| 8394691 | 463666 | CPB.N | USD | 4,548,549 |
| 8394691 | 463666 | DISCA.OQ | USD | 77,475,116 |
| 8394691 | 463666 | DISCK.OQ | USD | 6,361,280 |
| 8394691 | 463666 | EEM.P | USD | 28,473,365 |
| 8394691 | 463666 | FTCH.N | USD | 9,126,058 |
| 8394691 | 463666 | FUBO.N | USD | 873 |
| 8394691 | 463666 | FUTU.OQ | USD | 389,277,681 |
| 8394691 | 463666 | FXI.P | USD | 26,387,546 |
| 8394691 | 463666 | GIS.N | USD | 2,140,788 |
| 8394691 | 463666 | GSX.N | USD | 311,874,528 |
| 8394691 | 463666 | IQ.OQ | USD | 100,204,643 |
| 8394691 | 463666 | K.N | USD | (1,139,792) |
| 8394691 | 463666 | KHC.OQ | USD | 21,052,761 |
| 8394691 | 463666 | LC.N | USD | (10,318,899) |
| 8394691 | 463666 | RKT.N | USD | 5,947,244 |
| 8394691 | 463666 | SIM.N | USD | 12,900,625 |
| 8394691 | 463666 | SPY.P | USD | 23,077,501 |
| 8394691 | 463666 | TCBI.OQ | USD | (67,710,777) |
| 8394691 | 463666 | TME.N | USD | (42,466,249) |
| 8394691 | 463666 | VIAC.OQ | USD | (219,324,980) |
| 8394691 | 466026 | UBACSPX2=UBSS | USD | 47,737,083 |
| 8394691 | 466026 | UBSACMAY=UBSS | USD | (3,735,132) |
| 8394691 | 470241 | 1776.HK | HKD | 1,206,438 |
| 8394691 | 470241 | 3908.HK | HKD | (557,198) |
| 8394691 | 470241 | 6030.HK | HKD | (5,547,592) |
| 8394691 | 470241 | 6066.HK | HKD | (545,475) |
| 8394691 | 470241 | 6837.HK | HKD | (2,008,999) |
| 8394691 | 470241 | 6881.HK | HKD | (2,167,355) |
| 8394691 | 470241 | 6886.HK | HKD | (2,001,560) |
| 8394691 | 471537 | 9983.T | JPY | 129,461 |

Total Close-out Amount 710,614,923

### Failed Settlements (Unpaid Amounts)

| CBS Code | Swap ID | RIC | Currency | Unpaid Amount (USD) |
|---|---|---|---|---|
| 8394691 | 463666 | BIDU.OQ | USD | (42,776,826) |
| 8394692 | 463666 | CPB.N | USD | 1,337,487 |
| 8394693 | 463666 | DISCA.OQ | USD | 103,052,677 |
| 8394693 | 463666 | DISCK.OQ | USD | 4,702,898 |
| 8394694 | 463666 | EEM.P | USD | 22,145,523 |
| 8394695 | 463666 | FTCH.N | USD | 20,429,093 |
| 8394696 | 463666 | FUBO.N | USD | 90,729 |
| 8394697 | 463666 | FUTU.OQ | USD | 56,094,256 |
| 8394698 | 463666 | FXI.P | USD | 14,140,205 |
| 8394699 | 463666 | GIS.N | USD | 821,596 |
| 8394700 | 463666 | GSX.N | USD | 115,623,144 |
| 8394701 | 463666 | IQ.OQ | USD | 67,882,315 |
| 8394702 | 463666 | K.N | USD | (106,699) |
| 8394703 | 463666 | KHC.OQ | USD | 6,265,244 |
| 8394704 | 463666 | LC.N | USD | (2,584,541) |
| 8394705 | 463666 | RKT.N | USD | 8,601,874 |
| 8394706 | 463666 | SPY.P | USD | 2,166,136 |
| 8394707 | 463666 | SIM.N | USD | 3,441,233 |
| 8394708 | 463666 | TCBI.OQ | USD | (9,659,890) |
| 8394709 | 463666 | TME.N | USD | 137,207,973 |
| 8394710 | 463666 | VIAC.OQ | USD | 317,863,248 |
| 8394691 | 466026 | UBACSPX2=UBSS | USD | 39,561,283 |
| 8394691 | 466026 | UBSACMAY=UBSS | USD | (1,378,257) |

Total Unpaid Amount 863,720,408

*Collateral and cash are denominated in USD.

| | |
|---|---|
| Early Termination Amount | 1,574,335,332 |
| Posted Collateral (VM) * | 174,207,174 |
| Net Early Termination Amount | 1,748,542,506 |
| UBS LLC Proceeds Amount (See Annex 2) | (204,592,694) |
| UBS LLC other cash* | (395,990,569) |
| UBS AG prime brokerage cash* | (287,590,460) |
| UBS Termination Amount | 860,268,783 |

CONFIDENTIAL TREATMENT
REQUESTED BY UBS

UBSARCH0000044

## Annex II

**Summary of UBS LLC Proceeds Amount**
**Archegos Fund, LP**    Positive number = money owed to UBS

|  |  |
|---|---|
| Proceeds | (204,693,738) |
| SEC Fees $ | 1,044 |
| UBS LLC Proceeds Amount $ | (204,692,694) |

| Side | RIC | Quantity | Average Ex | Proceeds |
|---|---|---|---|---|
| Sell | BIDU.OQ | 268,102 | 208.01 | (55,767,897) |
| Sell | DISCA.CQ | 626,607 | 41.49 | (25,999,554) |
| Sell | DISCK.CQ | 21,518 | 35.52 | (764,289) |
| Sell | FTCH.N | 279,655 | 52.75 | (14,751,528) |
| Sell | FISV.OQ | 8,303 | 121.17 | (1,006,042) |
| Sell | VIAC.OQ | 1,776,163 | 46.08 | (81,838,131) |
| Sell | YELP.N | 330,048 | 38.77 | (12,795,390) |
| Sell | Z.OQ | 97,284 | 121.00 | (11,770,907) |

CONFIDENTIAL TREATMENT
REQUESTED BY UBS

UBSARCH0000045

Annex 3

**Payment Instructions**
**Archegos Fund, LP**

| USD | Agent 57A: | UBS AG, Stamford ████████████ | Final Beneficiary 59A: | UBSWGB2LEQU ████████████ |
|-----|-----------|------------------------------|------------------------|--------------------------|

CONFIDENTIAL TREATMENT
REQUESTED BY UBS