MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

bjacobs@maglaw.com
212-856-9600

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
———
RETIRED/PARTNER EMERITUS
PAUL R. GRAND
———
ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

December 16, 2024

**BY ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re:   <u>*United States v. Sung Kook (Bill) Hwang et al.*, No. 22 Cr. 240 (AKH)</u>

Dear Judge Hellerstein:

     On behalf of defendant Bill Hwang, I write to address the updated victim impact statements received from the counterparty victims, as well as the government's submission dated December 10, 2024, with respect to the propriety of restitution and forfeiture. The submissions from both the government and the counterparties flout this Court's explicit rulings and, to varying extents, do not comply with the Court's order to submit restitution numbers equivalent to "[l]oss excluding interest minus recoveries." (11/20/24 Tr. 83.) Despite the Court's express direction that the government and the counterparties should not "remake" their "arguments," and should "[t]ake the law as I give it and apply it to the numbers" (11/20/24 Tr. 83), the government and the counterparties have nevertheless submitted to the Court demands for restitution that do not comply with the Court's rulings and include categories of losses the Court ruled are not compensable. For just one example, the government and the counterparties "remake" the argument that they should receive restitution for losses incurred from liquidating hedges. In addition, the counterparties' statements are replete with other problems, including the inclusion of other non-compensable categories of "loss" and apparent miscalculations, and the Court cannot rely upon them to fashion an accurate and fair restitution order in compliance with applicable law. Accordingly, the Court should deny restitution to the counterparties.

     To assist the Court with the determination of issues relating to restitution and forfeiture, after addressing the issue of restitution for the counterparties (Sections I-III), this letter further explains why the Court should decline to order a money judgment (Section IV), stay restitution and forfeiture pending appeal (Section V), and reconsider the forfeiture of the Archegos entities (Section VI).

## I.    Relevant Background

During Mr. Hwang's initial sentencing proceeding on November 20, 2024, the Court ruled that restitution for the counterparties should be calculated by looking at "[l]oss excluding interest minus recoveries." (11/20/24 Tr. 83.) In reaching that straightforward formula, the Court ruled that "losses on hedges are not to be counted," while "[l]osses on loans to Archegos"—consisting of unpaid margin loans and unreturned variation margin—are compensable. (11/20/24 Tr. 85-86.) The Court explained that "given the very large magnitude of loss, . . . there will be no interest to be computed in the loss." (11/20/24 Tr. 81.) With respect to certain banks' requests for attorneys' fees and other costs, the Court stated that "the magnitude of losses is such that there is no point in adding . . . consequential costs on." (11/20/24 Tr. 88.)

The Court also sustained Mr. Hwang's objection to the inclusion of six stocks in paragraph 40 of the Presentence Investigation Report ("PSR") on the ground that Mr. Hwang was not found guilty or charged with market manipulation with respect to those stocks: BIDU, FTCH, FUTU, IQ, RKT, and TCBI. (11/20/24 Tr. 14-15.)

The Court then set out the next steps for the banks and parties. After defense counsel explained that the numbers presented in the banks' original submissions were inconsistent with the Presentence Report and lacked support, the Court ordered the banks to submit updated statements incorporating the Court's formula for calculating loss, stating, "[i]f they want to have a claim for restitution, they have got to participate and show their claim." (11/20/24 Tr. 83, 87.) The Court instructed the government and defense counsel to confer regarding those updated statements and put together a joint submission addressing the counterparties' compensable losses. In particular, the Court ordered, "[t]ake the law as I give it and apply it to the numbers." (11/20/24 Tr. 83.)[1]

On December 10, 2024, the parties made their first submissions to the Court regarding, among other topics, the propriety of restitution and forfeiture. (Dkts. 360, 361.) Despite the Court's instruction to "[t]ake the law as I give it," the government, in its submission, asks the Court to revisit its prior ruling excluding losses on hedges from the restitution calculation. (*See*

---

[1] The Court asked the parties to attempt to reach an agreement on the numbers based on the law as the Court gave it, and the government and the defense conferred on December 13, 2024. (11/20/24 Tr. 83.) The parties were unable to reach an agreement. The government provided its proposed restitution numbers for the first time at 5:57 AM on Monday, December 16, the same day the parties' submissions on counterparty restitution are due. Thus, at the time of this filing, defense counsel has had less than twenty-four hours to review those numbers, all of which are different than the totals, and in some instances subtotals, that the counterparties have requested, and which require significant further analysis. By the government's own admission, the values may change as the counterparties provide the government with updates. BMO and UBS in particular have yet to provide the government with certain necessary information that the government believes will materially alter its proposal as to those counterparties. The government also continues to maintain its request for various categories of loss that should not be included, including trading losses. If the Court does not deny restitution outright, additional time is needed to analyze the government's proposed numbers.

Dkt. 361 at 31-33.)[2] The same day, the government submitted the updated victim impact statements from eight banks: MUSE, BMO, Credit Suisse, Jefferies, Macquarie, Morgan Stanley, UBS, and Nomura. (Dkt. 365.) Notwithstanding the Court's clear orders and simple formula, these counterparties also ask for restitution to recoup their trading losses and include figures associated with costs incurred from unwinding hedges in their submissions. Each bank computes and asks for restitution in the following amounts:

### 1. MUSE

MUSE seeks $166,607,570.68 excluding trading losses, or $243,192,502.68 including trading losses. (MUSE Second Stmt. at 2.) Consistent with the Court's direction, these amounts exclude outside counsel legal fees and are offset by $20,440,135.32 that MUSE recovered in private mediation. MUSE represents that it did not extend margin loans to Archegos. (*Id.* at 1.) Accordingly, its compensable losses are entirely attributable to $280,350,000 of unreturned variation margin, which MUSE offset by $93,318,005 that it owed Archegos because of Archegos unwinding four of its swaps. Although it does not appear that MUSE is seeking prejudgment interest, it does include $15,711 in interest that Archegos owed on the variation margin for the month of March 2021. (*Id.*)

MUSE's updated submission does not include any new supporting materials. Its original submission relied on, among other things, an April 1, 2021, notice of early termination that MUSE sent to Archegos pursuant to their ISDA agreement and following Archegos's default (MUFG-Archegos0006302) and a spreadsheet showing MUSE's claim for $263,632,628 (MUFG-Archegos0006309). The spreadsheet includes a chart that appears to show MUSE's gains and losses from unwinding the hedges that were put on in conjunction with the swaps, which it refers to as "cashflows due under TRS," including its positions in IQ, BIDU, and TCBI.

### 2. Credit Suisse

Credit Suisse seeks $4,365,477,644.78 excluding trading losses, or $4,905,877,323.78 including trading losses. (Credit Suisse Second Stmt. at 4.) Credit Suisse also provides a figure for total losses including prejudgment interest: $5,639,170,376.54. (*Id.*) These loss amounts include both unreturned variation margin ($4,745,794,439) and unpaid margin loans ($39,010,507.43 after the sale of collateral), less the variation margin and interest held by Credit Suisse in Archegos's favor, amounts owed to Archegos because of the early termination of the swaps, and approximately $409 million recovered in private mediation. (*Id.* at 2-4.) The amount



2

of unreturned variation margin includes $208,379 in contractual interest due under the parties' ISDA agreement through the date of Archegos's default. (*Id.* at 3 n.1.)

In addition to the supporting materials submitted with Credit Suisse's original victim impact statement, the new statement includes a spreadsheet summarizing trades in Credit Suisse's Archegos-related equity positions. (Second Fletcher Decl. Ex. 1.) The spreadsheet calculated the total loss or gain on each Archegos-related position by subtracting the price at which Credit Suisse purchased the position from the price at which Credit Suisse sold the position (multiplied by quantity). (Second Fletcher Decl. ¶ 2.) This spreadsheet, like the materials submitted in connection with the original statement, includes data pertaining to all six of the excluded stocks, as well as many other securities unrelated to the market manipulation scheme but that were apparently used as the reference stocks for the swaps. (*See* Second Fletcher Decl. Ex. 1.)

### 3. BMO

BMO seeks $5,212,059.67 excluding trading losses, or $35,677,674.58 including trading losses. (BMO Second Stmt. at 3.) BMO did not extend margin loans or variation margin to Archegos. (*Id.* at 2.) Accordingly, the full amount of its losses, excluding hedges, is attributable to "default loss," which BMO does not define. (*See id.* at 1; Second Friel Decl. Ex. A at 1.) It is not clear whether this amount includes interest that had accrued on the collateral up to that point in time. BMO then subtracted $4,566,467 in variation margin it received from Archegos, as well as $434,939.88 recovered in private mediation. (*Id.* at 3.)

The new statement includes a notice of default that BMO sent Archegos on March 31, 2021, which identifies the amounts owed to BMO under their ISDA agreement. (Second Friel Decl. Ex. A.) Neither this nor the original statement includes any spreadsheets or charts containing data to support the amount of loss that BMO now seeks as restitution.

### 4. Jefferies

Jefferies seeks $31,452,469.69 in restitution, which Jefferies attributes to "net losses from margin loans made to Archegos" and "variation margin owed by Archegos," but seems to include trading losses. (Jefferies Second Stmt. at 2.) This amount includes $8,065,436.12 loaned from Jefferies's prime brokerage account and $19,471,336.11 owed in variation margin. (*Id.* at 1-2.) The bank also states that it lost $15,046,955.68 in "net losses from securities purchased due to Archegos's prime brokerage and swaps transactions"—in other words, trading losses. (*Id.* at 2.) Curiously, and as Jefferies acknowledges, that number is identical to the amount that Jefferies claims for "net losses on its margin loans to Archegos." (*Id.* at 1.) Jefferies subtracted $3,065,822.10 recovered in private mediation. The category "losses on margin loans" also without explanation includes "the net settlement amount . . . , which represents difference between the value of the shares underlying the swaps at execution and the amount Jefferies recovered from the liquidation of those shares upon Archegos' default." (*Id.* at 2.)

Jefferies's updated submission does not include any additional supporting materials. Its original victim impact statement relied primarily on a "net settlement payment notice" that Jefferies sent to Archegos on March 31, 2021, pursuant to the ISDA agreement and other relevant contracts. (Miranda Decl. Ex. D at 1.) Although the notice attaches several unlabeled charts, including a list of transactions associated with a wide swath of stocks (including FTCH

4

and TCBI), it is not clear what those numbers are or how they factor into the amount that Jefferies now seeks in restitution.

     *5. Macquarie*

Macquarie seeks $32,023,527.49 in restitution, which purportedly includes trading losses, though it also references a significantly higher value of $2,119,254,036.86, which purportedly excludes trading losses. (*See* Macquarie Second Stmt. at 2-3.) Macquarie represents that it did not extend any margin loans or variation margin to Archegos. (*Id.* at 2.) It is not clear how any of the numbers in the chart on pages 2 and 3 of the submission add up to the total amounts that Macquarie now seeks. For example, the chart indicates that Macquarie did not deduct $194,136,049.49 in variation margin that it held or $2,672,036.71 recovered in private mediation in its calculation of total losses excluding hedges. (*See id.* at 3 line (xi) (representing that lines (vi) and (x) had not been deducted).) Further, the amount of loss that supposedly excludes hedges, $2,119,254,036.86, is the same as the amount listed for "the total amount due on the swaps based on the reference prices of the swaps." (*Id.* at 2.)

In support of its calculations, Macquarie attaches several documents including notices of early termination under the ISDA agreement and a four-page report from a mediator. Several excluded stocks, IQ, BIDU, and TCBI, are included in the chart that accompanied the notice of early termination.

     *6. Morgan Stanley*

Morgan Stanley seeks $137,008,781 excluding trading losses, or $911,461,263 including trading losses. (Morgan Stanley Second Stmt. at 3.) Morgan Stanley represents that there were no outstanding margin loans to Archegos at the time of default because the bank held approximately $2.1 billion in collateral, including a net credit, and that it has recovered $48.47 "to date" in connection with a resolution process. (*Id.* at 1-2.) Although the bank claims that it lost $14,464,464 in unreturned variation margin, the loss amount excluding hedges, $137,008,781, is the same as the amount supposedly "owed in accrued interest and dividends under the swap agreements" (*id.* at 2) and does not seem to incorporate the unreturned variation margin or exclude the amount recovered in mediation.

Morgan Stanley's updated submission does not include any additional supporting materials. The original victim impact statement included two spreadsheets collected from Libra and Poseidon that reflect positions liquidated in connection with Archegos's default from (1) the period from March 26 to March 29, 2021, and (2) after March 29, 2021. (Kouch Decl. Exs. 1, 2.) The spreadsheets include data pertaining to all six excluded stocks.

     *7. UBS*

UBS seeks $443,849,091 excluding trading losses, or $794,056,227 including trading losses. The non-hedge figure is based on $354,346,552 in unreturned variation margin and $863,720,408 "due on the swaps at time of final margin call (trades Archegos failed to settle from date of last reset)," less $66,252,555 recovered in private mediation, $204,692,694 in proceeds from the sale of collateral, and other cash that UBS held. (UBS Second Stmt. at 4-5.) UBS also claims that it lost $84,810,677 from its prime brokerage (*id.* at 2), but it is not clear whether that number factored into the loss calculation.

UBS's updated submission does not include any additional supporting materials. The original victim impact statement included a notice of early termination that UBS sent to

Archegos pursuant to the ISDA agreement and other related contracts, along with a chart of chart of "early termination amounts" that references excluded stocks (FUTU, BIDU, IQ, FTCH, and RKT). (*See* Brudner Decl. Ex. 6.)

### 8. *Nomura*

Nomura seeks $2,624,669,995.85, comprising $475,775,728.32 in losses on margin loans and an additional $2,373,192,484.52 in "losses on its TRSs with Archegos" and collateral posted by Nomura, minus $224,298,217 recovered. (Nomura Second Stmt. at 3-4.) Nomura does not provide a figure for losses excluding hedges. (*Id.* at 4.) The second category appears to include losses from liquidating Nomura's short and long positions in the reference stocks, or trading losses, in addition to approximately $65 million owed to Nomura "in connection with TRSs that were closed before Archegos's default but which remained unpaid as of March 25, 2021" and losses on the sale of collateral. (*See id.* at 3-4.) It also appears to contain a calculation error: Nomura claims that it lost $1,174,283,151 from liquidating its long positions, but the numbers provided yield a loss of $996,395,446.79. Nomura states that it "is not in a position to provide [information regarding variation margin exchanged with Archegos], including because, under the [relevant agreement], Nomura and Archegos agreed to a cross-margining arrangement that took into account both margin loan transactions and TRSs." (*Id.* at 4 n.5.)

Nomura's updated submission does not include any additional supporting materials. The spreadsheet produced in connection with Nomura's first submission includes data relating to all six excluded stocks.

## II.    The Banks' Submissions Do Not Adequately Establish the Banks' Losses

For a second time, the counterparties have not provided the Court with a sound basis for ordering restitution.

As an initial matter, it is notable that not a single counterparty has supplied the Court with an affidavit or declaration from a person with personal knowledge explaining the basis of the calculations and affirming the authenticity of the supporting records. Other courts in this District—as Mr. Hwang noted in his submission dated November 18, 2024 (Dkt. 343 at 3)— have required such materials to support requests for restitution amounts that are far lower than those the counterparties seek here. *See, e.g.*, *United States v. Hild*, 19 Cr. 602 (RA)(KHP) (S.D.N.Y.), Dkt. 198 (ordering government to submit a spreadsheet with restitution calculations as well as "an affidavit/declaration" from each victim "explaining the basis of any calculations" and attaching all necessary records, "affirming their authenticity"). The fact that the counterparties refuse to provide the Court with such basic reliable supporting materials, even as they request that the Court award them staggering sums in restitution, alone supports denial of their requests.

In fact, most of the updated victim impact statements include no additional supporting materials whatsoever. Accordingly, they suffer from the same deficiencies raised in Mr. Hwang's original November 18 submission. (*See* Dkt. 343 at 16-26.) The statements are also deficient insofar as they contravene this Court's order to follow a specific and straightforward formula for computing loss that excludes trading losses, consequential damages, and prejudgment interest.

Rather, the counterparties have generally provided two total loss figures—one including trading losses and one excluding trading losses—apparently at the government's direction. A

small number of the counterparties, namely MUSE and Credit Suisse, have helpfully displayed their losses in a way that makes it easy to discern how they reached a number that follows the Court's formula: money lost in the form of unreturned variation margin and unpaid margin loans, minus amounts recovered. The same cannot be said for the other counterparties, whose submissions range from omitting any figure for losses excluding hedges, inexplicably including categories of loss that have no obvious place in that formula, and seemingly making computation errors. Although the defense has sought to make sense of the numbers provided, the burden to establish a specific amount of loss lies with the counterparties and the government, not with the Court and Mr. Hwang. In this regard, to date, the government has failed to provide either the defense or the Court with a complete and straightforward list of the losses it seeks consistent with the Court's formula.

The problems with the updated submissions extend beyond the counterparties' failure to comply with the Court's order and make it all but impossible to calculate accurately restitution.

*First*, many of the submissions reference so-called "losses" that do not actually represent out-of-pocket losses incurred by the counterparties and thus should not be included in restitution. For example, MUSE and Credit Suisse have included interest that accrued on variation margin. Morgan Stanley, for its part, seeks restitution for amounts "owed in accrued interest and dividends under the swap agreements," as well as unpaid financing fees. (Morgan Stanley Second Stmt. at 2.) Nomura and BMO make vague reference to swap- and default-related losses but do not provide enough detail to determine whether they are compensable. (*See* BMO Second Stmt. at 1 (seeking restitution to compensate BMO "for the amount of Archegos's default on its payment obligation to BMO"); Nomura Second Stmt. at 4 (seeking $65 million "in connection with TRSs that were closed before Archegos's default").) Because contractual interest and fees do not represent out-of-pocket losses, but rather profit that the counterparties expected but never received, they should not be compensable as restitution.

*Second*, to the extent some of the parties have provided charts and spreadsheets in support of their calculations, many seem to include losses attributable to stocks that were not a part of the charged market manipulation scheme or as to which Mr. Hwang was found "not guilty" and which the Court ruled should not be included in the Presentence Report. (11/20/24 Tr. 14-15.) Others do not specify the stock associated with a particular position. Because the submissions do not make clear what percentage of the claimed losses were attributable to those excluded stocks, it is all but impossible to determine what amounts should be excluded to avoid improperly holding Mr. Hwang responsible for uncharged or acquitted conduct.

*Third*, many of the counterparties rely on the early termination notices that they sent to Archegos pursuant to their ISDA agreements, in which they set out the amounts owed by Archegos following the fund's default. It is not clear, however, that the mechanism for determining amounts owed under the ISDA agreements is an appropriate measure of actual loss for purposes of restitution. MUSE's submission indicates why. MUSE performed two different loss calculations in its original statement. The first, which drew directly from the early termination notice, applied end-of-day prices for the relevant securities when calculating trading losses. (MUSE Ex. A at 5.) The second calculation, which MUSE ultimately used to reach its total loss amount for purposes of restitution, referred to the actual prices at which MUSE liquidated its hedges. (MUSE Ex. A at 7.) To the extent other counterparties that rely on their notices of early termination used end-of-day stock prices to calculate the cost of liquidating their hedges, those values may not adequately capture the actual losses suffered by the banks. In any

7

event, this difficulty in accurately capturing trading loss illustrates the additional complexity involved if the Court ultimately includes that category in the calculation of restitution.

In sum, due to the counterparties' failure to follow the Court's orders, to provide satisfactory supporting materials (including a basic affidavit from someone with personal knowledge attesting to the loss amounts), to limit their requests to compensable out-of-pocket losses, and to compute accurately their actual losses, the Court should deny restitution.

### III.    The Government's Submission Fails to Establish the Counterparties' Losses

The absence of sufficient materials from the counterparties alone warrants denial of restitution, but it bears noting that the government itself continues to fall short of meeting its burden to prove by a preponderance that any counterparty is entitled to recoup any specific amount. Like the counterparties' submissions, the government's submission casts aside this Court's clear ruling as to trading losses and seeks restitution for money the banks lost from liquidating hedges, including in stocks that the jury and this Court found that Mr. Hwang did not manipulate in the first instance. (11/20/24 Tr. 14-15; Dkt. 249 at 3; Dkt. 134 at 40.) The government's attempt to relitigate the exclusion of trading losses on hedges is unpersuasive.

The government cites no authority to support its theory that trading losses are compensable as restitution as a legal matter. The two cases on which the government principally relies, *United States v. Paul*, 634 F.3d 668 (2d Cir. 2011), and *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), stand for nothing more than the proposition that losses stemming from unpaid and fraudulently obtained loans—a category of loss that this Court has already determined will factor into restitution—are attributable to the fraud and not to market fluctuations that caused the value of the underlying collateral to decrease.

In *Paul*, the defendant was convicted of securities fraud after he artificially inflated the price of certain stock and then used that same stock as collateral to obtain margin loans from banks. 634 F.3d at 670. When the scheme imploded and the price of the stock fell, the value of the collateral dropped and the defendant defaulted on the loans. *Id.* The Second Circuit rejected the defendant's argument that there was no causal chain because the value of the stock fell due to normal market forces. *Id.* at 677. The Second Circuit held instead that the loss was caused not by the decline in value of the collateral, but by the fraudulent making of the margin loans in the first place. *Id.* *Paul* makes no mention of hedges, nor does it account for the Archegos counterparties' independent and discretionary decisions to exit their positions at specific points in time. The single stock at issue in *Paul*, which comprised all the collateral, was the subject of the defendant's market manipulation scheme. Here, it appears that the swaps and hedges covered a broad swath of securities beyond those that Mr. Hwang was accused of manipulating, including the six that this Court expressly excluded from the PSR's section on market manipulation (including due to Mr. Hwang's acquittal on one count). (*See* 11/20/24 Tr. 14-15.)

*Turk*, a case involving mortgage fraud, is even less applicable to Mr. Hwang's case. There, the Second Circuit ruled for purposes of calculating loss under the Sentencing Guidelines that the victims' losses were "the principal value of the loans they made to [the defendant] which were never repaid and which the buildings were supposed to have collateralized but never did," not the decline in value of what was promised as collateral. 626 F.3d at 748. That holding is of little relevance here, where the hedges were put on not as collateral for the credit extended to Archegos, but as a way for the banks to manage their own risk in swap transactions designed to generate significant fees payable to the banks. (*See* Dkt. 361 at 12 (citing Trial Tr. 1558).) In

fact, the court in *Turk* explicitly distinguished between loans and stocks, stating, "[a] loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Id.* at 751. Unlike the variation margin and margin loans, no money flowed from the counterparties to Archegos when the counterparties put on, and then unwound, their hedges.

In the absence of persuasive legal authority, the government's submission focuses on the role Archegos played in the creation of the hedges in the first place. None of the counterparties would have traded in the equities underlying Archegos's swaps, the government argues, if Archegos had not executed swaps referencing those securities. (Dkt. 361 at 25.) But that factual narrative still does not adequately account for the way the counterparties ultimately unwound those positions—decisions in which Archegos played no part. Although the government's submission attempts to recharacterize the hedging losses as "swaps trading losses," it seems to acknowledge that the loss directly caused by Archegos's collapse was Archegos's failure to pay certain amounts due under the swap agreements and to return variation margin Archegos held on behalf of the banks. (Dkt. 361 at 31-32.) The trading losses, on the other hand, were merely the result of market risk that was "coextensive" with the Archegos swaps. (Dkt. 361 at 32.)

The government also argues that these trading losses were foreseeable to Mr. Hwang because the ISDA agreements governing the swaps contemplated that any loss calculation would include "loss or cost incurred in connection with [the counterparty] terminating, liquidating, or re-establishing any hedge." (Dkt. 361 at 30 (citing GX 325).) A contractual definition of "loss," however, where the parties are free to negotiate terms to maximize their rights under the contract, is not necessarily coterminous with the amount of actual loss that a victim suffers as a direct and proximate result of criminal activity.

Finally, the government advances a prudential argument that excluding trading losses would contravene the MVRA's command that victims be restored to the position they occupied before sustaining injury, and produce inequitable recoveries because counterparties took different approaches to managing the risks of trading with Archegos. (Dkt. 361 at 32-33.) The principle that victims should be made whole, however, is still limited by the requirement that all losses must be caused by the offense conduct. There is no inequity when a victim does not receive restitution for a loss that is not compensable in the first place. The fact that some counterparties took different approaches to managing risk and offloading their hedges, resulting in uneven trading losses, underscores that those losses—as the Court has already ruled—were substantially impacted by the counterparties' own decisions and other factors outside of Mr. Hwang's control.

## IV.    The Court Should Deny the Government's Request for a Forfeiture Money Judgment

As the Court ruled on November 20, 2024, when the Court stated "I deny forfeiture" (11/20/24 Tr. 96-97), a money judgment against Mr. Hwang is not warranted in this case because, to the extent that there were any "proceeds" from the charged conduct, Mr. Hwang never took personal possession of those proceeds. (Dkt. 360 at 6-7.) *See Honeycutt v. United States*, 581 U.S. 443, 454 (2017); *see also United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) ("[T]he calculation of a forfeiture amount in criminal cases is usually based on the

defendant's actual gain.") (citing *United States v. McGinty,* 610 F.3d 1242, 1247 (10th Cir. 2010)).

The government persists in challenging the Court's initial ruling, seeking a money judgment of over $12 billion, even though Mr. Hwang never placed any money in a personal account, because he "maintained control over all of Archegos's funds, including . . . proceeds that were paid by the counterparties in the form of variation margin." (Dkt. 361 at 47.) That argument relies on cases that are outdated and distinguishable from the circumstances here.

In fact, most of the government's cases involve situations where, unlike here, the defendant exerted control by taking *personal possession* of some portion of the criminal proceeds, even if just temporarily. In *United States v. Tanner,* for example, which the government cites, the defendant personally extracted $9.7 million from the specialty pharmacy he ran and laundered that money to his co-defendant using a series of shell companies that they owned and had established to disguise the payments. 942 F.3d 60, 63-64 (2d Cir. 2019). The Second Circuit held that *Honeycutt* did not foreclose forfeiture under the money laundering statute of the entire $9.7 million on those facts because the defendant did, at one point or another, actually "acquire[] the full proceeds" of the kickback scheme, even if he no longer possessed them. *Id.* at 68.

In *United States v. Bergstein,* which the government also cites, the Second Circuit affirmed the district court's order of forfeiture on the ground that defendant "effectively controlled the proceeds . . . as he was able to transfer the funds to shell companies *and use the funds for personal expenses,*" including paying off personal debts. 788 F. App'x 742, 748 (2d Cir. 2019) (emphasis added). Similarly, in *Rajaratnam v. United States,* on which the government relies, the Second Circuit held that defendant was not entitled to the extraordinary remedy of *coram nobis* because, as the founder and managing general partner of Galleon, he exercised control over the firm and its proceeds and, critically, personally retained a percentage as management fees. 736 F. App'x 279, 283-84 (2d Cir. 2018). By contrast, as this Court itself previously recognized (11/20/24 Tr. 95-97), there is no evidence that Mr. Hwang ever retained any amount of the extracted funds for himself.[3] Accordingly, consistent with the Court's statement on November 20, 2024, that it would "deny forfeiture" (11/20/24 Tr. 97), the Court should decline to impose a money judgment.

## V.    The Court Should Stay Any Restitution or Forfeiture Order

As discussed in Mr. Hwang's submission dated December 10, 2024, to the extent the Court imposes restitution and forfeiture, those orders should be stayed pending Mr. Hwang's appeal of his conviction because there are substantial issues for appeal and a substantial risk of irreparable harm if Mr. Hwang is ordered to liquidate extensive assets while the appeal is being resolved. (*See* Dkt. 360 at 8-9.) The government's submission effectively illustrates why a stay

---

[3] The remaining cases the government cites merit little of the Court's attention because they predate *Honeycutt,* but in those cases too, the defendants generally took personal possession of proceeds at one point or another. *See United States v. Ohle,* 441 F. App'x 798, 803-04 (2d Cir. 2011) (one defendant personally acquired stolen money before transferring funds to avoid paying taxes, and second defendant personally received sum that was derived from embezzled funds); *United States v. Uddin,* 551 F.3d 176, 181 (2d Cir. 2009) (defendant was liable for full amount of food stamp fraud where all proceeds were deposited in his bank account).

is warranted. First, the government agrees a stay is appropriate as to the Hwang residence. (Dkt. 361 at 40.) Second, regarding the numerous joint bank accounts, the government acknowledges that further factual development may be needed to properly divide the accounts, as well as the likelihood of objections and competing claims from third parties. That extensive proceedings will ensue if a stay is denied only confirms that a stay is appropriate.

**VI.    The Court Should Decline to Order Forfeiture of the Archegos Entities**

On November 20, 2024, this Court initially ordered the forfeiture of seven Archegos entities listed in the preliminary forfeiture order the government submitted (the "Archegos entities"), but the Court has not yet signed the preliminary order. (11/20/24 Tr. 94; Dkt. 340-1 at 3.)

The counterparty submissions dated December 10, 2024, appear to provide an additional reason why the Court should decline to order the forfeiture of the Archegos entities: Because at least some of the Archegos entities have entered into settlement agreements with several counterparty banks, including the counterparties now seeking restitution, pursuant to which the entities will pay sums to satisfy the counterparties' claims. The counterparty victims reference these payments throughout their submissions. (*See, e.g.*, Credit Suisse Second Stmt. at 4 (referring to "amount received as recovery in private mediation"); MUSE Second Stmt. at 2; BMO Second Stmt. at 3; Jefferies Second Stmt. at 2; Macquarie Second Stmt. at 2; Morgan Stanley Second Stmt. at 2; Nomura Second Stmt. at 4; UBS Second Stmt. at 4.) We understand that those private settlements were the product of extensive private negotiations in a mediation between Archegos and the counterparties that was supervised by a retired bankruptcy court judge, and that the government was kept apprised of the status of those negotiations and the terms of the settlement before that settlement was finalized. The government never objected to the terms of that settlement.

If the Archegos entities are forfeited, however, as the government requests, that forfeiture could undermine the existing settlement agreements with the counterparties. Accordingly, the Archegos entities should not be forfeited because, in addition to the reasons discussed in Court on November 20, 2024, forfeiture of the Archegos entities could undermine private recoveries.

The Court should decline to order forfeiture of the Archegos entities for the additional reason that Archegos Fund of Funds LP did not comprise the Archegos enterprise. As discussed during the initial sentencing, Archegos Fund of Funds was a separate investment fund that invested in other outside hedge funds. (11/20/24 Tr. 93; *see also* Trial Tr. 815:11-14.) The only evidence related to the Fund of Funds at trial was the introduction of a corporate organizational chart showing its relation to the other Archegos entities. Absent from the record is any indication that it was used to further the market manipulation or misrepresentation schemes. The Fund of Funds should therefore be excluded from any forfeiture order as to the entities.

*    *    *

For the foregoing reasons, the Court should deny restitution or at a minimum should order the counterparties to submit revised victim impact statements supported by sworn affidavits that exclude trading losses and in all other ways comply with the requirements dictated by the Court. In addition, the Court should decline to enter a money judgment against Mr. Hwang or an order of forfeiture as to the Archegos entities. To the extent the Court orders restitution or forfeiture, those orders should be stayed pending appeal.

Respectfully submitted,

_/s/ Brian A. Jacobs_
Brian A. Jacobs
Chloe Lewis

cc: Counsel of Record