# CLEARY GOTTLIEB STEEN & HAMILTON LLP

AMERICAS
NEW YORK
SAN FRANCISCO
SÃO PAULO
SILICON VALLEY
WASHINGTON, D.C.

ASIA
BEIJING
HONG KONG
SEOUL

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

D: +1 212-225-2085
rzutshi@cgsh.com

EUROPE & MIDDLE EAST
ABU DHABI
BRUSSELS
COLOGNE
FRANKFURT
LONDON
MILAN
PARIS
ROME

December 17, 2024

The Honorable Alvin K. Hellerstein
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Corrected Submission – *United States v. Hwang and Halligan*, 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

On behalf of Nomura Global Financial Products Inc. ("NGFP"), Nomura International plc ("NIP") and Nomura Securities International, Inc. ("NSI," and together with NGFP and NIP, "Nomura"), we respectfully submit this victim impact statement in the connection with sentencing in the above-captioned criminal matter and to supplement information previously provided by Nomura to the U.S. Attorney's Office. Defendants Sung Kook ("Bill") Hwang and Patrick A Halligan have been convicted of operating a massive fraud. Nomura was a victim of that fraud and lost billions of dollars as a direct result of the Defendants' crimes.

The evidence at trial established that, in furtherance of the Defendants' unlawful scheme, the Defendants and other Archegos personnel misrepresented key facts to Nomura and other counterparties, including the composition, concentration and liquidity of Archegos's stock holdings and trading positions. As a result of Archegos's false and misleading statements, Nomura continued to do business with Archegos through March 2021 in two ways: (1) by providing margin loans that Archegos used to purchase certain stocks and (2) by entering into total-return swaps ("TRSs") under which Archegos "synthetically" acquired economic ownership of certain stocks. Through both the margin loans and swaps, Nomura effectively extended many billions of dollars of credit to Archegos, and Nomura relied primarily on the value of the stocks purchased in connection with the margin loans and swaps to protect it against the risk that Archegos would fail to pay. But the prices of many of the relevant stocks had been inflated by the Defendants' own fraudulent scheme – a fact that Archegos concealed from Nomura through its fraud. When Archegos defaulted on March 25, 2021, the value of those stocks declined significantly. Even after liquidating the stock positions it held in connection with the margin loans and TRSs, Nomura suffered losses on its margin loans totaling $475,775,728.32 and losses

The Honorable Alvin K. Hellerstein, p.2

on its TRSs totaling $2,373,192,484.52. Nomura has received distributions from Archegos totaling $224,298,217.

As a result, and for the reasons below, Nomura is entitled to restitution in the amount of $2,624,669,995.84 under the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act, 18 § U.S.C. 3663.

**Applicable Law**

The MVRA defines a "victim" as a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The MVRA makes clear that restitution to victims is mandatory in cases like this one. It provides that "the court *shall* order … that the defendant make restitution to the victim" where a defendant has been convicted of "an offense against property … including any offense committed by fraud or deceit." *Id.* §§ 3663A(a)(1) (emphasis added), 3663A(c)(1)(A)(ii).

Each victim is entitled to restitution "in the full amount" of its losses. *Id.* § 3664A(f)(1)(A). Where a defendant has obtained an extension of credit from a victim as part of the defendant's fraudulent scheme, the Second Circuit has made clear that the victim is entitled to restitution in the full amount of its credit exposure to the defendant, minus only those amounts that the victim actually recovered through the liquidation of collateral or other interests held by the victim as "insulation against loss." *U.S. v. Turk*, 626 F.3d 743, 751 (2d Cir. 2010); *see also U.S. v. Paul*, 634 F.3d 668 (2d Cir. 2011) (same holding in the context of fraudulently obtained margin loans). Whether other factors affected the value of collateral held by the victim to insulate itself from loss is irrelevant: "the decline in value in any purported collateral need not have been foreseeable to [the defendant] in order for her to be held accountable for that entire loss." *Paul*, 634 F.3d at 678 (quoting *Turk*, 62 F.3d at 749).

**Nomura Is a Victim of the Defendants' Fraud Under the MVRA**

The jury convicted Defendants Hwang and Halligan of operating a criminal fraudulent scheme. *See* Verdict Form, ECF 249 (finding Defendants guilty of RICO conspiracy, securities fraud, wire fraud, and market manipulation – counts 1-6, 8-11). The evidence at trial established that the Defendants' scheme involved the Defendants and other Archegos personnel lying to Nomura and revealed the nature and purpose of those lies. Mr. Becker testified that he lied about "the risk of the [Archegos] portfolio," including "the size of the largest positions," "the leverage of the portfolio," and "the liquidity" of the portfolio. Trial Tr. 804:14-25. When asked how many banks he lied to about Archegos's portfolio, Mr. Becker admitted: "12, all of Archegos' counterparties." Trial Tr. 804:14-25. Mr. Tomita similarly admitted that Archegos' lies were designed to "conceal[] the level of risk of the Archegos portfolio." Trial Tr. 3052:02-08. And Mr. Tomita explained that the reason for "telling lies and [providing] materially misleading information to banks" was to induce Nomura and other counterparties "to finance our trades and lend us money." Trial Tr. at 3039:3-8. The evidence also showed that these lies were made at the direction of the Defendants. Mr. Becker testified that he understood from the Defendants that "it was part of my job" to lie to the banks, Trial Tr. 803:13-804:4, and Mr. Tomita recalled Mr. Hwang instructing him that he was "not only not supposed to disclose to the counterparties our

The Honorable Alvin K. Hellerstein, p.3

positions or what the portfolio looked like, but also to intentionally mislead the counterparties when necessary." Trial Tr. 3411:04-3412:02.

### Calculation of Nomura's Mandatory Restitution Amount

As part of the Defendants' fraudulent scheme, Archegos effectively acquired billions of dollars of credit or financing from Nomura by entering into two types of transactions under the parties' various contractual agreements.[1]

*First*, Archegos entered into margin loan transactions with Nomura. Under these transactions, Archegos borrowed funds from Nomura to purchase specific stocks identified by Archegos, and Archegos then pledged the purchased securities to Nomura as collateral for the cumulative loan balance owed by Archegos to Nomura. As of March 25, 2021, when Archegos defaulted on the margin loans it had obtained through the Defendants' fraud, Archegos owed Nomura $3,111,410,575.55 in connection with those margin loans. Following Archegos's default, Nomura liquidated the securities that it held as collateral and obtained proceeds totaling $2,635,634,847.23. Nomura is therefore entitled to restitution for its losses on the margin loan transactions, which total $475,775,728.32.[2]

*Second*, Archegos entered into TRSs with Nomura.[3] As with its margin loan transactions, Archegos used these TRSs to obtain exposure to specific stocks (or in a few cases to ETFs or baskets of stocks), while having Nomura bear the related financing costs. In other words, instead of acquiring the relevant stocks directly as Archegos had in connection with the margin loans, Archegos acquired a "synthetic" interest in the relevant stocks under the TRSs. But the underlying economics of the margin loans and TRSs were otherwise substantially the same. Under certain of the TRSs, Archegos acquired a "long" interest in the relevant stocks and, in the remainder, it acquired a "short" interest in the relevant stocks. With respect to the "long" TRSs,

---

[1] Nomura and Archegos entered into the following agreements: a Prime Brokerage Agreement between Archegos and NSI, dated September 19, 2016; an ISDA Master Agreement between Archegos and NIP, dated March 22, 2006; an ISDA Master Agreement between Archegos and NFGP, dated March 8, 2021; and the Cross Margining and Netting Agreement (the "CMNA") between Archegos and each Nomura entity, dated May 13, 2019.

[2] Nomura has previously produced documents to the government in connection with this matter, including a spreadsheet Bates-stamped NSI-ACM-00038001 through NSI-ACM-00038008, which provides detailed substantiation for the loss amounts set out in this letter on a security-by-security basis. In the course of liquidating the securities pledged in connection with the margin loans, Nomura also incurred additional costs in hedging the risks associated with holding those securities between the date of Archegos's default and the dates on which the securities were fully liquidated, as well as other incidental costs. To be conservative, Nomura has not included those costs in the calculation of the restitution amount owed to it. Nor has Nomura included any additional pre-judgment interest to which it is entitled.

[3] Although Archegos entered into TRSs with both NGFP and NIP, Nomura has not included losses incurred by NIP because they were de minimis relative to NGFP's losses.

The Honorable Alvin K. Hellerstein, p.4

Nomura paid $9,401,062,503.79 to purchase the relevant securities, and it received $8,404,667,057.00 from liquidating the relevant securities, resulting in a net loss of $996,395,446.79.[4] With respect to the "short" TRSs, Nomura paid $15,453,622,563.00 to purchase the relevant securities, and it received $14,279,339,412.00 from establishing the "short" position in the relevant securities, resulting in a net loss of $1,174,283,151.00. In addition, Archegos also owed Nomura $65,355,068.73 in connection with TRSs that were closed before Archegos's default but which remained unpaid as of March 25, 2021. Finally, as of March 25, 2021, Archegos was also holding $137,158,818.00 in collateral posted by Nomura. Nomura is therefore entitled to restitution for its losses on the TRSs totaling $2,373,192,484.52.[5] This is the sum of the losses on the "long," "short," and "closed" TRSs and collateral. This calculation is consistent with (a) the principles set out by the Second Circuit for calculating mandatory restitution amounts in connection with analogous margin loan transactions, and (b) Nomura's calculation of its losses in connection with the Archegos margin loan transactions, as discussed above.[6]

Beginning in September 2021, Nomura participated, along with Archegos and several other counterparties, in a resolution process led by former United States Bankruptcy Judge James M. Peck that was designed to facilitate the commercial negotiation and resolution of, among other things, certain claims against Archegos. In connection with that process, Nomura has received $224,298,217. Nomura has not released claims against Mr. Hwang as part of that resolution process or otherwise.

In conclusion, as a victim of the Defendants' fraud, Nomura respectfully submits that it is entitled to mandatory restitution in the amount of $2,624,669,995.84, which reflects Nomura's losses on its margin loan transactions with Archegos ($475,775,728.32), *plus* Nomura's losses on its TRSs with Archegos ($2,373,192,484.52), *minus* the amounts Nomura has recovered from Archegos to date ($224,298,217).

Respectfully submitted,

Rishi Zutshi

---

[4] The net loss attributable to the "long" TRSs was misstated in our December 10, 2024 letter as a result of a transcription error, and it has been corrected here.

[5] To be conservative, Nomura has again not included the additional costs it incurred over the course of the liquidation, such as its portfolio hedging costs or other incidental costs.

[6] We understand that certain of Archegos's counterparties have provided information regarding variation margin exchanged with Archegos in connection with their TRSs. Nomura is not in a position to provide comparable information, including because, under the CMNA, Nomura and Archegos agreed to a cross-margining arrangement that took into account both margin loan transactions and TRSs.