# Arnold & Porter

**Paul J. Fishman**
+1 973.776.1901 Direct
Paul.Fishman@arnoldporter.com

January 24, 2025

**VIA ECF**
The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Hwang*, 22-cr-240 (AKH)

Dear Judge Hellerstein:

    We represent Andrew Mills, the former Executive Chairman and Co-Chief Executive Officer of Archegos Capital Management ("ACM"). We write in response to the Government's letter dated January 21, 2025, regarding its proposed amendments to the Court's restitution findings (ECF 383) and pursuant to the Court's order dated January 8, 2025 (ECF 379).

    Under the circumstances—in particular, in light of the limited funds available for other former ACM employees seeking restitution—Mr. Mills has decided to withdraw his claim for restitution in this matter and respectfully requests that the Court distribute the available funds to other former employees as appropriate. Accordingly, there is no need for the Court to adjudicate Mr. Mills's entitlement to such relief at the upcoming sentencing hearing on January 27, 2025.

    Notwithstanding Mr. Mills's position on restitution, we submit this letter to correct the record on the Government's inflammatory and misleading characterization of Mr. Mills as anything other than an innocent victim. In fact, Mr. Mills was *not* a "knowing participant in any of the charged offenses," and the Government's characterization to the contrary is entirely incorrect.

    As an initial matter, the Government's letter effectively ignores how it has treated Mr. Mills since the beginning of its investigation in this matter. Mr. Mills has cooperated with the Government and made himself available whenever requested, including a lengthy proffer in March 2022 to the U.S. Attorney's Office ("USAO"), the Securities and Exchange Commission, and the Commodity Futures Trading Commission. None of those agencies has taken any criminal or civil action against him. Indeed, the USAO did not even include Mr. Mills on what we understand was the very lengthy list of co-conspirators that it provided to counsel for the defense and the Court.

Arnold & Porter Kaye Scholer LLP
One Gateway Center, Suite 1025 | Newark, NJ 07102-53150 | **www.arnoldporter.com**

Moreover, as the Government knows, Mr. Mills was even contacted about testifying at trial in this case by both the prosecution and the defense, and he was willing to do so if called by *either* side without any need or request for immunity or other protection. That reaction was entirely explicable: he had done nothing wrong, and the Government has never treated him otherwise.

None of the testimony or evidence cited in the Government's letter now warrants a different conclusion.

First, the Government points to Mr. Mills' signature on a letter that was intended to provide an overview of ACM's compliance procedures, as part of a far more comprehensive and rigorous process for onboarding new prime brokers. (*E.g.*, Trial Tr. at 821:12-13 (Becker)) One portion of that letter states that "All trades are reviewed daily" and "compliance has primary responsibility for reviewing and approving all trades." But all personal trades—those carried out by ACM employees on their own accounts—*were* "review[ed] and approv[ed] daily." (Trial Tr. 1783:11-21 (Piedra))

With respect to firm trading, those trades fell under the purview of Michael Satine, an ACM compliance professional. Although Mr. Satine was not called as a witness at trial, the testimony established that his practice was to conduct "research in support of the firm's trading positions," and "check to see whether there was news relating to the firm's trading positions that might indicate a potential MNPI concern." (Trial Tr. 1798:18-1800:5) (Piedra)) The testimony also established that Mr. Satine had ongoing access to the trade blotter that showed ACM's trades. (*Id.*) In short, from Mr. Mills's perspective, the statements in the letter about the review of trades were accurate. And, in any event, those statements were only a small part of a much more comprehensive onboarding process in which banks who were exploring new counterparty relationships with Archegos had the opportunity to inquire and receive additional information about what Mr. Mills understood to be robust compliance procedures.

Second, the Government points to a supposed conversation in which Patrick Halligan told Mr. Mills that Mr. Halligan and Scott Becker conducted calls with counterparties that were "purposely opaque." (Trial Tr. 1037:6-15) (Becker)) And the Government then infers that such instances involved information that the potential counterparties should have known. Even if there had been such a conversation, there was ample testimony about various *legitimate* reasons that ACM might have been "purposely opaque" with counterparties, including with respect to ACM's investment strategy. (*E.g.*, Trial Tr. 1197-99 (Becker)) There is no simply evidence that Mr. Mills was aware of any misstatements or deception; rather, it is far more likely that Mr. Mills was attentive to information that was properly confidential.

Third, the Government focuses heavily on Mr. Mills's statements to counterparties in the days leading up to ACM's collapse, including that—as of March 24, 2021—ACM was confronting a "liquidity" problem, rather than a "solvency" issue. (ECF 383 at 4.) Yet the Court itself remarked that this statement reflected an opinion, not a statement of fact, in light of the circumstances on March 24, 2021:

> MS. JAMES: In the context of [discussions with counterparties on March 24, 2021], as your Honor may recall, Mr. Mills relayed that they viewed this as a liquidity problem and not a solvency problem. We submit the evidence has shown that that statement was factually true. . . .
>
> THE COURT: That's an opinion, isn't it, where it's a liquidity problem, not a solvency problem?
>
> MS. JAMES: It is, your Honor. And we respectfully submit that there is no evidence [that] --
>
> THE COURT: Mr. Mills didn't believe it.

(Trial Tr. 4994-97.; *see also id.* 1086 (fact witness could not testify whether the situation was in fact one of liquidity or solvency).) Indeed, if the market had rebounded in the days that followed those phone calls, Mr. Mills would have been proved correct: the problem would have been one of liquidity and not solvency. There is simply no evidence that, as of the evening of March 24, 2021, Mr. Mills believed that the situation was anything other than a liquidity event.

The same is true for various other allegations in the Government's letter. For example, the Government claims that Mr. Mills "omitted" that Archegos was projecting a "$13 billion cash shortfall" on calls with counterparties on the evening of March 24. (ECF 383 at 4.) But, again, from the perspective of a person who believed the market could have rebounded, that shortfall was wholly dependent on the market conditions in the days to come.

The Government also points to an e-mail that Mr. Mills sent to a colleague on the same evening, in which he wrote: "Pray that the markets rise tomorrow otherwise liquidation might be dire." (*Id.* at 5.) Of this statement, in its closing, the Government argued: "The point at which your business plan involves divine intervention is the point at which you have a solvency problem." (Trial Tr. 5164.) Nothing could be further from the truth. As the Government is well aware, Mr. Mills is a deeply religious man who would have been genuinely praying on the evening of March 24 that the market would turn around for ACM. In Mr. Mills' case, it is not the hallmark of fraud, deception, or desperation. Rather, it is the hallmark of his faith, and hardly supports the Government's cynical assertion that Mr. Mills knew the firm was in fact collapsing and misrepresented the state of affairs to ACM's counterparties.

The Government also suggests that Mr. Mills "misdescribed" ACM's portfolio to brokers on the evening of March 24, supposedly to give the impression that it had significant FAANG names. (ECF 383 at 4.) What Mr. Mills actually said was that ACM's portfolio was a "mix of FAANGs, software, banking, fintech, the media names, and the Chinese names." (Trial Tr. 226 (Fairbanks)) Moreover, during the call, Mr. Mills also walked through the serious impact on ACM's book from market declines in Viacom and the firm's Chinese positions. (*Id.* 224-25 (Fairbanks)) Any misimpression about the firm's positions in FAANG stocks came from Mr. Becker's earlier rogue misstatements to banks (*e.g.*, *id.* 217, 276-79 (Fairbanks); 1676-77, 1682-83 (Kambhampati))—not from Mr. Mills.

Finally, it is important to stress that Mr. Mills was a "managerial operational leader" for ACM; he had no role in the firm's trading activities. (*See* Trial Tr. 532 (Jones)) Detailed estimates of trading volumes and liquidation timelines would have been outside of Mr. Mills's expertise, and he would have deferred to others on those issues. Therefore, the Government's reference to a call with counterparties on March 25, 2021, during which Mr. Hwang discussed the "liquidity of Archegos's largest positions" (Trial Tr. 257-61 (Fairbanks)) likewise has no bearing on Mr. Mills's status or culpability.

In short, Mr. Mills categorically disputes the Government's characterization of his role, and the evidence upon which the Government purports to rely does not support inferences and conclusions to the contrary. At the same time, Mr. Mills also recognizes that there are significantly limited resources available for restitution. To that end, he withdraws any claim for restitution in this matter and there is no longer a need for the Court to adjudicate Mr. Mills's status under the Mandatory Victim Restitution Act at the upcoming sentencing hearing on January 27, 2025.

Sincerely,

/s/ Paul J. Fishman

Paul J. Fishman

cc: All ECF Counsel