**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
             v.                           :        22 Cr. 240 (AKH) (BCM)
                                          :
SUNG KOOK (BILL) HWANG,                    :
                                          :
             Defendant.                   :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**OBJECTIONS TO REPORT & RECOMMENDATION**


MORVILLO ABRAMOWITZ GRAND
    IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Counsel for Defendant Bill Hwang*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.   Initial Proceedings Before This Court ............................................................... 3

    B.   Referral to Magistrate Judge Moses ............................................................... 11

    C.   The Evidentiary Hearings ................................................................................ 14

    D.   The Report and Recommendation .................................................................... 15

ARGUMENT ....................................................................................................................... 16

    A.   Standard of Review .......................................................................................... 16

    B.   The Court Should Decline to Order Restitution for Any Individuals, or at Most Award Restitution in the Amount of $16,913,894.45 ................................................... 16

    C.   Magistrate Judge Moses's Conclusion That Voluntariness Is Irrelevant Is Outside the Scope of This Court's Delegation ..................................................................... 24

    D.   Magistrate Judge Moses Erred by Relying on the Superseding Indictment, and Mr. Hwang Maintains His Objections to the Presentence Investigation Report .................... 28

    E.   Magistrate Judge Moses Erred by Recommending Restitution Based on Judicial Factfinding ....................................................................................................... 28

ADDITIONAL OPEN ISSUES ........................................................................................... 29

    A.   Stay Pending Appeal ....................................................................................... 29

    B.   Form of Proposed Restitution Order ............................................................... 31

    C.   Counterparty Restitution .................................................................................. 32

CONCLUSION .................................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Arizona v. California,* 460 U.S. 605 (1983)................................................................................. 26

*DeWeerth v. Baldinger*, 38 F.3d 1266 (2d Cir. 1994)................................................................ 25

*Erlinger v. United States*, 602 U.S. 821 (2024)........................................................................ 28

*Hester v. United States*, 586 U.S. 1104 (2019)......................................................................... 29

*In re PCH Assocs.,* 949 F.2d 585 (2d Cir. 1991) ...................................................................... 27

*Rimlawi v. United States*, 604 U.S. ---, 2025 WL 581567 (Mem) (Feb. 24, 2025)..................... 29

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017)........................... 29

*Southern Union Co. v. United States*, 567 U.S. 343 (2012) ...................................................... 28

*United States v. Archer*, 671 F.3d 149 (2d Cir. 2011) .............................................................. 23

*United States v. Brown*, 2016 WL 11263165 (E.D.N.Y. Dec. 2, 2016) ...................................... 22

*United States v. Calderon*, 944 F.3d 72 (2d. Cir. 2019) ..................................................... 18, 20

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)............................................................ 29

*United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013) ................................................ 20

*United States v. Gonzalez*, 647 F.3d 41 (2d Cir. 2011) ............................................................ 26

*United States v. Goodrich*, 12 F.4th 219 (2d Cir. 2021)................................................. 4, 18, 22

*United States v. Grant*, 235 F.3d 95 (2d Cir. 2000)................................................................. 32

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007)................................................................ 28

*United States v. Milton*, 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024)........................................ 31

*United States v. Paul*, 634 F.3d 668 (2d Cir. 2011).............................................................. 19, 20

*United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024)......................................................... 21

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .......................................................... 22, 29

*United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020) ........................................................ 5, 19

*United States v. Silver*, 2024 WL 5154075 (S.D.N.Y. Dec. 18, 2024)........................................ 32

*United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016) .................................................. 31

*United States v. Sullivan*, 118 F.4th 170 (2d Cir. 2024) .......................................................... 21

*United States v. Thompson*, 792 F.3d 273 (2d Cir. 2015)........................................................ 33

*United States v. Watson*, 2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ...................................... 19

*United States v. Young*, 108 F.4th 1307 (11th Cir. 2024)......................................................... 33

**Statutes**

18 U.S.C. § 3663A ............................................................................................................. 17, 21

18 U.S.C. § 3664 .................................................................................................. 16, 23, 24, 31

**Other Authorities**

18 Wright & Miller, *Federal Practice & Procedure* § 4478 (3d ed. 2025) ................................ 26

**Rules**

Fed. R. Crim. P. 59(b)(3) ..................................................................................................... 16

## INTRODUCTION

Since the beginning of Mr. Hwang's sentencing proceedings, this Court has focused on the question of whether employees who participated in Archegos's elective deferred compensation plan were pressured to do so by Mr. Hwang, finding that such pressure would justify including certain elective contributions in the restitution award. After the government submitted requests on behalf of 37 employees who had not previously sought restitution, this Court stated that it could not decide restitution without additional evidence from each employee showing whether their participation in the deferred compensation program was voluntary or coerced.

On March 12, 2025, this Court referred to Magistrate Judge Moses "the determination of which former Archegos employees are 'victims' for purposes of restitution under 18 U.S.C. § 3663A(a)(2), and how much restitution each is entitled to." (Dkt. 401.) Neither the government nor the victims, however, submitted additional proof of voluntariness to Magistrate Judge Moses. Accordingly, for the reasons that follow, Mr. Hwang objects to the restitution amount Magistrate Judge Moses recommends.

Following numerous submissions by the parties and two evidentiary hearings, Magistrate Judge Moses issued a Report and Recommendation (the "Report" or "R&R"), which concludes that (1) Mr. Hwang proximately caused *all* employee losses, and (2) the government was not required to submit proof that individual employees were pressured by Mr. Hwang to participate in the voluntary components of the deferred compensation program. The Report thus recommends that Mr. Hwang be directed to pay $32,996,491.58 in restitution to a total of 39 former Archegos employees. That group of employees consists of (a) the original 5 employees to whom this Court awarded restitution on December 19, 2024, (b) 33 employees who belatedly sought restitution only after this Court ruled as to the first 5, and (c) Dave Park, whom the

government excluded from its proposed schedule of victims on the ground that he was a knowing participant in the alleged scheme.

In the alternative, the Report states, "if the district judge disagrees with my conclusion that individualized proof of coercion is not properly a part of the proximate causation analysis under the MVRA, I recommend that the same 39 former employees be awarded a total of $20,197,981.58 in restitution." (R&R at 36-37.)

For the reasons set out below, pursuant to Fed. R. Crim. P. 59(b)(2), Mr. Hwang objects to the Report's recommendation that restitution be awarded to the 39 employees at all and respectfully requests that this Court decline to adopt the Report in full. In the alternative, Mr. Hwang objects to those employees receiving restitution in the amount of $32,996,491.58 because that number disregards this Court's determination that contributions would be subject to restitution only if coerced. If this Court decides to award any restitution to the former employees, subject to Mr. Hwang's other objections and without waiving them, at most the smaller award of $20,197,981.58 is warranted because that number excludes from the restitution award (1) amounts that employees elected to contribute to the elective deferred compensation plan, and (2) amounts that employees chose to re-defer when the funds became eligible for withdrawal. Even $20,197,981.58 is too high, however, because Magistrate Judge Moses made additional errors, set out below, that warrant reducing the restitution amount further to $16,913,894.45.

## BACKGROUND[1]

### A. Initial Proceedings Before This Court

#### 1. The Original Employee Submissions

Beginning in August 2024, four former employees of Archegos wrote to the government notifying it that they suffered losses following the collapse of Archegos and asking to be included in the government's request for restitution. The four former employees sought a total of some $11.9 million.[2] Two of those former employees, ████████████████████████[3] alleged that they felt pressure from senior management to maximize their deferred contributions.

On November 18, 2024, in advance of the initial sentencing scheduled for November 20, 2024, Mr. Hwang submitted a memorandum addressing the government's requests for restitution and forfeiture. (Dkt. 343). With respect to the former Archegos employees seeking restitution for lost deferred compensation, Mr. Hwang argued, among other things, that the submissions from those employees failed to satisfy the government's burden of proving causation, that is, that their claimed losses were caused by the offense conduct. (Dkt. 343 at 26-32.)

Mr. Hwang's initial sentencing spanned two days. As relevant here, the Court briefly addressed employee restitution toward the end of the first day. The Court noted that the former employees "had deferred compensation agreements," and "at their election," contributed "35 percent of their bonus" each year. (11/20/24 Tr. 74.) The Court asked, among other things,

---

[1] For the Court's convenience, this section provides a summary of the employee restitution proceedings thus far. Substantial portions of this section were previously included in Mr. Hwang's submissions to Magistrate Judge Moses dated April 18, 2025 (Dkt. 408) and May 19, 2025 (Dkt. 420).

[2] This total includes amounts sought to reimburse attorney's fees.

[3] As in previous filings, all references to information that this Court deemed confidential and other references to victims are redacted. An unredacted version of the submission will be furnished to the Court and counsel of record.

whether Mr. Hwang's criminal conduct directly and proximately caused these four former employees to lose their deferred compensation accounts under the rule set out in *United States v. Goodrich*, 12 F. 4th 219 (2d Cir. 2021), given that "[t]hey weren't required to defer their compensation." (11/20/24 Tr. 75.) The Court then observed that the employees "knew that Mr. Hwang was a highly successful securities investor. And one of the purposes of aligning yourself with someone like that is to share in the profits. So there's a lot of voluntarism in what they were doing." (11/20/24 Tr. 75.)

The Court deferred any final ruling on restitution and ordered simultaneous briefing on the question of proximate cause, among other things.

On December 10, 2024, Mr. Hwang filed a second submission responding to the Court's questions, including the proximate cause of the former employees' lost compensation. (Dkt. 360.) As set forth in that submission, the government had not cited any precedent for awarding restitution to compensate an employee for deferred compensation that was lost after an entity collapsed due to fraud.

Mr. Hwang's letter also argued that the record failed adequately to establish causation for three reasons.

*First*, the operative indictment did not charge Mr. Hwang with harming Archegos employees by fraudulently inducing them to invest in Archegos's portfolio. The indictment charged Mr. Hwang for his role in a RICO conspiracy that involved using manipulative trading strategies and making misrepresentations to banks to amass and conceal Archegos's market power. (*See* Dkt. 134.) There is no causal link, Mr. Hwang explained, between the charged conduct and the creation of the deferred compensation plans in the first instance (which predated the charged conspiracy), the employees' contributions (most of which predated the conspiracy),

4

or how those funds were invested. *See United States v. Seabrook*, 968 F.3d 224, 227-28, 236-37 (2d Cir. 2020) (union that lost investment following bribery scheme was not a "victim" under the MVRA because the charged conduct (wire fraud) did not injure the union, even if the purpose of the charged scheme was to mask the bribe that hurt the union).

*Second*, the employees' submissions highlighted the voluntary nature of the deferred compensation program, with respect to not only the employees' elective contributions, but also the employees' decisions to re-defer their 2016 bonuses at the end of the deferral term—a decision that was made in November 2019, before any of the charged offenses took place—and to continue working at Archegos rather than accept other job offers. ███████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████

*Third*, even if Mr. Hwang could have anticipated some drop in the value of Archegos's portfolio, there is no evidence that he could have reasonably foreseen that Archegos would collapse entirely, such that there would be no remaining funds with which to pay employees. (Dkt. 360 at 4.)

The government, for its part, argued that the elective contributions were not truly elective because (1) Archegos employees were pressured by "senior leadership" to contribute the maximum allowable amount to the elective plan, (2) employees were required to make their deferred contribution elections before they were told the amount of their annual bonus and would face "retaliation" in the form of lower bonuses for "disloyalty," and (3) employees were assured that "their contributions would be protected and guaranteed against losses by Archegos." (Dkt. 361 at 19.) As to proximate cause, the government argued it was foreseeable that employees

would lose their deferred bonuses because the bonuses were invested in Archegos's portfolio and Mr. Hwang put the entire portfolio at risk during the alleged scheme.

The government also sent the Court and defense counsel updated impact statements from the four former employees who had submitted requests for restitution up to that point. All four statements indicated that those individuals felt pressure to participate in the elective plan, not to withdraw bonuses that were eligible to be withdrawn, and/or to stay at Archegos (and keep their money in Archegos's portfolio) rather than leave for other professional opportunities. The statements ranged in their degree of specificity. █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

### 2. The Court's Ruling on December 19, 2024

During the December 19 hearing, this Court stated that the core issue of employee restitution was whether "the employees' losses [are] the direct and proximate result of Mr. Hwang's manipulations." (12/19/24 Tr. 6.) The Court noted that it "ruled last time" that "they were not victims," because "they made elect[ive] choices in deciding to put their money into the deferred compensation program and [to] allow it to be utilized by Mr. Hwang in the course of his investments." (12/19/24 Tr. 6.) Since that ruling, however, the Court observed that the "government has reminded me of a good deal of the testimony about the climate in Archegos, the requirement of employees to declare how much they would be putting into deferred compensation before Mr. Hwang told them what bonuses they would get and the distinct feeling that if they were not cooperative with Mr. Hwang they would suffer in their employment." (12/19/24 Tr. 6.) This Court found that the direct and proximate cause requirements were

satisfied because Mr. Hwang had "used this money as part of the capital that Archegos had to carry out its manipulation" such that "the losses they suffered were the direct and proximate result of the violations of law carried out by Mr. Hwang." (12/19/24 Tr. 6-7.)

At the close of the proceeding, this Court ordered the government to submit a revised order of restitution by January 9, 2025.

### 3. The New Employee Submissions

On January 8, 2025, the government filed a letter indicating that "multiple former Archegos employees ha[d] contacted the Government to request that they be included in the final restitution order." (Dkt. 379 at 1.) The government requested, and the District Court granted, a revised schedule to review and adjudicate the additional employee claims, including a 10-day window for any additional employees to supply the government with "evidence to substantiate the claim to restitution." (Dkt. 379 at 1.)

Pursuant to the revised schedule, on January 21, 2025, the government provided the District Court with a new proposed restitution letter and schedule of victims that included 36 former Archegos employees who had not previously sought restitution, raising the restitution amount by nearly $24 million. (Dkt. 383 at Gov. Ex. D.) The government accompanied its filing with various submissions from some (but not all) of the new claimants. Many of the submissions indicated that the employes had not previously received notice from the government of their right to submit a victim impact statement or to be included in a restitution order. Most of the newly added employees listed in the government's revised schedule of victims participated only in Archegos's mandatory deferred compensation program. Nine made elective contributions, and, in November 2019, an overlapping group of 15 chose to re-defer their 2016 contributions that would become eligible to be withdrawn in January 2021:

7



**Elective Contributions (9)[4]**

(Italicized names appear on both lists.)

The government's updated proposal differed in a few respects from the version it had submitted to this Court in December. As relevant here, the new proposal accounted only for base contributions made by each employee—both mandatory and elective—and excluded any appreciation or accretion. (Dkt. 383 at 3.) ███████████████████████ ███████████████████████████████████████████ ██████████████████████████████

Counsel for Mr. Park wrote to the Court to object to Mr. Park's exclusion from the proposed restitution order and the government's characterization of Mr. Park as a knowing co-conspirator. (Dkt. 389.) The letter reiterated that the government had failed to provide pool counsel with notice of the Court's ruling that certain employees were entitled to restitution. (Dkt. 389 at 1.)

---

[4] Dave Park also made contributions to the elective plan but was not included in the government's schedule of victims. ███████████████████████ ██████

On January 24, 2025, Mr. Hwang submitted a letter objecting to the government's proposed restitution order and schedule of victims, including the addition of any new employee claimants. (Dkt. 388.) The letter raised three principal issues: (1) the new submissions generally lacked any underlying account statements or other documentation to substantiate the amounts sought, other than "deferred compensation statements" that were prepared by a law firm in connection with settlement negotiations; (2) the government's submission indicated that the proposed restitution order included compensation for employees who did not affirmatively seek restitution after receiving notice from the government; and (3) three of the new employee claimants— ████████████████████████ —held senior management positions and based on the record were instrumental in compelling certain employees to elect maximum contributions, undermining any assertion that their own decisions to maximize the balance of their deferred compensation was anything but voluntary.

### 4. Mr. Halligan's Sentencing and Subsequent Briefing

During Mr. Halligan's sentencing on January 27, 2025, this Court questioned whether the dozens of former Archegos employees who had submitted requests for restitution just 10 days earlier were pressured to maximize their deferred compensation balances or did so voluntarily. (*See* 1/27/25 Tr. 55-59.) This Court observed that "people who are going to be working for hedge funds . . . want to make money, and if it's a voluntary deal, then they're not entirely victims." (1/27/25 Tr. 57.) What makes employees victims, the District Court explained, is where "a leader who wants liquidity, desperately, . . . tells his employees, look, if you want to work here, you've got to give me your money to invest, and I'll do that and you'll get paid handsomely," such that "that person has to calculate, do I want my job, or do I not want my

─────────────

████████████████████████████████████████████

job?" (1/27/25 Tr. 57.) In that scenario, this Court stated, the nature of the leader's "influence" is what "would prompt me to find that the person is a victim." (1/27/25 Tr. 57.) The Court also recognized that "there are other victims who, themselves, may be subject to this kind of pressure and act as agents for [a leader] in causing other people to forego their deferred compensation." (1/27/25 Tr. 57-58.) The Court stated it "want[ed] to delegate the task of making each person prove status before a magistrate judge" and asked for recommendations as to how to proceed. (1/27/25 Tr. 55, 59.)

In the days after Mr. Halligan's sentencing, the parties discussed a possible resolution. On January 31, 2025, in response to a request for additional supporting documentation, the government produced a spreadsheet from Archegos Capital Management that reflects the amount of elective and mandatory contributions for all Archegos employees.

On March 3, 2025, Mr. Hwang submitted a letter setting forth the basis and need for a hearing to resolve outstanding issues related to employee restitution. (Dkt. 399.) The letter explained that although courts cannot compel victims to testify under the MVRA, they can and do decline to order restitution if the government's existing evidence is not sufficient to satisfy the government's burden. (Dkt. 399 at 3-4.) Here, the record did not establish by a preponderance that any of the new employee claimants participated in the plan because Mr. Hwang coerced them into doing so, and not because they were either willing participants, or rather pressured ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. 399 at 4-5.) In fact, only two former employees asserted that they felt pressure from *anyone* at Archegos. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

████████████

Most of the remaining employees submitted only barebones letters from counsel that did

not address the issue of voluntariness. Others made no statement at all, relying instead on the

"deferred compensation statements" that merely set forth the amounts they contributed to the

deferred compensation plans, any accretion, and the amount of any settlement. (Dkt. 399 at 5-6.)

The letter also noted that the government's restitution requests to that point had been

based on ever-shifting source documents that contained errors requiring correction, and that the

government most recently had produced a spreadsheet that did not indicate amounts (if any) that

were withdrawn from the 2016 plan.

### B. Referral to Magistrate Judge Moses

On March 12, 2025, this Court entered an order cancelling the restitution hearing that it

had previously scheduled for March 17, 2025, and referred to Magistrate Judge Moses "the

determination of which former Archegos employees are 'victims' for purposes of restitution

under 18 U.S.C. § 3663A(a)(2), and how much restitution each is entitled to." (Dkt. 401.)

Magistrate Judge Moses subsequently ordered the parties to file a joint letter addressing four

issues: (1) the government's current proposed schedule of employee victims; (2) the

government's list of employees excluded from its proposed schedule of victims; (3) each party's

proposal for determining who is a victim; and (4) each party's proposal for determining the

amount of victim losses. (Dkt. 402.)

The parties made a joint submission on March 24, 2025. (Dkt. 403.) The government's

sections of the joint submission were accompanied by several new exhibits, including Excel

workbooks containing a list of former employees included in the government's proposal and the

fields, data, and formulas used to tabulate their losses. As to the third and fourth issues, the

government argued that any former Archegos employee who lost deferred compensation following the collapse of Archegos and did not knowingly participate in any of the criminal offenses that caused the loss is a victim, and that this group could be discerned based on the existing record. (Dkt. 403 at 3.) The government suggested that Mr. Park should be given an opportunity to rebut the government's prima facie showing that he was a knowing participant in the charged scheme, including by testifying in support of his claim.

For his part, Mr. Hwang urged the court to hear testimony (1) from any former employee seeking restitution who did not submit a request prior to the December 19, 2024 sentencing, including the 16 employees whose restitution amounts include compensation for elective contributions and/or bonuses that were eligible to be withdrawn, (2) concerning the role that senior executives played in inducing former employees to maximize their deferred compensation, and (3) from a government witness. (Dkt. 403 at 3-5.) Mr. Hwang also identified several issues that required further scrutiny, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

Magistrate Judge Moses then scheduled tentative restitution hearings for May 9, 2025 ("Phase I," to determine the victims) and May 21, 2025 ("Phase II," to determine restitution amounts) and asked the parties to file simultaneous submissions addressing certain issues. (Dkt. 405.) The court's order focused on the relevance of and need for additional evidence concerning whether employees' elections were coerced. (Dkt. 405 at 2.)

On April 18, 2025, Mr. Hwang and the government filed simultaneous submissions that addressed Magistrate Judge Moses's questions. (Dkts. 408, 409.) Mr. Hwang argued that the issue of voluntariness is law of the case, that individualized evidence of pressure is required

before restitution can be awarded, and that the existing record was deficient in that regard. The government disagreed on all points and asserted that it had no need or obligation to present further evidence as to coercion.

On May 7, 2025, Magistrate Judge Moses entered an order outlining the factual issues to be determined during the Phase I hearing. With respect to the issue of voluntariness, the court stated that, in its own view, "there is no principled distinction to be made between innocent employees who lost their deferred compensation because they were *required* to invest it in the Archegos fund and innocent employees who lost their deferred compensation because they *chose* to do so." (Dkt. 413 at 5.) Nonetheless, the court acknowledged that this Court had drawn a distinction between voluntarily and compulsorily deferred bonuses and agreed with Mr. Hwang that "neither the evidence presented at trial nor the victim statements submitted to date show that all sixteen employees who made elective deferral or re-deferral decisions did so as a result of coercion or pressure from the defendants." (Dkt. 413 at 5-6.) Magistrate Judge Moses ordered the government to "advise the Court and defendants whether it will present testimony or new documentary evidence at the Phase I hearing as to whether the elections made by sixteen employees challenged by defendant Hwang (or some subset thereof) were coerced rather than truly voluntary." (Dkt. 413 at 6.)

In response, the government advised Magistrate Judge Moses "that it d[id] not intend to present testimony or new documentary evidence at the Phase I hearing as to whether the elections made by the sixteen employees challenged by defendant Hwang were coerced rather than truly voluntary." (Dkt. 417.) Counsel for certain former employees, however, filed a letter noting that "the government ha[d] deferred to [him] the decision whether to present additional evidence on behalf of the former ACM employees represented by [his] firm," and asked the court

to grant him until May 15, 2025 "to submit affidavits creating a factual record regarding 'coercion.'" (Dkt. 414 at 1.)

### C. The Evidentiary Hearings

The Phase I hearing took place on May 9, 2025. At the outset of the hearing, counsel for Mr. Hwang objected to the proceedings continuing on the ground that "the government's decision . . . not to put in further evidence should be the end of [the restitution] proceedings and lea[d] this Court to recommend no further restitution." (5/9/25 Tr. 8.) Magistrate Judge Moses proceeded with the hearing over counsel's objection.

Neither the government nor counsel for any victim offered any evidence or elicited any testimony on the topic of voluntariness. The only witness who testified in open court, Mr. Park, confirmed on cross-examination that his participation in the elective deferred compensation plan was voluntary.[6] (5/9/25 Tr. 67:12-14.) At the end of the hearing, this Court gave the former employees and their counsel leave to submit additional evidence of coercion by May 15, 2025. (5/9/25 Tr. 106-07.) The Court then entered an order reiterating that "the deadline for the former Archegos employees seeking restitution to submit additional evidence with respect to the issue of coercion is May 15, 2025." (Dkt. 418.)

On May 15, the government filed a letter indicating that it had received a single supplemental affidavit from one former Archegos employee. (Dkt. 419.) That document came not from any of the former Archegos employees whose requests for restitution were before Magistrate Judge Moses, but rather from ▇▇▇▇▇▇▇, who is one of the original 5 former employees to whom this Court awarded restitution on December 19, 2024. (*See* 12/19/24 Tr. 7.)

---

[6] Executive 1 and Executive 2 gave testimony concerning their knowledge (or lack thereof) of the alleged scheme in a non-public setting.

None of the employees whose restitution is currently at issue made any submission. In response, Mr. Hwang urged Magistrate Judge Moses to disregard ▮▮▮▮▮▮ declaration, which was largely duplicative of his original submissions, because this Court had already held that he is entitled to restitution, and to deny his request for an additional $5,000 in legal fees spent preparing and submitting an unnecessary declaration. (Dkt. 420 at 3.)

The Phase II hearing—to determine the amount of restitution to be awarded to each eligible employee—took place on May 21, 2025. Shortly before the proceeding, the government advised counsel and the court that one of the employees on the government's list wished to withdraw his request for restitution. (*See* 5/21/25 Tr. 3.) The government then offered testimony from the FBI forensic account who had performed the calculations underlying the government's restitution request. (5/21/25 Tr. 8-16.)

### D. The Report and Recommendation

On June 13, 2025, Magistrate Judge Moses issued the Report. (Dkt. 428.) Magistrate Judge Moses found that the government had not satisfied its burden of proving that each employee who made an elective deferral or re-deferral was pressured or coerced into doing so, except as to ▮▮▮▮▮▮ (R&R at 33-34.) Nonetheless, Magistrate Judge Moses concluded as a legal matter that there is no distinction between compensation that employees were mandated to defer as opposed to compensation that employees elected to defer. On those grounds, Magistrate Judge Moses recommended awarding $32,996,491.58 in restitution to a total of 39 former Archegos employees, encompassing both mandatory and elective components of deferred compensation, as well as legal fees for 5 of the former employees. (R&R at 36.) Magistrate Judge Moses also provided an alternate recommendation of $20,197,981.58 in restitution to the same 39 former Archegos employees that excludes voluntary amounts for all employees except

for ███████████████████████████████████████████████. (R&R at 36-37.)

## ARGUMENT

### A. Standard of Review

This Court referred "the determination of which former Archegos employees are 'victims' for purposes of restitution . . . and how much restitution each is entitled to" to Magistrate Judge Moses pursuant to 18 U.S.C. § 3664(d)(6). (Dkt. 401.) Thus, the Court conducts a de novo review of the Report issued by Magistrate Judge Moses. *See* 18 U.S.C. § 3664(d)(6) ("The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge . . . for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court."); Fed. R. Crim. P. 59(b)(3).

### B. The Court Should Decline to Order Restitution for Any Individuals, or at Most Award Restitution in the Amount of $16,913,894.45

#### 1. The Court Should Not Order Any Restitution for Any Former Employees

This Court previously overruled Mr. Hwang's objections to the original 5 employee-claimants receiving restitution and ruled that they are entitled to recover their lost deferred bonuses (both mandatory and elective components) and legal fees. (12/19/24 Tr. 6-7.) As to the new group of former employees, Mr. Hwang reiterates all prior objections to the award of restitution.[7] (*See* Dkt. 360 at 2-6; Dkt. 388 at 4-5; Dkt. 399 at 4-7.) The Court should also decline to award restitution for lost deferred compensation because the Court's attempt to do so has "complicate[d and] prolong[ed] the sentencing process to a degree that the need to provide

---

[7] ███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C.
§ 3663A(c)(3)(B).

### 2. At Most, the Court Should Award $16,913,894.45 in Restitution to Former Employees

Subject to those prior objections, the Court should exclude from the final restitution
amount (a) all contributions to Archegos's elective deferred compensation plan, (b) all amounts
that employees elected to re-defer in November 2019, and (c) all amounts contributed by
Executive 1, Executive 2, and Mr. Park.

### a. The Loss of Elective Deferred Compensation and Re-Deferred Bonuses Was Not Proximately Caused by the Offense Conduct

The Report recommends finding that Mr. Hwang's offense conduct was the direct and
proximate cause of the lost deferred compensation, including elective amounts and amounts that
employees could have elected to withdraw in November 2019.

This Court has already determined that the proximate cause standard is not satisfied
insofar as employees "made elected choices in deciding to put their money into the deferred
compensation program and allow it to be utilized by Mr. Hwang in the course of his
investments." (12/19/24 Tr. 6.) During the proceeding on December 19, this Court identified
the issue before it as whether "the employees' losses [are] the direct and proximate cause of Mr.
Hwang's manipulations." (12/19/24 Tr. 6.) The Court explained that it was departing from its
prior ruling that the original group of employees were not victims only after the government
"reminded [the Court] of a good deal of the testimony about the climate in Archegos, the
requirement of employees to declare how much they would be putting into deferred
compensation before Mr. Hwang told them what bonuses they would get and the distinct feeling
they had that if they were not cooperative with Mr. Hwang they would suffer in their
employment." (12/19/24 Tr. 6.) With that evidence in hand, the Court found that Mr. Hwang

used the money he had allegedly induced employees to surrender "as part of the capital that Archegos had to carry out its manipulation," making their losses "the direct and proximate result of the violations of law carried out by Mr. Hwang." (12/19/24 Tr. 6-7.)  The Court only reached that conclusion with the benefit of the trial record and victim impact statements implicating Mr. Hwang in employees' decisions to opt into the optional aspects of the deferred compensation program.  The Court reiterated its ruling during Mr. Halligan's sentencing, stating, "if it's a voluntary deal, then they're not entirely victims." (1/27/25 Tr. 57.)

As discussed below in Section C, the parties should not be required to relitigate this issue. In any event, the Court's ruling on voluntariness is sound and the reasoning behind Magistrate Judge Moses's contrary conclusion that the loss of *all* deferred compensation was proximately caused by the offense conduct is faulty.[8]

Proximate cause "is a flexible concept that defies easy summary." *United States v. Calderon*, 944 F.3d 72, 9 5(2d. Cir. 2019).  Proximate cause exists when the offense conduct "has a sufficiently close connection to the conduct," which courts evaluate based on whether the defendant "could have foreseen the extent of losses that the [fraudulent scheme] was incurring." *Goodrich*, 12 F.4th at 229 (quoting *Robers v. United States*, 572 U.S. 639, 645 (2014), *United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011)).  The government bears the burden of proving causation. *Id.* at 231 (citing 18 U.S.C. § 3664(e)).

As the Court has noted, where the record reflects that an employee volunteered, without coercion, to defer compensation, there is an insufficiently close connection between any loss and

---

[8] As Mr. Hwang has argued in previous submissions, the absence of proximate cause should preclude restitution for all lost deferred compensation, including the mandatory portions.  These reasons apply with even more force to the elective contributions, which are even further removed from the offense conduct.

the offense conduct. Mr. Hwang was not charged with or convicted of misrepresenting the status of Archegos's portfolio to employees or otherwise inducing them to maximize their deferrals. By contrast, courts that award restitution to investors typically do so on the basis that the defendant made fraudulent misrepresentations to secure those investments. *See, e.g., United States v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011) (concluding that the defendant's fraud proximately caused lenders' losses because his misrepresentations bore directly on "the making of the loans in the first instance"); *United States v. Watson*, 2025 WL 510814, at *16 (E.D.N.Y. Feb. 16, 2025) (noting that the government had "identified trial evidence showing how each listed victim invested (at least in part) because of [the defendant's] misrepresentations").

There is also no evidence that Mr. Hwang created or promoted the deferred compensation program to employees with the object of maximizing the value of Archegos's portfolio and in furtherance of the alleged scheme. *Cf. Paul*, 634 F.3d at 677 (finding proximate cause where the defendant secured loans, on which he eventually defaulted, for the purpose of profiting from the crime of securities fraud). Here, Archegos simply offered its employees a compensation package typical of hedge funds, that would allow the employees to earn additional income with the success of the fund. Holding Mr. Hwang accountable for losses stemming from employees' voluntary investments and standard industry practice would therefore "graft[] an overarching uncharged scheme onto a charging instrument that fails to allege that scheme." *Seabrook*, 968 F.3d at 237 (citation omitted).[9]

---

[9] The Report states that causation exists because the defendants used employees' deferred compensation "in service of the offense of conviction." (R&R at 31.) It quotes a footnote in *Seabrook* in which the Second Circuit explained that its holding—that the conduct within the charged conspiracy did not itself injure the victim—was not inconsistent with cases in which the court found that it *was* appropriate for restitution to encompass losses that were effectuated in furtherance of the fraudulent scheme. 968 F.3d at 236 n.8. In *United States v. Desnoyers*, for example, the Second Circuit allowed restitution for costs associated with pre-abatement

Nor is there any indication that Mr. Hwang had *any* involvement in the election process. The government had multiple opportunities to meet its burden as to causation by submitting additional evidence of Mr. Hwang's involvement or influence, but the government repeatedly chose not to supplement the record. Without evidence that Mr. Hwang induced employees to defer compensation beyond the required amounts, or that he was even aware that employees were contributing beyond the required amounts,[10] there is no basis to find that Mr. Hwang could have foreseen the extent of losses suffered by those employees.

The Report relies instead on statements from employees that "the firm" promised the value of their deferred compensation "could not fall below what it was issued at." (R&R at 31 (quoting Trial Tr. 693-94 (Jones)).) To the extent any of those representations came from Mr. Hwang, that is not within the scope of his convictions for securities fraud, wire fraud, and market manipulation. There is also no indication that those representations were false at the time they were made. Moreover, and as the Report acknowledges, nearly all of the employees' decisions to opt into the voluntary components of the deferred compensation program predated the charged conduct. That sequence alone is reason to find that there is no proximate cause. *See Calderon*, 944 F.3d at 97 (finding that restitution was inappropriate because the charged fraud occurred

_____

sampling, even though it predated the fraud, because the sampling was a required step before commencing the abatement process and thus was "necessary" to the overall asbestos abatement fraud scheme. 708 F.3d 378, 390 (2d Cir. 2013). That logic does not apply here. Any employee funds that were in Archegos's portfolio were a miniscule fraction of its overall value and were not "necessary" for the defendants to carry out the alleged fraud. *Cf. Paul*, 634 F.3d at 677 (defendant could not have profited from his scheme without the loans on which he defaulted).

[10] The Report cites Rothman Ex. P (Dkt. 410-12), a cap table showing that Archegos's portfolio included deferred employee compensation, as evidence that "Defendants were well aware of the employee money under their stewardship . . . and utilized it, alongside Hwang's own capital, to fuel their unlawful trading." (R&R at 30.) The table does not distinguish between the mandatory and elective balances or otherwise indicate that employee contributions exceeded required amounts.

"after [the domestic banks] had already decided to offer loans to the relevant foreign banks," and therefore could not have "influenced" the banks' decision); *United States v. Sullivan*, 118 F.4th 170, 232-33 (2d Cir. 2024) (advancement of legal fees lacked sufficient causal relationship to defendants' convictions for misappropriation of funds because the obligation arose before the theft and company advanced the money voluntarily).

Although the Report is correct that contributory negligence does not disqualify a victim from receiving restitution (*see* R&R at 30-31), denying restitution in these circumstances would not impermissibly shift fault from Mr. Hwang to the employees because Mr. Hwang is not at fault to begin with. The employees who elected to contribute more than 25% of their bonuses, or not to withdraw available amounts, did so absent any misrepresentation or inducement from Mr. Hwang. As this Court recognized, "people who are going to be working for hedge funds understand what hedge funds do. And if there's a deferred compensation plan that's available[] and a hedge fund is making money, people are attracted to that idea." (1/27/25 Tr. 57.)

The Report also states that there is no basis in the for distinguishing between mandatory and elective contributions under the MVRA because "victim" "may include individuals who 'willingly participated in [the crime] in the hope of obtaining a benefit' and '[e]ven if [the victims] engaged in the scheme voluntarily.'" (R&R at 30 (quoting *United States v. Rainford*, 110 F.4th 455, 483-84 (2d Cir. 2024).) *Rainford* does not apply to the MVRA's definition of "victim." *See* 18 U.S.C. § 3663A(a)(2) ("[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense."). That aspect of *Rainford* concerns the meaning of "vulnerable victim" in Section 3A1.1(b)(1) of the U.S. Sentencing Guidelines, which may include individuals who "knew of the fraud and willingly participated in it." 110 F.4th at 483. Under the MVRA, however, anyone who knowingly participated in the

21

criminal conduct is not a "victim" and consequently is not eligible to receive restitution. *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006). In any event, restitution is improper here because the loss of compensation that former employees volunteered to defer was not proximately caused by the charged conduct.

In sum, the record establishes that the former employees' claimed losses were not proximately caused by Mr. Hwang, but by the employees' own decisions to participate in a deferred compensation program that they anticipated would yield millions of dollars in excess income. The Court should therefore decline to award restitution for *any* lost deferred compensation, but in particular for amounts that the new group of employees chose to defer in excess of the mandatory 25 percent. *See, e.g., Goodrich*, 12 F.4th at 231–33 (2d Cir. 2021) (vacating restitution order where evidence did not sufficiently demonstrate causal link between the offense conduct and the restitution amount sought); *United States v. Brown*, 2016 WL 11263165, at *13 (E.D.N.Y. Dec. 2, 2016) (recommending denying portion of restitution award where the evidence was "insufficient to determine" "if any loss associated . . . will be traceable to the original fraud"), *adopted by* 2018 WL 418900 (E.D.N.Y. Jan. 16, 2018).

[11] Magistrate Judge Moses correctly concluded that the government cannot meet its burden as to the remaining newly-named proposed victims by relying on the existing record. (R&R at 32.)

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

### c. Magistrate Judge Moses Erred by Shifting the Burden of Proof from the Government to Victims

This Court should decline to award any restitution to Executive 1, Executive 2, and Mr. Park because Magistrate Judge Moses impermissibly shifted the burden of persuasion from the government to those individuals.

Where proving that an individual was not a knowing participant in the scheme would require the government to prove a negative, *United States v. Archer* permits the court to shift the burden of production on the issue of knowledge to the defendant. 671 F.3d 149, 173-74 (2d Cir. 2011). If the defendant presents a triable issue of fact, "the burden of persuasion must be assumed by the prosecution." *Id.* at 173.

Magistrate Judge Moses correctly found that Mr. Hwang presented a triable issue of fact as to Executive 1 and Executive 2. (Dkt. 413 at 2; R&R at 22.) The government then had the opportunity to rebut that issue by presenting testimony as to Executive 1 and Executive 2 or submitting new documentary evidence. (Dkt. 413 at 3.) However, the government advised Magistrate Judge Moses that it did not intend to present further testimony or evidence as to those two employees. (Dkt. 417.) The inquiry should have ended there.

Instead of holding the government to its burden of persuasion as to the individuals' innocence, Magistrate Judge Moses shifted the burden to the victims themselves. *Archer* does not contemplate shifting the burden of proof to victims, nor does the MVRA, which explicitly provides that the court may assign burdens of proof to the "part[ies]." 18 U.S.C. § 3664(e) ("The

23

burden of demonstrating such other matters as the court deems appropriate shall be upon the *party* designated by the court as justice requires.") (emphasis added); *see also id.* § 3664(g)(1) ("No victim shall be required to participate in any phase of a restitution order.").

Magistrate Judge Moses committed the same error with respect to Mr. Park. In Mr. Park's case, there was no need for Mr. Hwang to bear the burden of production because the government had already put forth evidence that, in its view, Mr. Park was a knowing participant in the alleged scheme. But again, Magistrate Judge Moses shifted the burden to Mr. Park to prove that he was not, even as the government maintained its position that Mr. Park is not a victim.

Because the government did not meet its burden of proving that these three individuals were not knowing participants in the alleged scheme and therefore "victims" under the MVRA, their losses should not be included in the final restitution order. This Court should subtract the $8,008,837.13 claimed by these three individuals from the recommended restitution amount.[12]

### C. Magistrate Judge Moses's Conclusion That Voluntariness Is Irrelevant Is Outside the Scope of This Court's Delegation

#### 1. Magistrate Judge Moses's Finding That the Law of the Case Does Not Apply is Erroneous

This Court has stated repeatedly that the question of "voluntariness," the atmosphere at Archegos, and influence exerted by senior management are central to whether former Archegos employees are entitled to restitution for their lost deferred compensation. (*See* 12/19/24 Tr. 6;

---

12 

1/27/25 Tr. 57.) The Court resolved this issue after the relevance of voluntariness was thoroughly briefed and argued over the span of several months.

The Court also made clear that individualized evidence, in whatever form, is necessary to satisfy the government's burden. The Court stated during Mr. Halligan's sentencing: "[T]here's an argument that [Mr. Hwang] made that . . . a victim has to show what it . . . is just for that person to be treated as a victim rather than as a willing participant to what looked to be a very lucrative deferred compensation arrangement. So I want to delegate the task of making *each person* prove status before a magistrate judge." (1/27/25 Tr. 55 (emphasis added).)

In addition to the Court's explicit statements on the record, the procedural history of these proceedings makes clear that a finding that a given employee experienced pressure to opt into the elective program is necessary for that employee to qualify as a "victim." *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1271 (2d Cir. 1994) ("[T]he doctrine of the law of the case applies to issues that have been decided either expressly or by necessary implication.") (quotation and citations omitted). For example, the Court found that the original 5 employees were "victims" on December 19 only after the government reminded the Court of "the distinct feeling [the employees] had that if they were not cooperative with Mr. Hwang they would suffer in their employment." (12/19/24 Tr. 6.) This was the reason for the Court's departure from its prior ruling that the employees were not entitled to restitution for lost deferred compensation. If pressure to invest were irrelevant—or if individualized proof were unnecessary—the submissions from the original 5 employees would have been sufficient for this Court to find that any employee who lost deferred compensation, including the new group of employees, was also entitled to restitution. But at Mr. Halligan's sentencing, the Court stated that it wanted to make "each person prove status," despite that prior ruling.

25

It is thus clear from the record that this Court decided, as a matter of law, that the determination of victim status requires consideration of the pressure under which a given employee was under to comply with purported demands of senior executives. *See United States v. Gonzalez*, 647 F.3d 41, 65 (2d Cir. 2011) ("[T]he matter of whether a person is a 'victim' within the meaning of the MVRA is an issue of law.") (citation omitted). Mr. Hwang objects to the Report to the extent that the Report does not adhere to this Court's prior ruling, instead recommending restitution for amounts that should be excluded under this Court's decision. *See Arizona v. California,* 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

### 2.    The Court's Determination That Voluntariness Is Relevant Was Correct

Even if this Court's prior statements concerning voluntariness were mere dicta, this Court's determination that only Archegos employees whose contributions were the product of coercion are eligible for restitution nonetheless was correct (*see* Section B(2)(a) *supra*) and it "command[s] substantial respect." 18 Wright & Miller, *Federal Practice & Procedure* § 4478 (3d ed. 2025). Moreover, the Court was correct to identify voluntariness as a salient and individualized issue.

*First*, the record reflects that employees' views of their participation in the elective program (and their employment more generally) differed. In contrast to ███████ and the original employees to whom this Court already awarded restitution, Mr. Park testified during the Phase I hearing before Magistrate Judge Moses that his participation was "voluntary." (5/9/25 Tr. 67.) The degree to which employees participated in the elective program also varied. As the Report acknowledges, company data shows that some employees eligible for the elective plan chose to defer less than the maximum. (R&R at 33; Rothman Decl. Ex. R.) The Report also

recognizes that several employees left Archegos before the collapse, taking at least some of their deferred compensation with them. (R&R at 4.) Yet others—namely ████████████ ████, whom this Court already found are "victims"—stated that they were pressured to remain at the firm. (*See* Dkt. 388 at 5.)

*Second*, not all former employees seeking restitution were similarly situated. ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ A blanket approach to restitution overlooks these important distinctions.

*Third*, adherence to the Court's prior determination would promote consistency across the groups of former employees—the original 5, and the 34 new claimants included in Magistrate Judge Moses's recommendation. *See In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)

("Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.") (quotation omitted).

### D. Magistrate Judge Moses Erred by Relying on the Superseding Indictment, and Mr. Hwang Maintains His Objections to the Presentence Investigation Report

Throughout the Report, Magistrate Judge Moses cites to both the Superseding Indictment (Dkt. 134, "SI") and Presentence Investigation Report (Dkt. 332, "PSR"). To the extent the Report bases its recommendation on allegations in the Superseding Indictment that lack further support, that reliance on unsubstantiated charged conduct is erroneous. *See United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("[A]t sentencing, an indictment or a charge within an indictment, standing alone and without independent substantiation, cannot be the basis upon which a criminal punishment is imposed."). Mr. Hwang maintains all prior objections to the PSR and statements of the Report that rely on the PSR. (*See generally* 11/20/24 Tr. 3-29.)

### E. Magistrate Judge Moses Erred by Recommending Restitution Based on Judicial Factfinding [13]

The Court should decline to order restitution to all victims on the existing record for the additional reason that basing restitution on judicial factfinding without the aid of a jury violates the Sixth Amendment. The Supreme Court has held that "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed,'" *Erlinger v. United States*, 602 U.S. 821, 833 (2024) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)), including monetary fines, *Southern Union Co. v. United States*, 567 U.S. 343 (2012). Thus, a jury should find all the facts needed to justify the government's proposed restitution order. *See Rimlawi v. United States*, 604 U.S. ---, 2025 WL 581567 (Mem), at *1 (Feb. 24,

---

[13] Substantial portions of this section are copied from Mr. Hwang's letter to the Court dated March 3, 2025 (Dkt. 399 at 8-9).

2025) (Gorsuch J., dissenting from denial of certiorari); *Hester v. United States*, 586 U.S. 1104, 1105-06 (2019) (Gorsuch, J., dissenting from denial of certiorari).[14]

Here, the jury was not asked to make any findings about the extent to which the defendants' conduct caused any specific losses, especially concerning the way in which the banks disposed of Archegos's portfolio and their own hedged positions and the loss of deferred compensation. On the contrary, as the government pointed out in its summation, whether the defendants succeeded in their alleged schemes was not an element of any count. (Trial Tr. 5165, 5167); *see also United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (a "scheme to defraud need not have been successful or complete" in order to impose criminal liability); *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) ("manipulative conduct need [not] be successful in order to violate the securities laws"). Any award of restitution on the existing record is therefore improper.

## ADDITIONAL OPEN ISSUES

For the Court's convenience, below are several issues concerning restitution and forfeiture beyond the Report that remain open. Mr. Hwang respectfully asks the Court to rule on these issues at Mr. Hwang's July 22, 2025 sentencing.

### A. Stay Pending Appeal

If this Court adopts Magistrate Judge Moses's recommendation in full, the employee restitution total will increase by over $24 million. The Court has already ruled that the restitution due to individuals for lost compensation will be given priority and payable immediately. (12/19/24 Tr. 7.)

---

[14] Although the Second Circuit held in *Reifler* that restitution under the MVRA does not evoke Sixth Amendment protection, *see* 446 F.3d at 118, that aspect of that case was wrongly decided.

During the December 19 hearing, this Court recognized that it will be nearly impossible to get money back from individuals if Mr. Hwang prevails on appeal. (12/19/24 Tr. 48 ("I will take judicial notice of the fact that if you pay out money and the person you're paying uses it or needs it, it's hard to get it back.").) However, the Court suggested a possible solution: "The individual losses as to which there should be priority, somewhere between $5 and $10 million, should be subject to prompt payment and distribution. The balance should be subject to the lien, . . . to be held in finality, or some part of it could be paid in escrow to the government and some could be held back." (12/19/24 Tr. 49.) Due to the addition of 34 new victims, however, the individuals' share of restitution alone will deplete Mr. Hwang's available assets, which will likely net between approximately $5 and $26 million. (*See* 12/19/24 Tr. 62.) Moreover, it will be far more difficult to recover payments from 39 individuals than from 5 individuals, and Mr. Hwang may lose the ability to recover *all* funds if either his conviction or the ruling on employee restitution is overturned.

For these reasons, and for the reasons set forth in Mr. Hwang's prior submissions, the Court should order a stay of restitution pending appeal. (*See* Dkt. 360 at 8-9; Dkt. 366 at 10-11; Dkt. 388 at 9.)

To the extent the Court denies a stay of restitution pending appeal and orders Mr. Hwang to turn over his available assets immediately, the Court should order that the government's *distribution* of all restitution payments is stayed and the funds be subject to a lien or held in escrow during the pendency of Mr. Hwang's appeal.

The Court should also stay forfeiture of the Archegos entities pending appeal. (*See* Dkt. 360 at 8-9.) As this Court recognized when it granted bail pending appeal, there are "a lot of appealable issues" and "very good arguments to make before the Second Circuit." (11/20/24 Tr.

43; 11/21/24 Tr. 109.) Where courts have granted bail pending appeal based on the presence of substantial issues, they have also granted a stay of financial penalties. *See, e.g., United States v. Silver*, 203 F. Supp. 3d 370, 385 (S.D.N.Y. 2016) (staying payment of fine under Fed. R. Crim. P. 38 after granting bail pending appeal); *United States v. Milton*, 2024 WL 779210, at *9 (S.D.N.Y. Feb. 26, 2024) (granting stay of forfeiture order where the court previously granted bail pending appeal and there were "substantial issues" raised throughout the case.). That practice should apply here.

### B. Form of Proposed Restitution Order

The government previously submitted a proposed restitution order in January. (Dkt. 385-1.) Given the passage of time and the proceedings before Magistrate Judge Moses, the government will likely submit a revised proposed restitution order, either in advance or soon after the July 22 sentencing. Nonetheless, Mr. Hwang raises an objection related to the form of the current proposed order that is likely to arise again.

As noted in Mr. Hwang's prior submissions (*see* Dkt. 388 at 3-4, Dkt. 399 at 9), the current version of the government's proposed schedule orders Mr. Hwang to pay over $9.4 billion in two lump sums and thus fails to consider "the financial resources and other assets of the defendant." *See* 18 U.S.C. § 3664(f)(2). (Dkt. 388 at 3-4.) This Court has recognized numerous times that the restitution amount (whatever the final number is) vastly exceeds the value of Mr. Hwang's interests in the assets listed in the Presentence Investigation Report. Mr. Hwang also lacks control over when certain categories of assets will be liquidated or made available to him. Even if the Court were to consider the discrepancy between Mr. Hwang's assets and the total restitution amount in fashioning a restitution schedule, it would still be exceedingly difficult for Mr. Hwang to meet the benchmarks set forth in the proposed order.

The order should provide instead that the balance of restitution will be payable at a rate that is based on a percentage of Mr. Hwang's net monthly income following his release from custody, due on the 30th day of each month and to begin on the first day of supervised release. *See United States v. Silver*, No. 20 Cr. 360 (AKH) (S.D.N.Y.), Dkt. 100 (ordering defendant to pay restitution at a rate of 10% of his monthly net income following release from custody).

To the extent the government has any concern with its ability to attempt to monetize any newly discovered sources of restitution funds, that concern provides no basis to insert language into the restitution order because the restitution statute provides the proper remedy: Pursuant to 18 U.S.C. § 3664(k), the government retains the ability to request that the Court modify the restitution order upon notice of a material change in the defendant's economic circumstances. *See United States v. Silver*, 2024 WL 5154075, at *2 (S.D.N.Y. Dec. 18, 2024) (Hellerstein, J.) (amending restitution order pursuant to Section 3664(k) and ordering defendant to make immediate lump sum payment consisting of appreciation in value of investment accounts); *see also United States v. Grant*, 235 F.3d 95, 100-01 (2d Cir. 2000) (affirming amended restitution order due to material change in defendant's economic circumstances stemming from unfreezing of inmate account).

### C. Counterparty Restitution

On December 19, 2024, this Court ruled that the counterparty victims are entitled to a restitution award totaling $9,376,525,023.18. (12/19/24 Tr. 52.) That ruling was based on a version of a chart that was presented for the first time during the December 19 proceeding. (Dkt. 373-2.) Upon review of the materials submitted by the counterparties, it is unclear from the record whether the following amounts were included: (1) fees and interest Archegos paid to the banks on swap and margin loans (*see* Trial Tr. 299-300, 610-11, 1558, 1741, 2669-70; 9/30/24 Fletcher Decl., referring to those fees); (2) other benefits banks obtained from the hedges, such

as stock lending fees (*see* Trial Tr. 1255); (3) dividends the banks retained on the hedges; and (4) dividends the banks passed along to Archegos pursuant to the swap agreements (*see* Trial Tr. 610; Jeffries Second Stmt. at 2). Further, as the trial record makes clear, banks did not hold hedges on a one-to-one basis for the duration of a swap and used various strategies to clear the underlying hedges from its balance sheets, such as balancing a short swap with a long swap. (*See* Trial Tr. 1252-53, 1583, 1602, 1662, 1736, 2682 (multiple bank witnesses, testifying that the banks use various strategies to clear the hedge from their balance sheets or use it for other purposes during the duration of the swap).) It is possible that the government's loss calculations failed to account for the possibility that banks cleared hedges from their balance sheets *before* terminating the swaps by netting them out with other transactions.

To the extent any of these categories are included in the current restitution amount, they would result in a windfall for the counterparties and thus should be excluded from the final restitution order. *See United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (restitution is limited to "actual loss" to avoid awarding the victim a windfall) (citing cases); *United States v. Young*, 108 F.4th 1307, 1319–20 (11th Cir. 2024). ("[T]he court must account for and subtract any value that a defendants' scheme bestowed on the victim."). Mr. Hwang respectfully asks the Court to order the government to make a supplemental submission detailing whether the current $9.38 billion figure includes any of these amounts. If so, the Court should reduce the restitution amount by the corresponding value.

## CONCLUSION

For the foregoing reasons, the Court should decline to adopt the Report and deny restitution in full. To the extent any restitution is awarded to former Archegos employees, the

Court should at minimum exclude from the award the categories of claimed losses described above, and award at most $16,913,894.45 in restitution.

In addition, the Court should (1) grant a stay of restitution and forfeiture pending appeal, or at minimum stay the government's distribution of all restitution payments pending appeal, (2) strike the payment schedule in the current version of the proposed restitution order and instead direct that payments be made in installments of a percentage of Mr. Hwang's net monthly income following his release from custody, and (3) order the government to make a supplemental submission addressing the issues raised above with respect to the bank counterparties' restitution award.

Dated:    New York, New York     Respectfully submitted,
           June 26, 2025

                                  MORVILLO ABRAMOWITZ GRAND
                                   IASON & ANELLO P.C.

                                  By: /s/ *Brian A. Jacobs*
                                  Brian A. Jacobs
                                  Chloe Lewis
                                  565 Fifth Avenue
                                  New York, NY 10017
                                  (212) 856-9600

                                  *Counsel for Defendant Bill Hwang*